# BOURICIUS

# VS.

# MESA COUNTY

### Deposition

# DEBRA BOURICIUS

*02/22/2019*

---

# AB Court Reporting & Video
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

**EXHIBIT 5**

1    A    It says here $58,000.

2    Q    Do you remember if that's correct?

3    A    It was so long ago, I don't.

4    Q    If it --

5    A    I would assume so.

6    Q    I'm sorry?

7    A    I would assume so.  It's in the document.

8    Q    You can flip that over.  We'll take a look

9    now at another exhibit.

10        (Exhibit 3 marked.)

11    Q    (By Ms. Severn) And I understand that you

12    signed these discovery responses this morning.  Is

13    that right?

14    A    Yes.

15        MS. BISBEE:  Just to be clear, she's

16    verifying the interrogatories.

17        MS. SEVERN:  That's right.  Thank you.

18        MS. BISBEE:  This is a whole document

19    of --

20        MS. SEVERN:  Right.  Thank you for that

21    clarification.

22    Q    (By Ms. Severn) So you verified the

23    interrogatories this morning.  Is that correct?

24    A    M-hm.

25    Q    Before today have you seen these

1     Q     Let's take a look at page 6, and about in

2  the middle of the page, in the full paragraph that's

3  there, four lines down in that paragraph there's a

4  sentence that starts, "In addition."  Do you see

5  that?

6     A     I'm sorry, I'm not --

7     Q     That's okay.  It starts "In addition."  Do

8  you see that sentence?

9     A     Yes.

10     Q     When did you sell your family farm in Mesa

11  County?

12     A     That was an error, and I clarified that

13  with Hunter Swain that we didn't sell our family

14  farm.

15     Q     Okay.  Does that mean that you may have

16  seen this before?

17     A     I don't think I saw this document, but it

18  was like in a Complaint I thought.

19     Q     Okay.

20     A     And I clarified with Hunter that that was

21  not true.

22     Q     All right.  So you didn't sell the farm.

23     A     No.

24     Q     Okay.  How much income do you get annually

25  from the farm?

**EXHIBIT 5**

*DEBRA BOURICIUS 2/22/2019*                    37

1        A       $1,000.

2        Q       Has that been consistent over the last 20

3    years?

4        A       Oh.  From our Hummingbird Orchards I

5    don't -- I don't recall what it was.  It varied from

6    year to year.  There'd be a freeze one year and no

7    income and then -- but -- so I don't recall.

8        Q       Would there be any documents that would

9    show how much income Hummingbird Orchards brought in?

10       A       Tax documents.

11       Q       I'm sorry, did you say tax documents?

12       A       Yes.

13       Q       Okay.  Let's look at Deposition <mark>Exhibit 3</mark>.

14   These were the discovery responses we talked about.

15   Do you have those there?

16               And let's take a look at request for

17   production number 9.  This is on page 11.  And go

18   ahead and take a read through request for production

19   9 and your response.

20       A       Okay.

21       Q       Does your response look complete to you?

22               MS. BISBEE:  Objection to the extent she

23   does not have the responsive documents in front of

24   her that are noted in the response.

25       Q       (By Ms. Severn) All right.  Let's take a

**EXHIBIT 5**

1    Q    Is it available to the general public?

2    A    Information -- certain information is

3    available.

4    Q    And specific to your plan and your

5    accrual, would that be public?

6    A    Absolutely not.

7    Q    Okay.  I didn't think so.  I just wanted

8    to double-check.

9         So that would be something you could

10   access but nobody else could.

11   A    Yes.

12   Q    Have you given to your attorneys any

13   information about your PERA account to turn over --

14   A    Not that I can recall.

15   Q    Okay.  What other benefits do you have at

16   Boulder County?

17   A    At this time I can't think of any other

18   benefits.

19   Q    Do you have health insurance?

20   A    Oh, of course, yes.

21   Q    Okay.  Do you know how much you pay for

22   health insurance?

23   A    No, I can't.

24   Q    Where would that be found?

25   A    With personnel.

**EXHIBIT 5**

1    second and third lines where it talks about higher

2    clearance, more winter-ready vehicle, higher

3    utilities, a 20-mile commute to do laundry.  Do you

4    see that?

5         A    Yes.

6         Q    What information did you provide to your

7    expert witness regarding a higher clearance, more

8    winter-ready vehicle?

9         A    I told him I had a Corolla and couldn't

10   drive it out of the driveway and I had to get a

11   four-wheel-drive vehicle.

12        Q    What about higher utilities?  What did you

13   talk about with your expert about higher utilities?

14        A    I can't recall.

15        Q    Do you know where -- let me ask it this

16   way.  Do you know if your utilities are higher in

17   Lyons, Colorado than they were at your house in

18   Palisade?

19        A    I don't think that's relevant.  It's more

20   that we did not heat the ███ place when we were

21   gone when we lived in ███, whereas now we're

22   having to heat both houses.

23        Q    All right.  So it's not that -- just make

24   sure I'm understanding.  It's not that the utilities

25   at the ███ address are higher than the ███

1    property, it's that you didn't used to heat ███ and

2    now you do.  Am I understanding that right?

3        A    That's correct.

4        Q    Okay.  What are your utility costs?

5        A    I don't know.  My husband pays those

6    bills.

7        Q    Do you have a general idea?

8        A    I'd hate to speculate.

9        Q    Did you provide any utility bills or talk

10   about utility bill numbers with the expert witness?

11       A    Just all I might have said is the same

12   thing I described to you, that we were heating both

13   places now.

14       Q    Was there ever a time when the ███

15   property had heat on during the winter?

16       A    No.

17       Q    Never.

18       A    No.

19       Q    What about when your husband would go to

20   the ███ address to check on the neighboring

21   adjacent property, ███?  Did he ever use heat then?

22       A    Well, of course.

23       Q    Okay.

24       A    I understood your question to say when we

25   were not there.

1    that talks about more burdensome utilities?  How is

2    that different than higher utilities?

3        A    I'm sorry.  I kind of lost my spot here.

4        Q    No worries.  So let's go back to that.

5    It's the second-to-last bullet point.  We were

6    looking at the second and third lines, and I'm going

7    down to the fourth where it says more burdensome

8    utilities.

9        A    Well, I'm not sure.  We don't have a

10    central heating system in our house in ███, so my

11    husband has to cut wood to keep the fireplace going.

12        Q    Is the cutting of wood, was that something

13    related to utilities that you talked about with the

14    expert witness?

15        A    I don't recall at this time.

16        Q    And what about the 20-mile commute to do

17    laundry?  What did you talk about with the expert

18    about this?

19        A    The ███ is so small we don't have room

20    for laundry facilities, so my husband is driving down

21    to do laundry weekly.

22        Q    Your husband is the one who does laundry?

23        A    Yes.

24        Q    Do you know where the laundromat is that

25    he goes to?

1        A       Longmont.

2        Q       Do you know what the address is or the

3  name of it even?

4        A       No.

5        Q       Would there be anything that would state

6  where the laundromat is, a receipt, anything like

7  that?

8        A       Sure.

9        Q       Are there any laundromats that are closer

10  to your house?

11        A       No.

12        Q       Have you looked around?

13        A       Yes.

14        Q       Then let's flip the page to page 5, and

15  I'm looking at the second line from the top of the

16  page, starting about the center of that line.  It

17  says "renting a storage shed."  Do you see that?

18        A       M-hm.  Yes.

19        Q       What storage shed do you rent?

20        A       We don't.

21        Q       You don't rent a storage shed?

22        A       No.

23        Q       Did you talk about a storage shed with the

24  expert witness?

25        A       No.

1    was.

2         Q    You don't have a recollection of who she

3    is?

4         A    No.

5         Q    Any recollection of an e-mail or a phone

6    call that you may have received from her?  Is

7    anything --

8         A    I don't even recall who she is.

9         Q    Okay.  All right.

10             What did you talk about regarding your

11   claims with Rick Corsi?

12        A    It would be in the e-mails.  I don't

13   believe I had a phone conversation with him.

14        Q    So everything should be documented e-mails

15   with Rick?

16        A    As far as I know.

17        Q    What about text messages?  Any text

18   messages with Rick?

19        A    No.

20        Q    What did you talk about your claims with

21   Janine Corsi?

22        A    I don't recall specifics.

23        Q    Do you know how you communicated with

24   Ms. Corsi?

25             MS. BISBEE:  Objection.

**EXHIBIT 5**

DEBRA BOURICIUS 2/22/2019                    248

1    A    I don't recall.

2    Q    (By Ms. Severn) Could they be in e-mails?

3    A    Yes.

4    Q    Text messages?

5    A    I don't recall.

6    Q    Have you looked for text messages?

7    A    I don't recall.  I think I downloaded some

8    to give in discovery, but I can't remember.

9    Q    Okay.  When you say "some," do you think

10   there may be others --

11   A    Oh, no.  I gave them everything I had.

12   Q    What did you discuss about your claims

13   with Lynn Zubek?

14        MS. BISBEE:  Objection.

15   A    I can't recall the specifics.

16   Q    (By Ms. Severn) Do you know how you

17   communicated with her?

18        MS. BISBEE:  Objection.

19   A    I can't recall.

20   Q    (By Ms. Severn) Put that to the side, but

21   keep it handy.  We're going to come back to that.

22        (Exhibit 22 marked.)

23   Q    (By Ms. Severn) Have you seen Exhibit 22

24   before?

25   A    It looks like one of the e-mails I

**EXHIBIT 5**

1    counties.  Maybe more but I don't recall.

2         Q    Do you remember what the search terms were

3    that you used for your general internet searches?

4         A    I can't recall.  Certainly analyst,

5    business analyst, project manager.  I can't recall

6    all of them.

7         Q    Any others that come to mind, or is that

8    all?

9         A    I can't recall.

10        Q    What cities did you look at?

11        A    Primarily all Colorado.

12        Q    Why did you look at an area that

13   expansive?

14        A    Because I was unemployed.

15        Q    Were you willing to move?

16        A    I did not see an option in Grand Junction

17   or I would be there forever looking for a job that

18   met my qualifications.

19        Q    How do you know that?

20        A    Because I've lived in Grand Junction for

21   27 years.

22        Q    During that time do you know whether the

23   City of Grand Junction ever hired business analysts?

24        A    Yeah, occasionally they did.

25        Q    Did other cities in the area?

**EXHIBIT 5**

1      A      They certainly wouldn't be at the level

2   that I was at.   They just don't have the employees.

3      Q      How do you know that?

4      A      Because I -- I don't know.   It's my

5   opinion.

6      Q      So you didn't want a job in a smaller

7   city?

8      A      It didn't have anything to do with city,

9   it had to do with the job requirements.

10      Q      Did you want the job requirements to be as

11   close to what you were doing at Mesa County as

12   possible?

13      A      Certainly.

14      Q      Would you have taken anything less?

15      A      It would all depend on the circumstances.

16   I can't say.

17      Q      Any of the jobs listed here in response to

18   interrogatory 3, were their job duties less than what

19   you were doing at Mesa County?

20      A      You're asking me to compare something that

21   I don't have in front of me.   I don't know.

22      Q      What would you need in order to be able to

23   answer that?

24      A      The job description.

25      Q      Do you have copies of the positions as

**EXHIBIT 5**

1   they were advertised that you applied for?

2        A     Not anymore.

3        Q     Where did they go?

4        A     I believe the trash.

5        Q     Do you remember when you got rid of them?

6        A     I don't know.  I don't know.  I have some

7   maybe.  I haven't looked at it.  I got a job.

8        Q     Do you think you threw them away maybe

9   when you moved?

10       A     I told you, I may have some, I may not

11  have some.  I don't know.

12       Q     What counties did you look at?

13       A     I can't recall.  I thought I had given you

14  pretty much a complete list.  I mean, I -- these are

15  ones certainly I applied for.  I probably looked at

16  every county in -- almost every county in Colorado.

17       Q     Is that speculation or do you recall that?

18       A     I don't recall.

19       Q     What would help you remember?

20       A     I don't know.

21       Q     Ms. Bouricius, this is the only time I

22  have to talk to you, so if there is anything out

23  there, I'd like to know so we can help you recall.

24  Okay?

25       A     M-hm.

**EXHIBIT 5**

*DEBRA BOURICIUS 2/22/2019*                    *261*