```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
Civil Action No. 18-cv-01144-WYD-STV
_____
VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

                                      July 11, 2019
_____
DEBRA BOURICIUS,

      Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board
of County Commissioners,

      Defendant.


_____



          Pursuant to Notice and the Federal Rules
of Civil Procedure, the videotaped deposition of
FRANK WHIDDEN, called by Plaintiff, was taken on
Thursday, July 11, 2019, commencing at 9:07 a.m.,
at 205 North 4th Street, Grand Junction, Colorado,
before Candice F. Flowers, Certified Shorthand
Reporter and Notary Public within and for the State
of Colorado.
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1   residences at different places.  I went to Phoenix
 2   for one, and then I went for like the other
 3   residential at Indiana.
 4        Q    Okay.  So...
 5        A    And I have one other degree as well.
 6        Q    I'm sorry?
 7        A    I have one other degree as well.  I don't
 8   know if you're --
 9        Q    What's that?
10        A    I have a degree in marriage and family
11   therapy from North Central University.  It was a
12   Master of Arts, and I got that a couple years ago,
13   the one I completed.
14        Q    So when did you join Mesa County?
15        A    August of 2011.
16        Q    Let's talk about before that.  Your
17   résumé stated that you worked at Fortune 500
18   companies?
19        A    Correct.
20        Q    What Fortune 500 companies did you work
21   at?
22        A    Well, going back several years, Boeing
23   was a Fortune 500 company.  I don't know where --
24   SunGard at the time was privately held, and that's
25   where I was immediately preceding Mesa County, was
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

Frank Whidden   July 11, 2019

 1   County Administrator, Tom Fisher, decided to wipe

 2   out a layer of directors, and that included HR, IT,

 3   finance, facilities.  And it was regional services

 4   grouped together like facilities, parks and rec,

 5   and things like that.

 6           He decided to wipe all of that out and

 7   make me responsible for all of those, and that's

 8   the responsibility I had there in '14.  And then he

 9   left and the commissioners made me County

10   Administrator, so I had all of that responsibility

11   plus the County Administrator.

12           Since that time, I managed to hire --

13   well, I hired a chief financial officer, Scott

14   Stewart, who was with us for a year or two and then

15   he left, and I promoted from within a director of

16   finance.  I also -- in that time after I became

17   County Administrator, I created a facilities

18   director, so I have that now, and I combined parks

19   and all of that and the fairgrounds under the

20   director of facilities.

21       Q   Okay.  We're going to -- I'm going to ask

22   you some more specific questions about that, but

23   just so I understand.

24           When the previous County Administrator

25   left, you were doing the County Administrator's job

EXHIBIT 3
18-CV-01144-DDD-STV

Frank Whidden   July 11, 2019

```
 1   plus were overseeing finance, facilities,

 2   fairgrounds, HR, and IT?

 3        A    Yes.

 4        Q    Are there any other departments that you

 5   didn't oversee?

 6        A    You mean when I was resource management

 7   or -- sorry.

 8        Q    That's okay.

 9             When you took over as County Attorney,

10   like tell me all -- I mean not County Attorney --

11   County Administrator, all the positions that you

12   oversaw.  You said you were trying -- you got a CFO

13   finally and you have a -- it sounds like a

14   facilities person now?

15        A    A facilities director.

16        Q    Okay.  Were you overseeing all of...

17        A    Yes.

18        Q    Everything.

19        A    Yes.

20        Q    Okay.  Okay.  All right.  So let's back

21   up now.

22             It looks, to me, like you have been at

23   Mesa County for about eight years now; is that

24   correct?

25        A    August will be eight years.  That is
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1    correct.
 2         Q    Okay.  So about -- I've got about three
 3    and a half years after you started is when you
 4    became -- about three and a half years after you
 5    started at Mesa County is when you were appointed
 6    the County Administrator; is that right?
 7         A    Huh-uh.  No, ma'am.
 8         Q    I'm sorry.  Go ahead.
 9         A    That's when I became Deputy Administrator
10    for Resource Management.
11         Q    Okay.  And -- right.  You became the
12    County Administrator in 20 -- in January of 2015;
13    is that right?
14         A    That is correct.
15         Q    Okay.  Do you know who else had applied
16    for the County Administrator's position?
17         A    I have heard that Barbara Brewer put in
18    for it.  That's the only name that I have heard
19    that also put in for that position.
20         Q    Did you ever talk with her?
21         A    I have spoken to Barbara, yes.
22         Q    I'm sorry.  About applying for the
23    position.
24         A    No, ma'am.
25         Q    So do you remember how you knew that she
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

 1   applied?

 2        A    Rose Pugliese told me.

 3        Q    Did she tell you that after you had

 4   already been appointed the position or before?

 5        A    Long after.

 6        Q    Did you talk to any of the other County

 7   Commissioners?

 8        A    No.

 9        Q    I should restate that just so the record

10   is clear.

11             Did you talk to any of the other County

12   Commissioners about who applied for your position

13   as County Administrator?

14        A    No, ma'am.

15        Q    So give me an overview of what your job

16   duties are as the County Administrator.

17        A    Well, the bottom line is that my job is

18   to implement the policies that the board has given

19   me.  It's to oversee the day-to-day affairs of the

20   County.  The way the County is organized, there are

21   three direct reports to the board:  Myself, the

22   County Attorney, the executive director of DHS,

23   Tracy Garchar.  I do not oversee them or their

24   operations.  I also don't oversee directly the

25   seven elected departments or offices.  So that's my

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

38

```
 1    responsibility.  The job description goes on and on

 2    and on, but basically it's to take care of and see

 3    to the day-to-day affairs of the County.

 4         Then as far as -- like HR is the daily

 5    affairs of HR, the things that happen, the

 6    personnel matters that arise.  If the HR manager

 7    feels that there's something that needs to rise to

 8    my level or she wants my advice or guidance on

 9    something, we discuss that.

10         In IT, I'm probably more involved because

11    that's where my expertise really lies as far as my

12    background and all of that.  So I'm more involved,

13    I would say, in IT and what's happening, the

14    systems and how they run, and what we're going to

15    do, how we're going to do it, those kinds of

16    things.

17         Q    How many departments do you oversee?

18         A    I don't -- we have -- I believe we have

19    23 agencies in the County, and I oversee public

20    works and everything associated with that, which is

21    road and bridge and all that's associated with

22    that.  I oversee -- so we've discussed all the

23    internal core functions:  HR, IT, finance,

24    facilities, parks, fairgrounds, Criminal Justice

25    Services Division.  I think animal services is
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1              So this was the 2014 time period that
 2     we're talking about?
 3         A    That's correct.  And when I said I worked
 4     on the budget, I think I said I worked on the
 5     budgets for all the different groups.
 6         Q    Okay.  Is that the same time period that
 7     Mesa County started to be self-insured for health
 8     insurance?
 9         A    No, ma'am.  They have been doing that for
10     a lot of years.  I don't know exactly how long, but
11     it was -- been quite a while.
12         Q    So what was new?  Why were you having to
13     spend so much time on it?
14         A    The contracts were -- the contracts with
15     the reinsurer and the third-party administrator
16     were changing or could be changed.  We had to bid
17     those out.  We were getting a lot of attention from
18     the public, from concerned citizens, and so we had
19     to spend a lot of time with what I would call
20     minute dealing with these contracts and these kinds
21     of things.  So we took a lot of time with that.
22              And then like I said, looking for
23     efficiencies in all the departments to do what we
24     could because we were under big financial pressure.
25         Q    In 2014?
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

56

```
 1      A    Since I got there in 2011, we were under
 2   pressure.
 3      Q    Well, that's true every year, hasn't it
 4   been, that there's been a lot of pressure for
 5   finances -- from a financial standpoint from the
 6   County?
 7      A    Well, certainly since I have been here.
 8   But as I understand, from what I've been told and
 9   read, the recession hit this side of the mountain
10   slower than it did the Front Range, so we went into
11   it more slowly and dealt with it much longer.  I
12   would say we really didn't start to come out of it
13   until last year.
14          And then part of what complicates our
15   budgetary situation over here is the Taxpayer Bill
16   of Rights, TABOR.  We're one of the only three or
17   four counties in Colorado, my understanding, that
18   still enforces what's the revenue cap under TABOR,
19   and that greatly complicates our whole budgetary
20   scenario.
21      Q    So how did the County start to come out
22   of it last year?
23      A    We -- in 2017, we passed what we called
24   the Public Safety Initiative.  It was put on the
25   ballot to increase sales tax by a very small
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1   in salaries and be happy.  That's not how it works

 2   in Mesa County.

 3       Q    So in 2018, although the revenues looked

 4   good, it may also be another year where there might

 5   be a projected -- for 2018, was there a deficit or

 6   did you have to go into general funds?

 7       A    No.  And the other part to understand is

 8   that because there was that surplus, if you will,

 9   by a TABOR definition in 2018, it lags by two

10   years --

11       Q    Okay.

12       A    -- to have to pay that out.

13       Q    Okay.

14       A    So it will actually hit us with the 20 --

15   it will be paid out in 2020 if it's paid out.  They

16   all -- the commissioners also have the option to go

17   to the ballot and ask the voters can we keep that

18   refund for whatever reason.

19       Q    So if the money does have to be paid out

20   in full, is Mesa County looking at a budget deficit

21   again?

22       A    I'm not sure what you define budget

23   deficit.  It means that we may very well have to go

24   into reserves to pay that.

25       Q    Okay.  And you said the reserves were
```

Frank Whidden   July 11, 2019

60

```
1    between 18 and 25 when you started?
2         A    18 to 20.
3         Q    18 to 20.  I'm sorry.
4         A    And we're down -- we're down to -- prior
5    to last year when we started last year's budget,
6    around the 12-million-dollar range.
7         Q    Have you been lower than 12 million in
8    your general fund?
9         A    Not at the end of the year.
10        Q    Have you been higher?
11        A    Yes.  It's progressively gone down
12   through the recession.  It kept going down.  That
13   was part of the concern that we had.
14        Q    Did it go down in 2018?
15        A    No.
16        Q    What about 2017, did the reserve fund go
17   down in 2017?
18        A    I don't think so.  I think we were almost
19   even in 17, as I recall.
20        Q    So you hadn't built back up yet.  In
21   other words, you hadn't replenished the reserves,
22   but at least you weren't going down any further; is
23   that fair?
24        A    That is correct.  Because one of the
25   goals that the commissioners of the board had was
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1          Q    What managers are you referring to?

 2          A    The IT managers in this case, so Lhana,

 3     Troy, and at that time Rick Corsi.

 4          Q    Was Lhana an IT manager?

 5          A    Yes.  She was the customer service

 6     manager, was her title, I believe, at the time.

 7          Q    And you said you were involved in who was

 8     assigned to which projects?  You actually --

 9          A    Yes.

10          Q    -- said, Troy, I want these people

11     assigned to this project?

12          A    We would discuss who was going to be on

13     which project.  If there was an upgrade to a major

14     system, we'd talk about which BSA or if it -- or

15     the team.  Who's going to be on the team, who's

16     going to play what parts, what roles are needed for

17     this project, who's going to -- who's going to do

18     that.

19          Q    So these were in meetings that you had

20     with the IT managers and Lhana Jordan?

21          A    Yes.

22          Q    And are there -- did you have agendas for

23     these meetings?

24          A    Not usually.  We don't usually do written

25     agendas and things like that.
```

**Frank Whidden   July 11, 2019**

69

1    Q    Right, and I would expect that.  If

2    there's a big issue, you would be involved.

3              But I'm saying on a day-to-day,

4    week-to-week, month-to-month basis, were you

5    involved in the daily supervision of the IT

6    employees other than the three we've talked about?

7    A    I might walk down there and talk to them

8    about a given project or a given matter that's

9    going on or if I knew they had -- they were

10   involved in a given area, I might come down and

11   have a conversation about what's going on here,

12   what do you see.

13             There would be times if I knew there was

14   a -- New World is an example.  New World is a set

15   of software that law enforcement runs on, and I

16   would talk to the people involved in that project

17   to see -- just to get a touch, feel for what's

18   going on on the ground, what's happening with this

19   particular project.  It was -- New World never

20   ends, and it's been a problematic system since I

21   have been here.

22   Q    Well, I appreciate that you may have

23   walked around and talked with the IT staff now and

24   then, but actually that wasn't quite my question.

25             I'm wondering if you're involved in the

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

Frank Whidden   July 11, 2019

```
 1    day-to-day supervision of the IT staff other than

 2    Mr. Flick, Ms. Jordan, and Mr. Corsi during your

 3    time as the Deputy Administrator?

 4         A    I'm not sure exactly what you mean by day

 5    to day.  I mean, I have managers who see that did

 6    they come in, are they going out sick today.  They

 7    would approve those kinds of things.  They would

 8    take care of their vacation time, who's going on

 9    vacation.  We have a calendar that I can look at

10    and check and see who's in and who's not, but I

11    expect my managers to see to that.

12         Q    Who was assigned to New World?

13         A    Lori is the main person who was assigned.

14    She's been there for a long time.  There was a lady

15    named Elizabeth who's no longer with us who was in

16    there.

17         Q    Is that true back in 2016?  Lori was the

18    project manager?

19         A    I believe so, yes.  She's always been the

20    lead on New World because she was there from before

21    the beginning, when they -- when they talked about

22    getting the software.

23         Q    So she was there when Mesa County

24    discussed whether to bring that software on board

25    or not?
```

EXHIBIT 3
18-CV-01144-DDD-STV

**Frank Whidden   July 11, 2019**

80

1      A    When I first came to Mesa County as IT

2    director, we were directed to use the format that

3    we were given, which had -- which had a numerical

4    rating.

5      Q    Okay.

6      A    1 to 5.

7      Q    And that's the system that you did away

8    with?

9      A    As far as my direct reports, yes.

10      Q    Okay.  So from 2011 forward, have you

11    used any objective criteria in rating employees

12    after you did away with this numerical system?

13      A    No, not -- not with my direct reports.  I

14    have not used any kind of numbers or numerical

15    rating.  No, I have not.

16      Q    With anybody else, any other employees,

17    have you used any objective factors to gauge

18    performance?

19      A    Certainly in my mind.  It's like, okay,

20    are they performing or nonperforming.

21      Q    Well, isn't that a subjective question?

22      A    That's my point.

23      Q    All right.

24      A    There is no such thing as an objective

25    system.  I don't care if you put numbers to it or

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

1    Q    So why was it fair to give somebody who's

2    been with Mesa County 26 years the same relative

3    severance as somebody who had been there only a

4    couple years?

5    A    I did not try to distinguish between the

6    number of years of service.  Like I said, Rick had

7    been a longstanding manager, and I felt like that

8    should be taken into consideration.

9    Q    Had anybody else been there longer than

10    Rick?

11    A    I don't think so, but I also did not look

12    up and see who has the most years of seniority.

13    That was not a basis of my decision.

14    Q    Well, then I'm just a little confused.

15         How is it that you took seniority into

16    account because -- are you saying you did not take

17    seniority into account or you did?

18    A    I did not.  I looked at performance and

19    other -- I didn't look at, Okay, somebody's been

20    here 20 years and they should stay and somebody

21    else has been here 10 years and they should go.  I

22    did not use that as a basis of evaluation.

23    Q    Except for Rick.

24    A    Except for Rick as a longstanding

25    manager, it did occur to me that he had been there

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

116

```
 1    primary financial resources for their family?

 2         A     No, I really didn't.  That's not

 3    something that usually comes up in the course of

 4    conversation.  I don't -- even the people that I

 5    know pretty well, I don't know that I know the

 6    answer to that question.

 7         Q     Do you know if Ms. Bouricius was?

 8         A     No, I do not.

 9         Q     Okay.  So you were about ready to tell me

10    how you created this initial list, and why don't

11    you list for me the factors that you used to decide

12    who to put on that list.

13         A     I went through, in my mind, the people

14    that I felt like we needed to keep, the people that

15    we absolutely could not do without, and that was

16    the list to keep, and then that, therefore, vets

17    out the ones that didn't make that list.

18         Q     So was there another list that you wrote

19    down in people that we need to keep?

20         A     Not that I write down, no.

21         Q     Okay.  Is this you sitting and thinking

22    in your head like, Okay, well, we can't lose this

23    person, we can't lose this person, and then, just

24    by process of elimination, writing the names of the

25    other people down?
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

Frank Whidden   July 11, 2019

117

 1        A     Basically, yes.

 2        Q     Okay.  So prior to making that list, did

 3   you talk to anyone about what you were thinking?

 4        A     Yes.  I had spoken to the commissioners,

 5   because they had tasked me with finding the budget

 6   shortfall that we were facing if we didn't make

 7   changes.  I did not talk to them about any

 8   individual specifics at all.  They told me you need

 9   to -- this is your task.  Find us -- the number was

10   about $1.4 million overall, over the whole County.

11   And that was the shortfall at that point we were

12   looking at for the next year.

13        Q     When did you have this discussion with

14   the Board of County Commissioners about the budget

15   shortfall?

16        A     Before this decision was made, in the

17   months before, sometime before that.  It wasn't a

18   long time before that.  A couple of months, maybe.

19   It wasn't a long time.  It wasn't long before we

20   made these changes.  But I don't know -- I couldn't

21   tell you an exact date.  I don't remember.

22        Q     Was this at a board meeting?

23        A     No.

24        Q     So this is just you informally talking

25   with the commissioners?

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

118

```
 1        A     Correct.

 2        Q     And you had these informal chats with the

 3   commissioners about a prospective budget shortfall

 4   that was coming up?

 5        A     Yes.

 6        Q     And did you simply tell them what you

 7   were going to propose to do to address that

 8   shortfall?

 9        A     In the sense that I felt like I would

10   have to make decreases in personnel, yes.

11        Q     Did you tell them that?

12        A     I'm sure that I told them that, yes, I

13   was -- I was thinking that I would have to make

14   cuts in order to get to that level of reduction in

15   the budget.  The only place that could come from

16   was personnel reduction.

17        Q     You would have to do a layoff?

18        A     Uh-huh.  And --

19        Q     You have to say yes or no.

20        A     I'm sorry.  Yes.

21        Q     That's okay.

22        A     More -- and there were more layoffs.  It

23   was around the County system, not just IT.  There

24   were other layoffs in elected divisions and those

25   kinds of things as well.  So I'm not saying that
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1    the layoffs I did in IT met that number.  Clearly
 2    it did not.  But as County Administrator, I felt
 3    like if we were asking the others to make cuts, I
 4    needed to take the lead and show that, hey, yeah,
 5    he's protected his divisions, but he's going to
 6    make us take cuts in others.
 7         Q    What other divisions did you cut?
 8         A    I did not.  The elect -- one of the
 9    notable ones was the clerk and recorder's office,
10    she closed the two offices, the DMV offices in
11    Clifton and Fruita, laid off a number of people out
12    of there.  Public works I think reduced by a
13    couple.  So those are other reductions that were
14    made, and I don't remember, of the other
15    departments, who also made specific cuts.
16         Q    Well, I'm asking about you.
17         A    Oh, me and my group.
18         Q    Did you make any decisions about any
19    other job layoffs, other than the ones in the IT
20    department?
21         A    No.  I did not specifically say, Okay,
22    we're going to remove, for instance, these two
23    people from CJSD.  We did have a -- we put a hiring
24    freeze on for everybody except public safety.
25         Q    When was that in effect, the hiring
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden  July 11, 2019**

126

1   also paid their health insurance for that 30 days.

2   I don't remember that for a solid gold fact, but I

3   think we did.

4        Q    So when you created this list of people

5   to terminate, did you talk with anybody about it

6   before you finalized your decision?

7        A    I did speak -- yes.  Before I finalized

8   the decision, yes.  I met with Troy and Lhana and

9   asked them to look over the list of people that I

10  was proposing to cut and tell me if they disagreed

11  or if they thought there was a problem with the

12  people that were on the list, that I had made a

13  mistake and that they thought there was somebody

14  that we just couldn't live without.

15       Q    And you actually gave them a hard copy of

16  the list?

17       A    I don't -- no.  I kept -- whatever we

18  reviewed there, that list, was -- was just that.

19  No, I didn't send it around.

20       Q    Well, did they -- I mean, did you just

21  verbally tell them who was on the list or --

22       A    I show -- no.  I shared -- they were -- I

23  mean, I showed them -- I don't remember if I had

24  the piece of paper in my hand or not.  I shared the

25  names with them, and I don't remember if I had that

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

Frank Whidden   July 11, 2019

137

1    that work with that spreadsheet that I referred to.

2        Q    Did Mr. Flick give you any specific

3    information about Ms. Bouricius' performance?

4        A    Not that I recall.

5        Q    Did Ms. Jordan give you any specific

6    information about Ms. Bouricius' performance?

7        A    She did agree that there was weakness in

8    customer service.

9        Q    But specifically with respect to Ms.

10   Bouricius, did she give you any information about

11   Ms. Bouricius' performance?

12       A    Yes.  She said that she had weakness in

13   customer service.

14       Q    So Ms. Jordan said that Ms. Bouricius was

15   weak in customer service?

16       A    Uh-huh.

17       Q    And did she give you any more -- give you

18   any more details?

19       A    She said that there had been people

20   around the County who had complained about

21   incidents that Deb had worked on.

22       Q    Can you give me an example?

23       A    I don't remember specifically.  Deb was

24   over the Eden system, which is the financial

25   system, and that would have been the system that

**Frank Whidden   July 11, 2019**

138

```
 1   she would have been particularly involved with, I
 2   would think, in giving assistance.  She had worked
 3   with me personally on that and I had observed some
 4   issues I thought with her customer service.
 5        Q    What issues did you observe?
 6        A    I felt like she was less than helpful
 7   with an attitude that like, well, I've showed you
 8   and she didn't want to come back and deal with it
 9   again when I had the same problem again the next
10   week.
11        Q    Did you document that issue?
12        A    No.
13        Q    Any other issues that you had with her
14   performance?
15        A    No.  I would say that there were -- there
16   was skill sets I thought that weren't there as far
17   as other systems, that she wasn't -- she didn't
18   work with, as far as I knew.
19        Q    Okay.  Well, let's get back to Ms.
20   Jordan.
21             Did Ms. Jordan give you any specifics on
22   how she thought Ms. Bouricius had weaknesses in
23   customer service?
24        A    As I said, she said she had customer
25   complaints.
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1   discrimination lawsuit.

 2            I'm saying:  In your career at Mesa

 3   County, have you ever -- are you aware of any

 4   situation in which Mesa County, in the HR

 5   department, substantiated a claim of illegal

 6   discrimination by an employee?

 7        A    Not --

 8                 MR. SANTO:  Same objection.

 9        A    Not that I can recall.

10        Q    (By Ms. Greisen) Okay.  Let's take it

11   beyond Mesa County.

12            In your entire career, have you ever been

13   employed by an employer or been the boss yourself

14   where you have substantiated a claim of illegal

15   discrimination?

16                 MR. SANTO:  Object to form.

17        A    Not that I can recall.

18        Q    (By Ms. Greisen) So it's my understanding

19   that in all three cases -- for Rick Corsi, Janine

20   Corsi, and Ms. Bouricius -- you were the sole

21   decision-maker regarding who would be laid off; is

22   that correct?

23        A    Yes.

24        Q    Okay.  So I'm still a little unclear

25   about exactly what your expert opinions are at
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

214

```
 1        A    No, I don't think so.

 2        Q    So certain -- I'll go back to October

 3   7th.

 4             Certain employees in the IT department

 5   were notified that their positions were being

 6   eliminated on that day?

 7        A    If that was the day of the termination.

 8   I couldn't tell you that was the exact date.  I

 9   assume that it is.

10        Q    Well, I think if you look at the exhibit

11   I have given you in your stack, you will see it's

12   dated October 7th --

13        A    Okay.

14        Q    -- 2016.

15        A    Okay.

16             MR. SANTO:  Is this 50?

17             THE DEPONENT:  Yeah.

18        A    You're referring to the letter, the

19   release letter.

20        Q    (By Ms. Greisen) Right.  You gave them

21   that letter at the same time they were terminated,

22   right?

23        A    Correct.  We gave them the letter in that

24   meeting.

25        Q    Right.
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1        A     I don't know if I physically handed it to

 2   them or not.  Brenda was there and I only spoke for

 3   a couple of minutes, and I don't think I -- she --

 4   usually what happens in terminations is that HR has

 5   a packet of material to give to the people who are

 6   being terminated.  And so we gave -- I don't think

 7   I gave them anything.  I didn't hand them anything.

 8        Q     Okay.

 9        A     But this letter, I believe, was in their

10   packet.

11        Q     Well, that's the letter you signed,

12   right, to --

13        A     Correct.

14        Q     -- give to them?

15        A     Yes.

16        Q     Right?

17        A     Yes.

18        Q     So I want to go through the people that

19   you decided to terminate.  Let's start with Ms.

20   Bouricius.

21              Can you tell me each and every reason you

22   decided to terminate Ms. Bouricius' employment.

23        A     Because I did not feel that she was as

24   strong a player on the remaining team, if you will,

25   as compare -- a comparative business systems
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

216

1    analyst, which was her position, I believe, and

2    those who would remain; but, in particular, the

3    other senior BSA who would remain.

4         Q    Who was that?

5         A    Kelly Leuallen.

6         Q    Okay.  What was that knowledge based on?

7         A    I believe that Kelly is more

8    knowledgeable about more systems.  I believed that

9    he stays up to date better on the changes and

10   things that are made.  I believe that he does a

11   better job as far as customers are concerned.  I

12   felt like he did a much better job as far as

13   documentation was concerned, and I felt like that,

14   therefore, he was the stronger player.  That was a

15   hole in the boat that we couldn't afford at that

16   time.

17        Q    And can you give me an example of how you

18   thought Kelly was more knowledgeable about systems

19   than Ms. Bouricius.

20        A    Whenever I -- questions came up and the

21   more complex they were, the more involved Kelly

22   was.  As far as the systems that we supported, he

23   appeared, to me, to be more well-rounded and more

24   knowledgeable about the whole stack.  We have some

25   100 to 200 software systems in our stack, and I

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

Frank Whidden   July 11, 2019

217

```
 1   felt that Kelly, I still feel, that Kelly was
 2   stronger.
 3        Q    Can you give me any more examples of how
 4   Kelly's knowledge about systems was better?
 5        A    I think that was sufficient.  No.
 6        Q    Okay.  And can you give me any examples
 7   of how Kelly was better with customers than Ms.
 8   Bouricius?
 9        A    Yes.  Kelly is thorough, very painstaking
10   as far as explaining how a system works or doesn't
11   work or helping a client deal with whatever issues
12   they may have in front of them.  I got reports of
13   that from clients, from management, that he was --
14   he was more thorough, more detailed, and more
15   helpful to the clients.
16        Q    Can you give me any specific clients?
17        A    As far as being thorough, I know that
18   Kristen Cole in my office upstairs has been -- is
19   an example of someone who says that Kelly is
20   extremely thorough.  Lhana has said that.  I have
21   seen it as evidenced in his documentation, the
22   e-mails that he sends out about how to do things,
23   how to -- like if we're making an upgrade, here are
24   the changes, here's what the user can see with
25   screenshots and examples and, you know, ad
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1    infinitum there.  He -- I have seen that myself

 2    come across.

 3              So that's -- and that's something that

 4    generally IT people don't do and we have to work on

 5    them, is do that kind of documentation at that

 6    level so a normal person can understand what is

 7    expected and what they need to do.

 8        Q    Can you give me some examples of when Ms.

 9    Bouricius was not thorough with her documentation.

10        A    I don't recall seeing her write out

11    anything like that that compared to the work that

12    Kelly's done.  I don't recall seeing her send

13    something out that had that level of detail in it.

14        Q    Okay.  So with Ms. Bouricius, you said

15    you decided to terminate her because -- you talked

16    about Kelly Leuallen, but Kelly Leuallen wasn't the

17    only BSA, right?

18        A    But he was -- they were the two that were

19    most senior.

20        Q    Okay.  Did you compare her to anyone

21    else?

22        A    As far as the remaining stack that was

23    there and the systems they covered, I felt that the

24    coverage that we needed on the various systems was

25    better represented by the people who remained.
```

**Frank Whidden   July 11, 2019**

1    Q   So it had been two years since you worked

2    with her directly, right?

3    A   I was still the director of IT and still

4    involved on basically a daily basis.  I still am

5    doing that.

6    Q   So tell me what kind of interactions you

7    had with her on a daily or weekly basis.

8    A   Whatever project was going on at the

9    given time, what was going -- there might be

10   something in Eden that's going on, which was the

11   system that she was supposed to be an expert on,

12   things like that.  What's -- what's going on with

13   those projects and those kinds of things, because

14   she was a senior BSA.

15   Q   And I'm just curious if you can tell me

16   what those projects are or things that required you

17   to have interaction with her.

18   A   I -- other than Eden, I can't tell you a

19   specific system.  I don't remember.

20   Q   And did you have any direct interaction

21   with her on Eden or was that through Rick Corsi?

22   A   I certainly spoke to her about --

23   directly to her about issues on software systems,

24   and I would think Eden for sure, because that's the

25   main system.  That's our main financial system, and

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

1    Q    So can you tell me what skills Ms.
2  Bouricius did have at the time of her layoff?
3    A    She had a great deal of institutional
4  knowledge about Eden and how it had been installed
5  and why decisions were made about the installation,
6  why we use procedures the way we did or didn't.  So
7  that was particularly a skill set, I think, that
8  she had/has.
9    Q    What other skills did she have that you
10  were aware of at the time of her layoff?
11    A    That's the major thing that I know about
12  about.  Rick had a great deal of confidence as far
13  as project management and things like that.  I
14  personally didn't see that.  I didn't see a great
15  deal of skill as far as project management was
16  concerned, carry through, getting things done,
17  hitting milestones.  I didn't -- I didn't see
18  evidence of that.
19    Q    What projects did you supervise or
20  oversee her on?
21    A    Ultimately all of them.
22    Q    I understand that, but what projects were
23  you directly involved in or constantly supervising?
24  In other words, I know there are lots of projects
25  that go on every single day.

**Frank Whidden   July 11, 2019**

```
 1          A     Right.

 2          Q     Were there any big projects that Ms.

 3     Bouricius worked on that you were involved in?

 4          A     I can't recall one in particular.  I'm

 5     sure we did like Eden upgrades and things like that

 6     that she would have been involved in, but I don't

 7     remember one specifically saying, yeah, that

 8     particular one.

 9          Q     Okay.  Can you tell me any time she was

10     disciplined or talked to about her skills regarding

11     project management?

12          A     I don't know if Rick spoke to her about

13     that or not.  I didn't.

14          Q     Can you tell us what areas in the IT

15     department that Ms. Bouricius worked on in her 26

16     years of employment with Mesa County?

17          A     As I just said, Eden was the main, and

18     then there were -- the software stack is divided up

19     between the BSAs, and I can't -- we have over 100

20     systems.  I don't know exactly which ones each one

21     was responsible for.  I know -- as far as I know,

22     she never worked on New World, as far as I know,

23     and that was a particular skill that Lori had, for

24     instance, that was critical.

25          Q     Well, I'm asking a slightly different
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

238

```
 1   helping the client resolve it, she would basically
 2   give them -- tell them to call outside help to get
 3   help with the problem.
 4        Q    Anything else other than that?
 5        A    And then my personal interaction when I
 6   asked for help with Eden.
 7        Q    Okay.  So have you now told me all the
 8   skills that you're aware Ms. Bouricius had at the
 9   time of her layoff?
10        A    I believe so, yes.
11        Q    And all of the areas that she worked in,
12   to the best of your knowledge, during her time at
13   the IT department at Mesa County?
14        A    Yes.
15        Q    Did you -- can you tell me what skill
16   sets Terrie Hotary had that Ms. Bouricius did not
17   have in October 2016?
18        A    I felt that, first of all, the salary was
19   less; and, secondly, Terrie was more approachable,
20   more customer service oriented, and seemed more
21   eager to learn, more eager to be a team player,
22   more motivated to be involved and to be engaged.
23   That's what I saw.
24        Q    Is -- are there any documents or any --
25   any specific evidence that you can point to to show
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

239

```
 1   that Terrie was more eager and motivated than Ms.
 2   Bouricius?
 3        A    I don't have a document to point to.
 4   That was, again, feedback that I had heard and
 5   received and from personal observation as well.
 6        Q    Can you give me any specifics about the
 7   feedback you received:  Who it was from, what it
 8   was about, and when it occurred?
 9        A    I don't remember a specific instance.  I
10   know she was more involved in New World, willing to
11   learn New World and be involved in that.  That was
12   a really critical issue at the time.  And she was
13   showing a willingness to be involved with that and
14   a willingness to learn and grow as far as her SQL
15   knowledge -- it's a language -- and those kinds of
16   things, that she had -- she seemed more motivated
17   to be an engaged player on the team.
18        Q    And, again, is that your personal
19   observations?
20        A    Yes, as well as feedback.  I -- the
21   trouble right now I'm having in my mind is
22   remembering -- Lhana has certainly told me that.  I
23   can't say specifically, though, was that before the
24   layoff or after the layoff.  There certainly has
25   been a lot of good feedback since that time, but
```

**Frank Whidden   July 11, 2019**

241

 1  you chose to terminate Ms. Bouricius rather than

 2  Terrie Hotary?

 3      A    Yes.

 4      Q    Eager, engaged.

 5           Can you tell me what you mean by being

 6  more engaged.  You said that Terrie Hotary was more

 7  engaged than Ms. Bouricius, what that means.

 8      A    It means being willing to interact with

 9  the teams, with clients, being more willing to

10  learn about new systems, being -- initiative, to

11  me, is a part of that.

12      Q    And on all those facets, you thought Ms.

13  Hotary was more -- satisfied that skill set more

14  than Ms. Bouricius?

15      A    Yes.

16      Q    And, again, that's just based on your

17  personal observations?

18      A    And -- and feedback from clients.

19      Q    And, again, I'm going to ask you if you

20  have any specifics, which clients, who gave you

21  that feedback.  Can you share them with us?

22      A    I do not.

23      Q    So was Ms. Bouricius as proficient in

24  customer support as was Ms. Hotary?

25      A    I would say no.

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1   time, but understanding her involvement with the

 2   project from its inception.  She also knew the old

 3   system which was Spillman.

 4        Q    I'm sorry.  Let me -- let me slow you

 5   down a minute --

 6        A    I'm sorry.

 7        Q    -- so Candice doesn't throw something at

 8   us.

 9             You said her knowledge of law

10   enforcement.  What specifically are you talking

11   about?

12        A    Her husband's a cop.  She's been involved

13   with law enforcement.  She knows the people over

14   there.  She understands -- they have their own

15   language, just like IT does.  She speaks their

16   language.  They trust her because of her deep

17   involvement with them and all the things that they

18   do.

19        Q    So what knowledge, skill set in IT does

20   Lori Marak -- that she had in October of 2016 that

21   Ms. Bouricius didn't have?

22        A    Her knowledge of New World, specifically.

23        Q    Anything else?

24        A    I think that was the -- that was the most

25   critical thing, in my mind, was the New World
```

```
 1                    MR. SANTO:  Okay.  I'll take your
 2   word for it.
 3                    MS. GREISEN:  We can take a break if
 4   you want.
 5                    MR. SANTO:  I apologize.  Thank you
 6   for that.
 7                    MS. GREISEN:  That's fine.
 8                    THE VIDEOGRAPHER:  The time is 3:14.
 9   We're off the record.
10                    (Recess taken.)
11                    THE VIDEOGRAPHER:  The time is 3:27.
12   We're back on the record.
13        Q    (By Ms. Greisen) Mr. Whidden, do you know
14   who trained Kelly Leuallen when he first came on to
15   the IT department?
16        A    I do not.
17        Q    What skill sets did Elizabeth McDowell
18   have that Ms. Bouricius did not have?
19        A    She was actually part-time GIS as well as
20   IT, so she had a whole GIS skill set that, as far
21   as I know, Deb didn't have, and she was also part
22   of the New World team.  So she -- Lori had been
23   training her on New World.  In fact, they had an
24   office in IT and over at the sheriff's office, and
25   they generally spent most their time at the SO and
```

**Frank Whidden  July 11, 2019**

249

```
 1   the GIS piece, yes.
 2        Q    And who would be most knowledgeable about
 3   the division of Ms. McDowell's time between
 4   business system analyst and GIS?
 5        A    Lhana was her last supervisor before she
 6   left, so Lhana would have been and then Rick before
 7   that.
 8        Q    When did she leave?
 9        A    It's -- I would say a year or so back.  I
10   don't remember the exact time, but it's been a
11   while that she left.  I was -- as far as
12   knowledgeable about her position, one of the
13   important projects that she worked on in GIS had to
14   do with how tax revenue is distributed along the
15   various entities in the County:  School districts,
16   municipalities, all that.  And I was aware of that
17   project because of its relationship to the outside
18   entities.  And that was one of the real concerns
19   that I had, especially when she left, was who was
20   going to take that over and how we're going to deal
21   with that.
22        Q    All right.  But that's -- you're talking
23   about 2018 now, right?
24        A    That was -- it's -- well, no.  I knew
25   about it when we first had her doing it.
```

**Frank Whidden   July 11, 2019**

250

```
 1        Q     Uh-huh.
 2        A     That goes back before Rick left.  Not
 3   long, I think, after she first came on that --
 4   there's a certain report that they do about how
 5   to -- how to distribute that revenue and that was
 6   before her being let go.  So the reason I bring
 7   that up is that's part of me saying why I thought
 8   she needed to stay.
 9        Q     Who took over those jobs?
10        A     I think Chris Kadel is the prob -- Chris
11   Kadel is the main person dealing with that, and I
12   think Ryan also has been involved with that.
13        Q     Are you talking about Ryan Davison?
14        A     Yes.
15        Q     And Chris Kadel?
16        A     Kadel is how I say it --
17        Q     Kadel.
18        A     -- but that doesn't make it right.
19        Q     So they absorbed her GIS duties, Ms.
20   McDowell's GIS duties?
21        A     Yes.  We did not refill that position
22   when she left, the GIS piece anyway.
23        Q     Did you refill the business system
24   analyst piece?
25        A     Let me think.  I don't think we have.  I
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

251

```
 1    think -- I think that position is still open since

 2    Liz left.  We -- because there's nobody else new

 3    down there.  I don't believe we've refilled that

 4    position.

 5         Q    What skill sets did David Underwood have

 6    that Ms. Bouricius did not have in October of 2016?

 7         A    David is a hardware person, so he works

 8    on the internals of computers and those kinds of

 9    things and, to my knowledge, Deb doesn't have that

10    skill set.  She was on the software side of the

11    house.  Dave is hardware.  So all the things that

12    would be dealt with -- end-user contact, how to use

13    things like Microsoft Word, the common

14    OfficeSuite -- that's what -- he's a tech and

15    that's what the techs do.

16         Q    Is that true for both the tech

17    positions -- or all four of them?

18         A    Yes, yes.

19         Q    So can you be any more specific other

20    than he worked on hardware?

21         A    The other things that I said.  The other

22    expertise as far as helping on the OfficeSuite and

23    those kinds of things, Google, those things that

24    are there where the end-users interact.  But

25    hardware is the main piece because that's mainly
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

252

```
 1   what they do.  Working on printers, troubleshooting
 2   those -- the hardware piece of all of that.  That's
 3   their particular skill set.
 4        Q    So do you know whether or not Ms.
 5   Bouricius had any of that skill set at the time she
 6   was terminated?
 7        A    If she did, I certainly had never seen
 8   any evidence of it.
 9        Q    Did you ask anyone?
10        A    No, because it's a pretty safe bet in the
11   IT world that if somebody's on the software side of
12   the house and they are into coding and database
13   administration and those kinds of things, that they
14   are not a hardware person.  It's like a separation
15   of duties.
16        Q    And what skills did Andrew Wetzel have
17   that Ms. Bouricius did not have?  Is it essentially
18   the same answer?
19        A    Yes.  He -- at the time that the
20   terminations were made, he was a tech.  He's now
21   moved over to the network team, but -- so he had --
22   as well as the end-user hardware, he also had
23   networking skills along the lines of like what Troy
24   and Ron and those -- Bill Tarlton, what they can
25   do.  As far as I know, again, she doesn't have that
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1   skill set, the network administration and server

 2   administration skills and all that kind of thing.

 3        Q    Do you -- I'm trying to figure out what

 4   you base that knowledge on, other than your

 5   personal observation.

 6             Do you -- have you looked to see in any

 7   of her tenure history what she's actually worked on

 8   while at Mesa County?

 9        A    I said before I did not look at

10   historical records about had she ever been a

11   hardware tech or anything like that.  I haven't

12   looked at that.

13        Q    Do you know if she ever performed the

14   duties of a senior support specialist during her 26

15   years?

16        A    I do not know.

17        Q    And Joseph Keene, he is a Web

18   administrator?

19        A    Joe, yes.

20        Q    Joe.  What skill sets did he have that

21   Ms. Bouricius did not have?

22        A    He -- Joe was on the Web team and he

23   worked with the Web administration and those kinds

24   of things; and to my knowledge, I didn't know that

25   she had any skill set in that area.
```

**Frank Whidden   July 11, 2019**

1    Q    Well, I was just going to ask you my next
2  question.
3         Do you know whether she, Ms. Bouricius,
4  was ever a Web administrator during her career at
5  Mesa County?
6    A    I did not know that.
7    Q    Did you know at one time she was the only
8  Web administrator?
9    A    I did not know that.
10   Q    Is there any reason that you're aware of
11 that Ms. Bouricius could not have been transferred
12 to one of the Web administrator or support
13 specialist jobs instead of terminated?
14   A    I did not know she had any skill set in
15 that area or had worked in that area, certainly
16 since I have been there, since 2011, and it was
17 never brought up when I asked the question about
18 who had the skill sets that we needed and do we
19 have the right people on the boat.  Joe and Lani
20 were the ones who had the skill sets that -- in
21 this case, Troy wound up running that team -- that
22 he thought they would need in order to get the job
23 done.
24   Q    So -- I'm sorry.  It's your testimony
25 that Troy said that Joe and Lani had the expertise?

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden July 11, 2019**

274

```
 1        Q    And you said -- oh, you said also that
 2   Lhana had better software skills.
 3        A    No.  Better customer service skills.
 4        Q    Better customer service.
 5             Again, is that just based on your
 6   personal observation?
 7        A    Yes.  And also, as I said earlier, about
 8   information I had been given about customer
 9   complaints.
10        Q    From Lhana.
11        A    From Lhana.  I've had -- I've had
12   customers tell me that they didn't like the service
13   that they received.
14        Q    What customers?
15        A    Kristen Cole would be one.  I don't
16   remember exactly who said that to me over the
17   years.
18        Q    So Kristen Cole.  What -- what -- what --
19        A    She's administrative assistant and -- and
20   I think Kristen was there before Deb left.
21        Q    So what year was this complaint made?
22        A    I don't remember.
23        Q    Was there anything in writing about it?
24        A    Not unless there was something in work
25   orders that covered it.  I didn't read anything
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden  July 11, 2019**

283

1   was canceled by the end of the month, of October,

2   right?

3        A    That's what that letter says.

4        Q    Do you have any reason to disbelieve it?

5        A    No.

6        Q    So are there any -- well, I want to go

7   back and talk about how the whole termination

8   meeting happened.

9        A    Uh-huh.

10        Q    You've said that you had a conversation

11   with Troy Flick and Ms. Lhana Jordan about a week

12   before and got their okay for your decision.

13        A    Yes.

14        Q    Is that fair?

15        A    Yes.

16        Q    And then what did you decide to do at

17   that point?

18        A    I decided that we would have one meeting

19   and have everybody there and I would announce what

20   was happening with the layoff, and then Brenda --

21   at the time I expected it to be Krista, but she was

22   on vacation.  That Brenda would be there and she

23   would go through the HR details, for instance, of

24   health insurance, COBRA, all of the things that are

25   involved, retirement accounts, all those things.

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1   did.

 2        Q    And I think the next page is also people

 3   that stayed.

 4        A    Right.  So Ryan...

 5        Q    Is it just all of them had more skills

 6   than she did?

 7        A    I believe, yes.  Looking at this --

 8        Q    Okay.

 9        A    -- the difference, yes.

10        Q    So can you identify --

11        A    Not counting the temps.

12        Q    Okay.

13        A    I don't know those people.

14        Q    Can you identify -- we can go through

15   this pretty quickly -- if there is any additional

16   information, other than what you have already given

17   to me, what skills does Ms. Jordan have more than

18   Ms. Bouricius?

19        A    The hardware skills, the -- we did answer

20   this before.

21        Q    Okay.

22        A    The hardware skills, the customer service

23   skills, those things.

24        Q    And is that true with David Underwood as

25   well?
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1        A    David Underwood, customer service, I
 2   would say yes.  But he's already a hardware tech so
 3   the hardware skills.
 4        Q    And Troy Flick?
 5        A    The network administration skills as well
 6   as management skills.
 7        Q    And Lori Marak, Marak?
 8        A    Lori Marak.  New World particularly and
 9   institutional knowledge.  We have talked about that
10   as well making a comparison.
11        Q    And Kelly Leuallen I think you have
12   already talked about.
13        A    We went lengthy into that.
14        Q    Chris Kadel?
15        A    Chris is a GIS expert and all that.
16        Q    I understand that they have different job
17   titles than she did.  I would like you to tell me,
18   as best you can, what specific skill they had more
19   proficient than Ms. Bouricius, if you can.
20        A    That's what I meant, was GIS expert.
21   He's an expert in government informational systems,
22   the mapping, and Esri and all the -- which is a
23   database and a platform.  So all the things that
24   are associated with GIS, that's the skill set that
25   he has that she, to my knowledge, doesn't have.
```

**Frank Whidden   July 11, 2019**

341

1     Q    And she doesn't have it based on your

2   personal observation; is that right?

3     A    That is correct.

4     Q    And then the Web administrators, Ms.

5   Boyles and Mr. Keene?

6     A    We didn't really talk about Lani, but we

7   certainly talked about Joe, that as far as I knew,

8   to the best -- that they had more Web administrator

9   skills, HTML skills, Hypertext Markup Language.

10  It's language of the Internet.  As far as I knew,

11  and the scripting and the programming, they had --

12  Joe had stronger skills and Lani had stronger

13  skills than that.  I didn't know she had any skills

14  in that area.

15    Q    You didn't know who?  Ms. Bouricius?

16    A    Ms. Bouricius had skills in that area.

17    Q    And Elizabeth McDowell, have you told me

18  everything --

19    A    Yes.

20    Q    -- with respect to that?

21    A    Yes.

22    Q    And with the support specialists and

23  technical support specialists, is it just generally

24  that they work on hardware, and that would be their

25  skill that Ms. Bouricius did not have?

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

```
 1        A     Generally speaking, yes.  But Paul is
 2   help desk extraordinaire.  He is simply amazing and
 3   is able to handle all manner of -- whether it's
 4   hardware, software, he is amazing.  And so cus --
 5   from customer service and all of that, Paul -- so I
 6   think he's got some tremendous skills there that,
 7   to my knowledge, that's not -- that's not her
 8   forte.
 9        Q     Do you know whether Ms. Bouricius has
10   ever worked on the help desk?
11        A     I do not know.
12        Q     Did you ask anyone?
13        A     No.
14        Q     Okay.  What about the -- we've gone
15   through Terrie Hotary and I think we've gone
16   through Tarlton.
17        A     Uh-huh.
18        Q     Eric Farslow, does he have any skills
19   that Ms. Bouricius doesn't have?
20        A     Same comment as the other technicians.
21   He's got extreme skills with the hardware and the
22   frontline techs, just like the others that we
23   discussed.
24        Q     Okay.  Is that true with all the support
25   specialists, kind of this frontline --
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

343

```
 1        A     Yes.

 2        Q     -- hardware --

 3        A     Yes.

 4        Q     -- experience?

 5        A     Yes.  Yes.

 6        Q     Okay.  Is there anything else you feel

 7   like that you know or can tell me about Matter No.

 8   3?

 9        A     No.

10        Q     Can you answer No. 4 for me.  Can you

11   give me the identity of all persons with personal

12   knowledge that support the defense asserted by Mesa

13   County in this case?

14        A     I believe that would be mainly Troy Flick

15   and Lhana Jordan.

16        Q     Anyone else?

17        A     Not to my knowledge.

18        Q     Okay.  No. 5, can you tell me the

19   identity of any documents reviewed to prepare any

20   of your 30(b)(6) rule deposition?

21        A     I didn't refer to any documents to

22   prepare for this.

23        Q     Okay.  So let's go down to Denials in

24   Defendant's Answer.  Let's go to 15.  And why don't

25   you open up Exhibit 12 because I don't expect you
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

**Frank Whidden   July 11, 2019**

347

```
 1    under Layoffs on Page 48 of the policy manual?
 2         A    I see 8.03, Layoff, yes.
 3         Q    Do you see in there where it says that
 4    County Administrator can make recommendations, but
 5    the Board of County Commissioners has the final or
 6    must make the final vote on who is deter -- who is
 7    laid off?
 8         A    I see it says this:  The County
 9    Administrator will review and comment on the
10    proposals recommend -- this is from other
11    directors, I take it.  If you want me to read the
12    whole thing, I can.  Any change felt necessary to
13    the Board of County Commissioners, who will make
14    the final decision.
15         Q    Right.  The Board of County Commissioners
16    makes the final decision with respect to layoffs,
17    right?
18         A    That's what that says.
19         Q    Okay.
20         A    My understanding was that when they told
21    me that -- and I let them know that I was going to
22    make layoffs, that they commissioned me to move
23    forward, and that was my understanding of I had
24    their approval to move forward.
25         Q    Would you agree that that's not in
```

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

## CORRECTION SHEET

Debra Bouricius v. Mesa County, by and through the Mesa County Board of County Commissioners.

    Case Number: 18-CV-01144-DDD-STV
    Deposition of: Frank Whidden
    Date of Deposition: July 11, 2019

I, FRANK WHIDDEN, wish to make the following changes or corrections to my deposition:

| Page | Line | Should Read | Reason |
|------|------|-------------|--------|
| 19 | 12-13 | Add "I did not frequently discuss federal lawsuits with the commissioners." | The question was stated in the negative, making my response unclear. This statement is meant to clarify my answer. |
| 39 | 18 | Change "Try River" to "Tri-River." | This change is made to correct a misspelling. |
| 250 | 6 | Change "her" to "Elizabeth McDowell." | It was unclear to whom the word "her" referred in this sentence. For clarification purposes, the word "her" refers to Ms. McDowell. |

_Frank Whidden_ _(signature)_

**Frank Whidden**

_8/15/19_

**Date**

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

STATE OF COLORADO    )
                     )ss.
COUNTY OF MESA       )

Subscribed and sworn before me this __15th__ day of August 2019 by Frank Whidden.

_____
Notary Public

RACHEL ENGLEHART
Notary Public – State of Colorado
Notary ID 20174047333
My Commission Expires Nov 15, 2021

My Commission Expires: __Nov 15, 2021__

**EXHIBIT 3**
**18-CV-01144-DDD-STV**

## Alicia Severn

| | |
|---|---|
| **From:** | Alicia Severn |
| **Sent:** | Thursday, August 15, 2019 3:07 PM |
| **To:** | Candice Flowers (candice@westerncoloradoreporting.com) |
| **Cc:** | Michael Santo (santo@bechtelsanto.com) |
| **Subject:** | Case no. 18-cv-01144-DDD-STV: Whidden deposition correction sheet |
| **Attachments:** | Correction sheet cover letter_Frank Whidden.pdf; CORRECTION SHEET_Frank Whidden deposition 8-15-2019 SIGNED.pdf |

Good afternoon, Ms. Flowers,

Attached please find a correction sheet and cover letter regarding the deposition of Frank Whidden, which took place on July 11, 2019 in case 18-cv-01144-DDD-STV.

Thank you,
Alicia Severn

Alicia Williams Severn
Bechtel Santo & Severn
205 N. 4th Street, Suite 300
Grand Junction, CO 81501
Telephone: 970.683.5888
Facsimile: 970.683.5887

CONFIDENTIALITY NOTICE:  This electronic mail transmission and any accompanying documents contain information belonging to the sender which may be confidential and legally privileged.  This information is intended only for the use of the individual or entity to whom this electronic mail transmission was sent as indicated above.  If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this transmission is strictly prohibited.  If you have received this transmission in error, please call collect at 970-683-5888 and delete this transmission.  Thank you.

SECURITY NOTICE:
Bechtel Santo & Severn cannot assure that email messages are secure or will be delivered via the Internet. If you are transmitting information to Bechtel Santo & Severn that you consider urgent and are uncertain whether it has been received, or if you are expecting an email response that you have not received, please call 970.683.5888 to confirm the status. If you are uncomfortable using email to communicate with Bechtel Santo & Severn, please call and specify another method of communication.

1

**EXHIBIT 3**
**18-CV-01144-DDD-STV**