# *BOURICIUS*

# *VS.*

# *MESA COUNTY*

**Deposition**

# *DEBRA BOURICIUS*

*02/22/2019*

_____

## *AB Court Reporting & Video*
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

EXHIBIT 3
18-CV-01144-DDD-STV

```
 1      A     Yes.
 2      Q     Was the decision to remove the trees to
 3  put in a vineyard made before your employment at Mesa
 4  County ended?
 5      A     We were considering different options,
 6  putting in peaches, putting in grapes.  We had
 7  discussed the vineyard.  I mean, I would have liked
 8  to have done it.
 9      Q     The vineyard?
10      A     M-hm.
11      Q     Yeah.  So when was the decision made to
12  remove the apple trees?  Was that before --
13      A     Yes, it was before I got laid off.
14      Q     All right.
15      A     And I made that clear to Hunter.
16      Q     Let's look at what's already been marked
17  as Exhibit 7, and this is what we looked at with
18  response to request for production 9.  Do you have
19  Exhibit 7 there?
20      A     Okay.
21      Q     What do these -- it looks like photographs
22  to me.  Would that be accurate do you think?
23      A     Yes.  Aerial photos.
24      Q     What do these show?
25      A     The orchard on 454 when it was still there
```

| | | |
|---|---|---|
| 1 | Q | And anything on Indeed about this case? |
| 2 | A | No. |
| 3 | Q | Any other social media accounts? |
| 4 | A | Not that I can recall. |
| 5 | Q | And do you have a cell phone? |
| 6 | A | Yes. |
| 7 | Q | What's that cell phone number? |
| 8 | A | 970-208-7198. |
| 9 | Q | Do you have a home phone or just a cell? |
| 10 | A | Just a cell. |
| 11 | Q | And where do you currently work? |
| 12 | A | Boulder County District Attorney. |
| 13 | Q | How long have you worked there? |
| 14 | A | Two years and one month. |
| 15 | Q | How did you hear about the job that you |
| 16 | currently have? | |
| 17 | A | I looked on governmentjobs.com. |
| 18 | Q | Have you been promoted at all in the time |
| 19 | you've been with the Boulder County District | |
| 20 | Attorney's office? | |
| 21 | A | I have not been promoted to a different |
| 22 | position, no. | |
| 23 | Q | So it's the same position as when you |
| 24 | started? | |
| 25 | A | Yes. |

1  Q  Why do you think that?
2  A  I worked with her for years. Have no
3  reason to believe not -- that she's not credible.
4  Q  Do you have a belief as to Janine's
5  honesty?
6  A  I believe she's honest.
7  Q  And why do you think so?
8  A  I've never seen her be dishonest.
9  Q  And have you talked with Janine since you
10  left employment with Mesa County?
11  A  Yes.
12  Q  When have you talked with her?
13  A  I can't tell you specifically.
14  Q  What would help you remember?
15  A  I don't know. E-mails, my phone.
16  Q  I believe we have some e-mails and text
17  messages, and we'll look at those a little later
18  today. Let's continue down and talk about the next
19  person, Rick Corsi. Do you know Rick?
20  A  Yes.
21  Q  Who is Rick Corsi?
22  A  He was my boss.
23  Q  Was he your direct supervisor?
24  A  Yes.
25  Q  When you were at Mesa County, who were

1         MS. BISBEE:  It is here.

2         MS. SEVERN:  Okay.  Let's do that.

3   Q  (By Ms. Severn) Just one more then.  The
4 next one down is Troy Flick.  Do you know Mr. Flick?

5   A  Yes.

6   Q  Who is Mr. Flick?

7   A  He was the supervisor of the network and
8 database administrators in county IT at Mesa County.

9   Q  Did he ever supervise you?

10   A  No.

11   Q  When did you meet Mr. Flick?

12   A  I can't recall the exact date.

13   Q  Did he come to Mesa County after you?

14   A  Yes.

15   Q  And what was your relationship like?

16   A  It was okay.  I didn't necessarily
17 interface with him directly that much.  It was mostly
18 his staff.

19   Q  Did you ever work with him directly?

20   A  Yes.

21   Q  What would you work with him directly on?

22   A  Well, at one point I was given the
23 responsibilities of being a database administrator
24 for the SQL servers, and he was in network, so at
25 that time I -- it was co-worker.

```
1       A       Yes.
2       Q       When did you become a senior business
3    systems analyst?
4       A       I can't recall the exact date.
5       Q       By the time 2016 rolled around, had you
6    been in that position for a number of years?
7       A       It was a recent -- not really a promotion.
8    It was just a rename of my position.
9       Q       Not a promotion you said?
10      A       No.
11      Q       Okay.
12      A       Not unless you consider a dollar a
13   promotion in salary.
14      Q       I'm sorry, say it again?
15      A       Not unless you consider a dollar promotion
16   in salary.  I was doing the same job that I was
17   before.
18      Q       What was your title before you were a
19   senior business systems analyst?
20      A       Business systems analyst.
21      Q       And the change in job title happened
22   somewhere close in time to 2016?
23      A       I can't give you a specific date.
24      Q       Sure, that's fine.
25              With the change you said there was a
```

1    dollar --
2        A    I believe it was a dollar.
3        Q    Okay.  Were you paid by the hour, or were
4    you paid salary?
5        A    Salary.
6        Q    Was the dollar $1 more a month, $1 more a
7    year?
8        A    I think it was just $1 more a year.
9        Q    Okay.  Were you paid by the hour?
10       A    No.  No, I was salary.
11       Q    What were your primary duties when you
12   were a senior business systems analyst?
13       A    My job was to support the larger systems
14   in the county, and that included going in and talking
15   to the users, find out their needs and requirements.
16   Often they were either changing a process and they
17   wanted our help in the workflow of that process, help
18   them become more efficient, and -- or we would be
19   looking at purchasing a new system and implementing a
20   new system, so we would document their requirements
21   and publish it in a request for proposals.
22              We would get the proposals in and
23   facilitate demos with the vendor and evaluation.  So
24   we'd facilitate those meetings in evaluating the
25   product, help them determine who they would like to

1    work with.

2              And then we would negotiate a contract
3    with the vendor and start the actual implementation
4    of the project.  And that would involve setting up
5    new servers, working with PCs if they needed
6    upgrading, working with the web people, scheduling
7    training.  Data conversion was usually a big part of
8    it where they moved the data from one system to
9    another.

10             We would coordinate all of that, and that
11   system would be implemented, and it would be a matter
12   of making sure -- doing a lot of testing on the
13   system, making sure the data moved over correctly,
14   working with the users to see if they had any issues.
15   Sometimes it was a bug, sometimes it was just
16   training -- user training -- needed some additional
17   user training.

18             Then once the system was fully
19   implemented, we would go into support mode, where we
20   might upgrade the system.  If there's new
21   functionality, there might be additional training
22   that needed to be scheduled with the users.  That
23   kind of thing.

24             On a daily basis we would take help desk
25   calls related to the larger systems.  We also may be

1  writing reports so that they could get information
2  out of the systems.
3          So that was the majority of what we did.
4     Q    When you say "we," are you talking about
5  all of the senior business systems analysts?
6     A    Really all of the analysts did that.  The
7  people that weren't senior typically didn't manage
8  projects.  It was typically senior business analysts
9  that managed the -- were project managers.
10    Q    Was it part of your job duty to write up
11 the request for proposal that you were talking about?
12    A    Yes, m-hm.
13    Q    Did you also negotiate the contracts with
14 the vendors?
15    A    We used to do that earlier in my career,
16 but it became more that Rick was doing most of the
17 negotiations with the vendor.
18    Q    Okay.  When you're upgrading PCs --
19    A    M-hm.
20    Q    -- is that when you would talk with some
21 of the PC support folks --
22    A    M-hm.
23    Q    -- that we talked about?
24    A    M-hm.
25    Q    Is that yes?

1      A     Yes.

2      Q     What information do you have to say that
3 Mesa County failed to consider objective performance
4 criteria?

5      A     Because I did my job well, and I know -- I
6 worked with other people and I knew somewhat their
7 level of skill, and so I -- based on those facts, my
8 opinion.

9      Q     Okay. And do you have any information --
10 let me start that again.

11            What information do you have regarding
12 Mesa County's failure to consider something in
13 particular? Do you have any information like that?

14            MS. BISBEE: Objection.

15      A     No.

16      Q     (By Ms. Severn) Has anyone told you that
17 Mesa County did not consider objective performance
18 criteria?

19      A     What do you mean by anybody told me?

20      Q     Did just somebody, a Mesa County employee,
21 somebody else, did anybody ever say Mesa County
22 didn't look at objective performance criteria?

23      A     No.

24      Q     While you were working for Mesa County,
25 did anyone ever make an age-related comment to you?

1  A     Well, during the MCEA employee
2  association -- well, not when I was employed, no.
3  Q     Okay.  Why do you think that you were
4  targeted because of your age?
5  A     Again, the personnel manual says that they
6  need to look at performance, and my performance was
7  exceptional.  They need to look at your special
8  abilities.  I had -- I trained a lot of the people
9  that came into that department after me.  I had all
10 the abilities that were required for that position.
11 And it also said -- stated to look at the length of
12 service, and I had been there the longest of anybody
13 in the IT department.
14       When I -- they took us into the room, you
15 could look around, and you could see everybody in
16 that room was over 50.  In fact Janine said, well, it
17 sure looks like you're targeting older employees.
18 Q     Janine said that?
19 A     M-hm.
20 Q     Yes?
21 A     Yes.
22 Q     Did you talk to HR?
23 A     Talk to HR?  They were in the room.
24 Q     Did you talk to HR?
25 A     No.

1  evaluation in front of me.
2      Q    Okay.  Let's look at paragraph 26, and
3  this is on page 5.  Are you there?
4      A    On page what?
5      Q    Page 5.
6      A    5, yes.
7      Q    Paragraph 26.
8      A    Yes.
9      Q    And it says:  In 2016 Mesa County faced a
10 budget deficit of almost 1.7 million dollars for the
11 coming year.
12         Do you see that?
13     A    Yes.
14     Q    And then goes on to say:  In response to
15 the expected budget shortfall, the Mesa County Board
16 of County Commissioners decided to lay off employees.
17         Do you see that?
18     A    Yes.
19     Q    When did you learn about the budget
20 deficit?
21     A    Actually, Mesa County's been in a deficit
22 since John Peacock was commissioner.
23     Q    When was John Peacock commissioner?
24     A    Oh, I can't recall, but it's probably been
25 nine years.

1   Q   Do you remember how you learned about the
2   budget deficit?
3   A   It was public information.
4   Q   Was it --
5   A   So it was in the newspapers. They told us
6   that they weren't hiring new employees; if you lost
7   an employee, you couldn't fill that position.
8   Q   Did you think the budget deficit was a
9   legitimate concern for Mesa County?
10  A   Yes.
11  Q   Was there ever anything that happened at
12  Mesa County to try to relieve the burden of the
13  budget deficit? Anything that you saw in your job in
14  IT? Like "we're doing this for budgetary reasons."
15  Anything like that ever happen?
16  A   I can't think of anything other than not
17  filling a position that had opened up.
18  Q   Did you ever sit in on any meetings
19  regarding layoffs, or were there any department
20  meetings about layoffs?
21  A   I can't recall.
22  Q   Let me ask a hypothetical question here.
23  If you had been in charge of layoffs in 2016 because
24  of the budget deficit, what would you have done?
25  A   If I -- could you repeat the question,

- AMENDMENT SHEET -

Deposition of DEBRA BOURICIUS
February 22, 2019
Bouricius v. Mesa County
Civil Action No. 18-cv-01144-WYD-STV

The deponent wishes to make the following changes in the testimony as originally given:

| Page | Line | Should Read | Reason |
|---|---|---|---|
| 54 | 15 | Catherine Olguin | Spelling |
| 54 | 15 | Katharina Booth | Spelling |
| 54 | 16 | Catrina Weigel | Spelling |
| 55 | 4 | Catherine Olguin | Spelling |
| 55 | 12 | Catherine | Spelling |
| 232 | 21 | Catherine | Spelling |
| 232 | 25 | Catherine | Spelling |
| 214 | 22 | Since John Peacock was County Administrator. | "Peacock was not Commissioner" |
| 214 | 23 | When was Jon Peacock County Administrator | |

Signature of Deponent: _Debra Bouricius_

Acknowledged before me this 29th day of March 2019.

Notary's signature _Aslinn Kisor_

My commission expires 08/10/2019.

ASLINN KISOR
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID# 20114050069
MY COMMISSION EXPIRES 08/10/2019

**EXHIBIT 4**
**18-CV-01144-DDD-STV**

# THE LAW FIRM OF
# BECHTEL SANTO & SEVERN

May 28, 2019

Patricia M. Wrede, RPR
AB Court Reporting & Video
216 16th Street, Suite 600
Denver, CO 80202

Re: *Bouricius v. Mesa County*: Defendant's objection filed in response to Debra Bouricius's amendment sheet.

Dear Ms. Wrede,

On May 3, 2019, Defendant received a copy of an amendment sheet executed by Debra Bouricius, dated March 29, 2019, relating to deposition testimony Ms. Bouricius provided on February 22, 2019. But this letter, the Defendant makes a formal record of its objection to one of Ms. Bouricius's amendments.

That is, F.R.C.P. 30(e) permits witnesses to review and make changes to their testimony. Courts explain that changes can be made to a witness's own testimony. *Felix-Torres v. Graham*, 687 F.Supp.2d 38, 50 (N.D.N.Y. 2009) (discussing changes made to a deponent's "own deposition testimony"); *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 277 F.R.D. 286, 292 (E.D.Va. 2011) (discussing "alter[ations] [to] the [deponent's] original testimony…").

Here, Ms. Bouricius indicated an amendment was needed with respect to page 214, line 23, in the form of changing "commissioner" to "county administrator." Line 23 was one of counsel's questions to the witness; it was not testimony provided by the witness in response to one of counsel's questions. Counsel does not consent to, and objects to, the change identified by Ms. Bouricius to counsel's question stated on page 214, line 23 because it was not an objection relating to Ms. Bouricius's testimony.

By noting this objection for the record, Defendant in no way waives or otherwise gives up any right(s) it may have with respect to any other aspect of or issue relating to Ms. Bouricius's deposition, the testimony given therein and the exhibits attached thereto, or any other aspect or issue relating to Ms. Bouricius's amendment sheet relating to her deposition.

Thank you.

Sincerely,

Alicia W. Severn

**EXHIBIT 4**
**18-CV-01144-DDD-STV**