# EXHIBIT 5

**Frank Whidden   July 11, 2019**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

_____

VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

July 11, 2019

_____

DEBRA BOURICIUS,

     Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

     Defendant.

_____


     Pursuant to Notice and the Federal Rules

of Civil Procedure, the videotaped deposition of

FRANK WHIDDEN, called by Plaintiff, was taken on

Thursday, July 11, 2019, commencing at 9:07 a.m.,

at 205 North 4th Street, Grand Junction, Colorado,

before Candice F. Flowers, Certified Shorthand

Reporter and Notary Public within and for the State

of Colorado.

**Frank Whidden   July 11, 2019**

```
 1    responsibility.  The job description goes on and on
 2    and on, but basically it's to take care of and see
 3    to the day-to-day affairs of the County.
 4            Then as far as -- like HR is the daily
 5    affairs of HR, the things that happen, the
 6    personnel matters that arise.  If the HR manager
 7    feels that there's something that needs to rise to
 8    my level or she wants my advice or guidance on
 9    something, we discuss that.
10            In IT, I'm probably more involved because
11    that's where my expertise really lies as far as my
12    background and all of that.  So I'm more involved,
13    I would say, in IT and what's happening, the
14    systems and how they run, and what we're going to
15    do, how we're going to do it, those kinds of
16    things.
17        Q    How many departments do you oversee?
18        A    I don't -- we have -- I believe we have
19    23 agencies in the County, and I oversee public
20    works and everything associated with that, which is
21    road and bridge and all that's associated with
22    that.  I oversee -- so we've discussed all the
23    internal core functions:  HR, IT, finance,
24    facilities, parks, fairgrounds, Criminal Justice
25    Services Division.  I think animal services is
```

Frank Whidden   July 11, 2019

1   government accounting.  I think I had a knowledge

2   of it, but I was always concerned about that

3   particular issue.

4       Q     Well, other than Tom, did you express

5   your concern to anyone about being named the

6   director of finance when you didn't have any

7   financial credentials?

8       A     Like personal friends and things like

9   that, but not -- not at Mesa County.

10      Q     You didn't express it to the County

11  Commissioners?

12      A     No.

13      Q     Did you have any credentials in HR at

14  that time?

15      A     Not other than my BBA.

16      Q     Your business administration degree?

17      A     Correct.

18      Q     But I'm talking about any certifications,

19  training classes, education specifically training

20  you to be the director of HR?

21      A     No, ma'am.

22      Q     So in the Deputy Administrator's

23  position, can you give me an idea of what -- kind

24  of a day in the life of your life was like when you

25  were the Deputy Administrator?  You had, it looks

**Frank Whidden   July 11, 2019**

1    use age as a factor that makes a difference in

2    whether or not to hire or fire an employee?

3                    MR. SANTO:   Same objection.

4         A    Yes.

5         Q    (By Ms. Greisen) As the director of HR,

6    have you provided any trainings to Mesa County

7    employees on discrimination?

8         A    No.

9         Q    Whose job is that at Mesa County?

10        A    Brenda, I would say.

11        Q    And I'm sorry.  Brenda's last name?

12        A    Moore now.  She was McKay.

13        Q    And what certifications or qualifications

14   does Brenda have to train people in HR?

15        A    She has an HR designation.  I think it's

16   like PHP, but I don't know the exact designation of

17   that, but she has a designation behind her name

18   about that certification from -- I believe it was

19   provided by Society for Human Resources, I believe

20   is where she got that designation.

21        Q    Well, I don't know what the designation

22   means.  Can you explain to me how that acronym

23   behind her name makes her qualified to teach human

24   resources?

25        A    My understanding is that that's -- that's

Frank Whidden   July 11, 2019

```
1    primary financial resources for their family?

2        A    No, I really didn't.  That's not

3    something that usually comes up in the course of

4    conversation.  I don't -- even the people that I

5    know pretty well, I don't know that I know the

6    answer to that question.

7        Q    Do you know if Ms. Bouricius was?

8        A    No, I do not.

9        Q    Okay.  So you were about ready to tell me

10   how you created this initial list, and why don't

11   you list for me the factors that you used to decide

12   who to put on that list.

13       A    I went through, in my mind, the people

14   that I felt like we needed to keep, the people that

15   we absolutely could not do without, and that was

16   the list to keep, and then that, therefore, vets

17   out the ones that didn't make that list.

18       Q    So was there another list that you wrote

19   down in people that we need to keep?

20       A    Not that I write down, no.

21       Q    Okay.  Is this you sitting and thinking

22   in your head like, Okay, well, we can't lose this

23   person, we can't lose this person, and then, just

24   by process of elimination, writing the names of the

25   other people down?
```

**Frank Whidden  July 11, 2019**

1      A     Basically, yes.

2      Q     Okay.  So prior to making that list, did

3   you talk to anyone about what you were thinking?

4      A     Yes.  I had spoken to the commissioners,

5   because they had tasked me with finding the budget

6   shortfall that we were facing if we didn't make

7   changes.  I did not talk to them about any

8   individual specifics at all.  They told me you need

9   to -- this is your task.  Find us -- the number was

10  about $1.4 million overall, over the whole County.

11  And that was the shortfall at that point we were

12  looking at for the next year.

13     Q     When did you have this discussion with

14  the Board of County Commissioners about the budget

15  shortfall?

16     A     Before this decision was made, in the

17  months before, sometime before that.  It wasn't a

18  long time before that.  A couple of months, maybe.

19  It wasn't a long time.  It wasn't long before we

20  made these changes.  But I don't know -- I couldn't

21  tell you an exact date.  I don't remember.

22     Q     Was this at a board meeting?

23     A     No.

24     Q     So this is just you informally talking

25  with the commissioners?

**Frank Whidden  July 11, 2019**

1      A    Correct.

2      Q    And you had these informal chats with the

3  commissioners about a prospective budget shortfall

4  that was coming up?

5      A    Yes.

6      Q    And did you simply tell them what you

7  were going to propose to do to address that

8  shortfall?

9      A    In the sense that I felt like I would

10  have to make decreases in personnel, yes.

11      Q    Did you tell them that?

12      A    I'm sure that I told them that, yes, I

13  was -- I was thinking that I would have to make

14  cuts in order to get to that level of reduction in

15  the budget.  The only place that could come from

16  was personnel reduction.

17      Q    You would have to do a layoff?

18      A    Uh-huh.  And --

19      Q    You have to say yes or no.

20      A    I'm sorry.  Yes.

21      Q    That's okay.

22      A    More -- and there were more layoffs.  It

23  was around the County system, not just IT.  There

24  were other layoffs in elected divisions and those

25  kinds of things as well.  So I'm not saying that

**Frank Whidden   July 11, 2019**

121

```
 1                    MS. GREISEN:  Sorry.
 2        Q    (By Ms. Greisen) An end user trainer?
 3        A    Yes.
 4                    THE DEPONENT:  Did you need me to
 5   spell that?  P-A-T-S-A-N-T-A-R-A-S, I believe.
 6        Q    (By Ms. Greisen) Were you responsible for
 7   laying her off?
 8        A    Ultimately, yes.
 9        Q    Well, who made the decision to --
10        A    I --
11        Q    -- lay her off?
12        A    I told the IT managers that we had to
13   make reductions and they recommended that position
14   to be cut.
15        Q    So was that Rick and Troy --
16        A    Rick and Troy --
17                    MR. SANTO:  I was just slowing him
18   down because he was interrupting your question.
19   That's why he stopped.
20        A    Rick and Troy and Lhana.
21        Q    (By Ms. Greisen) Okay.  So back to the
22   list.  You thought in your mind who you need to
23   keep.  By process of elimination, you got rid of
24   the people that you didn't think were essential.
25   Is that -- is that fair?
```

**Frank Whidden  July 11, 2019**

1      A     Yes.

2      Q     Okay.  And when did you decide to reduce

3   this to writing?

4      A     When I needed to find out the severance

5   payouts.  Could I afford it.

6      Q     So did you write it down and send it in

7   an e-mail or something, or what did you do?

8      A     I can't remember if I created the

9   spreadsheet or I had Jean Davis create the

10  spreadsheet.  I was being very careful not to put

11  anything in e-mail, so I know I didn't -- I know I

12  didn't put it in e-mail.

13     Q     Why were you being careful not to put it

14  in e-mails?

15     A     Because Janine Corsi -- security.  Janine

16  Corsi had access to the e-mail files, and I could

17  not take the risk of alerting the IT staff of the

18  cuts that were coming.

19     Q     And who's Jean Davis?

20     A     She is -- she takes care of special

21  projects and things like that for me.  She takes

22  care of the books for the different groups.

23     Q     What did you ask her to do?

24     A     I asked her to find out for me what their

25  pay was, what their -- and what we would be looking

**Frank Whidden   July 11, 2019**

1   also paid their health insurance for that 30 days.

2   I don't remember that for a solid gold fact, but I

3   think we did.

4        Q    So when you created this list of people

5   to terminate, did you talk with anybody about it

6   before you finalized your decision?

7        A    I did speak -- yes.  Before I finalized

8   the decision, yes.  I met with Troy and Lhana and

9   asked them to look over the list of people that I

10  was proposing to cut and tell me if they disagreed

11  or if they thought there was a problem with the

12  people that were on the list, that I had made a

13  mistake and that they thought there was somebody

14  that we just couldn't live without.

15       Q    And you actually gave them a hard copy of

16  the list?

17       A    I don't -- no.  I kept -- whatever we

18  reviewed there, that list, was -- was just that.

19  No, I didn't send it around.

20       Q    Well, did they -- I mean, did you just

21  verbally tell them who was on the list or --

22       A    I show -- no.  I shared -- they were -- I

23  mean, I showed them -- I don't remember if I had

24  the piece of paper in my hand or not.  I shared the

25  names with them, and I don't remember if I had that

**Frank Whidden   July 11, 2019**

129

 1   discussions -- public discussions after the layoffs

 2   about the layoffs?

 3       A    As far as the whole County, yes.

 4       Q    Well, I imagine at that point it was

 5   public knowledge, right?

 6       A    Yes.

 7       Q    And did the board discuss it at public

 8   meetings?

 9       A    Yes.

10       Q    And what was discussed?

11       A    The major topic of conversation was

12   closing the two DMV offices in Clifton and Fruita.

13       Q    Well, let me be more specific.

14            What was discussed about the layoffs that

15   you decided on?

16       A    I don't recall those being specifically

17   discussed as a separate matter.

18       Q    So the board never took a vote as to who

19   should be laid off?

20       A    No.   That was left to my discretion.

21       Q    And did you actually tell the Board of

22   County Commissioners who you intended to lay off?

23       A    I don't recall that I gave them any kind

24   of a list or enumerated names.

25       Q    Did anyone else, to your knowledge?

**Frank Whidden   July 11, 2019**

1      A    No, not that I know of.

2      Q    Were there any executive sessions about

3   it?

4      A    No.

5      Q    Did you tell them before it was going to

6   happen?  Did you tell the Board of County

7   Commissioners that you were going to do the layoffs

8   before you did the layoff?

9      A    Yes.

10     Q    When did you do that?

11     A    In discussions prior to taking the

12  action, but I couldn't say like, Okay, I know that

13  on this day, I talked to Scott, on this day I

14  talked to Rose.  I just had -- I know that I told

15  them that in order to meet the target, I had to

16  reduce staff.

17     Q    What other options did you look at other

18  than reducing staff?

19     A    We -- we looked at everything we could,

20  and we had been doing that for years to see what

21  could we cut in programs, services, those kinds of

22  things, without having complaints out of the

23  departments that we were -- you know, we were

24  hampering their procedures or their business.

25     Q    Well, I'm just talking about in

**Frank Whidden   July 11, 2019**

139

```
 1        Q     Did she give you any more information
 2   than that?
 3        A     Did she name somebody?  I don't recall.
 4   This has been too many years ago.  I don't remember
 5   a specific name saying, Well, she dealt with
 6   so-and-so personally and this was the problem that
 7   was there, no.
 8        Q     Where was this meeting?
 9        A     I don't remember where we had that
10   conver -- wait.  Are you talking about when I met
11   with Troy and Lhana?
12        Q     Yeah.
13        A     Oh, I'm sorry.  In my office.
14        Q     Did you call a meeting?
15        A     Yes.
16        Q     And did you, at that meeting, give them
17   the list of names that you were going to lay off?
18        A     Yes, I shared the list with them, the
19   names.
20        Q     How long was that meeting?
21        A     I don't remember.  It wasn't a hugely
22   long time.  I don't -- less than an hour.
23        Q     Did you tell them why you decided on the
24   people you chose?
25        A     No.  What I asked them was was to --
```

**Frank Whidden   July 11, 2019**

1   here's the names.  Tell me if you think that I have

2   got anybody on here who you think should not be on

3   here or -- along the lines of is there anyone here

4   that you think we can't live without that's going

5   to leave a hole in the boat that we can't deal

6   with.

7        Q    And one of the names that was on your

8   list was Rick Corsi, right?

9        A    Correct.

10       Q    But you were having his peer, Troy Flick,

11  review the list to say basically whether Rick Corsi

12  should go or not, right?

13       A    Yes.  His name on was there, and, yes, in

14  a sense, that was the case, but I really had more

15  reference to everybody else that was on there.  We

16  could not afford, in my book, that extra management

17  position, and that needed to be removed from the

18  org chart.  I didn't think we needed it and I

19  didn't think we could afford it.

20       Q    Well, I appreciate that.  But when you've

21  got two IT managers and you need to eliminate one

22  of the positions, so you go to the other one and

23  say, Yeah, should we get rid of the other guy?

24  Does it surprise you that he said yeah?

25       A    If you knew Troy, you would know that if

**Frank Whidden   July 11, 2019**

```
 1    it.
 2              You have been designated as an expert in
 3    this case; is that right?
 4         A    Yes.
 5              (Exhibit 51 was marked.)
 6         Q    (By Ms. Greisen) I'm putting in front of
 7    you Exhibit 51, and if you turn to the second page,
 8    you see that you have been listed as an expert to
 9    testify in this case, right?
10         A    Yes, ma'am.
11         Q    Okay.  And you've looked through this
12    designation and it looks appropriate to you?
13         A    Yes.
14         Q    So I'll let you finish it if you want to
15    continue reading.
16         A    No, it's okay.  I recognize it.
17         Q    Okay.  So I would like you to start with
18    telling me each expert opinion that you intend to
19    give at trial in this matter.
20         A    I don't know what expert opinions I'll be
21    expected to give.
22         Q    You have no idea?
23         A    No, I don't.
24         Q    Well, why -- do you know why you've been
25    designated as an expert?
```

**Frank Whidden   July 11, 2019**

 1        A     I would assume because of my background

 2     and credentials and experience.

 3        Q     But an expert in what?

 4        A     IT.

 5        Q     What does that have to do with the facts

 6     of this case, to your knowledge?

 7        A     I believe we're dealing with an IT

 8     workforce and who should be kept and who should be

 9     terminated.

10        Q     So are you planning on giving an expert

11     opinion that the decision to terminate the people

12     in October of 2016 was not illegal?

13                  MR. SANTO:  Object to -- objection

14     to the extent it calls for disclosure of

15     attorney-client privilege between Mr. Whidden and

16     the organization's attorneys.  So you can't say

17     when I talked to the attorneys.

18                  MS. GREISEN:  Well, I'm going to

19     object to that.  Mr. Whidden has been designated as

20     an expert.  I have a right to know all the facts

21     and circumstances and all the opinions --

22                  MR. SANTO:  You do.

23                  MS. GREISEN:  -- that he's going to

24     give at trial.

25                  MR. SANTO:  But not --

**Frank Whidden   July 11, 2019**

 1      Q    Do you have any expert opinions in this

 2   case?

 3      A    I do as far as IT and IT team makeup,

 4   yes.

 5      Q    What -- tell me what your expert opinions

 6   are.

 7      A    I believe that I'm an expert as far as

 8   what it takes to run an IT department, the skills

 9   that are necessary to run that IT department, and

10   what the likelihood of success is in an IT

11   department, so issues surrounding IT and how IT

12   should be run, I believe that's my area of

13   expertise.

14      Q    And how does that relate to this case?

15      A    I'm not a lawyer and I don't know.

16      Q    Well, is there any other expert opinion

17   that you're going to give in this case or that you

18   anticipate giving?

19      A    Not that I'm aware of.

20      Q    Okay.  So what, in your expert opinion,

21   is the IT experience that relates to this case?

22      A    The people who should remain and the

23   people who should go.

24      Q    So you anticipate that you have -- you

25   have an expert opinion as to who should be chosen

**Frank Whidden  July 11, 2019**

1   to be terminated as opposed to who should have

2   stayed in October of 2016?

3        A    I don't understand that question.

4        Q    Okay.  Sure.  I'll rephrase it.

5             You have -- well, strike that.

6             In your opinion, you're an expert on who

7   should have been chosen for layoffs in the 2016

8   October layoffs; is that correct?

9        A    Yes.  Sorry.  I thought you were done.

10  Yes.

11       Q    So is that opinion that you correctly

12  chose the people who should have been laid off in

13  October of 2016?

14       A    Yes.

15       Q    Okay.  So let's start with that.  Tell me

16  all the evidence that you have to base the expert

17  opinion on that you were correct in terminating the

18  people involved in the October 2016 layoff.

19       A    My knowledge of the staff and their

20  performance up to that point in time, the fact that

21  since then, as I said earlier, we haven't had any

22  major systems issues that couldn't be handled by

23  the people we had remaining, even though we faced

24  the same workload that we did before.

25       Q    Well, you're not relying on information

**Frank Whidden  July 11, 2019**

1    that you have now.

2         I want to know as of the time the

3    decision was made in October of 2016, was there any

4    other information, other than your general

5    knowledge, about staff as to who to lay off?

6    A    I think the answer to that is no.  I'm

7    sorry.  I got lost thinking about the earlier

8    question.  You might want to ask that again so I

9    can answer, please.

10   Q    Okay.  Ask --

11   A    Oh, sorry.

12   Q    I'm happy to -- I'm not quite sure which

13   one you mean.

14        I was asking about what evidence you base

15   your decision on in your expert opinion in

16   September, October of 2016.  Can you point to any

17   evidence other than your -- your own knowledge?

18   A    It was all my knowledge of what they did

19   and the experience and the interaction that I have

20   had with the IT staff.

21   Q    And did you look at any documents to

22   arrive at that expert opinion?

23   A    No.

24   Q    Who did you talk to in forming that

25   opinion?

**Frank Whidden   July 11, 2019**

```
 1        A    I made it on my own.  I did not talk to
 2   anybody else about any assessments or anything like
 3   that.
 4        Q    Did you discuss the facts that form the
 5   basis of that opinion with any of your attorneys?
 6             MR. SANTO:  You can answer yes or no
 7   to that one.
 8        A    Yes.
 9        Q    (By Ms. Greisen) And does that include
10   Ms. Atencio and lawyers at Mr. Santo's firm?
11        A    Yes.
12        Q    Okay.  What facts did you provide to the
13   attorneys that formed the basis of that opinion?
14             MR. SANTO:  Still objecting on the
15   basis of attorney-client privilege.
16             MS. GREISEN:  Would you mark that
17   because we'll have to come back and call the Court
18   on these questions, and we probably should -- as
19   soon as we take our next break, we'll go ahead and
20   call the Court because I'm going to have a series
21   of these questions that we'll have to get answered.
22        Q    (By Ms. Greisen) Are there any -- so if
23   I'm understanding your testimony, there were facts
24   that you gave to the attorneys -- to your attorneys
25   that form the basis of your expert opinion in this
```

**Frank Whidden   July 11, 2019**

```
 1    case, right?
 2         A    The fact that we were facing was the
 3    budgetary issue, and that's what we talked about.
 4         Q    I'm simply saying:  Are there facts that
 5    you gave your attorney that form the basis of your
 6    expert opinion in this case?
 7         A    Yes, I suppose.
 8         Q    And are you going to tell me what those
 9    facts are?
10              MR. SANTO:  I thought we were going
11    to take this up later.
12              MS. GREISEN:  I'm -- I'm preserving
13    my record.
14              MR. SANTO:  Oh, okay.  I'm sorry.
15              MS. GREISEN:  I'm going to mark all
16    the questions.
17              MR. SANTO:  Would you repeat that
18    question again?  I'm sorry.
19              MS. GREISEN:  Sure.  Candice, could
20    you go ahead and read it back.
21              MR. SANTO:  Thank you.
22           (The Record at Page 151, Line 4 through
23            Page 151, Line 9 was read.)
24              MR. SANTO:  Okay.  You can testify
25    to that.
```

**Frank Whidden   July 11, 2019**

1      A    I did not discuss any parameters, if

2    that's the question, of how I arrived at my

3    decision that I can recall.

4      Q    (By Ms. Greisen) No.  I'm asking you:

5    What facts did you give your counsel, Mesa County

6    attorneys or anybody in Mr. Santo's firm, what

7    facts did you give to them that form the basis of

8    your expert opinion?

9      A    As far as I --

10      Q    In other words, did you tell them that

11    this was budget-related?

12      A    Yes.

13      Q    Okay.  And did you give them any facts to

14    back that up?

15      A    None other than we had the target of 1.4

16    million to meet, and this is an action that we

17    needed to take, I felt like.

18      Q    Did you give your attorneys any other

19    facts about why you decided to terminate the

20    specific people that you did?

21      A    No.

22      Q    Did you give your attorneys any documents

23    regarding the facts that form the basis of your

24    expert opinion?

25      A    No.

**Frank Whidden   July 11, 2019**

```
 1        Q     Did you --
 2              MS. GREISEN:  Is this interfering
 3   with you?  Okay.
 4        Q     (By Ms. Greisen) Did you talk with anyone
 5   other than the attorneys about the facts that
 6   formed the basis of your opinion?
 7        A     No, other than -- unless you count the
 8   meeting where Troy -- I discussed with Troy and
 9   Lhana the people that I was going to release, but I
10   didn't talk about -- we didn't get into, well, why
11   did you pick this one or why did you pick that one.
12   We did not -- that wasn't part of the discussion.
13        Q     So in this preliminary meeting with Troy
14   Flick and Lhana Jordan, the three of you did not
15   discuss the ins and -- the details of who was being
16   picked, right?
17        A     That is correct.
18        Q     Okay.  And is it your testimony that you
19   didn't discuss that with anybody?
20        A     That is correct.
21        Q     Okay.  And did you document the basis for
22   that opinion in any manner?  Did you document your
23   decision to terminate those specific employees?
24        A     No.
25        Q     To your knowledge, did anybody else
```

**Frank Whidden   July 11, 2019**

154

```
 1   document that?
 2       A    No.  I don't know how anyone else would
 3   have known.  I didn't discuss it with them.
 4       Q    So did you provide your attorneys with
 5   information on performance-related issues regarding
 6   Ms. Bouricius?
 7       A    No.
 8       Q    And that's because your decision wasn't
 9   based on performance; is that correct?
10       A    Correct.
11       Q    The decision was strictly based on skill
12   set; is that right?
13       A    I might correct.  It was based on -- the
14   whole thing was a budgetary discussion.
15       Q    Uh-huh.  Well, you've said that you
16   didn't pick people based on performance.  You
17   didn't pick people based on seniority.  So was
18   there the reason that you did pick people on?  I'm
19   trying to get to -- I know what you didn't pick
20   them on.
21            But what was the basis for you to go
22   through and choose?
23       A    As I --
24               MR. SANTO:  Object to form.  Go
25   ahead.
```

Frank Whidden  July 11, 2019

1    A    As I said earlier today, I looked at the

2  skill set that I thought we needed to have

3  remaining and who could provide the best skill sets

4  for what we needed to do in the future going

5  forward, and the people who were not on that list,

6  as far as who did I need to keep, were the people

7  who would go.

8    Q    (By Ms. Greisen) So what skill sets

9  were -- did you decide were needed for the future?

10    A    To provide support for all the systems,

11  hardware and software, that we support at Mesa

12  County.

13    Q    Anything more specific than that?  I

14  mean, that's kind of the whole purpose of the IT

15  department in general.

16    A    Correct.

17    Q    So I'm saying you're saying looking

18  forward, you wanted to pick the people who were

19  most qualified to provide these skill sets.

20         Can you give me any other basis for what

21  you were looking at, other than providing IT

22  support?

23    A    I think it -- it needs to be

24  all-inclusive because that's -- like as you just

25  said, that's what we do and that's what I was

**Frank Whidden   July 11, 2019**

156

```
 1   looking at.
 2       Q    Can you give me any more details other
 3   than that?
 4       A    No, ma'am.
 5       Q    Did you -- in determining what people's
 6   skill sets were, did you look at job descriptions?
 7       A    No.
 8       Q    Did you look at the employees'
 9   performance reviews?
10       A    No.
11       Q    You were asked by the Colorado Civil
12   Rights Division to interview with their
13   investigator, right?
14       A    Yes.
15       Q    And you declined to be interviewed,
16   right?
17               MR. SANTO:  Are we still on the
18   expert designation part of it or have we moved out?
19               MS. GREISEN:  Well, I may come in
20   and out, depending on my question.  I'm just asking
21   him whether or not he declined an interview.
22               MR. SANTO:  I need to understand the
23   question because if it's not as part of the expert,
24   then that would make it attorney-client privilege.
25               MS. GREISEN:  I don't think whether
```

**Frank Whidden   July 11, 2019**

```
 1                    MS. GREISEN:  Okay.
 2       Q     (By Ms. Greisen) Go ahead, Mr. Whidden.
 3                    MR. SANTO:  So he's no longer
 4   testifying as an expert.
 5       Q     (By Ms. Greisen) Go ahead, Mr. Whidden.
 6       A     I discussed that matter with counsel.
 7       Q     Okay.  Did you look to see whether or not
 8   the Mesa County policies and procedures were
 9   followed?
10       A     I asked counsel if we were following the
11   policies correctly.
12       Q     Okay.  So let me go back.
13             At the time that the layoffs occurred,
14   did you look to see whether or not the policies and
15   procedures were followed?
16       A     No.  I asked counsel and HR to vet what
17   was being done to make sure that we were complying
18   with all the policies and procedures and that sort
19   of thing.
20       Q     When did you do that?
21       A     Prior to the layoff.  I don't remember
22   exactly the date, but it was within that time frame
23   when we were looking to do it to make sure that we
24   were complying.
25       Q     So is that the same counsel that's
```

**Frank Whidden   July 11, 2019**

1   because I wanted to make sure that hopefully we

2   wouldn't get to where we're sitting today.

3        Q    Did you give Patrick the name of the

4   people that you were wanting to terminate?

5        A    I don't remember specifically telling him

6   who was on the list.  I knew his office had access

7   to that information.  We were discussing more in

8   terms of, you know, am I -- is there -- are we

9   worried about categories that we can't discriminate

10  against, those kinds -- those HR questions.  Are we

11  going to trip any bright wires about this problem?

12       Q    So let me understand.  You talked with

13  Patrick specifically about whether or not there

14  could be any claim for discrimination based on the

15  group of laid-off people?

16       A    Yes.

17       Q    Is that right?

18       A    Yes.

19       Q    And -- but you didn't give him the names

20  of who the people were?

21       A    I don't remember sitting in the meeting

22  and saying name by name by name who they were.

23       Q    Well, how would -- tell me, then, how you

24  gave him enough information to form an opinion.

25       A    He told me as long as it was a strictly

**Frank Whidden   July 11, 2019**

```
 1   budgetary decision and we were removing the

 2   positions, then we were good to go.  That's what he

 3   told me.

 4        Q    So you never sat down and reviewed the

 5   list of people you wanted to terminate with him.

 6        A    I do not recall going with him over name

 7   by name.

 8        Q    Okay.

 9        A    I don't recall that.

10        Q    And did you give that information to Ms.

11   Atencio?

12        A    I did not personally.

13        Q    To your knowledge, did anyone else?

14        A    I believe Krista did.

15        Q    And she gave you the -- Krista gave her

16   the information about the list of people that you

17   were proposing?

18        A    Yes.  I believe she shared the

19   spreadsheet that I have discussed.  I believe she

20   did with Nina.

21        Q    And that was prior to the implementation

22   of the decision?

23        A    Correct.

24        Q    Okay.  And did you have any conversations

25   with Nina in forming your expert opinion as to
```

**Frank Whidden   July 11, 2019**

1          MS. GREISEN:  I said any discussions
2    he had --
3          MR. SANTO:  Okay.
4          MS. GREISEN:  -- in forming his
5    expert opinion.
6          MR. SANTO:  I'm going to object to
7    that because it's outside the scope of the expert
8    designation and instruct the witness not to answer
9    that question.  That exceeds the scope of the
10   expert designation.
11      Q    (By Ms. Greisen) So I'm not sure what the
12   scope of the expert designation is because I don't
13   think you are either, are you?
14          MR. SANTO:  I will gladly read it
15   again.
16          MS. GREISEN:  I'm asking Mr.
17   Whidden.
18      Q    (By Ms. Greisen) Do you know what the
19   scope of your expert designation is?
20          MR. SANTO:  Off the top of his head?
21          MS. GREISEN:  Yeah.
22      A    As I said before, I believe that what
23   I'm -- what I'm called to talk about as an expert
24   is IT, the functions of IT --
25      Q    Uh-huh.

**Frank Whidden  July 11, 2019**

1      A    -- and -- and the skill sets that are

2  necessary in order to carry out that function.

3  That's what I understand that I'm qualified to act

4  as an expert about.

5      Q    (By Ms. Greisen) Are you going to be

6  giving an opinion on the fact that in your expert

7  opinion, there was a proper selection of people

8  that were terminated in October 2016?

9              MR. SANTO:  Object to form.

10     Q    (By Ms. Greisen) Is that what you intend

11 to give an opinion about?

12     A    I don't know, as I've said before --

13     Q    Well --

14     A    -- what I'm going to be asked --

15     Q    I understand.

16     A    -- as far as being an expert --

17     Q    But I have a right to ask you what your

18 expert opinion is.

19          So regardless of what your lawyer says,

20 I'm saying:  Do you have an expert opinion on that?

21             MR. SANTO:  Object to form.

22     A    I have an opinion about who needed to

23 remain at Mesa County in order to carry out the

24 functions of the IT department.

25     Q    (By Ms. Greisen) Well, I understand that

**Frank Whidden   July 11, 2019**

1  because you made that decision, right?  So you

2  obviously have an opinion about it, right?

3       A    Sure.

4       Q    What I want to know is:  Do you have an

5  expert opinion about it?

6       A    I believe I have an expert opinion about

7  it.

8       Q    And what is that expert opinion?

9       A    That the people that I selected to remain

10  were the skill sets and the mix that was necessary

11  in order to carry out the IT functions of Mesa

12  County.

13       Q    Okay.  So is it fair to say that part of

14  your expert opinion is that nobody was

15  discriminated based on age in the 2016 layoffs?

16                 MR. SANTO:  Object to form.

17       A    I do believe that.  Now, I don't know if

18  you are trying to make a distinction between am I

19  an expert on discrimination law or not, but I do

20  believe that based on relying on counsel, that what

21  we were doing was in compliance with the law.

22       Q    (By Ms. Greisen) Uh-huh.  And I

23  understand that you have talked with Patrick

24  Coleman.  I'm just trying to understand what you're

25  going to be testifying at trial about.

**Frank Whidden  July 11, 2019**

1    And what I understand is that you're

2    going to testify that your decision to lay off the

3    people you did, in your expert opinion, was the

4    right decision.

5    A    I would assume that, yes.

6    Q    Yeah.

7    A    I would think so.

8    Q    Right.

9    Since the layoffs, have you learned any

10   other facts or circumstances that have helped

11   inform your expert opinion?

12   A    I would say the successful operation of

13   the department is -- testifies to having made the

14   right decision.

15   Q    Well, that's kind of using a crystal

16   ball, right?  You don't know whether or not those

17   people or not resulted in that -- in the outcome

18   that it is right now.

19   I'm saying:  Since the layoff -- you know

20   what?  We can -- we can pull back on the camera.

21   A    Am I doing something?

22   Q    No.

23   Since the layoff, have you -- have you

24   received any evidence that your decision did

25   violate the law?

**Frank Whidden  July 11, 2019**

176

```
 1                   MR. SANTO:  Object to form.
 2        A    Sure, it would be important to know, and
 3    that's why I vetted this by counsel to find out if
 4    we were in compliance.
 5        Q    (By Ms. Greisen) And after the fact in
 6    forming the expert opinion you intend to give at
 7    trial, have you looked to see whether or not the
 8    policies and procedures were followed?
 9        A    I'm still --
10                   MR. SANTO:  Object to form.
11        A    I'm still relying on counsel to be the
12    expert as far as compliance is concerned with legal
13    questions.
14        Q    (By Ms. Greisen) Well, I understand that
15    you're relying on counsel.  I have the right to
16    find out the facts and basis that form your expert
17    opinion.
18                   So what I need to know is:  Have you
19    received any information to show that Mesa County's
20    policies and procedures weren't followed?
21                   MR. SANTO:  Object to form.
22        A    No.
23        Q    (By Ms. Greisen) Have you yourself
24    reviewed any of the allegations into Ms. Bouricius'
25    allegations of discrimination?
```

**Frank Whidden   July 11, 2019**

```
 1        A     I read at least something that said the

 2   allegation was because of age.

 3        Q     Did you read anything else?

 4        A     That's the most that I remember reading.

 5        Q     Did you read the charge of discrimination

 6   she filed?

 7        A     Discrimination based on what?

 8        Q     Age.

 9        A     Yes.

10        Q     Okay.  What was your understanding of her

11   complaint?

12        A     That she felt she was discriminated

13   because she was over 40 and the decision was made

14   based on age.

15        Q     Do you remember anything else about her

16   complaint?

17        A     That's what I remember.

18        Q     To your knowledge, did Mesa County

19   conduct any investigation into her allegations of

20   discrimination in this case?

21        A     I'm not aware of what was done after

22   that, after the charge was made.

23        Q     Well, at any time are you aware of an

24   internal investigation conducted by Mesa County

25   regarding a complaint of age discrimination by Ms.
```

**Frank Whidden  July 11, 2019**

1    Bouricius?

2         A    No.

3         Q    And did you ask anyone at Mesa County --

4                   MR. SANTO:  Object to the extent --

5         Q    (By Ms. Greisen) -- to investigate the

6    complaint of discrimination regarding Ms.

7    Bouricius?

8                   MR. SANTO:  Object to the extent

9    that this goes to attorney-client privilege.  This

10   issue has been ruled on by the Court with respect

11   to this investigation.

12        Q    (By Ms. Greisen) Did you ask anyone to do

13   an investigation?

14                   MR. SANTO:  You can say yes or no.

15        A    You're going to have to ask me again.

16        Q    (By Ms. Greisen) Sure.  You've heard --

17   as a manager, you've heard of companies

18   investigating complaints before --

19        A    Yes.

20        Q    -- right?

21             So when you became aware of Ms.

22   Bouricius' charge of discrimination, did you ask

23   anyone at the County to investigate it?

24        A    I did not.

25        Q    Did you review the investigation into the

**Frank Whidden   July 11, 2019**

```
 1    allegations of discrimination conducted by the
 2    CCRD?
 3                   MR. SANTO:  I'm sorry.  Can you -- I
 4    apologize.  Can you repeat that question?
 5                   MS. GREISEN:  Sure.  I asked him if
 6    he's aware of the investigation that the CCRD made
 7    into Ms. Bouricius' complaint --
 8                   MR. SANTO:  Thank you.
 9                   MS. GREISEN:  -- of discrimination.
10         A    I -- I read some things that came from
11    the CCRD case.  I don't remember specifically which
12    parts of that I saw.
13         Q    (By Ms. Greisen) Did any of the
14    investigation conducted by the Colorado Civil
15    Rights Division inform your expert opinion in this
16    matter?
17                   MR. SANTO:  Object to form.
18         A    No.
19         Q    (By Ms. Greisen) Why didn't you ask
20    anyone to investigate Ms. Bouricius' claims of
21    discrimination as director of HR?
22         A    Because I felt like that was in the realm
23    of the County Attorney's office, to take care of
24    anything coming out of that investigation if
25    they -- out of the CCRD case.  And if they needed
```

**Frank Whidden   July 11, 2019**

1        MR. SANTO:  I believe he answered

2   that one as well, did he not?

3        A    I said I read certain thing -- I read

4   some stuff that came from the CCRD.  I don't

5   remember exactly what that contained.

6        Q    (By Ms. Greisen) Well, in forming an

7   expert opinion in this case, did you try to gather

8   as much information as you could to form the basis

9   of your opinion?

10       A    Yes.

11       Q    So what information did you gather to

12   form the basis of your expert opinion?

13       A    I relied on my knowledge and experience

14   of the skills and the mix that was there of the

15   people who were involved.

16       Q    Were you aware that the State of Colorado

17   determined that there was probable cause to believe

18   that Ms. Bouricius' termination was illegal

19   discrimination based on age?

20            MR. SANTO:  Object to form.

21       A    I knew that -- yes, that they said that

22   she could move forward with an allegation.

23       Q    (By Ms. Greisen) Well, I'm not asking you

24   if you knew that they said she could move forward.

25            I'm asking:  Are you aware that the State

**Frank Whidden   July 11, 2019**

1   of Colorado determined there was probable cause to

2   believe Ms. Bouricius was discriminated against

3   based on her age?

4        A    No.

5                  MR. SANTO:   Same objection.

6        A    I did not realize that that was the

7   State.

8        Q    (By Ms. Greisen) Is it your testimony

9   you've never read the determination?

10       A    I said I don't remember it saying that.

11       Q    Is it fair to say that if the State of

12   Colorado had made such a determination, that's

13   something that would stand out to you?

14       A    Yes.  I would think that, but there's

15   been an awful lot of material surrounding this

16   case.

17       Q    Well, I agree that there has, but the

18   question really was:  Do you think that would

19   impress you in any way to have a finding by the

20   State of Colorado that there was probable cause to

21   believe Ms. Bouricius was discriminated against?

22       A    I think if you look at the statistics of

23   the CCRD, that it's not surprising to say that

24   they're going to have a finding of some kind when a

25   case like this is brought.

**Frank Whidden   July 11, 2019**

```
 1   decision.

 2       Q    I'm -- I'm simply asking you the

 3   question.

 4            As an expert giving your opinion, are you

 5   allowed to look at all of the circumstances, both

 6   before and after the event in question?

 7                 MR. SANTO:  Object to form.

 8       A    I guess so, yes.

 9       Q    (By Ms. Greisen) Okay.  So did the CCRD

10   determination -- did you -- as an expert forming

11   your opinion, did you discuss the determinations

12   with anyone?

13                 MR. SANTO:  Object to the extent

14   it's outside the scope of the disclosure.

15       A    I think no.

16                 MS. GREISEN:  Do you have another

17   Diet Coke, Nina or Mike?  I need to -- I'm a little

18   dehydrated.  I need to get something.

19                 MR. SANTO:  Sure.  Do you want to

20   take a break?  A break be good?

21                 MS. GREISEN:  We can do that.

22                 MR. SANTO:  I think the person

23   shaking her hands would like the break.

24                 MS. GREISEN:  Oh, sorry.

25                 THE VIDEOGRAPHER:  The time's 1:54.
```

Frank Whidden  July 11, 2019

1    Q    Do you know where this document came
2  from?
3    A    No.
4    Q    Have you seen it before?
5    A    Not that I recall, no.
6    Q    What about the -- the second and third
7  pages on this exhibit, have you seen those before?
8    A    Not that I can recall in this format,
9  because it lists temps and that's not something
10  that I recall looking at.  So I -- this looks
11  like -- to me, like some kind of listing from HR of
12  some kind.  And I have certainly seen HR lists, but
13  I don't recall seeing this partic -- this one in
14  particular.  And I don't recall having seen one
15  that listed the years of seniority this way.
16    Q    So the one that you testified about
17  earlier actually has a total at the bottom of what
18  the severance payout would be not just for each
19  person but the aggregate total.
20    A    Correct.  Because that's what we were
21  trying to find out, was could I afford it?  Was it
22  within my appropriation?
23    Q    What was your appropriation?  Do you
24  remember?
25    A    No.  It's -- and we're talking now about

**Frank Whidden  July 11, 2019**

196

1    he's aware of other charges.

2              MR. SANTO:  And then he said the

3    documents were.  I was saying the source of his

4    information --

5              MS. GREISEN:  I didn't ask him the

6    source.  I asked him whether he was aware.

7              MR. SANTO:  But if his knowledge

8    comes from attorney-client privilege, that's my

9    concern.

10             MS. GREISEN:  Well...

11             MR. SANTO:  If you could ask him

12   where his knowledge comes from --

13             MS. GREISEN:  No.  I just asked the

14   question.  I'll rephrase it.

15        Q    (By Ms. Greisen) In your expert opinion,

16   do you believe that all of the terminations that

17   you decided to do in October of 2016 were done

18   appropriately and legally?

19        A    Yes.

20             MR. SANTO:  Object to -- hold up.

21   Object to the extent it exceeds the scope of the

22   expert designation.

23        Q    (By Ms. Greisen) And in looking and

24   forming that expert opinion, are you aware of

25   complaints about other people of age discrimination

**Frank Whidden   July 11, 2019**

```
 1              MS. GREISEN:  I appreciate it.  I
 2   don't need it.  I'm asking the question.
 3          Can you repeat --
 4              MR. SANTO:  I'm trying to make a
 5   clear record.
 6              MS. GREISEN:  Would you repeat the
 7   question, please, Candice.
 8          (Question at Page 196, Line 23 was read.)
 9              MR. SANTO:  And I objected to the
10   extent it's outside the expert disclosure.
11      Q    (By Ms. Greisen) Go ahead, Mr. Whidden.
12      A    I believe as far as the decision that was
13   made from an IT perspective, yes, I believe that it
14   was a correct decision.  As far as the legal
15   compliance, I relied on counsel to vet that and
16   tell me that they believed as well that that was a
17   sound legal decision.  I'm not a legal expert and I
18   don't know.
19      Q    Well, I'm asking for your expert opinion.
20   So it's your ex --
21      A    My expert --
22      Q    Go ahead.
23              MR. SANTO:  Same objection.
24      Q    (By Ms. Greisen) Go ahead.
25      A    My expert opinion from the -- from the
```

**Frank Whidden   July 11, 2019**

1   don't -- it's not attorney-client privilege, so I'm

2   not instructing the witness not to answer, but it's

3   outside the scope of his designation.

4        Q    (By Ms. Greisen) Okay.  Go ahead,

5   Mr. Whidden.  Can you answer my question?

6        A    I do not have an expert opinion as an

7   expert about legal compliance.

8        Q    As the County Administrator, do you have

9   an opinion about whether Rick and Janine Corsi's --

10  whether Rick or Janine Corsi were discriminated

11  against on the basis of age from Mesa County?

12       A    Do I have an opinion about that?

13       Q    Yeah.

14       A    I believe they were not.

15       Q    Okay.  And can you tell me all the

16  evidence that you have to support your opinion.

17       A    Certainly.  Age had no basis in my

18  decision whatsoever.  I made my decision based on

19  the budget and the decision that needed to be made

20  about reduction in cost.

21       Q    Did you see -- well, strike that.

22            As an expert, are you aware of any

23  investigations made by Mesa County into any

24  complaints of discrimination concerning the 2016

25  layoff?

**Frank Whidden   July 11, 2019**

```
 1                  MR. SANTO:  Object as outside the
 2   expert designation.
 3        A    I'm not aware of any investigations that
 4   were made based on any allegations from them.
 5        Q    (By Ms. Greisen) As an expert, have
 6   you -- or did you request that any such
 7   investigations be conducted?
 8                  MR. SANTO:  Same objection.
 9        A    No, because as far as my expert opinion
10   is concerned, that's outside what I would be
11   opining about.
12        Q    (By Ms. Greisen) Did you -- as an expert,
13   did you review any investigations conducted by Mesa
14   County into allegations of discrimination?
15                  MR. SANTO:  Same objection.
16        A    No.
17        Q    (By Ms. Greisen) Fair to say -- well,
18   have you reviewed any of the documents brought
19   by -- regarding complaints of discrimination
20   brought by Rick and Janine Corsi?
21        A    I'm -- I don't remember if I saw any
22   particular documents.  Nina spoke to me about what
23   was going on, but I don't remember if I saw
24   specific documents about Rick and Janine from the
25   CCRD, or anything else for that matter.
```

**Frank Whidden  July 11, 2019**

1      Q    Are you aware that the CCRD also found

2   that there was probable cause to believe that Rick

3   and Janine Corsi were discriminated against on the

4   basis of their age when they were terminated in

5   2016?

6      A    No.  The County Attorney's office handled

7   the settlement with -- with them.  I was not party

8   to that discussion.

9      Q    I'm just asking if you're aware that the

10  State of Colorado found that there was probable

11  cause to believe age discrimination --

12     A    I don't remember what -- which

13  allegations the CCRD found with -- with them.  I

14  don't remember.

15     Q    Do you remember if they found any

16  allegations in support of -- or determinations in

17  support of Rick and Janine?

18     A    No, I don't remember if there were

19  because, as I said, that got settled, and I don't

20  know what stage they were in when that happened.

21     Q    Well, would it be important to you, as

22  County Administrator, to find out that the State of

23  Colorado determined that Mesa County -- there was

24  probable cause to believe that Mesa County had

25  committed age discrimination?

**Frank Whidden  July 11, 2019**

1      A    I believe we signed a nondisclosure

2   agreement --

3      Q    Okay.  My question is --

4      A    And, therefore, the less I know about

5   that, probably the better.  If there were legal

6   issues, I would expect counsel to raise those and

7   inform me and tell me if I needed to be involved.

8      Q    My -- my question is --

9           MS. GREISEN:  Maybe you could read

10   it back, Candice.

11           (Question at Page 203, Line 21 was read.)

12      A    No.  I would believe that that would --

13   that would come from legal counsel to tell me if we

14   needed to make changes or if something else

15   different needed to be done because they're the

16   legal experts.

17      Q    (By Ms. Greisen) So I'm just -- for the

18   record, you're testifying that it would not be

19   important to you, as a County Administrator, that

20   there were findings by the State of Colorado

21   determining probable cause to believe age

22   discrimination had occurred, correct?

23      A    Correct.  I believe that what would be

24   important is that the counsel would relay to me

25   what they thought I needed to know about that

**Frank Whidden   July 11, 2019**

```
 1    situation and if changes needed to be made in the

 2    administration of the County.

 3         Q    So your -- am I understanding right that

 4    the Board of County Commissioners would have

 5    informed you -- your understanding is they would

 6    have informed you?

 7         A    No.  I said the County Attorney.

 8         Q    What involvement would the County

 9    Commissioners have?

10         A    Probably less than mine.  They would rely

11    on counsel to inform them should they -- should

12    they feel that something rose to their level that

13    they needed to know.

14         Q    Well, do you feel like, as a County

15    Administrator, that you should be told if the State

16    of Colorado finds probable cause for

17    discrimination?  Do you think that's something that

18    you should be told about?

19         A    If they think that there was something

20    that we could do differently, that we could make a

21    change in the system in some way, then yes.

22         Q    Well, I appreciate that, but I'm just

23    saying:  Just the mere fact that the State of

24    Colorado determined probable cause to believe

25    discrimination occurred, as the County
```

**Frank Whidden   July 11, 2019**

1   listed a designation of you as an expert as having

2   management experience over your career.

3        A    Correct.

4        Q    In your career, have you ever been made

5   aware of any complaints of illegal discrimination

6   brought by any employee that you've managed?

7        A    Not that I recall, no.

8        Q    In your career, whether it be HR or as a

9   manager, have you ever investigated any complaints

10   of discrimination?

11              MR. SANTO:  Object to form.

12        A    I haven't conducted an investigation as

13   such.  I have certainly been aware of

14   investigations that have taken place, but I -- I

15   didn't conduct any investigations.

16        Q    (By Ms. Greisen) Did you oversee or

17   supervise?

18        A    In the sense that I'm the HR director,

19   yes.

20        Q    Okay.  What --

21        A    I mean I'm responsible --

22        Q    With that --

23        A    -- ultimately.

24        Q    You don't have to tell me the names, but

25   give me the types of discrimination investigations

Frank Whidden   July 11, 2019

```
 1   discrimination lawsuit.
 2           I'm saying:  In your career at Mesa
 3   County, have you ever -- are you aware of any
 4   situation in which Mesa County, in the HR
 5   department, substantiated a claim of illegal
 6   discrimination by an employee?
 7       A    Not --
 8               MR. SANTO:  Same objection.
 9       A    Not that I can recall.
10       Q    (By Ms. Greisen) Okay.  Let's take it
11   beyond Mesa County.
12           In your entire career, have you ever been
13   employed by an employer or been the boss yourself
14   where you have substantiated a claim of illegal
15   discrimination?
16               MR. SANTO:  Object to form.
17       A    Not that I can recall.
18       Q    (By Ms. Greisen) So it's my understanding
19   that in all three cases -- for Rick Corsi, Janine
20   Corsi, and Ms. Bouricius -- you were the sole
21   decision-maker regarding who would be laid off; is
22   that correct?
23       A    Yes.
24       Q    Okay.  So I'm still a little unclear
25   about exactly what your expert opinions are at
```

**Frank Whidden   July 11, 2019**

1    trial.

2              My understanding right now is that one of

3    your expert opinions, whether or not it's phrased

4    exactly this way, is that in your expert opinion,

5    the decisions about who to lay off in the October

6    2016 layoff were not based on age; is that correct?

7              MR. SANTO:  Object to form.

8         A    That is correct.

9         Q    (By Ms. Greisen) And another opinion that

10   you have is that the -- let's see if I wrote this

11   one down any better than I wrote the last one down.

12   Well, I'll let you expand on that.

13             Are there any other, or do you want to

14   expand on that opinion at all?

15        A    No.

16        Q    In your expert opinion, I take it, then,

17   that the layoff was simply due to budget factors.

18             MR. SANTO:  Object to form.

19        A    Yes.

20        Q    (By Ms. Greisen) And what is your expert

21   opinion about why certain people were -- have you

22   told me everything now about why certain people

23   were chosen --

24        A    Yes.

25        Q    -- for termination?

**Frank Whidden   July 11, 2019**

```
 1          A     Yes, I believe so.
 2          Q     And that is basically you looked around
 3     and saw basically who you thought you couldn't live
 4     without and they made the keep list, and the people
 5     you thought you could do without made the go list.
 6          A     That's pretty much it, yes.
 7          Q     Any other expert opinions?
 8          A     Not that I can think of.
 9          Q     When did you become aware that Rick
10     and/or Janine Corsi had complained about age
11     discrimination?
12          A     I don't remember specifically that theirs
13     was an age complaint.  I saw a rather lengthy
14     document that I believe Rick had written and it
15     went on and on and on and made all kinds of
16     allegations, and I don't remember specifically what
17     they all were, but there was a long list.  It was a
18     long document.
19          Q     Was there a point in time that you were
20     aware that Rick and/or Janine Corsi made complaints
21     of age discrimination?
22          A     I don't remember specifically what
23     counsel told me the allegations were to CCRD or
24     what CCRD upheld.
25          Q     So is it fair to say you don't -- you did
```

**Frank Whidden   July 11, 2019**

```
 1    not read the charges of discrimination that they
 2    filed?
 3         A    It's fair to say I don't remember it.
 4         Q    Okay.  And do you remember reading the
 5    determination by the State of Colorado with respect
 6    to either Rick or Janine?
 7         A    No.
 8         Q    So my understanding, going back to the
 9    budget cuts, is that your testimony is that the
10    Board of County Commissioners in Mesa County
11    determined at some point in time that cuts were
12    needed to address a projected budget deficit for
13    2017, right?
14         A    Correct.
15         Q    And I apologize if I have asked you this,
16    but was there a public discussion about that matter
17    that occurred with the Board of County
18    Commissioners prior to October of 2016?
19                   MR. SANTO:  Object to form.
20         A    No.
21         Q    (By Ms. Greisen) Was there a public --
22    because that question wasn't that clear.
23              Was there a public discussion held by the
24    Board of County Commissioners about the budget
25    deficit prior to October 7, 2016?
```

**Frank Whidden  July 11, 2019**

219

```
 1        Q    Okay.  So have you told me now all the
 2   skills that you think Ms. Bouricius did not have
 3   that were needed?
 4        A    I think -- if I mentioned customer
 5   service, I think so.
 6        Q    You said customer service, documentation,
 7   and knowledgeable about systems.
 8             Are those the three?
 9        A    I would say yes.
10        Q    Okay.  And is that also true that -- do
11   you know if she -- sorry.  Strike that.
12             Do you know if she had been written up
13   for any performance reviews on any of those three
14   issues?
15        A    Not to my knowledge.
16        Q    Did you look to see?
17        A    No.  Not when I was making this
18   determination, no.
19        Q    So who is the person probably the most
20   familiar with Ms. Bouricius' skill set at the time
21   in October of 2016?
22        A    I would say Rick Corsi would be the
23   most --
24        Q    So did you --
25        A    -- then the other two managers also
```

**Frank Whidden   July 11, 2019**

1   had -- they all work very closely together, so...

2        Q    So -- but Rick Corsi was her direct

3   supervisor.

4        A    Direct supervisor, sure.

5        Q    So did you go and talk to Mr. Corsi about

6   what skills Ms. Bouricius did or did not have?

7        A    No.

8        Q    Why not?

9        A    Because I could not signal this action

10  ahead of time.

11       Q    Well, you wouldn't have to tell him he

12  was going to be a part of a layoff, right?

13       A    I could not signal with a layoff of this

14  size what was coming.  Rumors start very quickly,

15  and that would present a security risk for IT.

16       Q    But didn't you signal it to Troy Flick

17  and Lhana Jordan?

18       A    Only immediately beforehand.

19       Q    Oh, I thought you told me there was a

20  conversation at least a week beforehand.

21       A    I'm saying -- okay.  When I say

22  immediately beforehand, that's what I'm talking

23  about --

24       Q    Uh-huh.

25       A    -- is it was right there and they were

**Frank Whidden  July 11, 2019**

221

```
 1    the only two that I spoke to.  I certainly was not
 2    going to speak to someone who was about to be laid
 3    off about the coming action.
 4         Q    So you didn't feel like you could just go
 5    say, Hey, Rick, you know, I know Deb's been around
 6    a long time.  Kind of, you know, give me -- give me
 7    an idea on how she's doing these days.
 8              You could have had that conversation,
 9    right?
10         A    I could have, but I didn't, and I didn't
11    think it was necessary.
12         Q    Because -- is it fair to say you thought
13    you knew Ms. Bouricius' skill set as well as Rick
14    Corsi?
15         A    I wouldn't say as well as Rick.  He'd
16    been -- they'd been together for a long, long time,
17    and I would never say that I knew the ins and outs
18    as well as he did but I think well enough to make
19    the decision.
20         Q    Okay.  And what do you base that on?  How
21    did -- how did you know her well enough to make the
22    decision?
23         A    The interactions that I had had with her
24    personally as well as what I had observed from the
25    years that we had been working together.
```

Frank Whidden   July 11, 2019

```
1        Q    So it had been two years since you worked
2   with her directly, right?
3        A    I was still the director of IT and still
4   involved on basically a daily basis.  I still am
5   doing that.
6        Q    So tell me what kind of interactions you
7   had with her on a daily or weekly basis.
8        A    Whatever project was going on at the
9   given time, what was going -- there might be
10  something in Eden that's going on, which was the
11  system that she was supposed to be an expert on,
12  things like that.  What's -- what's going on with
13  those projects and those kinds of things, because
14  she was a senior BSA.
15       Q    And I'm just curious if you can tell me
16  what those projects are or things that required you
17  to have interaction with her.
18       A    I -- other than Eden, I can't tell you a
19  specific system.  I don't remember.
20       Q    And did you have any direct interaction
21  with her on Eden or was that through Rick Corsi?
22       A    I certainly spoke to her about --
23  directly to her about issues on software systems,
24  and I would think Eden for sure, because that's the
25  main system.  That's our main financial system, and
```

Frank Whidden  July 11, 2019

223

```
 1    she was the main BSA supporting that.
 2         Q    Well, what I'm trying to get at:  Was --
 3    was there a time where you worked closely with her
 4    on a project as opposed to just kind of like having
 5    a one-off, here's a problem, somebody needs to fix
 6    it or something like that?  I mean, I'm trying to
 7    figure out how substantive this interaction is.
 8         A    Substantive is -- I don't know about that
 9    part.  But there's no question that I did not have
10    as much interaction once I became the Deputy
11    Administrator and the County Administrator.  Simply
12    there are only so many hours in the day.  But I was
13    still involved with IT.  I mean, IT is my baby,
14    okay?  That's my background.  That's my --
15         Q    I'm just trying to figure out how much
16    interaction you had with Ms. Bouricius.
17         A    I had interaction.  I don't know -- I --
18    I don't think I had it on a daily basis, by any
19    means, and I couldn't say how frequently.  I don't
20    remember that.
21         Q    Couple times a year?
22         A    I would say more than that, but I don't
23    know.
24         Q    But you don't know?
25         A    No, I don't remember.  I don't -- as I
```

**Frank Whidden   July 11, 2019**

1      A     Right.

2      Q     Were there any big projects that Ms.

3   Bouricius worked on that you were involved in?

4      A     I can't recall one in particular.  I'm

5   sure we did like Eden upgrades and things like that

6   that she would have been involved in, but I don't

7   remember one specifically saying, yeah, that

8   particular one.

9      Q     Okay.  Can you tell me any time she was

10  disciplined or talked to about her skills regarding

11  project management?

12     A     I don't know if Rick spoke to her about

13  that or not.  I didn't.

14     Q     Can you tell us what areas in the IT

15  department that Ms. Bouricius worked on in her 26

16  years of employment with Mesa County?

17     A     As I just said, Eden was the main, and

18  then there were -- the software stack is divided up

19  between the BSAs, and I can't -- we have over 100

20  systems.  I don't know exactly which ones each one

21  was responsible for.  I know -- as far as I know,

22  she never worked on New World, as far as I know,

23  and that was a particular skill that Lori had, for

24  instance, that was critical.

25     Q     Well, I'm asking a slightly different

**Frank Whidden   July 11, 2019**

```
 1   question, which is:  You're aware Ms. Bouricius was
 2   there for 26 years -- over 26 years, right?
 3        A    I did not know how long she had been
 4   there.
 5        Q    Okay.  Does that sound about right to
 6   you?
 7        A    I know it was a long time, yes.
 8        Q    Okay.  So sitting -- can you tell me,
 9   other than the skills that she was using and the
10   project she was working on at the time of her
11   termination, what her skill set was throughout her
12   tenure at Mesa County?
13        A    No.  I did not read the -- any old files
14   or what had happened before.  I did not read any of
15   that.
16        Q    So how did you know what experience Ms.
17   Bouricius had in different areas?  Was it just
18   based on your personal observation?
19        A    My personal observation, the feedback
20   that I got from other managers, and then -- and
21   clients.
22        Q    Okay.  So tell me, were there -- did her
23   manager or clients complain about her?
24        A    Rick did not.
25        Q    Did any other manager?
```

**Frank Whidden   July 11, 2019**

1    helping the client resolve it, she would basically

2    give them -- tell them to call outside help to get

3    help with the problem.

4        Q    Anything else other than that?

5        A    And then my personal interaction when I

6    asked for help with Eden.

7        Q    Okay.  So have you now told me all the

8    skills that you're aware Ms. Bouricius had at the

9    time of her layoff?

10       A    I believe so, yes.

11       Q    And all of the areas that she worked in,

12   to the best of your knowledge, during her time at

13   the IT department at Mesa County?

14       A    Yes.

15       Q    Did you -- can you tell me what skill

16   sets Terrie Hotary had that Ms. Bouricius did not

17   have in October 2016?

18       A    I felt that, first of all, the salary was

19   less; and, secondly, Terrie was more approachable,

20   more customer service oriented, and seemed more

21   eager to learn, more eager to be a team player,

22   more motivated to be involved and to be engaged.

23   That's what I saw.

24       Q    Is -- are there any documents or any --

25   any specific evidence that you can point to to show

**Frank Whidden  July 11, 2019**

1   that Terrie was more eager and motivated than Ms.

2   Bouricius?

3        A    I don't have a document to point to.

4   That was, again, feedback that I had heard and

5   received and from personal observation as well.

6        Q    Can you give me any specifics about the

7   feedback you received:  Who it was from, what it

8   was about, and when it occurred?

9        A    I don't remember a specific instance.  I

10  know she was more involved in New World, willing to

11  learn New World and be involved in that.  That was

12  a really critical issue at the time.  And she was

13  showing a willingness to be involved with that and

14  a willingness to learn and grow as far as her SQL

15  knowledge -- it's a language -- and those kinds of

16  things, that she had -- she seemed more motivated

17  to be an engaged player on the team.

18       Q    And, again, is that your personal

19  observations?

20       A    Yes, as well as feedback.  I -- the

21  trouble right now I'm having in my mind is

22  remembering -- Lhana has certainly told me that.  I

23  can't say specifically, though, was that before the

24  layoff or after the layoff.  There certainly has

25  been a lot of good feedback since that time, but

**Frank Whidden   July 11, 2019**

```
1    it's hard for me to distinguish exactly, you know,

2    Okay, did you get told that before or after.

3         Q    I want to make sure I got your testimony

4    down.  You said she was more eager and motivated to

5    learn, and there was another word that you used

6    too.  A-P-P?

7         A    Engaged.

8         Q    Engaged.  Okay.

9              So more eager, engaged, and motivated

10   than Ms. Bouricius.  Is that your testimony?

11        A    Yes.

12        Q    Okay.  Any other reasons why you chose to

13   keep Terrie Hotary -- or -- I'm sorry.  Let me back

14   up.

15             Are there any other skill sets that

16   Terrie Hotary had that Ms. Bouricius did not have

17   in October of 2016?

18        A    Her involvement with New World.

19        Q    Anything else?

20        A    No.

21        Q    And did you make any inquiry as to Ms.

22   Bouricius' ability to work on the New World

23   software?

24        A    Not that I recall, no.

25        Q    So have you now told me every reason why
```

**Frank Whidden   July 11, 2019**

```
 1    you chose to terminate Ms. Bouricius rather than

 2    Terrie Hotary?

 3         A    Yes.

 4         Q    Eager, engaged.

 5              Can you tell me what you mean by being

 6    more engaged.  You said that Terrie Hotary was more

 7    engaged than Ms. Bouricius, what that means.

 8         A    It means being willing to interact with

 9    the teams, with clients, being more willing to

10    learn about new systems, being -- initiative, to

11    me, is a part of that.

12         Q    And on all those facets, you thought Ms.

13    Hotary was more -- satisfied that skill set more

14    than Ms. Bouricius?

15         A    Yes.

16         Q    And, again, that's just based on your

17    personal observations?

18         A    And -- and feedback from clients.

19         Q    And, again, I'm going to ask you if you

20    have any specifics, which clients, who gave you

21    that feedback.  Can you share them with us?

22         A    I do not.

23         Q    So was Ms. Bouricius as proficient in

24    customer support as was Ms. Hotary?

25         A    I would say no.
```

**Frank Whidden   July 11, 2019**

 1    that's where Liz was based until she left us.

 2        Q    Do you know who the project manager was

 3    on New World when it was implemented?

 4        A    No, that was before my -- the start of

 5    the implementation was before my time.

 6        Q    At any point in time, do you know who the

 7    project manager was?

 8        A    I thought Lori was.

 9        Q    What makes you think that?

10        A    Because, as I said, she was the one that

11    was involved and knew what was going on and had

12    been there forever, was so involved with law

13    enforcement, and seemed to be the go-to person.

14    When a question would come up on the system or what

15    are we going to do or things like that, as far as I

16    could tell, Lori always took the lead.

17        Q    Do you know if Ms. Bouricius had any role

18    in the New World project?

19        A    I never observed her having a role after

20    I was there, but before that, I clearly don't know.

21        Q    What about -- okay.  You said the GIS.

22             What percentage of her time -- Ms.

23    McDowell's time was spent on the GIS versus the

24    other business system analyst work?

25        A    I don't know.  There was a percentage,

**Frank Whidden   July 11, 2019**

1   what they do.  Working on printers, troubleshooting

2   those -- the hardware piece of all of that.  That's

3   their particular skill set.

4        Q    So do you know whether or not Ms.

5   Bouricius had any of that skill set at the time she

6   was terminated?

7        A    If she did, I certainly had never seen

8   any evidence of it.

9        Q    Did you ask anyone?

10       A    No, because it's a pretty safe bet in the

11  IT world that if somebody's on the software side of

12  the house and they are into coding and database

13  administration and those kinds of things, that they

14  are not a hardware person.  It's like a separation

15  of duties.

16       Q    And what skills did Andrew Wetzel have

17  that Ms. Bouricius did not have?  Is it essentially

18  the same answer?

19       A    Yes.  He -- at the time that the

20  terminations were made, he was a tech.  He's now

21  moved over to the network team, but -- so he had --

22  as well as the end-user hardware, he also had

23  networking skills along the lines of like what Troy

24  and Ron and those -- Bill Tarlton, what they can

25  do.  As far as I know, again, she doesn't have that

**Frank Whidden  July 11, 2019**

 1   skill set, the network administration and server

 2   administration skills and all that kind of thing.

 3       Q    Do you -- I'm trying to figure out what

 4   you base that knowledge on, other than your

 5   personal observation.

 6           Do you -- have you looked to see in any

 7   of her tenure history what she's actually worked on

 8   while at Mesa County?

 9       A    I said before I did not look at

10   historical records about had she ever been a

11   hardware tech or anything like that.  I haven't

12   looked at that.

13       Q    Do you know if she ever performed the

14   duties of a senior support specialist during her 26

15   years?

16       A    I do not know.

17       Q    And Joseph Keene, he is a Web

18   administrator?

19       A    Joe, yes.

20       Q    Joe.  What skill sets did he have that

21   Ms. Bouricius did not have?

22       A    He -- Joe was on the Web team and he

23   worked with the Web administration and those kinds

24   of things; and to my knowledge, I didn't know that

25   she had any skill set in that area.

**Frank Whidden   July 11, 2019**

```
 1        Q     Well, I was just going to ask you my next
 2   question.
 3             Do you know whether she, Ms. Bouricius,
 4   was ever a Web administrator during her career at
 5   Mesa County?
 6        A     I did not know that.
 7        Q     Did you know at one time she was the only
 8   Web administrator?
 9        A     I did not know that.
10        Q     Is there any reason that you're aware of
11   that Ms. Bouricius could not have been transferred
12   to one of the Web administrator or support
13   specialist jobs instead of terminated?
14        A     I did not know she had any skill set in
15   that area or had worked in that area, certainly
16   since I have been there, since 2011, and it was
17   never brought up when I asked the question about
18   who had the skill sets that we needed and do we
19   have the right people on the boat.  Joe and Lani
20   were the ones who had the skill sets that -- in
21   this case, Troy wound up running that team -- that
22   he thought they would need in order to get the job
23   done.
24        Q     So -- I'm sorry.  It's your testimony
25   that Troy said that Joe and Lani had the expertise?
```

Frank Whidden   July 11, 2019

```
 1      A    Correct, in the sense that when I asked
 2  the question -- here's the list.  Do you see a
 3  problem there with what we're doing?  He didn't
 4  say, Oh, well, Deb's got more strength in Web
 5  administration than Joe does and so we should pull
 6  Deb over there, which is what I would have wanted
 7  him to say if that were the case and he had
 8  knowledge of that.
 9      Q    Did you tell him that, though?  Did you
10  say, Look, can we move these people around any, in
11  any way?  For instance, Joshua Dallman is a support
12  specialist who had been there for 1.3 years.
13      A    Uh-huh.
14      Q    Was there a discussion about, Well, maybe
15  we should look and see what skills a 26-year
16  employee has to see if, rather than termination, we
17  can move her into that spot?
18           MR. SANTO:  Objection.
19      A    No.
20           MR. SANTO:  Go ahead.
21      A    No, I did not, and one reason was he
22  makes probably half the pay that she did, and my
23  guess was that that would be an insult to Deb to
24  suggest that she take that much of a pay cut.
25      Q    (By Ms. Greisen) Did you look at it?
```

**Frank Whidden   July 11, 2019**

1    A    Yes.   As far as, again, TCP/IP, the

2   Windows stack, the security protocols, how to

3   maintain identity within a network system.   He had

4   a broader knowledge of, I believe, IT security.   He

5   had taken lead on that.   He had a much stronger

6   background as far as writing scripts and shells and

7   handling the log-in scripts and those kinds of

8   things.   Bill had a lot of experience in all of the

9   above that, to my knowledge, Janine really didn't

10  have.

11    Q    And is that just based on your personal

12  experience or is that based on documented evidence?

13    A    That was based on my personal experience.

14    Q    And did you ever see any documentation

15  showing that Janine did not have those

16  knowledges -- that knowledge?

17    A    I never saw her produce any work product

18  along those lines that could tell me that she could

19  do it, and I saw her failings as far as Novell and

20  Google was concerned.

21    Q    Did any of those four network

22  administrators have a higher degree in education in

23  computer science?

24    A    I honestly don't know what their degree

25  levels were.   I was going based on their

**Frank Whidden   July 11, 2019**

1    performance and the work product that I saw.

2        Q    Okay.  Again, it was based on the

3    performance that you personally observed.

4        A    Yes.

5        Q    Did you have any discussions with anybody

6    about Janine Corsi's shortcomings or performance

7    issues --

8        A    I did.

9        Q    -- prior to --

10       A    Yes.  With Troy.

11       Q    With Troy.  When was that?

12       A    I don't remember the timing.  I just know

13   that we discussed it.  I know -- I know that it had

14   become evident to me by the time we were getting

15   rid of the Novell system and coming up on Google,

16   and I didn't like the fact that she was going to

17   take the Google lead but she did, and I thought

18   that was going to be problematic.

19       Q    Well, what did Troy -- did Troy

20   discipline her for something?

21       A    I -- not to my knowledge.

22       Q    So I thought you said Troy talked with

23   you about performance issued related to Janine.

24       A    Yes.

25       Q    Okay.  So what performance issues did

**Frank Whidden   July 11, 2019**

1   the Structured Query Language.  He -- because he

2   previously had been a DBA, database administrator.

3   He was previously on Rick's team, and then he came

4   over to the network team after that.  So he had, if

5   you will, the database administration skill set in

6   addition to the network administration and the

7   kinds of things I described that Bill can do, those

8   same kinds of things to be able to handle security

9   protocols, TCP/IP, the network stack, network

10  operating systems, those kind -- servers, routers,

11  switches.  Ron could do all of that.

12      Q    Is it your testimony that Ms. Corsi could

13  not do that?

14      A    I don't believe she had much talent in

15  routers and switches and those kinds of things.

16      Q    Well, you listed off about ten --

17      A    Ten things.

18      Q    -- ten things there.

19      A    Right.

20      Q    Is there -- are there any of those ten

21  things that Ms. Corsi could do?

22      A    I don't know about could do.  Could she

23  do them better than Ron or Bill, no.

24      Q    And what's that based on?  Your personal

25  observation?

**Frank Whidden   July 11, 2019**

```
 1          A     Personal observation.
 2          Q     Sorry.  I didn't mean to talk over you.
 3                Just so the record's clear, is that based
 4     on your personal observation?
 5          A     Yes.
 6          Q     So the document that's in front of you,
 7     Exhibit 52, Ms. Corsi, Janine Corsi, if you look on
 8     that document, she had at the time of termination
 9     23 and a half years of service.
10          A     Okay.
11          Q     Well, you tell me.  Is that right?
12          A     I'm trying to find her.
13          Q     It's on the last page.
14          A     That's what it says, yes.
15          Q     Well, do you have any reason to disagree
16     with it?
17          A     No.
18          Q     Okay.  I mean, this is a document that
19     was produced by Mesa County with Ms. Atencio's
20     e-mail on the cover attaching these.  So if you
21     have any reason to disbelieve what's in here,
22     please tell me.
23          A     I will.
24          Q     Okay.  So Ms. Corsi is 23 years of
25     service.  Carey Stieb is also somebody who was
```

**Frank Whidden  July 11, 2019**

1  technical knowledge that Corsi did not have.

2      Q    Can you give me an example?

3      A    How to replace a motherboard, how to

4  replace memory in a computer.  Do you want me to

5  name all the parts of the computer that she can do

6  because it's every one of them, and he can't.

7      Q    And how do you know he can't?

8      A    He's not technical, doesn't have the

9  background, doesn't have the credentials or the

10  experience, to the best of my knowledge.

11      Q    Is it just based on your personal

12  observations that you believe he's got -- he

13  doesn't have as strong of skills as Ms. Jordan?

14      A    Correct.  And as well as, I've said, my

15  knowledge of the fact that -- I don't know if you

16  call this personal observation or not -- that his

17  background is GIS, which I believe is where he's

18  gone to again, is back into the GIS field.

19      Q    Is Lhana Jordan still the customer

20  service manager or has she gotten a promotion?

21      A    She was promoted to take over the

22  business systems analysts, so she got that in

23  addition to what she had before.

24      Q    When was she promoted to the BSA

25  position?

Frank Whidden   July 11, 2019

```
 1    to say do the salaries compare.  That's what I'm
 2    talking about.  And it's difficult to find one
 3    that's descriptive of all that she does.
 4         Q    So where is this chart that has a red
 5    line?  It has the range and it has a chart.  A red
 6    line as to the range of salaries.
 7         A    That's our -- that's our compensation
 8    table.  I don't know what the official title is of
 9    that document.
10         Q    Well, where do you go to look at it?
11         A    HR has it, the salary grid.  I don't --
12    for all I know, it's on the HR Web.  But usually if
13    I need to know something, I have somebody go look
14    it up for me and tell me what it is.  I don't go
15    try to dig through and find it.
16         Q    Did you look at that when you decided who
17    to terminate?
18         A    No.
19         Q    Well, you made a com -- you made a
20    comment about salaries.
21         A    Uh-huh.
22         Q    In context of termination.
23         A    Uh-huh.
24         Q    So tell me what you meant by that.
25         A    I meant that I had a limited amount of
```

**Frank Whidden   July 11, 2019**

1    except Deb's got the software side of things that

2    Rick didn't have.  Deb -- wait.  You're comparing

3    Rick to Lhana.

4         Q    No.  I'm comparing Deb to Lhana.

5         A    Oh.  As far as I knew, again, the

6    hardware skill -- hardware skills of a technician,

7    all of the things associated with desktop user

8    support, and then stronger customer service skills.

9         Q    When you say "desktop user support," how

10   was Lhana more skilled at desktop user support than

11   was Ms. Bouricius?

12        A    I see her do that all day, every day.  I

13   never observed or was told or had any information

14   that Deb had any skills in that area.

15        Q    Okay.  Do you have any other evidence of

16   desktop user -- of Lhana being stronger in desktop

17   user support than Ms. Bouricius other than what

18   you've just testified?

19        A    No.

20        Q    And you said hardware skills.  You

21   believe Lhana has better hardware skills than Ms.

22   Bouricius?

23        A    Yes.

24        Q    And what's that based on?

25        A    Personal observation.

**Frank Whidden   July 11, 2019**

1    Q    Did Janine or anybody else make any

2    comments at that meeting?

3    A    A couple of people made comments.  Janine

4    did.  And I don't remember if anybody else said

5    anything or not.  I remember Janine made a comment.

6    Q    What was her comment?

7    A    It looks like you're letting only the

8    most senior people go, something along that line.

9    Q    And what did you say?

10   A    I disagreed.  I said if you look around

11   the table, I don't think -- not everybody here has

12   the same amount of seniority.  The people who are

13   staying is not the same.  I disagreed.  I kept my

14   comments very short.

15   Q    So did you respond to her at all about

16   her complaint about the fact the oldest people were

17   being -- oldest employees were being terminated?

18   Did you give her any substantive response other

19   than you disagree?

20   A    I said, If you look around this table, I

21   don't think that's the case, as well as the people

22   who are remaining.  I said words to that effect.

23   Q    And did you report her complaint of

24   discrimination to anyone?

25                    MR. SANTO:  Object to form.  Go

**Frank Whidden   July 11, 2019**

1    ahead.

2         A    I didn't take that as an age

3    discrimination comment.  I took it as seniority.

4         Q    (By Ms. Greisen) Well, when she said, It

5    looks to me like the oldest people are being

6    employed, you didn't take that as an age --

7         A    I --

8         Q    Let me finish.

9              -- you don't take that as a complaint of

10   age discrimination?

11        A    I misspoke.  When I said oldest, the

12   people I took it to mean the way that she said it,

13   she was talking about the longest-serving.  That's

14   the way I took what she said.

15        Q    But she used the term --

16        A    Oldest I believe was my term.  I don't

17   know if she used that word or not.  I don't recall

18   that that specifically.

19        Q    You don't --

20        A    I don't --

21        Q    You don't know.  She could have used the

22   word "oldest" or maybe not.  You just don't

23   remember?

24        A    I don't remember her specific words, no.

25        Q    But did you understand that she was

**Frank Whidden   July 11, 2019**

1   complaining about age discrimination?

2       A    I did not.

3       Q    If you had thought she was complaining

4   about age discrimination, what would your

5   obligation be at that point?

6       A    I would have involved the County

7   Attorneys to tell us what is our next step, what do

8   we need to do.

9       Q    So as the director of HR, if it's

10  ambiguous as to whether somebody is making a claim

11  of illegal discrimination, is the policy that you

12  document it in any event to make sure that

13  documentation exists?  In other words -- I'll state

14  that again.

15          Is the policy, the HR policy, at Mesa

16  County that if a supervisor hears a complaint like

17  that -- seniority, oldest, those kind of words --

18  in connection with an adverse action, is there any

19  obligation to document it, even if you're not

20  crystal clear?

21              MR. SANTO:  Object to form.

22      A    Not in a termination situation, no.

23      Q    (By Ms. Greisen) Why is that?

24      A    Because at that point they are basically

25  no longer employees of Mesa County, but just to be

**Frank Whidden   July 11, 2019**

1    sure, as I said, I would talk to counsel about

2    what's going on and is there -- do we -- are we --

3    which I had already vetted, but, you know, is there

4    an issue there?

5         I did not -- I did not understand her

6    comment to be about age discrimination.  I did --

7    that's not the way I understood her comment.

8    Q    So correct me if I'm wrong.

9         Are you saying that if a comment of

10   illegal discrimination occurs in the context of a

11   termination, then no subsequent investigation is

12   required?

13                  MR. SANTO:  Object to form.

14   A    I believe that in that case, I would take

15   it to the attorneys and say, What do we need to do?

16   And I would certainly talk to the people who have

17   the HR certifications about, Okay, what do you-all

18   think about this scenario?  I had -- Brenda was in

19   the room and heard what was said.

20   Q    (By Ms. Greisen) So I'm asking you as the

21   director of HR.

22   A    I hear you.

23   Q    Did you document it or report it to any

24   person?

25   A    No.

**Frank Whidden   July 11, 2019**

```
 1    about the terminations.  There's no doubt about
 2    that, but that's not quite what I'm asking.
 3              You're giving essentially an expert
 4    opinion that, in your expert opinion, you didn't do
 5    anything wrong, right?
 6                    MR. SANTO:  Object to form.
 7       A    I'm giving an opinion that I made the
 8    correct decision from an IT perspective, and I
 9    believe I'm qualified to give that opinion.
10       Q    (By Ms. Greisen) So in other words,
11    you're giving an expert opinion that your
12    decision -- that you did nothing wrong in making
13    your decision, right?
14                    MR. SANTO:  Object to form.
15       A    Correct, with the vetting of counsel, who
16    were the ones who suggested that I be an expert
17    witness and what does that -- I'm not a person who
18    can tell you exactly what's the legal definition of
19    that.
20       Q    (By Ms. Greisen) Well, do you see any
21    conflict?  I mean, you've been around a long time,
22    you've been a manager, head of the county
23    administration.
24              Do you, just sitting here right now, see
25    any conflict with this idea that you're giving an
```

Frank Whidden  July 11, 2019

```
1   expert opinion as to the righteousness or the

2   correctness of your opinion?

3                   MR. SANTO:  Same objection.

4                   THE DEPONENT:  Did you say no

5   objection?

6                   MS. GREISEN:  No.

7                   MR. SANTO:  I said same objection.

8                   THE DEPONENT:  Oh, okay.

9       A    That thought had not occurred to me, and

10  I would have thought that if there was an issue of

11  conflict of interest, that counsel would have

12  pointed that out.

13      Q    (By Ms. Greisen) Okay.  Well, I'm just

14  asking you right now, then.

15      A    Uh-huh.  No, I --

16      Q    Do you perceive any -- any conflict

17  between the fact that you are giving an expert

18  opinion on the correctness of your original

19  opinion?

20      A    No.  I don't believe that I'm being

21  biased by the fact that -- the decision that I

22  made.  I think I can defend it based on what I

23  know.

24      Q    Have you yourself ever conducted

25  investigations into discrimination?
```

**Frank Whidden   July 11, 2019**

```
 1        A     No.
 2        Q     I think you said you have supervised
 3   such --
 4        A     Uh-huh.
 5        Q     -- right, such investigations; is that
 6   correct?
 7        A     Yes.
 8        Q     And when you oversee or supervised an
 9   investigation, in your opinion, would it be
10   appropriate for the HR person to go to the person
11   who is alleged to have done the wrongdoing and ask
12   him, Did you do -- did you do it or not, and then
13   just rely solely on that person's decision?
14                   MR. SANTO:  Object to form.
15        A     I certainly wouldn't rely solely on
16   that -- that testimony, no, or that statement.
17        Q     (By Ms. Greisen) What else would you look
18   at?
19        A     The other people who might be involved,
20   who were involved.
21        Q     Who else was involved in this decision?
22        A     Well, I wasn't talking about this
23   decision.  I was talking about the other situations
24   that were there.
25        Q     Right.  I -- I understand that.  I'm
```

**Frank Whidden   July 11, 2019**

```
 1                    MS. GREISEN:  That's fine.
 2                    MR. SANTO:  Okay.  Thank you.
 3        Q    (By Ms. Greisen) Other than talking with
 4   your counsel, did you do anything to prepare for
 5   your testimony today as a Rule 30(b)(6) designee?
 6        A    No.
 7        Q    Okay.  If you could look at Exhibit 57,
 8   the first number, Matter No. 1 on Page 2, I'm not
 9   going to read these to save Candice's fingers.
10             I want you to read that and tell me if
11   there is any more information that you can provide
12   me as Rule 30(b)(6) testimony under Matter 1 than
13   what you have already testify to.
14        A    (Deponent reviewing document.)
15             I believe we have already discussed all
16   the matters that are involved there.
17        Q    Okay.  So is it fair to say that your
18   testimony regarding all the issues in Matter 1 is
19   the same regardless of whether you're testifying as
20   an expert or Rule 30(b)(6) witness or a fact
21   witness?
22        A    Yes.
23                    MR. SANTO:  Object.
24        Q    (By Ms. Greisen) Matter No. 2, again, can
25   you read that and tell me if you have already
```

**Frank Whidden   July 11, 2019**

338

```
1    testified to all the information that you have
2    under Matter No. 2.
3         A    Yes.
4         Q    Or that Mesa County has.
5         A    I believe that all the information that
6    would pertain to that matter we have covered, yes.
7         Q    Okay.  So Matter No. 3, we talked a
8    little bit about skill sets.  So I would like you
9    to, if you could, look at Exhibit 52, the second
10   page of Exhibit 52 -- the second and third pages
11   are pages that have the employees that remained.
12   And if you could just go down and tell me -- are
13   you on the same page?
14        A    I think.
15        Q    Yeah.  It's Defendant 61 at the bottom.
16        A    This.
17        Q    Yeah.  Okay.  So Matter No. 3 says:  For
18   each skill, Plaintiff, Ms. Bouricius, did not have
19   in comparison with individuals that stayed.
20             Tell me each one of these people who had
21   more skills than plaintiff.
22        A    Okay.  Lhana had more skills and David
23   did, Troy did, Lori did, Kelly did, Chris did,
24   Leilani did, Joseph did, Elizabeth did, Paul did,
25   Eric did, William Tarlton did, and Terrie Hotary
```

**Frank Whidden   July 11, 2019**

```
 1   did.
 2       Q     And I think the next page is also people
 3   that stayed.
 4       A     Right.  So Ryan...
 5       Q     Is it just all of them had more skills
 6   than she did?
 7       A     I believe, yes.  Looking at this --
 8       Q     Okay.
 9       A     -- the difference, yes.
10       Q     So can you identify --
11       A     Not counting the temps.
12       Q     Okay.
13       A     I don't know those people.
14       Q     Can you identify -- we can go through
15   this pretty quickly -- if there is any additional
16   information, other than what you have already given
17   to me, what skills does Ms. Jordan have more than
18   Ms. Bouricius?
19       A     The hardware skills, the -- we did answer
20   this before.
21       Q     Okay.
22       A     The hardware skills, the customer service
23   skills, those things.
24       Q     And is that true with David Underwood as
25   well?
```

**Frank Whidden   July 11, 2019**

1    A    David Underwood, customer service, I

2    would say yes.  But he's already a hardware tech so

3    the hardware skills.

4    Q    And Troy Flick?

5    A    The network administration skills as well

6    as management skills.

7    Q    And Lori Marak, Marak?

8    A    Lori Marak.  New World particularly and

9    institutional knowledge.  We have talked about that

10   as well making a comparison.

11   Q    And Kelly Leuallen I think you have

12   already talked about.

13   A    We went lengthy into that.

14   Q    Chris Kadel?

15   A    Chris is a GIS expert and all that.

16   Q    I understand that they have different job

17   titles than she did.  I would like you to tell me,

18   as best you can, what specific skill they had more

19   proficient than Ms. Bouricius, if you can.

20   A    That's what I meant, was GIS expert.

21   He's an expert in government informational systems,

22   the mapping, and Esri and all the -- which is a

23   database and a platform.  So all the things that

24   are associated with GIS, that's the skill set that

25   he has that she, to my knowledge, doesn't have.

**Frank Whidden   July 11, 2019**

1    Q    And she doesn't have it based on your

2    personal observation; is that right?

3    A    That is correct.

4    Q    And then the Web administrators, Ms.

5    Boyles and Mr. Keene?

6    A    We didn't really talk about Lani, but we

7    certainly talked about Joe, that as far as I knew,

8    to the best -- that they had more Web administrator

9    skills, HTML skills, Hypertext Markup Language.

10   It's language of the Internet.  As far as I knew,

11   and the scripting and the programming, they had --

12   Joe had stronger skills and Lani had stronger

13   skills than that.  I didn't know she had any skills

14   in that area.

15   Q    You didn't know who?  Ms. Bouricius?

16   A    Ms. Bouricius had skills in that area.

17   Q    And Elizabeth McDowell, have you told me

18   everything --

19   A    Yes.

20   Q    -- with respect to that?

21   A    Yes.

22   Q    And with the support specialists and

23   technical support specialists, is it just generally

24   that they work on hardware, and that would be their

25   skill that Ms. Bouricius did not have?

**Frank Whidden   July 11, 2019**

1    A    Generally speaking, yes.  But Paul is

2  help desk extraordinaire.  He is simply amazing and

3  is able to handle all manner of -- whether it's

4  hardware, software, he is amazing.  And so cus --

5  from customer service and all of that, Paul -- so I

6  think he's got some tremendous skills there that,

7  to my knowledge, that's not -- that's not her

8  forte.

9    Q    Do you know whether Ms. Bouricius has

10  ever worked on the help desk?

11    A    I do not know.

12    Q    Did you ask anyone?

13    A    No.

14    Q    Okay.  What about the -- we've gone

15  through Terrie Hotary and I think we've gone

16  through Tarlton.

17    A    Uh-huh.

18    Q    Eric Farslow, does he have any skills

19  that Ms. Bouricius doesn't have?

20    A    Same comment as the other technicians.

21  He's got extreme skills with the hardware and the

22  frontline techs, just like the others that we

23  discussed.

24    Q    Okay.  Is that true with all the support

25  specialists, kind of this frontline --

Frank Whidden   July 11, 2019

1        A    Yes.

2        Q    -- hardware --

3        A    Yes.

4        Q    -- experience?

5        A    Yes.  Yes.

6        Q    Okay.  Is there anything else you feel

7   like that you know or can tell me about Matter No.

8   3?

9        A    No.

10       Q    Can you answer No. 4 for me.  Can you

11   give me the identity of all persons with personal

12   knowledge that support the defense asserted by Mesa

13   County in this case?

14       A    I believe that would be mainly Troy Flick

15   and Lhana Jordan.

16       Q    Anyone else?

17       A    Not to my knowledge.

18       Q    Okay.  No. 5, can you tell me the

19   identity of any documents reviewed to prepare any

20   of your 30(b)(6) rule deposition?

21       A    I didn't refer to any documents to

22   prepare for this.

23       Q    Okay.  So let's go down to Denials in

24   Defendant's Answer.  Let's go to 15.  And why don't

25   you open up Exhibit 12 because I don't expect you

**Frank Whidden   July 11, 2019**

352

```
 1   STATE OF COLORADO)
 2                   )ss.    REPORTER'S CERTIFICATE
 3   COUNTY OF MESA  )
 4        I, Candice F. Flowers, do hereby certify that
 5   I am a Certified Shorthand Reporter and Notary
 6   Public within the State of Colorado; that previous
 7   to the commencement of the examination, the
 8   deponent was duly sworn to testify to the truth.
 9        I further certify that this deposition was
10   taken in shorthand by me at the time and place
11   herein set forth, that it was thereafter reduced to
12   typewritten form, and that the foregoing
13   constitutes a true and correct transcript.
14        I further certify that I am not related to,
15   employed by, nor counsel for any of the parties or
16   attorneys herein, nor otherwise interested in the
17   result of the within action.
18        In witness whereof, I have affixed my
19   signature this 20th day of July, 2019.
20        My commission expires February 14, 2020.
21
22
23                      _____
                        Candice F. Flowers, CSR
24                      671 Alexia Court
                        Grand Junction, CO 81505
25
```