# EXHIBIT B

**Frank Whidden   July 11, 2019**

1

```
         IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV
_____

VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

                                    July 11, 2019
_____

DEBRA BOURICIUS,

     Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

     Defendant.


_____



         Pursuant to Notice and the Federal Rules

of Civil Procedure, the videotaped deposition of

FRANK WHIDDEN, called by Plaintiff, was taken on

Thursday, July 11, 2019, commencing at 9:07 a.m.,

at 205 North 4th Street, Grand Junction, Colorado,

before Candice F. Flowers, Certified Shorthand

Reporter and Notary Public within and for the State

of Colorado.
```

**Frank Whidden   July 11, 2019**

```
 1                    THE COURT REPORTER:  That's okay.
 2                    MR. SANTO:  She'll kick you.  You've
 3    got to be careful.
 4                    THE COURT REPORTER:  And he's in
 5    striking distance.
 6                    MS. GREISEN:  Let's mark this.
 7              (Exhibit 46 was marked.)
 8              (Discussion off the record.)
 9        Q    (By Ms. Greisen) I have put in front of
10    you what I have marked as Exhibit 46.
11              Do you recognize this printout, Mr.
12    Whidden?
13        A    It looks like a printout from my LinkedIn
14    page.
15        Q    And is -- this printout of your LinkedIn
16    page, does it reflect an accurate accounting of
17    your jobs and positions held in the past?
18        A    It appears that there's at least one
19    missing there in Mesa County.
20        Q    And which position is that?
21        A    Deputy Administrator for Resource
22    Management, which is from about April of 2014 to
23    December 31 of 2015.
24        Q    I'm sorry.  Can you give me those dates
25    again.  April of...
```

**Frank Whidden   July 11, 2019**

1   business together to -- same type of business, but
2   we expanded it.  When I was doing it, I only had
3   one office.  And then we had the bright idea we'd
4   open offices around all the little towns around
5   Meridian, and that was part of the IT stuff and all
6   of that.  And at one time we had a payroll as high
7   as $50,000, but it just -- because of what the IRS
8   was doing, we just didn't think it was tenable to
9   continue that.
10          And I had the interest in Computers Mean
11  Business and he was Vision Software, and we both
12  decided we'd rather take our shot at the IT side of
13  things rather than staying in the income tax
14  business.
15      Q    Are you still in touch with Mr. Pugh?
16      A    I haven't talked to him in a number of
17  years, but yes, we're still good friends.
18      Q    So your current position right now is
19  County Administrator of Mesa County; is that
20  correct?
21      A    That is correct.  Also serve as the IT
22  director and the HR director.
23          And going back to when I was Deputy
24  Administrator for Resource Management, what
25  happened was, to explain that a bit, the former

**Frank Whidden   July 11, 2019**

```
 1   County Administrator, Tom Fisher, decided to wipe

 2   out a layer of directors, and that included HR, IT,

 3   finance, facilities.  And it was regional services

 4   grouped together like facilities, parks and rec,

 5   and things like that.

 6           He decided to wipe all of that out and

 7   make me responsible for all of those, and that's

 8   the responsibility I had there in '14.  And then he

 9   left and the commissioners made me County

10   Administrator, so I had all of that responsibility

11   plus the County Administrator.

12           Since that time, I managed to hire --

13   well, I hired a chief financial officer, Scott

14   Stewart, who was with us for a year or two and then

15   he left, and I promoted from within a director of

16   finance.  I also -- in that time after I became

17   County Administrator, I created a facilities

18   director, so I have that now, and I combined parks

19   and all of that and the fairgrounds under the

20   director of facilities.

21      Q    Okay.  We're going to -- I'm going to ask

22   you some more specific questions about that, but

23   just so I understand.

24           When the previous County Administrator

25   left, you were doing the County Administrator's job
```

Frank Whidden   July 11, 2019

1    correct.

2         Q    Okay.  So about -- I've got about three

3    and a half years after you started is when you

4    became -- about three and a half years after you

5    started at Mesa County is when you were appointed

6    the County Administrator; is that right?

7         A    Huh-uh.  No, ma'am.

8         Q    I'm sorry.  Go ahead.

9         A    That's when I became Deputy Administrator

10   for Resource Management.

11        Q    Okay.  And -- right.  You became the

12   County Administrator in 20 -- in January of 2015;

13   is that right?

14        A    That is correct.

15        Q    Okay.  Do you know who else had applied

16   for the County Administrator's position?

17        A    I have heard that Barbara Brewer put in

18   for it.  That's the only name that I have heard

19   that also put in for that position.

20        Q    Did you ever talk with her?

21        A    I have spoken to Barbara, yes.

22        Q    I'm sorry.  About applying for the

23   position.

24        A    No, ma'am.

25        Q    So do you remember how you knew that she

**Frank Whidden   July 11, 2019**

 1   responsibility.  The job description goes on and on

 2   and on, but basically it's to take care of and see

 3   to the day-to-day affairs of the County.

 4          Then as far as -- like HR is the daily

 5   affairs of HR, the things that happen, the

 6   personnel matters that arise.  If the HR manager

 7   feels that there's something that needs to rise to

 8   my level or she wants my advice or guidance on

 9   something, we discuss that.

10          In IT, I'm probably more involved because

11   that's where my expertise really lies as far as my

12   background and all of that.  So I'm more involved,

13   I would say, in IT and what's happening, the

14   systems and how they run, and what we're going to

15   do, how we're going to do it, those kinds of

16   things.

17          Q    How many departments do you oversee?

18          A    I don't -- we have -- I believe we have

19   23 agencies in the County, and I oversee public

20   works and everything associated with that, which is

21   road and bridge and all that's associated with

22   that.  I oversee -- so we've discussed all the

23   internal core functions:  HR, IT, finance,

24   facilities, parks, fairgrounds, Criminal Justice

25   Services Division.  I think animal services is

**Frank Whidden   July 11, 2019**

1    attached to CJSD, that they're part of that.   I

2    think that's all that's direct.   It's hard to do

3    without an org chart in front of you.

4         Q    Well, you said you oversee 23 agencies,

5    so public works is one.

6         A    What I meant was there are 23 agencies

7    across the County as a whole.   I don't oversee all

8    of those.

9         Q    Okay.

10        A    There are seven elected offices, et

11   cetera.

12             The ones that I enumerated are the ones

13   that I have direct reports, who report to me in

14   those different group.

15        Q    So I have got HR, IT, finance,

16   facilities, criminal justice, animal services, and

17   probably the Tri River Extension services as well?

18        A    Try River -- well...

19        Q    Not so much?

20        A    They are part of us, but Tri River is not

21   an agency of Mesa County.   You can think of them

22   more as a partner of Mesa County, the extension

23   service.   We pay money into that, but I don't

24   oversee the daily activities of what happens in Tri

25   River.   And I think you left out parks in your

Frank Whidden   July 11, 2019

```
 1    through those days.
 2         Q     Excuse me.  So when you say it's
 3    management by walking around, where do you walk
 4    around?
 5         A     I can go anywhere -- anywhere in the
 6    County.  I spend a lot of time at the Rood building
 7    because -- 544 Rood -- because that's where a lot
 8    of the operations are headquartered.  That could
 9    also mean going to where public works is over here
10    at Mesa County Central Services.  It could mean
11    going to the sheriff's office.  Really, any of the
12    County facilities.  DHS has a big operat --
13    Department of Human Service, that's their campus on
14    North Avenue.
15         Q     So these are all located at different --
16    all these departments are located at different
17    locations?
18         A     The ones I just mentioned are off -- yes.
19         Q     What's at -- you said the root building.
20    What's in that building?
21         A     Rood.  That's our -- that's the old
22    courthouse.  That's the main -- that's where the
23    commissioners are, that's my office.  HR, IT,
24    finance are all in that building.
25         Q     And are you on the same floor as the IT
```

**Frank Whidden   July 11, 2019**

1    and HR?

2         A    No.  I'm on the third floor with the

3    County Commissioners.  IT is in the basement.  HR

4    is on the third floor of the annex building that's

5    attached to 544.

6         Q    Okay.  Anything else that you routinely

7    handle other than what you've told us already?

8         A    No.  And then the facilities is

9    headquartered out at the fairgrounds.  I made --

10   had them move out there and consolidate at the

11   fairgrounds.

12        Q    So you travel around a fair bit?

13        A    Yes, ma'am.

14        Q    How much time do you actually spend in

15   your office?

16        A    It literally depends on the day and where

17   the meetings are, where they're going to be held,

18   who I -- what's going -- what's blowing up today.

19        Q    Well, I assume that on Mondays and

20   Tuesday, you spend more office time --

21        A    Definitely, yes.

22        Q    Wednesday, Thursdays and Fridays, are you

23   often out of the office?

24        A    A good bit, yes.

25        Q    And that would be at one of these other

**Frank Whidden   July 11, 2019**

49

1    government accounting.  I think I had a knowledge

2    of it, but I was always concerned about that

3    particular issue.

4         Q    Well, other than Tom, did you express

5    your concern to anyone about being named the

6    director of finance when you didn't have any

7    financial credentials?

8         A    Like personal friends and things like

9    that, but not -- not at Mesa County.

10        Q    You didn't express it to the County

11   Commissioners?

12        A    No.

13        Q    Did you have any credentials in HR at

14   that time?

15        A    Not other than my BBA.

16        Q    Your business administration degree?

17        A    Correct.

18        Q    But I'm talking about any certifications,

19   training classes, education specifically training

20   you to be the director of HR?

21        A    No, ma'am.

22        Q    So in the Deputy Administrator's

23   position, can you give me an idea of what -- kind

24   of a day in the life of your life was like when you

25   were the Deputy Administrator?  You had, it looks

**Frank Whidden   July 11, 2019**

1   like, five to six different areas that you were

2   overseeing; is that right?

3        A    Yes.

4        Q    Okay.

5        A    Oh, okay.  So I did not at that time have

6   to attend the public hearing and there wasn't a

7   Tuesday afternoon meeting at that time, the way it

8   was set up.

9            A lot of what I spent my time dealing

10  with there was the budgets in the various

11  departments.  We were undergoing extreme budgetary

12  pressures and it was a matter of seeking

13  efficiencies wherever I could to -- we were -- we

14  were going through, just like everybody else, the

15  great recession, and we were attempting to find all

16  the efficiencies that we possibly could in those

17  operations, and that's what I spent a lot of my

18  time doing.

19            We also at that time were working on the

20  benefits side of employees' compensation and

21  particularly the health insurance, and there was a

22  great deal of attention being paid to how that

23  would be run.  We are set up as self-funded

24  insurance up to a specific loss point, so we insure

25  that part, and then we have reinsurers who pick up

**Frank Whidden   July 11, 2019**

 1   a stop-loss after that point.  And that means that

 2   we have what's called a third-party administrator

 3   that handles the claims and those kinds of things.

 4           So working on those contracts, those

 5   relationships, and how that would -- what that

 6   would look like, and there was a lot of public

 7   interest in those decisions and what was happening,

 8   so a lot of time was being spent on those things.

 9           IT, it's the usual things of what

10   equipment needs to be replaced, what software needs

11   to be replaced, what projects are we working on,

12   you know, when are they due, where are we at, and,

13   you know, what's breaking today, what needs to be

14   fixed, those kinds of things.

15       Q    So I think I understand self-pay

16   insurance, but I'm just going to ask you a few

17   questions for the record.

18           Essentially what that means is if it's a

19   self-funded insurance, that the County picks up the

20   costs for medical care of its employees up to a

21   certain amount of a -- a cap on limitations; is

22   that right?

23       A    Correct.

24       Q    Okay.  And that once the County goes over

25   that cap, does the County still have to contribute

**Frank Whidden   July 11, 2019**

54

```
 1   policy.

 2        Q    Okay.

 3        A    And depending on where that's at and

 4   where all those other caps are would say what Mesa

 5   County has to pay or the reinsurer, as the case may

 6   be.

 7        Q    Okay.  So an individual might pay their

 8   10, 20 percent deductible and then Mesa County

 9   would pick up the rest.

10        A    Yes, under the -- if we were under the

11   stop-loss, yes.

12        Q    All right.  Okay.

13             MS. GREISEN:  I'm going to take a

14   break.  We can go off the record.

15             THE VIDEOGRAPHER:  The time's 10:09.

16   We're off the record.

17             (Recess taken.)

18             THE VIDEOGRAPHER:  The time's 10:20.

19   We're back on the record.

20             MS. GREISEN:  Thank you.

21        Q    (By Ms. Greisen) Mr. Whidden, you were --

22   before I stopped us, you were talking about your

23   duties as the Deputy Administrator, and you said

24   you'd spent a lot of time on the budget, on the

25   health insurance issue.
```

**Frank Whidden   July 11, 2019**

```
1              So this was the 2014 time period that
2     we're talking about?
3          A    That's correct.  And when I said I worked
4     on the budget, I think I said I worked on the
5     budgets for all the different groups.
6          Q    Okay.  Is that the same time period that
7     Mesa County started to be self-insured for health
8     insurance?
9          A    No, ma'am.  They have been doing that for
10    a lot of years.  I don't know exactly how long, but
11    it was -- been quite a while.
12         Q    So what was new?  Why were you having to
13    spend so much time on it?
14         A    The contracts were -- the contracts with
15    the reinsurer and the third-party administrator
16    were changing or could be changed.  We had to bid
17    those out.  We were getting a lot of attention from
18    the public, from concerned citizens, and so we had
19    to spend a lot of time with what I would call
20    minute dealing with these contracts and these kinds
21    of things.  So we took a lot of time with that.
22              And then like I said, looking for
23    efficiencies in all the departments to do what we
24    could because we were under big financial pressure.
25         Q    In 2014?
```

**Frank Whidden   July 11, 2019**

```
 1        A     Since I got there in 2011, we were under
 2   pressure.
 3        Q     Well, that's true every year, hasn't it
 4   been, that there's been a lot of pressure for
 5   finances -- from a financial standpoint from the
 6   County?
 7        A     Well, certainly since I have been here.
 8   But as I understand, from what I've been told and
 9   read, the recession hit this side of the mountain
10   slower than it did the Front Range, so we went into
11   it more slowly and dealt with it much longer.  I
12   would say we really didn't start to come out of it
13   until last year.
14              And then part of what complicates our
15   budgetary situation over here is the Taxpayer Bill
16   of Rights, TABOR.  We're one of the only three or
17   four counties in Colorado, my understanding, that
18   still enforces what's the revenue cap under TABOR,
19   and that greatly complicates our whole budgetary
20   scenario.
21        Q     So how did the County start to come out
22   of it last year?
23        A     We -- in 2017, we passed what we called
24   the Public Safety Initiative.  It was put on the
25   ballot to increase sales tax by a very small
```

**Frank Whidden  July 11, 2019**

57

1    percentage in the County.  And the sheriff's office

2    and the DA, what we commonly refer to as public

3    safety, represents about 48 percent of our general

4    fund budget.  And a lot of the times when we talk

5    about, quote, unquote, our budget, we really have

6    reference to the general fund, because that's where

7    the bulk of our salaries are paid and the daily

8    operations come out of.

9           But in government, it's set up under

10   what's called fund accounting, and every fund has

11   its own rules and restriction and et cetera.  So

12   that mix is what makes the budget complicated as

13   well as the revenue cap, so we had a great sales

14   tax year.  If I was in any other county in any

15   other state in the country, we'd jump up and down

16   on the table saying we're back.

17       Q    But let me -- let me ask you because I

18   want to zero in on this question.

19           Every year that you have been at the

20   County since 2011, the County was operating at a

21   deficit; is that correct?

22       A    Legally we cannot.  It means that we have

23   to pare our budget, find efficiencies during the

24   year.  We can't go over the appropriation by law.

25       Q    Well, but the -- the County certainly has

**Frank Whidden   July 11, 2019**

1   gone into reserve funds, right?

2        A    On occasion, yes.

3        Q    Yes.

4             And what I'm trying to get at is that you

5   said last year, sometime in 2018, the County came

6   out of it, I think was the words you used.

7        A    Uh-huh.

8        Q    Was that the first time the County

9   started showing a positive increase in revenue?

10        A    In essence, yes.  Yes.

11        Q    What does that mean, "in essence"?

12        A    Well, a lot depends on your definition of

13  where you're standing at the time you make the

14  comment.  We have never gone over our appropriation

15  because we can't, but we have had to dip into

16  reserves.  Our reserves in 2011 and that time frame

17  were about 18 to 20 million dollars.  We're down

18  to -- we're bumping 11 to 12 million up until last

19  year.  And so a great year sales-taxwise, but now

20  we're facing a 4-million-dollar refund to taxpayers

21  because the revenue rose too quickly because of the

22  revenue cap.  So even if you have what was a great

23  year from a revenue perspective, there's a cutoff

24  and you have to give that money back.  So it's not

25  like we have a great year, we can pass it all out

**Frank Whidden   July 11, 2019**

```
 1   in salaries and be happy.  That's not how it works
 2   in Mesa County.
 3        Q    So in 2018, although the revenues looked
 4   good, it may also be another year where there might
 5   be a projected -- for 2018, was there a deficit or
 6   did you have to go into general funds?
 7        A    No.  And the other part to understand is
 8   that because there was that surplus, if you will,
 9   by a TABOR definition in 2018, it lags by two
10   years --
11        Q    Okay.
12        A    -- to have to pay that out.
13        Q    Okay.
14        A    So it will actually hit us with the 20 --
15   it will be paid out in 2020 if it's paid out.  They
16   all -- the commissioners also have the option to go
17   to the ballot and ask the voters can we keep that
18   refund for whatever reason.
19        Q    So if the money does have to be paid out
20   in full, is Mesa County looking at a budget deficit
21   again?
22        A    I'm not sure what you define budget
23   deficit.  It means that we may very well have to go
24   into reserves to pay that.
25        Q    Okay.  And you said the reserves were
```

**Frank Whidden  July 11, 2019**

1   between 18 and 25 when you started?

2       A    18 to 20.

3       Q    18 to 20.  I'm sorry.

4       A    And we're down -- we're down to -- prior

5   to last year when we started last year's budget,

6   around the 12-million-dollar range.

7       Q    Have you been lower than 12 million in

8   your general fund?

9       A    Not at the end of the year.

10      Q    Have you been higher?

11      A    Yes.  It's progressively gone down

12  through the recession.  It kept going down.  That

13  was part of the concern that we had.

14      Q    Did it go down in 2018?

15      A    No.

16      Q    What about 2017, did the reserve fund go

17  down in 2017?

18      A    I don't think so.  I think we were almost

19  even in 17, as I recall.

20      Q    So you hadn't built back up yet.  In

21  other words, you hadn't replenished the reserves,

22  but at least you weren't going down any further; is

23  that fair?

24      A    That is correct.  Because one of the

25  goals that the commissioners of the board had was

**Frank Whidden  July 11, 2019**

1        Q    What managers are you referring to?

2        A    The IT managers in this case, so Lhana,

3   Troy, and at that time Rick Corsi.

4        Q    Was Lhana an IT manager?

5        A    Yes.  She was the customer service

6   manager, was her title, I believe, at the time.

7        Q    And you said you were involved in who was

8   assigned to which projects?  You actually --

9        A    Yes.

10       Q    -- said, Troy, I want these people

11   assigned to this project?

12       A    We would discuss who was going to be on

13   which project.  If there was an upgrade to a major

14   system, we'd talk about which BSA or if it -- or

15   the team.  Who's going to be on the team, who's

16   going to play what parts, what roles are needed for

17   this project, who's going to -- who's going to do

18   that.

19       Q    So these were in meetings that you had

20   with the IT managers and Lhana Jordan?

21       A    Yes.

22       Q    And are there -- did you have agendas for

23   these meetings?

24       A    Not usually.  We don't usually do written

25   agendas and things like that.

**Frank Whidden   July 11, 2019**

1          MS. GREISEN:  Your objection is

2    noted for the record.

3          MR. SANTO:  And I will continue --

4     Q    (By Ms. Greisen) Mr. Whidden --

5          MS. GREISEN:  If you continue to

6    interrupt my question, I will get the phone on the

7    Court.  When I feel like a question is being

8    nonresponsive, I will interrupt the witness.  It's

9    my deposition.  You can do it at your deposition.

10         MR. SANTO:  Let me -- let me see if

11   I understand.

12    Q    (By Ms. Greisen) Mr. Whidden --

13         MR. SANTO:  So you're not letting

14   him finish the answer, right?

15         MS. GREISEN:  No.  I'm stopping him.

16    Q    (By Ms. Greisen) Mr. Whidden, I

17   understand what continuous feedback is.  I want to

18   ask about written performance reviews.

19         Did you change the format of the written

20   as well other than writing a narrative and taking

21   away the numerical?

22         MR. SANTO:  I would like to note

23   that if the court reporter kicks Mr. Whidden, you

24   should also feel free to kick the counsel who

25   interrupts Mr. Whidden.

**Frank Whidden   July 11, 2019**

```
 1        A     I changed the format to a narrative

 2   feedback.

 3        Q     (By Ms. Greisen) Uh-huh.

 4        A     That's it.

 5        Q     And you took away the objective scoring

 6   or the numerical scoring.

 7        A     That is correct.

 8        Q     And did you actually write those reviews

 9   yourself?

10        A     I did.

11        Q     And did you also sign off on reviews that

12   other people wrote?

13        A     I did.

14        Q     Okay.  And did you sign off on the

15   reviews that Mr. Flick and Mr. Corsi and Ms. Jordan

16   wrote for their employees?

17        A     I did.

18        Q     The narrative approach as opposed to a

19   numerical approach, tell me -- you said you thought

20   companies were moving away from the numerical

21   rating?

22        A     Uh-huh.

23        Q     Tell me what you mean by that.  Who's

24   moving away from it?

25        A     Companies like Microsoft.
```

**Frank Whidden   July 11, 2019**

```
 1        A    When I first came to Mesa County as IT
 2   director, we were directed to use the format that
 3   we were given, which had -- which had a numerical
 4   rating.
 5        Q    Okay.
 6        A    1 to 5.
 7        Q    And that's the system that you did away
 8   with?
 9        A    As far as my direct reports, yes.
10        Q    Okay.  So from 2011 forward, have you
11   used any objective criteria in rating employees
12   after you did away with this numerical system?
13        A    No, not -- not with my direct reports.  I
14   have not used any kind of numbers or numerical
15   rating.  No, I have not.
16        Q    With anybody else, any other employees,
17   have you used any objective factors to gauge
18   performance?
19        A    Certainly in my mind.  It's like, okay,
20   are they performing or nonperforming.
21        Q    Well, isn't that a subjective question?
22        A    That's my point.
23        Q    All right.
24        A    There is no such thing as an objective
25   system.  I don't care if you put numbers to it or
```

**Frank Whidden   July 11, 2019**

```
 1        Q    So you're using your subjective judgment
 2   to decide whether somebody's doing a good job or
 3   not --
 4        A    Absolutely.
 5        Q    -- right?
 6        A    Yes.
 7        Q    Okay.  There aren't any metrics that you
 8   use, there's no her goal was 100 chits and she got
 9   102, so she gets an A, right?
10                  MR. SANTO:  Object to form.
11        A    No.  I don't have a grid --
12        Q    (By Ms. Greisen) Okay.
13        A    -- of that kind of a thing.
14        Q    You use your personal judgment to decide
15   whether somebody has done a good job.
16        A    I might ask a question like, What does it
17   look like, the workload?  How many -- what does it
18   look like as far as the balance that's taking
19   place?
20        Q    Okay.  So you're using your personal
21   judgment as to whether or not people are doing a
22   good job.
23        A    Yes.
24                  MR. SANTO:  Same objection.
25        Q    (By Ms. Greisen) Okay.  Have you been --
```

**Frank Whidden  July 11, 2019**

1   to the terminations, that that's the -- that's the

2   document that was turned over to CCRD and I would

3   assume later to your office.  That's the file.

4   That's the one document.

5       Q    Excuse me.  I'm wrapping myself up in my

6   microphone cord.

7           So it's a document that had just the

8   names of the terminated people but not everybody in

9   IT.

10      A    I believe that's correct.  We only had

11  the people on there that we were considering for

12  termination.  There was one person on that list

13  originally who did not get terminated.  We wound up

14  being able to pay them out of another fund,

15  because --

16      Q    Who was that?

17      A    Ryan -- I'm sorry.  Ryan's last name

18  escapes me.  But he was GIS.  GIS is attached to

19  IT.  It used to be a separate department, and road

20  and bridge felt like that they really didn't want

21  us to cut down to just one person left in GIS.  So

22  they agreed that they could take that person's pay

23  out of road and bridge, so he did not get

24  terminated but he was on the list.

25      Q    Okay.  Well, let's go back, because I

**Frank Whidden   July 11, 2019**

1   Q    So why was it fair to give somebody who's

2   been with Mesa County 26 years the same relative

3   severance as somebody who had been there only a

4   couple years?

5   A    I did not try to distinguish between the

6   number of years of service.  Like I said, Rick had

7   been a longstanding manager, and I felt like that

8   should be taken into consideration.

9   Q    Had anybody else been there longer than

10  Rick?

11  A    I don't think so, but I also did not look

12  up and see who has the most years of seniority.

13  That was not a basis of my decision.

14  Q    Well, then I'm just a little confused.

15       How is it that you took seniority into

16  account because -- are you saying you did not take

17  seniority into account or you did?

18  A    I did not.  I looked at performance and

19  other -- I didn't look at, Okay, somebody's been

20  here 20 years and they should stay and somebody

21  else has been here 10 years and they should go.  I

22  did not use that as a basis of evaluation.

23  Q    Except for Rick.

24  A    Except for Rick as a longstanding

25  manager, it did occur to me that he had been there

**Frank Whidden  July 11, 2019**

1  primary financial resources for their family?

2      A    No, I really didn't.  That's not

3  something that usually comes up in the course of

4  conversation.  I don't -- even the people that I

5  know pretty well, I don't know that I know the

6  answer to that question.

7      Q    Do you know if Ms. Bouricius was?

8      A    No, I do not.

9      Q    Okay.  So you were about ready to tell me

10  how you created this initial list, and why don't

11  you list for me the factors that you used to decide

12  who to put on that list.

13      A    I went through, in my mind, the people

14  that I felt like we needed to keep, the people that

15  we absolutely could not do without, and that was

16  the list to keep, and then that, therefore, vets

17  out the ones that didn't make that list.

18      Q    So was there another list that you wrote

19  down in people that we need to keep?

20      A    Not that I write down, no.

21      Q    Okay.  Is this you sitting and thinking

22  in your head like, Okay, well, we can't lose this

23  person, we can't lose this person, and then, just

24  by process of elimination, writing the names of the

25  other people down?

**Frank Whidden   July 11, 2019**

1      A     Basically, yes.

2      Q     Okay.  So prior to making that list, did

3  you talk to anyone about what you were thinking?

4      A     Yes.  I had spoken to the commissioners,

5  because they had tasked me with finding the budget

6  shortfall that we were facing if we didn't make

7  changes.  I did not talk to them about any

8  individual specifics at all.  They told me you need

9  to -- this is your task.  Find us -- the number was

10  about $1.4 million overall, over the whole County.

11  And that was the shortfall at that point we were

12  looking at for the next year.

13      Q     When did you have this discussion with

14  the Board of County Commissioners about the budget

15  shortfall?

16      A     Before this decision was made, in the

17  months before, sometime before that.  It wasn't a

18  long time before that.  A couple of months, maybe.

19  It wasn't a long time.  It wasn't long before we

20  made these changes.  But I don't know -- I couldn't

21  tell you an exact date.  I don't remember.

22      Q     Was this at a board meeting?

23      A     No.

24      Q     So this is just you informally talking

25  with the commissioners?

**Frank Whidden  July 11, 2019**

1    A    Correct.

2    Q    And you had these informal chats with the

3  commissioners about a prospective budget shortfall

4  that was coming up?

5    A    Yes.

6    Q    And did you simply tell them what you

7  were going to propose to do to address that

8  shortfall?

9    A    In the sense that I felt like I would

10  have to make decreases in personnel, yes.

11    Q    Did you tell them that?

12    A    I'm sure that I told them that, yes, I

13  was -- I was thinking that I would have to make

14  cuts in order to get to that level of reduction in

15  the budget.  The only place that could come from

16  was personnel reduction.

17    Q    You would have to do a layoff?

18    A    Uh-huh.  And --

19    Q    You have to say yes or no.

20    A    I'm sorry.  Yes.

21    Q    That's okay.

22    A    More -- and there were more layoffs.  It

23  was around the County system, not just IT.  There

24  were other layoffs in elected divisions and those

25  kinds of things as well.  So I'm not saying that

**Frank Whidden  July 11, 2019**

1    I don't remember what the order of companies was.

2    About the time -- it was one season, so about the

3    time I went to work for the University of West

4    Alabama, I would say, in between there.

5         Q    So going back to what we were talking

6    about before we took a break, you mentioned that

7    you had talked with Rose Pugliese about the layoffs

8    or who -- about the need for layoffs; is that

9    right?

10        A    Correct.

11        Q    In 2016?

12        A    Yes.

13        Q    Did you talk with any of the other County

14   Commissioners about that?

15        A    Yes.

16        Q    Which ones?

17        A    Both of the others.

18        Q    Okay.  Was there a public discussion held

19   about the 1.4-million-dollar deficit?

20        A    No.

21        Q    Was there a public discussion held about

22   potential layoffs?

23        A    Not before, no.  Not before any layoffs

24   were made, I don't believe, no.

25        Q    So is it your belief that there were

**Frank Whidden   July 11, 2019**

```
 1   discussions -- public discussions after the layoffs
 2   about the layoffs?
 3        A    As far as the whole County, yes.
 4        Q    Well, I imagine at that point it was
 5   public knowledge, right?
 6        A    Yes.
 7        Q    And did the board discuss it at public
 8   meetings?
 9        A    Yes.
10        Q    And what was discussed?
11        A    The major topic of conversation was
12   closing the two DMV offices in Clifton and Fruita.
13        Q    Well, let me be more specific.
14             What was discussed about the layoffs that
15   you decided on?
16        A    I don't recall those being specifically
17   discussed as a separate matter.
18        Q    So the board never took a vote as to who
19   should be laid off?
20        A    No.  That was left to my discretion.
21        Q    And did you actually tell the Board of
22   County Commissioners who you intended to lay off?
23        A    I don't recall that I gave them any kind
24   of a list or enumerated names.
25        Q    Did anyone else, to your knowledge?
```

Frank Whidden  July 11, 2019

 1   October -- September, October of 2016.  What other

 2   options did you look at, other than --

 3        A    Other than personnel?

 4        Q    -- laying off...

 5        A    I was aware that to reach this kind of an

 6   amount, the highest portion of our budget are

 7   salaries, and this was the only logical thing to

 8   look at to reach this kind of reduction.

 9        Q    When you say this kind of amount, what

10   kind of amount are you talking about?

11        A    The amount that we were saving in

12   salaries year over year.

13        Q    What -- just can you give me a ballpark

14   of what number you're talking about?

15        A    I was trying to, as a County, achieve the

16   target of 1.4 million.

17        Q    So you were trying to achieve a budget

18   cutback of 1.4 million annually?

19        A    Yes, at least.

20        Q    And did you achieve that in 2016?

21        A    I think we were very close, yes.  Now,

22   the budget reduction took effect in the next year.

23   So it was the next year's budget was where we had

24   to have the reduction, not in the year where we did

25   the terminations.  It was the next year's budget

**Frank Whidden   July 11, 2019**

1   was where the shortfall was that we were trying to

2   meet.

3        Q    I may be remembering your testimony

4   wrong, but I thought you testified previously that

5   you were also in a budget deficit in 2017.

6        A    We had done a hire -- we had done some

7   things, yes, to try to be as efficient as we could

8   and to make reductions, yes.  But it wasn't to the

9   magnitude that we were thinking we were facing in

10  the following year.

11       Q    Was there -- was there a hiring freeze in

12  2017?

13       A    I'm thinking that we did because it went

14  over the year.  We -- I'm pretty sure that there

15  was for '17.  I don't remember if it was all year

16  or partial year.

17       Q    Do you remember if it was the beginning

18  or the end of the year?

19       A    It was beginning, for sure.  I'm pretty

20  sure we had it in the first of the year, for sure.

21       Q    So was that a complete hiring freeze at

22  the beginning of the first, what, six months of

23  2017?

24       A    I would say yes.  Now, when I say a

25  complete freeze, there were exceptions made.  The

Frank Whidden  July 11, 2019

1   board could grant exceptions, and they did

2   particularly in the area of public safety.  Public

3   safety was excluded.

4        Q    Any other exceptions?

5        A    They had historically made exceptions for

6   Department of Human Services, because a lot of

7   those positions are only funded about 10 percent --

8   10 to 20 percent are funded by the County fund.

9   Most of that comes out of State and federal money.

10       Q    I'm just wondering if, during the hiring

11  freeze of 2017, to your knowledge, were there any

12  exceptions made for hiring other than in public

13  safety?

14       A    That's what I'm trying to explain, is

15  that they did -- they would make exceptions at

16  times for DHS because of the way they're funded.

17       Q    So did they in 2017?

18       A    I believe, yes.

19       Q    Do you know what position it was that

20  they hired?

21       A    No, I don't remember.

22       Q    So when you had these informal

23  discussions with the Board of County Commissioners

24  about this layoff, did the Board of County

25  Commissioners -- any of the Board of County

**Frank Whidden  July 11, 2019**

1   Commissioners tell you to lay off people or did you

2   tell them that you were going to need to lay off

3   people?

4        A    It was that we were facing the

5   1.4-million-dollar problem and my -- I was told to

6   do what I could to try to meet that, so they did

7   not tell me lay off personnel.  They did not say

8   that.

9        Q    Any documentation created about your

10  discussions with the Board of County Commissioners?

11       A    Not to my knowledge.

12       Q    Okay.  So I want to try to understand the

13  timeline.  The first thing that happens is you

14  realize there's going to be a 1.4 deficit.

15            When did you find out that that was going

16  to occur?

17       A    Somewhere after the time we started the

18  budget season, which normally is in the June, July

19  time frame we start the budget season for the next

20  year.  And the board had told public safety,

21  because they were a higher priority, that that's

22  where the money would go and, therefore, the 1.4

23  million, and that we had to find it somewhere else

24  then or try to -- we had to.  We had to find that

25  money somewhere.

**Frank Whidden   July 11, 2019**

137

```
 1    that work with that spreadsheet that I referred to.
 2         Q     Did Mr. Flick give you any specific
 3    information about Ms. Bouricius' performance?
 4         A     Not that I recall.
 5         Q     Did Ms. Jordan give you any specific
 6    information about Ms. Bouricius' performance?
 7         A     She did agree that there was weakness in
 8    customer service.
 9         Q     But specifically with respect to Ms.
10    Bouricius, did she give you any information about
11    Ms. Bouricius' performance?
12         A     Yes.  She said that she had weakness in
13    customer service.
14         Q     So Ms. Jordan said that Ms. Bouricius was
15    weak in customer service?
16         A     Uh-huh.
17         Q     And did she give you any more -- give you
18    any more details?
19         A     She said that there had been people
20    around the County who had complained about
21    incidents that Deb had worked on.
22         Q     Can you give me an example?
23         A     I don't remember specifically.  Deb was
24    over the Eden system, which is the financial
25    system, and that would have been the system that
```

**Frank Whidden   July 11, 2019**

```
 1   she would have been particularly involved with, I
 2   would think, in giving assistance.  She had worked
 3   with me personally on that and I had observed some
 4   issues I thought with her customer service.
 5        Q    What issues did you observe?
 6        A    I felt like she was less than helpful
 7   with an attitude that like, well, I've showed you
 8   and she didn't want to come back and deal with it
 9   again when I had the same problem again the next
10   week.
11        Q    Did you document that issue?
12        A    No.
13        Q    Any other issues that you had with her
14   performance?
15        A    No.  I would say that there were -- there
16   was skill sets I thought that weren't there as far
17   as other systems, that she wasn't -- she didn't
18   work with, as far as I knew.
19        Q    Okay.  Well, let's get back to Ms.
20   Jordan.
21             Did Ms. Jordan give you any specifics on
22   how she thought Ms. Bouricius had weaknesses in
23   customer service?
24        A    As I said, she said she had customer
25   complaints.
```

**Frank Whidden   July 11, 2019**

```
 1        Q    Did she give you any more information
 2   than that?
 3        A    Did she name somebody?  I don't recall.
 4   This has been too many years ago.  I don't remember
 5   a specific name saying, Well, she dealt with
 6   so-and-so personally and this was the problem that
 7   was there, no.
 8        Q    Where was this meeting?
 9        A    I don't remember where we had that
10   conver -- wait.  Are you talking about when I met
11   with Troy and Lhana?
12        Q    Yeah.
13        A    Oh, I'm sorry.  In my office.
14        Q    Did you call a meeting?
15        A    Yes.
16        Q    And did you, at that meeting, give them
17   the list of names that you were going to lay off?
18        A    Yes, I shared the list with them, the
19   names.
20        Q    How long was that meeting?
21        A    I don't remember.  It wasn't a hugely
22   long time.  I don't -- less than an hour.
23        Q    Did you tell them why you decided on the
24   people you chose?
25        A    No.  What I asked them was was to --
```

**Frank Whidden   July 11, 2019**

```
 1    he thought we couldn't do without Rick, he would

 2    say so and so would Lhana, that they would -- they

 3    would tell you that, Well, now wait a minute,

 4    Frank.  I think he's got this particular set of

 5    skills.  One thing you need to understand is Rick's

 6    not technical.  By that I mean he doesn't have an

 7    IT background.  He's GIS, government information

 8    systems, mapping.  That's where he comes from.

 9    That's what he does.

10         Q    Did Troy supervise Rick?

11         A    No.  They were -- they were peers.

12         Q    Did Lhana supervise anybody on the -- on

13    the list of people to be terminated?

14         A    Yes.

15         Q    Who did she supervise?

16         A    The lady who was on the help desk.  She

17    supervised her, and Troy supervised Janine.  So

18    there were people out of -- out of almost every

19    group, there was people who were reduced.

20         Q    So the customer service manager was

21    responsible for supervising which employees?

22         A    The technicians and the help desk.

23         Q    Okay.  So there were two technicians?

24         A    No.

25         Q    Technical support specialist, is that
```

**Frank Whidden  July 11, 2019**

149

1    that you have now.

2            I want to know as of the time the

3    decision was made in October of 2016, was there any

4    other information, other than your general

5    knowledge, about staff as to who to lay off?

6        A    I think the answer to that is no.  I'm

7    sorry.  I got lost thinking about the earlier

8    question.  You might want to ask that again so I

9    can answer, please.

10       Q    Okay.  Ask --

11       A    Oh, sorry.

12       Q    I'm happy to -- I'm not quite sure which

13   one you mean.

14            I was asking about what evidence you base

15   your decision on in your expert opinion in

16   September, October of 2016.  Can you point to any

17   evidence other than your -- your own knowledge?

18       A    It was all my knowledge of what they did

19   and the experience and the interaction that I have

20   had with the IT staff.

21       Q    And did you look at any documents to

22   arrive at that expert opinion?

23       A    No.

24       Q    Who did you talk to in forming that

25   opinion?

**Frank Whidden   July 11, 2019**

```
 1          Q     Did you --
 2                     MS. GREISEN:   Is this interfering
 3     with you?  Okay.
 4          Q     (By Ms. Greisen) Did you talk with anyone
 5     other than the attorneys about the facts that
 6     formed the basis of your opinion?
 7          A     No, other than -- unless you count the
 8     meeting where Troy -- I discussed with Troy and
 9     Lhana the people that I was going to release, but I
10     didn't talk about -- we didn't get into, well, why
11     did you pick this one or why did you pick that one.
12     We did not -- that wasn't part of the discussion.
13          Q     So in this preliminary meeting with Troy
14     Flick and Lhana Jordan, the three of you did not
15     discuss the ins and -- the details of who was being
16     picked, right?
17          A     That is correct.
18          Q     Okay.  And is it your testimony that you
19     didn't discuss that with anybody?
20          A     That is correct.
21          Q     Okay.  And did you document the basis for
22     that opinion in any manner?  Did you document your
23     decision to terminate those specific employees?
24          A     No.
25          Q     To your knowledge, did anybody else
```

**Frank Whidden   July 11, 2019**

```
 1   document that?

 2       A    No.  I don't know how anyone else would

 3   have known.  I didn't discuss it with them.

 4       Q    So did you provide your attorneys with

 5   information on performance-related issues regarding

 6   Ms. Bouricius?

 7       A    No.

 8       Q    And that's because your decision wasn't

 9   based on performance; is that correct?

10       A    Correct.

11       Q    The decision was strictly based on skill

12   set; is that right?

13       A    I might correct.  It was based on -- the

14   whole thing was a budgetary discussion.

15       Q    Uh-huh.  Well, you've said that you

16   didn't pick people based on performance.  You

17   didn't pick people based on seniority.  So was

18   there the reason that you did pick people on?  I'm

19   trying to get to -- I know what you didn't pick

20   them on.

21            But what was the basis for you to go

22   through and choose?

23       A    As I --

24                MR. SANTO:  Object to form.  Go

25   ahead.
```

**Frank Whidden   July 11, 2019**

1    A    As I said earlier today, I looked at the

2   skill set that I thought we needed to have

3   remaining and who could provide the best skill sets

4   for what we needed to do in the future going

5   forward, and the people who were not on that list,

6   as far as who did I need to keep, were the people

7   who would go.

8    Q    (By Ms. Greisen) So what skill sets

9   were -- did you decide were needed for the future?

10    A    To provide support for all the systems,

11   hardware and software, that we support at Mesa

12   County.

13    Q    Anything more specific than that?  I

14   mean, that's kind of the whole purpose of the IT

15   department in general.

16    A    Correct.

17    Q    So I'm saying you're saying looking

18   forward, you wanted to pick the people who were

19   most qualified to provide these skill sets.

20         Can you give me any other basis for what

21   you were looking at, other than providing IT

22   support?

23    A    I think it -- it needs to be

24   all-inclusive because that's -- like as you just

25   said, that's what we do and that's what I was

**Frank Whidden   July 11, 2019**

 1   looking at.

 2       Q    Can you give me any more details other

 3   than that?

 4       A    No, ma'am.

 5       Q    Did you -- in determining what people's

 6   skill sets were, did you look at job descriptions?

 7       A    No.

 8       Q    Did you look at the employees'

 9   performance reviews?

10       A    No.

11       Q    You were asked by the Colorado Civil

12   Rights Division to interview with their

13   investigator, right?

14       A    Yes.

15       Q    And you declined to be interviewed,

16   right?

17               MR. SANTO:  Are we still on the

18   expert designation part of it or have we moved out?

19               MS. GREISEN:  Well, I may come in

20   and out, depending on my question.  I'm just asking

21   him whether or not he declined an interview.

22               MR. SANTO:  I need to understand the

23   question because if it's not as part of the expert,

24   then that would make it attorney-client privilege.

25               MS. GREISEN:  I don't think whether

**Frank Whidden   July 11, 2019**

```
 1    because I wanted to make sure that hopefully we
 2    wouldn't get to where we're sitting today.
 3         Q    Did you give Patrick the name of the
 4    people that you were wanting to terminate?
 5         A    I don't remember specifically telling him
 6    who was on the list.  I knew his office had access
 7    to that information.  We were discussing more in
 8    terms of, you know, am I -- is there -- are we
 9    worried about categories that we can't discriminate
10    against, those kinds -- those HR questions.  Are we
11    going to trip any bright wires about this problem?
12         Q    So let me understand.  You talked with
13    Patrick specifically about whether or not there
14    could be any claim for discrimination based on the
15    group of laid-off people?
16         A    Yes.
17         Q    Is that right?
18         A    Yes.
19         Q    And -- but you didn't give him the names
20    of who the people were?
21         A    I don't remember sitting in the meeting
22    and saying name by name by name who they were.
23         Q    Well, how would -- tell me, then, how you
24    gave him enough information to form an opinion.
25         A    He told me as long as it was a strictly
```

**Frank Whidden   July 11, 2019**

1   budgetary decision and we were removing the

2   positions, then we were good to go.  That's what he

3   told me.

4       Q    So you never sat down and reviewed the

5   list of people you wanted to terminate with him.

6       A    I do not recall going with him over name

7   by name.

8       Q    Okay.

9       A    I don't recall that.

10      Q    And did you give that information to Ms.

11  Atencio?

12      A    I did not personally.

13      Q    To your knowledge, did anyone else?

14      A    I believe Krista did.

15      Q    And she gave you the -- Krista gave her

16  the information about the list of people that you

17  were proposing?

18      A    Yes.  I believe she shared the

19  spreadsheet that I have discussed.  I believe she

20  did with Nina.

21      Q    And that was prior to the implementation

22  of the decision?

23      A    Correct.

24      Q    Okay.  And did you have any conversations

25  with Nina in forming your expert opinion as to

**Frank Whidden   July 11, 2019**

 1          MR. SANTO:  I believe he answered

 2     that one as well, did he not?

 3          A    I said I read certain thing -- I read

 4     some stuff that came from the CCRD.  I don't

 5     remember exactly what that contained.

 6          Q    (By Ms. Greisen) Well, in forming an

 7     expert opinion in this case, did you try to gather

 8     as much information as you could to form the basis

 9     of your opinion?

10          A    Yes.

11          Q    So what information did you gather to

12     form the basis of your expert opinion?

13          A    I relied on my knowledge and experience

14     of the skills and the mix that was there of the

15     people who were involved.

16          Q    Were you aware that the State of Colorado

17     determined that there was probable cause to believe

18     that Ms. Bouricius' termination was illegal

19     discrimination based on age?

20          MR. SANTO:  Object to form.

21          A    I knew that -- yes, that they said that

22     she could move forward with an allegation.

23          Q    (By Ms. Greisen) Well, I'm not asking you

24     if you knew that they said she could move forward.

25          I'm asking:  Are you aware that the State

**Frank Whidden  July 11, 2019**

```
 1    of Colorado determined there was probable cause to

 2    believe Ms. Bouricius was discriminated against

 3    based on her age?

 4         A    No.

 5                   MR. SANTO:  Same objection.

 6         A    I did not realize that that was the

 7    State.

 8         Q    (By Ms. Greisen) Is it your testimony

 9    you've never read the determination?

10         A    I said I don't remember it saying that.

11         Q    Is it fair to say that if the State of

12    Colorado had made such a determination, that's

13    something that would stand out to you?

14         A    Yes.  I would think that, but there's

15    been an awful lot of material surrounding this

16    case.

17         Q    Well, I agree that there has, but the

18    question really was:  Do you think that would

19    impress you in any way to have a finding by the

20    State of Colorado that there was probable cause to

21    believe Ms. Bouricius was discriminated against?

22         A    I think if you look at the statistics of

23    the CCRD, that it's not surprising to say that

24    they're going to have a finding of some kind when a

25    case like this is brought.
```

**Frank Whidden   July 11, 2019**

```
 1    don't -- it's not attorney-client privilege, so I'm

 2    not instructing the witness not to answer, but it's

 3    outside the scope of his designation.

 4         Q    (By Ms. Greisen) Okay.  Go ahead,

 5    Mr. Whidden.  Can you answer my question?

 6         A    I do not have an expert opinion as an

 7    expert about legal compliance.

 8         Q    As the County Administrator, do you have

 9    an opinion about whether Rick and Janine Corsi's --

10    whether Rick or Janine Corsi were discriminated

11    against on the basis of age from Mesa County?

12         A    Do I have an opinion about that?

13         Q    Yeah.

14         A    I believe they were not.

15         Q    Okay.  And can you tell me all the

16    evidence that you have to support your opinion.

17         A    Certainly.  Age had no basis in my

18    decision whatsoever.  I made my decision based on

19    the budget and the decision that needed to be made

20    about reduction in cost.

21         Q    Did you see -- well, strike that.

22              As an expert, are you aware of any

23    investigations made by Mesa County into any

24    complaints of discrimination concerning the 2016

25    layoff?
```

**Frank Whidden   July 11, 2019**

```
 1                    MR. SANTO:  Object as outside the
 2    expert designation.
 3        A     I'm not aware of any investigations that
 4    were made based on any allegations from them.
 5        Q     (By Ms. Greisen) As an expert, have
 6    you -- or did you request that any such
 7    investigations be conducted?
 8                    MR. SANTO:  Same objection.
 9        A     No, because as far as my expert opinion
10    is concerned, that's outside what I would be
11    opining about.
12        Q     (By Ms. Greisen) Did you -- as an expert,
13    did you review any investigations conducted by Mesa
14    County into allegations of discrimination?
15                    MR. SANTO:  Same objection.
16        A     No.
17        Q     (By Ms. Greisen) Fair to say -- well,
18    have you reviewed any of the documents brought
19    by -- regarding complaints of discrimination
20    brought by Rick and Janine Corsi?
21        A     I'm -- I don't remember if I saw any
22    particular documents.  Nina spoke to me about what
23    was going on, but I don't remember if I saw
24    specific documents about Rick and Janine from the
25    CCRD, or anything else for that matter.
```

**Frank Whidden   July 11, 2019**

```
 1        Q    Are you aware that the CCRD also found
 2   that there was probable cause to believe that Rick
 3   and Janine Corsi were discriminated against on the
 4   basis of their age when they were terminated in
 5   2016?
 6        A    No.  The County Attorney's office handled
 7   the settlement with -- with them.  I was not party
 8   to that discussion.
 9        Q    I'm just asking if you're aware that the
10   State of Colorado found that there was probable
11   cause to believe age discrimination --
12        A    I don't remember what -- which
13   allegations the CCRD found with -- with them.  I
14   don't remember.
15        Q    Do you remember if they found any
16   allegations in support of -- or determinations in
17   support of Rick and Janine?
18        A    No, I don't remember if there were
19   because, as I said, that got settled, and I don't
20   know what stage they were in when that happened.
21        Q    Well, would it be important to you, as
22   County Administrator, to find out that the State of
23   Colorado determined that Mesa County -- there was
24   probable cause to believe that Mesa County had
25   committed age discrimination?
```

**Frank Whidden   July 11, 2019**

```
 1    discrimination lawsuit.
 2              I'm saying:  In your career at Mesa
 3    County, have you ever -- are you aware of any
 4    situation in which Mesa County, in the HR
 5    department, substantiated a claim of illegal
 6    discrimination by an employee?
 7         A    Not --
 8                   MR. SANTO:  Same objection.
 9         A    Not that I can recall.
10         Q    (By Ms. Greisen) Okay.  Let's take it
11    beyond Mesa County.
12              In your entire career, have you ever been
13    employed by an employer or been the boss yourself
14    where you have substantiated a claim of illegal
15    discrimination?
16                   MR. SANTO:  Object to form.
17         A    Not that I can recall.
18         Q    (By Ms. Greisen) So it's my understanding
19    that in all three cases -- for Rick Corsi, Janine
20    Corsi, and Ms. Bouricius -- you were the sole
21    decision-maker regarding who would be laid off; is
22    that correct?
23         A    Yes.
24         Q    Okay.  So I'm still a little unclear
25    about exactly what your expert opinions are at
```

**Frank Whidden   July 11, 2019**

1    A    Yes, I believe so.

2    Q    And that is basically you looked around

3  and saw basically who you thought you couldn't live

4  without and they made the keep list, and the people

5  you thought you could do without made the go list.

6    A    That's pretty much it, yes.

7    Q    Any other expert opinions?

8    A    Not that I can think of.

9    Q    When did you become aware that Rick

10  and/or Janine Corsi had complained about age

11  discrimination?

12    A    I don't remember specifically that theirs

13  was an age complaint.  I saw a rather lengthy

14  document that I believe Rick had written and it

15  went on and on and on and made all kinds of

16  allegations, and I don't remember specifically what

17  they all were, but there was a long list.  It was a

18  long document.

19    Q    Was there a point in time that you were

20  aware that Rick and/or Janine Corsi made complaints

21  of age discrimination?

22    A    I don't remember specifically what

23  counsel told me the allegations were to CCRD or

24  what CCRD upheld.

25    Q    So is it fair to say you don't -- you did

**Frank Whidden   July 11, 2019**

```
 1        Q    Okay.  So have you told me now all the
 2   skills that you think Ms. Bouricius did not have
 3   that were needed?
 4        A    I think -- if I mentioned customer
 5   service, I think so.
 6        Q    You said customer service, documentation,
 7   and knowledgeable about systems.
 8             Are those the three?
 9        A    I would say yes.
10        Q    Okay.  And is that also true that -- do
11   you know if she -- sorry.  Strike that.
12             Do you know if she had been written up
13   for any performance reviews on any of those three
14   issues?
15        A    Not to my knowledge.
16        Q    Did you look to see?
17        A    No.  Not when I was making this
18   determination, no.
19        Q    So who is the person probably the most
20   familiar with Ms. Bouricius' skill set at the time
21   in October of 2016?
22        A    I would say Rick Corsi would be the
23   most --
24        Q    So did you --
25        A    -- then the other two managers also
```

**Frank Whidden   July 11, 2019**

220

1   had -- they all work very closely together, so...

2        Q    So -- but Rick Corsi was her direct

3   supervisor.

4        A    Direct supervisor, sure.

5        Q    So did you go and talk to Mr. Corsi about

6   what skills Ms. Bouricius did or did not have?

7        A    No.

8        Q    Why not?

9        A    Because I could not signal this action

10  ahead of time.

11       Q    Well, you wouldn't have to tell him he

12  was going to be a part of a layoff, right?

13       A    I could not signal with a layoff of this

14  size what was coming.  Rumors start very quickly,

15  and that would present a security risk for IT.

16       Q    But didn't you signal it to Troy Flick

17  and Lhana Jordan?

18       A    Only immediately beforehand.

19       Q    Oh, I thought you told me there was a

20  conversation at least a week beforehand.

21       A    I'm saying -- okay.  When I say

22  immediately beforehand, that's what I'm talking

23  about --

24       Q    Uh-huh.

25       A    -- is it was right there and they were

Frank Whidden   July 11, 2019

1    she was the main BSA supporting that.

2         Q    Well, what I'm trying to get at:  Was --

3    was there a time where you worked closely with her

4    on a project as opposed to just kind of like having

5    a one-off, here's a problem, somebody needs to fix

6    it or something like that?  I mean, I'm trying to

7    figure out how substantive this interaction is.

8         A    Substantive is -- I don't know about that

9    part.  But there's no question that I did not have

10   as much interaction once I became the Deputy

11   Administrator and the County Administrator.  Simply

12   there are only so many hours in the day.  But I was

13   still involved with IT.  I mean, IT is my baby,

14   okay?  That's my background.  That's my --

15        Q    I'm just trying to figure out how much

16   interaction you had with Ms. Bouricius.

17        A    I had interaction.  I don't know -- I --

18   I don't think I had it on a daily basis, by any

19   means, and I couldn't say how frequently.  I don't

20   remember that.

21        Q    Couple times a year?

22        A    I would say more than that, but I don't

23   know.

24        Q    But you don't know?

25        A    No, I don't remember.  I don't -- as I

**Frank Whidden   July 11, 2019**

1      A      Right.

2      Q      Were there any big projects that Ms.

3    Bouricius worked on that you were involved in?

4      A      I can't recall one in particular.  I'm

5    sure we did like Eden upgrades and things like that

6    that she would have been involved in, but I don't

7    remember one specifically saying, yeah, that

8    particular one.

9      Q      Okay.  Can you tell me any time she was

10   disciplined or talked to about her skills regarding

11   project management?

12     A      I don't know if Rick spoke to her about

13   that or not.  I didn't.

14     Q      Can you tell us what areas in the IT

15   department that Ms. Bouricius worked on in her 26

16   years of employment with Mesa County?

17     A      As I just said, Eden was the main, and

18   then there were -- the software stack is divided up

19   between the BSAs, and I can't -- we have over 100

20   systems.  I don't know exactly which ones each one

21   was responsible for.  I know -- as far as I know,

22   she never worked on New World, as far as I know,

23   and that was a particular skill that Lori had, for

24   instance, that was critical.

25     Q      Well, I'm asking a slightly different

**Frank Whidden   July 11, 2019**

1   question, which is:  You're aware Ms. Bouricius was

2   there for 26 years -- over 26 years, right?

3       A    I did not know how long she had been

4   there.

5       Q    Okay.  Does that sound about right to

6   you?

7       A    I know it was a long time, yes.

8       Q    Okay.  So sitting -- can you tell me,

9   other than the skills that she was using and the

10  project she was working on at the time of her

11  termination, what her skill set was throughout her

12  tenure at Mesa County?

13      A    No.  I did not read the -- any old files

14  or what had happened before.  I did not read any of

15  that.

16      Q    So how did you know what experience Ms.

17  Bouricius had in different areas?  Was it just

18  based on your personal observation?

19      A    My personal observation, the feedback

20  that I got from other managers, and then -- and

21  clients.

22      Q    Okay.  So tell me, were there -- did her

23  manager or clients complain about her?

24      A    Rick did not.

25      Q    Did any other manager?

**Frank Whidden  July 11, 2019**

 1      A    Lhana did have -- she said that she had

 2   had complaints from customer -- about customers and

 3   customer service.

 4      Q    Okay.  But none documented that you're

 5   aware of?

 6      A    I don't know if there was anything in the

 7   work orders or not that stated, Okay, I don't like

 8   how this ended up or I'm not happy with the

 9   resolution.  I don't know.  I'm not saying that

10   there isn't.

11      Q    What year were these complaints made?

12      A    I don't know.

13      Q    Well, was it close in time to her

14   termin -- to Ms. Bouricius' termination or was it

15   many years prior?

16      A    It was, I would say, yeah, close enough

17   to her termination that I remembered it, was aware

18   of it, and felt that it was an issue.

19      Q    And what was it that the complaint was

20   based on?  What kind of complaint was it?

21      A    As I --

22      Q    What did they complain about?

23      A    As I stated earlier, they felt that she

24   was not as helpful as she should be, that she

25   would -- that a question would arise and instead of

**Frank Whidden   July 11, 2019**

1   they fit in.

2           So it wasn't so much to specifically try

3   to answer your question, you're better than

4   somebody else at doing this, although to me she was

5   head and shoulders above everybody else in the

6   department.

7       Q    Were there skills that Ms. Bouricius had

8   that Lori did not have?

9       A    I don't think Lori is as strong on the

10  Eden system as Deb was or is.

11      Q    What about Terrie Hotary, are there

12  skills that Ms. Bouricius had that Ms. Hotary did

13  not have?

14      A    She was much more senior and I thought,

15  yes, she probably had stronger skills in, for

16  instance, SQL, Sequel, and Eden itself.

17      Q    SQL?

18      A    Structured Query Language.

19      Q    So SQL and -- and Eden.

20           Are there any other skill sets that Ms.

21  Bouricius had that were stronger than Ms. Hotary's?

22      A    I think those were the main ones.

23               MR. SANTO:  We're going to need a

24  break.  I'm not feeling quite as well.

25               MS. GREISEN:  It is not my fault.

**Frank Whidden   July 11, 2019**

1    that's where Liz was based until she left us.

2         Q    Do you know who the project manager was

3    on New World when it was implemented?

4         A    No, that was before my -- the start of

5    the implementation was before my time.

6         Q    At any point in time, do you know who the

7    project manager was?

8         A    I thought Lori was.

9         Q    What makes you think that?

10        A    Because, as I said, she was the one that

11   was involved and knew what was going on and had

12   been there forever, was so involved with law

13   enforcement, and seemed to be the go-to person.

14   When a question would come up on the system or what

15   are we going to do or things like that, as far as I

16   could tell, Lori always took the lead.

17        Q    Do you know if Ms. Bouricius had any role

18   in the New World project?

19        A    I never observed her having a role after

20   I was there, but before that, I clearly don't know.

21        Q    What about -- okay.  You said the GIS.

22             What percentage of her time -- Ms.

23   McDowell's time was spent on the GIS versus the

24   other business system analyst work?

25        A    I don't know.  There was a percentage,

**Frank Whidden   July 11, 2019**

1    what they do.  Working on printers, troubleshooting

2    those -- the hardware piece of all of that.  That's

3    their particular skill set.

4         Q    So do you know whether or not Ms.

5    Bouricius had any of that skill set at the time she

6    was terminated?

7         A    If she did, I certainly had never seen

8    any evidence of it.

9         Q    Did you ask anyone?

10        A    No, because it's a pretty safe bet in the

11   IT world that if somebody's on the software side of

12   the house and they are into coding and database

13   administration and those kinds of things, that they

14   are not a hardware person.  It's like a separation

15   of duties.

16        Q    And what skills did Andrew Wetzel have

17   that Ms. Bouricius did not have?  Is it essentially

18   the same answer?

19        A    Yes.  He -- at the time that the

20   terminations were made, he was a tech.  He's now

21   moved over to the network team, but -- so he had --

22   as well as the end-user hardware, he also had

23   networking skills along the lines of like what Troy

24   and Ron and those -- Bill Tarlton, what they can

25   do.  As far as I know, again, she doesn't have that

**Frank Whidden   July 11, 2019**

1    skill set, the network administration and server

2    administration skills and all that kind of thing.

3        Q    Do you -- I'm trying to figure out what

4    you base that knowledge on, other than your

5    personal observation.

6            Do you -- have you looked to see in any

7    of her tenure history what she's actually worked on

8    while at Mesa County?

9        A    I said before I did not look at

10   historical records about had she ever been a

11   hardware tech or anything like that.  I haven't

12   looked at that.

13       Q    Do you know if she ever performed the

14   duties of a senior support specialist during her 26

15   years?

16       A    I do not know.

17       Q    And Joseph Keene, he is a Web

18   administrator?

19       A    Joe, yes.

20       Q    Joe.  What skill sets did he have that

21   Ms. Bouricius did not have?

22       A    He -- Joe was on the Web team and he

23   worked with the Web administration and those kinds

24   of things; and to my knowledge, I didn't know that

25   she had any skill set in that area.

**Frank Whidden  July 11, 2019**

254

```
 1        Q    Well, I was just going to ask you my next
 2   question.
 3             Do you know whether she, Ms. Bouricius,
 4   was ever a Web administrator during her career at
 5   Mesa County?
 6        A    I did not know that.
 7        Q    Did you know at one time she was the only
 8   Web administrator?
 9        A    I did not know that.
10        Q    Is there any reason that you're aware of
11   that Ms. Bouricius could not have been transferred
12   to one of the Web administrator or support
13   specialist jobs instead of terminated?
14        A    I did not know she had any skill set in
15   that area or had worked in that area, certainly
16   since I have been there, since 2011, and it was
17   never brought up when I asked the question about
18   who had the skill sets that we needed and do we
19   have the right people on the boat.  Joe and Lani
20   were the ones who had the skill sets that -- in
21   this case, Troy wound up running that team -- that
22   he thought they would need in order to get the job
23   done.
24        Q    So -- I'm sorry.  It's your testimony
25   that Troy said that Joe and Lani had the expertise?
```

**Frank Whidden  July 11, 2019**

 1      A    Correct, in the sense that when I asked

 2   the question -- here's the list.  Do you see a

 3   problem there with what we're doing?  He didn't

 4   say, Oh, well, Deb's got more strength in Web

 5   administration than Joe does and so we should pull

 6   Deb over there, which is what I would have wanted

 7   him to say if that were the case and he had

 8   knowledge of that.

 9      Q    Did you tell him that, though?  Did you

10   say, Look, can we move these people around any, in

11   any way?  For instance, Joshua Dallman is a support

12   specialist who had been there for 1.3 years.

13      A    Uh-huh.

14      Q    Was there a discussion about, Well, maybe

15   we should look and see what skills a 26-year

16   employee has to see if, rather than termination, we

17   can move her into that spot?

18            MR. SANTO:  Objection.

19      A    No.

20            MR. SANTO:  Go ahead.

21      A    No, I did not, and one reason was he

22   makes probably half the pay that she did, and my

23   guess was that that would be an insult to Deb to

24   suggest that she take that much of a pay cut.

25      Q    (By Ms. Greisen) Did you look at it?

**Frank Whidden   July 11, 2019**

```
 1        A     Yes.   As far as, again, TCP/IP, the

 2   Windows stack, the security protocols, how to

 3   maintain identity within a network system.  He had

 4   a broader knowledge of, I believe, IT security.  He

 5   had taken lead on that.  He had a much stronger

 6   background as far as writing scripts and shells and

 7   handling the log-in scripts and those kinds of

 8   things.  Bill had a lot of experience in all of the

 9   above that, to my knowledge, Janine really didn't

10   have.

11        Q     And is that just based on your personal

12   experience or is that based on documented evidence?

13        A     That was based on my personal experience.

14        Q     And did you ever see any documentation

15   showing that Janine did not have those

16   knowledges -- that knowledge?

17        A     I never saw her produce any work product

18   along those lines that could tell me that she could

19   do it, and I saw her failings as far as Novell and

20   Google was concerned.

21        Q     Did any of those four network

22   administrators have a higher degree in education in

23   computer science?

24        A     I honestly don't know what their degree

25   levels were.  I was going based on their
```

**Frank Whidden   July 11, 2019**

```
 1    performance and the work product that I saw.
 2         Q    Okay.  Again, it was based on the
 3    performance that you personally observed.
 4         A    Yes.
 5         Q    Did you have any discussions with anybody
 6    about Janine Corsi's shortcomings or performance
 7    issues --
 8         A    I did.
 9         Q    -- prior to --
10         A    Yes.  With Troy.
11         Q    With Troy.  When was that?
12         A    I don't remember the timing.  I just know
13    that we discussed it.  I know -- I know that it had
14    become evident to me by the time we were getting
15    rid of the Novell system and coming up on Google,
16    and I didn't like the fact that she was going to
17    take the Google lead but she did, and I thought
18    that was going to be problematic.
19         Q    Well, what did Troy -- did Troy
20    discipline her for something?
21         A    I -- not to my knowledge.
22         Q    So I thought you said Troy talked with
23    you about performance issued related to Janine.
24         A    Yes.
25         Q    Okay.  So what performance issues did
```

**Frank Whidden  July 11, 2019**

```
 1        A     To supervise the BSAs.  Right after the
 2   terminations were done, because somebody had to
 3   take the lead on that.
 4        Q     So right after Ms. Bouricius was
 5   terminated, Lhana Jordan assumed the
 6   responsibilities of supervising the BSAs?
 7        A     Yes.
 8        Q     And did she also get a raise?
 9        A     I believe I gave her a small raise at
10   that time.  I think I did.  I'm not certain.  She
11   has had subsequent raises, for sure.  I think so.
12   I think --
13        Q     So this was in 2016, she would have
14   gotten a raise?
15        A     I honestly don't remember.  We had that
16   freeze on, and I can't remember if that was a
17   problem with doing any raises at that point.  I
18   don't remember for sure if she got one before the
19   end of '16 or not.  I don't remember.
20        Q     Did anyone else get a promotion after the
21   2016 layoffs?
22        A     Not until quite some time later.  Troy
23   got the Web team and GIS, but he didn't get any
24   promotion.  His title didn't change.  So I split
25   the teams that Rick had between Troy and Lhana.
```

**Frank Whidden  July 11, 2019**

1  except Deb's got the software side of things that

2  Rick didn't have.  Deb -- wait.  You're comparing

3  Rick to Lhana.

4       Q    No.  I'm comparing Deb to Lhana.

5       A    Oh.  As far as I knew, again, the

6  hardware skill -- hardware skills of a technician,

7  all of the things associated with desktop user

8  support, and then stronger customer service skills.

9       Q    When you say "desktop user support," how

10 was Lhana more skilled at desktop user support than

11 was Ms. Bouricius?

12      A    I see her do that all day, every day.  I

13 never observed or was told or had any information

14 that Deb had any skills in that area.

15      Q    Okay.  Do you have any other evidence of

16 desktop user -- of Lhana being stronger in desktop

17 user support than Ms. Bouricius other than what

18 you've just testified?

19      A    No.

20      Q    And you said hardware skills.  You

21 believe Lhana has better hardware skills than Ms.

22 Bouricius?

23      A    Yes.

24      Q    And what's that based on?

25      A    Personal observation.

**Frank Whidden   July 11, 2019**

1   Q    And you said -- oh, you said also that

2   Lhana had better software skills.

3   A    No.  Better customer service skills.

4   Q    Better customer service.

5        Again, is that just based on your

6   personal observation?

7   A    Yes.  And also, as I said earlier, about

8   information I had been given about customer

9   complaints.

10   Q    From Lhana.

11   A    From Lhana.  I've had -- I've had

12   customers tell me that they didn't like the service

13   that they received.

14   Q    What customers?

15   A    Kristen Cole would be one.  I don't

16   remember exactly who said that to me over the

17   years.

18   Q    So Kristen Cole.  What -- what -- what --

19   A    She's administrative assistant and -- and

20   I think Kristen was there before Deb left.

21   Q    So what year was this complaint made?

22   A    I don't remember.

23   Q    Was there anything in writing about it?

24   A    Not unless there was something in work

25   orders that covered it.  I didn't read anything

**Frank Whidden   July 11, 2019**

 1   that I can recall.  It was verbal.

 2       Q     So why do you need these skills to be a

 3   manager?

 4       A     I think that in order to manage,

 5   especially frontline technicians, you've got to

 6   have a knowledge of the work that they are doing.

 7   That's what I think.

 8       Q     And you think Lhana had better knowledge

 9   of that than Ms. Bouricius?

10       A     Yes.

11       Q     Again, is that just based on your

12   personal observations?

13       A     Yes.  And I've also heard the flip side

14   of customers rave about Lhana and the work that she

15   does and the relationship to the users.

16       Q     Okay.  And I think I cut you off before

17   and I apologize.

18             We were talking about this chart.  You

19   called it a compensation table.

20       A     Uh-huh.  Yes.

21       Q     Thank you.

22             What -- what, if any, role -- I take that

23   back.

24             Where -- did you say HR keeps a copy of

25   that?

**Frank Whidden   July 11, 2019**

 1  accurate job descriptions that existed at the time

 2  of Ms. Bouricius' termination.

 3       A     As far as I know, I believe they are.

 4       Q     Okay.  You said earlier that you believed

 5  all the policies and procedures at Mesa County were

 6  followed.  Can I see your stack, please, the rest

 7  of it.

 8             Turning to Exhibit 48, and if you look on

 9  Page 48, you will see a copy of the policy

10  regarding layoffs in Section 8.03.  Do you see

11  that?

12       A     Yes.

13       Q     And it's your testimony that that policy

14  was followed with respect to Ms. Bouricius'

15  termination; is that correct?

16       A     Yes.  I asked counsel to review and make

17  sure that what we were doing was -- was compliant,

18  and I was told that it was.

19       Q     Okay.  Well, you have the policy in front

20  of you.  The policy requires that with a layoff,

21  employees get 30 days' notice prior to the

22  effective date of termination, right?

23       A     Yes, it says that.

24       Q     And, in fact, employees were not given 30

25  days' notice prior to the effective date of their

**Frank Whidden   July 11, 2019**

1    termination, right?

2        A    They did not get 30 days' notice.

3        Q    In fact, employees were given their final

4    paycheck on October 7th --

5        A    I believe that is --

6        Q    -- right?

7        A    -- correct, yes.

8        Q    So technically in the policy, the last

9    effective working date for the employees should

10   have been November 7th of 2016, right?

11       A    If you construed that policy strictly

12   speaking, yes.

13       Q    Well, I'm just reading it.

14       A    No, I hear you.

15       Q    I'm just asking you.

16       A    But in an IT situation, I believe any IT

17   professional will tell you that you've got to be

18   very careful about telling IT staff about a coming

19   layoff and that there's an extreme security risk

20   there.  That was one reason that I was trying to

21   give them as much severance as possible so that

22   they would have the 30 days.

23       Q    Well, you could have given them 30 days

24   until their last date -- effective date of

25   termination and not given them access to the

**Frank Whidden   July 11, 2019**

```
 1        Q    Did Janine or anybody else make any
 2   comments at that meeting?
 3        A    A couple of people made comments.  Janine
 4   did.  And I don't remember if anybody else said
 5   anything or not.  I remember Janine made a comment.
 6        Q    What was her comment?
 7        A    It looks like you're letting only the
 8   most senior people go, something along that line.
 9        Q    And what did you say?
10        A    I disagreed.  I said if you look around
11   the table, I don't think -- not everybody here has
12   the same amount of seniority.  The people who are
13   staying is not the same.  I disagreed.  I kept my
14   comments very short.
15        Q    So did you respond to her at all about
16   her complaint about the fact the oldest people were
17   being -- oldest employees were being terminated?
18   Did you give her any substantive response other
19   than you disagree?
20        A    I said, If you look around this table, I
21   don't think that's the case, as well as the people
22   who are remaining.  I said words to that effect.
23        Q    And did you report her complaint of
24   discrimination to anyone?
25                  MR. SANTO:  Object to form.  Go
```

**Frank Whidden   July 11, 2019**

1   sure, as I said, I would talk to counsel about

2   what's going on and is there -- do we -- are we --

3   which I had already vetted, but, you know, is there

4   an issue there?

5          I did not -- I did not understand her

6   comment to be about age discrimination.  I did --

7   that's not the way I understood her comment.

8      Q    So correct me if I'm wrong.

9          Are you saying that if a comment of

10  illegal discrimination occurs in the context of a

11  termination, then no subsequent investigation is

12  required?

13              MR. SANTO:  Object to form.

14     A    I believe that in that case, I would take

15  it to the attorneys and say, What do we need to do?

16  And I would certainly talk to the people who have

17  the HR certifications about, Okay, what do you-all

18  think about this scenario?  I had -- Brenda was in

19  the room and heard what was said.

20     Q    (By Ms. Greisen) So I'm asking you as the

21  director of HR.

22     A    I hear you.

23     Q    Did you document it or report it to any

24  person?

25     A    No.

**Frank Whidden  July 11, 2019**

1    Q    Well, did you approve -- I think your

2  testimony is you did not approve that?

3    A    To the best of my knowledge, I was not

4  involved in the decision of the settlements.

5    Q    Were you involved in the decision of the

6  settlements with Janine Corsi?

7    A    No, no.  Same answer as Rick.

8    Q    So you did not authorize the settlement

9  with Janine?

10    A    No.

11    Q    Was there a formal vote taken by the

12  Board of County Commissioners either with respect

13  to Mr. or Ms. Corsi's settlement?

14           MR. SANTO:  In executive session or

15  in open session?

16           MS. GREISEN:  No, votes can't take

17  place in executive session.

18           MR. SANTO:  I just wanted to

19  clarify.  I understand.

20           MS. GREISEN:  Yeah.

21    A    To the best of my knowledge, there was

22  nothing stated in a public meeting about any

23  settlements, to the best of my knowledge.

24    Q    (By Ms. Greisen) Did you talk with the

25  Board of County Commissioners about the settlements

**Frank Whidden   July 11, 2019**

```
 1    just --
 2         A     Who else -- who else was involved in
 3    this.
 4         Q     In making the decision to terminate --
 5         A     Right.
 6         Q     -- these individuals.
 7         A     That was -- that was me, and then if
 8    you -- depending on how you want to count Troy and
 9    Lhana when I asked them to vet the list.
10         Q     But you were the sole decision-maker.
11         A     Yes.
12         Q     Okay.
13         A     I was.
14         Q     Do you still operate your outside
15    business of marriage and family therapy?
16         A     It exists.  I don't -- I'm not actively
17    doing anything right now.  I hurt my back back in
18    January, and I only ever had one set of clients, so
19    I don't think I can be said to be operating a
20    business.
21         Q     Well, you got a license to conduct this
22    business, right?
23         A     I have what's called a candidate's
24    license, yes.  And that was the point of trying to
25    set that business up, is because I have to amass
```

**Frank Whidden   July 11, 2019**

```
 1        Q    And you had tuition bills and Mesa County
 2   paid those tuition bills to you, correct?
 3        A    They -- yes.  We categorized that as
 4   training and, yes, they were paid.
 5        Q    You decided what was training?  I'm
 6   sorry.
 7        A    Huh?
 8        Q    What was training?
 9        A    Those classes were training.
10        Q    So training for your position as Mesa
11   County Administrator?
12        A    It was part of that, yes.  We have a
13   significant suicide problem that's well documented
14   in the county.  We deal with -- the sheriff says he
15   has the largest mental hospital in Mesa County.
16   And so there's a significant amount of exposure as
17   far as the mental health community -- the mental
18   health problem in our community.
19             Having discussed it with the
20   commissioners -- for instance, at performance
21   evaluations -- they agreed that it made sense --
22   while I'm not an expert, it made sense for me to
23   become knowledgeable in that area, and they signed
24   off on me doing that.
25        Q    What relevance does couples and sex
```

**Frank Whidden   July 11, 2019**

```
 1   therapy have to your job as a County Administrator?

 2        A    I've found that emotional wounds are

 3   involved in sex and a lot of the problems they have

 4   that go into problems like suicide and things like

 5   that are involved with that.

 6        Q    So you give employees sex therapy at

 7   work?

 8        A    I did not say employees, but people in

 9   the community.  I spent -- I had to get 500 hours

10   of clinical in order to obtain the degree.  Most of

11   that was worked on the weekends in the crisis

12   center at Mind Springs, and every possible human

13   condition, just about, that you can think of --

14        Q    Well, that's not quite --

15        A    -- was involved.

16        Q    -- my question.  I'm trying to figure out

17   how -- let's -- let's go back.

18             You -- you asked for and received

19   approval from the Board of County Commissioners in

20   November of 2015, after my client's termination,

21   you asked and received approval for Mesa County to

22   pay for your couples and sex therapy class so that

23   you could get your license, right?

24        A    So that I could obtain the degree and

25   obtain -- basically obtain the credential to be
```

Frank Whidden   July 11, 2019

```
 1    able to sit at a decision-making table with people
 2    like from Mind Springs and the sheriff's office and
 3    other entities with the County -- Partners,
 4    Strive -- to be able to carry on intelligent
 5    conversation with those people.
 6         Q    So you're saying it's directly related to
 7    your County Administrator's work?
 8         A    Yes.
 9         Q    And all these classes that you took
10    that -- let's see, that -- that -- the sex --
11    couples and sex therapy class, that was $2,286.
12              Does that sound about right?
13         A    Yes.
14         Q    And then you took another class in
15    December for another 2,286, right?
16         A    That sounds right.
17         Q    And it looks like there were several
18    classes after that, and then your practicum was
19    also paid for by Mesa County, right?
20         A    Yes.
21         Q    Is there any interest that Mesa County
22    would have in you actually getting your license in
23    family therapy, other than simply taking the
24    classes?
25         A    Yes.  To be able to participate in the
```

**Frank Whidden   July 11, 2019**

326

```
 1   the appropriations had already been made for '17,
 2   but we were concerned that we were -- we were going
 3   to go over, that we were going to have problems,
 4   that we weren't going to have -- let me put this
 5   another way.  We weren't going to have the revenue
 6   to cover the appropriations that had been made.
 7        Q    So I'm going to ask this.  It may come
 8   off as tongue in cheek, but it seems like every
 9   year you have been there, there have been budget
10   deficits.
11        A    I would certainly say budget problems,
12   yes.
13        Q    Budget problems.
14        A    Yes.
15        Q    And in at least in the last handful of
16   years, you have laid off staff and reduced FTEs in
17   certain departments, right?
18        A    Yes, yes.
19        Q    But in 2018, you got almost a 38 percent
20   salary raise, right?
21        A    That is correct.
22        Q    You went from a salary of around 130,000
23   a year to $180,000 a year --
24        A    That is correct.
25        Q    -- right?
```

**Frank Whidden   July 11, 2019**

 1      Q    And she doesn't have it based on your

 2   personal observation; is that right?

 3      A    That is correct.

 4      Q    And then the Web administrators, Ms.

 5   Boyles and Mr. Keene?

 6      A    We didn't really talk about Lani, but we

 7   certainly talked about Joe, that as far as I knew,

 8   to the best -- that they had more Web administrator

 9   skills, HTML skills, Hypertext Markup Language.

10   It's language of the Internet.  As far as I knew,

11   and the scripting and the programming, they had --

12   Joe had stronger skills and Lani had stronger

13   skills than that.  I didn't know she had any skills

14   in that area.

15      Q    You didn't know who?  Ms. Bouricius?

16      A    Ms. Bouricius had skills in that area.

17      Q    And Elizabeth McDowell, have you told me

18   everything --

19      A    Yes.

20      Q    -- with respect to that?

21      A    Yes.

22      Q    And with the support specialists and

23   technical support specialists, is it just generally

24   that they work on hardware, and that would be their

25   skill that Ms. Bouricius did not have?

**Frank Whidden  July 11, 2019**

```
 1        A      Generally speaking, yes.  But Paul is

 2   help desk extraordinaire.  He is simply amazing and

 3   is able to handle all manner of -- whether it's

 4   hardware, software, he is amazing.  And so cus --

 5   from customer service and all of that, Paul -- so I

 6   think he's got some tremendous skills there that,

 7   to my knowledge, that's not -- that's not her

 8   forte.

 9        Q      Do you know whether Ms. Bouricius has

10   ever worked on the help desk?

11        A      I do not know.

12        Q      Did you ask anyone?

13        A      No.

14        Q      Okay.  What about the -- we've gone

15   through Terrie Hotary and I think we've gone

16   through Tarlton.

17        A      Uh-huh.

18        Q      Eric Farslow, does he have any skills

19   that Ms. Bouricius doesn't have?

20        A      Same comment as the other technicians.

21   He's got extreme skills with the hardware and the

22   frontline techs, just like the others that we

23   discussed.

24        Q      Okay.  Is that true with all the support

25   specialists, kind of this frontline --
```

344

```
 1    to have these memorized.  So I'm going to put the
 2    complaint, which is Exhibit 12, in front of you and
 3    ask if you could -- Matter No. 15 asks you to
 4    describe the facts supporting the denial of Mesa
 5    County's -- Mesa County's denial of the allegations
 6    in Paragraph 22.
 7              Do you have Paragraph 22 in front of you?
 8    A     I believe this is it on Page 4.
 9    Q     Can you just read the --
10    A     Yes.
11    Q     -- assertion that's being denied.
12    A     Ms. Bouricius was a consistently
13    high-performing employee whose job performance was
14    always satisfactory throughout her employment at
15    Mesa County.
16    Q     Do you deny that statement?
17    A     No.
18    Q     Okay.  Just so the record's clear,
19    because sometimes when you get a double negative,
20    it's really hard to figure out what a person meant.
21              Would you agree with the paragraph or the
22    allegations or the statements set forth in
23    Paragraph 22 of the complaint?
24    A     I believe that she was a consistently
25    high-performing employee whose job performance was
```

**Frank Whidden   July 11, 2019**

 1    always satisfactory through her employment at Mesa

 2    County.

 3         Q    Thank you.

 4              Would you go down to Paragraph 27 of the

 5    complaint and read that.

 6         A    The individual who selected IT department

 7    employees to be laid off was Mesa County

 8    Administrator Frank Whidden, who also served as

 9    Mesa County's IT department director and human

10    resources director.

11              That is a true statement.

12         Q    So the statements made in Paragraph No.

13    27 are true, correct?

14         A    Yes, that is correct.

15         Q    And just go down to 28 and 29 of the

16    complaint and tell me if the statements made in

17    Paragraph 28 and 29 of the complaint, in your

18    opinion, are true or not.

19         A    28 says:  Because Whidden served as both

20    IT director and County Administrator, Mesa County's

21    written human resources policies provided that

22    Whidden would recommend individuals to the Board of

23    County Commissioners.

24              I disagree with that.

25         Q    Okay.  Go ahead to the next one.

**Frank Whidden  July 11, 2019**

352

```
 1   STATE OF COLORADO)
 2                   )ss.    REPORTER'S CERTIFICATE
 3   COUNTY OF MESA  )
 4        I, Candice F. Flowers, do hereby certify that
 5   I am a Certified Shorthand Reporter and Notary
 6   Public within the State of Colorado; that previous
 7   to the commencement of the examination, the
 8   deponent was duly sworn to testify to the truth.
 9        I further certify that this deposition was
10   taken in shorthand by me at the time and place
11   herein set forth, that it was thereafter reduced to
12   typewritten form, and that the foregoing
13   constitutes a true and correct transcript.
14        I further certify that I am not related to,
15   employed by, nor counsel for any of the parties or
16   attorneys herein, nor otherwise interested in the
17   result of the within action.
18        In witness whereof, I have affixed my
19   signature this 20th day of July, 2019.
20        My commission expires February 14, 2020.
21
22
23                         _____
                           Candice F. Flowers, CSR
24                         671 Alexia Court
                           Grand Junction, CO 81505
25
```