# EXHIBIT F

Transcript of the Testimony of

## JANINE CORSI
**April 22, 2019**

### Debra Bouricius
### v
### Mesa County, et al.

# Linda L. Frizzell, RPR

*Linda L. Frizzell, RPR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444



Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                 April 22, 2019

                                                      Page 11

 1      A.  Yes.

 2      **Q.  And what is your position?**

 3      A.  Community College of Denver.  I'm a -- they just

 4  changed our title to analyst, and when I was hired it was

 5  desktop technician.

 6      **Q.  Okay.  And when did you start Community College**

 7  **of Denver?**

 8      A.  It was August of -- let's see.  We got laid off

 9  in October 2016, so it must have been August of 2017.

10      **Q.  Okay.  And you were laid off from Mesa County in**

11  **October of 2016, correct?**

12      A.  Yes.

13      **Q.  And I believe you just testified your title was**

14  **network administrator?  Is that true?**

15      A.  Uh-huh.

16      **Q.  What were your job responsibilities?**

17      A.  Pretty much anything to do with network

18  security, infrastructure, hardware and software,

19  supporting the various departments, maintaining the

20  firewall, maintaining the servers, backups, email,

21  administration.

22      **Q.  How long had you worked at Mesa County?**

23      A.  I started in July of 19- -- no, I started in

24  March of 1992 -- 1993.  Sorry.  Because my kids were born

25  in March of 1994.

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

```
                                                    Page 14

 1        A.  Because she was kind of disturbed by he called

 2   her "sweetheart," and she thought it was inappropriate.

 3   So she brought that to the attention of HR, I think.

 4        Q.  Okay.

 5        A.  And to my husband.

 6        Q.  Was your husband her supervisor then?

 7        A.  Um.  No, I don't think she ever worked for him

 8   directly.

 9        Q.  Okay.  Do you recall who was head of HR that she

10   complained to -- or I'm sorry.  Did you say the head of

11   HR or just HR?

12        A.  She brought it up to Rick, and then he could

13   probably tell you more.  I can't really remember who they

14   talked to about it.  They just thought it was odd.  She

15   thought it was odd the way he was calling her

16   "sweetheart" and "honey" kind of thing, and then they

17   thought maybe because he was from the South.  I don't

18   know.  This is all just things I heard.

19        Q.  Okay.  Do you know if anything ever came of it?

20   Their complaint?

21        A.  I don't think anything ever came of it.  He --

22   Frank ended up getting hired at a lower level than he is

23   now.

24        Q.  Okay.

25        A.  The commissioners moved him up into county
```

Debra Bouricius                                              JANINE CORSI
Mesa County, et al.                                          April 22, 2019

Page 17

1    actually, I think Lhana worked for Troy, and then there
2    was some PC support people:  Derek Conlon, two other guys
3    that were PC support, and then there was Paul Mitts and
4    Chrislynn Howerton were the -- basically the phone help
5    desk.  They would answer the calls and create tickets and
6    that kind of thing.
7            And then my husband had web group, which was
8    Leilani Boyles and Joe Keene; the GS group:  Chris Kadel,
9    and Ryan, I can't remember his last name; and then the
10   BSA group, which was Lori Marak, Deb Bouricius, Terrie --
11   she was -- I can't remember her last name, Kelly
12   Leuallen, and David Barnett.  They were all business
13   systems analysts.
14           Basically, he had web, database, and GIS and
15   business systems analyst.  And Troy had network
16   administration and help desk.  And Frank was directly
17   above Rick and Troy.
18       Q.  So when Frank Whidden was the IT director, was
19   his office in your space?
20       A.  No.  He was in the third floor of the
21   courthouse, which is kind of a -- it's an older building,
22   so it's kind of in, like, the spiral staircase.  So there
23   wasn't a lot of direct contact with Frank.  He would come
24   down occasionally.
25       Q.  How often?

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

                                                    Page 18

 1      A.  You could go a couple of weeks without seeing

 2   him.  He didn't directly come down usually unless

 3   something was broken --

 4      **Q.  And this was --**

 5      A.  -- the network was down or something.

 6      **Q.  And this was when he was the IT director alone?**

 7      A.  I'm remembering more when he was finally the

 8   administrator, but I'm not sure even when he was IC

 9   director that he really -- I didn't have much contact

10   with Frank directly.

11      **Q.  Did he ever have an office like within the IT**

12   **department, a physical office?**

13      A.  Yeah, I think he did, and then he went -- when

14   he became county administrator, he moved upstairs.

15      **Q.  Do you recall how long he was just the IT**

16   **director?**

17          MS. SEVERN:  Object to form.

18      A.  I'd say maybe a year and a half or something.

19   I'm not really sure.

20      **Q.  (BY MS. BISBEE) What kind of interaction would**

21   **you have with Frank when he was the IT director?**

22      A.  Occasionally, have a meeting with everybody.

23   Talked to him maybe a couple times when email was a

24   problem.  We were having problems with our email not

25   being delivered, and I was kind of the person stuck with

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                      April 22, 2019

```
                                                           Page 19
 1   administering the email.  So -- but normally he would
 2   talk to the managers, not really talk to me, or he'd go
 3   through the channels.
 4        Q.  Could you say how many times you and he had a
 5   one-on-one conversation when he was the IT director about
 6   IT work?
 7        A.  I can remember.  Maybe three times.
 8        Q.  In a year and a half?
 9        A.  However long he was there, yeah.  I can't really
10   recall exactly.
11        Q.  Was he involved in your review process at all?
12        A.  I hadn't been reviewed.  They weren't doing --
13   Troy wasn't doing reviews.
14        Q.  Okay.  How do you mean?
15        A.  He just didn't do them.
16        Q.  Do you know when --
17        A.  I hadn't been reviewed for a few years.  I think
18   that was in my original statement.
19        Q.  Okay.  So at the time of your layoff, you hadn't
20   been reviewed for a few years?
21        A.  Uh-huh.  Yes.  He hadn't -- Troy hadn't reviewed
22   anybody, and he didn't like doing it and I think he just
23   avoided it.  They were supposed to do them every year.
24        Q.  Do you know when Troy became your supervisor?
25        A.  Maybe five or six years before I got laid off.
```

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                               April 22, 2019

                                                      Page 23

 1   **Ryan?**

 2        A.   Yeah, I think --

 3             MS. SEVERN:   Object to form.

 4        A.   -- I think so.

 5        **Q.   (BY MS. BISBEE) Do you know if she supervised**

 6   **him?**

 7             MS. SEVERN:   Object to form.

 8        A.   I believe so.

 9        **Q.   (BY MS. BISBEE) Okay.   So in your role as**

10   **network administrator, can you explain to me just a**

11   **little bit of what that means?**

12        A.   Okay.   Well, we had a server room with all our

13   servers that ran email, ran close to databases for the

14   sheriff's office for CJSD.   It ran -- it had application

15   servers, it had web servers, so that was kind of the

16   core.   And then all that information that was stored had

17   to be backed up and made sure that if something happened,

18   we could recover it from a disaster or if something

19   happened to that room.   So there was a lot of planning

20   that went into disaster recovery.

21             There was a lot of just day-to-day help desk

22   tickets where some user would have a problem, and we'd

23   get a ticket to go fix it basically.   And there was doing

24   upgrades where we would go out and replace equipment,

25   switches and -- we had fiber between the buildings that

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

Page 24

1    we maintained the connections between the buildings.  We

2    had a firewall to protect the information that we had to

3    manage, and VPNs so people could work probably -- and

4    every so often they would decide to upgrade a system.  So

5    that would be -- we would be involved in provisioning the

6    servers, purchasing the servers to support the

7    applications that, you know, the sheriff's office wanted

8    to buy, and we'd help convert -- convert their data.  A

9    lot of it -- some of it was just, you know, driven by

10   help desk tickets, and other -- others were -- other

11   parts of it were working on projects.  It was kind of two

12   different types of work.

13        **Q.  Okay.  Now, did the whole IT department have**

14   **help desk responsibilities or just the network**

15   **administrators?**

16        A.  They would get tickets in the BSA group or the

17   web group, but we would get a lot more, I guess.

18        **Q.  Okay.  Did it just depend on the kind of ticket**

19   **it was --**

20        A.  Yeah.

21        **Q.  -- or was it a first-come/first-served type of**

22   **thing?**

23        A.  They would assign it to the network group if

24   they thought we were the ones that could solve it;

25   otherwise, it would go to -- if it was an application

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

Page 28

 1      A.   Yeah, he moved up to the third floor with the
 2   commissioners.
 3      Q.   Okay.  And how often did you see him in your
 4   work area after that?
 5      A.   Very rarely.
 6      Q.   Was it more than once a week?
 7      A.   No.
 8      Q.   Was it --
 9      A.   You know, I'd say you could go three, four weeks
10   without seeing him.  I could anyway.
11      Q.   Did he ever ask you about your work?
12      A.   He usually would go to somebody else, but if I
13   was the only person that knew, he would ask me about the
14   email, what was going on.
15      Q.   Okay.  I mean, did he ever actually ask you
16   about what it is you do on a daily basis?
17      A.   No.
18      Q.   Did you ever receive any feedback from Troy
19   Flick that Frank Whidden was upset with your work
20   performance?
21           MS. SEVERN:  Object to form.
22      A.   No, not that I recall.
23      Q.   (BY MS. BISBEE) Did anyone ever tell you that
24   Frank Whidden was upset about your work performance?
25      A.   No.

Debra Bouricius                                        JANINE CORSI
Mesa County, et al.                                    April 22, 2019

```
                                                     Page 29
  1        Q.  Have you ever had a negative review at Mesa
  2   County?
  3        A.  No.
  4        Q.  Did you observe Mr. Whidden spend any time with
  5   other IT staff?
  6        A.  He would come down and talk to Bill and Troy and
  7   sometimes Carey and Ron.  I forgot about Ron.  So I'd say
  8   direct contact was mostly with Troy and Rick.  He didn't
  9   get involved that much, Frank didn't.
 10        Q.  So I just want to clarify, so this is Bill
 11   Tarlton --
 12        A.  Ron Sage, Carey Stieb, and myself were the four
 13   network administrators.
 14        Q.  Do you know how old Bill Tarlton is?
 15        A.  I think he might have just turned 40 a while --
 16   before we were -- at or around the same time.
 17        Q.  Okay.  What about Troy Flick?
 18        MS. SEVERN:  Object to form.
 19        A.  He was in his 40s.
 20        Q.  (BY MS. BISBEE) Ron Sage?
 21        MS. SEVERN:  Object to form.
 22        A.  He might have been under 40.
 23        Q.  (BY MS. BISBEE) Do you know how old Carey
 24   Stieb was?
 25        MS. SEVERN:  Object to form.
```

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                    April 22, 2019

                                                        Page 30

    1        A.  In his 40s, I'd say.

    2        Q.  (BY MS. BISBEE) Later 40s?

    3            MS. SEVERN:  Object to form.

    4        A.  Well, I know Ron was 18 years older than me -- I

    5    mean, younger than me, because he was born when I

    6    graduated high school or something.  I remember that

    7    fact.

    8        Q.  (BY MS. BISBEE) All right.

    9        A.  And I'm 62 now.  So that would have been --

   10    anyway, I don't know their exact date of birth or

   11    anything, but they weren't young.

   12        Q.  Okay.  Were you one of the oldest?

   13            MS. SEVERN:  Object to form.

   14        A.  Yeah, I was.

   15        Q.  (BY MS. BISBEE) Okay.  Did anyone in your

   16    department ever discuss with you your age?

   17        A.  Not directly, but we talked about Rick and I

   18    retiring sometimes.

   19        Q.  So your coworkers would ask you about

   20    retirement, is that --

   21        A.  I know we'd talk about it.  I don't know.  I

   22    would just say, When we had enough money, you know,

   23    that's when we'll retire.

   24        Q.  Who -- who is "we"?  Who were you having these

   25    conversations with?

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                      April 22, 2019

Page 31

1        A.   In our little group meetings with Troy, Ron,
2   Carey, Bill and I.
3        **Q.   How would your retirement come up?**
4        A.   Just joking mostly.
5        **Q.   And would you bring it up?**
6        A.   I don't recall exactly how it came up.
7        **Q.   Was anyone in particular engaging you about your**
8   **retirement during these conversations?**
9        A.   No.  I just got the feeling that I was kind of
10   being put on the shelf as far as not being given new
11   projects, just maintaining the old system, that kind of
12   thing.
13        **Q.   And who was responsible for assigning you work?**
14        A.   Troy.
15        **Q.   Was Mr. Whidden also involved?**
16        A.   Not directly.  He would say things like, We need
17   to virtualize all the desktops, and Troy would try and
18   figure out how to do that.  And usually it would be him
19   and Ron getting together and planning things out.  I know
20   that Bill and Carey and I felt excluded a lot on the
21   decision-making.  Definitely there was some favoritism
22   going on with Troy, and Ron was definitely his favorite.
23        **Q.   And Ron was -- was he the one that was 18 years**
24   **younger than you?**
25        A.   Uh-huh.

Debra Bouricius                                              JANINE CORSI
Mesa County, et al.                                         April 22, 2019

Page 36

    1        Q.  Is there anything specific you can tell me about

    2   Deb Bouricius' work?

    3            MS. SEVERN:  Object to form.

    4        A.  She was kind of more serious like me.  Not

    5   kind -- kind of no nonsense; just wanted to get it done,

    6   get the work done, but she got along very well with

    7   everybody, you know.

    8        Q.  (BY MS. BISBEE) Okay.

    9        A.  As far as I could tell.

   10        Q.  Okay.  Was she knowledgeable?

   11            MS. SEVERN:  Object to form.

   12        A.  Yes.  She -- she was involved in some big

   13   projects like the new rule system for the sheriff's

   14   office and the finance conversion.  She was the kind of

   15   go-to person for that and really the only person that

   16   knew much about it.

   17        Q.  (BY MS. BISBEE) And knew much about what

   18   specifically?

   19        A.  Eden, the finance system that they had.  She was

   20   the point person for that in IT.

   21        Q.  Okay.

   22        A.  And she managed projects.  She worked with the

   23   vendors, worked with the users, and she seemed to get

   24   along with everybody.  She would get kudos.

   25        Q.  Okay.  And anything that you can recall

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

Page 38

 1        Q.  Was that just by virtue of the department
 2   growing?
 3        A.  Yeah.
 4        Q.  More internet-based services, et cetera, et
 5   cetera?
 6        A.  More interconnecting buildings and building up
 7   the network infrastructure, the fiber between buildings.
 8   And there was just a lot of that happened.  We went from
 9   Unix to Windows.  We got rid of a big -- a couple big
10   mini computers.  But -- so Deb kind of evolved to -- from
11   doing the Unix and Fornix to doing Microsoft SQL server.
12   So it was constantly changing.
13             You have to just try and keep up.  But I always
14   valued Deb's opinion.  She always seemed very wise to me,
15   and she is a hard worker.
16        Q.  Did you ever ask her anything she couldn't help
17   you out with?
18        A.  No.  If she didn't know the answer, she'd find
19   out for me.
20        Q.  Was she one of the most, in your opinion,
21   experienced BSAs?
22             MS. SEVERN:  Object to form.
23        A.  Yes.
24        Q.  (BY MS. BISBEE) Okay.
25        A.  Her and Kelly Leuallen, I would say.  I would go

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                    April 22, 2019

Page 39

 1   to them first if I need -- needed to know something.

 2         Q.  Okay.  Do you know when Kelly started?

 3             MS. SEVERN:  Object to form.

 4         A.  He started shortly after I did, I believe.

 5         Q.  (BY MS. BISBEE) Okay.  So he's been there less

 6   time as Deb as well?

 7         A.  Yes, he started more as a PC support person.

 8         Q.  Are you aware of any problems anyone at Mesa

 9   County had with Deb Bouricius' work?

10             MS. SEVERN:  Object to form.

11         A.  No.

12         Q.  (BY MS. BISBEE) Did you ever hear that she

13   didn't complete a project?

14             MS. SEVERN:  Object to form.

15         A.  No.  The problems that came up were mostly the

16   vendors not performing, but she didn't have any control

17   over that.

18         Q.  (BY MS. BISBEE) So I'm sorry, it's -- your

19   testimony is that if one of her projects had an issue,

20   it was generally a vendor problem not --

21         A.  Yeah, just the software wasn't designed to do

22   what they needed it to do.

23         Q.  Okay.  So if she could make a patch, would she

24   make the -- the right patch on that?

25         A.  She'd work with the vendors to get the problems

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                     April 22, 2019

Page 48

1        Q.  So you walk in and there's just a guy sitting
2    there?
3        A.  Yeah.
4        Q.  And McKay, did she walk in with Whidden?
5        A.  She was kind of there seeing if everybody was
6    there, and then she didn't come to the meeting.  There
7    was no HR person there.
8        Q.  Okay.  Now, did Whidden shut the door?
9        A.  Yes.
10       Q.  What did he do next?
11       A.  From what I recall, he just sat down and said,
12   This is the hardest thing I've ever had to do, I'm just
13   paraphrasing, the County needs to save half a million
14   dollars or $500,000.  Your jobs have been terminated.
15           And at the time, my husband thought we were
16   being outsourced.  I don't think he got that we were
17   being fired.  So he's -- he's kind of confused I think.
18   I just remember seeing him across the table, and --
19   anyway, I said something about, Well, it looks like you
20   are just firing all the oldest people.  And he said,
21   That's not the -- Frank said, That's not the case.  And I
22   said, Well, look around.
23       Q.  Did he look around?
24       A.  No.  He was just, Oh, no, that's not the case.
25       Q.  And he was seated down; is that correct?

Debra Bouricius                                      JANINE CORSI
Mesa County, et al.                                  April 22, 2019

Page 49

 1       A.  Yeah, and then he basically told us to go

 2  talk -- get our final paycheck and collect our belongings

 3  and that our logins were being disabled.  So don't try to

 4  log in.

 5       **Q.  Okay.  So aside from saying, You're terminated**

 6  **and that it's not because you are the oldest people --**

 7       A.  Right.

 8       **Q.  -- and then telling you to collect your checks,**

 9  **I mean, was there any other conversation?**

10       A.  No, just -- I think people were kind of shocked

11  and didn't know what to say because when they said to go

12  downstairs Rick was, like, Go back to work?  No, we're

13  not going back to work.

14       **Q.  So when you -- when you said to Frank that it**

15  **looks like it's the oldest people --**

16       A.  I think I said oldest or most -- I know I said

17  "oldest," but I said also think said it's "most

18  experienced."

19       **Q.  Did he change his facial expression at all?**

20       A.  He was kind of abrupt.  That's not the case.

21  Something like that.  They wanted us to believe it was

22  for budget reasons.

23       **Q.  Did -- did they say that?**

24       A.  He said it was for budget reasons.

25       **Q.  Okay.  Did he --**

Debra Bouricius                                              JANINE CORSI
Mesa County, et al.                                          April 22, 2019

                                                              Page 50

 1        A.   And in our letter, I think it said budget

 2   reasons.

 3        Q.   Did he say anything about everybody's skills

 4   that were in the room?

 5        A.   No.  He said it -- he might have said it had

 6   nothing to do with your performance, you know.

 7        Q.   Did you -- are you aware of anyone in the room

 8   having performance issues?

 9             MS. SEVERN:  Object to the form.

10        A.   No.

11        Q.   (BY MS. BISBEE) But you never had any, right?

12        A.   No.

13        Q.   In your experience with Deb Bouricius, she never

14   had any?

15             MS. SEVERN:  Object to form.

16        A.   No, not that I know.  There were people that had

17   issues, but Deb wasn't one of them.

18        Q.   (BY MS. BISBEE) So do you know if the County

19   had followed its layoff policy with your termination?

20             MS. SEVERN:  Object to form.

21        A.   They didn't.

22        Q.   (BY MS. BISBEE) "They didn't."  Why you do say

23   that?

24        A.   They were supposed to go -- there was, like,

25   three criteria in the policy manual:  Special skills was

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

---

Page 55

1       Q.  Uh-huh.  Do you know anything that Terrie Hotary

2   has not done well on?

3           MS. SEVERN:  Object to form.

4       A.  I know she doesn't get along with her coworkers

5   that well, and she just didn't do things she was

6   supposed -- she didn't get things done basically that she

7   was supposed to be doing.

8       Q.  (BY MS. BISBEE) And she's --

9       A.  She was fairly recently hired.

10      Q.  Okay.

11      A.  She didn't have a whole lot of experience.

12      Q.  Do you know if she is younger than Debbie?

13          MS. SEVERN:  Object to form.

14      A.  I believe she probably is, yeah.  And then just

15  from the type of work that's needed, the network group

16  was pretty much where everybody went for help.  We were

17  the ones that had the technical expertise.  It just

18  didn't make sense to lay off two of us out of four

19  people.

20      Q.  (BY MS. BISBEE) So who was -- who was left in

21  your department?

22      A.  In our -- in my network?

23      Q.  Your network administrator group.

24      A.  Bill Tarlton and Ron Sage.

25      Q.  Okay.

---

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

```
                                                      Page 57
 1      A.  Yes.
 2      Q.  Were -- were Mr. Whidden and Mr. Flick social?
 3          MS. SEVERN:  Object to form.
 4      A.  I would say they were friends outside of work
 5  that I know of.
 6      Q.  (BY MS. BISBEE) Okay.  But to the best of your
 7  knowledge, Frank Whidden knew that Mr. Flick was
 8  hanging around these younger guys, correct?
 9          MS. SEVERN:  Object to form.
10      A.  Yes, and he knew about the card playing.  Other
11  things that weren't getting done.
12      Q.  (BY MS. BISBEE) So when you put in your charge
13  that it was potentially sex discrimination, I know,
14  first of all, that you were making sure all your bases
15  were covered, correct?
16      A.  Yes.
17      Q.  But these guys were all younger as well, right?
18      A.  Yes.
19      Q.  So it could have as easily been age
20  discrimination, right?
21          MS. SEVERN:  Object to form.
22      A.  Yes, they just happened to be male.
23      Q.  (BY MS. BISBEE) Do you have any knowledge --
24  aside from the CCRD determining that you were
25  terminated based on your age, do you have any knowledge
```

Debra Bouricius                                      JANINE CORSI
Mesa County, et al.                                  April 22, 2019

                                                     Page 60

 1   I think people are afraid to talk to us.  They didn't
 2   want to jeopardize their employment at the County.
 3        Q.  Is that --
 4        A.  I think it's just natural that people still have
 5   to work there.  They want to think the best of their
 6   employer.  I didn't want to bring anybody down.
 7        Q.  Do you have any experience, or have you ever
 8   heard that Mesa County retaliates against people who
 9   participated?
10        A.  No, I haven't -- I haven't heard of any
11   retaliation.  I know there's been other cases settled
12   with age discrimination that people in DHS and Cindy
13   Enos-Martinez have complained and gone to court.  We
14   never had to go to court.  We just settled in mediation,
15   which I guess is kind of unusual.
16        Q.  Do you know anything personally about anybody's
17   age discrimination cases aside from yours and Rick's?
18        MS. SEVERN:  Object to form.
19        A.  I just know when Stephanie Conley was there, she
20   had a list of people that were over 40, she called it
21   succession planning or something, and Cindy Enos-Martinez
22   was working in HR, she knew about this list and thought
23   it was part of her -- she ended up getting terminated,
24   and she thought it was part of her complaint that they
25   had discriminated against her, you know, because they're

Debra Bouricius                                        JANINE CORSI
Mesa County, et al.                                   April 22, 2019

Page 61

```
 1    over 40.
 2         Q.  (BY MS. BISBEE) Did you hear that from
 3    Ms. Enos-Martinez, or is that something you saw in a
 4    document?
 5         A.  I just saw it online, but I heard about the list
 6    when I was working there.
 7         Q.  Okay.
 8         A.  I think it was in the Sentinel too.  I'm not
 9    sure.  And the people from the DHS, Diane Rice was one of
10    them, I knew her a little bit from work and from
11    quilting.  She was also a quilter.  And there's, I think,
12    three women that are pretty high up at DHS that were
13    terminated and ended up filing a complaint.
14         Q.  Based on their ages?
15         A.  I think so.
16         Q.  How big is Mesa County?
17         A.  We had maybe 900 users.  I think probably 1,000
18    employees.
19         Q.  I mean, is it -- is it a small community or --
20         A.  Yeah, the County itself is a big geographic
21    area, but there -- when we first moved there, there was
22    less than 100,000 people and it's grown a lot since then,
23    but --
24         Q.  Okay.
25         A.  -- it's still a small community.
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                      April 22, 2019

```
                                                   Page 64
 1        Q.  And then you did talk to Lori from our office to
 2   get the actual day squared away today; is that correct?
 3        A.  Yes, yes.
 4        Q.  You didn't have any other conversations with her
 5   about the allegations in the complaint?
 6        A.  No.
 7        Q.  And you didn't have any conversations with me
 8   about the allegations in the complaint.  Is that true?
 9        A.  That's true.
10        Q.  Do you believe that Mesa County has a pattern of
11   terminating older workers?
12            MS. SEVERN:  Object to form.
13        A.  Yes.
14            MS. BISBEE:  All right.  I think I'm done.
15            MS. SEVERN:  Okay.
16            MS. BISBEE:  I would like to take a quick break.
17            MS. SEVERN:  Sure.
18            (Recess taken from 12:23 to 12:30 p.m.)
19                         EXAMINATION
20   BY MS. SEVERN:
21        Q.  Ms. Corsi, before the deposition got going this
22   morning, we had just talked briefly that you're going to
23   be moving soon; is that right?
24        A.  Yes.
25        Q.  Where are you moving to?
```

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                      April 22, 2019

```
                                                    Page 88

 1                  REPORTER'S CERTIFICATE

 2

    STATE OF COLORADO    )
 3                       )  ss.
    COUNTY OF DENVER      )

 4

 5              I, LINDA L. FRIZZELL, Registered Professional

 6   Reporter and Notary Public, State of Colorado, do hereby

 7   certify that previous to the commencement of the

 8   examination, the said JANINE CORSI was duly sworn by me

 9   to testify to the truth in relation to the matters in

10   controversy between the parties hereto; that the said

11   deposition was taken in machine shorthand by me at the

12   time and place aforesaid and was thereafter reduced to

13   typewritten form, consisting of 88 pages herein; that the

14   foregoing is a true transcript of the questions asked,

15   testimony given, and proceedings had.  I further certify

16   that I am not employed by, related to, nor of counsel for

17   any of the parties herein, nor otherwise interested in

18   the outcome of this litigation.

19              IN WITNESS WHEREOF, I have affixed my signature

20   and seal this 28th day of April, 2019.

21              My commission expires July 27, 2019.

22              _____

23              Linda L. Frizzell
                Registered Professional Reporter
24              Commission No. 19914008994

25
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444