# EXHIBIT H

Transcript of the Testimony of

**RICK CORSI**
**April 22, 2019**

**Debra Bouricius**
**v**
**Mesa County, et al.**

**Linda L. Frizzell, RPR**

*Linda L. Frizzell, RPR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444



Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                       April 22, 2019

Page 13

 1        Q.   (BY MS. BISBEE) How many individuals worked

 2   under you at that time?

 3        A.   Approximately 11, maybe 12.

 4        Q.   Okay.  Was that roughly the same as it had been

 5   since you became the IT manager in -- in the mid-2000s?

 6        A.   Yes.

 7        Q.   Okay.  Okay.  What was the structure of the IT

 8   department when you left?

 9        A.   Frank Whidden had many roles.  He was IT

10   manager, he was HR director -- or he was IT director, I

11   guess.  He was HR director, he was finance director, and

12   I believe he was finance direct- -- director at that

13   time -- no, I think he became finance director later, and

14   he was county administrator.  And then myself and Troy

15   Flick and Lhana Jordan were a different level.  Troy and

16   I were the same level of IT manager.  Lhana was in charge

17   of PC support and help desk.

18        Q.   Okay.  So she was not an IT manager?

19        A.   I -- I'm not sure.  I don't remember exactly

20   what her title was at the time.

21        Q.   Did you ever --

22        A.   She may have been.  I don't believe she had the

23   same title.

24        Q.   Okay.  Do you know -- had you ever seen an

25   organizational chart of the IT department?

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                    April 22, 2019

Page 14

```
 1      A.   Yes.
 2      Q.   Were you and Lhana and -- and Flick on the same
 3   level?
 4      A.   We all reported to Frank Whidden.
 5      Q.   Okay.  But do you know, was Lhana's position
 6   somehow lesser than you and Troy?
 7           MS. SEVERN:  Object to form.
 8      A.   She was -- her pay scale was at a lower level --
 9      Q.   (BY MS. BISBEE) Okay.
10      A.   -- than mine.
11      Q.   And her experience, do you know what her
12   background was?
13           MS. SEVERN:  Object to the form.
14      A.   Her experience was she -- when we hired her, she
15   was working for Department of Human Services.  She had
16   some computer experience.  We hired her as a help desk
17   technician, and then she later moved up into a desktop
18   support position.  And then -- then was promoted into
19   supervising the desktop and help --
20      Q.   (BY MS. BISBEE) Okay.
21      A.   -- desk.
22      Q.   Did you have anything to do with her being
23   promoted?
24      A.   Yes.
25      Q.   Okay.
```

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

Page 30

 1   doing work that he hadn't been consulted on first?

 2           MS. SEVERN:  Object to the form.

 3      A.  No.

 4      Q.  (BY MS. BISBEE) Did he ever give you any

 5   indication that he was dissatisfied with your work

 6   performance?

 7      A.  No.

 8      Q.  Did he ever give you any indication that he was

 9   dissatisfied with any of your employees' work

10   performance?

11           MS. SEVERN:  Object to form.

12      A.  Yes.

13      Q.  (BY MS. BISBEE) Okay.  When was that?

14      A.  We had a couple of -- over -- over a few years,

15   we had some people that had performance problems, and I

16   would, you know, I would develop plans and work with

17   them.  And there were occasions where -- I mean, he knew

18   what was going on, and there were some people that he --

19   he wasn't happy with their performance.

20      Q.  Okay.  So who are these people?

21      A.  There was -- the two that I could think of right

22   off the top -- I am trying to remember their names.

23   There was a lady -- I honest- -- I can't remember her

24   name.  She was a business system analyst, and she wasn't

25   performing at the level we needed.

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                       April 22, 2019

                                                              Page 31

 1              And then there was another guy who worked for

 2     me.  I'm trying -- I can't remember his -- his name

 3     either off the top of my head.  And he -- he had some

 4     issues in his performance, and they were actually both

 5     terminated.

 6          Q.  Okay.  So they were terminated prior to you

 7     being terminated?

 8          A.  Yes.

 9          Q.  Now, did Mr. Whidden have personal knowledge of

10     these performance issues, or was this something that you

11     communicated to him during one of your meetings?

12          A.  He had -- probably had some personal knowledge,

13     but for the most part it was through me.

14          Q.  Did he ever come to you and complain about Deb

15     Bouricius' performance?

16          A.  No.

17          Q.  Did you ever tell him that her performance was

18     lacking in some way?

19          A.  No.

20          Q.  Are you aware of anyone ever telling him Deb

21     Bouricius' performance was not up to snuff?

22              MS. SEVERN:  Object to form.

23          A.  I'm not directly aware that anyone ever made a

24     comment to him about that.

25          Q.  (BY MS. BISBEE) What do you mean by "not

Debra Bouricius                                        RICK CORSI
Mesa County, et al.                                April 22, 2019

                                                      Page 32

 1    directly" or --

 2         A.   I just don't -- I --

 3         Q.   Okay.

 4         A.   -- I'm not 100 percent sure that somebody

 5    would -- would have said something, but I just don't

 6    know.

 7         Q.   So you don't know whether it happened one way or

 8    the other?

 9         A.   Right.

10         Q.   Okay.  You're just never going to say it never

11    happened because you don't know; is that correct?

12         A.   I'm not going to say it never happened.

13         Q.   Would you expect him to come to you as her

14    supervisor if somebody had made a complaint?

15         A.   Yes.

16         Q.   And he never did that, correct?

17         A.   No.

18         Q.   These folks that got laid off that you don't

19    remember their names, did you and Frank Whidden have

20    specific conversations about these individuals before

21    they were terminated?

22         A.   Yes, along with the county attorney's office and

23    HR.

24         Q.   So this -- it was a meeting convened to discuss

25    whether or not termination was appropriate?

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                April 22, 2019

```
                                                        Page 33
   1        A.  Always.  Every termination I was ever involved

   2   in.

   3        Q.  Why was that?

   4           MS. SEVERN:  Object to form.

   5        A.  To follow policy and procedure.

   6        Q.  (BY MS. BISBEE) Okay.  You say "follow policy

   7   and procedure."  Is there a specific policy and

   8   procedure that you are referring to?

   9           MS. SEVERN:  Object to form.

  10        A.  There is a policy and procedure outlining

  11   termination in the policy manual.  I don't have it in

  12   front of me, but there is a policy.

  13        Q.  (BY MS. BISBEE) Okay.  In the Mesa County

  14   policy?

  15        A.  Correct.

  16        Q.  Does Mesa County have an age discrimination

  17   policy?

  18           MS. SEVERN:  Object to form.

  19        A.  I have never seen an age -- specific age

  20   discrimination policy.

  21        Q.  (BY MS. BISBEE) So you have never seen

  22   anything in writing that says Mesa County's age

  23   discrimination policy?

  24           MS. SEVERN:  Object to form.

  25        A.  Not that I recall.
```

Debra Bouricius                                                    RICK CORSI
Mesa County, et al.                                               April 22, 2019

                                                                  Page 36

 1    positions?  Did his office move?

 2         A.  Yes.

 3         Q.  Okay.  Do you recall how long into his tenure at

 4    the County that happened?

 5         A.  Two or three years in is what I recall, but I

 6    wouldn't say for sure with that.

 7         Q.  Okay.  And where would -- and where was his new

 8    office in relation to yours?

 9         A.  On the third floor, I guess, of the courthouse.

10    My office was in the basement of the courthouse.

11         Q.  Okay.  So did he spend much time in the IT

12    offices after he moved to the third floor?

13         A.  Not a lot of time, no.  He would come down

14    occasionally.

15         Q.  What about observing the IT workers, did he do

16    much of that?

17         A.  Not much at all at that point.

18         Q.  Okay.  Did you still continue to meet?

19         A.  Yes.

20         Q.  Once a week?

21         A.  Prior -- yeah, not -- and it may not have even

22    been once a week at that point.  It could have been -- it

23    wasn't a regular, but I recall there wasn't a regular

24    time frame.

25         Q.  So did he dedicate less time to the IT

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                         April 22, 2019

Page 42

1        Q.   -- letters she has in her file?

2        A.   No.

3        Q.   She's been there longer than you have, correct?

4        A.   Yes, a couple of years, yes.

5        Q.   When did you begin supervising Ms. Bouricius?

6        A.   Again, I'm trying to remember, but probably

7   the -- the mid-2000s.

8        Q.   Okay.  So when you became the IT manager?

9        A.   Yes, or whatever they called it at that time.

10       Q.   Okay.  Were you responsible for the letter

11  regarding the data breach going into Ms. Bouricius' file,

12  or did somebody else make that decision?

13            MS. SEVERN:  Object to form.

14       A.   I was aware of it, but the decision was made by

15  the county attorney's office, by Stephanie Conley, and

16  probably the sheriff and undersheriff.

17       Q.   (BY MS. BISBEE) Okay.  So -- then I think that

18  you testified something they were covering their butts.

19  Is that what you said?

20       A.   Yes, they were covering themselves.

21       Q.   Did somebody say that specifically to you?

22       A.   No.  It was just they -- when you have a data

23  breach, they want to make sure that everything is

24  covered.

25       Q.   So somebody has got to wear the jacket?

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

Debra Bouricius                                         RICK CORSI
Mesa County, et al.                                April 22, 2019

                                                        Page 44

    1              MS. SEVERN:  Object to form.

    2         A.   He actually reported to me.

    3         Q.   (BY MS. BISBEE) Okay.  Do you know who he

    4    reports to now?

    5              MS. SEVERN:  Object to form.

    6         A.   I believe he would report to Troy, but no one

    7    has really talked to me since they fired me.

    8         Q.   (BY MS. BISBEE) Okay.  And nobody told you

    9    that you were fired because of this data breach,

   10    correct?

   11         A.   No.

   12         Q.   And Troy Flick got the same level of discipline

   13    as you did, didn't he?

   14              MS. SEVERN:  Object to form.

   15         A.   Yes.

   16         Q.   (BY MS. BISBEE) Okay.  Did Frank Whidden ever

   17    make any comments to you regarding your age?

   18         A.   I believe there were -- I could remember times

   19    where there were comments made just about how old I was

   20    and -- and about retirement and stuff like that.

   21         Q.   Okay.

   22         A.   I don't remember specifically, you know, or what

   23    those comments were, but, I mean, they're -- we talked,

   24    yes.

   25         Q.   Frank?

Debra Bouricius                                            RICK CORSI
Mesa County, et al.                                   April 22, 2019

```
                                                      Page 45
   1        A.  Yeah.  Again, I can't remember specific

   2   instances where that would have happened directly with

   3   him, but I believe there were.

   4        Q.  You believe you had conversation with Frank

   5   Whidden?

   6        A.  Yes, I don't remember at the time.

   7        Q.  Okay.

   8        A.  I don't remember right now.

   9        Q.  Okay.  What about anyone else?  Do you remember

  10   any specific conversations about your age with anyone

  11   else at Mesa County?

  12        A.  I did with -- Troy Flick had made comments.

  13        Q.  What can you tell me about that?

  14        A.  He asked on several occasions when we were going

  15   to retire, and that we had enough money to retire

  16   whenever we wanted.  And basically we were old enough to

  17   retire.

  18        Q.  Do you recall how many times he made these type

  19   of comments?

  20        A.  Several times.  More toward the end.

  21        Q.  Okay.  So in the last year that you were there,

  22   can you --

  23        A.  Several times.

  24        Q.  Several times in that last year?

  25        A.  Yeah.
```

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                       April 22, 2019

```
                                                          Page 49
 1        Q.   Okay.  And what about her -- she was with the

 2   County for a long time, right?

 3        A.   Yes, 23, 24 years, something like that.

 4        Q.   Did she have a lot of institutional knowledge

 5   that --

 6        A.   Yes.

 7             MS. SEVERN:  Object to form.

 8        Q.   (BY MS. BISBEE) -- helped her in her job?

 9             MS. SEVERN:  Object to form.

10        A.   Yes.

11        Q.   (BY MS. BISBEE) Can you give me any examples

12   of that?

13        A.   Again, on the treasurer system, she helped

14   support the treasurer system for quite some time; finance

15   system, she was involved in the initial implementation of

16   the Eden system; assessor system, again, she was involved

17   in the initial implementation of that system and actually

18   supporting a -- a Unisys system prior to that, years and

19   years prior to them moving to the Tyler system.

20        Q.   Would you say she -- her skill set exceeded

21   other people's in the Eden system?

22             MS. SEVERN:  Object to form.

23        A.   Yes.

24        Q.   (BY MS. BISBEE) Any other -- any other systems

25   or projects where she would have superior skills to --
```

Debra Bouricius                                           RICK CORSI
Mesa County, et al.                                   April 22, 2019

```
                                                         Page 50

   1       A.   Prob- --

   2       Q.   -- other members of the team?

   3            MS. SEVERN:  Object to form.

   4       A.   On the Tyler system, on the assessor and

   5   treasurer system.

   6       Q.   (BY MS. BISBEE) Okay.  All right.

   7            MS. BISBEE:  I wondered where this was.

   8       Q.   (BY MS. BISBEE) Did you and Frank Whidden

   9   email?

  10       A.   Did I what?

  11       Q.   Did you email at work often?

  12       A.   Yes.  We used email quite a bit for

  13   communication.

  14       Q.   Did he --

  15       A.   Let me -- Lindsey was the other person who was

  16   terminated who -- that I was trying to think of.

  17       Q.   Okay.  Lindsey was the woman that you were

  18   discussing?

  19       A.   Yes.

  20       Q.   Did Frank Whidden ever email you about employee

  21   performance?

  22       A.   Only that we needed to provide employee

  23   evaluation.

  24       Q.   Okay.  When was this?

  25       A.   Every year.
```

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

                                                        Page 58

 1    any bad information in a desk file or otherwise about

 2    Debbie Bouricius' performance?

 3         A.   I did not have anything.

 4         Q.   Okay.  And you never documented that she had

 5    problems getting along with her coworkers?

 6         A.   No.

 7         Q.   Do you recall ever receiving any documents

 8    complaining about Debbie Bouricius?

 9         A.   No.

10         Q.   Do you recall ever having to talk to her about

11    any performance issues?

12         A.   No.

13         Q.   Do you recall ever communicating to Frank

14    Whidden that she was somehow deficient as a business

15    systems analyst?

16         A.   No.

17         Q.   Did he ever ask you?

18         A.   No.

19         Q.   As part of your job in your management role,

20    what, if any, type of input did you have every year at

21    budget time?

22              MS. SEVERN:  Object to form.

23         A.   I worked on -- on the budget, and Troy and Lhana

24    and I all worked on what our -- what the budget plan was

25    along with another lady, Janie, which was, I think,

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                      April 22, 2019

```
                                                          Page 59
 1   Frank's admin assistant or something.  We never really
 2   figured out what she did, but she was usually involved in
 3   wanting spreadsheets and documents.  Frank also met with
 4   us, but we planned out the budget.
 5           I -- you know, Troy worked on the -- the network
 6   side of it, hardware and -- and network infrastructure.
 7   I worked on the -- what we were going to be needing to --
 8   to spend on applications and GIS, support, maintenance
 9   support, and things like that.  Lhana worked on the PC
10   side of it, replacement.  And we all worked together on
11   it.
12       Q.  (BY MS. BISBEE) What about staffing, was that
13   part of your analysis?
14       A.  We knew -- I mean, we knew what the budget was
15   and how much went to staffing.
16       Q.  And then you had to work within what was left
17   over kind of?
18       A.  Yeah, there's -- there's a couple of different
19   pools of money, and so it's separated a little bit that
20   way but because of taxing and whatnot.
21       Q.  Is that -- so this budgetary process, is this
22   something you did every year?
23       A.  Yes.
24       Q.  Once you became manager at least?
25       A.  Yes, I -- from the time I became GIS coordinator
```

Debra Bouricius                                            RICK CORSI
Mesa County, et al.                                    April 22, 2019

```
                                                      Page 60
 1   at the beginning --

 2        Q.  Okay.

 3        A.  -- I worked on budgets.

 4        Q.  So was there a process with the County?  I mean,

 5   did this start at a certain time of year?

 6        A.  Yes, I mean, we started, I believe, in -- in --

 7   sometime in the summer and continued on until the budget,

 8   final budget was approved in November or December.

 9        Q.  Okay.  So what types of documents did you

10   create?

11        A.  There would have been spreadsheets.

12        Q.  Okay.  And what did these spreadsheets show?

13        A.  Maintenance costs, costs of new computers, how

14   many computers were going to get replaced, if there was a

15   new system that was going in.

16            Like at the time I left, there was a system we

17   were working on with CJSD, criminal justice department,

18   and there was a -- a pretty large camera system that we

19   were working on with several -- several departments, the

20   sheriff's office, CJSD, and actually DHS.  So those

21   numbers would have been in there, proposal numbers or

22   estimates in some cases, because we might not have had

23   actual proposals yet.

24        Q.  Okay.  So to start the process did -- were you

25   given marching orders?  Did somebody come to you and say,
```

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

---

Page 61

1    **Hey, this is what we are looking at?  This is what you**

2    **need to do this year?  This is where we're going?  How**

3    **did you --**

4              MS. SEVERN:  Object to form.

5         A.  We knew what we our final budget number needed

6    to be.

7         **Q.  (BY MS. BISBEE) Okay.  So somebody -- somebody**

8    **gave you a final budget number?**

9         A.  Or close to it.  Or toward the end a final

10   budget number minus a certain percentage, you know,

11   10 percent or whatever when they claimed they were having

12   budget issues.

13        **Q.  Okay.  So walk me through that process as it**

14   **went.  In the beginning of summer, somebody came,**

15   **somebody -- who would that be?  Whidden?**

16             MS. SEVERN:  Object to form.

17        A.  Well, yeah, I mean, our -- our finance

18   department would -- had a huge spreadsheet that had

19   everybody -- all the different department numbers on

20   it --

21        **Q.  (BY MS. BISBEE) Okay.**

22        A.  -- not just IT.  And we took the IT section and

23   tried to come up with the best budget and, in fact, about

24   the time we left, we had -- we were in the process of

25   making some decisions on how to save money.

---

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                            April 22, 2019

```
                                             Page 62
 1        Q.  Okay.  Was there something different about 2016,
 2   or did you guys have the same budget processes you had
 3   the prior years?
 4        A.  Overall, I think it was the same budget process.
 5   We -- we were asked to look at reductions in budget.
 6        Q.  But did it start in the summer?
 7        A.  I believe so.  And, I mean, it was -- yeah, I
 8   believe it was the summer when it started or --
 9        Q.  So would you have created some documents and
10   then sent them to finance for an initial review?
11        A.  Or they -- yes, yes.  There was a budget process
12   that -- budgets were -- proposals were -- department
13   proposals were put in, and they went to the finance or
14   budget department.
15        Q.  Do you recall doing that in 2016?
16        A.  Yes.
17        Q.  Do you know what time that was?
18        A.  I don't.  It would have been summer to fall.  It
19   would have had to have been before --
20        Q.  Do -- did you get any -- were you part of any
21   discussions where that budget was sent back, and you were
22   asked to do something else?
23        A.  We were continually asked that last year to try
24   to make adjustments with the budget, and we were --
25        Q.  So every time it came back to you, you were able
```

Debra Bouricius                                            RICK CORSI
Mesa County, et al.                                      April 22, 2019

---

Page 63

1    to find more cuts?

2         A.  Adjust it, yes.

3         Q.  Okay.  Did anyone come to you in that 2016 year

4    and say, You know what, it's going to be staff?

5         A.  No.

6         Q.  Had you ever been through the budget -- like a

7    reduction in force for somebody who did ask you at budget

8    time to cut staff?

9         A.  With the County?

10        Q.  Yes.

11        A.  No.

12        Q.  Was there anything different about that 2016

13   budget process that you can recall from other years that

14   you had helped prepare the IT numbers?

15        A.  It seemed like it was pretty much going the same

16   way.  Again, we did have -- were asked to look at

17   reductions in budget.

18        Q.  Uh-huh.

19        A.  But other than that, if I recall, it was pretty

20   much the same --

21        Q.  Okay.

22        A.  -- basic process.

23        Q.  And you had been asked to reduce budget costs at

24   other years, correct?

25        A.  Yeah, I mean --

---

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                      April 22, 2019

---

Page 64

1        Q.  And Frank Whidden never said anything to you

2   about, you know, it was going to be people this year?

3        A.  No.

4            MS. SEVERN:  Can we take a break soon?  Whenever

5   is good for you.

6            MS. BISBEE:  You know, I would love some coffee.

7   Let's go off the record.

8              (Recess taken from 2:45 to 2:58 p.m. )

9        Q.  (BY MS. BISBEE) Mr. Corsi, I think before the

10   break, we were talking about your employees' job

11   evaluations.  Do you -- were they used for a particular

12   purpose?

13       A.  Not really.  Initially, years ago, when people

14   would actually get raises, they were used to determine

15   the level of raise that someone would get.  And, I mean,

16   it's been -- it was probably -- I don't know, eight

17   years, seven, eight years since regular raises were

18   actually given.  So, you know, they really weren't used

19   besides documenting and talking with employees about what

20   was coming up, and if there would have been an issue,

21   discussing the issues with them.

22       Q.  Okay.  After you would -- completed these

23   evaluations in 2015, did you share them with Frank

24   Whidden?

25       A.  Yes, he -- he reviewed all of them in fact.

---

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

Page 66

 1          MS. SEVERN:   Object to form.

 2     A.   I -- I don't recall ever discussing whether he

 3   actually looked at them, but if I recall correctly, he

 4   would have -- they would have been routed to him and --

 5   and signed off by him.

 6     Q.   (BY MS. BISBEE) Okay.  So there would be some

 7   sort of electronic imprint that would --

 8     A.   If I -- if I'm recalling correctly, there would

 9   have been, yes.

10     Q.   Okay.  That may have been separate from him

11   having an actual signature block on them?

12     A.   If I recall correctly, the signature block

13   should be -- I don't see it there, but I recall them

14   being routed to him.

15     Q.   Okay.  Either way, you don't recall him coming

16   to you after these 2015 --

17     A.   No.

18     Q.   -- reviews and saying, Hey, what's going on with

19   anybody's performance?

20     A.   No.

21     Q.   He didn't come to you and say, Debra just sounds

22   like a terrible employee?

23     A.   No.

24     Q.   Or what's wrong with Deb's performance?

25     A.   No.

Debra Bouricius                                        RICK CORSI
Mesa County, et al.                                 April 22, 2019

Page 68

 1    documents?

 2        A.  If I'm subpoenaed for them, yes.

 3        Q.  Okay.  Fair enough.

 4            Did you ever have any conversations with anyone

 5    about the age spreadsheet?

 6        A.  I believe I had heard about it from Stephanie

 7    Conley, and I think Troy would have been there.  I

 8    believe that's how it -- how I became aware of it, but

 9    I -- I don't recall a specific conversation about it, but

10    I -- I recall that's -- that was the process.

11        Q.  You believe a scenario or a situation happened

12    where you, Stephanie and Conley -- Stephanie Conley and

13    Troy Flick were together discussing the age spreadsheet?

14        A.  Not the -- the existence of it.

15        Q.  Do you, to the best of your recollection, think

16    that this was around the time that it was being created?

17        A.  No, I believe it was later.

18        Q.  Do you recall if it was before or after it

19    became the subject of complaints of age discrimination?

20        A.  I believe it was after it became a subject by

21    Cindy Enos-Martinez.

22        Q.  Do you have any personal knowledge of various

23    individuals like Cindy Enos-Martinez' claims of

24    discrimination?

25            MS. SEVERN:  Object to form.

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

                                                        Page 69

 1        A.   Yes.   Besides her, there were two or three

 2   ladies from Department of Human Services that I believe

 3   had complaints about discrimination.   There were other

 4   people that I'm aware of that have filed discrimination

 5   complaints.

 6        Q.   (BY MS. BISBEE) Okay.   Age discrimination?

 7        A.   I'm not aware of whether they were age

 8   discrimination or other discrimination.

 9        Q.   Okay.   Have you ever had any conversation with

10   any individual that has filed an age discrimination

11   complaint against Mesa County?

12             MS. SEVERN:   Object to form.

13        A.   No.   Besides my wife?

14        Q.   (BY MS. BISBEE) Yeah, besides your wife.   The

15   individuals that you listed in your charge, do you

16   recall writing a letter in addition to your charge of

17   discrimination?

18        A.   Yes.

19        Q.   Did you receive that information pursuant to

20   CORA requests that you had made?

21        A.   No, this was knowledge that I had prior.

22        Q.   Okay.   Okay.   Was Debra's -- Debbie's, Deb's

23   performance superior to any of the BSAs?

24        A.   It was superior to some of them, yes.

25        Q.   Okay.   Who?

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                 April 22, 2019

                                                         Page 70

 1        A.   In different areas, different people.  Her

 2    project management abilities were probably at the top.

 3    Her other skills, I mean, Terrie would have been one that

 4    she probably -- she definitely had more experience and --

 5    with applications, specifically, in the County.  The

 6    different systems -- I mean, it's going to vary from

 7    system to system; on the law enforcement side, she

 8    wouldn't have been as strong as -- you know, the three

 9    primary people supporting that.  On some of the other

10    systems, on the -- the scanning and document system, she

11    wouldn't have been as strong as, say, David Barnett, but

12    it varies, but she was in some areas a strong -- you

13    know, on the top of the -- the areas.

14        Q.   Okay.  Would you have had any concerns with her

15    being able to absorb more work had she been one of the

16    ones that remained at the County?

17             MS. SEVERN:  Object to form.

18        A.   No, no.

19        Q.   (BY MS. BISBEE) Do you think the three law

20    enforcement site BSAs that remained were the three

21    individuals that could have absorbed the remaining

22    work?

23             MS. SEVERN:  Object to form.

24        A.   No.

25        Q.   (BY MS. BISBEE) Was Terrie Hotary well

Debra Bouricius                                                    RICK CORSI
Mesa County, et al.                                            April 22, 2019

Page 71

 1    **situated to absorb Debbie's -- the void that Debbie**
 2    **left?**
 3              MS. SEVERN:  Object to form.
 4        A.  No.
 5        **Q.  (BY MS. BISBEE) So is it fair to say that at**
 6    **the time of your layoff, you would have been in the**
 7    **best position to evaluate the folks that reported to**
 8    **you?**
 9              MS. SEVERN:  Object to form.
10        A.  Yes, and, in fact, I -- I was the only one who
11    ever -- well, there were only two of us that supervised
12    people that did any form of evaluation.
13        **Q.  (BY MS. BISBEE) What do you mean by that?**
14        A.  Troy Flick, to the best of my recollection, did
15    not do a performance evaluation on any of his people for
16    20, 24 months.  And the reason I know that is because he
17    was proud of it, that he got away without doing
18    performance evaluations on his people.
19        **Q.  So he just didn't want to do the work?**
20        A.  Yes.
21        **Q.  Okay.**
22        A.  He was busy playing games.
23        **Q.  And Troy Flick is younger than you are, right?**
24        A.  Yes, I believe he is.  I haven't seen his birth
25    certificate, but...

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

Page 79

 1    for when he was traveling on one or more occasions.

 2         Q.  Okay.  Was this known to Frank Whidden to

 3    your -- the best of your knowledge?

 4              MS. SEVERN:  Object to form.

 5         A.  It was known to Frank Whidden, and it was also

 6    known to HR which he was the director of because I went

 7    to HR and asked about what was going on and why this

 8    was -- you know, standard policies were not being

 9    followed.

10         Q.  (BY MS. BISBEE) And what did you say

11    specifically to Frank Whidden?

12         A.  I had several issues with Troy and the people

13    who worked for Troy about abusing sick time, about

14    gambling during work hours, during lunch, which lunch

15    sometimes for them went from 11:00 to 2:00.  And, you

16    know, playing cards on premises.

17         Q.  And what did Frank say to you?

18         A.  He'd deal with it.  And he also said, Well,

19    maybe you need to take some more comp time off for the

20    extra hours that I put in.

21         Q.  Now, did you have knowledge that these

22    extracurricular activities were going on aside from what

23    Janine would tell you?

24              MS. SEVERN:  Object to form.

25         A.  Yes, I mean, it was -- it was obvious.  I would

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                      April 22, 2019

```
                                                            Page 80
 1   sometimes -- I would have other people, my staff needed
 2   something done by the network group, and they couldn't
 3   get ahold of, you know, Ron or Troy, or -- or Bill
 4   Tarlton, and they would ask me to look into it.  I would
 5   go down to the conference room or find them hiding out in
 6   the -- what we'd call the old jail and playing cards.  I
 7   received questions from people in the assessor's office
 8   about IT people playing cards in the old jail.
 9           It was common knowledge that -- and it -- and it
10   affected work, and I -- I discussed it with Frank, and he
11   said he would take care of it.
12       Q.  (BY MS. BISBEE) When do you think you
13   discussed it with him?
14       A.  It would have been in my last six months there,
15   probably was --
16       Q.  Did you talk to him more than once about it?
17       A.  I don't recall whether it was more than once,
18   but I -- I did talk to him.  It may have been more than
19   once, but --
20       Q.  So what is your workspace like in IT?  Is it --
21   are people in cubes?
22       A.  Cubes and offices.  There were -- at the
23   basement, where we were, was broken into two sections or
24   three sections, probably, I guess you could say, with
25   mainly my group, we were on one end, and then there was a
```

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                     April 22, 2019

Page 84

1    listed in the -- in the "To" box for lack of a better

2    term?

3         A.   Yes.

4         Q.   Okay.  So what did the email say?

5         A.   It said -- listed names.  It said, This group,

6    the six of us that were fired, report at -- I -- I can't

7    remember what time.  I believe it was 9:00 or something

8    like that.  Another group, report, like, an hour later

9    and then hour -- a third group an hour later.

10             So when I saw that Ryan wasn't listed on there,

11   I texted or emailed Frank and said, Ryan's not listed on

12   here, what -- you know, and he said, Oh, just have him go

13   in the second group or whatever.  So he basically wasn't

14   even aware of all his employees.

15        Q.   Was this an odd email to get?  Did you ever

16   receive anything similar?

17        A.   No.

18        Q.   Did you think anything of it?

19        A.   I was a bit concerned.  I -- I think we were

20   told that it was about just HR policies or something like

21   that.  I don't remember exactly what it said.

22        Q.   So what ended up happening at the meeting?

23        A.   They only had one meeting.

24             MS. SEVERN:  Form.

25        A.   And that was the meeting that the six of us went

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

```
                                                    Page 85
 1   to, and we got there and there was a HR representative,

 2   Brenda, I -- again, last name, not -- I don't remember

 3   right now.  It will come to me in a couple minutes like

 4   it usually does.  And another gentleman that was -- no

 5   one had ever seen before.  And then Frank came in, and

 6   said, The County has got -- I can't remember what it was

 7   a 2 million deficit -- or the need for $2 million or

 8   something like that, budget issue, and 500,000 of that

 9   has got to come from IT, and your positions have been

10   eliminated.

11        Q.  (BY MS. BISBEE) Did he say anything else?

12        A.  He was asked a couple of questions, but he got

13   out of there fairly quickly, and said that Brenda has

14   paperwork for us.  And the guy sitting at the table was

15   from EAP or some place like that, and if we needed

16   assistance, talk to him.

17        This guy -- after Frank almost -- very quickly

18   left the room, this guy said, I've never seen anything

19   like this before in all his years of experience.

20        Q.  So how long was the meeting in total?

21        A.  Probably less than 15 minutes.  They asked us to

22   sign some -- I can't remember what it was, to sign a

23   paper basically.  I don't remember what the paper was,

24   but -- probably a forwarding address or something, I

25   don't know.
```

Debra Bouricius                                                    RICK CORSI
Mesa County, et al.                                            April 22, 2019

Page 91

 1    you?

 2         A.  Yes.

 3         Q.  **Have you ever spoken to Frank Whidden since your**

 4    **termination?**

 5         A.  No, I emailed him immediately after requesting

 6    a -- again, through that very strange command structure

 7    that was there because I didn't know who fired me,

 8    whether it was the IT director, the finance -- you know,

 9    I didn't know who fired me.  So I requested an appeal,

10    and he immediately responded or the county attorney

11    immediately -- one of them responded that because this

12    was -- I don't know, not for cause or whatever, then

13    there was no appeal.

14         Q.  **So your understanding was that you weren't fired**

15    **based on your performance?**

16         MS. SEVERN:  Object to form.

17         A.  We were told we were not.  This was not

18    performance based.

19         Q.  **(BY MS. BISBEE) So you and everyone in that**

20    **meeting?**

21         A.  Yes.

22         Q.  **Okay.  So would it surprise you to learn that**

23    **when Mesa County responded to Deb Bouricius' charge of**

24    **discrimination, it took the position that her skills were**

25    **not as strong as her coworkers?**

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                        April 22, 2019

Page 94

 1        Q.   (BY MS. BISBEE) And you never said anything to

 2   Frank Whidden about Deb's performance lacking in any

 3   way?

 4            MS. SEVERN:   Object to form.

 5        A.   No.

 6        Q.   (BY MS. BISBEE) He never asked you about her

 7   performance in any way?

 8        A.   No.

 9        Q.   And he specifically said that you-all aren't

10   being terminated because of performance, correct?

11            MS. SEVERN:   Object to form.

12        A.   Yes.

13        Q.   (BY MS. BISBEE) So as you looked around the

14   room after Frank made his announcement that you are all

15   being let go, you saw the ages of everyone else there,

16   right?

17            MS. SEVERN:   Object to form.

18        A.   Their approximate age, yes.

19        Q.   (BY MS. BISBEE) And that's when Janine said,

20   Hey, this is the oldest and most experienced or

21   something to that effect?

22        A.   Something like that, yes.

23        Q.   Had anyone there, to your knowledge, received

24   any performance reviews that would justify them being

25   laid off?

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                     April 22, 2019

```
                                                      Page 96
   1        Q.  Okay.

   2        A.  And I was the highest-paid one in the

   3   department.

   4        Q.  And also the oldest, right?

   5        A.  I wasn't the oldest.

   6        Q.  No?

   7        A.  My wife is older than me.

   8        Q.  Okay.  But you're older than Troy Flick?

   9        A.  Yes.

  10        Q.  And you are older than Lhana Jordan?

  11        A.  Yes.

  12        Q.  So these are all the reasons that you think your

  13   layoff, your termination was based on age discrimination,

  14   correct?

  15        A.  Yes.

  16        Q.  Any other reason that you think it was based on

  17   age discrimination?

  18        A.  Just some of the comments that have been -- that

  19   I had heard, you know.  You don't know there is a pattern

  20   until the pattern has been created.  And there has been a

  21   pattern of age discrimination at the County over many

  22   years.  You could just see.  It's common sense.

  23        Q.  Okay.  So the comments you are talking about

  24   then is that what we talked about earlier --

  25        A.  Yes.
```

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                         April 22, 2019

Page 101

1    a LiDAR project in Mesa County at the State, and I, you

2    know, provided the County with that LiDAR, and we were

3    working with vendors.  So it was business -- business

4    related.

5         **Q.  Okay.  I am going to help the court reporter.**

6    **LiDAR, is that an acronym?**

7         A.  It's -- you know?

8         **Q.  Oh, you know?**

9         A.  You know what -- okay.  We're good.  It's

10   contours basically is what it is.

11        **Q.  Okay.**

12        A.  And we have a data request that goes out every

13   year for parcels and addresses, that goes to Chris and

14   Ryan.  The GIS -- it goes to every GIS person in the

15   state at local governments in every county.

16             I've also had communication with David Barnett.

17   He is doing some GIS consulting, and he -- through the

18   state, we provide data and information.  So I have had

19   communications with him.

20        **Q.  Okay.  So is your current role, have you moved**

21   **back more into this GIS role?**

22        A.  Than I was at -- yes, more hands-on.

23        **Q.  Okay.  Chris Kadel and I believe you said Ryan,**

24   **do they seem okay talking to you now or is it still**

25   **awkward?**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                    April 22, 2019

                                                        Page 102

 1            MS. SEVERN:  Object to form.
 2       A.  I don't -- they're not -- it's not awkward
 3  talking to them.
 4       Q.  (BY MS. BISBEE) Okay.  Okay.  So as far as you
 5  know, it's not an issue based --
 6       A.  I've never talked to them about specific -- you
 7  know, about -- besides, you know, we're -- we're sorry
 8  you got laid off or whatever, fired or whatever.
 9       Q.  Right.
10       A.  And I never talked to them about anything like
11  that.
12       Q.  Okay.
13       A.  It's been, you know, about -- oh, I have known
14  Chris for years, you know, we were friends, but never
15  anything specific about why did they fire us or whatever.
16       Q.  Okay.  Can you tell me -- I believe it was in
17  your -- the letter you attached to your charge.  There is
18  some mention of Terry Gardner or Garchar or something?
19       A.  Oh, not Terry.  What's his name?  The -- the DHS
20  director.
21       Q.  Yes.  That person.
22       A.  It's not Terry.
23       Q.  I'm going to go ahead and -- is it -- will your
24  charge refresh your recollection?
25       A.  Yeah, it will help.

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

Page 104

1    **3585.  Finally.**

2         A.  Finally found it.

3         **Q.  Let me pull out what I was -- at the top in the**

4    **first paragraph.**

5         A.  Oh.  Tracey.  David Barnett was the expert for

6    DHS, the primary support.

7         **Q.  Okay.**

8         A.  Business system analyst.  And by him being --

9    and the commissioners have stated that DHS is very

10   important to Human Services.  And by --

11        **Q.  Wait.  The commissioner or --**

12        A.  The commissioners, I believe, is what I had said

13   or what he --

14        **Q.  So the commissioner --**

15        A.  The commissioners.

16        **Q.  Can you start from the beginning.  Okay.  So**

17   **David -- did you have a conversation with David Barnett**

18   **about --**

19        A.  No, I think what I was referring to was an email

20   that Tracey Garchar sent that said that terminating IT

21   staff would be a major -- would leave major voids in

22   support and security of the IT systems.  And Tracey had

23   stated that DHS was important to the board.  So if DHS

24   was important to the board, then terminating the primary

25   DHS business system analysts would leave a huge void in

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

                                                          Page 105

 1    their support.  And --

 2         Q.  Okay.

 3         A.  -- and no one else that was left of the business

 4    system analysts had ever supported DHS.

 5         Q.  Did you ever hear of another time where -- where

 6    Mr. Garchar made any comments about the layoffs?

 7         A.  I don't recall specifically.

 8         Q.  Okay.  So we just kind of looked at this charge

 9    here, I think it was Exhibit 35 [sic].  You'll -- you'll

10    agree with me that there's several pages of --

11         A.  Issues.

12         Q.  -- texts that you wrote --

13         A.  Yes.

14         Q.  -- in support of your charge, correct?

15         A.  Yes.

16         Q.  But we've already established that you had been

17    advised to put in as much detail as possible --

18         A.  Yes.

19         Q.  -- just to cover your bases, right?

20         A.  Yes.

21         Q.  And your primary belief is that it had to do

22    with your age?  Is that fair to say?

23         A.  Yes.

24         Q.  And, you know, even to the extent that there's

25    the sex discrimination because Lhana Jordan was retained,

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                       April 22, 2019

```
                                                        Page 113
 1              MS. SEVERN:  Okay.

 2              MS. BISBEE:  Except I'm going to try to identify

 3   what I was looking for before.

 4              MS. SEVERN:  Sure.  Yeah.  Can we take a little

 5   break and then come back?

 6              MS. BISBEE:  Sure.

 7              MS. SEVERN:  Yeah.  Okay.

 8              (Recess taken from 4:19 to 4:27 p.m.)

 9         Q.   (BY MS. BISBEE) Okay.  Mr. Corsi, this big

10   packet of your charge, that I think we marked

11   Exhibit 3- --

12         A.   6.

13         Q.   On page 3579, there at the bottom.

14         A.   Uh-huh.

15         Q.   This last paragraph reads, As recently as the

16   week of November 7, 2016, the DHS director announced at a

17   staff meeting that employees with more than five years

18   experience are being targeted by the Administration and

19   Board to be terminated.  Is the DHS director Terrie

20   Garchar -- or Tracey --

21              MS. SEVERN:  Object to form.

22         A.   Tracey, yes.

23         Q.   (BY MS. BISBEE) -- I'm sorry.

24              MS. SEVERN:  Object to form.

25         A.   Yes, yes.
```

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

```
                                                    Page 114
 1        Q.  (BY MS. BISBEE) Where did you learn about this
 2   announcement?
 3        A.  From -- I believe it was from, if I recall
 4   correctly, from one of my web people, Leilani.  Her
 5   sister also works for the County for DHS, and I believe
 6   that was the source of information that led to that
 7   statement.
 8        Q.  Okay.  So to the best of your recollection, was
 9   this before Frank Whidden sent off a directive not to
10   talk to you, or did Leilani talk to you in spite of being
11   instructed not to?
12             MS. SEVERN:  Object to form.
13        A.  Oh, no, that -- no, wait.  Let me remember again
14   now.  I was thinking that was before I left, because I --
15   I thought I had heard that before I left.  I never talked
16   to Leilani after I left.
17        Q.  (BY MS. BISBEE) Okay.
18        A.  It -- it may have been an email in one of my
19   open records requests.
20        Q.  Okay.  So again, this could be something --
21        A.  Yeah.  I was thinking this was before that I had
22   left that he made a statement in a -- in a meeting, but I
23   think I was recalling -- not recalling correctly --
24        Q.  Okay.
25        A.  -- because I had never -- I had never talked to
```

Debra Bouricius                                                    RICK CORSI
Mesa County, et al.                                          April 22, 2019

                                                              Page 118

 1        A.  There was discussion about it.
 2        **Q.  Okay.  What was the discussion?**
 3        A.  Frank -- Victoria worked in the administration
 4   office as a -- I believe a supervisor role up there.
 5   Frank did not get along with her.  Frank wanted to move
 6   her out of that administration department.  So he placed
 7   her in IT under Troy Flick to become a project manager
 8   for -- even though there's no experience, she had to go
 9   take basic project management training, but he placed her
10   under Troy because he felt like Troy did not have the
11   proper project management skills to get -- to have
12   successful completion of projects in his infrastructure
13   group.
14        **Q.  Did Mr. Whidden use those words?**
15        A.  I don't -- I'm -- I'm paraphrasing.  I don't
16   know exactly what words, I just know what happened.  And
17   then basically he put Victoria in a position that she
18   would fail at, and she was then -- her position was
19   eliminated.
20        **Q.  Okay.  What conversations did you have with the**
21   **Mesa County commissioners regarding the layoffs that**
22   **happened in October of 2016?**
23             MS. BISBEE:  Objection.  Form.
24        A.  I have never talked to them -- spoken to a
25   county commissioner.

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

Page 119

1         Q.   (BY MS. SEVERN) When you were employed with

2    Mesa County, let's just talk about towards the end of

3    your employment, did you ever hear about any budgetary

4    concerns going on with the County?

5         A.   Yes.

6         Q.   What did you hear?

7         A.   That there were shortfalls in taxes and budget

8    reductions needed to be made across the County.

9         Q.   When did you hear of this?  Do you remember?

10        A.   It would have been probably throughout --

11   probably starting in 2015 throughout 2016, and that's

12   when we were putting together budget plans that would

13   have reduced the budget without reducing staff because

14   there were also studies from outside consultants that

15   still said that the IT department at Mesa County was

16   understaffed for the workload that we had.

17        Q.   Who did you hear from regarding the budget

18   shortfalls and the reductions needed to be done?  Who

19   told you about that?

20        A.   It would have come from Frank.

21        Q.   Okay.  Did you ever see any mention in a

22   newspaper or a -- a public article or anything like that?

23   Does that sound familiar?

24        A.   Yes.

25        Q.   Okay.  You -- you remember seeing information

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

Page 133

 1      A.  I remember being in meetings where age was
 2   talked about, retirement was talked about with me.
 3      Q.  (BY MS. SEVERN) Okay.  Well, how was age
 4   talked about with you?
 5      A.  Retirement.  From the retirement side.
 6      Q.  Okay.  How was retirement talked about with you?
 7      A.  I was asked several times when I planned on
 8   retiring.  I don't whether that was specifically by
 9   Mr. Whidden.
10      Q.  What was it that you were asked about
11   retirement?
12      A.  By anyone?
13      Q.  By any -- yes.  Thank you.
14      A.  When we planned on retiring.
15      Q.  Was that all?
16      A.  Well, in -- yeah, and comments were made, Well,
17   we have enough money to do everything that we wanted, so
18   we could retire anytime.
19      Q.  And I believe you testified that it was Troy who
20   made that comment about you having enough money; is that
21   right?
22      A.  Yes.
23      Q.  Okay.  How did Troy know how much money you had?
24      A.  I don't know.  I mean, I -- over years, people
25   talk about things in network.  I don't think he knew

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                    April 22, 2019

Page 134

1    specifically how much we had, but he had known we -- we

2    saved money.

3        Q.  Okay.  Who did you report those comments to

4    after they were made to you?

5        A.  No one.

6        Q.  Why not?

7        A.  Didn't think much of it at the time.

8        Q.  Did they bother you at the time?

9        A.  Stuck in my memory, but they didn't -- it didn't

10   bother me, no.

11       Q.  Okay.  And you had gone through a discrimination

12   and harassment training, correct?

13       A.  Yes.

14       Q.  So you were aware of how to report comments that

15   were bothersome to you.  Would that be accurate to say?

16       A.  Yes.

17       Q.  All right.  You spoke a little bit this

18   afternoon about projects that Ms. Bouricius worked on

19   including at the district attorney's office on DocuSign;

20   is that correct?

21       A.  Yes.

22       Q.  Okay.  Do you remember when that was?  When that

23   project was?

24       A.  It was in 2016.

25       Q.  All right.  And you talked some as well

Debra Bouricius                                      RICK CORSI
Mesa County, et al.                               April 22, 2019

Page 135

1   regarding Ms. Bouricius' skills, in your opinion, were

2   better on -- or with respect to the Eden program.  Is

3   that -- would that be fair to say?

4        A.  Yes.

5        Q.  Okay.  What kind of measurements or comparisons

6   did you do to come to the conclusion that Ms. Bouricius'

7   skills were better in that area than other employees you

8   had?

9        A.  She was familiar with the system.  There were

10  probably only two people with any familiarity with the

11  system.  And out of those two people, she would have been

12  the one with the most knowledge.  She was the only one

13  that had been there from the beginning of the

14  implementation of the project.

15       Q.  Am I understanding correctly, then, that your

16  opinion is based on time rather than a comparison of

17  skill to skill among employees?  Would that be fair to

18  say?

19       A.  Time and skill.

20       Q.  Okay.  How --

21       A.  Knowledge of the system, knowledge of the

22  different components of the system, and working with the

23  finance department on the system and building reports for

24  them and developing reports, things like that.

25       Q.  Did you ever take any steps to determine if

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                      April 22, 2019

```
                                                      Page 158
  1              MS. BISBEE:  Oh, okay.  I jumped the gun.
  2              MS. SEVERN:  It's all right.  No, it's okay.
  3         Q.  (BY MS. SEVERN) Mr. Corsi, would it be fair to
  4    say that you don't like Mr. Whidden?
  5         A.  I don't think that's fair.  I mean, after --
  6    after he fired me and the way he went about firing me,
  7    did not leave a good feeling about him.  As for I don't
  8    like him -- well, I guess when somebody fires you, you
  9    probably wouldn't like him.
 10              MS. SEVERN:  Okay.  Yeah, we can certainly take
 11    a break.
 12              MS. BISBEE:  Okay.
 13              (Recess taken from 5:43 to 5:49 p.m.)
 14              MS. BISBEE:  Are we back on?
 15                          EXAMINATION
 16    BY MS. BISBEE:
 17         Q.  Mr. Corsi, just a couple follow-up questions.  I
 18    think you testified that over the last 15 years -- or
 19    your last 15 years working at Mesa County, there was
 20    always talk about outsourcing IT?
 21         A.  Yes.
 22         Q.  Is that because it's a local government, we're
 23    always overarching budget concerns?  Is that fair to say?
 24         A.  Yes, yes.
 25         Q.  In 2016, do you specifically recall Frank
```

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                    April 22, 2019

Page 159

1   Whidden telling you and Lhana and Troy about a potential

2   budget shortfall?

3       A.  There was -- I mean, yes, there had been talk

4   about budget --

5       Q.  Okay.  But at -- but at no time he said, You

6   need to look at cutting staff?

7       A.  Not that I recall.

8       Q.  Okay.  And you filed CORA requests with the

9   County regarding the budget, correct?

10      A.  Yes.

11      Q.  And I believe you said that you received

12  newspaper articles in response from the County?

13      A.  Yes.

14      Q.  So they didn't provide you actual budget

15  documents?  They gave you third-party information?

16          MS. SEVERN:  Object to form.

17      A.  They gave me third-party information, yes.

18      Q.  (BY MS. BISBEE) Were these the articles -- the

19  same articles they attached to their response to your

20  charge of discrimination?  Do you recall?

21          MS. SEVERN:  Object to form.

22      A.  Yes.  I believe so, yes.

23      Q.  (BY MS. BISBEE) And do you remember the date?

24      A.  That may be when I saw those.

25      Q.  Do you remember the date of when those articles

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                      April 22, 2019

---

                                                        Page 173

 1                    REPORTER'S CERTIFICATE

 2

    STATE OF COLORADO    )
 3                       )  ss.
    COUNTY OF DENVER      )

 4

 5            I, LINDA L. FRIZZELL, Registered Professional

 6    Reporter and Notary Public, State of Colorado, do hereby

 7    certify that previous to the commencement of the

 8    examination, the said RICK CORSI was duly sworn by me to

 9    testify to the truth in relation to the matters in

10    controversy between the parties hereto; that the said

11    deposition was taken in machine shorthand by me at the

12    time and place aforesaid and was thereafter reduced to

13    typewritten form, consisting of 173 pages herein; that

14    the foregoing is a true transcript of the questions

15    asked, testimony given, and proceedings had.  I further

16    certify that I am not employed by, related to, nor of

17    counsel for any of the parties herein, nor otherwise

18    interested in the outcome of this litigation.

19            IN WITNESS WHEREOF, I have affixed my signature

20    and seal this 28th day of April, 2019.

21        My commission expires July 27, 2019.

22                    _____

23                    Linda L. Frizzell
                      Registered Professional Reporter
24                    Commission No. 19914008994

25

---