# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

─────────────────────────────────────────────────────

DEBRA BOURICIUS,

     Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board of
County Commissioners,

     Defendant.

─────────────────────────────────────────────────────

DEPOSITION OF JOHN JUSTMAN

─────────────────────────────────────────────────────


Friday, May 3, 2019

9:02 a.m.


PURSUANT TO NOTICE and the Federal Rules of Civil
Procedure, the above-entitled deposition was taken on
behalf of Plaintiff at 205 North 4th Street, Suite 300,
Grand Junction, Colorado, before K. Michelle Dittmer,
Registered Professional Reporter and Notary Public within
Colorado.

```
 1              A.    No.

 2              Q.    How do you, as a county commissioner, know

 3    if the county attorney's office is performing sufficient

 4    oversight of its workplace to ensure compliance with

 5    state and federal laws?

 6                    MR. SANTO:  Object to the form.

 7              A.    I can't answer that.

 8              Q.    (By Ms. Greisen)  Do you have any way to

 9    know?

10              A.    I'm not an attorney.  How would I know?

11              Q.    Well, I'm asking you.  Do --

12              A.    I don't know.

13              Q.    Okay.  Is it the county attorney's office

14    that is in charge of ensuring that personnel issues are

15    handled in a manner that complies with the state and

16    federal laws?

17                    MR. SANTO:  Object to form.

18              A.    I can't an- -- I don't -- I don't know.

19              Q.    (By Ms. Greisen)  Do you know what the

20    county attorney's office does?

21              A.    Yes.

22              Q.    Give me an idea.

23              A.    They do contracts.

24              Q.    Okay.

25              A.    They handle litigation.
```

 1    smoothly?

 2                    MR. SANTO:   Object to form.

 3         A.    Yes.

 4         Q.   (By Ms. Greisen)   Okay.   So is it fair to

 5    say that because he's taking this big picture, he's not

 6    involved in the daily workings of any specific

 7    department, but instead focuses on the big picture?

 8         A.    He has a lot of interaction with all the

 9    department heads.   How far that really goes, I can't -- I

10    don't have a real answer.

11         Q.    You don't know?

12         A.    I mean, he -- yes.

13         Q.    Because it's kind of a double negative.

14                I'm just saying, fair to say that you're

15    not aware of the nature of his involvement with specific

16    departments?

17         A.    Correct.

18         Q.    But his overall job is to make sure that

19    the system as a whole is working properly?

20         A.    Correct.

21         Q.    And how many county employees are there?

22         A.    Somewhere in the neighborhood of 1,050 to,

23    I don't know, 1,100.   I don't believe it's over 1,100,

24    but it could be 1,050.

25         Q.    1,500?

```
 1             A.   Pardon?

 2             Q.   1,500?

 3             A.   No, no --

 4             Q.   Or 1,050?

 5             A.   -- 1,050.

 6             Q.   Okay.

 7             A.   To 1,100.  I don't believe we're over

 8   1,100.

 9             Q.   Okay.  And is Mr. Whidden responsible for

10   all or most of those employees?

11             A.   Yes.

12             Q.   So even though the county attorney might

13   not report to Mr. Whidden, is it fair to say that the

14   Mesa County employees in the county attorney's office are

15   still under the administration of Frank Whidden?

16             A.   I wouldn't say so.  I would say because

17   the county attorney is a -- is one of our hires, he

18   probably manages his people, but he also -- I would say

19   he works with Frank on that.

20             Q.   Okay.

21             A.   Or Frank is aware of what's going on.

22             Q.   How long have you known Frank?

23             A.   Since I've been at the county.

24             Q.   Did you know --

25             A.   2013.
```

1    insufficient income or revenue, is it fair to say that

2    the Board's first priority is to find ways to save money

3    other than the termination of its employees?

4              MR. SANTO:  Object to form.

5         A.   Yes.

6         Q.   (By Ms. Greisen)  Okay.  And is it fair to

7    say that the Board has made clear to the managers at Mesa

8    County that laying off people is -- is a last resort when

9    there's a budget problem?

10        A.   I don't know that I agree with that.

11        Q.   Okay.  Well, what -- tell me where it is

12   on the priority.

13        A.   We do not have a priority list.

14        Q.   Okay.  Are there any factors that you do

15   look at to determine whether or not a layoff, versus some

16   other expenditure, cutting of expenditures should happen?

17        A.   It would be -- my opinion, it would be a

18   combination of things.  You'd have to look at where you

19   can cut costs and look at your staffing levels.  That --

20   those are the two items that you're going to have to

21   address.

22        Q.   And would these be -- would you ask the

23   department heads for proposals on those matters?

24        A.   Yes.

25        Q.   So was the policy that the Board would ask

1    the department heads and they would prepare written

2    proposals and present it to the Board?

3              A.   They --

4                   MR. SANTO:  Object to form.

5                   Sorry.

6              A.   They would present it to Frank and he --

7    and they -- we could be a -- it could be a combination,

8    Frank and/or them.

9              Q.  (By Ms. Greisen)  Okay.  And would Frank

10   and/or the department heads then put their proposals down

11   in writing and submit it to the Board?

12             A.   Correct.

13             Q.   And would the process be, then, the Board

14   would then vote on the right path to take to deal with

15   those decreased revenues?

16             A.   No.

17             Q.   So how would -- if the Board doesn't vote,

18   what happens?

19             A.   It's reflected in the final budget.

20             Q.   Okay.  So if, during a fiscal year, you

21   know, the Board has approved a budget and the Board

22   understands that, Hm, it may not generate as much in

23   revenues that it was projecting; does the Board have the

24   flexibility, then, to change the budget?

25                   MR. SANTO:  Object to form.

1    do you expect your county employees to take

2    discrimination allegations seriously?

3              A.   Yes.

4              Q.   Okay.  Have you ever heard of the Older

5    Workers Benefit Protection Act?

6              A.   No.

7              Q.   Can you tell me what your understanding of

8    the law is against age discrimination?

9                   MR. SANTO:  Object --

10             A.   No.

11                  MR. SANTO:  -- to form.

12                  Sorry.

13             Q.   (By Ms. Greisen)  Do you have any

14   understanding of what the law is with respect to age

15   discrimination?

16                  MR. SANTO:  Object to form.  Sorry.  I was

17   waiting . . .

18             A.   No.

19             Q.   (By Ms. Greisen)  Okay.  Do you know what,

20   if any, processes are in place to ensure that decisions

21   made by the county do not discriminate illegally against

22   its employees?

23             A.   Can you restate that, please.

24             Q.   Sure.

25                  Do you know if there are any processes in

1    place at the county to ensure that county employees

2    aren't discriminated against?

3            A.   I'm sure we have a process, but I haven't

4    read it.

5            Q.   Do you have any idea what it is?

6            A.   No.

7            Q.   So what's the basis?  You say you're sure

8    there is a process.  What's the basis of that?

9            A.   Because we have a legal team.

10           Q.   Is there any other reason, other than you

11   have attorneys, that you feel confident there are

12   processes in place?

13           A.   Yes.

14           Q.   What are those?  What are the reasons?  Or

15   is that the only reason?

16                I'm sorry.  Maybe --

17                MR. SANTO:  Yeah.

18           Q.  (By Ms. Greisen)  -- I missed -- maybe I

19   didn't hear you right.

20                Is the fact that you have attorneys the

21   only basis, that you're aware of, to -- that makes you

22   believe there are processes in place to ensure that

23   discrimination does not occur; is --

24           A.   Yes.

25           Q.   -- that correct?

1            A.   Some -- someone in finance, the finance

2    department, prepared a -- a budget projection.  I

3    remember seeing that.

4            Q.   Okay.

5            A.   I don't know who repaired it -- who

6    prepared it.

7            Q.   So what happened after the Board got that

8    budget projection?

9            A.   That's when we implemented the hiring

10   freeze.

11           Q.   So is it correct to say the Board of

12   County Commissioners voted on the hiring freeze at that

13   point?

14           A.   Pardon?  Did we vote on it?

15           Q.   Yes.

16           A.   I don't recall.

17           Q.   So how did you implement a hiring freeze?

18           A.   I think it was -- Frank probably sent out

19   a state- -- or a comment to the department heads and --

20   that we were -- we were having -- Mesa County was having

21   a hiring freeze.

22           Q.   And the hiring freeze, was there a length

23   of time that that was supposed to apply?

24           A.   I don't recall.

25           Q.   Okay.  But after the hiring freeze -- and

1          Q.   Okay.  Do you know when that hiring freeze

2   was lifted?

3          A.   No.

4          Q.   Was there also a layoff in 2016 of Mesa

5   County employees?

6          A.   Yes.

7          Q.   Okay.  And what was the reason for the

8   layoff?

9          A.   Lack of revenue.

10          Q.   So that was sales tax revenue, or was

11   it --

12          A.   I think it was primarily sales tax.

13          Q.   So why was there a deficit in -- in

14   revenue?  What happened with the forecasting?

15          A.   People weren't spending money in the

16   county.  I mean, that's where it all comes from.

17          Q.   Is that the biggest source of sales tax?

18          A.   You know, income?  You know, but it's a --

19   it's a -- it's a huge part of our revenue.

20          Q.   So did the board decide to implement

21   layoffs in 2016?

22               MR. SANTO:  Object to form.

23          A.   I don't -- I don't think that's -- I don't

24   think that's correct.

25          Q.   (By Ms. Greisen)  Did the Board vote for

1    layoffs in 2016?

2              MR. SANTO:  Same objection.

3         A.   I don't recall.

4         Q.  (By Ms. Greisen)  And so how did the

5    decision to lay off people in 2016, how did that come

6    about?

7         A.   I think it was part of Frank's

8    recommendations as he worked with the department heads

9    and probably polled us individually.

10        Q.   Did Frank -- and by "Frank," I mean

11   Mr. Whidden -- did he submit a written proposal to the

12   Board --

13        A.   No.

14        Q.   -- about the proposed layoffs?

15        A.   No.

16        Q.   So throughout your time as a board of

17   county commissioner, there have been, at least, between

18   $12 and $14 million in general fund reserves in the

19   county?

20        A.   Yes.

21        Q.   So why were layoffs deemed necessary?

22             MR. SANTO:  Object to form.

23        A.   Because we feel 12 million, or whatever

24   the number is, that's -- that's -- we don't want to go

25   lower than that.

1          Q.   (By Ms. Greisen)   Did the Board discuss it?

2          A.   No.

3          Q.   Did anyone other than Mr. Whidden propose

4    layoffs?

5               MR. SANTO:   Same objection.

6          A.   I don't know.

7          Q.   (By Ms. Greisen)   Okay.   As far as you

8    know --

9          A.   Well, he --

10         Q.   -- to the Board --

11         A.   Correct.

12         Q.   -- was anyone other than Mr. Whidden

13   proposing layoffs?

14         A.   No.

15         Q.   Do you recall that when you were running

16   for reelection in 2016, didn't you say that the county

17   almost always predicts a huge budget deficit when looking

18   at the budget every year, but it's never as bad as they

19   project?

20         A.   Say that again.

21         Q.   Sure.

22              Did you say that the county almost always

23   predicts a high budget deficit when looking at the budget

24   every year, but it's never as bad as they project?

25         A.   Generally speaking, that's true.   There's

1    been years when it -- when the deficit was more than the

2    budget said.  But generally speaking, the budget deficit

3    is, for the most part, more years, it's not been quite as

4    low as we stated.

5                Q.   So you would agree that that is a

6    statement you would have made?

7                A.   Yes.

8                Q.   Okay.  So did the Board -- well, I guess

9    the Board never convened as a board to discuss the

10   layoff; is that correct?

11               A.   Correct.

12               Q.   And was there actually a document

13   presented to you as to how the layoffs would occur?

14               A.   No.

15               Q.   Have you ever seen any documentation about

16   how it was decided the layoffs would occur?

17               A.   No.

18               Q.   Would you agree that prior to making

19   layoffs of individual people, that it would be -- well,

20   let me restate that.

21                    Before making any layoffs, the department

22   heads, the people who had the most knowledge about the

23   efficiencies of their staff, they would be consulted

24   about who should or should not be laid off; is that fair?

25               A.   Yes.

     1              Q.   And were there other cost-saving methods

     2    looked at, other than layoffs, at that time?

     3              A.   I believe -- I believe there was some job

     4    consolidations if someone left.

     5              Q.   Anything else?

     6              A.   I don't recall.

     7              Q.   Do you know what criteria was used for who

     8    was laid off?

     9              A.   No.

    10              Q.   Do you know who made the decision as to

    11    who would get laid off?

    12              A.   No.

    13              Q.   Did you speak to Frank Whidden about who

    14    was going to be laid off before that decision was

    15    finalized?

    16              A.   No.

    17              Q.   Did you speak to Frank Whidden about who

    18    was going to be laid off after the decision was

    19    finalized?

    20              A.   No.

    21              Q.   Do you know any of the factors used to

    22    make decisions about who would be terminated during that

    23    layoff?

    24              A.   No.

    25              Q.   Did Frank Whidden tell you -- discuss with

```
 1   being laid off?

 2           A.   No.

 3           Q.   So you weren't present at any of the

 4   meetings where people were told they were going to be

 5   laid off?

 6           A.   No.

 7           Q.   Did you ever find out who was laid off?

 8           A.   No.

 9           Q.   Did you ever ask?

10           A.   No.

11           Q.   Was there ever a report given to the Board

12   about the layoffs and the impact of the layoffs?

13           A.   No.

14           Q.   Were you told any of the reasons why the

15   specific people who were laid off were chosen?

16           A.   No.

17           Q.   Do you have any knowledge about the work

18   performance or skill set of any of the people chosen for

19   the layoff?

20           A.   No.

21           Q.   At any time did you look to see who was

22   terminated --

23           A.   No.

24           Q.   -- in that layoff?

25                Did you look to see -- even if you didn't
```

1    look to see the names, did you look to see the years of

2    service that any of those employees had given to Mesa

3    County?

4            A.    No.

5            Q.    Are you aware that some of those people

6    laid off had been with the county for over two decades?

7            A.    No.

8            Q.    Were you aware that most of the people in

9    the IT department that were laid off were the older

10   employees?

11           A.    No.

12           Q.    Did you ever talk to the other board

13   members about who was being terminated?

14           A.    No.

15           Q.    Did you ever ask Whidden for any

16   documentation showing who he terminated?

17           A.    No.

18           Q.    Did you ever ask him for any documentation

19   showing the basis for his decision?

20           A.    No.

21           Q.    So fair to say, it was just kind of like

22   we're -- yeah, we'll -- that's fine or that you said it

23   was okay to do layoffs to Frank, but you really -- other

24   than that participation, you didn't have any further

25   conversations with the Board or with Frank about it?

 1    narrating on the record, Mr. Santo.

 2              MR. SANTO:  Well --

 3         Q.  (By Ms. Greisen)  I'm asking if you saw

 4    Exhibit 37 before?

 5         A.   No.

 6         Q.   And did you, at any time, review the

 7    county attorney's response to any charges of

 8    discrimination filed at the Colorado Civil Rights

 9    Division?

10         A.   No.

11         Q.   Are you -- let's see.

12              MS. GREISEN:  Let's mark this one.

13              (Deposition Exhibit 38 was marked.)

14              THE COURT REPORTER:  38.

15         Q.  (By Ms. Greisen)  I've put in front of you

16    Exhibit 38.

17              Have you seen that document before?

18         A.   No.

19         Q.   Are you aware that the State of Colorado

20    determined that Mesa County -- there was probable cause

21    to believe that Mesa County discriminated against my

22    client, Ms. Bouricius?

23         A.   No.

24         Q.   So you're not aware that the State

25    conducted its own investigation into this case?

 1              MS. GREISEN:  Has it already been marked?

 2   It's already an exhibit, so I guess I'll just --

 3              Q.  (By Ms. Greisen)  Actually, I'll put in

 4   front of you Exhibit 36, and ask you if you've seen that

 5   exhibit before?

 6              A.    No.

 7              Q.    Were you aware that Mr. Corsi also filed a

 8   charge of discrimination with respect to his termination

 9   in 2015?

10              A.    No.

11              Q.    And were you aware about any investigation

12   related to either Mr. Rick Corsi or Ms. Janine Corsi's

13   Charge of Discrimination?

14              A.    No.

15              Q.    And have you participated in board

16   discussions about those charges of discrimination?

17              A.    No.

18              Q.    Are you aware that the State conducted an

19   investigation into those claims of discrimination as

20   well?

21              A.    No.

22              Q.    Are you aware that the State of Colorado

23   also found that there was probable cause to believe that

24   Janine Corsi and Rick Corsi were also discriminated

25   against on the basis of age?

```
 1              A.    No.

 2              Q.    Would it be important to you to know that?

 3              A.    Yes.

 4              Q.    So if the State of Colorado determines

 5    that there are three Mesa County employees that are --

 6    have -- there's probable cause to believe they've been

 7    discriminated against in a layoff termination -- a layoff

 8    decision, do you have any idea why you don't know about

 9    that?

10              A.    No.

11              Q.    Are those decisions, as a matter of

12    policy, kept from you?

13              A.    No.

14              MR. SANTO:  Object to form.

15              Q.    (By Ms. Greisen)  Are those decisions, to

16    your knowledge, as a matter of policy, given to you?  Are

17    you made aware of those type of determinations?

18              A.    No.

19              Q.    You're not?

20              A.    (Witness shook head from side to side.)

21              Q.    Why not?

22              A.    I don't -- legal department hasn't -- we

23    haven't met with them.

24              Q.    Well, you've said it would be important to

25    you to know that, right?  Right?
```

 1              Q.   (By Ms. Greisen)   No.

 2                   But as an elected official, would you

 3    agree that the person's age should not be a deciding

 4    factor in whether or not that person is terminated or

 5    not?

 6              A.   Yes.

 7              Q.   So before the break, we were going over

 8    the charges of discrimination filed by three people with

 9    respect to the 2016 layoff.

10                   Do you recall that?

11              A.   Yes.

12              Q.   Okay.  Are you aware of any other time in

13    which charges of discrimination have been filed against

14    Mesa County concerning age discrimination?

15              A.   Not that I'm aware of.

16              Q.   Would you expect to be aware of those type

17    of allegations?

18              A.   You mean additional ones, you mean, or --

19              Q.   Right.

20              A.   Yeah.

21                   MS. GREISEN:  I don't have a stapler.  Do

22    you have a stapler, by any chance?

23                   MR. SANTO:  I can grab one.  Just a sec.

24                   MS. GREISEN:  Could you, please?

25                   MR. SANTO:  Yeah.  Don't go far without

```
 1    me.

 2                    MS. GREISEN:  I will try.

 3                    (Discussion off the record.)

 4                    MS. GREISEN:  Mark an exhibit.

 5                    (Deposition Exhibit 41 was marked.)

 6                    MR. SANTO:  41?

 7                    THE COURT REPORTER:  Yes.  41.

 8           Q.   (By Ms. Greisen)  I've put Exhibit 41 in

 9    front of you.

10                    Have you seen that document before?

11           A.   No.

12           Q.   Were you aware that ███████████████

13    filed a Charge of Discrimination against Mesa County?

14                    MR. SANTO:  Object to the extent it calls

15    for disclosure of attorney-client privilege.

16           Q.   (By Ms. Greisen)  Were you aware of that?

17           A.   No.

18                    MS. GREISEN:  And for the record, I've

19    only put two pages because I'm trying not to kill any

20    more trees and having Shelly walk around with a really

21    heavy binder.

22                    So Exhibit 41 is two pages of

23    ██████████████  Charge of Discrimination.

24                    MR. SANTO:  Do you want to identify the

25    Bates numbers, just for the record?
```

       1                 A.    Yes.

       2                 Q.    -- right?

       3                       And -- but it's your testimony you didn't

       4      know anything about this Charge of Discrimination?

       5                 A.    I don't recall it, no.

       6                 Q.    And is it also fair to say you don't know

       7      anything about what investigation, if any, was done --

       8                 A.    No.

       9                 Q.    -- about that Charge of Discrimination; is

      10      that correct?

      11                 A.    Correct.

      12                 Q.    Is there anyone charged with investigating

      13      whether or not Mesa County has engaged in discrimination,

      14      that you're aware of?

      15                 A.    No, I'm not aware of it.

      16                 Q.    Were you ever aware that there were

      17      allegations that an -- something I'll refer to as an "age

      18      spreadsheet" was prepared by Mesa County that showed the

      19      ages of all of its employees on it?

      20                 A.    Not that I'm aware of.

      21                 Q.    You've never seen that kind of document

      22      before?

      23                 A.    No.

      24                 Q.    Would there be -- sitting here today, do

      25      you know of any purpose a document with all the ages of

1    whether or not to raise his compensation was made a part

2    of the public record because there's a public interest,

3    right?

4                    MR. SANTO:   Object to form.

5         A.   Yes.

6         Q.   (By Ms. Greisen)   Okay.   Have there been

7    times when the Board has implemented substantial pay

8    increases to Mesa County employees without making those

9    decisions public?

10        A.   Not that I recall.

11        Q.   Are you aware of any times that the Board

12   intentionally removed discussions about pay raises from

13   the administrative agenda because the media would be

14   present on any particular board meeting?

15        A.   Not that I recall.

16        Q.   You ever heard any complaints about the

17   Board not complying with the Open Record laws with

18   respect to compensation decisions?

19        A.   Not that I recall.

20        Q.   Or with respect to any kind of financial

21   or budget decisions, are you aware of any complaints that

22   the Board hasn't followed Open Records laws with respect

23   to financial or budget-related decisions?

24        A.   Not that I recall.

25        Q.   And when you were reelected in 2016, you

 1   got a 20 percent pay increase, right?

 2              A.    Yes.

 3              Q.    And you accepted --

 4              A.    Accepted at state legislature, not the

 5   county.

 6              Q.    Right.  You have the option of turning

 7   down --

 8              A.    Really?

 9              Q.    -- a pay increase, right?

10              A.    I didn't.

11              Q.    You didn't?

12              A.    I earn every cent I make.

13              Q.    I'm not questioning that.  I'm saying

14   you -- you would have --

15              A.    I did not.

16              Q.    -- had the -- just let me finish the

17   question real quick.

18                    You had the option of turning down that

19   pay increase, right?

20              A.    I imagine I could work for free.

21              Q.    So the question is, you had the option of

22   turning down that pay increase, right?

23              A.    I wasn't aware of that, no.

24              Q.    So is it your testimony that you did not

25   have that option?

 1                    A.    No, I'm not testifying that at all.  I

 2    didn't ask.  I didn't go look.

 3                    Q.    Okay.  You took that pay increase, right?

 4                    A.    Yeah, I did.  Like I said, I think I earn

 5    every cent of it.

 6                    Q.    And the Board has also given Frank Whidden

 7    a 37 percent increase in his salary since 2016 as well,

 8    right?

 9                    A.    I guess that's true.  I haven't done the

10    math on it.

11                    Q.    You participated --

12                    A.    Yes, okay.  Yes.

13                    Q.    Okay.  Just -- I want to make sure the

14    record is clear.

15                    MR. SANTO:  Even if you know.

16                    Q.  (By Ms. Greisen)  You participated in a

17    substantial pay increase for Mr. Whidden since 2016,

18    right?

19                    A.    Yes.

20                    Q.    Okay.  Do you recall, he went from making

21    131,000 a year to 180,000 a year?

22                    A.    I don't know the exact numbers.  That

23    sounds correct.

24                    Q.    And there was no public vote that was

25    taken by the Board on increasing his compensation,

    1   correct?

    2              A.    Not that I'm aware of.

    3              Q.    Okay.  Was there -- let me correct that.

    4                    The same year, the Board also agreed to

    5   raise the salary of the county attorney, Pat Coleman,

    6   right --

    7              A.    Yes.

    8              Q.    -- 20 --

    9                    Okay.  And Mr. Coleman's was raised from

   10   around 140,000 to almost 160,000 that year, right?

   11              A.    Tell me them numbers again.

   12              Q.    Sure.

   13                    From 140,000 up to 160,000; does --

   14              A.    That --

   15              Q.    -- that sound right?

   16              A.    -- sounds correct.

   17              Q.    And the public works director, Mr. Baier,

   18   B-a-i-e-r --

   19              A.    Yes.

   20              Q.    -- was given a raise, about a 16 percent

   21   raise, from 125,000 to about 145,000, right?

   22              A.    I don't know that.  He's not under the

   23   commissioners.

   24              Q.    Did you participate in approving his

   25   raise?

```
 1            A.    No.

 2            Q.    Who -- who would have determined his

 3    raise?

 4            A.    I can't -- I don't -- I don't know who to

 5    tell you, other than probably reports to Frank, so --

 6    Mr. Whidden, so other than that -- I had no discussions.

 7            Q.    And health and human services director,

 8    Mr. Garcher, he was also approved for a 21 percent raise

 9    by the Board of County Commissioners since 2016?

10            A.    Yes.

11            Q.    I'm sorry, did you say "yes"?

12            A.    Yeah.  I did say yes.

13            Q.    Okay.

14            A.    I'm sorry.

15            Q.    Can you explain why no notice was put --

16    no public notice was made about the Board discussing a

17    raise for Mr. Garcher?

18            A.    I don't -- I don't -- don't recall how we

19    did that.

20            Q.    Is it your belief that a public notice was

21    made about discussing his compensation?

22            A.    I'm not aware of that.

23            Q.    There was no public vote taken on his

24    compensation, correct?

25            A.    Correct.
```

```
 1              A.   I don't know offhand.

 2              Q.   Are any of those expenses training

 3    expenses or continuing education expenses for Mesa County

 4    employees covered or paid for by the county?

 5              A.   I would assume so, yes.

 6              Q.   What type of training or tuition coverage

 7    would be paid for by the county?

 8              A.   I -- I don't -- I don't know.  That's

 9    not -- I don't write the policy, and I don't know what

10    kind of training they get.  The department head would

11    have to approve it.

12              Q.   Are you ever asked to approve those

13    requests?

14              A.   No.

15              Q.   Would it be fair to say that Mesa County

16    would only pay for training and tuition coverage for

17    employees if the training or education was directly

18    related to the employees' job?

19              MR. SANTO:  Object to form.

20              A.   Yes.

21              Q.   (By Ms. Greisen)  Have you ever approved

22    any training or tuition charges for Frank Whidden?

23              A.   For what?

24              Q.   For Mr. Whidden.

25              A.   Yeah, but what kind of training?
```

1            Q.   Training or tuition charges.

2            A.   I don't know.  I would -- I don't really

3    know offhand if we did or didn't.

4            Q.   I'm going to put another exhibit in front

5    of you.

6                 MS. GREISEN:  If you can mark that.

7                 MR. SANTO:  Has this one been produced

8    before?

9                 MS. GREISEN:  You produced it.

10                MR. SANTO:  That was the answer to the

11   question.

12                (Deposition Exhibit 44 was marked.)

13                THE COURT REPORTER:  44.

14                MR. SANTO:  44, right?

15                THE COURT REPORTER:  Yes.

16           Q.   (By Ms. Greisen)  Is that your signature on

17   Exhibit 44?

18           A.   That's what it says right here, yes.

19           Q.   And this was a "Training Approval"

20   document you signed at the end of 2015, agreeing that

21   Mr. Whidden would ". . . be reimbursed for

22   training/tuition charges up to $10,000 per year."

23                Right?

24           A.   Yes.

25           Q.   And, "Mr. Whidden," it goes on to say,

1          A.    What page are you on now?

2          Q.    The last two.

3          A.    Yeah.

4          Q.    Right?  So that's a 40- -- over $4600 for

5    him to get his license in marriage and family therapy,

6    right?

7          A.    It looks like.

8          Q.    And are you also -- well, let me ask.

9                Have you had any public discussions about

10   Mesa County paying for Mr. Whidden to get his license in

11   marriage and family therapy?

12         A.    No.

13         Q.    Were you aware that he was doing that?

14         A.    No.

15         Q.    So given the fact that some employees who

16   had worked at Mesa County for decades were laid off in

17   2016, in your opinion, was it appropriate for Mesa County

18   to be paying for Whidden to obtain a marriage and family

19   counselor license right after these individuals were

20   terminated?

21         A.    Yes.

22         Q.    And after he got his master's degree and

23   license from Northcentral, you know he then opened up a

24   family and marriage therapy counseling service, a private

25   one on the side, right?

1          A.   I have no idea about that.

2          Q.   You're not aware that he has his own

3    private business being a marriage and family therapist?

4          A.   No.

5          Q.   Would it concern you that after the county

6    paid for this, that he then opened up a private business?

7          A.   Yes.

8          Q.   Because it certainly has the appearance of

9    impropriety, even if it's not, right?

10               MR. SANTO:  Object to form.

11         A.   There may be more to the story than we're

12   talking about that I don't -- I'm not aware of, so I'm

13   not going to comment.

14         Q.   (By Ms. Greisen)  You may be -- there may

15   be, but my question was:  It at least has a minimum of an

16   appearance of impropriety?

17         A.   Yes, your opinion.  I don't have an

18   opinion on it.

19         Q.   So why does it cause you concern?

20         A.   Pardon?

21         Q.   You said it caused you some concern.

22         A.   Yeah, but --

23         Q.   I want to know why.

24         A.   Quite likely, there's more to the story.

25         Q.   No.

1    moment.

2              Q.    What would you need to have an intelligent

3    answer?

4              A.    I need to know what it was spent on, just

5    other than some title.  I don't actually know what it was

6    spent on.

7              Q.    Is it appropriate for top executives at

8    Mesa County, who are salaried employees, to have their

9    own side private businesses?

10             MR. SANTO:  Object to form.

11             A.    I don't know if we have -- I don't know

12   what our policy is on that.

13             Q.  (By Ms. Greisen)  Have you heard about that

14   happening before?

15             A.    No.

16             Q.    Do you have any reservations about

17   somebody -- a top management official having a side

18   business or a private business in addition to their

19   responsibilities?

20             A.    No.

21             Q.    And if -- do you have any opinion as to if

22   that business, private business being conducted was paid

23   for by taxpayer dollars, would that cause you any

24   concern?

25             A.    Yes.

1              Q.   If the training for that private business

2     was paid for by taxpayer dollars, would that cause you

3     concern?

4              A.   I don't know that that's factual.  I mean,

5     I don't know just by this.

6              Q.   I -- I'm not asking --

7              A.   It appears that it would be, yes.

8              Q.   And it's fair to say there's been no

9     discussion, at least no public discussion, by the Board

10    of County Commissioners about Mr. Whidden's private

11    practice, whether it's appropriate or not; is that

12    correct?

13             A.   Correct.

14             MR. SANTO:  When you finish, I'd like

15    to -- you know, change over categories, I'd appreciate a

16    break.

17             MS. GREISEN:  Oh, we can -- we can take a

18    break.

19             (Recess taken from 2:18 p.m. until

20    2:32 p.m.)

21             Q.   (By Ms. Greisen)  Mr. Justman, before, you

22    told me that salaries -- I think we were talking about

23    Mr. Garcher's salary, that his salary increase was based

24    on a market adjustment.

25             Do you recall talking --

1    Mr. Coleman brought anything to the thing, or we may have

2    went through, you know, what was happening in his office

3    and we're having done X, Y and Z.

4             Q.    Do you recall any documents that were

5    reviewed?

6             A.    Not offhand, no.

7             Q.    And the same is true for Mr. Garcher?

8             A.    Yes.

9             Q.    And was anybody else present for those

10   compensation decisions, other than the Board and the

11   person involved?

12            A.    No.   No.

13            Q.    Is Mesa County self-insured for insurance,

14   health insurance?

15            A.    Yes.

16            Q.    When did that happen?

17            A.    2008 or '9, somewhere in there.

18            Q.    Do you know Deb Bouricius?

19            A.    Pardon?

20            Q.    Do you know Debbie or Deb Bouricius?

21            A.    No.

22            Q.    Do you know anything about her skill set

23   or expertise?

24            A.    No.

25            Q.    Do you -- well, strike that.

| 98 | 19 | Change "state" to "statement." | If I did not finish saying the entire word "statement" during my testimony, I meant to do so. |
|-----|-----|-------------------------------|---------------------------------|
| 194 | 19 | Change "I don't think so" to "If the amount is $50,000 or under, the County Administrator has the authority to approve the amount." | During the deposition, I stated that I was not certain about the answer to this question. After reviewing this transcript, I recalled this information. |

John Justman

**John Justman**

7 - 03 - 2019

**Date**

STATE OF COLORADO )
                          ) ss.
COUNTY OF MESA )

Subscribed and sworn before me this 3rd day of July 2019 by John Justman.

Rhonda J. Witt

Notary Public

My Commission Expires: 10 - 12 - 2022

RHONDA J. WITT
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID #19994025040
My Commission Expires October 12, 2022

4

1                          REPORTER'S CERTIFICATE

2

3              I, K. MICHELLE DITTMER, Registered Professional

4     Reporter and Notary Public, State of Colorado, do hereby

5     certify that previous to the commencement of the

6     examination, the deponent was duly sworn by me to testify

7     to the truth in relation to the matters in controversy

8     between the parties hereto; that the said deposition was

9     taken in machine shorthand by me at the time and place

10    aforesaid and was thereafter reduced to typewritten form;

11    that the foregoing is a true transcript of the questions

12    asked, testimony given, and proceedings had.  I further

13    certify that I am not employed by, related to, nor

14    counsel for any of the parties herein, nor otherwise

15    interested in the outcome of this litigation.

16              IN WITNESS WHEREOF, I have affixed my signature

17    this 5th day of June, 2019.

18

19        My commission expires April 13, 2020.

20        _____

21                  K. MICHELLE DITTMER
                Registered Professional Reporter
22          My commission expires April 13, 2020.

23

24

25