# EXHIBIT 9

**Frank Whidden   July 11, 2019**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

_____

VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

July 11, 2019

_____

DEBRA BOURICIUS,

     Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

     Defendant.

_____


       Pursuant to Notice and the Federal Rules

of Civil Procedure, the videotaped deposition of

FRANK WHIDDEN, called by Plaintiff, was taken on

Thursday, July 11, 2019, commencing at 9:07 a.m.,

at 205 North 4th Street, Grand Junction, Colorado,

before Candice F. Flowers, Certified Shorthand

Reporter and Notary Public within and for the State

of Colorado.

**Frank Whidden   July 11, 2019**

```
 1   primary financial resources for their family?
 2        A    No, I really didn't.  That's not
 3   something that usually comes up in the course of
 4   conversation.  I don't -- even the people that I
 5   know pretty well, I don't know that I know the
 6   answer to that question.
 7        Q    Do you know if Ms. Bouricius was?
 8        A    No, I do not.
 9        Q    Okay.  So you were about ready to tell me
10   how you created this initial list, and why don't
11   you list for me the factors that you used to decide
12   who to put on that list.
13        A    I went through, in my mind, the people
14   that I felt like we needed to keep, the people that
15   we absolutely could not do without, and that was
16   the list to keep, and then that, therefore, vets
17   out the ones that didn't make that list.
18        Q    So was there another list that you wrote
19   down in people that we need to keep?
20        A    Not that I write down, no.
21        Q    Okay.  Is this you sitting and thinking
22   in your head like, Okay, well, we can't lose this
23   person, we can't lose this person, and then, just
24   by process of elimination, writing the names of the
25   other people down?
```

**Frank Whidden   July 11, 2019**

1    it.

2             You have been designated as an expert in

3    this case; is that right?

4        A    Yes.

5             (Exhibit 51 was marked.)

6        Q    (By Ms. Greisen) I'm putting in front of

7    you Exhibit 51, and if you turn to the second page,

8    you see that you have been listed as an expert to

9    testify in this case, right?

10       A    Yes, ma'am.

11       Q    Okay.  And you've looked through this

12   designation and it looks appropriate to you?

13       A    Yes.

14       Q    So I'll let you finish it if you want to

15   continue reading.

16       A    No, it's okay.  I recognize it.

17       Q    Okay.  So I would like you to start with

18   telling me each expert opinion that you intend to

19   give at trial in this matter.

20       A    I don't know what expert opinions I'll be

21   expected to give.

22       Q    You have no idea?

23       A    No, I don't.

24       Q    Well, why -- do you know why you've been

25   designated as an expert?

**Frank Whidden  July 11, 2019**

```
 1        A     I would assume because of my background

 2    and credentials and experience.

 3        Q     But an expert in what?

 4        A     IT.

 5        Q     What does that have to do with the facts

 6    of this case, to your knowledge?

 7        A     I believe we're dealing with an IT

 8    workforce and who should be kept and who should be

 9    terminated.

10        Q     So are you planning on giving an expert

11    opinion that the decision to terminate the people

12    in October of 2016 was not illegal?

13                MR. SANTO:  Object to -- objection

14    to the extent it calls for disclosure of

15    attorney-client privilege between Mr. Whidden and

16    the organization's attorneys.  So you can't say

17    when I talked to the attorneys.

18                MS. GREISEN:  Well, I'm going to

19    object to that.  Mr. Whidden has been designated as

20    an expert.  I have a right to know all the facts

21    and circumstances and all the opinions --

22                MR. SANTO:  You do.

23                MS. GREISEN:  -- that he's going to

24    give at trial.

25                MR. SANTO:  But not --
```

**Frank Whidden   July 11, 2019**

```
 1        Q     Do you have any expert opinions in this

 2   case?

 3        A     I do as far as IT and IT team makeup,

 4   yes.

 5        Q     What -- tell me what your expert opinions

 6   are.

 7        A     I believe that I'm an expert as far as

 8   what it takes to run an IT department, the skills

 9   that are necessary to run that IT department, and

10   what the likelihood of success is in an IT

11   department, so issues surrounding IT and how IT

12   should be run, I believe that's my area of

13   expertise.

14        Q     And how does that relate to this case?

15        A     I'm not a lawyer and I don't know.

16        Q     Well, is there any other expert opinion

17   that you're going to give in this case or that you

18   anticipate giving?

19        A     Not that I'm aware of.

20        Q     Okay.  So what, in your expert opinion,

21   is the IT experience that relates to this case?

22        A     The people who should remain and the

23   people who should go.

24        Q     So you anticipate that you have -- you

25   have an expert opinion as to who should be chosen
```

**Frank Whidden   July 11, 2019**

148

```
 1    to be terminated as opposed to who should have
 2    stayed in October of 2016?
 3         A    I don't understand that question.
 4         Q    Okay.  Sure.  I'll rephrase it.
 5              You have -- well, strike that.
 6              In your opinion, you're an expert on who
 7    should have been chosen for layoffs in the 2016
 8    October layoffs; is that correct?
 9         A    Yes.  Sorry.  I thought you were done.
10    Yes.
11         Q    So is that opinion that you correctly
12    chose the people who should have been laid off in
13    October of 2016?
14         A    Yes.
15         Q    Okay.  So let's start with that.  Tell me
16    all the evidence that you have to base the expert
17    opinion on that you were correct in terminating the
18    people involved in the October 2016 layoff.
19         A    My knowledge of the staff and their
20    performance up to that point in time, the fact that
21    since then, as I said earlier, we haven't had any
22    major systems issues that couldn't be handled by
23    the people we had remaining, even though we faced
24    the same workload that we did before.
25         Q    Well, you're not relying on information
```

**Frank Whidden   July 11, 2019**

1   that you have now.

2          I want to know as of the time the

3   decision was made in October of 2016, was there any

4   other information, other than your general

5   knowledge, about staff as to who to lay off?

6      A    I think the answer to that is no.  I'm

7   sorry.  I got lost thinking about the earlier

8   question.  You might want to ask that again so I

9   can answer, please.

10     Q    Okay.  Ask --

11     A    Oh, sorry.

12     Q    I'm happy to -- I'm not quite sure which

13  one you mean.

14         I was asking about what evidence you base

15  your decision on in your expert opinion in

16  September, October of 2016.  Can you point to any

17  evidence other than your -- your own knowledge?

18     A    It was all my knowledge of what they did

19  and the experience and the interaction that I have

20  had with the IT staff.

21     Q    And did you look at any documents to

22  arrive at that expert opinion?

23     A    No.

24     Q    Who did you talk to in forming that

25  opinion?

**Frank Whidden   July 11, 2019**

```
 1        A     As I said earlier today, I looked at the
 2   skill set that I thought we needed to have
 3   remaining and who could provide the best skill sets
 4   for what we needed to do in the future going
 5   forward, and the people who were not on that list,
 6   as far as who did I need to keep, were the people
 7   who would go.
 8        Q     (By Ms. Greisen) So what skill sets
 9   were -- did you decide were needed for the future?
10        A     To provide support for all the systems,
11   hardware and software, that we support at Mesa
12   County.
13        Q     Anything more specific than that?  I
14   mean, that's kind of the whole purpose of the IT
15   department in general.
16        A     Correct.
17        Q     So I'm saying you're saying looking
18   forward, you wanted to pick the people who were
19   most qualified to provide these skill sets.
20              Can you give me any other basis for what
21   you were looking at, other than providing IT
22   support?
23        A     I think it -- it needs to be
24   all-inclusive because that's -- like as you just
25   said, that's what we do and that's what I was
```

**Frank Whidden   July 11, 2019**

156

```
 1    looking at.
 2         Q    Can you give me any more details other
 3    than that?
 4         A    No, ma'am.
 5         Q    Did you -- in determining what people's
 6    skill sets were, did you look at job descriptions?
 7         A    No.
 8         Q    Did you look at the employees'
 9    performance reviews?
10         A    No.
11         Q    You were asked by the Colorado Civil
12    Rights Division to interview with their
13    investigator, right?
14         A    Yes.
15         Q    And you declined to be interviewed,
16    right?
17              MR. SANTO:  Are we still on the
18    expert designation part of it or have we moved out?
19              MS. GREISEN:  Well, I may come in
20    and out, depending on my question.  I'm just asking
21    him whether or not he declined an interview.
22              MR. SANTO:  I need to understand the
23    question because if it's not as part of the expert,
24    then that would make it attorney-client privilege.
25              MS. GREISEN:  I don't think whether
```

**Frank Whidden   July 11, 2019**

1    A    -- and -- and the skill sets that are

2  necessary in order to carry out that function.

3  That's what I understand that I'm qualified to act

4  as an expert about.

5    Q    (By Ms. Greisen) Are you going to be

6  giving an opinion on the fact that in your expert

7  opinion, there was a proper selection of people

8  that were terminated in October 2016?

9              MR. SANTO:  Object to form.

10    Q    (By Ms. Greisen) Is that what you intend

11  to give an opinion about?

12    A    I don't know, as I've said before --

13    Q    Well --

14    A    -- what I'm going to be asked --

15    Q    I understand.

16    A    -- as far as being an expert --

17    Q    But I have a right to ask you what your

18  expert opinion is.

19          So regardless of what your lawyer says,

20  I'm saying:  Do you have an expert opinion on that?

21              MR. SANTO:  Object to form.

22    A    I have an opinion about who needed to

23  remain at Mesa County in order to carry out the

24  functions of the IT department.

25    Q    (By Ms. Greisen) Well, I understand that

**Frank Whidden   July 11, 2019**

```
 1   discrimination lawsuit.
 2            I'm saying:  In your career at Mesa
 3   County, have you ever -- are you aware of any
 4   situation in which Mesa County, in the HR
 5   department, substantiated a claim of illegal
 6   discrimination by an employee?
 7       A    Not --
 8                MR. SANTO:  Same objection.
 9       A    Not that I can recall.
10       Q    (By Ms. Greisen) Okay.  Let's take it
11   beyond Mesa County.
12            In your entire career, have you ever been
13   employed by an employer or been the boss yourself
14   where you have substantiated a claim of illegal
15   discrimination?
16                MR. SANTO:  Object to form.
17       A    Not that I can recall.
18       Q    (By Ms. Greisen) So it's my understanding
19   that in all three cases -- for Rick Corsi, Janine
20   Corsi, and Ms. Bouricius -- you were the sole
21   decision-maker regarding who would be laid off; is
22   that correct?
23       A    Yes.
24       Q    Okay.  So I'm still a little unclear
25   about exactly what your expert opinions are at
```

**Frank Whidden   July 11, 2019**

211

```
 1    trial.
 2            My understanding right now is that one of
 3    your expert opinions, whether or not it's phrased
 4    exactly this way, is that in your expert opinion,
 5    the decisions about who to lay off in the October
 6    2016 layoff were not based on age; is that correct?
 7                    MR. SANTO:  Object to form.
 8       A    That is correct.
 9       Q    (By Ms. Greisen) And another opinion that
10    you have is that the -- let's see if I wrote this
11    one down any better than I wrote the last one down.
12    Well, I'll let you expand on that.
13            Are there any other, or do you want to
14    expand on that opinion at all?
15       A    No.
16       Q    In your expert opinion, I take it, then,
17    that the layoff was simply due to budget factors.
18                    MR. SANTO:  Object to form.
19       A    Yes.
20       Q    (By Ms. Greisen) And what is your expert
21    opinion about why certain people were -- have you
22    told me everything now about why certain people
23    were chosen --
24       A    Yes.
25       Q    -- for termination?
```

**Frank Whidden   July 11, 2019**

1   A    Yes, I believe so.

2   Q    And that is basically you looked around

3   and saw basically who you thought you couldn't live

4   without and they made the keep list, and the people

5   you thought you could do without made the go list.

6   A    That's pretty much it, yes.

7   Q    Any other expert opinions?

8   A    Not that I can think of.

9   Q    When did you become aware that Rick

10   and/or Janine Corsi had complained about age

11   discrimination?

12   A    I don't remember specifically that theirs

13   was an age complaint.  I saw a rather lengthy

14   document that I believe Rick had written and it

15   went on and on and on and made all kinds of

16   allegations, and I don't remember specifically what

17   they all were, but there was a long list.  It was a

18   long document.

19   Q    Was there a point in time that you were

20   aware that Rick and/or Janine Corsi made complaints

21   of age discrimination?

22   A    I don't remember specifically what

23   counsel told me the allegations were to CCRD or

24   what CCRD upheld.

25   Q    So is it fair to say you don't -- you did

**Frank Whidden   July 11, 2019**

1    Q    Okay.  So have you told me now all the

2    skills that you think Ms. Bouricius did not have

3    that were needed?

4    A    I think -- if I mentioned customer

5    service, I think so.

6    Q    You said customer service, documentation,

7    and knowledgeable about systems.

8         Are those the three?

9    A    I would say yes.

10    Q    Okay.  And is that also true that -- do

11    you know if she -- sorry.  Strike that.

12         Do you know if she had been written up

13    for any performance reviews on any of those three

14    issues?

15    A    Not to my knowledge.

16    Q    Did you look to see?

17    A    No.  Not when I was making this

18    determination, no.

19    Q    So who is the person probably the most

20    familiar with Ms. Bouricius' skill set at the time

21    in October of 2016?

22    A    I would say Rick Corsi would be the

23    most --

24    Q    So did you --

25    A    -- then the other two managers also

**Frank Whidden   July 11, 2019**

```
 1    had -- they all work very closely together, so...
 2         Q    So -- but Rick Corsi was her direct
 3    supervisor.
 4         A    Direct supervisor, sure.
 5         Q    So did you go and talk to Mr. Corsi about
 6    what skills Ms. Bouricius did or did not have?
 7         A    No.
 8         Q    Why not?
 9         A    Because I could not signal this action
10    ahead of time.
11         Q    Well, you wouldn't have to tell him he
12    was going to be a part of a layoff, right?
13         A    I could not signal with a layoff of this
14    size what was coming.  Rumors start very quickly,
15    and that would present a security risk for IT.
16         Q    But didn't you signal it to Troy Flick
17    and Lhana Jordan?
18         A    Only immediately beforehand.
19         Q    Oh, I thought you told me there was a
20    conversation at least a week beforehand.
21         A    I'm saying -- okay.  When I say
22    immediately beforehand, that's what I'm talking
23    about --
24         Q    Uh-huh.
25         A    -- is it was right there and they were
```

**Frank Whidden   July 11, 2019**

1   she was the main BSA supporting that.

2        Q     Well, what I'm trying to get at:  Was --

3   was there a time where you worked closely with her

4   on a project as opposed to just kind of like having

5   a one-off, here's a problem, somebody needs to fix

6   it or something like that?  I mean, I'm trying to

7   figure out how substantive this interaction is.

8        A     Substantive is -- I don't know about that

9   part.  But there's no question that I did not have

10  as much interaction once I became the Deputy

11  Administrator and the County Administrator.  Simply

12  there are only so many hours in the day.  But I was

13  still involved with IT.  I mean, IT is my baby,

14  okay?  That's my background.  That's my --

15       Q     I'm just trying to figure out how much

16  interaction you had with Ms. Bouricius.

17       A     I had interaction.  I don't know -- I --

18  I don't think I had it on a daily basis, by any

19  means, and I couldn't say how frequently.  I don't

20  remember that.

21       Q     Couple times a year?

22       A     I would say more than that, but I don't

23  know.

24       Q     But you don't know?

25       A     No, I don't remember.  I don't -- as I

Frank Whidden   July 11, 2019

235

1      A    Right.

2      Q    Were there any big projects that Ms.

3  Bouricius worked on that you were involved in?

4      A    I can't recall one in particular.  I'm

5  sure we did like Eden upgrades and things like that

6  that she would have been involved in, but I don't

7  remember one specifically saying, yeah, that

8  particular one.

9      Q    Okay.  Can you tell me any time she was

10  disciplined or talked to about her skills regarding

11  project management?

12      A    I don't know if Rick spoke to her about

13  that or not.  I didn't.

14      Q    Can you tell us what areas in the IT

15  department that Ms. Bouricius worked on in her 26

16  years of employment with Mesa County?

17      A    As I just said, Eden was the main, and

18  then there were -- the software stack is divided up

19  between the BSAs, and I can't -- we have over 100

20  systems.  I don't know exactly which ones each one

21  was responsible for.  I know -- as far as I know,

22  she never worked on New World, as far as I know,

23  and that was a particular skill that Lori had, for

24  instance, that was critical.

25      Q    Well, I'm asking a slightly different

**Frank Whidden   July 11, 2019**

236

```
1   question, which is:  You're aware Ms. Bouricius was
2   there for 26 years -- over 26 years, right?
3       A    I did not know how long she had been
4   there.
5       Q    Okay.  Does that sound about right to
6   you?
7       A    I know it was a long time, yes.
8       Q    Okay.  So sitting -- can you tell me,
9   other than the skills that she was using and the
10  project she was working on at the time of her
11  termination, what her skill set was throughout her
12  tenure at Mesa County?
13      A    No.  I did not read the -- any old files
14  or what had happened before.  I did not read any of
15  that.
16      Q    So how did you know what experience Ms.
17  Bouricius had in different areas?  Was it just
18  based on your personal observation?
19      A    My personal observation, the feedback
20  that I got from other managers, and then -- and
21  clients.
22      Q    Okay.  So tell me, were there -- did her
23  manager or clients complain about her?
24      A    Rick did not.
25      Q    Did any other manager?
```

**Frank Whidden   July 11, 2019**

1    that's where Liz was based until she left us.

2        Q    Do you know who the project manager was

3    on New World when it was implemented?

4        A    No, that was before my -- the start of

5    the implementation was before my time.

6        Q    At any point in time, do you know who the

7    project manager was?

8        A    I thought Lori was.

9        Q    What makes you think that?

10       A    Because, as I said, she was the one that

11   was involved and knew what was going on and had

12   been there forever, was so involved with law

13   enforcement, and seemed to be the go-to person.

14   When a question would come up on the system or what

15   are we going to do or things like that, as far as I

16   could tell, Lori always took the lead.

17       Q    Do you know if Ms. Bouricius had any role

18   in the New World project?

19       A    I never observed her having a role after

20   I was there, but before that, I clearly don't know.

21       Q    What about -- okay.  You said the GIS.

22            What percentage of her time -- Ms.

23   McDowell's time was spent on the GIS versus the

24   other business system analyst work?

25       A    I don't know.  There was a percentage,

**Frank Whidden   July 11, 2019**

1   what they do.  Working on printers, troubleshooting

2   those -- the hardware piece of all of that.  That's

3   their particular skill set.

4        Q    So do you know whether or not Ms.

5   Bouricius had any of that skill set at the time she

6   was terminated?

7        A    If she did, I certainly had never seen

8   any evidence of it.

9        Q    Did you ask anyone?

10       A    No, because it's a pretty safe bet in the

11   IT world that if somebody's on the software side of

12   the house and they are into coding and database

13   administration and those kinds of things, that they

14   are not a hardware person.  It's like a separation

15   of duties.

16       Q    And what skills did Andrew Wetzel have

17   that Ms. Bouricius did not have?  Is it essentially

18   the same answer?

19       A    Yes.  He -- at the time that the

20   terminations were made, he was a tech.  He's now

21   moved over to the network team, but -- so he had --

22   as well as the end-user hardware, he also had

23   networking skills along the lines of like what Troy

24   and Ron and those -- Bill Tarlton, what they can

25   do.  As far as I know, again, she doesn't have that

**Frank Whidden   July 11, 2019**

253

1   skill set, the network administration and server

2   administration skills and all that kind of thing.

3        Q    Do you -- I'm trying to figure out what

4   you base that knowledge on, other than your

5   personal observation.

6             Do you -- have you looked to see in any

7   of her tenure history what she's actually worked on

8   while at Mesa County?

9        A    I said before I did not look at

10  historical records about had she ever been a

11  hardware tech or anything like that.  I haven't

12  looked at that.

13       Q    Do you know if she ever performed the

14  duties of a senior support specialist during her 26

15  years?

16       A    I do not know.

17       Q    And Joseph Keene, he is a Web

18  administrator?

19       A    Joe, yes.

20       Q    Joe.  What skill sets did he have that

21  Ms. Bouricius did not have?

22       A    He -- Joe was on the Web team and he

23  worked with the Web administration and those kinds

24  of things; and to my knowledge, I didn't know that

25  she had any skill set in that area.

**Frank Whidden   July 11, 2019**

1    Q    Well, I was just going to ask you my next

2    question.

3         Do you know whether she, Ms. Bouricius,

4    was ever a Web administrator during her career at

5    Mesa County?

6    A    I did not know that.

7    Q    Did you know at one time she was the only

8    Web administrator?

9    A    I did not know that.

10   Q    Is there any reason that you're aware of

11   that Ms. Bouricius could not have been transferred

12   to one of the Web administrator or support

13   specialist jobs instead of terminated?

14   A    I did not know she had any skill set in

15   that area or had worked in that area, certainly

16   since I have been there, since 2011, and it was

17   never brought up when I asked the question about

18   who had the skill sets that we needed and do we

19   have the right people on the boat.  Joe and Lani

20   were the ones who had the skill sets that -- in

21   this case, Troy wound up running that team -- that

22   he thought they would need in order to get the job

23   done.

24   Q    So -- I'm sorry.  It's your testimony

25   that Troy said that Joe and Lani had the expertise?

**Frank Whidden   July 11, 2019**

339

1   did.

2      Q    And I think the next page is also people

3   that stayed.

4      A    Right.  So Ryan...

5      Q    Is it just all of them had more skills

6   than she did?

7      A    I believe, yes.  Looking at this --

8      Q    Okay.

9      A    -- the difference, yes.

10     Q    So can you identify --

11     A    Not counting the temps.

12     Q    Okay.

13     A    I don't know those people.

14     Q    Can you identify -- we can go through

15  this pretty quickly -- if there is any additional

16  information, other than what you have already given

17  to me, what skills does Ms. Jordan have more than

18  Ms. Bouricius?

19     A    The hardware skills, the -- we did answer

20  this before.

21     Q    Okay.

22     A    The hardware skills, the customer service

23  skills, those things.

24     Q    And is that true with David Underwood as

25  well?

**Frank Whidden   July 11, 2019**

1   Q    And she doesn't have it based on your

2   personal observation; is that right?

3   A    That is correct.

4   Q    And then the Web administrators, Ms.

5   Boyles and Mr. Keene?

6   A    We didn't really talk about Lani, but we

7   certainly talked about Joe, that as far as I knew,

8   to the best -- that they had more Web administrator

9   skills, HTML skills, Hypertext Markup Language.

10  It's language of the Internet.  As far as I knew,

11  and the scripting and the programming, they had --

12  Joe had stronger skills and Lani had stronger

13  skills than that.  I didn't know she had any skills

14  in that area.

15  Q    You didn't know who?  Ms. Bouricius?

16  A    Ms. Bouricius had skills in that area.

17  Q    And Elizabeth McDowell, have you told me

18  everything --

19  A    Yes.

20  Q    -- with respect to that?

21  A    Yes.

22  Q    And with the support specialists and

23  technical support specialists, is it just generally

24  that they work on hardware, and that would be their

25  skill that Ms. Bouricius did not have?

**Frank Whidden   July 11, 2019**

```
 1        A    Generally speaking, yes.  But Paul is
 2   help desk extraordinaire.  He is simply amazing and
 3   is able to handle all manner of -- whether it's
 4   hardware, software, he is amazing.  And so cus --
 5   from customer service and all of that, Paul -- so I
 6   think he's got some tremendous skills there that,
 7   to my knowledge, that's not -- that's not her
 8   forte.
 9        Q    Do you know whether Ms. Bouricius has
10   ever worked on the help desk?
11        A    I do not know.
12        Q    Did you ask anyone?
13        A    No.
14        Q    Okay.  What about the -- we've gone
15   through Terrie Hotary and I think we've gone
16   through Tarlton.
17        A    Uh-huh.
18        Q    Eric Farslow, does he have any skills
19   that Ms. Bouricius doesn't have?
20        A    Same comment as the other technicians.
21   He's got extreme skills with the hardware and the
22   frontline techs, just like the others that we
23   discussed.
24        Q    Okay.  Is that true with all the support
25   specialists, kind of this frontline --
```

**Frank Whidden   July 11, 2019**

352

```
 1   STATE OF COLORADO)

 2                   )ss.    REPORTER'S CERTIFICATE

 3   COUNTY OF MESA  )

 4       I, Candice F. Flowers, do hereby certify that

 5   I am a Certified Shorthand Reporter and Notary

 6   Public within the State of Colorado; that previous

 7   to the commencement of the examination, the

 8   deponent was duly sworn to testify to the truth.

 9       I further certify that this deposition was

10   taken in shorthand by me at the time and place

11   herein set forth, that it was thereafter reduced to

12   typewritten form, and that the foregoing

13   constitutes a true and correct transcript.

14       I further certify that I am not related to,

15   employed by, nor counsel for any of the parties or

16   attorneys herein, nor otherwise interested in the

17   result of the within action.

18       In witness whereof, I have affixed my

19   signature this 20th day of July, 2019.

20       My commission expires February 14, 2020.

21

22

23                   _____
                     Candice F. Flowers, CSR
24                   671 Alexia Court
                     Grand Junction, CO 81505
25
```