**Frank Whidden   July 11, 2019**

1

```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
Civil Action No. 18-cv-01144-WYD-STV
_____
VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

                                         July 11, 2019
_____
DEBRA BOURICIUS,

     Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board
of County Commissioners,

     Defendant.

_____



          Pursuant to Notice and the Federal Rules
of Civil Procedure, the videotaped deposition of
FRANK WHIDDEN, called by Plaintiff, was taken on
Thursday, July 11, 2019, commencing at 9:07 a.m.,
at 205 North 4th Street, Grand Junction, Colorado,
before Candice F. Flowers, Certified Shorthand
Reporter and Notary Public within and for the State
of Colorado.
```

```
 1              And what I understand is that you're
 2   going to testify that your decision to lay off the
 3   people you did, in your expert opinion, was the
 4   right decision.
 5        A     I would assume that, yes.
 6        Q     Yeah.
 7        A     I would think so.
 8        Q     Right.
 9              Since the layoffs, have you learned any
10   other facts or circumstances that have helped
11   inform your expert opinion?
12        A     I would say the successful operation of
13   the department is -- testifies to having made the
14   right decision.
15        Q     Well, that's kind of using a crystal
16   ball, right?  You don't know whether or not those
17   people or not resulted in that -- in the outcome
18   that it is right now.
19              I'm saying:  Since the layoff -- you know
20   what?  We can -- we can pull back on the camera.
21        A     Am I doing something?
22        Q     No.
23              Since the layoff, have you -- have you
24   received any evidence that your decision did
25   violate the law?
```

Frank Whidden   July 11, 2019

278

1  accurate job descriptions that existed at the time
2  of Ms. Bouricius' termination.
3      A   As far as I know, I believe they are.
4      Q   Okay.  You said earlier that you believed
5  all the policies and procedures at Mesa County were
6  followed.  Can I see your stack, please, the rest
7  of it.
8          Turning to Exhibit 48, and if you look on
9  Page 48, you will see a copy of the policy
10 regarding layoffs in Section 8.03.  Do you see
11 that?
12     A   Yes.
13     Q   And it's your testimony that that policy
14 was followed with respect to Ms. Bouricius'
15 termination; is that correct?
16     A   Yes.  I asked counsel to review and make
17 sure that what we were doing was -- was compliant,
18 and I was told that it was.
19     Q   Okay.  Well, you have the policy in front
20 of you.  The policy requires that with a layoff,
21 employees get 30 days' notice prior to the
22 effective date of termination, right?
23     A   Yes, it says that.
24     Q   And, in fact, employees were not given 30
25 days' notice prior to the effective date of their

```
 1  termination, right?
 2       A    They did not get 30 days' notice.
 3       Q    In fact, employees were given their final
 4  paycheck on October 7th --
 5       A    I believe that is --
 6       Q    -- right?
 7       A    -- correct, yes.
 8       Q    So technically in the policy, the last
 9  effective working date for the employees should
10  have been November 7th of 2016, right?
11       A    If you construed that policy strictly
12  speaking, yes.
13       Q    Well, I'm just reading it.
14       A    No, I hear you.
15       Q    I'm just asking you.
16       A    But in an IT situation, I believe any IT
17  professional will tell you that you've got to be
18  very careful about telling IT staff about a coming
19  layoff and that there's an extreme security risk
20  there.  That was one reason that I was trying to
21  give them as much severance as possible so that
22  they would have the 30 days.
23       Q    Well, you could have given them 30 days
24  until their last date -- effective date of
25  termination and not given them access to the
```

```
 1   system, right?
 2        A    I suppose you could have done that, yes.
 3        Q    Well --
 4        A    And in my mind, that's the same thing as
 5   giving 30 days' severance.
 6        Q    So is it -- in your mind as the director
 7   of HR, it's the same thing as giving somebody 30
 8   days' severance, giving them 30 effective days?
 9        A    Yes.
10        Q    Well, if an employee's final working date
11   was November 7, 2016, then the employee's health,
12   dental, and vision benefits would have extended to
13   the end of November, right?
14        A    I don't know about that.
15        Q    As the director of HR, you don't --
16        A    Without -- without sitting down and
17   looking at what our contracts are with the
18   insurance companies -- because it's not like it's
19   just our decision.  It's a matter of what those
20   contracts call for and those kinds of things, and I
21   don't know exactly what those stipulations are.  To
22   me -- to me, what you just said is logical, but I
23   don't know if that's the case with those contracts.
24        Q    Well, let me -- let me just repeat the
25   question and state the whole question.
```

Frank Whidden   July 11, 2019

289

```
 1  ahead.
 2       A    I didn't take that as an age
 3  discrimination comment.  I took it as seniority.
 4       Q    (By Ms. Greisen) Well, when she said, It
 5  looks to me like the oldest people are being
 6  employed, you didn't take that as an age --
 7       A    I --
 8       Q    Let me finish.
 9            -- you don't take that as a complaint of
10  age discrimination?
11       A    I misspoke.  When I said oldest, the
12  people I took it to mean the way that she said it,
13  she was talking about the longest-serving.  That's
14  the way I took what she said.
15       Q    But she used the term --
16       A    Oldest I believe was my term.  I don't
17  know if she used that word or not.  I don't recall
18  that that specifically.
19       Q    You don't --
20       A    I don't --
21       Q    You don't know.  She could have used the
22  word "oldest" or maybe not.  You just don't
23  remember?
24       A    I don't remember her specific words, no.
25       Q    But did you understand that she was
```

Frank Whidden   July 11, 2019

302

```
 1  obligation to report the fact of the settlements as
 2  well as the amounts of the settlements to the Board
 3  of County Commissioners as County Administrator?
 4       A    None.
 5                MR. SANTO:  Object to form.
 6       A    No, not to my knowledge.  It was -- I
 7  wasn't involved in the decision or the payments or
 8  those kinds of things.  I didn't have knowledge of
 9  it, other than what I was told later.
10       Q    (By Ms. Greisen) I'm going to put in
11  front of you Exhibit 31, previously marked in this
12  case.
13            Do you recognize that exhibit?
14       A    I don't.
15       Q    Can you turn to the last page of that
16  exhibit and tell me if that's your signature.
17       A    I did sign this, yes.
18       Q    And can you turn to Exhibit 33, and,
19  again, turn to the last page of Exhibit 33 and tell
20  me if that's your signature.
21       A    Yes, that's my signature.
22       Q    So in forming your expert opinion about
23  whether or not age discrimination occurred in this
24  case, are you aware of any other times at Mesa
25  County where there have been allegations of
```

Frank Whidden   July 11, 2019

303

```
 1   discrimination based on age?
 2              MR. SANTO:  Objection.  It's outside
 3   the extent of the disclosure.
 4       Q    (By Ms. Greisen) Go ahead.
 5       A    Not that I can recall.
 6       Q    Have you looked to see if any such
 7   allegations of discrimination have ever occurred?
 8       A    No.
 9       Q    Have you asked anyone?
10       A    No.
11       Q    Would it be important to you, giving an
12   expert opinion in a case, to know whether or not
13   there has been a history at Mesa County of age
14   discrimination?
15              MR. SANTO:  Same objection.
16       A    No, because that wasn't part of my
17   decision.
18       Q    (By Ms. Greisen) Do you -- where is it
19   written down that you have authority only up to
20   49.9?
21       A    That's in the procurement policy, and
22   that's kind of the issue with some of this stuff,
23   too, is that's when we buy stuff.  So I don't even
24   know if you can say that procurement policy...
25       Q    Translates.
```

Frank Whidden   July 11, 2019

304

1    A    Yeah. But in our mind, that's the limit
2  that we have. If it goes over 49.9, then it needs
3  to go to the board. That's kind of a general rule
4  that we use. But it's a procurement policy where
5  that's actually stated.
6    Q    Well, have there been other civil cases
7  settled by Mesa County that you're aware of in
8  which the authority has -- in which the settlement
9  exceeds the 49.9 number?
10   A    Not that I can recall that I knew about
11 during my time, no.
12   Q    Have you ever heard --
13   A    But I had forgotten -- I had forgotten I
14 signed that too, so...
15   Q    Have you heard of ▮▮▮ ▮▮▮▮▮▮▮▮▮ charge
16 of discrimination?
17   A    I'm sorry. Who?
18   Q    ▮▮▮▮▮▮▮▮▮▮
19   A    That name -- I don't remember that name.
20   Q    Did -- are you aware of the -- what's
21 known as the age spreadsheet that was created --
22   A    I --
23   Q    -- in Mesa County?
24   A    I have heard that talked about but as --
25 as sort of urban legend. But I have never seen

```
 1  such spreadsheet nor have I heard any -- anything
 2  that I could say that I felt was credible that that
 3  existed, but there's definitely scuttlebutt around
 4  the County that that occurred.
 5       Q    Well, what investigation have you done to
 6  determine whether or not that allegation is
 7  credible?
 8       A    None.  I did not -- that was -- happened,
 9  my understanding was, before -- long before my time
10  at the County, and I certainly didn't go digging up
11  ancient history to see what happened.
12       Q    Do you know anything about the
13  settlements that Mesa County entered into in that
14  case?
15       A    No.
16       Q    And that is a settlement that was entered
17  into in 2014.  I'll put this exhibit in front of
18  you.  Do you see Exhibit 43, that that was a
19  settlement entered into during your tenure at Mesa
20  County?
21       A    I see that that was at that time, yeah,
22  that that's when the dates are, yes.
23       Q    And as director of HR, are you aware of
24  when complaints of discrimination are made against
25  Mesa County?
```

Frank Whidden   July 11, 2019

326

```
 1  the appropriations had already been made for '17,
 2  but we were concerned that we were -- we were going
 3  to go over, that we were going to have problems,
 4  that we weren't going to have -- let me put this
 5  another way.  We weren't going to have the revenue
 6  to cover the appropriations that had been made.
 7       Q    So I'm going to ask this.  It may come
 8  off as tongue in cheek, but it seems like every
 9  year you have been there, there have been budget
10  deficits.
11       A    I would certainly say budget problems,
12  yes.
13       Q    Budget problems.
14       A    Yes.
15       Q    And in at least in the last handful of
16  years, you have laid off staff and reduced FTEs in
17  certain departments, right?
18       A    Yes, yes.
19       Q    But in 2018, you got almost a 38 percent
20  salary raise, right?
21       A    That is correct.
22       Q    You went from a salary of around 130,000
23  a year to $180,000 a year --
24       A    That is correct.
25       Q    -- right?
```

1          Did you ask for that increase?
2      A   Yes.
3      Q   And who did you make that request of?
4      A   The board.
5      Q   And what was that request based on?
6      A   Based on the fact that since 2014, when I
7  was promoted to Deputy Administrator, that I had
8  been carrying between three to five positions worth
9  of work, and that should they have to replace me,
10 the replacement cost would be extremely higher than
11 180.  And I felt that it wasn't fair for me to
12 continue to operate in all those positions and have
13 all that responsibility without a fair raise.  I
14 had not had a raise since I came in 2011.  I had
15 promotions, but I never had an in-position raise
16 since I came in 2011.
17     Q   But your salary certainly had gone up
18 since you started there, right?
19     A   As I was promoted, yes.
20     Q   Right.
21     A   Yes, yes.
22     Q   So you say you asked the Board of County
23 Commissioners for this raise?
24     A   I did.
25     Q   Did you document your request?