**Frank Whidden   July 11, 2019**

1

```
          IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

_____

VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

                                    July 11, 2019

_____

DEBRA BOURICIUS,

      Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

      Defendant.

_____



          Pursuant to Notice and the Federal Rules

of Civil Procedure, the videotaped deposition of

FRANK WHIDDEN, called by Plaintiff, was taken on

Thursday, July 11, 2019, commencing at 9:07 a.m.,

at 205 North 4th Street, Grand Junction, Colorado,

before Candice F. Flowers, Certified Shorthand

Reporter and Notary Public within and for the State

of Colorado.
```

**Frank Whidden   July 11, 2019**

117

1    A    Basically, yes.

2    Q    Okay.  So prior to making that list, did

3    you talk to anyone about what you were thinking?

4    A    Yes.  I had spoken to the commissioners,

5    because they had tasked me with finding the budget

6    shortfall that we were facing if we didn't make

7    changes.  I did not talk to them about any

8    individual specifics at all.  They told me you need

9    to -- this is your task.  Find us -- the number was

10   about $1.4 million overall, over the whole County.

11   And that was the shortfall at that point we were

12   looking at for the next year.

13   Q    When did you have this discussion with

14   the Board of County Commissioners about the budget

15   shortfall?

16   A    Before this decision was made, in the

17   months before, sometime before that.  It wasn't a

18   long time before that.  A couple of months, maybe.

19   It wasn't a long time.  It wasn't long before we

20   made these changes.  But I don't know -- I couldn't

21   tell you an exact date.  I don't remember.

22   Q    Was this at a board meeting?

23   A    No.

24   Q    So this is just you informally talking

25   with the commissioners?

Frank Whidden   July 11, 2019

118

1      A     Correct.

2      Q     And you had these informal chats with the

3   commissioners about a prospective budget shortfall

4   that was coming up?

5      A     Yes.

6      Q     And did you simply tell them what you

7   were going to propose to do to address that

8   shortfall?

9      A     In the sense that I felt like I would

10  have to make decreases in personnel, yes.

11     Q     Did you tell them that?

12     A     I'm sure that I told them that, yes, I

13  was -- I was thinking that I would have to make

14  cuts in order to get to that level of reduction in

15  the budget.   The only place that could come from

16  was personnel reduction.

17     Q     You would have to do a layoff?

18     A     Uh-huh.   And --

19     Q     You have to say yes or no.

20     A     I'm sorry.   Yes.

21     Q     That's okay.

22     A     More -- and there were more layoffs.   It

23  was around the County system, not just IT.   There

24  were other layoffs in elected divisions and those

25  kinds of things as well.   So I'm not saying that

**Frank Whidden   July 11, 2019**

1    the layoffs I did in IT met that number.  Clearly

2    it did not.  But as County Administrator, I felt

3    like if we were asking the others to make cuts, I

4    needed to take the lead and show that, hey, yeah,

5    he's protected his divisions, but he's going to

6    make us take cuts in others.

7        Q    What other divisions did you cut?

8        A    I did not.  The elect -- one of the

9    notable ones was the clerk and recorder's office,

10   she closed the two offices, the DMV offices in

11   Clifton and Fruita, laid off a number of people out

12   of there.  Public works I think reduced by a

13   couple.  So those are other reductions that were

14   made, and I don't remember, of the other

15   departments, who also made specific cuts.

16       Q    Well, I'm asking about you.

17       A    Oh, me and my group.

18       Q    Did you make any decisions about any

19   other job layoffs, other than the ones in the IT

20   department?

21       A    No.  I did not specifically say, Okay,

22   we're going to remove, for instance, these two

23   people from CJSD.  We did have a -- we put a hiring

24   freeze on for everybody except public safety.

25       Q    When was that in effect, the hiring

**Frank Whidden   July 11, 2019**

203

1        Q      Are you aware that the CCRD also found

2     that there was probable cause to believe that Rick

3     and Janine Corsi were discriminated against on the

4     basis of their age when they were terminated in

5     2016?

6        A      No.   The County Attorney's office handled

7     the settlement with -- with them.   I was not party

8     to that discussion.

9        Q      I'm just asking if you're aware that the

10    State of Colorado found that there was probable

11    cause to believe age discrimination --

12       A      I don't remember what -- which

13    allegations the CCRD found with -- with them.   I

14    don't remember.

15       Q      Do you remember if they found any

16    allegations in support of -- or determinations in

17    support of Rick and Janine?

18       A      No, I don't remember if there were

19    because, as I said, that got settled, and I don't

20    know what stage they were in when that happened.

21       Q      Well, would it be important to you, as

22    County Administrator, to find out that the State of

23    Colorado determined that Mesa County -- there was

24    probable cause to believe that Mesa County had

25    committed age discrimination?

**Frank Whidden   July 11, 2019**

206

```
 1    Administrator, would you want to be aware of that?
 2         A    I would rely on counsel to tell me if
 3    they thought that it was something that I needed to
 4    be involved in.
 5         Q    I understand that you're relying on
 6    counsel.
 7              I'm asking you as the County
 8    Administrator whether it would be important to you.
 9         A    I just said how I would deal with that.
10         Q    I'm not asking how you'd deal.  I just
11    want to know if it would be important to you.
12         A    If they thought it rose to the level that
13    I needed to know, then yes.
14         Q    So are there any times when a State
15    investigation into Mesa County is conducted where
16    it is determined that Mesa County has -- there's
17    probable cause to believe Mesa County has done some
18    wrongdoing, you wouldn't want to be aware of that?
19              MR. SANTO:   Object to form.
20         A    If there was something that I could do
21    about it, yes.  But if it was a matter that the
22    County Attorney office was handling and they felt
23    it was better to settle it and move on versus, you
24    know, making changes and things like that, then no.
25         Q    (By Ms. Greisen) So your counsel has
```

**Frank Whidden   July 11, 2019**

298

1    the Corsis as I did for Deb Bouricius.

2         Q    Correct.  It's the same opinion?

3         A    Yes.

4         Q    Is that correct?

5         A    Yes.

6         Q    Okay.  Did you authorize a settlement

7    with Rick Corsi regarding his claim that Mesa

8    County discriminated against him on the basis of

9    his age?

10        A    I did not.

11        Q    Who did?

12        A    I was not involved in that discussion.

13   It was -- I don't know.  I would think that it was

14   the County Attorney's office, but as far as I know,

15   that -- those decisions were made.  I was not

16   involved in those decisions.  I...

17        Q    So you were --

18        A    There were some executive sessions with

19   the commissioners, I believe.

20             MR. SANTO:  Do not testify -- let me

21   jump in.

22             THE DEPONENT:  Okay.

23             MR. SANTO:  Do not testify to what

24   occurred in executive session.

25             THE DEPONENT:  Okay.

**Frank Whidden   July 11, 2019**

1          Q     (By Ms. Greisen) No.   I want to know who

2     had the authority to authorize those settlements.

3          A     Executive session.

4          Q     Well, I'm asking:   As County

5     Administrator, do you have authority to authorize

6     those settlements?

7          A     I'll put it this way:   I did not.

8          Q     You did not have authority or you did not

9     authorize?

10         A     No.  With the amounts that were there,

11    it's over my authority.

12         Q     What's your authority?

13         A     49,999.

14         Q     So who is above you in authority?

15         A     The County Commissioners.

16         Q     So the issue would have had to have gone

17    to the Board of County Commissioners for approval

18    of settlements after 49,999?

19                    MR. SANTO:   Objection.

20         A     Yes.

21                    MR. SANTO:   Object to form.

22         A     Yes.

23         Q     (By Ms. Greisen) Okay.   And did that

24    happen with Mr. Corsi's settlement?

25         A     In executive session.

**Frank Whidden   July 11, 2019**

300

1          Q    Well, did you approve -- I think your
2     testimony is you did not approve that?
3          A    To the best of my knowledge, I was not
4     involved in the decision of the settlements.
5          Q    Were you involved in the decision of the
6     settlements with Janine Corsi?
7          A    No, no.  Same answer as Rick.
8          Q    So you did not authorize the settlement
9     with Janine?
10         A    No.
11         Q    Was there a formal vote taken by the
12    Board of County Commissioners either with respect
13    to Mr. or Ms. Corsi's settlement?
14                   MR. SANTO:  In executive session or
15    in open session?
16                   MS. GREISEN:  No, votes can't take
17    place in executive session.
18                   MR. SANTO:  I just wanted to
19    clarify.  I understand.
20                   MS. GREISEN:  Yeah.
21         A    To the best of my knowledge, there was
22    nothing stated in a public meeting about any
23    settlements, to the best of my knowledge.
24         Q    (By Ms. Greisen) Did you talk with the
25    Board of County Commissioners about the settlements

**Frank Whidden   July 11, 2019**

1  of those claims?

2       A     No.

3       Q     So when did you find out that those

4  settlements had occurred?

5       A     Nina told me.

6              MR. SANTO:  I'm going to ask the

7  witness --

8              THE DEPONENT:  To not --

9              MR. SANTO:  Yeah.

10              THE DEPONENT:  Sorry.

11              MR. SANTO:  To withdraw that.  That

12  is attorney-client privilege.

13              MS. GREISEN:  That's fine.

14              MR. SANTO:  I appreciate that.

15       Q     (By Ms. Greisen) Do you have an

16  obligation to report the fact of the settlements

17  and the amount of the settlements to the Board of

18  County Commissioners as the County Attorney?

19       A     I'm not the County Attorney.

20       Q     I'm sorry.  County Administrator?

21              MR. SANTO:  Could you -- I missed

22  the whole question.  Could you start --

23              MS. GREISEN:  Sure.

24              MR. SANTO:  -- that again?

25       Q     (By Ms. Greisen) Do you -- do you have an

**Frank Whidden   July 11, 2019**

302

1    obligation to report the fact of the settlements as

2    well as the amounts of the settlements to the Board

3    of County Commissioners as County Administrator?

4         A     None.

5                   MR. SANTO:   Object to form.

6         A     No, not to my knowledge.   It was -- I

7    wasn't involved in the decision or the payments or

8    those kinds of things.   I didn't have knowledge of

9    it, other than what I was told later.

10        Q     (By Ms. Greisen) I'm going to put in

11   front of you Exhibit 31, previously marked in this

12   case.

13                Do you recognize that exhibit?

14        A     I don't.

15        Q     Can you turn to the last page of that

16   exhibit and tell me if that's your signature.

17        A     I did sign this, yes.

18        Q     And can you turn to Exhibit 33, and,

19   again, turn to the last page of Exhibit 33 and tell

20   me if that's your signature.

21        A     Yes, that's my signature.

22        Q     So in forming your expert opinion about

23   whether or not age discrimination occurred in this

24   case, are you aware of any other times at Mesa

25   County where there have been allegations of

**Frank Whidden   July 11, 2019**

303

```
1    discrimination based on age?
2                    MR. SANTO:  Objection.  It's outside
3    the extent of the disclosure.
4         Q    (By Ms. Greisen) Go ahead.
5         A    Not that I can recall.
6         Q    Have you looked to see if any such
7    allegations of discrimination have ever occurred?
8         A    No.
9         Q    Have you asked anyone?
10        A    No.
11        Q    Would it be important to you, giving an
12   expert opinion in a case, to know whether or not
13   there has been a history at Mesa County of age
14   discrimination?
15                   MR. SANTO:  Same objection.
16        A    No, because that wasn't part of my
17   decision.
18        Q    (By Ms. Greisen) Do you -- where is it
19   written down that you have authority only up to
20   49.9?
21        A     That's in the procurement policy, and
22   that's kind of the issue with some of this stuff,
23   too, is that's when we buy stuff.  So I don't even
24   know if you can say that procurement policy...
25        Q     Translates.
```

**Frank Whidden   July 11, 2019**

304

1      A      Yeah.  But in our mind, that's the limit
2  that we have.  If it goes over 49.9, then it needs
3  to go to the board.  That's kind of a general rule
4  that we use.  But it's a procurement policy where
5  that's actually stated.
6      Q      Well, have there been other civil cases
7  settled by Mesa County that you're aware of in
8  which the authority has -- in which the settlement
9  exceeds the 49.9 number?
10     A      Not that I can recall that I knew about
11 during my time, no.
12     Q      Have you ever heard --
13     A      But I had forgotten -- I had forgotten I
14 signed that too, so...
15     Q      Have you heard of Ms. Altenbern's charge
16 of discrimination?
17     A      I'm sorry.  Who?
18     Q      Altenbern.
19     A      That name -- I don't remember that name.
20     Q      Did -- are you aware of the -- what's
21 known as the age spreadsheet that was created --
22     A      I --
23     Q      -- in Mesa County?
24     A      I have heard that talked about but as --
25 as sort of urban legend.  But I have never seen

Frank Whidden   July 11, 2019

305

1   such spreadsheet nor have I heard any -- anything

2   that I could say that I felt was credible that that

3   existed, but there's definitely scuttlebutt around

4   the County that that occurred.

5        Q    Well, what investigation have you done to

6   determine whether or not that allegation is

7   credible?

8        A    None.  I did not -- that was -- happened,

9   my understanding was, before -- long before my time

10  at the County, and I certainly didn't go digging up

11  ancient history to see what happened.

12       Q    Do you know anything about the

13  settlements that Mesa County entered into in that

14  case?

15       A    No.

16       Q    And that is a settlement that was entered

17  into in 2014.  I'll put this exhibit in front of

18  you.  Do you see Exhibit 43, that that was a

19  settlement entered into during your tenure at Mesa

20  County?

21       A    I see that that was at that time, yeah,

22  that that's when the dates are, yes.

23       Q    And as director of HR, are you aware of

24  when complaints of discrimination are made against

25  Mesa County?

Frank Whidden   July 11, 2019

306

1          A     Usually I would say yes, I would be
2    notified depending on the situation and what's
3    going on.   I don't remember this particular case.
4    I --
5          Q     Well --
6          A     Go ahead.
7          Q     You say usually you'd be notified.
8                Under what scenario would you not be
9    notified?
10         A     I just -- making a blanket statement that
11   I get notified every time makes me nervous because
12   I can't say that I am every time.
13         Q     Well, what's the policy?
14               MR. SANTO:   Object to form.
15         A     I don't know that we have a policy that
16   says I have to be notified.
17         Q     (By Ms. Greisen) Do you have a practice?
18         A     The one I just stated, that I think
19   usually I would be notified.   I can remember an
20   occasion in another elected office, not this one,
21   it was an HR problem.   I don't know -- it didn't
22   fall into any of the protected categories of
23   discrimination, but we settled that case, I
24   believe.   So I knew about -- I remember that one,
25   because there were some significant outstanding

**Frank Whidden   July 11, 2019**

307

1    characteristics about that.

2        Q    Well, this case -- if you look on the

3    front page, you see the settlement in this case,

4    Ms. Altenbern's case, was for $75,000?

5        A    Okay.  I see that.

6        Q    Would that be a significant settlement,

7    in your mind?

8        A    In terms of a 172-million-dollar budget,

9    no.

10       Q    I'm not asking about in terms of a

11   172-million-dollar budget.

12           I'm simply saying your -- the suggestion

13   I get is that the important or the significant

14   settlements you're aware of.

15           I'm asking you:  Is a 75,000-dollar

16   settlement a significant settlement, in your mind,

17   as director of HR?

18       A    When I -- when I said significant, I was

19   talking about the details of the case, something

20   that would make me remember or realize that it was

21   there.

22           When I mentioned the budget figure, the

23   172 million, that's to try to determine what's

24   significant and what isn't; for instance, if you're

25   talking about from an audit perspective.  That's

Frank Whidden   July 11, 2019

308

1    what I meant.  So I don't think that, in the

2    greater scheme of things, that 75K is something I'm

3    going to spend a whole lot of time with.

4         Q    Is this case a case that you view as

5    significant?

6         A    Which one?

7         Q    The one that we're here on today, Ms.

8    Bouricius' case.

9         A    Yeah.  I don't have any choice.  We --

10   the Court ordered to deal with this, so...

11        Q    Well, besides that.  If the Court hadn't

12   ordered you or you hadn't been subpoenaed to be

13   here, would you consider this a significant case?

14        A    Not to this date yet.

15        Q    What about Rick Corsi's case, did you

16   consider that a significant case?

17        A    Certainly not once it was settled.

18        Q    Or even before?

19        A    Well, because you have risk.  So you've

20   got to think in terms of what's your -- what's your

21   risk that's out there.

22        Q    That's true with every case, right?

23        A    Maybe.  What are the -- I think it's --

24   you have got a bigger issue once you've got

25   something sustained by somebody like CCRD.  Your

**Frank Whidden   July 11, 2019**

1   risk rises, and so that becomes more significant.

2   These are because I was the one who took the

3   action, so, of course, that's more on my radar,

4   more --

5        Q    Sure?

6        A    -- in my bailiwick, so...

7        Q    The question still is:  Do you view them

8   as significant cases, either before or after the

9   CCRD determination?

10       A    Yes.

11       Q    All of them or some of them?

12       A    I would say all of them because I was

13   personally involved.

14       Q    Okay.  And let me ask you about that.

15   You're serving in an expert capacity to talk about

16   the correctness of your decisions.

17            Did it occur to you at all that you

18   should not be involved in giving an expert opinion

19   when you are the person being complained about?

20                MR. SANTO:  Object to form.

21       A    No, because it would be very difficult to

22   have anybody else who could speak to the issues

23   that are involved.

24       Q    (By Ms. Greisen) Well, that certainly

25   makes you a fact witness about the discipline -- or

**Frank Whidden   July 11, 2019**

304

```
 1        A     Yeah.  But in our mind, that's the limit
 2   that we have.  If it goes over 49.9, then it needs
 3   to go to the board.  That's kind of a general rule
 4   that we use.  But it's a procurement policy where
 5   that's actually stated.
 6        Q     Well, have there been other civil cases
 7   settled by Mesa County that you're aware of in
 8   which the authority has -- in which the settlement
 9   exceeds the 49.9 number?
10        A     Not that I can recall that I knew about
11   during my time, no.
12        Q     Have you ever heard --
13        A     But I had forgotten -- I had forgotten I
14   signed that too, so...
15        Q     Have you heard of Ms. Altenbern's charge
16   of discrimination?
17        A     I'm sorry.  Who?
18        Q     Altenbern.
19        A     That name -- I don't remember that name.
20        Q     Did -- are you aware of the -- what's
21   known as the age spreadsheet that was created --
22        A     I --
23        Q     -- in Mesa County?
24        A     I have heard that talked about but as --
25   as sort of urban legend.  But I have never seen
```

Frank Whidden   July 11, 2019

313

```
 1    just --
 2         A     Who else -- who else was involved in
 3    this.
 4         Q     In making the decision to terminate --
 5         A     Right.
 6         Q     -- these individuals.
 7         A     That was -- that was me, and then if
 8    you -- depending on how you want to count Troy and
 9    Lhana when I asked them to vet the list.
10         Q     But you were the sole decision-maker.
11         A     Yes.
12         Q     Okay.
13         A     I was.
14         Q     Do you still operate your outside
15    business of marriage and family therapy?
16         A     It exists.  I don't -- I'm not actively
17    doing anything right now.  I hurt my back back in
18    January, and I only ever had one set of clients, so
19    I don't think I can be said to be operating a
20    business.
21         Q     Well, you got a license to conduct this
22    business, right?
23         A     I have what's called a candidate's
24    license, yes.  And that was the point of trying to
25    set that business up, is because I have to amass
```

Frank Whidden   July 11, 2019

1   2,000 hours, clinical hours, in order -- in order

2   to obtain licensure.

3        Q    So you don't have a marriage and family

4   therapy license?

5        A    I have a candidate's license, is what I

6   think it's called.

7        Q    And -- but you still advertise that

8   you're open for business, right?

9        A    I have not shut down the website.

10        Q    Okay.

11        A    And one of the reasons I did not -- even

12   though if this were not going on, I probably would

13   have -- was I didn't want to face accusations about

14   I was trying to hide something, so I thought at

15   this point, it's better to leave it up.

16        Q    Well --

17        A    But the phone has been turned -- the

18   phone is off and nobody is answering -- well, it's

19   a Google voice line.  It's up.  But, anyway, the

20   phone that was being used is off.

21        Q    So the classes that you took to get that

22   license, those were classes that were paid for by

23   the taxpayers of Mesa County, right?

24        A    I did take -- under training, I did pay

25   for classes, yes.

**Frank Whidden   July 11, 2019**

1    Q    And you had tuition bills and Mesa County

2    paid those tuition bills to you, correct?

3    A    They -- yes.  We categorized that as

4    training and, yes, they were paid.

5    Q    You decided what was training?  I'm

6    sorry.

7    A    Huh?

8    Q    What was training?

9    A    Those classes were training.

10   Q    So training for your position as Mesa

11   County Administrator?

12   A    It was part of that, yes.  We have a

13   significant suicide problem that's well documented

14   in the county.  We deal with -- the sheriff says he

15   has the largest mental hospital in Mesa County.

16   And so there's a significant amount of exposure as

17   far as the mental health community -- the mental

18   health problem in our community.

19        Having discussed it with the

20   commissioners -- for instance, at performance

21   evaluations -- they agreed that it made sense --

22   while I'm not an expert, it made sense for me to

23   become knowledgeable in that area, and they signed

24   off on me doing that.

25   Q    What relevance does couples and sex

**Frank Whidden   July 11, 2019**

316

1  therapy have to your job as a County Administrator?

2      A    I've found that emotional wounds are

3  involved in sex and a lot of the problems they have

4  that go into problems like suicide and things like

5  that are involved with that.

6      Q    So you give employees sex therapy at

7  work?

8      A    I did not say employees, but people in

9  the community.  I spent -- I had to get 500 hours

10  of clinical in order to obtain the degree.  Most of

11  that was worked on the weekends in the crisis

12  center at Mind Springs, and every possible human

13  condition, just about, that you can think of --

14      Q    Well, that's not quite --

15      A    -- was involved.

16      Q    -- my question.  I'm trying to figure out

17  how -- let's -- let's go back.

18          You -- you asked for and received

19  approval from the Board of County Commissioners in

20  November of 2015, after my client's termination,

21  you asked and received approval for Mesa County to

22  pay for your couples and sex therapy class so that

23  you could get your license, right?

24      A    So that I could obtain the degree and

25  obtain -- basically obtain the credential to be

**Frank Whidden   July 11, 2019**

1    able to sit at a decision-making table with people

2    like from Mind Springs and the sheriff's office and

3    other entities with the County -- Partners,

4    Strive -- to be able to carry on intelligent

5    conversation with those people.

6         Q    So you're saying it's directly related to

7    your County Administrator's work?

8         A    Yes.

9         Q    And all these classes that you took

10   that -- let's see, that -- that -- the sex --

11   couples and sex therapy class, that was $2,286.

12             Does that sound about right?

13        A    Yes.

14        Q    And then you took another class in

15   December for another 2,286, right?

16        A    That sounds right.

17        Q    And it looks like there were several

18   classes after that, and then your practicum was

19   also paid for by Mesa County, right?

20        A    Yes.

21        Q    Is there any interest that Mesa County

22   would have in you actually getting your license in

23   family therapy, other than simply taking the

24   classes?

25        A    Yes.  To be able to participate in the

**Frank Whidden  July 11, 2019**

1   various forums and with the various groups and to

2   also be able to be conversant with the issues that

3   we -- the mental health issues that we face in Mesa

4   County.

5        Q    Well, you don't need a certification to

6   do that, right?

7        A    It certainly helps to be able to have a

8   credential to be able to speak to a given issue and

9   to have -- if I'm the representative of Mesa County

10  at the table, to be able to speak intelligently on

11  the matter.

12       Q    What issue have you spoken with in the

13  last year that directly relates to your family

14  and -- marriage and family therapy certification?

15       A    We --

16            MR. SANTO:  I assume you don't need

17  names.

18            MS. GREISEN:  No.

19       Q    (By Ms. Greisen) I'm not talking about a

20  person.  I'm just saying you're talking about

21  attending situations.

22       A    Sure.  I served for a time on the Mind

23  Springs board.

24       Q    On the what?

25       A    Mind Springs.

**Frank Whidden   July 11, 2019**

```
 1          Q      But when was that?

 2          A      I don't remember what the exact date was.

 3          Q      That was before you got your

 4   certification, wasn't it?

 5          A      Yes --

 6          Q      Okay.

 7          A      -- it was.

 8          Q      So you didn't need a certification to

 9   participate in that mental health activity?

10          A      It helped me understand why I needed it.

11          Q      I'm just saying you didn't need to --

12          A      They didn't say --

13          Q      -- participate.

14          A      -- you have to have this to sit on the

15   board, no.

16          Q      Okay.

17          A      The Criminal Justice Services Division

18   had quite a number of issues along this line.

19          Q      Any that require certification?

20          A      As -- yes.  As far as candidacy is

21   concerned, Mind Springs conducts evaluations of

22   clients at CJSD.

23          Q      Okay.  Have you been working for Mind

24   Springs since you got your certification?

25          A      No.
```

**Frank Whidden   July 11, 2019**

320

1    Q    Okay.

2    A    I only did that when I was working to get

3    the degree.

4    Q    Okay.  So let's talk about after your

5    certification.

6         Can you tell me in the last year what, if

7    any, job responsibilities of the County

8    Administrator you have performed that required the

9    certification?

10   A    Being able to talk intelligently with the

11   sheriff about what the mental health needs are in

12   the jail.  We're working on a new jail now -- jail

13   expansion.  I should say that.  And part of -- a

14   big piece of that that he wants to do is the mental

15   health that's going on there.  CJSD, as I mentioned

16   earlier, has that population and they report

17   directly to me, CJSD does.

18   Q    But didn't you have those conversations

19   before you got the certification as well?

20   A    I don't think as intelligently as I did

21   after I got it.

22   Q    Okay.  Well, I'm asking about

23   conversations or projects that required

24   certification.

25        Can you -- can you identify any of those