IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV
_____

DEBRA BOURICIUS,

    Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board of
County Commissioners,

    Defendant.
_____

DEPOSITION OF JOHN JUSTMAN
_____

Friday, May 3, 2019

9:02 a.m.


PURSUANT TO NOTICE and the Federal Rules of Civil
Procedure, the above-entitled deposition was taken on
behalf of Plaintiff at 205 North 4th Street, Suite 300,
Grand Junction, Colorado, before K. Michelle Dittmer,
Registered Professional Reporter and Notary Public within
Colorado.

Exhibit 9

1      A.    Yes.

2      Q.    -- right?

3          And -- but it's your testimony you didn't

4 know anything about this Charge of Discrimination?

5      A.    I don't recall it, no.

6      Q.    And is it also fair to say you don't know

7 anything about what investigation, if any, was done --

8      A.    No.

9      Q.    -- about that Charge of Discrimination; is

10 that correct?

11      A.    Correct.

12      Q.    Is there anyone charged with investigating

13 whether or not Mesa County has engaged in discrimination,

14 that you're aware of?

15      A.    No, I'm not aware of it.

16      Q.    Were you ever aware that there were

17 ==allegations that an -- something I'll refer to as an "age==

18 ==spreadsheet" was prepared by Mesa County that showed the==

19 ==ages of all of its employees on it?==

20      ==A.==    ==Not that I'm aware of.==

21      ==Q.==    ==You've never seen that kind of document==

22 ==before?==

23      ==A.==    ==No.==

24      Q.    Would there be -- sitting here today, do

25 you know of any purpose a document with all the ages of

Exhibit 9

```
 1   public or not.  I can't -- I don't have an answer for
 2   that.
 3            Q.   Well, is --
 4            A.   Because personnel is a different situation
 5   than general business.
 6            Q.   What I'm trying to figure out is, who's
 7   got authority to resolve these?  Does it lie with the
 8   Board, or does it lie with some -- somebody else?
 9            A.   I don't have a -- I don't know how to
10   answer that.
11            Q.   So you don't know what the answer is?
12            A.   Correct.
13            Q.   Okay.  And have you participated in
14   discussions where it was decided whether or not to vote
15   on a resolution of a lawsuit concerning an employee?
16                 MR. SANTO:  Object to the extent it calls
17   for attorney-client privilege.
18            A.   I don't recall doing that.
19                 MS. GREISEN:  Let's mark an exhibit.
20                 (Deposition Exhibit 42 was marked.)
21                 THE COURT REPORTER:  42.
22            Q.   (By Ms. Greisen)  I've put in front of you
23   Exhibit 42, which is a document entitled "Settlement
24   Agreement and Release."
25                 Have you seen that document before?
```

Exhibit 9

```
 1                  MR. SANTO:  While the commissioner is
 2   reviewing the document, I will identify that we've
 3   objected to this document in a previous discovery
 4   request.
 5         A.   I don't think -- my signature is not on
 6   here anywhere, so I don't believe I've seen it.
 7         Q.   (By Ms. Greisen)  Were you aware that that
 8   document existed?
 9         A.   I don't recall that I did.
10         Q.   And you see that document reflects, and
11   you see the first paragraph shows the document is between
12   Rick Corsi and Mesa County?
13              Do you see that?
14         A.   The second paragraph?
15         Q.   It's the first one.  It just says the
16   settlement agreement is between Rick Corsi and Mesa
17   County.
18              Do you see that?
19         A.   I'm not sure where you're talk- -- what
20   spot you're talking about.
21         Q.   So you see the very first sentence, "This
22   Settlement Agreement and Release . . ."
23         A.   Yes.
24         Q.   Okay.  Is made and entered into on the
25   date, by and between Rick Corsi and Mesa County?
```

Exhibit 9

```
 1              A.   Yes, I see that.
 2              Q.   Okay.  And that this document -- if you
 3   turn to the last page, you see it was signed in January
 4   of 2018?
 5              A.   Yes.  Yes.
 6              Q.   And do you understand, if you -- if you go
 7   down and look at the next paragraph, starting with
 8   "WHEREAS," that this document concerns the Charge of
 9   Discrimination against Mesa County that Mr. Corsi filed?
10                   Go back to the first page.
11              A.   Oh, the first page.
12              Q.   Yeah.
13              A.   I'm sorry.
14              Q.   That's okay.
15                   "WHEREAS," you see it mentions that it's
16   regarding, "Rick Corsi filed a Charge of Discrimination
17   against Mesa County . . . on December . . . 2016."
18                   Do you see that?
19              A.   Were you on this last paragraph?  Is that
20   where you're at?  Or the -- up here?
21              Q.   The second paragraph.
22              A.   Yeah.  I see that, where it says that.
23              Q.   Okay.  So this is a Settlement -- would
24   you agree, this is a Settlement Agreement and Release
25   with -- between Rick Corsi and Mesa County with respect
```

Exhibit 9

```
 1   to the Charge of Discrimination that he filed concerning
 2   age discrimination?
 3              MR. SANTO:  Object to form.
 4         A.   That -- I mean, I haven't read this whole
 5   document and -- that's what it appears to say, yes.
 6         Q.   (By Ms. Greisen)  Okay.  And do you know
 7   how much was paid to Rick Corsi by the county as a result
 8   of this settlement?
 9         A.   No.
10         Q.   Are you -- do you participate in the
11   decisions as to how much to pay employees when settlement
12   agreements like this are entered into?
13         A.   I don't recall how we handle it.
14         Q.   Well, generally, are you involved in the
15   decisions like this?
16              MR. SANTO:  Object to form.
17         A.   Probably, but I don't -- I don't know how
18   to tell you how we did it.  We did -- probably did not do
19   it -- I would assume we were probably polled individually
20   if we are -- "This is the offer, are you okay with this
21   or not okay with it?"
22         Q.   (By Ms. Greisen)  Okay.  If you look at
23   page 3, second paragraph?
24         A.   Yeah.
25         Q.   You see the word "Payment"?  And do you
```

Exhibit 9

```
 1    see that the Mesa County paid Mr. Corsi $62,500 in
 2    exchange for this settlement?
 3              A.   Yeah, that's what it says.
 4              Q.   Were you aware of that amount?
 5              A.   Not that I recall.
 6              Q.   I'm going to ask you to look at Deposition
 7    Exhibit 31.
 8                   Do you see that document?
 9              A.   Yeah.
10              Q.   And have you seen that document before
11    today?
12              A.   No.
13              Q.   You see that that's a Settlement Agreement
14    and Release made between Janine Corsi and Mesa County?
15                   MR. SANTO:  And for the record, we have an
16    objection as to this document as well.
17              A.   Yeah, I can see it.
18              Q.   (By Ms. Greisen)  And if you look on the
19    second -- I'm sorry, the third page of that document, you
20    see that Ms. Corsi was also paid $62,500 for settlement
21    of her claims of discrimination against Mesa County?
22                   Do --
23              A.   Yes.
24              Q.   -- you see that?
25                   Were you involved in the decision to pay
```

Exhibit 9

```
 1   Ms. Corsi $62,500?
 2        A.   I don't recall that.
 3        Q.   And these documents -- if you look on the
 4   last page, these documents are signed; do you see that?
 5   They're signed by Frank Whidden?
 6        A.   Uh-huh, yes.
 7        Q.   Okay.  Does Mr. Whidden have authority to
 8   enter into settlement agreements with Mesa County
 9   employees without the input of the Board of County
10   Commissioners?
11        A.   I'm not -- I would -- yes, I would assume
12   he probably can, but I don't know.
13        Q.   Well, as a matter of policy, do you know
14   whether or not he does?
15             MR. SANTO:  Object to form.
16        A.   Yeah, I think he can.
17        Q.   (By Ms. Greisen)  So it doesn't concern you
18   that you were not aware of that settlement?
19        A.   No.
20        Q.   I think we have a double negative going
21   on.
22             Is it fair to say, it doesn't concern you
23   that Mr. Whidden signed those settlement agreements
24   without consulting with the Board?
25             MR. SANTO:  Object to form.
```

Exhibit 9

```
 1        A.   I would think he would talk to the legal
 2   department before he signed it.
 3        Q.   (By Ms. Greisen)  My question was, does it
 4   concern you that he signed the settlement documents
 5   without consultation with the Board?
 6        A.   No.
 7             MS. GREISEN:  Let's mark another exhibit.
 8             (Deposition Exhibit 43 was marked.)
 9             THE COURT REPORTER:  43.
10        Q.   (By Ms. Greisen)  I've put Exhibit 43 in
11   front of you.
12             Do you -- have you seen that document
13   before?
14        A.   Not that I recall, no.
15        Q.   Were you aware that Mesa County entered
16   into a Settlement Agreement with Cynthia Altenbern in
17   2014?  Were you aware of that?
18        A.   No.
19        Q.   Were you aware, at any time, that Mesa
20   County paid Ms. Altenbern $75,000 to settle her claims of
21   age discrimination against the county?
22        A.   Not that I recall.
23        Q.   Does it concern you at all that the county
24   has paid out so much money with respect to charges of age
25   discrimination?
```

Exhibit 9

```
 1               A.   Yes.
 2               Q.   And is it also fair to say that none of
 3   those Settlement Agreements have been made public, to
 4   your knowledge?
 5               A.   I'm not aware that they were made public.
 6               Q.   Is -- as an elected official, in your
 7   opinion, should information like that be made public to
 8   the citizens of Mesa County?
 9               A.   I think employee and personnel is probably
10   not.
11               Q.   Well, this isn't personnel.
12                    This is the county expenditure of county
13   funds, right?
14               A.   Nonetheless, it's -- you're involving --
15   employees and personnel matters are different than
16   spending money for roads.
17               Q.   It is different.  Does that mean it should
18   not be made public?
19               A.   Yes.
20               Q.   And why is that?
21               A.   That's my feeling on it, based on that.
22               Q.   I appreciate that that's your feeling and
23   that's your opinion.
24                    I'm just wondering if you can explain why
25   settlements, amounts paid to employees in exchange for
```

Exhibit 9

```
 1   release of claims of age discrimination, why you feel
 2   that should not be public knowledge?
 3            A.   Because it's a personnel matter.
 4            Q.   And that's all you can -- that's the best
 5   explanation?
 6            A.   Yes.
 7            Q.   And are you aware that it was also your
 8   county attorney's office -- and, in fact, I think it was
 9   Nina Atencio, who's present today -- that responded in --
10   to the State of Colorado in response to Ms. Altenbern's
11   charge?
12                 Were you aware of that?
13                 MR. SANTO:   Object to form.
14            A.   I'm not aware of that.
15            Q.   (By Ms. Greisen)  What factors -- as a
16   matter of policy, what factors are -- does the Board or
17   the county attorneys take -- I'm sorry.  Strike that.
18                 What factor does the Board or county
19   employees take into account in deciding whether or not to
20   resolve these types of charges of discrimination?
21            A.   I rely on my -- our legal staff.
22            Q.   So we've talked a little bit about how the
23   BOCC, the Board of County Commissioners, operates and
24   what's made public.
25                 I think it's -- is it fair to say that,
```

Exhibit 9

```
 1   was "all."
 2              MS. GREISEN:  Except for the first page.
 3   I do not know why that page does not have a Bates number
 4   on it, but --
 5              MR. SANTO:  Okay.  So --
 6              MS. GREISEN:  -- they're all concerning
 7   training, so --
 8              MR. SANTO:  I'll just note for the record
 9   that you're not letting me --
10              MS. GREISEN:  That's fine.
11              MR. SANTO:  -- meet with my client about a
12   document that you just came up with.
13              MS. GREISEN:  That's fine.
14         Q.   (By Ms. Greisen)  Have you seen any of
15   these before?
16         A.   No.
17         Q.   So would you agree that sex therapy
18   training would not be a part of the regular training
19   program within Mr. Whidden's department?
20         A.   So where do you see that?
21         Q.   Well, if you look on document DEF 5711,
22   which is the second document, you see that's an invoice
23   for "Couples and Sex Therapy" class?
24         A.   I have no opinion on that.
25         Q.   I'm not asking you whether you have an
```

Exhibit 9

```
 1   opinion on the document.
 2              I'm asking you whether you think sex
 3   therapy is a part of the regular training program within
 4   Mr. Whidden's department?
 5        A.   Yes.
 6        Q.   So sex therapy -- I'm sorry, so I
 7   understand.
 8              You believe sex therapy training is a part
 9   of the regular training program within his department?
10        A.   My belief is, there's probably more to it
11   than that title is -- I don't know.
12        Q.   I'm asking you, sitting here now --
13        A.   I just gave you an answer.
14        Q.   -- as an elected official, is it your
15   testimony that you think sex therapy could be a part of
16   the regular training program within his department?
17              MR. SANTO:  Object.  He responded, "I
18   don't know."
19              MS. GREISEN:  Go ahead.
20        A.   I don't know.
21        Q.   (By Ms. Greisen)  You don't know?
22        A.   No.
23        Q.   You don't have any opinion?
24        A.   How would I know?
25              MR. SANTO:  Object.  Asked and answered.
```

Exhibit 9

1    Argumentative.

2           Q.  (By Ms. Greisen)  Do you know what the term
3    "sex therapy" means?
4           A.   I don't know.  I've never had to have any.
5           Q.   Well, I haven't, either.
6                But I'm asking you whether or not you have
7    any understanding of what that term means?
8           A.   Not on this situation here, no.
9           Q.   Do you think any type of sex counseling is
10   appropriate as a regular training program within any
11   department of Mesa County?
12          A.   I don't know.
13          Q.   And you have no opinion?
14          A.   No opinion.
15          Q.   Would you agree that Family Therapy with
16   Children would not be a regular training program within
17   Mr. Whidden's department?
18          A.   When he deals with DHS, that's all they
19   deal with so --
20          Q.   So --
21          A.   -- yes.
22          Q.   -- it's your opinion that Family Therapy
23   with Children would -- could be a part of the regular
24   training program?
25          A.   Yes.

Exhibit 9

```
 1          Q.   Would you agree that marriage and family
 2   therapy would not be considered a regular training
 3   program within Mr. Whidden's department?
 4          A.   With all the employees he deals with, it
 5   probably is.
 6          Q.   So do you think it is -- it is
 7   appropriate -- if you look on page -- I think they --
 8   starting on page 2 and again on page 3, and it indicates
 9   that Mr. Whidden is attending Northcentral University
10   conducting his master's degree coursework.
11               Do you see that?
12          A.   On which page are you on?
13          Q.   Well, if you just turn to page 2, you see
14   on the right-hand side of that page?  Just right
15   here (indicating).
16               On page 2, do you see right here, it
17   indicates these invoices are for Mr. Whidden's master's
18   coursework?
19               MR. SANTO:  Object to form.
20          A.   It says, ". . . for further career
21   development and credentials associated with County Human
22   Services [sic] Management," that one?
23          Q.   (By Ms. Greisen)  Right.  Do you see that?
24          A.   Yeah.
25          Q.   Do you think sex therapy is legal
```

Exhibit 9

```
 1   "coursework required for further career development and
 2   credentials associated with" the HR department with the
 3   county?
 4           A.   Yes.
 5           Q.   And is it also your testimony that the
 6   other invoices -- the Family Therapy with Children, the
 7   Families in Crisis, and the Family Development -- those
 8   would all be fairly considered a regular training program
 9   within his department?
10           A.   Yes.
11           Q.   Okay.  So looking at these invoices, you
12   can see that these invoices reflect -- and I'm sure you
13   can just add them up, not precisely -- but there's been
14   over $10,000 paid for Mr. Whidden to go to this therapy,
15   right -- or to go to this training.
16                Do you see that?
17           A.   Yeah.
18           Q.   And, in fact, the last two invoices are --
19   represent the cost for Mr. Whidden to take his Marriage
20   and Family Therapy tests, right?
21           A.   Yeah.
22           Q.   To take his --
23           A.   Yes.
24           Q.   -- practicums, right?
25                Do you see that?
```

Exhibit 9

```
 1              A.    What page are you on now?
 2              Q.    The last two.
 3              A.    Yeah.
 4              Q.    Right?  So that's a 40- -- over $4600 for
 5   him to get his license in marriage and family therapy,
 6   right?
 7              A.    It looks like.
 8              Q.    And are you also -- well, let me ask.
 9                    Have you had any public discussions about
10   Mesa County paying for Mr. Whidden to get his license in
11   marriage and family therapy?
12              A.    No.
13              Q.    Were you aware that he was doing that?
14              A.    No.
15              Q.    So given the fact that some employees who
16   had worked at Mesa County for decades were laid off in
17   2016, in your opinion, was it appropriate for Mesa County
18   to be paying for Whidden to obtain a marriage and family
19   counselor license right after these individuals were
20   terminated?
21              A.    Yes.
22              Q.    And after he got his master's degree and
23   license from Northcentral, you know he then opened up a
24   family and marriage therapy counseling service, a private
25   one on the side, right?
```

Exhibit 9

```
 1          A.   I have no idea about that.
 2          Q.   You're not aware that he has his own
 3   private business being a marriage and family therapist?
 4          A.   No.
 5          Q.   Would it concern you that after the county
 6   paid for this, that he then opened up a private business?
 7          A.   Yes.
 8          Q.   Because it certainly has the appearance of
 9   impropriety, even if it's not, right?
10               MR. SANTO:  Object to form.
11          A.   There may be more to the story than we're
12   talking about that I don't -- I'm not aware of, so I'm
13   not going to comment.
14          Q.   (By Ms. Greisen)  You may be -- there may
15   be, but my question was:  It at least has a minimum of an
16   appearance of impropriety?
17          A.   Yes, your opinion.  I don't have an
18   opinion on it.
19          Q.   So why does it cause you concern?
20          A.   Pardon?
21          Q.   You said it caused you some concern.
22          A.   Yeah, but --
23          Q.   I want to know why.
24          A.   Quite likely, there's more to the story.
25          Q.   No.
```

Exhibit 9

```
 1                My question is, why did it cause you --
 2   does it cause you concern?
 3           A.   Well, maybe I'll change my mind.  It don't
 4   concern me.
 5           Q.   So now your testimony is, it does not
 6   cause you concern?
 7           A.   I haven't seen this document before, and
 8   I'm supposed to make a decision like this, this, and
 9   that (indicating)?
10           Q.   No.  I'm asking --
11           A.   That's not -- that's not the thing to do.
12           Q.   I'm asking for your impression.  Sitting
13   here right now, looking at the documents that I've just
14   shown you, does it cause you concern that Mesa County
15   paid for him to get certification in this marriage and
16   family therapy area, to have him then open up his own
17   private practice of which you were not aware?
18           A.   I'm not going to answer because I -- I --
19   there's more to -- there's probably more to the story.
20   Based on this, and I get ten seconds to read it, and I'm
21   supposed to tell you, yes, no, or maybe, and --
22           Q.   If you need a --
23           A.   -- I'm not going to do that.
24           Q.   If you need a couple minutes to read it,
25   I'm happy --
```

Exhibit 9