# EXHIBIT 5

# Deposition Excerpts from Mesa County Commissioner John Justman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

_____

DEBRA BOURICIUS,

    Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board of
County Commissioners,

    Defendant.

_____

DEPOSITION OF JOHN JUSTMAN

_____


Friday, May 3, 2019

9:02 a.m.


PURSUANT TO NOTICE and the Federal Rules of Civil
Procedure, the above-entitled deposition was taken on
behalf of Plaintiff at 205 North 4th Street, Suite 300,
Grand Junction, Colorado, before K. Michelle Dittmer,
Registered Professional Reporter and Notary Public within
Colorado.

1          Q.   (By Ms. Greisen)  So can you tell me what

2     your job duties as a county commissioner are?

3               You're laughing.  Why are you laughing?

4          A.   It's going to be long.

5          Q.   Yeah.  Give me your best shot.  I mean,

6     you know, the --

7          A.   Like, I'm just --

8          Q.   -- in the top tier --

9          A.   -- going to speak for myself.  I mean,

10    I --

11         Q.   Sure, yeah.

12         A.   I am one of the CEOs of the county.

13         Q.   Okay.

14         A.   We -- we go through a long budget process

15    for months, and we have to certify the budget to the

16    State by the 15th of December.

17              We oversee -- oh, that isn't quite the

18    right word.  We work with all the various department

19    heads in the county, whether it's human services or road

20    and bridge, fleet, that keeps the vehicles running.

21              Obviously we -- we have an elected

22    sheriff.  We have an elected DA.  We have an elected

23    treasurer, an assessor, and a surveyor.

24         Q.   And is the clerk elected as well?

25         A.   Yes.  Clerk and recorder.  If I didn't say

1    county allow a layoff to occur?

2              A.    Primarily, we don't have the revenue, so

3    obviously something has to -- you have to reduce costs

4    somehow.

5              Q.   What's the Board's involvement in the

6    layoff process?

7              A.    The Board is not really involved.

8              Q.   So who is responsible for making sure any

9    layoffs are done in compliance with federal and state

10   laws?

11             MR. SANTO:   Object to form.

12             A.    I would -- county administrator.

13   Department heads, if they have -- if they feel they have

14   too many people, may also be involved.   Other than that,

15   that's it.

16             Q.  (By Ms. Greisen)  And is that also true

17   with respect to employment practices at the county --

18             A.   Yes.   Excuse me.

19             MR. SANTO:  Wait for her to finish.

20             Q.  (By Ms. Greisen)  That's okay.  I'll state

21   it over.

22             In terms of who is responsible at the

23   county for following the law with respect to employment

24   practices, is it the county administrator that's also

25   responsible for ensuring compliance with those laws?

1          MR. SANTO:  Object to form.

2          A.   We have the county -- county

3   administrator.  That was --

4          Q.  (By Ms. Greisen)  Let me ask it again.

5          A.   Yeah.

6          Q.   With respect to employment practices, who

7   at the county is responsible for ensuring compliance with

8   state and federal laws?

9          A.   Probably HR --

10          MR. SANTO:  Same objection.

11          A.   -- HR department.

12          Q.  (By Ms. Greisen)  Who's the head of the HR

13   department?

14          A.   Right at the moment, I don't know because

15   one -- they're on -- on leave.  I'm not -- not certain

16   who the person is right now.

17          Q.   Who was the --

18          A.   Brenda McKay is on maternity leave, so I'm

19   not sure who filled in -- who's filling in for her.

20          Q.   And who's Brenda's boss?

21          A.   Frank Whidden, the administrator.

22          Q.   Does Mr. Whidden also have a title with --

23   let me back up.

24          Does Mr. Whidden also have an HR title

25   with the county?

```
 1                 A.    I can't answer that.  I don't know.

 2                 Q.    And you said that the Board hires -- also

 3    hires the county attorney.

 4                       Who oversees the county attorney's office?

 5    Is that the Board?

 6                 A.    The Board and the attorney -- I mean, the

 7    county attorney runs his office.  We don't run it for

 8    him.

 9                 Q.    But the county attorney reports to the

10    Board?

11                 A.    Correct.

12                 Q.    And the county attorney, when you were

13    elected, was Pat Coleman; is that right?

14                 A.    No.

15                 Q.    Who was it?

16                 A.    Lyle Dechant.

17                 Q.    Okay.  When did Pat Coleman become the

18    county attorney?

19                 A.    When did he become attorney?

20                 Q.    Yeah.

21                 A.    Probably -- I believe in 2014.

22                 Q.    And when did he leave?

23                 A.    Mr. Coleman?  He's still there.

24                 Q.    He's still the county attorney?

25                 A.    Yes.
```

 1           Q.   Do you know how many attorneys he has in
 2   his office?
 3           A.   Not precisely.   In the neighborhood of 18
 4   to 21 or '2.
 5           Q.   Is Ms. Atencio one of the attorneys in Pat
 6   Coleman's office?
 7           A.   Yes.
 8           Q.   And Mike Santo's office is representing
 9   the county in this lawsuit, right?
10           A.   Correct.
11           Q.   What role does Mr. Santo's firm have with
12   respect to advising the county on anti-discrimination
13   laws?
14           A.   I don't know.
15           Q.   Is Mr. Santo's firm contracted to provide
16   other services, other than representing the county in
17   this type of lawsuit?
18           A.   I don't know.
19           Q.   So are you involved at all with who the
20   county attorney's office hires to provide training to the
21   county?
22           A.   No.
23           Q.   Do you know -- are you aware that
24   Mr. Santo's office provides training with respect to
25   anti-discrimination laws to the county?

```
 1              A.    No.

 2              Q.    How do you, as a county commissioner, know

 3    if the county attorney's office is performing sufficient

 4    oversight of its workplace to ensure compliance with

 5    state and federal laws?

 6                    MR. SANTO:  Object to the form.

 7              A.    I can't answer that.

 8              Q.    (By Ms. Greisen)  Do you have any way to

 9    know?

10              A.    I'm not an attorney.  How would I know?

11              Q.    Well, I'm asking you.  Do --

12              A.    I don't know.

13              Q.    Okay.  Is it the county attorney's office

14    that is in charge of ensuring that personnel issues are

15    handled in a manner that complies with the state and

16    federal laws?

17                    MR. SANTO:  Object to form.

18              A.    I can't an- -- I don't -- I don't know.

19              Q.    (By Ms. Greisen)  Do you know what the

20    county attorney's office does?

21              A.    Yes.

22              Q.    Give me an idea.

23              A.    They do contracts.

24              Q.    Okay.

25              A.    They handle litigation.
```

1          Q.    Okay.

2          A.    They do child welfare.  You know, I mean,

3    all the other things that a county would need an attorney

4    for.  They handle everything, the wide spectrum of things

5    that a county has to do legally and -- and . . .

6          Q.    So is it fair to say, then, that one of

7    the responsibilities of the county attorney's office is

8    to ensure that the workplace is operated in compliance

9    with the law?

10         A.    Yes.

11         Q.    And that would include workplace policies

12   with respect to how employees are treated?

13               MR. SANTO:  Object to form.

14         A.    I don't know what the workplace policies

15   are.

16         Q.   (By Ms. Greisen)  Well, maybe I used the

17   wrong word.

18               It would include workplace laws regarding

19   how employees must be treated?

20         A.    Yes.

21               MR. SANTO:  Same objection.

22         Q.   (By Ms. Greisen)  Do the settlement of

23   employment-related claims have to be approved by the

24   Board of County Commissioners?

25         A.    I don't know.

 1    about during these reviews?  Does the Board have any kind

 2    of format for specifically what's discussed?

 3              A.    Probably not.

 4              Q.    And is this type of review that you're

 5    describing the same type of review process that's

 6    conducted for the head of human services and the county

 7    attorney?

 8              A.    Correct.

 9              Q.    Okay.  So are these reviews actually

10    written up?  I mean, are there -- or reduced to writing

11    about these three individuals?

12              A.    I don't think so.

13              Q.    Okay.  And can you describe or tell us any

14    of the documents that are gathered with respect to these

15    reviews, other than talking with the individual themself?

16              A.    None.  We talk to each one of those

17    individually.  That's . . .

18              Q.    Okay.  So it's a -- usually an executive

19    session, where the board members call the person in and

20    there's a discussion, and then a review is given to that

21    person, but nothing is reduced in writing; is that --

22              A.    That's correct.

23              Q.    -- accurate?

24              Do you know what, if any, training

25    Mr. Whidden has had with managing human resources or with

1    human resources at all?

2              A.   I can't answer that.  I don't have an

3    answer.

4              Q.   And is that because you don't know?

5              A.   I don't know.

6              Q.   Okay.

7              A.   I'm sorry.  That's --

8              Q.   That's okay.  And do you know what the

9    basis of -- I'll rephrase that.

10             Do you have any idea whether or not

11   Mr. Whidden has any knowledge about how to comply with

12   state and federal antidiscrimination laws?

13             MR. SANTO:  Object to form.

14             A.   I can't answer that.  I don't know.

15             Q.   (By Ms. Greisen)  Okay.  And is it fair to

16   say you -- from -- since the time you've been a

17   commissioner, you don't know what his -- what

18   Mr. Whidden's knowledge is about those laws; is that

19   correct?

20             A.   I can't -- I don't know.

21             Q.   Well, let me -- me rephrase.

22             I'm saying:  Fair to say that since you've

23   been a county commissioner, you have no idea what, if

24   any, training Frank Whidden has had with respect to how

25   to comply with state and federal antidiscrimination laws;

1    is that correct?

2              A.    That's correct.

3              Q.    Okay.  And you said Brenda -- I'm sorry, I

4    forgot her last name -- was the head of HR?

5              A.    Yes.

6              Q.    Do you know what her title is?

7              A.    HR director.

8              Q.    Okay.  Is she -- how long has she been out

9    on leave, do you know?

10             A.    Like a month.

11             Q.    Has she been the HR director the whole

12   time since you've been the county commissioner?

13             A.    No.

14             Q.    Who was the previous HR director?

15             A.    I can't answer -- I don't -- I don't

16   know -- recall her name.

17             Q.    When did Brenda start, just generally?

18             A.    Three years.

19             Q.    So Brenda's been there about three years?

20             A.    I'm -- yes.

21             Q.    Okay.  And do you know what Brenda's

22   knowledge is about how to comply with state or federal

23   antidiscrimination laws?

24             A.    No.

25             Q.    Do you know if she has any?

```
 1                    MS. GREISEN:  -- about --

 2           Q.  (By Ms. Greisen)  Did you read the

 3    Complaint?

 4           A.   No.

 5           Q.   Why not?

 6           A.   I didn't need to.

 7           Q.   Why not?

 8           A.   That's what I have legal staff for.

 9           Q.   So do you feel like you know a sufficient

10    amount about this -- I'll back up.

11                Do you feel like you know enough

12    information about this case to answer questions about

13    what occurred during the time period involved in this

14    lawsuit?

15           A.   No.

16           Q.   Have you done anything to refresh your

17    memory at all?

18           A.   No.

19           Q.   And other than what your attorney has

20    said, have you talked to anybody about this lawsuit?

21           A.   No.

22           Q.   And again, other than what your attorney

23    has said, have you made any efforts whatsoever to find

24    out whether or not there's any merit to this lawsuit?

25           A.   They're not what?
```

 1                    Q.   To find out whether or not there's any

 2    truth to this -- to Ms. Bouricius's claims in this case.

 3                    A.   No.

 4                    Q.   Okay.  So sitting here today, is it fair

 5    to say that you don't know whether or not discrimination

 6    happened or not?

 7                         MR. SANTO:  Object to form.

 8                    A.   I don't know.

 9                    Q.  (By Ms. Greisen)  Okay.  And you haven't --

10    to your -- you haven't taken any steps to investigate

11    whether it happened, right?

12                    A.   No.

13                    Q.   Okay.  And to your knowledge, did anyone

14    else take any steps to investigate whether or not

15    discrimination happened?

16                    A.   No.

17                         MR. SANTO:  Object to form.

18                    Q.  (By Ms. Greisen)  Okay.  Have you been

19    told -- other than your attorney, of course -- about the

20    results of any investigation that Mesa County did into

21    the allegations of discrimination in this case?

22                    A.   No.

23                    Q.   Would you agree that allegations involving

24    somebody being discriminated against because of their age

25    are very serious allegations?

 1          A.    Yes.

 2          Q.    Okay.  And that if there was a federal

 3    lawsuit making such allegations, you would expect and

 4    require the county to take it very seriously?

 5               MR. SANTO:  Object to form.

 6          A.    Restate that, please.

 7          Q.  (By Ms. Greisen)  Sure.

 8               If there was a federal lawsuit that was

 9    filed against the county claiming age discrimination or

10    any kind of discrimination, you would require, as a

11    county commissioner, that the county take that seriously?

12               MR. SANTO:  I'm going to object to any

13    extent that this calls for him to identify communications

14    with counsel.

15               MS. GREISEN:  I'm not.

16          Q.  (By Ms. Greisen)  I'm just asking you, as a

17    county commissioner, would you expect -- or would you

18    require the county to take it seriously?

19               MR. SANTO:  And I'm going to object again

20    if -- that "require" is any discussions with counsel.

21          A.    That's what I have a legal team for.

22    That's not my expertise.

23          Q.  (By Ms. Greisen)  I'm not asking you for

24    expertise.

25               I'm asking you, as a county commissioner,

```
 1    do you expect your county employees to take

 2    discrimination allegations seriously?

 3              A.   Yes.

 4              Q.   Okay.  Have you ever heard of the Older

 5    Workers Benefit Protection Act?

 6              A.   No.

 7              Q.   Can you tell me what your understanding of

 8    the law is against age discrimination?

 9                   MR. SANTO:  Object --

10              A.   No.

11                   MR. SANTO:  -- to form.

12                   Sorry.

13              Q.   (By Ms. Greisen)  Do you have any

14    understanding of what the law is with respect to age

15    discrimination?

16                   MR. SANTO:  Object to form.  Sorry.  I was

17    waiting . . .

18              A.   No.

19              Q.   (By Ms. Greisen)  Okay.  Do you know what,

20    if any, processes are in place to ensure that decisions

21    made by the county do not discriminate illegally against

22    its employees?

23              A.   Can you restate that, please.

24              Q.   Sure.

25                   Do you know if there are any processes in
```

```
1    layoffs in 2016?

2                  MR. SANTO:  Same objection.

3          A.   I don't recall.

4          Q.  (By Ms. Greisen)  And so how did the

5    decision to lay off people in 2016, how did that come

6    about?

7          A.   I think it was part of Frank's

8    recommendations as he worked with the department heads

9    and probably polled us individually.

10         Q.   Did Frank -- and by "Frank," I mean

11   Mr. Whidden -- did he submit a written proposal to the

12   Board --

13         A.   No.

14         Q.   -- about the proposed layoffs?

15         A.   No.

16         Q.   So throughout your time as a board of

17   county commissioner, there have been, at least, between

18   $12 and $14 million in general fund reserves in the

19   county?

20         A.   Yes.

21         Q.   So why were layoffs deemed necessary?

22                  MR. SANTO:  Object to form.

23         A.   Because we feel 12 million, or whatever

24   the number is, that's -- that's -- we don't want to go

25   lower than that.
```

1         Q.   (By Ms. Greisen)   Did the Board discuss it?

2         A.   No.

3         Q.   Did anyone other than Mr. Whidden propose

4    layoffs?

5              MR. SANTO:   Same objection.

6         A.   I don't know.

7         Q.   (By Ms. Greisen)   Okay.   As far as you

8    know --

9         A.   Well, he --

10        Q.   -- to the Board --

11        A.   Correct.

12        Q.   -- was anyone other than Mr. Whidden

13   proposing layoffs?

14        A.   No.

15        Q.   Do you recall that when you were running

16   for reelection in 2016, didn't you say that the county

17   almost always predicts a huge budget deficit when looking

18   at the budget every year, but it's never as bad as they

19   project?

20        A.   Say that again.

21        Q.   Sure.

22             Did you say that the county almost always

23   predicts a high budget deficit when looking at the budget

24   every year, but it's never as bad as they project?

25        A.   Generally speaking, that's true.   There's

1   been years when it -- when the deficit was more than the

2   budget said.  But generally speaking, the budget deficit

3   is, for the most part, more years, it's not been quite as

4   low as we stated.

5            Q.   So you would agree that that is a

6   statement you would have made?

7            A.   Yes.

8            Q.   Okay.  So did the Board -- well, I guess

9   the Board never convened as a board to discuss the

10  layoff; is that correct?

11           A.   Correct.

12           Q.   And was there actually a document

13  presented to you as to how the layoffs would occur?

14           A.   No.

15           Q.   Have you ever seen any documentation about

16  how it was decided the layoffs would occur?

17           A.   No.

18           Q.   Would you agree that prior to making

19  layoffs of individual people, that it would be -- well,

20  let me restate that.

21                Before making any layoffs, the department

22  heads, the people who had the most knowledge about the

23  efficiencies of their staff, they would be consulted

24  about who should or should not be laid off; is that fair?

25           A.   Yes.

1          Q.   And were there other cost-saving methods

2     looked at, other than layoffs, at that time?

3          A.   I believe -- I believe there was some job

4     consolidations if someone left.

5          Q.   Anything else?

6          A.   I don't recall.

7          Q.   Do you know what criteria was used for who

8     was laid off?

9          A.   No.

10         Q.   Do you know who made the decision as to

11     who would get laid off?

12         A.   No.

13         Q.   Did you speak to Frank Whidden about who

14     was going to be laid off before that decision was

15     finalized?

16         A.   No.

17         Q.   Did you speak to Frank Whidden about who

18     was going to be laid off after the decision was

19     finalized?

20         A.   No.

21         Q.   Do you know any of the factors used to

22     make decisions about who would be terminated during that

23     layoff?

24         A.   No.

25         Q.   Did Frank Whidden tell you -- discuss with

1    you as to who he was proposing to lay off?

2              A.    No.

3              Q.    So when did you find out a layoff had

4    occurred?

5              A.    I don't recall.

6              Q.    Did you find out about it after it had

7    happened?

8              A.    I don't recall that.

9              Q.    Are you aware that the layoff that I'm

10   talking about in 2016 is part of the main issue in this

11   lawsuit?

12              MR. SANTO:   And again, I'm going to

13   instruct the --

14              A.    No.

15              MR. SANTO:   -- witness not to answer the

16   question if it requires a disclosure of attorney-client

17   privilege.

18              Q.   (By Ms. Greisen)  So when you came to this

19   deposition today, what did you think the focus was going

20   to be?

21              MR. SANTO:   And I would again instruct the

22   witness not to answer any questions that require him to

23   identify the information that we discussed.

24              MS. GREISEN:   I'm not.

25              Q.   (By Ms. Greisen)  I'm just asking him, what

1    did you think you were going to answer questions about?

2              A.   I don't know.

3              Q.   Have you talked to any of your board --

4    other county commissioners about being deposed in this

5    matter?

6                   MR. SANTO:  Object to form.

7              A.   I don't know.

8              Q.  (By Ms. Greisen)  Well, I'm asking you.

9                   Did you talk to the other commissioners

10   about being deposed --

11             A.   No.

12             Q.   -- in this case?

13                  Have you talked to anyone outside of your

14   attorneys about this case at all?

15                  MR. SANTO:  Same --

16             A.   No.

17                  MR. SANTO:  -- objection.

18             Q.  (By Ms. Greisen)  So I'm going to go

19   through and ask you these questions, but is it fair to

20   say you really don't know any of the details about this

21   case at all?

22             A.   True.

23             Q.   And you've made no effort to find out,

24   correct?

25             A.   No.

1              Q.   I just want to make sure for the record.

2                   I said, is it fair to say you've taken no

3     efforts to find out any of the details of that case; is

4     that correct?

5                   MR. SANTO:  Object to form.

6              A.   Yes.

7              Q.  (By Ms. Greisen)  Okay.  Is it fair to say

8     that you assumed that, before making these layoffs, Frank

9     Whidden talked to the department heads about who should

10    be laid off?

11             A.   I can't answer that.

12             Q.   I'm asking you.  Is it fair that you would

13    assume that he would have done that?

14                  MR. SANTO:  Object to form.

15             A.   No.

16             Q.  (By Ms. Greisen)  Why not?

17             A.   Because that's his job.

18             Q.   Oh, I'm -- I appreciate that that's his

19    job.

20                  I'm simply asking you, before budget

21    cuts -- or before layoffs were made, do you think that

22    Mr. Whidden would go to the people with the most

23    knowledge about the employees' skills and efficiencies?

24             A.   I can't speak for Mr. Whidden.

25             Q.   I'm not asking you to.  I'm asking about

 1    what you would assume.

 2              A.   I'm not assuming anything.

 3              Q.   Well, I'm asking you to.  Yes or no?

 4              A.   No.

 5              Q.   What do you think -- what do you assume

 6    Mr. Whidden would have done before deciding to lay off

 7    people?

 8              A.   I don't know that I can answer that.

 9              Q.   Do you have an expectation that he would

10    have done anything at all?  Pick names out of a hat?

11                   I mean --

12                   MR. SANTO:  Object to form.

13              Q.   (By Ms. Greisen)  -- what process, if any,

14    do you expect that he would have used?

15              A.   He would have used the most

16    cost-effective -- you know, the best interests of the

17    county to cut the costs as best we can and where -- and

18    where it needed to be happening.

19              Q.   My question was, what do you believe he

20    should have done prior to making decisions about who

21    would be terminated?

22              A.   I can't -- I can't answer that.

23              Q.   You have no idea?

24              A.   No.

25              Q.   Okay.  Did you or anyone else, to your

 1    knowledge, look to see if Whidden had followed Mesa

 2    County's policies about what factors should be taken into

 3    account when making decisions about who to lay off?

 4                    MR. SANTO:   Object to form.

 5          A.    Can you restate that, please.

 6          Q.    (By Ms. Greisen)   Yeah.

 7                Did you -- are you aware of any

 8    investigation that was done to make sure that Frank

 9    Whidden followed Mesa County's policies on how to conduct

10    a layoff?

11          A.    I can't -- I don't know.

12          Q.    So you're not aware of any?

13          A.    No.

14          Q.    So when were you informed that Mr. Whidden

15    was going to lay people off?

16          A.    I don't know.

17          Q.    Did you participate in any of the

18    termination meetings?

19          A.    No.

20          Q.    Were you told in advance that any of them

21    were going to happen?

22          A.    Restate that, please.

23          Q.    Sure.

24                Were you told -- do you know how the

25    layoffs happened, how people were informed they were

1    being laid off?

2            A.    No.

3            Q.    So you weren't present at any of the

4    meetings where people were told they were going to be

5    laid off?

6            A.    No.

7            Q.    Did you ever find out who was laid off?

8            A.    No.

9            Q.    Did you ever ask?

10           A.    No.

11           Q.    Was there ever a report given to the Board

12   about the layoffs and the impact of the layoffs?

13           A.    No.

14           Q.    Were you told any of the reasons why the

15   specific people who were laid off were chosen?

16           A.    No.

17           Q.    Do you have any knowledge about the work

18   performance or skill set of any of the people chosen for

19   the layoff?

20           A.    No.

21           Q.    At any time did you look to see who was

22   terminated --

23           A.    No.

24           Q.    -- in that layoff?

25                 Did you look to see -- even if you didn't

1    look to see the names, did you look to see the years of

2    service that any of those employees had given to Mesa

3    County?

4            A.    No.

5            Q.    Are you aware that some of those people

6    laid off had been with the county for over two decades?

7            A.    No.

8            Q.    Were you aware that most of the people in

9    the IT department that were laid off were the older

10   employees?

11           A.    No.

12           Q.    Did you ever talk to the other board

13   members about who was being terminated?

14           A.    No.

15           Q.    Did you ever ask Whidden for any

16   documentation showing who he terminated?

17           A.    No.

18           Q.    Did you ever ask him for any documentation

19   showing the basis for his decision?

20           A.    No.

21           Q.    So fair to say, it was just kind of like

22   we're -- yeah, we'll -- that's fine or that you said it

23   was okay to do layoffs to Frank, but you really -- other

24   than that participation, you didn't have any further

25   conversations with the Board or with Frank about it?

1                    MR. SANTO:  Object to form.

2          A.   No.

3          Q.   (By Ms. Greisen)  That's not fair?

4          A.    That's true.

5          Q.    Oh, it is true.  Okay.  I just want to ask

6    the question again because I said --

7          A.    Ask your question again.

8          Q.    -- is it fair?  That's fine.

9                    So you said earlier that you might have --

10   you think you had a conversation with Frank, kind of an

11   informal conversation about his proposal of layoffs; it

12   wasn't discussed with the whole board.

13                   And then I assume, other than that, you

14   haven't had any more discussions with the Board about

15   anything related to that layoff; is --

16         A.    That's correct.

17         Q.    -- that correct?

18                   Okay.  And after the -- when did you

19   become aware that this lawsuit was filed?

20                   MR. SANTO:  Again, instruct the witness

21   not to provide any information with respect to

22   discussions with your attorney.

23                   THE WITNESS:  Yeah.

24                   MR. SANTO:  So if your attorney told you,

25   you cannot testify to that.

1                    THE WITNESS:  Okay.

2              A.    I don't -- I don't recall.

3              Q.    (By Ms. Greisen)  Did you see the Charge of

4    Discrimination when it was filed?

5              A.    The -- see what?

6              Q.    The Charge of Discrimination that was

7    filed with the Colorado Civil Rights Division.

8              A.    No.

9              Q.    You've never seen that?

10             A.    No.

11             Q.    Have you talked with the Board outside of

12   the presence of your attorney about that?

13             A.    No.

14             Q.    So when you saw the Charge, was it before

15   or after the lawsuit was filed?

16                   MR. SANTO:  Object to form.

17             A.    I don't -- I don't have an answer.  I

18   don't know.

19             Q.    (By Ms. Greisen)  You don't know?

20                   Did you read it, the Charge of

21   Discrimination?

22             A.    No.

23             Q.    Why not?

24             A.    That's why I have an -- that's why I have

25   an attorney, to take care of this for us.

 1   narrating on the record, Mr. Santo.

 2                  MR. SANTO:  Well --

 3         Q.   (By Ms. Greisen)  I'm asking if you saw

 4   Exhibit 37 before?

 5         A.   No.

 6         Q.   And did you, at any time, review the

 7   county attorney's response to any charges of

 8   discrimination filed at the Colorado Civil Rights

 9   Division?

10         A.   No.

11         Q.   Are you -- let's see.

12                  MS. GREISEN:  Let's mark this one.

13                  (Deposition Exhibit 38 was marked.)

14                  THE COURT REPORTER:  38.

15         Q.   (By Ms. Greisen)  I've put in front of you

16   Exhibit 38.

17                  Have you seen that document before?

18         A.   No.

19         Q.   Are you aware that the State of Colorado

20   determined that Mesa County -- there was probable cause

21   to believe that Mesa County discriminated against my

22   client, Ms. Bouricius?

23         A.   No.

24         Q.   So you're not aware that the State

25   conducted its own investigation into this case?

```
 1              MR. SANTO:  Object to form.

 2              Go ahead.

 3         A.   Not that I'm aware of.

 4         Q.   (By Ms. Greisen)  Colorado -- CCRD, the

 5    Colorado Civil Rights Division, do you -- are you aware

 6    that that is the state agency that conducts

 7    investigations into complaints of discrimination?

 8         A.   Yes.

 9         Q.   Okay.  Have you made any inquiries into

10    what the State's investigation, other than your

11    attorneys, showed in this case?

12         A.   No.

13         Q.   Okay.  Would it be important to you, as a

14    county commissioner, to know that the State of Colorado

15    found there was probable cause to believe discrimination

16    occurred?

17         A.   Yes.

18         Q.   Do you have any idea why you don't know?

19              MR. SANTO:  Don't know?

20         A.   I don't know.

21         Q.   (By Ms. Greisen)  Well, I -- did you ever

22    ask anybody what's happened with it?

23              MR. SANTO:  Except your attorney --

24         A.   No.

25              MR. SANTO:  -- of course.
```

1    answer any information that was disclosed to him by

2    counsel.

3              Q.   (By Ms. Greisen)  And are you aware of any

4    other charges of discrimination that have been filed

5    against Mesa County for discrimination based on age?

6              A.   No.

7              Q.   Are you aware of any other charges of

8    discrimination against Mesa County based on any form of

9    discrimination?

10             A.   No.

11             Q.   Would you expect that if such charges were

12   filed, that, as a county commissioner, you would be aware

13   of them?

14             A.   Yes.

15             MS. GREISEN:  Okay.  I think we can wrap

16   it up and take a lunch break.

17             MR. SANTO:  So magnanimous of you.

18             (Recess taken from 12:05 p.m. until

19   1:14 p.m.)

20             Q.   (By Ms. Greisen)  Mr. Justman, before we

21   went on our lunch break, you mentioned that Lyle Dechant

22   was the previous county attorney?

23             A.   Yes.

24             Q.   And I think you said he left in 2014; is

25   that right?

 1          Q.   (By Ms. Greisen)   No.

 2               But as an elected official, would you

 3    agree that the person's age should not be a deciding

 4    factor in whether or not that person is terminated or

 5    not?

 6          A.   Yes.

 7          Q.   So before the break, we were going over

 8    the charges of discrimination filed by three people with

 9    respect to the 2016 layoff.

10               Do you recall that?

11          A.   Yes.

12          Q.   Okay.  Are you aware of any other time in

13    which charges of discrimination have been filed against

14    Mesa County concerning age discrimination?

15          A.   Not that I'm aware of.

16          Q.   Would you expect to be aware of those type

17    of allegations?

18          A.   You mean additional ones, you mean, or --

19          Q.   Right.

20          A.   Yeah.

21               MS. GREISEN:  I don't have a stapler.  Do

22    you have a stapler, by any chance?

23               MR. SANTO:  I can grab one.  Just a sec.

24               MS. GREISEN:  Could you, please?

25               MR. SANTO:  Yeah.  Don't go far without

```
 1    me.

 2                    MS. GREISEN:  I will try.

 3                    (Discussion off the record.)

 4                    MS. GREISEN:  Mark an exhibit.

 5                    (Deposition Exhibit 41 was marked.)

 6                    MR. SANTO:  41?

 7                    THE COURT REPORTER:  Yes.  41.

 8            Q.   (By Ms. Greisen)  I've put Exhibit 41 in

 9    front of you.

10                    Have you seen that document before?

11            A.   No.

12            Q.   Were you aware that ███████████

13    filed a Charge of Discrimination against Mesa County?

14                    MR. SANTO:  Object to the extent it calls

15    for disclosure of attorney-client privilege.

16            Q.   (By Ms. Greisen)  Were you aware of that?

17            A.   No.

18                    MS. GREISEN:  And for the record, I've

19    only put two pages because I'm trying not to kill any

20    more trees and having Shelly walk around with a really

21    heavy binder.

22                    So Exhibit 41 is two pages of

23    ███████████  Charge of Discrimination.

24                    MR. SANTO:  Do you want to identify the

25    Bates numbers, just for the record?
```

1              MS. GREISEN:  Defendant -- DEF 2168 and

2     DEF 2169.

3              MR. SANTO:  Sounds good.

4         Q.  (By Ms. Greisen)  Would it refresh your

5     recollection at all if I gave you the entire packet --

6         A.    Probably not.

7         Q.    -- included?

8         A.    No.

9         Q.    Okay.  Just checking.  I don't want you to

10    come back later and said, "Oh, if you had given me this,

11    I would have remembered it."  So I'm not going to put the

12    entire packet into the record.

13              And she -- do you see in there that she

14    alleges under "Personal Harm," that the discrimination

15    continued through March of 2013?  Do you see that first

16    sentence there?

17              MR. SANTO:  Okay if I point it out?

18              MS. GREISEN:  Sure.

19              MR. SANTO:  She's looking right there,

20    "That on or about" and "continuing through March 8,

21    2013."

22         Q.  (By Ms. Greisen)  You see that?

23         A.    Yeah.  I can see it, but I mean --

24         Q.    Okay.  Well, I'm just trying to establish,

25    that was during your tenure as a county commissioner --

1          A.    Yes.

2          Q.    -- right?

3                And -- but it's your testimony you didn't

4     know anything about this Charge of Discrimination?

5          A.    I don't recall it, no.

6          Q.    And is it also fair to say you don't know

7     anything about what investigation, if any, was done --

8          A.    No.

9          Q.    -- about that Charge of Discrimination; is

10    that correct?

11         A.    Correct.

12         Q.    Is there anyone charged with investigating

13    whether or not Mesa County has engaged in discrimination,

14    that you're aware of?

15         A.    No, I'm not aware of it.

16         Q.    Were you ever aware that there were

17    allegations that an -- something I'll refer to as an "age

18    spreadsheet" was prepared by Mesa County that showed the

19    ages of all of its employees on it?

20         A.    Not that I'm aware of.

21         Q.    You've never seen that kind of document

22    before?

23         A.    No.

24         Q.    Would there be -- sitting here today, do

25    you know of any purpose a document with all the ages of

```
 1    the employees on it would have for Mesa County?

 2              A.    I've never seen one.  I mean, I don't

 3    think it would be appropriate.

 4              Q.    Why?

 5              A.    Why?

 6              Q.    Yeah.

 7              A.    I don't know why we would need it.

 8              Q.    And it gives the impression that the

 9    county is looking at employees' ages, as opposed to skill

10    set, right?

11              A.    I've --

12              MR. SANTO:   Object to form.

13              A.    -- never seen anything like that.

14              Q.  (By Ms. Greisen)   Right.

15              And you said it would be inappropriate

16    because it would give that impression --

17              A.    Yes.

18              Q.    -- right?

19              So is it also fair to say, you don't know

20    what happened with ▮▮▮▮▮▮▮▮ Charge of

21    Discrimination?

22              A.    I don't recall that.

23              Q.    Okay.  If you had been involved in the

24    resolution of it, is it something you think you would

25    recall?
```

     1              A.   I would think he would talk to the legal

     2    department before he signed it.

     3              Q.  (By Ms. Greisen)   My question was, does it

     4    concern you that he signed the settlement documents

     5    without consultation with the Board?

     6              A.   No.

     7              MS. GREISEN:  Let's mark another exhibit.

     8              (Deposition Exhibit 43 was marked.)

     9              THE COURT REPORTER:  43.

    10              Q.  (By Ms. Greisen)  I've put Exhibit 43 in

    11    front of you.

    12              Do you -- have you seen that document

    13    before?

    14              A.   Not that I recall, no.

    15              Q.   Were you aware that Mesa County entered

    16    into a Settlement Agreement with ███████████████  in

    17    2014?  Were you aware of that?

    18              A.   No.

    19              Q.   Were you aware, at any time, that Mesa

    20    County paid ███████████████  to settle her claims of

    21    age discrimination against the county?

    22              A.   Not that I recall.

    23              Q.   Does it concern you at all that the county

    24    has paid out so much money with respect to charges of age

    25    discrimination?

```
 1   do a market analysis --

 2            A.    No.

 3            Q.    -- of those counties?

 4            A.    Probably not.

 5            Q.    And who was present during that executive

 6   session?

 7            A.    I don't -- I think all three of us were

 8   there.

 9            Q.    Anyone else?

10            A.    Probably Mr. Garcher and -- and I don't --

11   not -- I'm not -- I don't know if Mr. Coleman would have

12   been there or not.  I don't recall.

13            Q.    Did Mr. Garcher provide you with the

14   information?

15            A.    He could have brought some of it in, yes.

16            Q.    You just don't recall?

17            A.    No.

18            Q.    In -- since you've been a county

19   commissioner, what are the rules or policies at the

20   county for paying for training or continuing education of

21   Mesa County employees?

22            A.    That's not my level of -- I would say,

23   probably our administrator would take care of that.

24            Q.    What's the policy about what the county

25   will pay?
```

```
 1                  A.   I don't know offhand.

 2                  Q.   Are any of those expenses training

 3     expenses or continuing education expenses for Mesa County

 4     employees covered or paid for by the county?

 5                  A.   I would assume so, yes.

 6                  Q.   What type of training or tuition coverage

 7     would be paid for by the county?

 8                  A.   I -- I don't -- I don't know.  That's

 9     not -- I don't write the policy, and I don't know what

10     kind of training they get.  The department head would

11     have to approve it.

12                  Q.   Are you ever asked to approve those

13     requests?

14                  A.   No.

15                  Q.   Would it be fair to say that Mesa County

16     would only pay for training and tuition coverage for

17     employees if the training or education was directly

18     related to the employees' job?

19                  MR. SANTO:  Object to form.

20                  A.   Yes.

21                  Q.   (By Ms. Greisen)  Have you ever approved

22     any training or tuition charges for Frank Whidden?

23                  A.   For what?

24                  Q.   For Mr. Whidden.

25                  A.   Yeah, but what kind of training?
```

1          Q.   Training or tuition charges.

2          A.   I don't know.  I would -- I don't really

3     know offhand if we did or didn't.

4          Q.   I'm going to put another exhibit in front

5     of you.

6               MS. GREISEN:  If you can mark that.

7               MR. SANTO:  Has this one been produced

8     before?

9               MS. GREISEN:  You produced it.

10              MR. SANTO:  That was the answer to the

11    question.

12              (Deposition Exhibit 44 was marked.)

13              THE COURT REPORTER:  44.

14              MR. SANTO:  44, right?

15              THE COURT REPORTER:  Yes.

16         Q.   (By Ms. Greisen)  Is that your signature on

17    Exhibit 44?

18         A.   That's what it says right here, yes.

19         Q.   And this was a "Training Approval"

20    document you signed at the end of 2015, agreeing that

21    Mr. Whidden would ". . . be reimbursed for

22    training/tuition charges up to $10,000 per year."

23              Right?

24         A.   Yes.

25         Q.   And, "Mr. Whidden," it goes on to say,

 1    "must be able to pay for these charges from existing

 2    budget as part of the regular training program within his

 3    departments."

 4                    Right?

 5         A.    Yes.

 6         Q.    Okay.  Do you know what training

 7    Mr. Whidden had covered under this approval?

 8         A.    No.

 9         Q.    Have you ever seen the documents

10    reflecting the receipts he submitted?

11         A.    No.

12              MS. GREISEN:  Can you mark this.

13              (Deposition Exhibit 45 was marked.)

14              THE COURT REPORTER:  45.

15         Q.  (By Ms. Greisen)  I've put Exhibit 45 in

16    front of you.

17              MR. SANTO:  First one -- just for

18    clarification, the first one doesn't look like it's a

19    part of a production.

20              MS. GREISEN:  It does not look like it has

21    a Bates number on it, that's correct.

22              MR. SANTO:  Well, I'd like an opportunity

23    to go over this with my client.  I haven't seen this

24    document.

25              MS. GREISEN:  I'll ask some general

 1    questions about it.  You can --

 2                   MR. SANTO:  I still haven't seen the

 3    document before today.

 4                   MS. GREISEN:  You can note your objections

 5    for the record.

 6                   MR. SANTO:  So you're not going to let me

 7    break to talk with my client --

 8                   MS. GREISEN:  No.

 9                   MR. SANTO:  -- about a document you just

10    produced today?

11                   MS. GREISEN:  That's correct.  I think

12    these are all the same thing.

13              Q.   (By Ms. Greisen)  Have you seen any of the

14    documents in the -- in the exhibit --

15                   MR. SANTO:  Let me -- hold on.  Let me ask

16    a question.

17                   MS. GREISEN:  Go ahead.

18                   MR. SANTO:  What do you mean, they're "all

19    the same thing"?  They're all not --

20                   MS. GREISEN:  Yeah.

21                   MR. SANTO:  -- documents previously

22    produced.

23                   MS. GREISEN:  No, that's not true.

24    They're mainly documents your office produced.

25                   MR. SANTO:  They're "mainly," but my word

 1    was "all."

 2                    MS. GREISEN:  Except for the first page.

 3    I do not know why that page does not have a Bates number

 4    on it, but --

 5                    MR. SANTO:  Okay.  So --

 6                    MS. GREISEN:  -- they're all concerning

 7    training, so --

 8                    MR. SANTO:  I'll just note for the record

 9    that you're not letting me --

10                    MS. GREISEN:  That's fine.

11                    MR. SANTO:  -- meet with my client about a

12    document that you just came up with.

13                    MS. GREISEN:  That's fine.

14            Q.   (By Ms. Greisen)  Have you seen any of

15    these before?

16            A.   No.

17            Q.   So would you agree that sex therapy

18    training would not be a part of the regular training

19    program within Mr. Whidden's department?

20            A.   So where do you see that?

21            Q.   Well, if you look on document DEF 5711,

22    which is the second document, you see that's an invoice

23    for "Couples and Sex Therapy" class?

24            A.   I have no opinion on that.

25            Q.   I'm not asking you whether you have an

     1    opinion on the document.

     2              I'm asking you whether you think sex

     3    therapy is a part of the regular training program within

     4    Mr. Whidden's department?

     5         A.   Yes.

     6         Q.   So sex therapy -- I'm sorry, so I

     7    understand.

     8              You believe sex therapy training is a part

     9    of the regular training program within his department?

    10         A.   My belief is, there's probably more to it

    11    than that title is -- I don't know.

    12         Q.   I'm asking you, sitting here now --

    13         A.   I just gave you an answer.

    14         Q.   -- as an elected official, is it your

    15    testimony that you think sex therapy could be a part of

    16    the regular training program within his department?

    17              MR. SANTO:  Object.  He responded, "I

    18    don't know."

    19              MS. GREISEN:  Go ahead.

    20         A.   I don't know.

    21         Q.   (By Ms. Greisen)  You don't know?

    22         A.   No.

    23         Q.   You don't have any opinion?

    24         A.   How would I know?

    25              MR. SANTO:  Object.  Asked and answered.

 1      Argumentative.

 2                Q.   (By Ms. Greisen)   Do you know what the term

 3      "sex therapy" means?

 4                A.   I don't know.   I've never had to have any.

 5                Q.   Well, I haven't, either.

 6                     But I'm asking you whether or not you have

 7      any understanding of what that term means?

 8                A.   Not on this situation here, no.

 9                Q.   Do you think any type of sex counseling is

10      appropriate as a regular training program within any

11      department of Mesa County?

12                A.   I don't know.

13                Q.   And you have no opinion?

14                A.   No opinion.

15                Q.   Would you agree that Family Therapy with

16      Children would not be a regular training program within

17      Mr. Whidden's department?

18                A.   When he deals with DHS, that's all they

19      deal with so --

20                Q.   So --

21                A.   -- yes.

22                Q.   -- it's your opinion that Family Therapy

23      with Children would -- could be a part of the regular

24      training program?

25                A.   Yes.

1          Q.   Would you agree that marriage and family

2   therapy would not be considered a regular training

3   program within Mr. Whidden's department?

4          A.   With all the employees he deals with, it

5   probably is.

6          Q.   So do you think it is -- it is

7   appropriate -- if you look on page -- I think they --

8   starting on page 2 and again on page 3, and it indicates

9   that Mr. Whidden is attending Northcentral University

10  conducting his master's degree coursework.

11         Do you see that?

12         A.   On which page are you on?

13         Q.   Well, if you just turn to page 2, you see

14  on the right-hand side of that page?  Just right

15  here (indicating).

16         On page 2, do you see right here, it

17  indicates these invoices are for Mr. Whidden's master's

18  coursework?

19         MR. SANTO:  Object to form.

20         A.   It says, ". . . for further career

21  development and credentials associated with County Human

22  Services [sic] Management," that one?

23         Q.   (By Ms. Greisen)  Right.  Do you see that?

24         A.   Yeah.

25         Q.   Do you think sex therapy is legal

1    "coursework required for further career development and

2    credentials associated with" the HR department with the

3    county?

4            A.   Yes.

5            Q.   And is it also your testimony that the

6    other invoices -- the Family Therapy with Children, the

7    Families in Crisis, and the Family Development -- those

8    would all be fairly considered a regular training program

9    within his department?

10           A.   Yes.

11           Q.   Okay.  So looking at these invoices, you

12   can see that these invoices reflect -- and I'm sure you

13   can just add them up, not precisely -- but there's been

14   over $10,000 paid for Mr. Whidden to go to this therapy,

15   right -- or to go to this training.

16               Do you see that?

17           A.   Yeah.

18           Q.   And, in fact, the last two invoices are --

19   represent the cost for Mr. Whidden to take his Marriage

20   and Family Therapy tests, right?

21           A.   Yeah.

22           Q.   To take his --

23           A.   Yes.

24           Q.   -- practicums, right?

25               Do you see that?

```
 1              A.    What page are you on now?

 2              Q.    The last two.

 3              A.    Yeah.

 4              Q.    Right?  So that's a 40- -- over $4600 for

 5    him to get his license in marriage and family therapy,

 6    right?

 7              A.    It looks like.

 8              Q.    And are you also -- well, let me ask.

 9                    Have you had any public discussions about

10    Mesa County paying for Mr. Whidden to get his license in

11    marriage and family therapy?

12              A.    No.

13              Q.    Were you aware that he was doing that?

14              A.    No.

15              Q.    So given the fact that some employees who

16    had worked at Mesa County for decades were laid off in

17    2016, in your opinion, was it appropriate for Mesa County

18    to be paying for Whidden to obtain a marriage and family

19    counselor license right after these individuals were

20    terminated?

21              A.    Yes.

22              Q.    And after he got his master's degree and

23    license from Northcentral, you know he then opened up a

24    family and marriage therapy counseling service, a private

25    one on the side, right?
```

```
1              A.   I have no idea about that.

2              Q.   You're not aware that he has his own

3    private business being a marriage and family therapist?

4              A.   No.

5              Q.   Would it concern you that after the county

6    paid for this, that he then opened up a private business?

7              A.   Yes.

8              Q.   Because it certainly has the appearance of

9    impropriety, even if it's not, right?

10                  MR. SANTO:  Object to form.

11             A.   There may be more to the story than we're

12   talking about that I don't -- I'm not aware of, so I'm

13   not going to comment.

14             Q.  (By Ms. Greisen)  You may be -- there may

15   be, but my question was:  It at least has a minimum of an

16   appearance of impropriety?

17             A.   Yes, your opinion.  I don't have an

18   opinion on it.

19             Q.   So why does it cause you concern?

20             A.   Pardon?

21             Q.   You said it caused you some concern.

22             A.   Yeah, but --

23             Q.   I want to know why.

24             A.   Quite likely, there's more to the story.

25             Q.   No.
```

1              My question is, why did it cause you --

2    does it cause you concern?

3              A.   Well, maybe I'll change my mind.  It don't

4    concern me.

5              Q.   So now your testimony is, it does not

6    cause you concern?

7              A.   I haven't seen this document before, and

8    I'm supposed to make a decision like this, this, and

9    that (indicating)?

10             Q.   No.  I'm asking --

11             A.   That's not -- that's not the thing to do.

12             Q.   I'm asking for your impression.  Sitting

13   here right now, looking at the documents that I've just

14   shown you, does it cause you concern that Mesa County

15   paid for him to get certification in this marriage and

16   family therapy area, to have him then open up his own

17   private practice of which you were not aware?

18             A.   I'm not going to answer because I -- I --

19   there's more to -- there's probably more to the story.

20   Based on this, and I get ten seconds to read it, and I'm

21   supposed to tell you, yes, no, or maybe, and --

22             Q.   If you need a --

23             A.   -- I'm not going to do that.

24             Q.   If you need a couple minutes to read it,

25   I'm happy --

```
 1              A.   I did.

 2              Q.   -- to let you.

 3              A.   I'm not going to give you an answer.

 4              Q.   And what's the basis, why are you

 5    refusing?

 6              A.   I'm not sure I have all the information I

 7    need to make an informed decision.

 8              Q.   I appreciate that you may want to get

 9    other information.

10                   I'm asking you, based on the information

11    that you've seen, does it cause you concern?

12              A.   I can't answer at this time.

13              Q.   So you don't know?

14              A.   That's correct.

15              Q.   Do you think that the citizens of Mesa

16    County have a right to ask that question?

17              A.   I -- I have no -- I don't know.

18              Q.   Do you think it should be a matter of

19    public knowledge?

20                   MR. SANTO:  Object.

21              A.   No.

22              Q.   (By Ms. Greisen)  Why not?

23              A.   Because I said so.

24              Q.   And is that basically --

25              A.   Basically because we don't know what we're
```

1    talking about here.  You show me five or six papers, and

2    I'm supposed to give you an informed answer based on this

3    hunk of paper.

4              Q.   No, I'm --

5              A.   And I can't give you an informed answer

6    today.

7                   MS. GREISEN:  Can you read my question

8    back, Shelly.

9                   (The following was read:

10                  "QUESTION:  Do you think it should be a

11   matter of public knowledge?

12                  "ANSWER:  No.

13                  "QUESTION:  Why not?

14                  "ANSWER:  Because I said so.")

15                  MR. SANTO:  Didn't I object in there?

16                  THE COURT REPORTER:  Yeah.

17                  MR. SANTO:  Okay.

18                  THE COURT REPORTER:  Just the word

19   "Object."  I'm sorry.

20                  MR. SANTO:  That's okay.

21             Q.   (By Ms. Greisen)  Any other reason, because

22   you said so -- other than because you said so?

23             A.   Like I just told you, I get these things,

24   they're -- they're -- I've never seen it before.  I don't

25   think I can give you an intelligent answer right at the

 1   moment.

 2           Q.   What would you need to have an intelligent

 3   answer?

 4           A.   I need to know what it was spent on, just

 5   other than some title.  I don't actually know what it was

 6   spent on.

 7           Q.   Is it appropriate for top executives at

 8   Mesa County, who are salaried employees, to have their

 9   own side private businesses?

10                MR. SANTO:  Object to form.

11           A.   I don't know if we have -- I don't know

12   what our policy is on that.

13           Q.   (By Ms. Greisen)  Have you heard about that

14   happening before?

15           A.   No.

16           Q.   Do you have any reservations about

17   somebody -- a top management official having a side

18   business or a private business in addition to their

19   responsibilities?

20           A.   No.

21           Q.   And if -- do you have any opinion as to if

22   that business, private business being conducted was paid

23   for by taxpayer dollars, would that cause you any

24   concern?

25           A.   Yes.

1             Q.    If the training for that private business

2    was paid for by taxpayer dollars, would that cause you

3    concern?

4             A.    I don't know that that's factual.  I mean,

5    I don't know just by this.

6             Q.    I -- I'm not asking --

7             A.    It appears that it would be, yes.

8             Q.    And it's fair to say there's been no

9    discussion, at least no public discussion, by the Board

10   of County Commissioners about Mr. Whidden's private

11   practice, whether it's appropriate or not; is that

12   correct?

13            A.    Correct.

14            MR. SANTO:  When you finish, I'd like

15   to -- you know, change over categories, I'd appreciate a

16   break.

17            MS. GREISEN:  Oh, we can -- we can take a

18   break.

19            (Recess taken from 2:18 p.m. until

20   2:32 p.m.)

21            Q.   (By Ms. Greisen)  Mr. Justman, before, you

22   told me that salaries -- I think we were talking about

23   Mr. Garcher's salary, that his salary increase was based

24   on a market adjustment.

25            Do you recall talking --

1          I, JOHN JUSTMAN, hereby certify that I have
    read the foregoing transcript and that the same and
2    accompanying correction sheets, if any, constitute a true
    and complete record of my testimony.

3

4    PAGE   LINE          NOW READS              SHOULD READ

5    ____   ____   _____   _____

6    ____   ____   _____   _____

7    ____   ____   _____   _____

8    ____   ____   _____   _____

9    ____   ____   _____   _____

10   ____   ____   _____   _____

11   ____   ____   _____   _____

12   ____   ____   _____   _____

13   ____   ____   _____   _____

14   ____   ____   _____   _____

15   ____   ____   _____   _____

16   ____   ____   _____   _____

17

18                  _____
                    JOHN JUSTMAN

19          Subscribed and sworn to before me this _____

20   day of _____, 20____.

21

22          My Commission expires: _____

23                  _____
                    Notary Public
                    Address: _____
24

25                          _____

1                    REPORTER'S CERTIFICATE

2

3          I, K. MICHELLE DITTMER, Registered Professional

4    Reporter and Notary Public, State of Colorado, do hereby

5    certify that previous to the commencement of the

6    examination, the deponent was duly sworn by me to testify

7    to the truth in relation to the matters in controversy

8    between the parties hereto; that the said deposition was

9    taken in machine shorthand by me at the time and place

10   aforesaid and was thereafter reduced to typewritten form;

11   that the foregoing is a true transcript of the questions

12   asked, testimony given, and proceedings had.  I further

13   certify that I am not employed by, related to, nor

14   counsel for any of the parties herein, nor otherwise

15   interested in the outcome of this litigation.

16          IN WITNESS WHEREOF, I have affixed my signature

17   this 5th day of June, 2019.

18

19          My commission expires April 13, 2020.

20   _____

21           K. MICHELLE DITTMER
            Registered Professional Reporter
22          My commission expires April 13, 2020.

23

24

25