# EXHIBIT 5

**Frank Whidden   July 11, 2019**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

————————————————————————————————————————————————

VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

July 11, 2019

————————————————————————————————————————————————

DEBRA BOURICIUS,

    Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

    Defendant.

————————————————————————————————————————————————

        Pursuant to Notice and the Federal Rules

of Civil Procedure, the videotaped deposition of

FRANK WHIDDEN, called by Plaintiff, was taken on

Thursday, July 11, 2019, commencing at 9:07 a.m.,

at 205 North 4th Street, Grand Junction, Colorado,

before Candice F. Flowers, Certified Shorthand

Reporter and Notary Public within and for the State

of Colorado.

**Frank Whidden   July 11, 2019**

1   to anyone in preparation for your deposition?

2        A    No.

3        Q    So I asked you if you read the complaint

4   in this case.

5             Do you understand that the complaint is

6   the document that my office filed on behalf of Ms.

7   Bouricius outlining her claims against Mesa County?

8        A    Yes.

9        Q    Did you at any time review the answer

10  filed by Mesa County to that complaint?

11       A    I believe I saw responses to that.

12       Q    Did you provide information for that

13  answer?

14            MR. SANTO:  Object to the extent it

15  calls for disclosure of attorney-client privilege.

16            So if you are going to say, Well, I

17  talked to Ms. Atencio or Mr. Santo or Ms. Severn...

18            THE DEPONENT:  That was going to be

19  my response, yes.

20            MR. SANTO:  You don't need to

21  provide that information.

22       Q    (By Ms. Greisen) Go ahead.  You can

23  answer.

24            MR. SANTO:  No.  I have instructed

25  the witness not to answer based upon

**Frank Whidden   July 11, 2019**

1   attorney-client privilege.

2        Q    (By Ms. Greisen) To the extent it doesn't

3   call for attorney-client privilege, you can answer

4   the question.

5                MR. SANTO:  Agreed.

6        A    I have spoken to my attorneys.  That's...

7        Q    (By Ms. Greisen) Okay.  So the -- you're

8   aware that there was an investigation by the

9   Colorado Civil Rights Division -- the State of

10  Colorado Civil Rights Division with respect to Ms.

11  Bouricius' claims, right?

12       A    Yes.

13       Q    And did you review the response that Mesa

14  County submitted to that investigation?

15       A    Again, I discussed that with the

16  attorneys.

17       Q    I'm asking you if you reviewed the

18  response.

19       A    I don't remember that I read anything in

20  writing.  Not that I recall.  I discussed the

21  back-and-forth with Nina, but that's what I recall.

22       Q    So you didn't actually look at the

23  documents that were submitted to the State of

24  Colorado in response to --

25       A    I'm saying I don't remember if I read

**Frank Whidden   July 11, 2019**

17

```
 1        Q    When -- when did you start that?
 2        A    I don't remember exact.  It's been a few
 3   years.  I couldn't tell you exactly.
 4        Q    Was it bef -- do you remember whether
 5   it's before or after 2016?
 6        A    I -- I don't remember.  I think before
 7   that, but I'm not certain.
 8        Q    So who have you talked to other than your
 9   counsel to prepare for your deposition today?
10        A    No one.
11        Q    Did you tell anyone other than your
12   counsel that you were coming to your deposition
13   today?
14        A    I did.
15        Q    Who did you tell?
16        A    My wife, Commissioner Pugliese.
17        Q    What was the conversation with you and
18   Commissioner Pugliese?
19        A    That I was coming to the deposition
20   today.
21        Q    Anything else?
22        A    No.
23        Q    Did she ask you what the case was about?
24        A    She knew what it was about, so I didn't
25   have to give her the background.
```

**Frank Whidden   July 11, 2019**

1    applied?

2         A     Rose Pugliese told me.

3         Q     Did she tell you that after you had

4    already been appointed the position or before?

5         A     Long after.

6         Q     Did you talk to any of the other County

7    Commissioners?

8         A     No.

9         Q     I should restate that just so the record

10   is clear.

11              Did you talk to any of the other County

12   Commissioners about who applied for your position

13   as County Administrator?

14        A     No, ma'am.

15        Q     So give me an overview of what your job

16   duties are as the County Administrator.

17        A     Well, the bottom line is that my job is

18   to implement the policies that the board has given

19   me.  It's to oversee the day-to-day affairs of the

20   County.  The way the County is organized, there are

21   three direct reports to the board:  Myself, the

22   County Attorney, the executive director of DHS,

23   Tracy Garchar.  I do not oversee them or their

24   operations.  I also don't oversee directly the

25   seven elected departments or offices.  So that's my

**Frank Whidden   July 11, 2019**

128

1  I don't remember what the order of companies was.

2  About the time -- it was one season, so about the

3  time I went to work for the University of West

4  Alabama, I would say, in between there.

5      Q    So going back to what we were talking

6  about before we took a break, you mentioned that

7  you had talked with Rose Pugliese about the layoffs

8  or who -- about the need for layoffs; is that

9  right?

10      A    Correct.

11      Q    In 2016?

12      A    Yes.

13      Q    Did you talk with any of the other County

14  Commissioners about that?

15      A    Yes.

16      Q    Which ones?

17      A    Both of the others.

18      Q    Okay.  Was there a public discussion held

19  about the 1.4-million-dollar deficit?

20      A    No.

21      Q    Was there a public discussion held about

22  potential layoffs?

23      A    Not before, no.  Not before any layoffs

24  were made, I don't believe, no.

25      Q    So is it your belief that there were

**Frank Whidden   July 11, 2019**

 1    discussions -- public discussions after the layoffs
 2    about the layoffs?
 3         A    As far as the whole County, yes.
 4         Q    Well, I imagine at that point it was
 5    public knowledge, right?
 6         A    Yes.
 7         Q    And did the board discuss it at public
 8    meetings?
 9         A    Yes.
10         Q    And what was discussed?
11         A    The major topic of conversation was
12    closing the two DMV offices in Clifton and Fruita.
13         Q    Well, let me be more specific.
14              What was discussed about the layoffs that
15    you decided on?
16         A    I don't recall those being specifically
17    discussed as a separate matter.
18         Q    So the board never took a vote as to who
19    should be laid off?
20         A    No.  That was left to my discretion.
21         Q    And did you actually tell the Board of
22    County Commissioners who you intended to lay off?
23         A    I don't recall that I gave them any kind
24    of a list or enumerated names.
25         Q    Did anyone else, to your knowledge?

**Frank Whidden  July 11, 2019**

```
 1        A     I would assume because of my background
 2   and credentials and experience.
 3        Q     But an expert in what?
 4        A     IT.
 5        Q     What does that have to do with the facts
 6   of this case, to your knowledge?
 7        A     I believe we're dealing with an IT
 8   workforce and who should be kept and who should be
 9   terminated.
10        Q     So are you planning on giving an expert
11   opinion that the decision to terminate the people
12   in October of 2016 was not illegal?
13                 MR. SANTO:  Object to -- objection
14   to the extent it calls for disclosure of
15   attorney-client privilege between Mr. Whidden and
16   the organization's attorneys.  So you can't say
17   when I talked to the attorneys.
18                 MS. GREISEN:  Well, I'm going to
19   object to that.  Mr. Whidden has been designated as
20   an expert.  I have a right to know all the facts
21   and circumstances and all the opinions --
22                 MR. SANTO:  You do.
23                 MS. GREISEN:  -- that he's going to
24   give at trial.
25                 MR. SANTO:  But not --
```

**Frank Whidden   July 11, 2019**

```
 1        A    I did not discuss any parameters, if
 2   that's the question, of how I arrived at my
 3   decision that I can recall.
 4        Q    (By Ms. Greisen) No.  I'm asking you:
 5   What facts did you give your counsel, Mesa County
 6   attorneys or anybody in Mr. Santo's firm, what
 7   facts did you give to them that form the basis of
 8   your expert opinion?
 9        A    As far as I --
10        Q    In other words, did you tell them that
11   this was budget-related?
12        A    Yes.
13        Q    Okay.  And did you give them any facts to
14   back that up?
15        A    None other than we had the target of 1.4
16   million to meet, and this is an action that we
17   needed to take, I felt like.
18        Q    Did you give your attorneys any other
19   facts about why you decided to terminate the
20   specific people that you did?
21        A    No.
22        Q    Did you give your attorneys any documents
23   regarding the facts that form the basis of your
24   expert opinion?
25        A    No.
```

**Frank Whidden   July 11, 2019**

1    Q    Did you --

2            MS. GREISEN:  Is this interfering

3    with you?  Okay.

4    Q    (By Ms. Greisen) Did you talk with anyone

5    other than the attorneys about the facts that

6    formed the basis of your opinion?

7    A    No, other than -- unless you count the

8    meeting where Troy -- I discussed with Troy and

9    Lhana the people that I was going to release, but I

10   didn't talk about -- we didn't get into, well, why

11   did you pick this one or why did you pick that one.

12   We did not -- that wasn't part of the discussion.

13   Q    So in this preliminary meeting with Troy

14   Flick and Lhana Jordan, the three of you did not

15   discuss the ins and -- the details of who was being

16   picked, right?

17   A    That is correct.

18   Q    Okay.  And is it your testimony that you

19   didn't discuss that with anybody?

20   A    That is correct.

21   Q    Okay.  And did you document the basis for

22   that opinion in any manner?  Did you document your

23   decision to terminate those specific employees?

24   A    No.

25   Q    To your knowledge, did anybody else

**Frank Whidden   July 11, 2019**

154

```
 1   document that?
 2        A     No.  I don't know how anyone else would
 3   have known.  I didn't discuss it with them.
 4        Q     So did you provide your attorneys with
 5   information on performance-related issues regarding
 6   Ms. Bouricius?
 7        A     No.
 8        Q     And that's because your decision wasn't
 9   based on performance; is that correct?
10        A     Correct.
11        Q     The decision was strictly based on skill
12   set; is that right?
13        A     I might correct.  It was based on -- the
14   whole thing was a budgetary discussion.
15        Q     Uh-huh.  Well, you've said that you
16   didn't pick people based on performance.  You
17   didn't pick people based on seniority.  So was
18   there the reason that you did pick people on?  I'm
19   trying to get to -- I know what you didn't pick
20   them on.
21              But what was the basis for you to go
22   through and choose?
23        A     As I --
24                    MR. SANTO:  Object to form.  Go
25   ahead.
```

**Frank Whidden  July 11, 2019**

1    looking at.

2        Q    Can you give me any more details other

3    than that?

4        A    No, ma'am.

5        Q    Did you -- in determining what people's

6    skill sets were, did you look at job descriptions?

7        A    No.

8        Q    Did you look at the employees'

9    performance reviews?

10       A    No.

11       Q    You were asked by the Colorado Civil

12   Rights Division to interview with their

13   investigator, right?

14       A    Yes.

15       Q    And you declined to be interviewed,

16   right?

17            MR. SANTO:  Are we still on the

18   expert designation part of it or have we moved out?

19            MS. GREISEN:  Well, I may come in

20   and out, depending on my question.  I'm just asking

21   him whether or not he declined an interview.

22            MR. SANTO:  I need to understand the

23   question because if it's not as part of the expert,

24   then that would make it attorney-client privilege.

25            MS. GREISEN:  I don't think whether

**Frank Whidden   July 11, 2019**

```
 1    he declined the interview is asking for
 2    attorney-client privilege information.
 3                    MR. SANTO:  But there may be
 4    conversations with counsel as to why that occurred.
 5                    MS. GREISEN:  Okay.
 6         Q    (By Ms. Greisen) Well, you don't have to
 7    answer that question that I didn't ask.  I'm just
 8    asking you:  Did you decline the interview?
 9         A    I don't remember that.
10         Q    You don't remember being asked to give an
11    interview?
12         A    Correct.
13                    MR. SANTO:  Object to the extent
14    that that question about who he was asked by came
15    from a question from counsel.
16         Q    (By Ms. Greisen) So is there -- sitting
17    here today, you don't recall them asking you to
18    talk to and you declining?
19         A    That's correct.
20         Q    Okay.  If -- if, in fact, it had been up
21    to you, would you have talked to them, the Colorado
22    Civil Rights Division?
23         A    I can't imagine why I would have
24    declined.  I don't remember that occurring, unless
25    there was something else involved somehow.
```

**Frank Whidden   July 11, 2019**

162

```
1    sitting here at the table today?

2         A    Yes.

3         Q    Okay.  So --

4         A    Well, I had conversations with Nina and I

5    also had conversations with the County Attorney,

6    Patrick Coleman.

7         Q    So did you give them the specific people

8    that you were intending to lay off?

9         A    Yes.  My understanding was -- I don't

10   know that I gave them the list, but my

11   understanding was that HR did.  They gave them the

12   list and they went through it to check it.

13        Q    So when you say HR did, who at HR did?

14        A    I believe it was Krista Ubersox that did.

15        Q    So Krista gave both Nina and Patrick

16   Coleman the list of people that you wanted to lay

17   off?

18        A    I believe she worked with Nina on the

19   list, and I had other conversations -- I had

20   conversations with Patrick about the layoffs.

21        Q    What were your conversations with Patrick

22   about the layoffs?

23                   MR. SANTO:  Is this as part of his

24   expert testimony?

25                   MS. GREISEN:  Sure.
```

**Frank Whidden   July 11, 2019**

```
 1        A      To make sure that we were in compliance,
 2   to make sure that we're not violating some law,
 3   that he didn't see this as being problematic as far
 4   as any issues that could arise.  So I was -- I was
 5   asking him for his legal opinion about where we
 6   stood and were we taking, you know, huge risks or
 7   was -- did he see a problem.
 8        Q      (By Ms. Greisen) And when was that
 9   conversation?
10        A      Prior to the layoffs.
11        Q      A week or a month or do you have any
12   idea?
13        A      I would say within two weeks or so of the
14   layoff.
15        Q      And was this meeting at Patrick's office?
16        A      I honestly don't remember.  I believe it
17   was in mine or maybe we were standing in a foyer
18   somewhere.  I -- it wasn't as though I called a
19   formal meeting and we had a time to meet.  We had
20   a -- he and I at one point -- and I don't remember.
21   This was probably in that time frame.
22             We had kind of a standing meeting every
23   other week, and I think it might have fallen into
24   one of those, but I honestly don't remember that.
25   I just know that I had a conversation with him,
```

**Frank Whidden   July 11, 2019**

```
 1    because I wanted to make sure that hopefully we

 2    wouldn't get to where we're sitting today.

 3         Q    Did you give Patrick the name of the

 4    people that you were wanting to terminate?

 5         A    I don't remember specifically telling him

 6    who was on the list.  I knew his office had access

 7    to that information.  We were discussing more in

 8    terms of, you know, am I -- is there -- are we

 9    worried about categories that we can't discriminate

10    against, those kinds -- those HR questions.  Are we

11    going to trip any bright wires about this problem?

12         Q    So let me understand.  You talked with

13    Patrick specifically about whether or not there

14    could be any claim for discrimination based on the

15    group of laid-off people?

16         A    Yes.

17         Q    Is that right?

18         A    Yes.

19         Q    And -- but you didn't give him the names

20    of who the people were?

21         A    I don't remember sitting in the meeting

22    and saying name by name by name who they were.

23         Q    Well, how would -- tell me, then, how you

24    gave him enough information to form an opinion.

25         A    He told me as long as it was a strictly
```

Frank Whidden   July 11, 2019

```
 1    budgetary decision and we were removing the

 2    positions, then we were good to go.  That's what he

 3    told me.

 4         Q    So you never sat down and reviewed the

 5    list of people you wanted to terminate with him.

 6         A    I do not recall going with him over name

 7    by name.

 8         Q    Okay.

 9         A    I don't recall that.

10         Q    And did you give that information to Ms.

11    Atencio?

12         A    I did not personally.

13         Q    To your knowledge, did anyone else?

14         A    I believe Krista did.

15         Q    And she gave you the -- Krista gave her

16    the information about the list of people that you

17    were proposing?

18         A    Yes.  I believe she shared the

19    spreadsheet that I have discussed.  I believe she

20    did with Nina.

21         Q    And that was prior to the implementation

22    of the decision?

23         A    Correct.

24         Q    Okay.  And did you have any conversations

25    with Nina in forming your expert opinion as to
```

**Frank Whidden  July 11, 2019**

 1   whether or not that was problematic, the people

 2   that you chose?

 3        A    You mean prior to the layoffs?

 4        Q    Right.

 5        A    Not that I recall, no.

 6        Q    Well, sitting here today, at any time in

 7   forming your expert opinion, did you have

 8   discussions with either -- any of your attorneys

 9   about whether or not your decision violated the

10   law?

11        A    Sure.  We talked about with -- when the

12   case came up with CCRD.  We talked --

13             MR. SANTO:  I think -- I just want

14   clarification.  I believe your questions were prior

15   to the layoff, correct?

16             THE DEPONENT:  No.  She said even

17   since then.

18             MR. SANTO:  Well --

19             MS. GREISEN:  Do you want to read

20   the question back, Candice.

21             (Question at Page 166, Line 6 was read.)

22             MR. SANTO:  Are you talking about

23   before the decision or after the decision -- I mean

24   after the implementation of the decision, is what

25   my question is.

**Frank Whidden   July 11, 2019**

```
 1              MS. GREISEN:  I don't think I

 2   specified.  I said is there anything that -- well,

 3   I don't need to read the sentence back again.  I'm

 4   asking him in his expert opinion, so...

 5              MR. SANTO:  Then let me make the

 6   objection with respect to this, which is before

 7   the -- I have no objection with respect to before

 8   the execution of the decision up until the time of

 9   the decision, but thereafter he has not been

10   designated an expert as to what occurred after,

11   which you have told him in your questioning.

12        One of your initial questions was when he

13   said, Well, we haven't had any problems.  You said,

14   Yes, but that's relying on information after.  I

15   only want to know before the decision.  And in

16   looking at the expert opinion, that's what it

17   appears to be limited to.

18              MS. GREISEN:  That's not my

19   understanding.

20        Q    (By Ms. Greisen) I guess your attorney

21   can clear that up for you.

22        Do you need me to read the question back

23   again, probably?

24        A    Yeah.

25        Q    Okay.
```

**Frank Whidden   July 11, 2019**

```
 1              (Question at Page 166, Line 6 was read.)
 2                   MR. SANTO:   And I would still note
 3      for the record, as I'm required to do after each
 4      question --
 5                   MS. GREISEN:   It's --
 6                   MR. SANTO:   -- that the designation
 7      says that he's going to --
 8                   MS. GREISEN:   Okay.  Would you stop
 9      giving speaking objections.   Your objection is
10      noted.
11         Q    (By Ms. Greisen) Do you need me --
12                   MR. SANTO:   Not for
13      attorney-client --
14         Q    (By Ms. Greisen) -- to read the question
15      back?
16                   MR. SANTO:   -- privilege it's not.
17      I have to give a full objection with respect to
18      attorney-client --
19                   MS. GREISEN:   Yeah --
20                   MR. SANTO:   -- privilege.
21                   MS. GREISEN:   -- your objection is
22      noted.
23         Q    (By Ms. Greisen) Do you need me to read
24      it back again?
25                   MR. SANTO:   I need to give it before
```

**Frank Whidden   July 11, 2019**

1    each question.

2                    MS. GREISEN:  Okay.  Why don't you

3    mark this, because this unnecessary delay of the

4    deposition is grounds for me continuing the already

5    eight-hour time limit that we have.

6                    MR. SANTO:  Understandable.  The

7    question --

8                    MS. GREISEN:  So go ahead and mark

9    that, please, Candice.

10                   MR. SANTO:  Thank you.  The

11   objection is that the expert opinion is limited to

12   the skill sets needed in the information technology

13   department, including Mesa County information

14   technology department and Mesa County's needs in

15   the information technology department.

16        So to the extent that your questions are

17   outside of that expert designation, I believe that

18   they -- I would instruct the witness not to answer

19   with respect to attorney-client privilege.

20                   MS. GREISEN:  Okay.  The objection

21   is fully on the record.

22        Q    (By Ms. Greisen) Do you need the question

23   read back to you?

24        A    Please.  One more time.

25                   MS. GREISEN:  And for the record, I

**Frank Whidden   July 11, 2019**

```
 1    will -- I will note that there's a standing

 2    objection to that same effect by your counsel so we

 3    don't have to go through this whole thing again.

 4                   MR. SANTO:  I appreciate that.

 5              (Question at Page 166, Line 6 was read.)

 6         A    I'm not sure I follow exactly the expert

 7    opinion part of that question.  I vetted the

 8    decision by the County Attorney to ask are we in

 9    compliance with the law.

10         Q    (By Ms. Greisen) Any other -- you're

11    talking about the decision with -- the conversation

12    with Patrick Coleman?

13         A    Yes.

14         Q    Any other times?

15         A    Not prior to the layoff.

16         Q    After the layoff?

17                   MR. SANTO:  You can answer that.

18         A    Yes.  With regard to the CCRD allegations

19    or in the whole deal in talking to CCRD.

20         Q    (By Ms. Greisen) Okay.  So tell me what

21    discussions you had that form the basis of your

22    expert opinion regarding -- or with -- with your

23    counsel.

24                   MR. SANTO:  With respect to the

25    CCRD?
```

**Frank Whidden  July 11, 2019**

```
 1                    MS. GREISEN:  I said any discussions
 2    he had --
 3                    MR. SANTO:  Okay.
 4                    MS. GREISEN:  -- in forming his
 5    expert opinion.
 6                    MR. SANTO:  I'm going to object to
 7    that because it's outside the scope of the expert
 8    designation and instruct the witness not to answer
 9    that question.  That exceeds the scope of the
10    expert designation.
11        Q    (By Ms. Greisen) So I'm not sure what the
12    scope of the expert designation is because I don't
13    think you are either, are you?
14                    MR. SANTO:  I will gladly read it
15    again.
16                    MS. GREISEN:  I'm asking Mr.
17    Whidden.
18        Q    (By Ms. Greisen) Do you know what the
19    scope of your expert designation is?
20                    MR. SANTO:  Off the top of his head?
21                    MS. GREISEN:  Yeah.
22        A    As I said before, I believe that what
23    I'm -- what I'm called to talk about as an expert
24    is IT, the functions of IT --
25        Q    Uh-huh.
```

**Frank Whidden   July 11, 2019**

1      A    -- and -- and the skill sets that are

2  necessary in order to carry out that function.

3  That's what I understand that I'm qualified to act

4  as an expert about.

5      Q    (By Ms. Greisen) Are you going to be

6  giving an opinion on the fact that in your expert

7  opinion, there was a proper selection of people

8  that were terminated in October 2016?

9              MR. SANTO:  Object to form.

10      Q    (By Ms. Greisen) Is that what you intend

11  to give an opinion about?

12      A    I don't know, as I've said before --

13      Q    Well --

14      A    -- what I'm going to be asked --

15      Q    I understand.

16      A    -- as far as being an expert --

17      Q    But I have a right to ask you what your

18  expert opinion is.

19              So regardless of what your lawyer says,

20  I'm saying:  Do you have an expert opinion on that?

21              MR. SANTO:  Object to form.

22      A    I have an opinion about who needed to

23  remain at Mesa County in order to carry out the

24  functions of the IT department.

25      Q    (By Ms. Greisen) Well, I understand that

**Frank Whidden   July 11, 2019**

1   because you made that decision, right?  So you

2   obviously have an opinion about it, right?

3        A    Sure.

4        Q    What I want to know is:  Do you have an

5   expert opinion about it?

6        A    I believe I have an expert opinion about

7   it.

8        Q    And what is that expert opinion?

9        A    That the people that I selected to remain

10  were the skill sets and the mix that was necessary

11  in order to carry out the IT functions of Mesa

12  County.

13       Q    Okay.  So is it fair to say that part of

14  your expert opinion is that nobody was

15  discriminated based on age in the 2016 layoffs?

16            MR. SANTO:  Object to form.

17       A    I do believe that.  Now, I don't know if

18  you are trying to make a distinction between am I

19  an expert on discrimination law or not, but I do

20  believe that based on relying on counsel, that what

21  we were doing was in compliance with the law.

22       Q    (By Ms. Greisen) Uh-huh.  And I

23  understand that you have talked with Patrick

24  Coleman.  I'm just trying to understand what you're

25  going to be testifying at trial about.

1          And what I understand is that you're

2    going to testify that your decision to lay off the

3    people you did, in your expert opinion, was the

4    right decision.

5         A    I would assume that, yes.

6         Q    Yeah.

7         A    I would think so.

8         Q    Right.

9               Since the layoffs, have you learned any

10   other facts or circumstances that have helped

11   inform your expert opinion?

12        A    I would say the successful operation of

13   the department is -- testifies to having made the

14   right decision.

15        Q    Well, that's kind of using a crystal

16   ball, right?  You don't know whether or not those

17   people or not resulted in that -- in the outcome

18   that it is right now.

19              I'm saying:  Since the layoff -- you know

20   what?  We can -- we can pull back on the camera.

21        A    Am I doing something?

22        Q    No.

23              Since the layoff, have you -- have you

24   received any evidence that your decision did

25   violate the law?

**Frank Whidden  July 11, 2019**

```
 1                    MR. SANTO:  Object to form.
 2        Q     (By Ms. Greisen) In forming your expert
 3   opinion.
 4        A     No.
 5        Q     And as an expert giving his expert
 6   opinion, would it be important to know whether
 7   those -- whether the Mesa County policies and
 8   procedures were followed during the 2016 layoff?
 9                    MR. SANTO:  I'm going to -- is there
10   a standing objection to outside the scope of the
11   expert designation?
12                    MS. GREISEN:  Sure.  Sure.
13                    MR. SANTO:  I don't have to do those
14   each time?
15                    MS. GREISEN:  No.
16                    MR. SANTO:  Okay.  Then I object to
17   form.
18        Q     (By Ms. Greisen) Do you want me to read
19   the question back?
20        A     Please.
21        Q     As an expert opining -- giving his
22   opinion in this matter, would it be important for
23   you, as an expert, to know whether or not the
24   policies and procedures of Mesa County were
25   followed during the layoff?
```

**Frank Whidden  July 11, 2019**

1          MR. SANTO:  Object to form.

2     A     Sure, it would be important to know, and

3  that's why I vetted this by counsel to find out if

4  we were in compliance.

5     Q     (By Ms. Greisen) And after the fact in

6  forming the expert opinion you intend to give at

7  trial, have you looked to see whether or not the

8  policies and procedures were followed?

9     A     I'm still --

10         MR. SANTO:  Object to form.

11    A     I'm still relying on counsel to be the

12  expert as far as compliance is concerned with legal

13  questions.

14    Q     (By Ms. Greisen) Well, I understand that

15  you're relying on counsel.  I have the right to

16  find out the facts and basis that form your expert

17  opinion.

18         So what I need to know is:  Have you

19  received any information to show that Mesa County's

20  policies and procedures weren't followed?

21         MR. SANTO:  Object to form.

22    A     No.

23    Q     (By Ms. Greisen) Have you yourself

24  reviewed any of the allegations into Ms. Bouricius'

25  allegations of discrimination?

**Frank Whidden   July 11, 2019**

```
 1    Bouricius?

 2         A     No.

 3         Q     And did you ask anyone at Mesa County --

 4               MR. SANTO:  Object to the extent --

 5         Q     (By Ms. Greisen) -- to investigate the

 6    complaint of discrimination regarding Ms.

 7    Bouricius?

 8               MR. SANTO:  Object to the extent

 9    that this goes to attorney-client privilege.  This

10    issue has been ruled on by the Court with respect

11    to this investigation.

12         Q     (By Ms. Greisen) Did you ask anyone to do

13    an investigation?

14               MR. SANTO:  You can say yes or no.

15         A     You're going to have to ask me again.

16         Q     (By Ms. Greisen) Sure.  You've heard --

17    as a manager, you've heard of companies

18    investigating complaints before --

19         A     Yes.

20         Q     -- right?

21               So when you became aware of Ms.

22    Bouricius' charge of discrimination, did you ask

23    anyone at the County to investigate it?

24         A     I did not.

25         Q     Did you review the investigation into the
```

**Frank Whidden   July 11, 2019**

 1   anything else done, that they would tell us, that

 2   the County Attorney knew the laws and what we

 3   should and shouldn't do.

 4        Q    And to your knowledge, who did the County

 5   Attorney talk to in finding out the facts about

 6   this complaint?

 7                MR. SANTO:  Object to -- object to

 8   this line of questioning.  This has already been

 9   ruled on by the Court, that the County does not

10   have to provide information with respect to the

11   investigation of the CCRD matter.

12        Q    (By Ms. Greisen) Go ahead, Mr. Whidden.

13                MR. SANTO:  Do not go ahead.  The

14   Court has ruled it's not discoverable.

15                MS. GREISEN:  That the investigation

16   is not discoverable?

17                MR. SANTO:  I believe that's what --

18                MS. GREISEN:  That's not --

19                MR. SANTO:  -- Magistrate Judge

20   Varholak ruled.

21                MS. GREISEN:  No.  He simply --

22                MR. SANTO:  What was your

23   understanding?

24                MS. GREISEN:  He simply said that

25   you weren't going to be asserting the

**Frank Whidden   July 11, 2019**

```
 1    Faragher-Ellerth defenses.  That was the extent of
 2    it and, therefore, we withdraw the 30(b)(6) and you
 3    withdrew your affirmative defense on that and we
 4    withdrew the 30(b)(6) question on it.  It doesn't
 5    say I cannot ask any questions about whether or not
 6    the County did its own investigation.
 7                  MR. SANTO:  I believe the Court's
 8    ruling said that the County does not have to
 9    provide that information because it was not forming
10    the basis of any part of the lawsuit.
11                  MS. GREISEN:  Well, I'm not asking
12    that.
13                  MR. SANTO:  But I'm doing it from
14    memory.  It's not in front of me.
15                  MS. GREISEN:  Yeah.  I'm asking Mr.
16    Whidden if he asked anybody to conduct such an
17    investigation.
18                  MR. SANTO:  I think he already
19    answered that question.
20        Q    (By Ms. Greisen) And you said no?
21                  MS. GREISEN:  What was the last
22    question?  I'm sorry.
23        Q    (By Ms. Greisen) Oh, I think I asked you
24    if you reviewed the investigation into the
25    allegation of discrimination conducted by the CCRD.
```

**Frank Whidden   July 11, 2019**

```
1               MR. SANTO:  I believe he answered
2     that one as well, did he not?
3          A    I said I read certain thing -- I read
4     some stuff that came from the CCRD.  I don't
5     remember exactly what that contained.
6          Q    (By Ms. Greisen) Well, in forming an
7     expert opinion in this case, did you try to gather
8     as much information as you could to form the basis
9     of your opinion?
10         A    Yes.
11         Q    So what information did you gather to
12    form the basis of your expert opinion?
13         A    I relied on my knowledge and experience
14    of the skills and the mix that was there of the
15    people who were involved.
16         Q    Were you aware that the State of Colorado
17    determined that there was probable cause to believe
18    that Ms. Bouricius' termination was illegal
19    discrimination based on age?
20              MR. SANTO:  Object to form.
21         A    I knew that -- yes, that they said that
22    she could move forward with an allegation.
23         Q    (By Ms. Greisen) Well, I'm not asking you
24    if you knew that they said she could move forward.
25              I'm asking:  Are you aware that the State
```

**Frank Whidden   July 11, 2019**

```
 1    age discrimination regarding the October 2016
 2    layoffs at Mesa County?
 3                   MR. SANTO:  Object to the extent the
 4    information was provided to you by counsel and
 5    instruct the witness not to answer if it comes from
 6    the County Attorney's office.
 7        Q    (By Ms. Greisen) Do you know?
 8        A    I'm going by what he just said.
 9        Q    Do you know whether or not there were
10    other charges of discrimination filed?
11                   MR. SANTO:  As lo -- as...
12        Q    (By Ms. Greisen) It's just a yes-or-no
13    question.
14                   MR. SANTO:  Yeah.  I'm just trying
15    to decide -- the problem, though, with my concern
16    is that if the yes-or-no information comes from
17    counsel, that would be covered by attorney-client
18    privilege.
19                   I believe you would agree, correct?
20                   MS. GREISEN:  No.  I believe Mr.
21    Whidden's testified that he read the CCRD
22    determinations, or at least some of them, and
23    looked at a lot of documents.  So I don't think
24    those documents are attorney-client privilege.  I'm
25    just trying to find out from Mr. Whidden whether
```

**Frank Whidden  July 11, 2019**

 1    he's aware of other charges.

 2              MR. SANTO:  And then he said the

 3    documents were.  I was saying the source of his

 4    information --

 5              MS. GREISEN:  I didn't ask him the

 6    source.  I asked him whether he was aware.

 7              MR. SANTO:  But if his knowledge

 8    comes from attorney-client privilege, that's my

 9    concern.

10              MS. GREISEN:  Well...

11              MR. SANTO:  If you could ask him

12    where his knowledge comes from --

13              MS. GREISEN:  No.  I just asked the

14    question.  I'll rephrase it.

15        Q    (By Ms. Greisen) In your expert opinion,

16    do you believe that all of the terminations that

17    you decided to do in October of 2016 were done

18    appropriately and legally?

19        A    Yes.

20              MR. SANTO:  Object to -- hold up.

21    Object to the extent it exceeds the scope of the

22    expert designation.

23        Q    (By Ms. Greisen) And in looking and

24    forming that expert opinion, are you aware of

25    complaints about other people of age discrimination

**Frank Whidden  July 11, 2019**

```
 1   whether Rick and Janine Corsi were discriminated

 2   against on the basis of age by Mesa County?

 3                 MR. SANTO:  Object.  This -- this

 4   exceeds the scope of -- no.  He's not testifying as

 5   an expert with respect to this.

 6                 MS. GREISEN:  I'm asking him if he

 7   has an opinion on that.

 8                 MR. SANTO:  But -- no.  If you asked

 9   his opinion on that, I wouldn't object.  But when

10   you say -- let me explain my objection.  If you

11   said his expert opinion, he's not been designated

12   as an expert with respect to the Corsi decision.

13                 MS. GREISEN:  I understand that.  Do

14   you want to -- are you going to instruct him not to

15   answer?

16                 MR. SANTO:  I'm going to wait to

17   hear your question.

18                 MS. GREISEN:  I just asked the

19   question.  I can repeat it.

20        Q    (By Ms. Greisen) Do you have an expert

21   opinion about whether Rick and Janine Corsi were

22   discriminated against on the basis of age from Mesa

23   County?

24                 MR. SANTO:  I'm going to object.

25   I'm going to object to this question on -- I
```

**Frank Whidden  July 11, 2019**

```
 1    don't -- it's not attorney-client privilege, so I'm
 2    not instructing the witness not to answer, but it's
 3    outside the scope of his designation.
 4         Q    (By Ms. Greisen) Okay.  Go ahead,
 5    Mr. Whidden.  Can you answer my question?
 6         A    I do not have an expert opinion as an
 7    expert about legal compliance.
 8         Q    As the County Administrator, do you have
 9    an opinion about whether Rick and Janine Corsi's --
10    whether Rick or Janine Corsi were discriminated
11    against on the basis of age from Mesa County?
12         A    Do I have an opinion about that?
13         Q    Yeah.
14         A    I believe they were not.
15         Q    Okay.  And can you tell me all the
16    evidence that you have to support your opinion.
17         A    Certainly.  Age had no basis in my
18    decision whatsoever.  I made my decision based on
19    the budget and the decision that needed to be made
20    about reduction in cost.
21         Q    Did you see -- well, strike that.
22              As an expert, are you aware of any
23    investigations made by Mesa County into any
24    complaints of discrimination concerning the 2016
25    layoff?
```

Frank Whidden  July 11, 2019

```
 1        Q    Was there a policy at Mesa County to

 2   instruct employees to not talk to people who had

 3   been terminated?

 4             MR. SANTO:  Object to form.

 5        A    Not to my knowledge.

 6        Q    (By Ms. Greisen) So you are aware that

 7   Mr. Corsi and Ms. Corsi both filed charges of

 8   discrimination at the Colorado Civil Rights

 9   Division, right?

10        A    Yes.

11        Q    And did you provide information to your

12   attorneys about how to respond to that charge of

13   discrimination?

14             MR. SANTO:  Object to form to the

15   extent it calls for any communications between Mr.

16   Whidden and the attorneys with the County.  So if

17   you're saying, "I told Nina this" --

18        Q    (By Ms. Greisen) It's a yes-or-no

19   question.

20             MR. SANTO:  I would instruct you not

21   to answer that question with respect to

22   attorney-client privilege.

23        Q    (By Ms. Greisen) Did you provide

24   information to respond to the CCRD?

25        A    I talk --
```

**Frank Whidden  July 11, 2019**

| | |
|---|---|
| 1 | MR. SANTO:  How is this not -- maybe |
| 2 | I'll ask for clarification.  How is this not |
| 3 | covered by attorney-client privilege?  You keep |
| 4 | asking. |
| 5 | MS. GREISEN:  It's not.  It's -- |
| 6 | it's facts and circumstances surrounding this case |
| 7 | and he's giving expert opinions on it. |
| 8 | MR. SANTO:  Not from -- |
| 9 | MS. GREISEN:  And, in fact, I'm not |
| 10 | asking about communications. |
| 11 | MR. SANTO:  Then I'm objecting -- |
| 12 | MS. GREISEN:  I'm simply asking |
| 13 | whether he provided information with responding to |
| 14 | the CCRD investigation. |
| 15 | MR. SANTO:  Okay.  That -- that one |
| 16 | I will not object to. |
| 17 | A    Yes. |
| 18 | Q    (By Ms. Greisen) What information did you |
| 19 | provide? |
| 20 | MR. SANTO:  That one I am objecting |
| 21 | to. |
| 22 | MS. GREISEN:  Based on? |
| 23 | MR. SANTO:  Attorney-client |
| 24 | privilege. |
| 25 | Q    (By Ms. Greisen) What information do you |

**Frank Whidden   July 11, 2019**

1          I, FRANK WHIDDEN, do hereby certify that

2    I have read the foregoing transcript and that the

3    same and accompanying amendment sheets, if any,

4    constitute a true and complete record of my

5    testimony.

6

7

8                              _____

9                              Signature of Deponent

                               (  ) No amendments

10                             (  ) Amendments attached

11

12          Acknowledged before me this _____ day of

13   _____, 2019.

14          Notary Public: _____

15          My commission expires _____

16          Seal:

17

18

19

20

21

22

23

24

25

**Frank Whidden   July 11, 2019**

352

```
 1   STATE OF COLORADO)
 2                   )ss.    REPORTER'S CERTIFICATE
 3   COUNTY OF MESA  )
 4       I, Candice F. Flowers, do hereby certify that
 5   I am a Certified Shorthand Reporter and Notary
 6   Public within the State of Colorado; that previous
 7   to the commencement of the examination, the
 8   deponent was duly sworn to testify to the truth.
 9       I further certify that this deposition was
10   taken in shorthand by me at the time and place
11   herein set forth, that it was thereafter reduced to
12   typewritten form, and that the foregoing
13   constitutes a true and correct transcript.
14       I further certify that I am not related to,
15   employed by, nor counsel for any of the parties or
16   attorneys herein, nor otherwise interested in the
17   result of the within action.
18       In witness whereof, I have affixed my
19   signature this 20th day of July, 2019.
20       My commission expires February 14, 2020.
21
22
23                       _____
                         Candice F. Flowers, CSR
24                       671 Alexia Court
                         Grand Junction, CO 81505
25
```