# Composite Deposition Testimony of

# Kristen Cole

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

————————————————————————————————————————————————

VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

July 11, 2019

————————————————————————————————————————————————

DEBRA BOURICIUS,

    Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

    Defendant.

————————————————————————————————————————————————

       Pursuant to Notice and the Federal Rules

of Civil Procedure, the videotaped deposition of

FRANK WHIDDEN, called by Plaintiff, was taken on

Thursday, July 11, 2019, commencing at 9:07 a.m.,

at 205 North 4th Street, Grand Junction, Colorado,

before Candice F. Flowers, Certified Shorthand

Reporter and Notary Public within and for the State

of Colorado.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

1    felt that Kelly, I still feel, that Kelly was

2    stronger.

3         Q    Can you give me any more examples of how

4    Kelly's knowledge about systems was better?

5         A    I think that was sufficient.  No.

6         Q    Okay.  And can you give me any examples

7    of how Kelly was better with customers than Ms.

8    Bouricius?

9         A    Yes.  Kelly is thorough, very painstaking

10   as far as explaining how a system works or doesn't

11   work or helping a client deal with whatever issues

12   they may have in front of them.  I got reports of

13   that from clients, from management, that he was --

14   he was more thorough, more detailed, and more

15   helpful to the clients.

16        Q    Can you give me any specific clients?

17        A    As far as being thorough, I know that

18   Kristen Cole in my office upstairs has been -- is

19   an example of someone who says that Kelly is

20   extremely thorough.  Lhana has said that.  I have

21   seen it as evidenced in his documentation, the

22   e-mails that he sends out about how to do things,

23   how to -- like if we're making an upgrade, here are

24   the changes, here's what the user can see with

25   screenshots and examples and, you know, ad

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

1    Q    And you said -- oh, you said also that

2  Lhana had better software skills.

3    A    No.  Better customer service skills.

4    Q    Better customer service.

5         Again, is that just based on your

6  personal observation?

7    A    Yes.  And also, as I said earlier, about

8  information I had been given about customer

9  complaints.

10    Q    From Lhana.

11    A    From Lhana.  I've had -- I've had

12  customers tell me that they didn't like the service

13  that they received.

14    Q    What customers?

15    A    Kristen Cole would be one.  I don't

16  remember exactly who said that to me over the

17  years.

18    Q    So Kristen Cole.  What -- what -- what --

19    A    She's administrative assistant and -- and

20  I think Kristen was there before Deb left.

21    Q    So what year was this complaint made?

22    A    I don't remember.

23    Q    Was there anything in writing about it?

24    A    Not unless there was something in work

25  orders that covered it.  I didn't read anything

**EXHIBIT 3**

Composite Deposition Testimony of

Patrick Coleman

**EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

_____

DEBRA BOURICIUS,

     Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board of
County Commissioners,

     Defendant.

_____

DEPOSITION OF JOHN JUSTMAN

_____


Friday, May 3, 2019

9:02 a.m.


PURSUANT TO NOTICE and the Federal Rules of Civil
Procedure, the above-entitled deposition was taken on
behalf of Plaintiff at 205 North 4th Street, Suite 300,
Grand Junction, Colorado, before K. Michelle Dittmer,
Registered Professional Reporter and Notary Public within
Colorado.

**EXHIBIT 3**

```
 1                  A.    I can't answer that.  I don't know.

 2                  Q.    And you said that the Board hires -- also

 3    hires the county attorney.

 4                        Who oversees the county attorney's office?

 5    Is that the Board?

 6                  A.    The Board and the attorney -- I mean, the

 7    county attorney runs his office.  We don't run it for

 8    him.

 9                  Q.    But the county attorney reports to the

10    Board?

11                  A.    Correct.

12                  Q.    And the county attorney, when you were

13    elected, was Pat Coleman; is that right?

14                  A.    No.

15                  Q.    Who was it?

16                  A.    Lyle Dechant.

17                  Q.    Okay.  When did Pat Coleman become the

18    county attorney?

19                  A.    When did he become attorney?

20                  Q.    Yeah.

21                  A.    Probably -- I believe in 2014.

22                  Q.    And when did he leave?

23                  A.    Mr. Coleman?  He's still there.

24                  Q.    He's still the county attorney?

25                  A.    Yes.
```

**EXHIBIT 3**

1    correct?

2              A.    Not that I'm aware of.

3              Q.    Okay.  Was there -- let me correct that.

4                    The same year, the Board also agreed to

5    raise the salary of the county attorney, Pat Coleman,

6    right --

7              A.    Yes.

8              Q.    -- 20 --

9                    Okay.  And Mr. Coleman's was raised from

10   around 140,000 to almost 160,000 that year, right?

11             A.    Tell me them numbers again.

12             Q.    Sure.

13                   From 140,000 up to 160,000; does --

14             A.    That --

15             Q.    -- that sound right?

16             A.    -- sounds correct.

17             Q.    And the public works director, Mr. Baier,

18   B-a-i-e-r --

19             A.    Yes.

20             Q.    -- was given a raise, about a 16 percent

21   raise, from 125,000 to about 145,000, right?

22             A.    I don't know that.  He's not under the

23   commissioners.

24             Q.    Did you participate in approving his

25   raise?

EXHIBIT 3

1          Q.    In fact, none of the votes -- the votes

2    concerning Mr. Coleman were also not public votes, right?

3          A.    I don't think so.

4          Q.    And with Mr. Garcher, why was he given a

5    raise?

6          A.    Because it's -- he's being compensated

7    because of -- he has one of the biggest budgets in the

8    county, has huge -- 250 employees, and if you go around

9    the state, that's about where he should be at.

10          Q.    Just so I make sure I understand your

11    answer, in your opinion, his raise was justified based on

12    a market adjustment; is that --

13          A.    Yes.

14          Q.    -- correct?

15                Okay.  So what factors did the Board look

16    at to make that decision?

17          A.    You look at what like-positions are paying

18    around the state, and -- and his workload, and the -- and

19    the workload that his group of employees do.  It's a huge

20    part of Mesa County.

21          Q.    What comparable markets did the Board look

22    at to determine that salary increase was justified?

23          A.    We looked at some on the Front Range --

24    because you can't compare the West Slope to Mesa County

25    because our population is two and three times bigger than

**EXHIBIT 3**

```
 1    do a market analysis --

 2              A.    No.

 3              Q.    -- of those counties?

 4              A.    Probably not.

 5              Q.    And who was present during that executive

 6    session?

 7              A.    I don't -- I think all three of us were

 8    there.

 9              Q.    Anyone else?

10              A.    Probably Mr. Garcher and -- and I don't --

11    not -- I'm not -- I don't know if Mr. Coleman would have

12    been there or not.  I don't recall.

13              Q.    Did Mr. Garcher provide you with the

14    information?

15              A.    He could have brought some of it in, yes.

16              Q.    You just don't recall?

17              A.    No.

18              Q.    In -- since you've been a county

19    commissioner, what are the rules or policies at the

20    county for paying for training or continuing education of

21    Mesa County employees?

22              A.    That's not my level of -- I would say,

23    probably our administrator would take care of that.

24              Q.    What's the policy about what the county

25    will pay?
```

**EXHIBIT 3**

1              Q.   But you don't know whether it was a board

2    member or some department head?

3              A.   I do not know who -- how we arrived at

4    that.

5              Q.   So is it fair to say, at this point, it's

6    your understanding that the 2015 or 2016 wage study is

7    not going to be finalized, ever?

8              A.   I don't know that I can answer that.  I

9    mean, there's no -- there's no -- there hasn't been any

10   work done on it since at least '16, if not earlier than

11   that.

12             Q.   So --

13             A.   So it's obsolete.

14             Q.   -- currently, it's obsolete, and there's

15   not going to be any more work done on it?

16             A.   Not on that one.

17             Q.   Did you see the narrative that came along

18   with the wage study as it is in its present form?

19             A.   No.

20             Q.   Do you know what conclusions were made in

21   the wage study?

22             A.   No.

23             Q.   So when you made these market adjustments

24   for Mr. Whidden, Mr. Coleman, Mr. Garcher, did you look

25   at either information in this study or anywhere else?

**EXHIBIT 3**

1           A.    No.

2           Q.    And we talked about how Mr. Whidden's

3    raise was determined.  And I wanted to get a sense of

4    whether or not, in deciding the raises for these other

5    individuals that we've talked about, was it same -- was

6    it the same process as followed with Mr. Whidden --

7                 MR. SANTO:  Object to --

8           Q.  (By Ms. Greisen)  -- that you went into

9    executive session and had a discussion about performance?

10                MR. SANTO:  Object --

11          A.    Yes.

12                MR. SANTO:  -- to form.

13          Q.  (By Ms. Greisen)  And then in that -- in

14   those discussions -- and we'll break it down -- with

15   Mr. Coleman, was it just Mr. Coleman and the Board

16   present during those discussions?

17          A.    With -- with Mr. Coleman?

18          Q.    Yes.

19          A.    Yes.

20          Q.    Okay.  And those were in the -- the 2016

21   discussions were a matter of public vote, right?

22          A.    Uh-huh.

23          Q.    And the later decisions to raise his

24   compensation was not made a public vote, correct?

25          A.    I think so, yes.

**EXHIBIT 3**

1          Q.    Okay.  Can you tell me why it was not made

2     public at the second --

3          A.    Because we can make decisions on a date --

4     on a daily business -- day-to-day business schedule also.

5          Q.    And so why was the first one conducted in

6     public but not the second one?

7          A.    I don't know.

8          Q.    Was anybody else, other than Mr. Coleman,

9     present during those discussions in executive session?

10         A.    No.

11         Q.    Okay.  And is that true with Mr. Garcher

12    and his compensation decisions, was it just Mr. Garcher

13    present with the Board?

14         A.    Yes.

15         Q.    Okay.  And did Mr. Baier come before the

16    Board?

17         A.    No.

18         Q.    Okay.  So with -- I think you testified

19    that with respect to Mr. Whidden's performance evaluation

20    and compensation increase, that there weren't any

21    documents that the Board reviewed.

22                Were there any documents that the Board

23    reviewed with respect to Mr. Coleman or Mr. Garcher

24    during his compensation increase?

25         A.    I mean, I don't know -- I do not recall if

**EXHIBIT 3**

1    Mr. Coleman brought anything to the thing, or we may have

2    went through, you know, what was happening in his office

3    and we're having done X, Y and Z.

4              Q.    Do you recall any documents that were

5    reviewed?

6              A.    Not offhand, no.

7              Q.    And the same is true for Mr. Garcher?

8              A.    Yes.

9              Q.    And was anybody else present for those

10   compensation decisions, other than the Board and the

11   person involved?

12             A.    No.  No.

13             Q.    Is Mesa County self-insured for insurance,

14   health insurance?

15             A.    Yes.

16             Q.    When did that happen?

17             A.    2008 or '9, somewhere in there.

18             Q.    Do you know Deb Bouricius?

19             A.    Pardon?

20             Q.    Do you know Debbie or Deb Bouricius?

21             A.    No.

22             Q.    Do you know anything about her skill set

23   or expertise?

24             A.    No.

25             Q.    Do you -- well, strike that.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

_____

VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

July 11, 2019

_____

DEBRA BOURICIUS,

     Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

     Defendant.

_____


          Pursuant to Notice and the Federal Rules

of Civil Procedure, the videotaped deposition of

FRANK WHIDDEN, called by Plaintiff, was taken on

Thursday, July 11, 2019, commencing at 9:07 a.m.,

at 205 North 4th Street, Grand Junction, Colorado,

before Candice F. Flowers, Certified Shorthand

Reporter and Notary Public within and for the State

of Colorado.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

162

```
 1    sitting here at the table today?

 2         A    Yes.

 3         Q    Okay.  So --

 4         A    Well, I had conversations with Nina and I

 5    also had conversations with the County Attorney,

 6    Patrick Coleman.

 7         Q    So did you give them the specific people

 8    that you were intending to lay off?

 9         A    Yes.  My understanding was -- I don't

10    know that I gave them the list, but my

11    understanding was that HR did.  They gave them the

12    list and they went through it to check it.

13         Q    So when you say HR did, who at HR did?

14         A    I believe it was Krista Ubersox that did.

15         Q    So Krista gave both Nina and Patrick

16    Coleman the list of people that you wanted to lay

17    off?

18         A    I believe she worked with Nina on the

19    list, and I had other conversations -- I had

20    conversations with Patrick about the layoffs.

21         Q    What were your conversations with Patrick

22    about the layoffs?

23                   MR. SANTO:  Is this as part of his

24    expert testimony?

25                   MS. GREISEN:  Sure.
```

**Frank Whidden   July 11, 2019**

164

1   because I wanted to make sure that hopefully we

2   wouldn't get to where we're sitting today.

3        Q    Did you give Patrick the name of the

4   people that you were wanting to terminate?

5        A    I don't remember specifically telling him

6   who was on the list.  I knew his office had access

7   to that information.  We were discussing more in

8   terms of, you know, am I -- is there -- are we

9   worried about categories that we can't discriminate

10  against, those kinds -- those HR questions.  Are we

11  going to trip any bright wires about this problem?

12       Q    So let me understand.  You talked with

13  Patrick specifically about whether or not there

14  could be any claim for discrimination based on the

15  group of laid-off people?

16       A    Yes.

17       Q    Is that right?

18       A    Yes.

19       Q    And -- but you didn't give him the names

20  of who the people were?

21       A    I don't remember sitting in the meeting

22  and saying name by name by name who they were.

23       Q    Well, how would -- tell me, then, how you

24  gave him enough information to form an opinion.

25       A    He told me as long as it was a strictly

**Frank Whidden  July 11, 2019**

```
 1   will -- I will note that there's a standing
 2   objection to that same effect by your counsel so we
 3   don't have to go through this whole thing again.
 4                MR. SANTO:  I appreciate that.
 5            (Question at Page 166, Line 6 was read.)
 6        A    I'm not sure I follow exactly the expert
 7   opinion part of that question.  I vetted the
 8   decision by the County Attorney to ask are we in
 9   compliance with the law.
10        Q    (By Ms. Greisen) Any other -- you're
11   talking about the decision with -- the conversation
12   with Patrick Coleman?
13        A    Yes.
14        Q    Any other times?
15        A    Not prior to the layoff.
16        Q    After the layoff?
17                MR. SANTO:  You can answer that.
18        A    Yes.  With regard to the CCRD allegations
19   or in the whole deal in talking to CCRD.
20        Q    (By Ms. Greisen) Okay.  So tell me what
21   discussions you had that form the basis of your
22   expert opinion regarding -- or with -- with your
23   counsel.
24                MR. SANTO:  With respect to the
25   CCRD?
```

**Frank Whidden   July 11, 2019**

1   because you made that decision, right?  So you

2   obviously have an opinion about it, right?

3       A    Sure.

4       Q    What I want to know is:  Do you have an

5   expert opinion about it?

6       A    I believe I have an expert opinion about

7   it.

8       Q    And what is that expert opinion?

9       A    That the people that I selected to remain

10  were the skill sets and the mix that was necessary

11  in order to carry out the IT functions of Mesa

12  County.

13      Q    Okay.  So is it fair to say that part of

14  your expert opinion is that nobody was

15  discriminated based on age in the 2016 layoffs?

16              MR. SANTO:  Object to form.

17      A    I do believe that.  Now, I don't know if

18  you are trying to make a distinction between am I

19  an expert on discrimination law or not, but I do

20  believe that based on relying on counsel, that what

21  we were doing was in compliance with the law.

22      Q    (By Ms. Greisen) Uh-huh.  And I

23  understand that you have talked with Patrick

24  Coleman.  I'm just trying to understand what you're

25  going to be testifying at trial about.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

331

```
 1   biggest raise?
 2        A    You mean like by total dollar amount?  I
 3   would say yes.
 4        Q    Well, both.  Percentage and dollar
 5   amount.
 6        A    I -- that's probably a fair statement,
 7   but I didn't do the comparison.  I don't know.
 8        Q    Well, it was pretty widely publicized,
 9   wasn't it, that all these salary raises were going
10   on without public comment?
11        A    The only two that they really seemed to
12   focus on was myself and Patrick Coleman.  I don't
13   recall anything ever being said or brought to light
14   about -- in the press about like Pete Baier, Todd
15   Hollenbeck, and those others.  I don't recall that
16   ever being brought up.  It was about Patrick
17   Coleman and myself.
18        Q    Well, and part of the -- part of the
19   controversy was that these were discussions held
20   behind closed doors and the votes were not made
21   public, right?
22        A    There was no vote.  This came under what
23   the board considered to be daily direction that did
24   not require public meetings.  That was my
25   understanding.
```

**EXHIBIT 3**

Composite Deposition Testimony of

Troy Flick

**EXHIBIT 3**

# *BOURICIUS*

# *VS.*

# *MESA COUNTY*

### Deposition

## *DEBRA BOURICIUS*

*02/22/2019*

---

## *AB Court Reporting & Video*
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

**EXHIBIT 3**

AB Court Reporting & Video

1                MS. BISBEE:  It is here.

2                MS. SEVERN:  Okay.  Let's do that.

3        Q     (By Ms. Severn) Just one more then.  The

4    next one down is Troy Flick.  Do you know Mr. Flick?

5        A     Yes.

6        Q     Who is Mr. Flick?

7        A     He was the supervisor of the network and

8    database administrators in county IT at Mesa County.

9        Q     Did he ever supervise you?

10       A     No.

11       Q     When did you meet Mr. Flick?

12       A     I can't recall the exact date.

13       Q     Did he come to Mesa County after you?

14       A     Yes.

15       Q     And what was your relationship like?

16       A     It was okay.  I didn't necessarily

17   interface with him directly that much.  It was mostly

18   his staff.

19       Q     Did you ever work with him directly?

20       A     Yes.

21       Q     What would you work with him directly on?

22       A     Well, at one point I was given the

23   responsibilities of being a database administrator

24   for the SQL servers, and he was in network, so at

25   that time I -- it was co-worker.

**EXHIBIT 3**

**AB Court Reporting & Video**

```
 1      Q      Okay.  But not your supervisor?

 2      A      No.

 3      Q      Any other times that you worked directly

 4   with Mr. Flick?

 5      A      I can't really think of any offhand.

 6      Q      Did you ever have any disagreements with

 7   Mr. Flick?

 8      A      No.

 9      Q      What information would you expect

10   Mr. Flick to have about your work performance?

11      A      Because I worked with him, he would have,

12   you know, some level, I suppose, but other than that

13   I don't know that he would have that much.

14      Q      And is that based on the times when you

15   worked directly with Mr. Flick?

16      A      M-hm.

17      Q      Yes?

18      A      Yes.

19      Q      Okay.  Did Mr. Flick, his performance of

20   his job, did that impact your ability to do your job?

21      A      Yes.

22      Q      How so?

23      A      Well, he was one that would typically come

24   in at 10 in the morning and leave at 4, so if a

25   decision needed to be made for whatever reason, he
```

**EXHIBIT 3**

AB Court Reporting & Video

1    was not available to help with that decision.

2         Q    He was -- okay.  He wasn't available if it

3    was before 10 or after 4 you mean?

4         A    Yeah.  I mean, it happened frequently.

5         Q    What kind of decisions would Mr. Flick

6    need to be involved in that his staff wouldn't be

7    able to handle?

8         A    I can't recall specifically, but I know

9    there was one instance, and I can't remember what it

10   was about, but we needed his response, and he wasn't

11   available.

12        Q    What information does Mr. Flick have

13   regarding the 2016 layoffs?

14        A    I don't know.

15        Q    Do you have a belief as to Mr. Flick's

16   credibility?

17        A    I can't speak to that.

18        Q    Okay.  Does that mean you find him to be

19   not credible, or you don't have an opinion?

20        A    I don't have an opinion.

21        Q    Do you have a belief as to his honesty?

22        A    I don't know.

23        Q    And, again, does that mean you don't think

24   he's honest, or you don't have an opinion?

25        A    It means I don't know.

EXHIBIT 3

*AB Court Reporting & Video*

```
 1          Q      Okay.    Fair enough.   Did you talk with
 2     Mr. Flick -- have you talked with him since your
 3     employment ended with Mesa County?
 4          A      No.
 5                 MS. SEVERN:   This is a good stopping place
 6     for lunch.
 7                 (The deposition recessed at 12:00 p.m.,
 8                  to be reconvened at 12:30 p.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**EXHIBIT 3**

Transcript of the Testimony of

## JANINE CORSI
### April 22, 2019

### Debra Bouricius
### v
### Mesa County, et al.

# Linda L. Frizzell, RPR

*Linda L. Frizzell, RPR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444



**EXHIBIT 3**

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                      April 22, 2019

Page 8

1          A.  But he did -- asked if we had -- if our case was

2     over, and I said it had been resolved.

3          Q.  The reason -- when you talk about your case,

4     that was your case against Mesa County, correct?

5          A.  Yes.

6          Q.  Where you also alleged age discrimination

7     against the County; is that right?

8          A.  Yes.

9          Q.  Was your conversation with -- did -- did Carey

10    say anything -- first of all, did you talk on the phone

11    or was it restricted to email?

12         A.  It was just email.

13         Q.  Okay.  Did he mention anything about believing

14    he was discriminated against based on his age?

15         A.  He doesn't know why, and he believes that Troy

16    didn't know anything about it, our supervisor, and that

17    Bill Tarlton told him that Troy didn't know anything

18    about it.

19         Q.  Oh --

20         A.  That we were going to be terminated.  So

21    basically that it was Frank's decision is what I inferred

22    from that.  That's what Carey believes.

23         Q.  Okay.  So Carey told you he -- he talked to Bill

24    Tarlton?

25         A.  Yeah, and Bill still works there.

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                              April 22, 2019

Page 9

1        Q.   And to the best of your understanding, Bill

2    Tarlton told Carey Stieb that Troy Flick had not known

3    about the layoff?

4        A.   Right.

5        Q.   In advance --

6        A.   That Troy or Lhana hadn't known about it.  So

7    they weren't any -- he believes they weren't any part of

8    it, and that they were -- Troy and Carey were friends, so

9    I think he would like to have seen that Troy didn't know.

10       Q.   Okay.

11       A.   I don't really know for sure if Troy knew or

12   not.

13       Q.   Okay.  And what was Carey's position?

14       A.   He was the network administrator, but on the --

15   when they laid us off, they had his position wrong, and

16   they also had him as a female instead of a male.

17       Q.   Oh, what do you mean by that?

18       A.   Somewhere I saw where they thought -- because

19   his name was Carey, it might have been some other thing

20   when they were trying to figure out if it was

21   discrimination, but, anyway, when he was laid off, they

22   had his position wrong.  He was -- said he was desktop

23   support or something.  He's actually -- was the same

24   level as me, network administrator.

25       Q.   Okay.  And so when you say "they," are you

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                      April 22, 2019

```
                                                          Page 12
 1        Q.  Okay.

 2        A.  So I got pregnant right after I started working

 3   there.  I think it's, like, 23 years or something like

 4   that.

 5        Q.  And your husband worked there as well?

 6        A.  Yeah.  He actually got hired after I did as a

 7   temporary, and then a job opened up that he was qualified

 8   for as GIS coordinator, and then he moved up into more of

 9   a management role.

10        Q.  When was that?  Do you recall?

11        A.  He's the one that started in August, I think,

12   but he started as a temporary.

13        Q.  So he started in August of '93?

14        A.  Yes.

15        Q.  Do you recall when he became a supervisor?

16        A.  He supervised from the very beginning, but it

17   was just three people just for GIS department, and then

18   I'm not sure exactly when it was, years later though,

19   that he became the IT manager.

20        Q.  Okay.

21        A.  And he had the web database applications and GIS

22   groups under him.  So he had about half the people.

23        Q.  Okay.  About half of the IT department?

24        A.  Uh-huh.  There was 24 people.  And then Troy was

25   IT manager of infrastructure, which I worked for Troy.
```

**EXHIBIT 3**

Debra Bouricius                                      JANINE CORSI
Mesa County, et al.                                  April 22, 2019

                                                          Page 13

1        Q.   Okay.  Did Troy have the other half of the

2   workers?

3        A.  Yes.  Well, then Lhana came along, and she was

4   desktop so she took over the help desk.  So then there

5   became three managers.  Eventually, Lhana Jordan was the

6   lower-level manager of the help desk.

7        Q.   Do you recall when she started?

8        A.  She came over from DHS.  She had worked there,

9   and she came over as -- I believe as a technician and

10  then they promoted her from there.

11       Q.   Do you recall if Frank Whidden promoted her?

12       A.  I believe so, yes.

13       Q.   Okay.

14       A.  So it was a little bit controversial because she

15  didn't have a degree.

16       Q.   Okay.  So if Frank Whidden -- I think came to

17  the County in 2011, her promotion would have been after

18  that?  Is that --

19       A.  Yeah, she actually --

20           MS. SEVERN:  Object to form.

21       A.  -- talked to him when -- before he started and

22  was getting his phone set up and stuff.  I remember that.

23       Q.   (BY MS. BISBEE) She talked to him?

24       A.  Yeah, to Frank.

25       Q.   Okay.  How do you remember that?

                                                    **EXHIBIT 3**

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                      April 22, 2019

Page 16

1        Q.   And I think you said the IT department had 24
2   employees; is that correct?
3        A.   I believe so.
4        Q.   Can you explain to me how it was structured?
5        A.   When we were laid off, there were two IT
6   managers.
7        Q.   So was Lhana Jordan an IT manager at that time?
8        A.   Her position was a different title.
9        Q.   Okay.
10       A.   I think she was something help desk.
11       Q.   Okay.
12       A.   Maybe help desk -- I don't know what her exact
13  title was actually.
14       Q.   So the IT managers were your husband, Rick
15  Corsi, and Troy Flick?
16       A.   Right.  And I'm not sure if Lhana was directly
17  under Frank, but Rick probably remembers all that better
18  than I do.
19       Q.   And how many -- did you report directly to Troy
20  Flick?
21       A.   Yes.
22       Q.   And how many other folks reported to Flick?
23       A.   There was Bill Tarlton, he was the network
24  administrator; Carey Stieb, network administrator;
25  myself, network administrator; and then there was --

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

Page 17

1    actually, I think Lhana worked for Troy, and then there
2    was some PC support people: Derek Conlon, two other guys
3    that were PC support, and then there was Paul Mitts and
4    Chrislynn Howerton were the -- basically the phone help
5    desk. They would answer the calls and create tickets and
6    that kind of thing.
7            And then my husband had web group, which was
8    Leilani Boyles and Joe Keene; the GS group:  Chris Kadel,
9    and Ryan, I can't remember his last name; and then the
10   BSA group, which was Lori Marak, Deb Bouricius, Terrie --
11   she was -- I can't remember her last name, Kelly
12   Leuallen, and David Barnett.  They were all business
13   systems analysts.
14           Basically, he had web, database, and GIS and
15   business systems analyst.  And Troy had network
16   administration and help desk.  And Frank was directly
17   above Rick and Troy.
18       Q.  So when Frank Whidden was the IT director, was
19   his office in your space?
20       A.  No.  He was in the third floor of the
21   courthouse, which is kind of a -- it's an older building,
22   so it's kind of in, like, the spiral staircase.  So there
23   wasn't a lot of direct contact with Frank.  He would come
24   down occasionally.
25       Q.  How often?

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

Page 19

1    administering the email.  So -- but normally he would

2    talk to the managers, not really talk to me, or he'd go

3    through the channels.

4         **Q.  Could you say how many times you and he had a**

5    **one-on-one conversation when he was the IT director about**

6    **IT work?**

7         A.  I can remember.  Maybe three times.

8         **Q.  In a year and a half?**

9         A.  However long he was there, yeah.  I can't really

10   recall exactly.

11        **Q.  Was he involved in your review process at all?**

12        A.  I hadn't been reviewed.  They weren't doing --

13   Troy wasn't doing reviews.

14        **Q.  Okay.  How do you mean?**

15        A.  He just didn't do them.

16        **Q.  Do you know when --**

17        A.  I hadn't been reviewed for a few years.  I think

18   that was in my original statement.

19        **Q.  Okay.  So at the time of your layoff, you hadn't**

20   **been reviewed for a few years?**

21        A.  Uh-huh.  Yes.  He hadn't -- Troy hadn't reviewed

22   anybody, and he didn't like doing it and I think he just

23   avoided it.  They were supposed to do them every year.

24        **Q.  Do you know when Troy became your supervisor?**

25        A.  Maybe five or six years before I got laid off.

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                      JANINE CORSI
Mesa County, et al.                                  April 22, 2019

Page 20

```
 1    I couldn't apply for the job because Rick and I were
 2    married and there was a policy against coworkers having
 3    the same supervisor that were married, so I couldn't
 4    apply for a job because Rick and I would have had the
 5    same supervisor.
 6         Q.  So you and Rick would have both had the same
 7    supervisor?  Is that what you're saying?
 8         A.  Yeah, I would have been IT manager instead of
 9    Troy, but I couldn't apply for it because of Rick being
10    IT manager.
11         Q.  So you both couldn't have the same title?
12         A.  We couldn't work for the same supervisor.  I had
13    another layer in between.  If I had moved up, I would
14    have been -- Rick and I would be both working for the
15    same supervisor.
16              When we first started, there was no policy
17    against working in the same department.  And they -- then
18    in another department they had some issues with some
19    married couples.  So -- but we were grandfathered in, and
20    we could work in the same department.
21         Q.  Okay.
22         A.  I know Frank was concerned about us being
23    married and working together.
24         Q.  Why you do say that?
25         A.  He brought it up to Rick a few times, and he
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

---

Page 28

```
 1        A.   Yeah, he moved up to the third floor with the
 2   commissioners.
 3        Q.   Okay.  And how often did you see him in your
 4   work area after that?
 5        A.   Very rarely.
 6        Q.   Was it more than once a week?
 7        A.   No.
 8        Q.   Was it --
 9        A.   You know, I'd say you could go three, four weeks
10   without seeing him.  I could anyway.
11        Q.   Did he ever ask you about your work?
12        A.   He usually would go to somebody else, but if I
13   was the only person that knew, he would ask me about the
14   email, what was going on.
15        Q.   Okay.  I mean, did he ever actually ask you
16   about what it is you do on a daily basis?
17        A.   No.
18        Q.   Did you ever receive any feedback from Troy
19   Flick that Frank Whidden was upset with your work
20   performance?
21             MS. SEVERN:  Object to form.
22        A.   No, not that I recall.
23        Q.   (BY MS. BISBEE) Did anyone ever tell you that
24   Frank Whidden was upset about your work performance?
25        A.   No.
```

---

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                      April 22, 2019

Page 29

1       Q.   Have you ever had a negative review at Mesa

2   County?

3       A.   No.

4       Q.   Did you observe Mr. Whidden spend any time with

5   other IT staff?

6       A.   He would come down and talk to Bill and Troy and

7   sometimes Carey and Ron.   I forgot about Ron.   So I'd say

8   direct contact was mostly with Troy and Rick.   He didn't

9   get involved that much, Frank didn't.

10      Q.   So I just want to clarify, so this is Bill

11  Tarlton --

12      A.   Ron Sage, Carey Stieb, and myself were the four

13  network administrators.

14      Q.   Do you know how old Bill Tarlton is?

15      A.   I think he might have just turned 40 a while --

16  before we were -- at or around the same time.

17      Q.   Okay.  What about Troy Flick?

18          MS. SEVERN:  Object to form.

19      A.   He was in his 40s.

20      Q.   (BY MS. BISBEE) Ron Sage?

21          MS. SEVERN:  Object to form.

22      A.   He might have been under 40.

23      Q.   (BY MS. BISBEE) Do you know how old Carey

24  Stieb was?

25          MS. SEVERN:  Object to form.

                                        **EXHIBIT 3**

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                      April 22, 2019

Page 31

```
 1        A.  In our little group meetings with Troy, Ron,
 2   Carey, Bill and I.
 3        Q.  How would your retirement come up?
 4        A.  Just joking mostly.
 5        Q.  And would you bring it up?
 6        A.  I don't recall exactly how it came up.
 7        Q.  Was anyone in particular engaging you about your
 8   retirement during these conversations?
 9        A.  No.  I just got the feeling that I was kind of
10   being put on the shelf as far as not being given new
11   projects, just maintaining the old system, that kind of
12   thing.
13        Q.  And who was responsible for assigning you work?
14        A.  Troy.
15        Q.  Was Mr. Whidden also involved?
16        A.  Not directly.  He would say things like, We need
17   to virtualize all the desktops, and Troy would try and
18   figure out how to do that.  And usually it would be him
19   and Ron getting together and planning things out.  I know
20   that Bill and Carey and I felt excluded a lot on the
21   decision-making.  Definitely there was some favoritism
22   going on with Troy, and Ron was definitely his favorite.
23        Q.  And Ron was -- was he the one that was 18 years
24   younger than you?
25        A.  Uh-huh.
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                              JANINE CORSI
Mesa County, et al.                                        April 22, 2019

Page 32

1        Q.  Is that a yes?

2        A.  Yes, sorry.

3        Q.  Okay.  So any other reason you felt like you

4    were being put on a shelf other than not getting new

5    projects?

6        A.  Um.  Well, I also felt the guys got together and

7    played cards during lunch a couple hours at a time, and I

8    just felt like I was left behind to do the work while

9    they were basically goofing off.

10       Q.  And these were the younger guys, right?

11       A.  Yeah.  Not that I wanted to play cards with

12   them.  And I know Bill and Carey felt like they had to do

13   it.  That's what they said.  They didn't really want to

14   play cards, but Troy and Ron forced them to do it, kind

15   of the peer pressure or something.

16       Q.  And was this playing cards, was this something

17   they did every day?

18       A.  Very frequently.  They would go to the old jail,

19   and it was an empty building kind of in the parking lot

20   between the courthouse and city hall.

21       Q.  And they did this during the workday?

22       A.  Yes.  It became an issue with me.  Of course, I

23   complained to my husband, and he brought it up with

24   Frank, but nothing ever was done about it.

25       Q.  How long did this go on?

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                               April 22, 2019

                                                     Page 33

 1        A.   Since Troy became supervisor, I guess, whenever

 2   that was.

 3        Q.   Did he -- did Troy Flick work at the County

 4   before he was your supervisor?

 5             MS. SEVERN:   Object to form.

 6        A.   Yes.

 7        Q.   (BY MS. BISBEE) What did he do then?

 8             MS. SEVERN:   Object to form.

 9        A.   He was my coworker, network administrator.  He

10   got promoted.

11        Q.   (BY MS. BISBEE) Do you know when he got

12   promoted?

13             MS. SEVERN:   Object to form.

14        A.   Not exactly.  I was part of the interviewing

15   team.  I -- actually, he was my choice.  I thought he

16   would be the best of the candidates they had.

17        Q.   (BY MS. BISBEE) And I'm sorry, we might have

18   gone over this.  Was he promoted before Frank Whidden

19   came to Mesa County?

20             MS. SEVERN:   Object to form.

21        A.   Yes.

22        Q.   (BY MS. BISBEE) Okay.

23        A.   I think so.

24        Q.   Let's see.  So have you in your job ever worked

25   with Deb Bouricius?

Debra Bouricius                                              JANINE CORSI
Mesa County, et al.                                        April 22, 2019

```
                                                              Page 56
   1        A.   Carey Stieb and I were both laid off.
   2        Q.   Okay.  So Bill and Ron, they were part of the
   3   card-playing group?
   4        A.   Yes.
   5        Q.   I think that we already established they were
   6   younger, correct?
   7        A.   Yes.
   8        Q.   And I think I saw something in your charge that
   9   these guys went with Troy Flick to buy tablets or
  10   something at Christmastime; is that correct?
  11             MS. SEVERN:  Object to form.
  12        A.   Yes.
  13        Q.   (BY MS. BISBEE) Did Troy Flick ever take you
  14   to get a tablet?
  15        A.   No.
  16        Q.   Did he ever ask you to play cards?
  17        A.   No.
  18        Q.   Did he ever take you to lunch?
  19        A.   Just if the vendors were buying --
  20        Q.   Okay.
  21        A.   -- we would go along sometimes, but we never
  22   went to lunch unless it was like a birthday lunch or
  23   something.
  24        Q.   So Mr. Flick was hanging around the younger
  25   guys; is that correct?
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

Page 57

 1      A.  Yes.
 2      Q.  Were -- were Mr. Whidden and Mr. Flick social?
 3          MS. SEVERN:  Object to form.
 4      A.  I would say they were friends outside of work
 5  that I know of.
 6      Q.  (BY MS. BISBEE) Okay.  But to the best of your
 7  knowledge, Frank Whidden knew that Mr. Flick was
 8  hanging around these younger guys, correct?
 9          MS. SEVERN:  Object to form.
10      A.  Yes, and he knew about the card playing.  Other
11  things that weren't getting done.
12      Q.  (BY MS. BISBEE) So when you put in your charge
13  that it was potentially sex discrimination, I know,
14  first of all, that you were making sure all your bases
15  were covered, correct?
16      A.  Yes.
17      Q.  But these guys were all younger as well, right?
18      A.  Yes.
19      Q.  So it could have as easily been age
20  discrimination, right?
21          MS. SEVERN:  Object to form.
22      A.  Yes, they just happened to be male.
23      Q.  (BY MS. BISBEE) Do you have any knowledge --
24  aside from the CCRD determining that you were
25  terminated based on your age, do you have any knowledge

                                                   **EXHIBIT 3**

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                      April 22, 2019

```
                                                      Page 58
 1   of why they made that decision aside from the
 2   percentage that you gave me?
 3         A.  I believe Troy had a lot to do with picking the
 4   people, but I don't know that for a fact.
 5         Q.  Do you know --
 6         A.  I just.
 7         Q.  -- who the CCRD talked to?
 8             MS. SEVERN:  Object to form.
 9         A.  As far as witnesses?
10         Q.  (BY MS. BISBEE) Yeah.
11         A.  I don't know.  I think Lori testified, Lori
12   Marak.
13         Q.  Okay.  Did anybody tell you that they had spoken
14   to the CCRD?
15         A.  Lori Marak did the one time I talked to her.
16         Q.  Okay.  Did the CCRD investigate or indicate to
17   you what any witnesses were testifying to?
18         A.  Um, no.  I think they were going to talk to some
19   people, but I don't know exactly who they talked to.
20         Q.  Okay.
21         A.  We put down some people that potentially could
22   be witnesses.  Actually, I do know they talked to Eric,
23   because I remember him saying something about the card
24   playing, it was just blowing off steam or something like
25   that.
```

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

Page 67

1         A.   No.

2         Q.   What about reviewing employees' performance?

3    Were you ever given that responsibility?

4         A.   Way back when I first started, we did peer

5    reviews, but that was like 2- -- when Don Dumont was --

6    when I was first there, back in the '90s.

7         Q.   Do you know when about that stopped?  Was it

8    still in the '90s?

9         A.   Yeah, people got mad at each other, and he

10   discontinued doing that fairly quickly after that.  I

11   didn't really have any input in anybody's review as I

12   recall.

13        Q.   Okay.  Now, you talked some that you thought

14   Troy was involved a little bit in the layoff.  Did I

15   understand that correctly?

16        A.   I don't have any evidence, except that Frank had

17   a meeting with Troy, like, shortly before and Lhana and

18   Rick weren't included.

19        Q.   How do you know about that meeting?

20        A.   Troy was concerned about it.  I think he was

21   wondering what it was about and why Rick and Lhana

22   weren't invited.  So he mentioned it to my husband.  So

23   it's from my husband.

24        Q.   Okay.  So it wasn't something that Troy talked

25   with you about?

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

                                              EXHIBIT 3

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

Page 68

```
 1       A.  No.

 2       Q.  Okay.  All right.

 3       A.  And then later, he said it was about Microsoft

 4   licensing.

 5       Q.  Who said it was about Microsoft?

 6       A.  Troy told Rick and Lhana that's what the meeting

 7   was about.

 8       Q.  And then your husband told you?

 9       A.  Yes.

10       Q.  Okay.

11       A.  And it just seemed odd because we got laid off a

12   day or two later.

13       Q.  Okay.

14       A.  It was unusual for Troy to have a meeting with

15   Frank by himself unless it was like a review or

16   something.

17       Q.  Did you ever hear what that meeting was about?

18           MS. BISBEE:  Object to form.

19       A.  Just that Troy said it was about Microsoft

20   licensing.

21       Q.  (BY MS. SEVERN) That was it?

22       A.  Yeah.

23       Q.  Okay.  Did you have any authority regarding who

24   should be laid off in 2016?

25       A.  No.
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                      JANINE CORSI
Mesa County, et al.                                  April 22, 2019

```
                                                    Page 72
 1        A.  -- on his letter of termination.  And we were,
 2   like, they don't even know his title.
 3        Q.  What was your role when you worked for Mesa
 4   County in hiring employees?
 5             MS. BISBEE:  Object to form.
 6        A.  Sometimes we'd be included in the interview
 7   process so we could give our input.
 8        Q.  (BY MS. SEVERN) How much did that happen where
 9   you were involved in that process?
10        A.  I'd say maybe four times in the course of my
11   career.
12        Q.  When was the last time?  Do you have a sense?
13        A.  I know I was included with hiring Troy when he
14   got promoted to supervise -- IT manager.  We had some
15   outside candidates, and then he was an internal
16   candidate.  And I also was involved with -- let's see.  I
17   remember sitting there.  I think it was when we hired
18   Bill Tarlton.
19        Q.  When was that?
20        A.  He had been there about five years, I think,
21   when we got laid off.
22        Q.  In those five years, do you recall being
23   involved in any other hiring?
24        A.  I'm trying to think.  No, the Troy one and Bill.
25   I don't think there was any others.
```

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

---

                                                   Page 83

 1    to increase their budget, and Frank was looking for money

 2    to be used for that.

 3         Q.  Do you know why the folks in particular were

 4    chosen as part of that layoff?

 5              MS. BISBEE:  Objection.

 6         A.  No, I could guess that Troy had something to do

 7    with it, and Frank made the final decision.

 8         Q.  (BY MS. SEVERN) Is that your speculation?

 9         A.  Yes, it's speculation.

10         Q.  And you also you mentioned that you believe

11    people are afraid to talk to you now.  Did I understand

12    that correctly?

13         A.  Not so much afraid as reluctance.

14         Q.  Who is reluctant to talk with you?

15         A.  Friends that I had in the past that still work

16    there.

17         Q.  Who would those be?

18         A.  Lori Marak.

19         Q.  Did Ms. Marak ever tell you that she was

20    reluctant to talk to you, or didn't want to talk to you

21    or something along those lines?

22         A.  She just said she was called as a witness, and

23    she felt it was the right thing to do to testify.

24         Q.  She was called --

25         A.  I remember her telling me.

---

**EXHIBIT 3**

Transcript of the Testimony of

**RICK CORSI**
**April 22, 2019**

**Debra Bouricius**
**v**
**Mesa County, et al.**

## Linda L. Frizzell, RPR

*Linda L. Frizzell, RPR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444



**EXHIBIT 3**

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                       April 22, 2019

---

                                                         Page 13

 1        Q.  (BY MS. BISBEE) How many individuals worked
 2   under you at that time?
 3        A.  Approximately 11, maybe 12.
 4        Q.  Okay.  Was that roughly the same as it had been
 5   since you became the IT manager in -- in the mid-2000s?
 6        A.  Yes.
 7        Q.  Okay.  Okay.  What was the structure of the IT
 8   department when you left?
 9        A.  Frank Whidden had many roles.  He was IT
10   manager, he was HR director -- or he was IT director, I
11   guess.  He was HR director, he was finance director, and
12   I believe he was finance direct- -- director at that
13   time -- no, I think he became finance director later, and
14   he was county administrator.  And then myself and Troy
15   Flick and Lhana Jordan were a different level.  Troy and
16   I were the same level of IT manager.  Lhana was in charge
17   of PC support and help desk.
18        Q.  Okay.  So she was not an IT manager?
19        A.  I -- I'm not sure.  I don't remember exactly
20   what her title was at the time.
21        Q.  Did you ever --
22        A.  She may have been.  I don't believe she had the
23   same title.
24        Q.  Okay.  Do you know -- had you ever seen an
25   organizational chart of the IT department?

---

         Hansen & Company, Inc. Registered Professional Reporters
                    (303) 691-0202 * (303) 691-2444
                                                    **EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

```
                                                        Page 14
  1      A.  Yes.
  2      Q.  Were you and Lhana and -- and Flick on the same
  3  level?
  4      A.  We all reported to Frank Whidden.
  5      Q.  Okay.  But do you know, was Lhana's position
  6  somehow lesser than you and Troy?
  7          MS. SEVERN:  Object to form.
  8      A.  She was -- her pay scale was at a lower level --
  9      Q.  (BY MS. BISBEE) Okay.
 10      A.  -- than mine.
 11      Q.  And her experience, do you know what her
 12  background was?
 13          MS. SEVERN:  Object to the form.
 14      A.  Her experience was she -- when we hired her, she
 15  was working for Department of Human Services.  She had
 16  some computer experience.  We hired her as a help desk
 17  technician, and then she later moved up into a desktop
 18  support position.  And then -- then was promoted into
 19  supervising the desktop and help --
 20      Q.  (BY MS. BISBEE) Okay.
 21      A.  -- desk.
 22      Q.  Did you have anything to do with her being
 23  promoted?
 24      A.  Yes.
 25      Q.  Okay.
```

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                    April 22, 2019

Page 15

```
 1        A.   I recommended that she --
 2        Q.   Had she at any time reported to you?
 3        A.   No.
 4        Q.   Do you know who she reported to?
 5        A.   Troy Flick.
 6        Q.   Okay.  So was the help desk under Troy Flick
 7   before Lhana became --
 8        A.   Yes.
 9        Q.   -- I guess what I'm trying to say -- in charge
10   of the help desk?
11        A.   Yes.
12        Q.   Okay.  So -- and you had GIS and business
13   systems analyst were you?
14        A.   And web.
15        Q.   And the web.  Okay.  So what are the -- what are
16   the different roles and responsibilities of the groups,
17   work groups that reported to you?
18        A.   GIS was in charge of web development and GIS
19   application development for the entire County.  We also
20   supported all -- all GIS work throughout the County.
21        Q.   Okay.
22        A.   So different --
23        Q.   Can you explain that to me like I'm in
24   kindergarten?  What exactly does GIS do for the County?
25        A.   GIS processes data, geographic data to be able
```

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                            April 22, 2019

Page 26

1        Q.  (BY MS. BISBEE) So did the BIS -- BIS -- BSAs,
2    interact with everyone in the -- in the IT department
3    in some way?
4        A.  Yes.
5        Q.  Okay.  And, I guess, when I say "interact," did
6    they have to work together regularly with other IT
7    positions?
8        A.  Yes.
9           MS. SEVERN:  Object to form.
10       Q.  (BY MS. BISBEE) Did everyone in the IT
11   department have an idea of what everyone else in the IT
12   department was doing for the most part?
13          MS. SEVERN:  Object to form.
14       A.  Yes.
15       Q.  (BY MS. BISBEE) Did you have regular meetings
16   with everyone present?
17       A.  Yes.
18       Q.  So when I say "everyone," it would be everyone
19   that reported to you and Troy Flick and Lhana Jordan?
20          MS. SEVERN:  Object to form.
21       A.  Yes, we had meetings.
22       Q.  (BY MS. BISBEE) Okay.  How often would you-all
23   meet as a group?
24       A.  I would say at least monthly, maybe -- maybe a
25   little more often than that.

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                        RICK CORSI
Mesa County, et al.                               April 22, 2019

Page 27

 1        Q.   What about you and Troy and Lhana?   Did you meet
 2   more often than monthly?
 3        A.   Yes.
 4        Q.   How often did you meet?
 5        A.   Probably weekly.
 6        Q.   Okay.  So you had a fairly good understanding of
 7   what their teams were doing, correct?
 8        A.   Yes.
 9             MS. SEVERN:  Object to form.
10        Q.   (BY MS. BISBEE) Now, if a BSA was assigned to
11   a project that needed a network administrator, did
12   those people then collaborate on a regular basis?
13             MS. SEVERN:  Object to form.
14        A.   Yes.
15        Q.   (BY MS. BISBEE) Okay.  Is it -- is that sort
16   of situation something that would happen often?
17        A.   Yes.
18        Q.   Okay.  So in addition to supervision, the -- the
19   three groups that were under you, what other
20   responsibilities, if any, did you -- did you have in your
21   role as IT manager?
22        A.   I managed many projects, you know, along with
23   the business system analysts.  There were some projects
24   that I actually managed on my own and did not have system
25   analysts assigned to it, or I worked right along with

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

```
                                                  Page 38
 1     his first name.

 2          Q.  (BY MS. BISBEE) Does the name John Sullivan

 3     ring a bell?

 4          A.  Yes.

 5          Q.  Who's he?

 6          A.  John was -- actually started the same day or

 7     same time I did as a temporary worker supporting desktop

 8     computers.  He then became a database analyst or database

 9     administrator and worked on several different systems.

10          Q.  Okay.  And did he report to you?

11          A.  No.

12          Q.  Okay.  He reported to Troy Flick, right?

13               MS. SEVERN:  Object to form.

14          A.  Yes.

15          Q.  (BY MS. BISBEE) And John Sullivan left the

16     County?  Isn't that true?

17          A.  Yes.

18               MS. SEVERN:  Object to form.

19          A.  Yes.

20          Q.  (BY MS. BISBEE) Do you know the circumstances

21     of why he left?

22          A.  Yes.

23          Q.  Can you please tell me about that?

24               MS. SEVERN:  Object to form.

25          A.  There was an incident at the County where there
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                       April 22, 2019

```
                                                             Page 39
 1    was a data breach, and that was directly related to

 2    something that John put on our FTP site.

 3         Q.  (BY MS. BISBEE) Okay.

 4         A.  And there was an investigation by the sheriff's

 5    office, by administration, by -- actually by Troy and I,

 6    and it was determined that that was the cause of the data

 7    breach.

 8         Q.  Okay.  And -- and Troy Flick had been his

 9    supervisor at that time?

10            MS. SEVERN:  Object to form.

11         A.  Yes.

12         Q.  (BY MS. BISBEE) Was anyone else in Troy

13    Flick's -- under Troy Flick's supervision involved in

14    this data breach?

15            MS. SEVERN:  Object to form.

16         A.  Not directly involved.  I mean, there was

17    another database analyst, but I -- I don't know whether

18    he -- I don't believe he had direct involvement in -- in

19    that data breach.

20         Q.  (BY MS. BISBEE) And who was that?

21         A.  Lonnie Sale.

22         Q.  You ended up receiving some discipline for that

23    data breach?

24         A.  I received a letter, yes.

25         Q.  Okay.  And why is it that you received
```

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

```
                                                      Page 40
 1   discipline?

 2        A.   The project that was being worked on was a

 3   project that our business system analysts were

 4   supporting.  So Troy and I both received a letter.  I

 5   don't remember what they called the letter, but it was a,

 6   you know, a letter saying, basically, you know, Don't

 7   do -- don't let this happen.  You know, it was not even

 8   really a letter of discipline, but just a letter stating

 9   that this had happened under our watch.

10        Q.   Okay.  And you didn't take a suspension or

11   anything, right?

12        A.   No.

13        Q.   You didn't lose any pay?

14        A.   No.

15        Q.   Get demoted?

16        A.   No.

17        Q.   And you wouldn't even call this discipline.  It

18   was just kind of a written-warning-type thing?

19        A.   The County was covering themselves.

20        Q.   Okay.  And Debbie Bouricius got a similar

21   letter; is that correct?

22             MS. SEVERN:  Object to form.

23        A.   Yes.

24        Q.   (BY MS. BISBEE) Was she the only BSA that had

25   been involved in the project?
```

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                    April 22, 2019

```
                                                      Page 43
 1        A.  Exactly.
 2        Q.  Had Debbie even done anything that caused this
 3    data breach?
 4            MS. SEVERN:  Object to form.
 5        A.  She was project manager.  She was assigned
 6    project manager on that -- on that system.
 7        Q.  (BY MS. BISBEE) Okay.
 8        A.  Um --
 9        Q.  But she didn't upload confidential informant
10    information onto the --
11        A.  No.
12        Q.  -- World Wide Web, correct?
13        A.  No.
14        Q.  And Mr. Sullivan hadn't reported to her that he
15    had done this; is this correct?
16        A.  No.  There was also, I believe, another person
17    who received a letter, and that would have been a web
18    analyst, but one who created the FTP site.
19        Q.  Okay.  Do you know who that was?
20        A.  Joe -- Joe --
21        Q.  Joe Keene?
22        A.  Joe Keene.
23        Q.  And he's still at the County, right?
24        A.  Yes.
25        Q.  Reporting to Troy Flick?
```

**EXHIBIT 3**

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                             April 22, 2019

```
                                              Page 44
 1           MS. SEVERN:  Object to form.
 2      A.  He actually reported to me.
 3      Q.  (BY MS. BISBEE) Okay.  Do you know who he
 4  reports to now?
 5           MS. SEVERN:  Object to form.
 6      A.  I believe he would report to Troy, but no one
 7  has really talked to me since they fired me.
 8      Q.  (BY MS. BISBEE) Okay.  And nobody told you
 9  that you were fired because of this data breach,
10  correct?
11      A.  No.
12      Q.  And Troy Flick got the same level of discipline
13  as you did, didn't he?
14           MS. SEVERN:  Object to form.
15      A.  Yes.
16      Q.  (BY MS. BISBEE) Okay.  Did Frank Whidden ever
17  make any comments to you regarding your age?
18      A.  I believe there were -- I could remember times
19  where there were comments made just about how old I was
20  and -- and about retirement and stuff like that.
21      Q.  Okay.
22      A.  I don't remember specifically, you know, or what
23  those comments were, but, I mean, they're -- we talked,
24  yes.
25      Q.  Frank?
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                        RICK CORSI
Mesa County, et al.                                April 22, 2019

Page 45

1           A.   Yeah.  Again, I can't remember specific

2    instances where that would have happened directly with

3    him, but I believe there were.

4           **Q.   You believe you had conversation with Frank**

5    **Whidden?**

6           A.   Yes, I don't remember at the time.

7           **Q.   Okay.**

8           A.   I don't remember right now.

9           **Q.   Okay.  What about anyone else?  Do you remember**

10   **any specific conversations about your age with anyone**

11   **else at Mesa County?**

12          A.   I did with -- Troy Flick had made comments.

13          **Q.   What can you tell me about that?**

14          A.   He asked on several occasions when we were going

15   to retire, and that we had enough money to retire

16   whenever we wanted.  And basically we were old enough to

17   retire.

18          **Q.   Do you recall how many times he made these type**

19   **of comments?**

20          A.   Several times.  More toward the end.

21          **Q.   O**kay.  **So in the last year that you were there,**

22   **can you --**

23          A.   Several times.

24          **Q.   Several times in that last year?**

25          A.   Yeah.

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

Page 46

```
 1        Q.  Maybe once a month --
 2        A.  I wouldn't say on a regular basis once a month,
 3   but it could have happened, you know, every 30 days,
 4   every now and then.  I mean, I'm not going to say it was
 5   every -- for 12 months every 30 days he said something,
 6   but there was more that one time he said something --
 7        Q.  Okay.
 8        A.  -- over the 12 months.
 9        Q.  Was there anything that would precipitate these
10   comments?  I mean, were you at staffing meetings or
11   something that would tend to make it come up?
12        A.  Not really, no.  I mean, it was at -- yeah, it
13   would have been -- it could have been at meetings or
14   what -- you know, when Lhana and Troy and I met.  I
15   remember once or twice at those meetings him asking me
16   about retirement.
17        Q.  Okay.  So you do remember Lhana Jordan being
18   present at least --
19        A.  Yeah.
20        Q.  -- at least once when these comments --
21        A.  At least once.
22        Q.  And would that be at least once in the year
23   prior to your separation?
24        A.  Yes.
25        Q.  Did you -- you hadn't had any plans to retire,
```

**EXHIBIT 3**

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                              April 22, 2019

Page 58

1    any bad information in a desk file or otherwise about

2    Debbie Bouricius' performance?

3        A.  I did not have anything.

4        Q.  Okay.  And you never documented that she had

5    problems getting along with her coworkers?

6        A.  No.

7        Q.  Do you recall ever receiving any documents

8    complaining about Debbie Bouricius?

9        A.  No.

10       Q.  Do you recall ever having to talk to her about

11   any performance issues?

12       A.  No.

13       Q.  Do you recall ever communicating to Frank

14   Whidden that she was somehow deficient as a business

15   systems analyst?

16       A.  No.

17       Q.  Did he ever ask you?

18       A.  No.

19       Q.  As part of your job in your management role,

20   what, if any, type of input did you have every year at

21   budget time?

22           MS. SEVERN:  Object to form.

23       A.  I worked on -- on the budget, and Troy and Lhana

24   and I all worked on what our -- what the budget plan was

25   along with another lady, Janie, which was, I think,

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

                                                          Page 59
1    Frank's admin assistant or something.  We never really

2    figured out what she did, but she was usually involved in

3    wanting spreadsheets and documents.  Frank also met with

4    us, but we planned out the budget.

5              I -- you know, Troy worked on the -- the network

6    side of it, hardware and -- and network infrastructure.

7    I worked on the -- what we were going to be needing to --

8    to spend on applications and GIS, support, maintenance

9    support, and things like that.  Lhana worked on the PC

10   side of it, replacement.  And we all worked together on

11   it.

12       Q.  (BY MS. BISBEE) What about staffing, was that

13   part of your analysis?

14       A.  We knew -- I mean, we knew what the budget was

15   and how much went to staffing.

16       Q.  And then you had to work within what was left

17   over kind of?

18       A.  Yeah, there's -- there's a couple of different

19   pools of money, and so it's separated a little bit that

20   way but because of taxing and whatnot.

21       Q.  Is that -- so this budgetary process, is this

22   something you did every year?

23       A.  Yes.

24       Q.  Once you became manager at least?

25       A.  Yes, I -- from the time I became GIS coordinator

                Hansen & Company, Inc. Registered Professional Reporters
                        (303) 691-0202 * (303) 691-2444
                                                        **EXHIBIT 3**

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                            April 22, 2019

Page 68

 1    documents?

 2         A.   If I'm subpoenaed for them, yes.

 3         Q.   Okay.  Fair enough.

 4              Did you ever have any conversations with anyone

 5    about the age spreadsheet?

 6         A.   I believe I had heard about it from Stephanie

 7    Conley, and I think Troy would have been there.  I

 8    believe that's how it -- how I became aware of it, but

 9    I -- I don't recall a specific conversation about it, but

10    I -- I recall that's -- that was the process.

11         Q.   You believe a scenario or a situation happened

12    where you, Stephanie and Conley -- Stephanie Conley and

13    Troy Flick were together discussing the age spreadsheet?

14         A.   Not the -- the existence of it.

15         Q.   Do you, to the best of your recollection, think

16    that this was around the time that it was being created?

17         A.   No, I believe it was later.

18         Q.   Do you recall if it was before or after it

19    became the subject of complaints of age discrimination?

20         A.   I believe it was after it became a subject by

21    Cindy Enos-Martinez.

22         Q.   Do you have any personal knowledge of various

23    individuals like Cindy Enos-Martinez' claims of

24    discrimination?

25              MS. SEVERN:  Object to form.

**EXHIBIT 3**

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                             April 22, 2019

Page 71

1    situated to absorb Debbie's -- the void that Debbie

2    left?

3              MS. SEVERN:  Object to form.

4         A.  No.

5         Q.  (BY MS. BISBEE) So is it fair to say that at

6    the time of your layoff, you would have been in the

7    best position to evaluate the folks that reported to

8    you?

9              MS. SEVERN:  Object to form.

10        A.  Yes, and, in fact, I -- I was the only one who

11   ever -- well, there were only two of us that supervised

12   people that did any form of evaluation.

13        Q.  (BY MS. BISBEE) What do you mean by that?

14        A.  Troy Flick, to the best of my recollection, did

15   not do a performance evaluation on any of his people for

16   20, 24 months.  And the reason I know that is because he

17   was proud of it, that he got away without doing

18   performance evaluations on his people.

19        Q.  So he just didn't want to do the work?

20        A.  Yes.

21        Q.  Okay.

22        A.  He was busy playing games.

23        Q.  And Troy Flick is younger than you are, right?

24        A.  Yes, I believe he is.  I haven't seen his birth

25   certificate, but...

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

---

                                                     Page 72

 1        Q.  Would you have been in a position, having been

 2   at the County for so long, to have taken over Troy

 3   Flick's responsibility?

 4             MS. SEVERN:  Object to form.

 5        A.  I believe I would have, yes.

 6        Q.  (BY MS. BISBEE) You had substantial

 7   institutional knowledge, right?

 8             MS. SEVERN:  Object to form.

 9        A.  I had knowledge of all areas of IT, yes.

10        Q.  (BY MS. BISBEE) And at the time you were

11   hired, the IT department was in its infancy, fair to

12   say?

13             MS. SEVERN:  Object to form.

14        A.  It was in its toddler stage.

15        Q.  (BY MS. BISBEE) And you had seen it expand?

16        A.  Yes, definitely.

17        Q.  And you had been a part of the decision-making

18   process to add employees?

19        A.  Yes.

20        Q.  And you had been part of a team that identified

21   what areas of growth needed to happen, right?

22        A.  Yes.

23        Q.  So you're pretty familiar with all aspects of

24   the IT department, correct?

25             MS. SEVERN:  Object to form.

---

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

Page 78

1    your final paycheck, or was that something that you

2    didn't get until your later settlement?

3        A.  I received my vacation time at my final

4    paycheck.

5        Q.  Okay.  And you don't recall seeing a line item

6    that says vacation payout or -- or you do?

7        A.  I don't re- -- I believe there was -- I think it

8    might have been broken down, vacation, and I also

9    received some sick leave pay.  You get, I don't know, a

10   third or a certain number of hours or whatever, and I had

11   the maximum number of hours at the time of sick leave.

12   So, you know, I received payout for that.

13       Q.  So you weren't an earner and burner?

14       A.  No.  Still aren't.  Never have been.

15       Q.  There was some complaints in Troy Flick's

16   department, right, about misuse of sick time?

17           MS. SEVERN:  Object to form.

18       A.  Yes.

19       Q.  (BY MS. BISBEE) What can you tell me about

20   that?

21           MS. SEVERN:  Object to form.

22       A.  Sick time was used for other purposes other than

23   being sick by several of his employees.

24       Q.  (BY MS. BISBEE) Can you give me any examples?

25       A.  Ron Sage was somebody who kind of used sick time

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                      April 22, 2019

```
                                                         Page 79
 1    for when he was traveling on one or more occasions.
 2         Q.  Okay.  Was this known to Frank Whidden to
 3    your -- the best of your knowledge?
 4              MS. SEVERN:  Object to form.
 5         A.  It was known to Frank Whidden, and it was also
 6    known to HR which he was the director of because I went
 7    to HR and asked about what was going on and why this
 8    was -- you know, standard policies were not being
 9    followed.
10         Q.  (BY MS. BISBEE) And what did you say
11    specifically to Frank Whidden?
12         A.  I had several issues with Troy and the people
13    who worked for Troy about abusing sick time, about
14    gambling during work hours, during lunch, which lunch
15    sometimes for them went from 11:00 to 2:00.  And, you
16    know, playing cards on premises.
17         Q.  And what did Frank say to you?
18         A.  He'd deal with it.  And he also said, Well,
19    maybe you need to take some more comp time off for the
20    extra hours that I put in.
21         Q.  Now, did you have knowledge that these
22    extracurricular activities were going on aside from what
23    Janine would tell you?
24              MS. SEVERN:  Object to form.
25         A.  Yes, I mean, it was -- it was obvious.  I would
```

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                    April 22, 2019

                                                          Page 80

1    sometimes -- I would have other people, my staff needed

2    something done by the network group, and they couldn't

3    get ahold of, you know, Ron or Troy, or -- or Bill

4    Tarlton, and they would ask me to look into it.  I would

5    go down to the conference room or find them hiding out in

6    the -- what we'd call the old jail and playing cards.  I

7    received questions from people in the assessor's office

8    about IT people playing cards in the old jail.

9              It was common knowledge that -- and it -- and it

10   affected work, and I -- I discussed it with Frank, and he

11   said he would take care of it.

12        Q.  (BY MS. BISBEE) When do you think you

13   discussed it with him?

14        A.  It would have been in my last six months there,

15   probably was --

16        Q.  Did you talk to him more than once about it?

17        A.  I don't recall whether it was more than once,

18   but I -- I did talk to him.  It may have been more than

19   once, but --

20        Q.  So what is your workspace like in IT?  Is it --

21   are people in cubes?

22        A.  Cubes and offices.  There were -- at the

23   basement, where we were, was broken into two sections or

24   three sections, probably, I guess you could say, with

25   mainly my group, we were on one end, and then there was a

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                           April 22, 2019

Page 81

 1   hallway, and then the network group was in the middle

 2   kind of, and then there was the help desk at the far end,

 3   and then we had another subbasement.  We called it "the

 4   pit" because it was down in a pit, and my GIS group and

 5   my web group were down there.

 6        Q.   Okay.  So if somebody was not at work one day,

 7   was it fairly easy --

 8        A.   Oh, yeah.

 9        Q.   -- for coworkers to assess that?

10             MS. SEVERN:  Object to form.

11        A.   Yes.

12        Q.   (BY MS. BISBEE) So when the Troy Flick group

13   is out playing cards for several hours during the

14   middle of the day, was that something that your

15   employees also noticed?

16             MS. BISBEE:  Object to form.

17        A.   Yes.

18        Q.   (BY MS. BISBEE) Did that cause a morale

19   problem?

20        A.   Definitely.  It was an infection.  It just kept

21   spreading.

22        Q.   Was anyone in HR concerned about -- about this?

23             MS. SEVERN:  Object to form.

24        A.   I spoke to Krista Ubersox about it.

25        Q.   (BY MS. BISBEE) Okay.

**EXHIBIT 3**

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                        April 22, 2019

```
                                                             Page 96
    1        Q.  Okay.

    2        A.  And I was the highest-paid one in the

    3   department.

    4        Q.  And also the oldest, right?

    5        A.  I wasn't the oldest.

    6        Q.  No?

    7        A.  My wife is older than me.

    8        Q.  Okay.  But you're older than Troy Flick?

    9        A.  Yes.

   10        Q.  And you are older than Lhana Jordan?

   11        A.  Yes.

   12        Q.  So these are all the reasons that you think your

   13   layoff, your termination was based on age discrimination,

   14   correct?

   15        A.  Yes.

   16        Q.  Any other reason that you think it was based on

   17   age discrimination?

   18        A.  Just some of the comments that have been -- that

   19   I had heard, you know.  You don't know there is a pattern

   20   until the pattern has been created.  And there has been a

   21   pattern of age discrimination at the County over many

   22   years.  You could just see.  It's common sense.

   23        Q.  Okay.  So the comments you are talking about

   24   then is that what we talked about earlier --

   25        A.  Yes.
```

**EXHIBIT 3**

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                            April 22, 2019

Page 97

 1       Q.   -- about Troy Flick and retirement?

 2       A.   Yes.

 3       Q.   Any other comments?

 4       A.   Not -- not that I recall.

 5       Q.   Now, when you -- when you filed with the CCRD,

 6   again, I just want to be clear, you wanted them to -- you

 7   wanted a full investigation; is that right?

 8       A.   Yes.

 9       Q.   Was -- was it your primary belief that you had

10   been laid off because of your age?

11       A.   I believe that was very likely.  I believe that

12   it was based on -- on -- I was the highest-paid one

13   there, which goes right along with my number of years of

14   service, then age.

15       Q.   And years of service is actually supposed to

16   benefit you in the layoff policy; isn't that correct?

17            MS. BISBEE:  Object to form.

18       A.   That is one of the -- I believe, that's one of

19   the criteria.

20       Q.   (BY MS. BISBEE) Meaning, if all things else

21   are equal, if you've been there the longest, you get a

22   step up; is that right?

23       A.   I believe that's one of them.

24       Q.   Did anyone ever tell you how staff was selected

25   for layoff?

**EXHIBIT 3**

Debra Bouricius                                        RICK CORSI
Mesa County, et al.                               April 22, 2019

Page 106

1    she's also younger than you, right?

2         A.  Yes.

3         Q.  And Troy Flick is younger than you, right?

4         A.  Yes.

5         Q.  Did the CCRD investigator ever discuss with you

6    his or her investigation?

7         A.  Um.  We did talk to him I think.  I believe they

8    called us shortly after we filed it, and then I can't

9    recall later what -- during the actual investigation

10   whether there was communication, but --

11        Q.  Do you recall ever learning what any -- what, if

12   anything, any witnesses told the CCRD?

13        A.  No.

14        Q.  Do you recall learning from the CCRD what the

15   county's position was as to your layoff?

16        A.  They filed -- or they submitted a -- I guess, a

17   rebuttal to my position, and they started bringing up

18   other issues that they just -- out of the blue, things

19   that they wanted to try to claim that were now the reason

20   that we were terminated.

21        Q.  What do you mean?

22        A.  Well, they claim that I had access to systems

23   that I shouldn't have had access to, and Janine gave me

24   access to those systems.  And -- and Troy had direct --

25   not Troy, and Lhana had access to those systems.  Several

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

```
                                                    Page 107
 1    county attorneys, including Nina, knew that I had been
 2    working on coming up with a better public -- or public --
 3    or records requests or a request system, and the testing
 4    that I was doing and some of the county attorneys, some
 5    have been gone now, were having issues with accessing
 6    documents and that for CORA requests, and I had the same
 7    level of access as they did.  Network administrators have
 8    more access, so some of the testing wouldn't have worked
 9    as well by them doing it.  Troy had more access since he
10    was a network person.
11            So I had access, Lhana had access to -- to
12    things that they claimed I shouldn't have had access to;
13    as a supervisor, as the person working on many CORA
14    requests for the county attorney's office, I had to have
15    access to them.  And they claim that -- that I should
16    have been terminated -- Janine and I should have been
17    terminated for that.
18        Q.  Okay.  So was this -- I think I'm understanding
19    what you're saying is the County took the position, after
20    the fact, to try and make the case that Janine had
21    somehow given you access you weren't supposed to have?
22        A.  Right.
23            MS. SEVERN:  Object to form.
24        A.  Yes.
25        Q.  (BY MS. BISBEE) Okay.  And had -- did you --
```

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

```
                                                      Page 108
 1    is part of what you just told us, were you saying that
 2    Lhana and Troy knew you had this access?
 3        A.   Yes, yes.
 4        Q.   Okay.  Did Frank know you had this access?
 5        A.   I believe he did, or he said -- what their
 6    statement said was that the -- he would have had to have
 7    been the one to give me access.  He had never given
 8    anybody access or taken that role on before.  And as IT
 9    manager -- as an IT manager, I then -- the project that I
10    was working on, that the county attorneys were involved
11    in and knew, and they would come to me for CORA assess --
12    for CORA requests, they -- it was well known by many that
13    I had access to email -- most of it was emails --
14        Q.   Okay.
15        A.   -- is what it was.
16        Q.   And this was something you needed to do your
17    job?
18        A.   To do the best testing, yes.
19             MS. SEVERN:  Object to form.
20        Q.   (BY MS. BISBEE) Did you have this email access
21    prior to Frank Whidden becoming -- or, you know, even
22    joining the County?
23        A.   I don't remember when it -- I received the
24    access.
25        Q.   Okay.  Were you ever given a directive not to
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                    April 22, 2019

```
                                                        Page 109
  1    have access?

  2         A.  No, no.

  3         Q.  Was Janine ever told you not --

  4         A.  No, no.

  5         Q.  -- told --

  6         A.  And -- and because Janine was my wife, anything

  7    that I worked with her on, Troy received an email.  He

  8    was cc'd on every email.  If I was asked to deliver a

  9    CORA -- about a CORA request, and the first thing I would

 10    do would be to go to Troy and say, Who you do want to

 11    work on this?  He would normally say, Janine should do

 12    the CORA request, because she has been doing them.  On

 13    every email that went to the county attorney that Janine

 14    and I were both on, Troy and the county attorney's office

 15    were always included on.  So they knew exactly -- the

 16    exact access that we had.  That I had.

 17         Q.  And at some point, did you ask for this access?

 18         A.  We were testing -- I mean, it was testing.  We

 19    were testing a system.  We were testing workflow, how we

 20    could give the county attorneys easier access to the

 21    information that they were requesting.  Where -- and we

 22    actually developed the system that they could go in then,

 23    and many of my requests were produced through this

 24    system, through this workflow, where they could actually

 25    go in and do the request themselves.
```

                                                     **EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                    April 22, 2019

```
                                                        Page 110
   1        Q.  So did you engage in some sort of clandestine
   2   operation with Janine to get access to this?
   3            MS. SEVERN:  Object to form.
   4        A.  No.
   5        Q.  (BY MS. BISBEE) Do you know how old in 2016
   6   Leilani Boyles was?
   7        A.  I don't.
   8        Q.  What about Derek C.?  I don't have the --
   9   Derek -- Derek Conlon?
  10        A.  I don't, no.
  11        Q.  Were you 59?
  12        A.  I believe I was, yes.
  13        Q.  And Janine 60?
  14        A.  Yes.
  15        Q.  Do you know how old John Dallman was?
  16        A.  No.
  17        Q.  What about Troy Flick?
  18        A.  I don't -- I don't know.  I could guess at their
  19   ages, but I don't know how old they were.
  20        Q.  Is he younger than you were?
  21        A.  Yes.
  22        Q.  What about Terrie Hotary?
  23        A.  Younger than me.
  24        Q.  Lhana Jordan?
  25            MS. SEVERN:  Object.
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                           RICK CORSI
Mesa County, et al.                                    April 22, 2019

                                                          Page 118

1        A.   There was discussion about it.

2        Q.   Okay.  What was the discussion?

3        A.   Frank -- Victoria worked in the administration

4    office as a -- I believe a supervisor role up there.

5    Frank did not get along with her.  Frank wanted to move

6    her out of that administration department.  So he placed

7    her in IT under Troy Flick to become a project manager

8    for -- even though there's no experience, she had to go

9    take basic project management training, but he placed her

10   under Troy because he felt like Troy did not have the

11   proper project management skills to get -- to have

12   successful completion of projects in his infrastructure

13   group.

14       Q.   Did Mr. Whidden use those words?

15       A.   I don't -- I'm -- I'm paraphrasing.  I don't

16   know exactly what words, I just know what happened.  And

17   then basically he put Victoria in a position that she

18   would fail at, and she was then -- her position was

19   eliminated.

20       Q.   Okay.  What conversations did you have with the

21   Mesa County commissioners regarding the layoffs that

22   happened in October of 2016?

23            MS. BISBEE:  Objection.  Form.

24       A.   I have never talked to them -- spoken to a

25   county commissioner.

                                                      **EXHIBIT 3**

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                            April 22, 2019

                                                    Page 124

```
 1        Q.  Okay.  All right.  All right.  So we talked some
 2   this afternoon, you described Lhana Jordan coming in and
 3   she had worked at one time for DHS is my understanding?
 4        A.  Yes, as a caseworker.
 5        Q.  As a caseworker.  Okay.  And then she came over
 6   to the IT department; is that right?
 7        A.  Yes.
 8        Q.  Okay.  Were you involved in hiring Ms. Jordan at
 9   all?
10        A.  Yes.
11        Q.  You were.  Okay.  What was your involvement?
12        A.  I was on the interview panel.
13        Q.  Who else was on the panel?
14        A.  I believe Troy Flick.  We usually brought in one
15   or two other people, desktop people.  I'm not sure who --
16   I interviewed dozens.
17        Q.  I'm sorry.  Go ahead.  Dozens?
18        A.  Yes.
19        Q.  Was Ms. Jordan hired before Mr. Whidden --
20            MS. SEVERN:  Are we okay here?
21            MS. BISBEE:  Yeah.
22            MS. SEVERN:  I had that happen in a deposition,
23   a crash right outside the window.  It was terrible.
24            THE DEPONENT:  Another deposition.
25            MS. SEVERN:  All right.  So totally derailed my
```

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

```
                                                  Page 125
 1    train.
 2         Q.  (BY MS. SEVERN) Here we go.  You talked about
 3    the panel hiring -- oh, was Ms. Jordan hired before or
 4    after Mr. Whidden came on board?
 5         A.  Before.
 6         Q.  Before.  So he was not involved?
 7         A.  No, not in the initial hiring.
 8         Q.  All right.  Who made the final decision, then,
 9    to hire Ms. Jordan?
10         A.  I believe she went to work for Troy Flick, so it
11    would have probably been Troy.  I'm not sure if she was
12    hired but -- when Tim was there or when Stephanie was
13    there, but one of them would have also had to have made
14    the --
15         Q.  Okay.
16         A.  -- final determination.
17         Q.  Those two, Troy and one of those?
18         A.  Yeah --
19         Q.  Okay.
20         A.  -- whoever was our boss at the time.
21         Q.  And you also talked some this afternoon about a
22    consultant who talked about an additional position, maybe
23    more positions that were needed.  Do you recall that?
24         A.  Yes.  There was a study several years before.
25         Q.  Okay.
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

                                                  **EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

                                                          Page 126

 1        A.   That was -- that the County brought in a
 2   consultant.  Troy and I worked with them, provided them
 3   with hundreds or thousands of documents about what
 4   projects we had, what people did.  They interviewed
 5   everyone in IT.  They interviewed customers.  And they
 6   came back and made a recommendation to hire probably
 7   50 -- I can't remember the exact number, but it was about
 8   50 percent more people than we had on staff.
 9        Q.   Did you provide the consultant any information
10   about Mesa County's budget issues during that process?
11        A.   I don't believe at that time there were large
12   budget -- budget issues.
13        Q.   What time did this happen?
14        A.   I don't remember the -- it was probably six to
15   eight months prior to the hiring of Frank Whidden.
16        Q.   Okay.  And when was that?  Do you have a sense
17   of when that was?
18        A.   Well, now that would be, I don't know -- what?
19   Seven years, I -- something like that.
20        Q.   Would you agree that it would be tough to hire
21   50 percent more employees if there's a shortfall in tax
22   revenue?
23             MS. BISBEE:  Object to form.
24        A.   If you hire people in the right place, such as
25   an information technology department, you'll actually

              Hansen & Company, Inc. Registered Professional Reporters
                      (303) 691-0202 * (303) 691-2444

                                                     **EXHIBIT 3**

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                       April 22, 2019

                                                              Page 129

     1      A.  Yeah.

     2      Q.  Okay.

     3      A.  I think, in fact, Nina provided one training.  I

     4   remember going to DHS, and I believe she provided a

     5   training at -- there.

     6      Q.  Okay.  All right.  And we talked some about a

     7   data breach relating to an FTP site.  Do you remember

     8   that conversation?

     9      A.  Yes.

    10      Q.  We talked about an employee, perhaps a former

    11   employee, named Joe Keene.  Do you remember that name?

    12      A.  He is not a former employee, but I remember Joe

    13   Keene.

    14      Q.  Is he a current employee?

    15      A.  Yes, as far as I know.

    16      Q.  Yeah, okay.  Okay.  And Mr. Keene, did he report

    17   to you or did he report to Troy or --

    18      A.  He reported to me at the time.

    19      Q.  To you.  Okay.  All right.  And we talked about

    20   a letter that Ms. Bouricius received regarding that data

    21   breach.  Do you remember that?  We talked about a

    22   letter --

    23      A.  Yes.

    24      Q.  Okay.  All right.  And I believe that you had

    25   testified that your opinion was that Mesa County provided

                                                        **EXHIBIT 3**

Debra Bouricius                                        RICK CORSI
Mesa County, et al.                                 April 22, 2019

Page 133

 1        A.  I remember being in meetings where age was

 2   talked about, retirement was talked about with me.

 3        Q.  (BY MS. SEVERN) Okay.  Well, how was age

 4   talked about with you?

 5        A.  Retirement.  From the retirement side.

 6        Q.  Okay.  How was retirement talked about with you?

 7        A.  I was asked several times when I planned on

 8   retiring.  I don't whether that was specifically by

 9   Mr. Whidden.

10        Q.  What was it that you were asked about

11   retirement?

12        A.  By anyone?

13        Q.  By any -- yes.  Thank you.

14        A.  When we planned on retiring.

15        Q.  Was that all?

16        A.  Well, in -- yeah, and comments were made, Well,

17   we have enough money to do everything that we wanted, so

18   we could retire anytime.

19        Q.  And I believe you testified that it was Troy who

20   made that comment about you having enough money; is that

21   right?

22        A.  Yes.

23        Q.  Okay.  How did Troy know how much money you had?

24        A.  I don't know.  I mean, I -- over years, people

25   talk about things in network.  I don't think he knew

**EXHIBIT 3**

Debra Bouricius                                            RICK CORSI
Mesa County, et al.                                    April 22, 2019

Page 140

```
 1        Q.  (BY MS. SEVERN) Okay.

 2        A.  And through, you know, the -- the training plans

 3   and through the opportunities that we provided, yes, we

 4   expected people to meet the goals and they had for the --

 5   the goals.

 6        Q.  Okay.  When you say training plans, is that

 7   related to the cross training that's mentioned?

 8        A.  Cross training, and also we contracted with a

 9   couple different companies to provide IT training and

10   other types of training --

11        Q.  Okay.

12        A.  -- project management, different types of

13   training.

14        Q.  Okay.  All right.  Let's see.  We talked some

15   about how you, Troy, and Lhana put together a budget

16   plan.  Do you remember that conversation?

17        A.  Yes.

18        Q.  Okay.  Were you involved in working on budgets

19   with any other department other than IT?

20        A.  IT covers a lot of departments.  One was -- and

21   we did work with other departments on -- on their budgets

22   and where money was going to come from.  We were working

23   at the time with the sheriff's office on a camera project

24   where they had some funding; we were working on a

25   commissary project at the sheriff's office where, through
```

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                 April 22, 2019

```
                                                    Page 143
 1    that?

 2         A.  Yes.

 3         Q.  Okay.  Have you ever worked in Troy's position

 4    or had you ever, I should say, when you were at Mesa

 5    County?

 6         A.  As an IT manager?  Yes.

 7         Q.  Did you work with the same areas or in the same

 8    areas that Troy worked in or oversaw?

 9             MS. BISBEE:  Object to form.

10         A.  Troy was technically on the server side and

11    network side more experienced than myself.  His job, he

12    had people that managed those systems.  His position was

13    to manage those people and understand the systems.  I

14    believe I had a good enough understanding.  You don't

15    have to be a certain skill set to manage -- you don't

16    have to be a -- an engineer to manage engineers, you have

17    to be able to manage people.

18         Q.  (BY MS. SEVERN) Okay.  So am I understanding

19    correctly that, in your opinion, it -- it didn't matter

20    or it wouldn't matter that Troy had more experience in

21    that area than you?

22         A.  Oh, it would -- it would matter, but I believe I

23    had enough experience in those areas that I could have

24    managed those systems.

25         Q.  Okay.  Had you ever done so?
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

                                                          Page 144

1          A.  We over- -- our management team overlapped when

2     people were out or on vacation.  So I had occasion to --

3     to work with those -- those people and --

4          **Q.  Okay.**

5          A.  -- I didn't manage those people, but I worked

6     with the -- the people on those systems to make sure that

7     they knew or if something failed we needed to know, and

8     they needed to work on it.

9          **Q.  Okay.  Would the same have been true for Troy?**

10    **If you were out and something needed to be done, maybe he**

11    **was the one that handled that situation?**

12         **A.  Very seldom.**

13         **Q.  How did you know that if you were out?**

14         **A.  I -- the people who worked for me, never relied**

15    **on Troy to direct them or to come to him for direction.**

16         **Q.  When you were in the office you mean?**

17         A.  When I was in the office and even when I was

18    out.  I haven't actually been out for many, many years.

19    I -- even when I'm on vacation, I get emails, I get

20    questions sent to me.

21         **Q.  Okay.**

22         A.  And I deal with them whether I'm on vacation or

23    not.

24         **Q.  Do you know if Troy ever did anything in your**

25    **area while you were out?**

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

                                                   **EXHIBIT 3**

Debra Bouricius                                      RICK CORSI
Mesa County, et al.                              April 22, 2019

Page 157

1        Q.  Okay.  What do you think of Frank Whidden?

2        A.  I thought he was someone that was very reactive.

3    He liked to please his superiors very much so.  He would

4    make decisions based on emotion rather than fact.

5        Q.  Do you have an example?

6        A.  Edward Morgan was laid off sometime during 2016,

7    I believe, and shortly after that, I was in a meeting

8    with Frank and Troy and Lhana, and Frank said I had to

9    get rid of Edward because he was -- he didn't get along

10   with him.  And that's why he was terminated.

11       Q.  Was that position ever filled?  Mr. Morgan's

12   position?

13       A.  Um.  I believe there were promotions.  I don't

14   know if that specific position was filled, but there were

15   promotions within that department.  That took over some

16   of the duties.

17            MS. BISBEE:  Alicia, I'm sorry.

18            MS. SEVERN:  Yeah.

19            MS. BISBEE:  I -- before Lori leaves, I was

20   hoping she could put together that subpoena.  So I just

21   wanted to call her --

22            MS. SEVERN:  Sure.

23            MS. BISBEE:  -- call upstairs.  I don't know how

24   much longer you had.

25            MS. SEVERN:  I just had one more question.

**EXHIBIT 3**

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                           April 22, 2019

                                                   Page 159

1    **Whidden telling you and Lhana and Troy about a potential**

2    **budget shortfall?**

3        A.   There was -- I mean, yes, there had been talk

4    about budget --

5        Q.   Okay.  But at -- but at no time he said, You

6    need to look at cutting staff?

7        A.   Not that I recall.

8        Q.   Okay.  And you filed CORA requests with the

9    County regarding the budget, correct?

10       A.   Yes.

11       Q.   And I believe you said that you received

12   newspaper articles in response from the County?

13       A.   Yes.

14       Q.   So they didn't provide you actual budget

15   documents?  They gave you third-party information?

16            MS. SEVERN:  Object to form.

17       A.   They gave me third-party information, yes.

18       Q.   (BY MS. BISBEE) Were these the articles -- the

19   same articles they attached to their response to your

20   charge of discrimination?  Do you recall?

21            MS. SEVERN:  Object to form.

22       A.   Yes.  I believe so, yes.

23       Q.   (BY MS. BISBEE) And do you remember the date?

24       A.   That may be when I saw those.

25       Q.   Do you remember the date of when those articles

Debra Bouricius                                      RICK CORSI
Mesa County, et al.                              April 22, 2019

                                                   Page 162

 1        Q.  Have you ever heard of that happening?

 2        A.  No.

 3        Q.  Have you ever heard of anyone being disciplined

 4   for engaging in discriminatory acts?

 5        A.  No.

 6        Q.  How about being -- for harassing somebody?

 7        A.  Yes.

 8        Q.  Okay.  When was that?

 9        A.  It was many years ago.  The director or manager,

10   I'm not -- what titles, I don't know what they were, of

11   the landfill harassed one of the employees by placing by

12   a GPS tracker in her car and followed her around.

13        Q.  Oh, well.  Was -- was the landfill guy

14   terminated?  Do you know?

15        A.  I -- he had several harassment complaints, and I

16   believe after that one, he was terminated.

17        Q.  Okay.  Did John Sullivan report to Troy Flick?

18            (Ms. Lori Mool arrives.)

19        A.  Yes.

20        Q.  (BY MS. BISBEE) Would John Sullivan have had

21   the responsibility to report his daily work to Troy

22   Flick?

23        A.  As a supervisor, Troy should have been knowing

24   what -- what John was doing, yes, was working on.

25        Q.  So would Troy have had information that this --

                                                   **EXHIBIT 3**

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                       April 22, 2019

Page 163

1    the information went out onto the FTP server?

2         A.  I -- I couldn't say for sure that John would

3    have said, I put it out there, and Troy would have -- I

4    wouldn't say for sure.

5         Q.  Okay.  But Troy was John's supervisor?

6         A.  Troy was John's supervisor, yes.

7         Q.  Would Troy have been in a better situation than

8    Debra to know exactly what John Sullivan was doing on a

9    daily basis?

10             MS. SEVERN:  Object to form.

11        A.  I believe he would have.  His office was right

12   outside of John's office, right next to John's office,

13   and he was John's supervisor.  Deb had no authority over

14   John or anyone besides working as a project manager.

15        Q.  (BY MS. BISBEE) Okay.  And you didn't have any

16   authority over John Sullivan?

17        A.  No, I didn't.

18        Q.  Okay.  Did Deb Bouricius screw up the DocuSign

19   project at all?

20             MS. SEVERN:  Object to form.

21        A.  Not that I recall.  I don't believe the DocuSign

22   project was screwed up.

23        Q.  (BY MS. BISBEE) Okay.  Did anyone ever

24   complain about Deb's work in DocuSign?

25        A.  No.

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

---

Page 166

1    credits, and then they could use up credits -- different

2    employees would use credits to take the trainings and

3    that.

4         Q.  Okay.

5         A.  There were a couple different --

6         Q.  So it was kind of an online module type?

7         A.  Online.  Some of it was in person.  The trainers

8    would come into one of the -- to one of the hotels and,

9    you know, have -- I don't know, project management

10   training or some type of training.

11        Q.  Did these trainings come with some sort of

12   verification or did it just differ or -- could it maybe

13   be they would get a certificate?  Maybe not?  I'm sorry.

14        A.  Yeah, I believe they probably -- you got a

15   certificate at the end of them, but...

16        Q.  Okay.  Would that make its way to you?

17        A.  It could have, but I -- I mean, normally people

18   just -- I mean, I think we knew what training they took.

19   We didn't need proof of training that they actually

20   showed up for the class --

21        Q.  Okay.

22        A.  -- and got a certificate.  I mean, a certificate

23   could be printed very easily.

24        Q.  So was it your testimony earlier that Troy Flick

25   never stepped into your IT manager role when you were out

---

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                         RICK CORSI
Mesa County, et al.                                  April 22, 2019

```
                                                   Page 167
 1    at the office or on vacation or something like that?

 2            MS. SEVERN:  Object to form.

 3        A.  As far as I know, I don't -- I don't believe he

 4    ever stepped into my role.

 5        Q.  (BY MS. BISBEE) Okay.  And do you have any

 6    recollection of conversations your staff had with you

 7    where they said, Oh, hey, I went to Troy on this, and

 8    he helped me out or something along those lines?

 9        A.  Not that I recall.

10        Q.  And he takes long lunches, correct?

11            MS. SEVERN:  Object to form.

12        A.  Yes.

13        Q.  (BY MS. BISBEE) Yes.  So there's a substantial

14    period of the day where he wouldn't be able to be

15    helping out your staff?

16            MS. SEVERN:  Object to form.

17        A.  Yeah.

18        Q.  (BY MS. BISBEE) Were you aware of any Mesa

19    County employee ever going to complain to the

20    commissioners about the terms and conditions of their

21    employment?

22            MS. SEVERN:  Object to form.

23        A.  No.

24        Q.  (BY MS. BISBEE) No.  Would you be concerned

25    that you would be retaliated against if you had --
```

**EXHIBIT 3**

Debra Bouricius                                                    RICK CORSI
Mesa County, et al.                                             April 22, 2019

Page 169

1       Q.  (BY MS. BISBEE) You never heard that before?

2       A.  Never once.

3       Q.  **And, in fact, you were told the exact opposite;**

4  **isn't that correct**?

5       A.  In fact, at the meeting I spoke of earlier with

6  Edward about Edward Morgan, one of us, Lhana, Troy, or I,

7  I can't remember which one, asked, Are any of us in

8  danger?  And Frank said, You'll know it if you are.

9           MS. BISBEE:  All right.  I think that's all I

10  have.  So -- Alicia?

11           MS. SEVERN:  Okay.  Just a few.

12                        EXAMINATION

13  BY MS. SEVERN:

14       Q.  **Mr. Corsi, do you have any reason to believe**

15  **that Mesa County did not have budget issues going on in**

16  **2016?**

17       A.  I believe they were over- -- overly expressed

18  that about the budget issues.  There were areas where

19  they had no problems spending money.  As recent as this

20  year, I mean, if two years ago they were 2 or $4 million

21  in the hole, where would the money come from for Frank

22  Whidden to get a $60,000 raise or whatever he just got

23  which was in the newspaper?

24       Q.  **When you worked for Mesa County or since, have**

25  **you had access to all of Mesa County's budgetary records**

**Lori Marak   May 10, 2019**

```
          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
Civil Action No. 18-cv-01144-WYD-STV
_____
DEPOSITION OF LORI MARAK
                                    May 10, 2019
_____
DEBRA BOURICIUS,

     Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board
of County Commissioners,

     Defendant.
_____


          Pursuant to Notice and the Federal Rules
of Civil Procedure, the deposition of LORI MARAK,
called by Plaintiff, was taken on Friday, May 10,
2019, commencing at 9:13 a.m., at 205 North 4th
Street, Grand Junction, Colorado, before Candice F.
Flowers, Certified Shorthand Reporter and Notary
Public within and for the State of Colorado.
```

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

25

```
 1   meeting.
 2        A    No, other than just the general talk of
 3   budget cuts.
 4        Q    Do you, in your role in IT, have any part
 5   to play in the budget formulation every year?
 6        A    No.
 7        Q    You don't put together any reports to
 8   send to the board or anything like that?
 9        A    No.
10        Q    Do you know who in IT is responsible for
11   pulling together numbers, if that, in fact,
12   happens?
13        A    That would be probably Lhana and Troy,
14   the two IT managers.
15        Q    But you don't do anything with the
16   sheriff's budget either, right?
17        A    No.  I have in the past, but once Rick
18   took over supervising me, I quit doing a lot of
19   that and would just formulate what was needed for
20   projects and hand that to him and let him take care
21   of how to make it happen.
22        Q    Okay.  Have you ever heard Frank Whidden
23   make any comments related to anybody's age?
24        A    No.
25        Q    Of the current employees in IT, have you
```

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

67

| | |
|---|---|
| 1 | somebody and you see data, that's from Google |
| 2 | crawling open systems out there of open |
| 3 | information, and then they put it in their database |
| 4 | for search results. |
| 5 | Q    Okay.  So instead of -- I'm really going |
| 6 | to dumb this down for me.  So instead of having |
| 7 | this data live, let's say, on a singular server |
| 8 | where nobody can get to it, was it on the Internet? |
| 9 | A    So that's where -- that data does live on |
| 10 | a single server that is protected and -- however, |
| 11 | he extracted a copy of the data out, put it out on |
| 12 | the web FTP site to get uploaded by the vendor, not |
| 13 | aware that it was not secure. |
| 14 | Q    Okay. |
| 15 | A    That's how it ended up out there. |
| 16 | Q    He actually put it on the Internet |
| 17 | somewhere. |
| 18 | A    Yes. |
| 19 | Q    Who was his supervisor? |
| 20 | A    Troy Flick. |
| 21 | Q    Troy Flick.  He's still in IT, right? |
| 22 | A    Yes. |
| 23 | Q    So if he's still there and Deb's not, Deb |
| 24 | being part of this probably doesn't have anything |
| 25 | to do with the layoff, right? |

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

68

```
 1              MR. SANTO:  Object to form.
 2       Q    (By Ms. Bisbee) If you understand my
 3  question.
 4            It would be silly to say that Deb having
 5  discipline in her file because of the data breach
 6  was a reason for her layoff, correct?
 7              MR. SANTO:  Object to form.
 8       Q    (By Ms. Bisbee) Given the fact that Troy
 9  Flick is still there.
10       A    Yes.  I would be surprised, because Deb
11  had nothing to do with the data breach from what I
12  was aware of.  Like I said before, we were not
13  responsible for the data extraction.  She was
14  project manager, asked him to do it and get it to
15  the vendor, but I'm not aware of her giving any
16  specific instructions.  She wasn't his supervisor,
17  so -- and I'm not sure of the extent of her
18  disciplinary actions either, so...
19       Q    You told me earlier about Commissioner
20  Justman coming to the October 7th meeting and
21  informing the IT department that the layoff was
22  purely financial, correct?
23       A    Yes.
24       Q    Do you recall if he said anything else at
25  the meeting?
```

**EXHIBIT 3**

**Lori Marak  May 10, 2019**

```
 1        Q    Did you ever hear any rumors that the
 2   County was looking into whether the layoff was
 3   discriminatory?
 4        A    We were told that they anticipated a
 5   lawsuit, so don't talk.
 6        Q    Okay.
 7        A    As soon as it happened, I would say, and
 8   I think that was just general, you know, now this
 9   is going to be coming to a lawsuit so -- or that
10   there was a lawsuit coming around.
11        Q    So when you say "they," who is "they"?
12        A    They, I would say management, just
13   because they might have been informed.  I'm not
14   sure, or maybe they anticipated -- IT management.
15   I'm sorry.
16        Q    IT management.  So we are talking Lhana
17   Jordan and Troy Flick.
18        A    Yes.
19        Q    What about Frank Whidden?
20        A    He would probably be in that same group,
21   and I don't know if that was communicated during
22   that meeting right after the layoffs.  I'm sorry.
23   It's all so fuzzy.  It was just getting the
24   heads-up that things were going to probably...
25        Q    If they hadn't done anything wrong, why
```

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

85

```
 1        A    Yes.
 2        Q    So let's say you call up Bill, Bill says,
 3   No, I'm not going to help you.  Then you would go
 4   tell Rick, like, Hey, Bill won't help me with this
 5   problem -- right?
 6        A    Well -- and never does Bill say, I'm not
 7   going to help you with that, but it would be, It's
 8   working fine, things like that.
 9        Q    Okay.  But if Rick Corsi would
10   complain -- or you would complain and then Rick
11   Corsi would get talked to, right?  Is that what you
12   said?
13        A    Yeah, or tell me he's working on it.
14        Q    So who would talk to Rick Corsi about
15   your complaint?
16        A    I don't know if that would have been like
17   either Frank or Troy, but I know that there were --
18   there were problems with having the Corsis married
19   and being in the same department, and then, of
20   course, Janine, Rick's wife, was under Troy Flick's
21   supervision, so...
22        Q    So there were problems you were aware of
23   or this was just something you heard, generally?
24        A    Well, I mean, just -- Janine was the only
25   female in their department, and I guess she wasn't
```

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

89

```
 1    other groups.
 2         Q    Did that include Troy Flick?
 3         A    Yes.
 4         Q    Were these guys generally younger IT
 5    employees?
 6                   MR. SANTO:  Object to form.
 7         A    Younger than?
 8         Q    (By Ms. Bisbee) Younger than you.
 9         A    Yes, they're younger than me.
10         Q    Troy Flick, is he younger than Rick
11    Corsi?
12         A    Yes.
13         Q    The guys playing poker, were they younger
14    than Janine Corsi?
15         A    Yes.
16                   MS. BISBEE:  I think that's all I
17    have.
18                   MR. SANTO:  Just a couple of
19    questions.
20                        EXAMINATION
21    BY MR. SANTO:
22         Q    Did you say harf data?
23         A    Harvest data.
24         Q    Harvest.  I heard harf.  That makes so
25    much more sense.
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

_____

VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

July 11, 2019

_____

DEBRA BOURICIUS,

     Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

     Defendant.


_____



     Pursuant to Notice and the Federal Rules

of Civil Procedure, the videotaped deposition of

FRANK WHIDDEN, called by Plaintiff, was taken on

Thursday, July 11, 2019, commencing at 9:07 a.m.,

at 205 North 4th Street, Grand Junction, Colorado,

before Candice F. Flowers, Certified Shorthand

Reporter and Notary Public within and for the State

of Colorado.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

46

```
 1   locations that you've already --
 2        A    It could be any of them or -- sorry.
 3             MR. SANTO:  You have to wait until
 4   she finishes.
 5             THE DEPONENT:  Sorry.  I thought I
 6   did.
 7             MS. GREISEN:  That's okay.
 8        Q    (By Ms. Greisen) One of the other
 9   locations that -- that you've already mentioned.
10        A    Yes.  As well as meetings with the
11   cities, the Chamber of Commerce, et cetera.
12        Q    Who are your direct reports?
13        A    Pete Baier, director of public works.  He
14   also carries the title of Deputy Administrator for
15   Public Works or something like that.
16             Brenda Moore, HR manager, and technically
17   all the HR staff reports to me because I'm the
18   director.
19             IT, which is Lhana and -- Lhana Jordan
20   and Troy Flick are managers, and then, again, I'm
21   the director of that department, so you could say
22   all the staff there.
23             There is Greg Linza, who's the director
24   of facilities.
25             Pam Noonan, who is the finance director.
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

67

1        Q    What managers are you referring to?

2        A    The IT managers in this case, so Lhana,

3   Troy, and at that time Rick Corsi.

4        Q    Was Lhana an IT manager?

5        A    Yes.  She was the customer service

6   manager, was her title, I believe, at the time.

7        Q    And you said you were involved in who was

8   assigned to which projects?  You actually --

9        A    Yes.

10        Q    -- said, Troy, I want these people

11   assigned to this project?

12        A    We would discuss who was going to be on

13   which project.  If there was an upgrade to a major

14   system, we'd talk about which BSA or if it -- or

15   the team.  Who's going to be on the team, who's

16   going to play what parts, what roles are needed for

17   this project, who's going to -- who's going to do

18   that.

19        Q    So these were in meetings that you had

20   with the IT managers and Lhana Jordan?

21        A    Yes.

22        Q    And are there -- did you have agendas for

23   these meetings?

24        A    Not usually.  We don't usually do written

25   agendas and things like that.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

```
 1        Q    Any minutes of these meetings?
 2        A    No.
 3        Q    And were these weekly meetings?
 4        A    No, ma'am.  I don't do -- generally, I
 5   don't do general -- I don't do standing meetings.
 6   The only two standing meetings that I really have
 7   are the public hearing and the Tuesday afternoon.
 8        Q    But I'm talking as -- when you were
 9   Deputy Administrator.
10        A    Oh, even back -- no.  Back then, no.  I'm
11   not a believer in standing meetings.
12        Q    So other than Ms. Jordan, Mr. Flick, and
13   Mr. Corsi, did you directly supervise any of the
14   other IT employees during your time as a deputy
15   administrator?
16        A    Yes.  If questions came up in any given
17   area, I could be involved depending on what the
18   question was and the gravity of it.
19        Q    Well, I understand that you could be.
20        A    Okay.  I'll rephrase that.  I was.  I was
21   involved in decisions if the gravity was enough
22   that I needed to be.  And by "gravity," what am I
23   talking about?  I define that as a production
24   system being down, for instance.  Then I would
25   definitely be involved.
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

70

1    day-to-day supervision of the IT staff other than

2    Mr. Flick, Ms. Jordan, and Mr. Corsi during your

3    time as the Deputy Administrator?

4        A    I'm not sure exactly what you mean by day

5    to day.  I mean, I have managers who see that did

6    they come in, are they going out sick today.  They

7    would approve those kinds of things.  They would

8    take care of their vacation time, who's going on

9    vacation.  We have a calendar that I can look at

10   and check and see who's in and who's not, but I

11   expect my managers to see to that.

12       Q    Who was assigned to New World?

13       A    Lori is the main person who was assigned.

14   She's been there for a long time.  There was a lady

15   named Elizabeth who's no longer with us who was in

16   there.

17       Q    Is that true back in 2016?  Lori was the

18   project manager?

19       A    I believe so, yes.  She's always been the

20   lead on New World because she was there from before

21   the beginning, when they -- when they talked about

22   getting the software.

23       Q    So she was there when Mesa County

24   discussed whether to bring that software on board

25   or not?

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

```
 1        A    Yes, and that was before my time, but
 2   that's my understanding, yes.
 3        Q    And where do you get that understanding?
 4        A    From talking to her.
 5        Q    During that eight-month period of time
 6   that you were the Deputy Administrator, at IT did
 7   you conduct any performance reviews?
 8        A    Yes.
 9        Q    Whose did you conduct?
10        A    My direct reports.
11        Q    So, again, that would have been
12   Mr. Flick, Ms. Jordan, and Mr. Corsi?
13        A    Correct, for IT.
14        Q    So you were there for eight months but
15   you gave an annual performance review at the end of
16   2014; is that right?
17        A    Yes, but I was IT director the whole
18   time.
19        Q    Right.
20        A    So I gave it based on that position.
21        Q    So you gave them their performance
22   reviews as the IT director?
23        A    Yes.
24        Q    And that was -- let's see.  From 2011 to
25   2014, you were the person responsible for giving
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

72

1    the performance reviews for Mr. Corsi, Ms. Jordan,

2    and Mr. Flick?

3        A    Rick and Troy, the whole time.   We

4    promoted -- we created Lhana's customer management

5    -- customer service management position during that

6    time.  I don't remember exactly when it was.

7    Before that, Troy wrote her performance

8    evaluations, and then once she became the manager,

9    I wrote her performance evaluations.

10       Q    So these -- when you were the director of

11   information technology, was it again Troy Flick,

12   Rick Corsi, and Lhana Jordan?

13       A    For part of the time.  When I first came

14   to Mesa County, she was a technician, and then we

15   decided that it would be helpful to have a direct

16   manager over the technicians.  And, really, Troy

17   and Rick approached me about doing that and who it

18   should be and things like that, and so we made the

19   decision to create that position.

20       Q    Did anyone apply other than Lhana Jordan?

21       A    I don't think so.  We promoted from

22   within.  I don't know that we did a job search for

23   that.  I truly don't remember.

24       Q    During your time as IT director, did you

25   issue any disciplinary actions?

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

74

```
 1         Q    And these were people in the IT
 2    department?
 3         A    Yes.
 4         Q    Was anybody terminated?
 5         A    Yes.
 6         Q    Was it one or two people who were
 7    terminated?
 8         A    One was terminated, one was not.
 9         Q    What year was that?
10         A    I don't remember.
11         Q    Somewhere between 2011 and 2014?
12         A    Yes.
13         Q    So other than between 2011 and 2014, have
14    you participated in the performance reviews of any
15    IT employees?
16         A    Yes.
17         Q    Tell me who.
18         A    Well, Troy and Lhana and Rick up until he
19    left.
20         Q    Were these written performance reviews?
21         A    Yes.
22         Q    And so those are the types of performance
23    reviews that would have been just kept in the
24    personnel files?
25         A    Yes.
```

**EXHIBIT 3**

Frank Whidden   July 11, 2019

78

```
 1          A     I changed the format to a narrative
 2     feedback.
 3          Q     (By Ms. Greisen) Uh-huh.
 4          A     That's it.
 5          Q     And you took away the objective scoring
 6     or the numerical scoring.
 7          A     That is correct.
 8          Q     And did you actually write those reviews
 9     yourself?
10          A     I did.
11          Q     And did you also sign off on reviews that
12     other people wrote?
13          A     I did.
14          Q     Okay.  And did you sign off on the
15     reviews that Mr. Flick and Mr. Corsi and Ms. Jordan
16     wrote for their employees?
17          A     I did.
18          Q     The narrative approach as opposed to a
19     numerical approach, tell me -- you said you thought
20     companies were moving away from the numerical
21     rating?
22          A     Uh-huh.
23          Q     Tell me what you mean by that.  Who's
24     moving away from it?
25          A     Companies like Microsoft.
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

121

```
 1                    MS. GREISEN:  Sorry.
 2         Q    (By Ms. Greisen) An end user trainer?
 3         A    Yes.
 4                    THE DEPONENT:  Did you need me to
 5    spell that?  P-A-T-S-A-N-T-A-R-A-S, I believe.
 6         Q    (By Ms. Greisen) Were you responsible for
 7    laying her off?
 8         A    Ultimately, yes.
 9         Q    Well, who made the decision to --
10         A    I --
11         Q    -- lay her off?
12         A    I told the IT managers that we had to
13    make reductions and they recommended that position
14    to be cut.
15         Q    So was that Rick and Troy --
16         A    Rick and Troy --
17                    MR. SANTO:  I was just slowing him
18    down because he was interrupting your question.
19    That's why he stopped.
20         A    Rick and Troy and Lhana.
21         Q    (By Ms. Greisen) Okay.  So back to the
22    list.  You thought in your mind who you need to
23    keep.  By process of elimination, you got rid of
24    the people that you didn't think were essential.
25    Is that -- is that fair?
```

**Frank Whidden   July 11, 2019**

126

```
1    also paid their health insurance for that 30 days.
2    I don't remember that for a solid gold fact, but I
3    think we did.
4        Q    So when you created this list of people
5    to terminate, did you talk with anybody about it
6    before you finalized your decision?
7        A    I did speak -- yes.  Before I finalized
8    the decision, yes.  I met with Troy and Lhana and
9    asked them to look over the list of people that I
10   was proposing to cut and tell me if they disagreed
11   or if they thought there was a problem with the
12   people that were on the list, that I had made a
13   mistake and that they thought there was somebody
14   that we just couldn't live without.
15       Q    And you actually gave them a hard copy of
16   the list?
17       A    I don't -- no.  I kept -- whatever we
18   reviewed there, that list, was -- was just that.
19   No, I didn't send it around.
20       Q    Well, did they -- I mean, did you just
21   verbally tell them who was on the list or --
22       A    I show -- no.  I shared -- they were -- I
23   mean, I showed them -- I don't remember if I had
24   the piece of paper in my hand or not.  I shared the
25   names with them, and I don't remember if I had that
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

```
 1   where we asked all the County departments to come

 2   up with a net 5 percent decrease.

 3        Q    That was in 2016?

 4        A    I -- we did it more than once.  I believe

 5   we did it in '16 and '17, as I recall, that we

 6   asked them to come up with that, and that's when

 7   the clerk and recorder decided to make those

 8   reductions in her staff, as well as other parts of

 9   the County.

10        Q    Did you discuss about who to lay off in

11   the IT department with anyone prior to making the

12   final decision?

13        A    Yes.

14        Q    And was that Troy Flick and Lhana Jordan?

15        A    That is correct.

16        Q    Okay.

17        A    And Jean Davis because she helped me

18   create the spreadsheet to talk about the amounts,

19   and I also spoke with Krista Ubersox, who was

20   involved in -- who was an HR person.

21        Q    Krista?

22        A    Krista Ubersox.  She's no longer with the

23   County.  She was the other HR person in there who

24   helped with this kind of a thing.  And so I

25   definitely discussed that because she was part of
```

**EXHIBIT 3**

Frank Whidden   July 11, 2019

137

```
 1   that work with that spreadsheet that I referred to.
 2       Q    Did Mr. Flick give you any specific
 3   information about Ms. Bouricius' performance?
 4       A    Not that I recall.
 5       Q    Did Ms. Jordan give you any specific
 6   information about Ms. Bouricius' performance?
 7       A    She did agree that there was weakness in
 8   customer service.
 9       Q    But specifically with respect to Ms.
10   Bouricius, did she give you any information about
11   Ms. Bouricius' performance?
12       A    Yes.  She said that she had weakness in
13   customer service.
14       Q    So Ms. Jordan said that Ms. Bouricius was
15   weak in customer service?
16       A    Uh-huh.
17       Q    And did she give you any more -- give you
18   any more details?
19       A    She said that there had been people
20   around the County who had complained about
21   incidents that Deb had worked on.
22       Q    Can you give me an example?
23       A    I don't remember specifically.  Deb was
24   over the Eden system, which is the financial
25   system, and that would have been the system that
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

139

```
 1        Q     Did she give you any more information
 2   than that?
 3        A     Did she name somebody?  I don't recall.
 4   This has been too many years ago.  I don't remember
 5   a specific name saying, Well, she dealt with
 6   so-and-so personally and this was the problem that
 7   was there, no.
 8        Q     Where was this meeting?
 9        A     I don't remember where we had that
10   conver -- wait.  Are you talking about when I met
11   with Troy and Lhana?
12        Q     Yeah.
13        A     Oh, I'm sorry.  In my office.
14        Q     Did you call a meeting?
15        A     Yes.
16        Q     And did you, at that meeting, give them
17   the list of names that you were going to lay off?
18        A     Yes, I shared the list with them, the
19   names.
20        Q     How long was that meeting?
21        A     I don't remember.  It wasn't a hugely
22   long time.  I don't -- less than an hour.
23        Q     Did you tell them why you decided on the
24   people you chose?
25        A     No.  What I asked them was was to --
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

1    here's the names.  Tell me if you think that I have

2    got anybody on here who you think should not be on

3    here or -- along the lines of is there anyone here

4    that you think we can't live without that's going

5    to leave a hole in the boat that we can't deal

6    with.

7         Q    And one of the names that was on your

8    list was Rick Corsi, right?

9         A    Correct.

10        Q    But you were having his peer, Troy Flick,

11   review the list to say basically whether Rick Corsi

12   should go or not, right?

13        A    Yes.  His name on was there, and, yes, in

14   a sense, that was the case, but I really had more

15   reference to everybody else that was on there.  We

16   could not afford, in my book, that extra management

17   position, and that needed to be removed from the

18   org chart.  I didn't think we needed it and I

19   didn't think we could afford it.

20        Q    Well, I appreciate that.  But when you've

21   got two IT managers and you need to eliminate one

22   of the positions, so you go to the other one and

23   say, Yeah, should we get rid of the other guy?

24   Does it surprise you that he said yeah?

25        A    If you knew Troy, you would know that if

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

141

1    he thought we couldn't do without Rick, he would

2    say so and so would Lhana, that they would -- they

3    would tell you that, Well, now wait a minute,

4    Frank.  I think he's got this particular set of

5    skills.  One thing you need to understand is Rick's

6    not technical.  By that I mean he doesn't have an

7    IT background.  He's GIS, government information

8    systems, mapping.  That's where he comes from.

9    That's what he does.

10        Q    Did Troy supervise Rick?

11        A    No.  They were -- they were peers.

12        Q    Did Lhana supervise anybody on the -- on

13   the list of people to be terminated?

14        A    Yes.

15        Q    Who did she supervise?

16        A    The lady who was on the help desk.  She

17   supervised her, and Troy supervised Janine.  So

18   there were people out of -- out of almost every

19   group, there was people who were reduced.

20        Q    So the customer service manager was

21   responsible for supervising which employees?

22        A    The technicians and the help desk.

23        Q    Okay.  So there were two technicians?

24        A    No.

25        Q    Technical support specialist, is that

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

153

```
 1        Q     Did you --
 2                    MS. GREISEN:   Is this interfering
 3     with you?  Okay.
 4        Q     (By Ms. Greisen)  Did you talk with anyone
 5     other than the attorneys about the facts that
 6     formed the basis of your opinion?
 7        A     No, other than -- unless you count the
 8     meeting where Troy -- I discussed with Troy and
 9     Lhana the people that I was going to release, but I
10     didn't talk about -- we didn't get into, well, why
11     did you pick this one or why did you pick that one.
12     We did not -- that wasn't part of the discussion.
13        Q     So in this preliminary meeting with Troy
14     Flick and Lhana Jordan, the three of you did not
15     discuss the ins and -- the details of who was being
16     picked, right?
17        A     That is correct.
18        Q     Okay.  And is it your testimony that you
19     didn't discuss that with anybody?
20        A     That is correct.
21        Q     Okay.  And did you document the basis for
22     that opinion in any manner?  Did you document your
23     decision to terminate those specific employees?
24        A     No.
25        Q     To your knowledge, did anybody else
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

220

```
 1    had -- they all work very closely together, so...
 2         Q     So -- but Rick Corsi was her direct
 3    supervisor.
 4         A     Direct supervisor, sure.
 5         Q     So did you go and talk to Mr. Corsi about
 6    what skills Ms. Bouricius did or did not have?
 7         A     No.
 8         Q     Why not?
 9         A     Because I could not signal this action
10    ahead of time.
11         Q     Well, you wouldn't have to tell him he
12    was going to be a part of a layoff, right?
13         A     I could not signal with a layoff of this
14    size what was coming.  Rumors start very quickly,
15    and that would present a security risk for IT.
16         Q     But didn't you signal it to Troy Flick
17    and Lhana Jordan?
18         A     Only immediately beforehand.
19         Q     Oh, I thought you told me there was a
20    conversation at least a week beforehand.
21         A     I'm saying -- okay.  When I say
22    immediately beforehand, that's what I'm talking
23    about --
24         Q     Uh-huh.
25         A     -- is it was right there and they were
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

224

1    said early, management by walking around and I

2    don't record the conversations when I'm doing that.

3        Q    Okay.  Can you tell me all the reasons --

4    each and every reason you decided to terminate Rick

5    Corsi, if there's anything more than what you have

6    already testified to.

7        A    The main -- the main reason was we were

8    eliminating the position.  We could not afford to

9    keep a manager in that position.  We had to

10   eliminate the position.

11       Q    Right.  But you chose Mr. Corsi.  So you

12   have given us a little bit of testimony about why

13   Mr. Corsi.  I'm just giving you the opportunity to

14   tell me.

15           Are there any reasons that you chose

16   Mr. Corsi over Mr. Flick?

17       A    Rick couldn't do Troy's job.

18       Q    And what part of Troy's job could he not

19   do?

20       A    Pretty much all of it.  Troy is an expert

21   on the network and the servers and all those kinds

22   of things.  Rick, as I stated earlier, is not

23   technical.  His background is GIS.  And we did

24   not -- I couldn't say, well, I'll remove Troy and

25   put Rick in that position.  It simply wouldn't

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

225

```
 1    work.
 2         Q    And prior to Mr. Flick being hired by
 3    Mesa County in 2000, who were the IT managers at
 4    that point?
 5         A    That's before my time and I don't know.
 6         Q    Well, was there a time where Mr. Corsi
 7    was responsible for all the things that Mr.
 8    Flick --
 9         A    I don't know.
10         Q    Let me -- let me just --
11         A    Sorry.
12         Q    That's okay.
13              Was there a time that Mr. Corsi was
14    responsible for the areas that Mr. Flick operated
15    in?
16         A    Not during my tenure.
17         Q    Do you know what areas Mr. Corsi was
18    responsible for prior to Mr. Flick's hiring?
19         A    No, I don't know.
20         Q    At some point I believe your testimony is
21    that there became like a bifurcation in IT manager
22    positions or job responsibilities.
23         A    Let me restate what I just said.  Rick,
24    as I understand it before I got there, going way
25    back, was over GIS, the government information
```

**Frank Whidden   July 11, 2019**

226

```
 1   system, the mapping.  Rick was over that.  And
 2   there was a time when GIS was not attached to IT.
 3   So at some point GIS was added to IT and through
 4   the years -- that's how we wound up with a husband
 5   and wife in the same department -- Rick got
 6   promoted to a manager position there, but all of
 7   that happened before my time there.
 8        Q    Do they have the same job description,
 9   Rick and Troy Flick?
10        A    I really don't know.  I wouldn't think
11   so.
12        Q    Have you ever looked to see?
13        A    Have I compared the two to see are they
14   the same?  No, ma'am --
15        Q    Yeah.
16        A    -- I have not looked at that to see.
17        Q    Okay.  So my understanding of your
18   testimony of Rick Corsi is that Rick couldn't do
19   Troy's job.  Primarily, Rick was focused on just
20   the GIS stuff and doesn't have the overall
21   knowledge to do all the other network
22   administration that Troy does; is that accurate?
23        A    Most of that is accurate.  Rick does not
24   have the skills, credentials, and qualifications to
25   do Troy's job.  His background was GIS and that was
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

231

1    you know, you install a system of that size -- the

2    various pieces and parts that we had difficulties

3    with, things you couldn't foresee.

4         Q    Sure.

5         A    And so I don't remember a specific

6    example of one on this given day, that's what it

7    was.  But over time as I would ask a question that

8    I thought she should be able to -- if she didn't

9    know it right that second, fine, but research it

10   and get me an answer, and that wasn't what I saw

11   happening.

12        Q    So fair to say you can't give any

13   specific examples right now of when that would

14   happen, when she would be less than -- well, I

15   should say that she would show poor skills with the

16   Google e-mail system?

17        A    No, I --

18             MR. SANTO:  Object to form.

19        A    I can't tell -- I don't remember a

20   specific example on a given day, it was this.

21        Q    (By Ms. Greisen) Did you or anyone else,

22   to your knowledge, ever write her up or discipline

23   her for that?

24        A    I had conversations with Troy about it

25   seemed that whenever we would have failures and

**EXHIBIT 3**

Frank Whidden   July 11, 2019

232

```
 1    problems with the e-mail system, she was usually
 2    involved, it seemed to me, and he agreed.
 3         Q    Did you ever write her up or --
 4         A    No, not --
 5         Q    -- issue any discipline?
 6         A    -- no, not -- no.  I left -- I thought
 7    that -- that was up to the manager's discretion to
 8    make that decision.  Troy was in a very difficult
 9    circumstance because her husband was his peer.
10         Q    Well, wasn't Troy responsible for fixing
11    the outages?
12         A    Yes, and he did.  That's what I'm saying.
13    Other people on the team would pick up.  A lot of
14    times it was Bill Tarlton who -- because he came
15    through, or Ron Sage.  And they would come through
16    with the answers and here's what we need to do, and
17    we could move forward.  It wasn't Janine.
18         Q    Were you there all the time when they
19    were having this dialogue back and forth?
20         A    No.  I certainly didn't sit with them
21    every minute of every hour.
22         Q    Right.
23         A    I would go down and say, Well, okay, we
24    need to get this resolved, whatever the issue is,
25    and let's -- let's have an answer.  And I would
```

**Frank Whidden   July 11, 2019**

233

1    find out where -- who -- who came up with this, who

2    resolved this.

3         Q    And the Novell system, can you articulate

4    any specific examples about her struggles with

5    Novell?

6         A    We had outages.  The system would simply

7    go down, and then there would be various pieces and

8    parts of what we have to do to get it back up, and

9    she was supposed to be senior on running that

10   system.  She was supposed to be the knowledgeable

11   party of how that system ran.

12        Q    Did you document any performance problems

13   with her regarding the Novell system?

14        A    No.  I expected Troy, as her direct

15   manager, to take care of documenting anything like

16   that.

17        Q    Do you know if Troy ever documented any

18   disciplinary actions with her concerning her

19   knowledge of the Novell system?

20        A    Not that I recall.

21        Q    Did you or anyone else, to your

22   knowledge, sit down and tell her that her

23   performance was not adequate on those systems?

24        A    I did not.  I don't know if Troy did or

25   not.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

252

1    what they do.  Working on printers, troubleshooting

2    those -- the hardware piece of all of that.  That's

3    their particular skill set.

4         Q    So do you know whether or not Ms.

5    Bouricius had any of that skill set at the time she

6    was terminated?

7         A    If she did, I certainly had never seen

8    any evidence of it.

9         Q    Did you ask anyone?

10        A    No, because it's a pretty safe bet in the

11   IT world that if somebody's on the software side of

12   the house and they are into coding and database

13   administration and those kinds of things, that they

14   are not a hardware person.  It's like a separation

15   of duties.

16        Q    And what skills did Andrew Wetzel have

17   that Ms. Bouricius did not have?  Is it essentially

18   the same answer?

19        A    Yes.  He -- at the time that the

20   terminations were made, he was a tech.  He's now

21   moved over to the network team, but -- so he had --

22   as well as the end-user hardware, he also had

23   networking skills along the lines of like what Troy

24   and Ron and those -- Bill Tarlton, what they can

25   do.  As far as I know, again, she doesn't have that

**Frank Whidden   July 11, 2019**

254

```
 1        Q    Well, I was just going to ask you my next
 2   question.
 3             Do you know whether she, Ms. Bouricius,
 4   was ever a Web administrator during her career at
 5   Mesa County?
 6        A    I did not know that.
 7        Q    Did you know at one time she was the only
 8   Web administrator?
 9        A    I did not know that.
10        Q    Is there any reason that you're aware of
11   that Ms. Bouricius could not have been transferred
12   to one of the Web administrator or support
13   specialist jobs instead of terminated?
14        A    I did not know she had any skill set in
15   that area or had worked in that area, certainly
16   since I have been there, since 2011, and it was
17   never brought up when I asked the question about
18   who had the skill sets that we needed and do we
19   have the right people on the boat. Joe and Lani
20   were the ones who had the skill sets that -- in
21   this case, Troy wound up running that team -- that
22   he thought they would need in order to get the job
23   done.
24        Q    So -- I'm sorry.  It's your testimony
25   that Troy said that Joe and Lani had the expertise?
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

261

```
 1   performance and the work product that I saw.
 2        Q     Okay.  Again, it was based on the
 3   performance that you personally observed.
 4        A     Yes.
 5        Q     Did you have any discussions with anybody
 6   about Janine Corsi's shortcomings or performance
 7   issues --
 8        A     I did.
 9        Q     -- prior to --
10        A     Yes.  With Troy.
11        Q     With Troy.  When was that?
12        A     I don't remember the timing.  I just know
13   that we discussed it.  I know -- I know that it had
14   become evident to me by the time we were getting
15   rid of the Novell system and coming up on Google,
16   and I didn't like the fact that she was going to
17   take the Google lead but she did, and I thought
18   that was going to be problematic.
19        Q     Well, what did Troy -- did Troy
20   discipline her for something?
21        A     I -- not to my knowledge.
22        Q     So I thought you said Troy talked with
23   you about performance issued related to Janine.
24        A     Yes.
25        Q     Okay.  So what performance issues did
```

**EXHIBIT 3**

Frank Whidden   July 11, 2019

262

```
 1      Troy tell you Janine had?
 2          A      What we just discussed.   The problems
 3      that we had with the Novell e-mail system and
 4      having -- having issues with that, and that's why
 5      it was crashing and having problems.
 6          Q      And he attributed those to Janine?
 7          A      Yes.
 8          Q      And when was this?
 9          A      Before we went live on Google, I believe,
10      was when we had that discussion or shortly
11      thereafter.
12          Q      Give me a year.
13          A      We went live in 2012.
14          Q      Somewhere around the 2012, 2013 time
15      frame.
16          A      I would say somewhere in there.
17          Q      Since that time, have you had any
18      discussions with anybody about performance problems
19      with Janine?
20          A      No, not -- I'm not sure I understand it.
21      Not since she's been gone, for sure, but -- well,
22      I'm sorry.  I'm trying to understand and answer
23      your question completely.
24          Q      Well, you talked about a -- the fact that
25      Troy Flick mentioned to you somewhat in the 2012,
```

EXHIBIT 3

Frank Whidden   July 11, 2019

263

1    2013 time frame about Janine.

2            What I'm saying:  Was there any later

3    time prior to her termination where somebody

4    complained to you about Janine?

5        A    There was an ongoing discussion about

6    issues between her and the other part of the

7    network team.  She herself had voiced issues about

8    not feeling a part of the team, and she didn't like

9    the way that Troy was running the shop.

10       Q    And do you have any specific examples of

11   what she didn't like?

12       A    Sure.  She didn't like the fact that they

13   played cards at lunch.  She didn't like the fact

14   that sometimes they would work remotely and -- her

15   and Rick both had an issue with people working

16   remotely, and that's -- in my opinion, that's just

17   modern IT.

18       Q    Who played cards at lunch?

19       A    I belie -- the guys did.  I don't know

20   who all.  I didn't ever play, so I don't know who

21   exactly was in there.  I have walked in at times

22   and there would be all the network team except

23   for Janine there.

24       Q    So it was all the guys in the network

25   team?

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

269

```
 1        A     To supervise the BSAs.  Right after the
 2    terminations were done, because somebody had to
 3    take the lead on that.
 4        Q     So right after Ms. Bouricius was
 5    terminated, Lhana Jordan assumed the
 6    responsibilities of supervising the BSAs?
 7        A     Yes.
 8        Q     And did she also get a raise?
 9        A     I believe I gave her a small raise at
10    that time.  I think I did.  I'm not certain.  She
11    has had subsequent raises, for sure.  I think so.
12    I think --
13        Q     So this was in 2016, she would have
14    gotten a raise?
15        A     I honestly don't remember.  We had that
16    freeze on, and I can't remember if that was a
17    problem with doing any raises at that point.  I
18    don't remember for sure if she got one before the
19    end of '16 or not.  I don't remember.
20        Q     Did anyone else get a promotion after the
21    2016 layoffs?
22        A     Not until quite some time later.  Troy
23    got the Web team and GIS, but he didn't get any
24    promotion.  His title didn't change.  So I split
25    the teams that Rick had between Troy and Lhana.
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

283

```
 1    was canceled by the end of the month, of October,
 2    right?
 3         A    That's what that letter says.
 4         Q    Do you have any reason to disbelieve it?
 5         A    No.
 6         Q    So are there any -- well, I want to go
 7    back and talk about how the whole termination
 8    meeting happened.
 9         A    Uh-huh.
10         Q    You've said that you had a conversation
11    with Troy Flick and Ms. Lhana Jordan about a week
12    before and got their okay for your decision.
13         A    Yes.
14         Q    Is that fair?
15         A    Yes.
16         Q    And then what did you decide to do at
17    that point?
18         A    I decided that we would have one meeting
19    and have everybody there and I would announce what
20    was happening with the layoff, and then Brenda --
21    at the time I expected it to be Krista, but she was
22    on vacation.  That Brenda would be there and she
23    would go through the HR details, for instance, of
24    health insurance, COBRA, all of the things that are
25    involved, retirement accounts, all those things.
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

313

```
 1    just --
 2         A    Who else -- who else was involved in
 3    this.
 4         Q    In making the decision to terminate --
 5         A    Right.
 6         Q    -- these individuals.
 7         A    That was -- that was me, and then if
 8    you -- depending on how you want to count Troy and
 9    Lhana when I asked them to vet the list.
10         Q    But you were the sole decision-maker.
11         A    Yes.
12         Q    Okay.
13         A    I was.
14         Q    Do you still operate your outside
15    business of marriage and family therapy?
16         A    It exists.  I don't -- I'm not actively
17    doing anything right now.  I hurt my back back in
18    January, and I only ever had one set of clients, so
19    I don't think I can be said to be operating a
20    business.
21         Q    Well, you got a license to conduct this
22    business, right?
23         A    I have what's called a candidate's
24    license, yes.  And that was the point of trying to
25    set that business up, is because I have to amass
```

**EXHIBIT 3**

**Frank Whidden  July 11, 2019**

338

```
1   testified to all the information that you have

2   under Matter No. 2.

3        A    Yes.

4        Q    Or that Mesa County has.

5        A    I believe that all the information that

6   would pertain to that matter we have covered, yes.

7        Q    Okay.  So Matter No. 3, we talked a

8   little bit about skill sets.  So I would like you

9   to, if you could, look at Exhibit 52, the second

10  page of Exhibit 52 -- the second and third pages

11  are pages that have the employees that remained.

12  And if you could just go down and tell me -- are

13  you on the same page?

14       A    I think.

15       Q    Yeah.  It's Defendant 61 at the bottom.

16       A    This.

17       Q    Yeah.  Okay.  So Matter No. 3 says:  For

18  each skill, Plaintiff, Ms. Bouricius, did not have

19  in comparison with individuals that stayed.

20            Tell me each one of these people who had

21  more skills than plaintiff.

22       A    Okay.  Lhana had more skills and David

23  did, Troy did, Lori did, Kelly did, Chris did,

24  Leilani did, Joseph did, Elizabeth did, Paul did,

25  Eric did, William Tarlton did, and Terrie Hotary
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

340

```
1        A    David Underwood, customer service, I
2   would say yes.  But he's already a hardware tech so
3   the hardware skills.
4        Q    And Troy Flick?
5        A    The network administration skills as well
6   as management skills.
7        Q    And Lori Marak, Marak?
8        A    Lori Marak.  New World particularly and
9   institutional knowledge.  We have talked about that
10  as well making a comparison.
11       Q    And Kelly Leuallen I think you have
12  already talked about.
13       A    We went lengthy into that.
14       Q    Chris Kadel?
15       A    Chris is a GIS expert and all that.
16       Q    I understand that they have different job
17  titles than she did.  I would like you to tell me,
18  as best you can, what specific skill they had more
19  proficient than Ms. Bouricius, if you can.
20       A    That's what I meant, was GIS expert.
21  He's an expert in government informational systems,
22  the mapping, and Esri and all the -- which is a
23  database and a platform.  So all the things that
24  are associated with GIS, that's the skill set that
25  he has that she, to my knowledge, doesn't have.
```

**Frank Whidden   July 11, 2019**

343

```
 1        A    Yes.

 2        Q    -- hardware --

 3        A    Yes.

 4        Q    -- experience?

 5        A    Yes.  Yes.

 6        Q    Okay.  Is there anything else you feel

 7   like that you know or can tell me about Matter No.

 8   3?

 9        A    No.

10        Q    Can you answer No. 4 for me.  Can you

11   give me the identity of all persons with personal

12   knowledge that support the defense asserted by Mesa

13   County in this case?

14        A    I believe that would be mainly Troy Flick

15   and Lhana Jordan.

16        Q    Anyone else?

17        A    Not to my knowledge.

18        Q    Okay.  No. 5, can you tell me the

19   identity of any documents reviewed to prepare any

20   of your 30(b)(6) rule deposition?

21        A    I didn't refer to any documents to

22   prepare for this.

23        Q    Okay.  So let's go down to Denials in

24   Defendant's Answer.  Let's go to 15.  And why don't

25   you open up Exhibit 12 because I don't expect you
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

349

```
 1   of you?

 2        A    Yes.

 3        Q    That doesn't count as my one question.

 4             If you would go to the third page of that

 5   document.

 6        A    Yes.

 7        Q    I believe you were asked by counsel for

 8   the plaintiff who to identify with respect to

 9   Matter No. 4, all persons with personal knowledge

10   which support blah, blah, blah, blah, blah.

11             Do you see that?

12        A    Yes.

13        Q    Okay.  And you identified Mr. Flick and

14   Lhana Jordan?

15        A    Correct.

16        Q    Would you also include yourself in that

17   list as well?

18             MS. GREISEN:  Well, that's leading,

19   but I won't object, because I will stipulate that

20   Mr. Whidden has personal knowledge.

21        A    Yes.  I didn't include myself in that

22   list, but yes.

23             MR. SANTO:  I have no further

24   questions.

25             MS. GREISEN:  We are done.  Thank
```

**EXHIBIT 3**

# Composite Deposition Testimony of

# Terrie Hotary

**EXHIBIT 3**

# *BOURICIUS*

# *VS.*

# *MESA COUNTY*

### Deposition

## *DEBRA BOURICIUS*

*02/22/2019*

---

## *AB Court Reporting & Video*
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

**EXHIBIT 3**

**AB Court Reporting & Video**

```
 1                  AFTERNOON SESSION              12:47 p.m.

 2              MS. BISBEE:  And now that we're on the

 3   record, as we continue to go through the plaintiff's

 4   disclosures, I want to reiterate my standing

 5   objection based on speculation for what each witness

 6   may or may not know.

 7              MS. SEVERN:  And since we are at it, I

 8   would note again for the record that speaking

 9   objections that coach the witness in any way are not

10   proper, so I would request again that they not be

11   used in this deposition.

12                  EXAMINATION (Continued)

13   BY MS. SEVERN:

14       Q    All right.  We were looking at the

15   plaintiff's initial disclosures.  We were on page 5.

16   Are you still there, Ms. Bouricius, on page 5?

17       A    Yes.

18       Q    Okay.  All right.  Well, let's get going

19   then.

20              So the next witness I wanted to talk about

21   was number 12, Terrie -- I'm not sure how to say the

22   last name.

23       A    Hotary.

24       Q    Hotary, thank you.

25              And who is Terrie Hotary?
```

**EXHIBIT 3**

*AB Court Reporting & Video*

```
1          A      She's a senior business analyst at Mesa

2     County in the IT department.

3          Q      When did you meet Ms. Hotary?

4          A      I don't recall specifically.

5          Q      Was she hired by Mesa County after you?

6          A      Yes.

7          Q      What was your relationship like with

8     Ms. Hotary?

9          A      It was fine.

10         Q      Did you work together?

11         A      Yes.

12         Q      How did you work together?

13         A      She primarily supported the sheriff's

14    office, and I also supported the sheriff's office.

15         Q      So you worked together on projects for the

16    sheriff's office?

17         A      Not necessarily projects, because we

18    had -- I'd just implemented a large project earlier

19    before she was hired, so it was support of that

20    product.

21         Q      Any other way that you worked together?

22         A      That was all.

23         Q      When we talked about Mr. Dallman before

24    lunch, I believe you said that he worked in the

25    sheriff's office and so you didn't work much with
```

**EXHIBIT 3**

1    him.   Is my understanding correct?

2          A     Yes, that's correct.

3          Q     But you did work with the sheriff's office

4    along with Ms. Hotary?

5          A     Yes.

6          Q     What's the difference there between what

7    you did and what Mr. Dallman did?

8          A     I supported the large systems, and he was

9    a PC support person.

10         Q     What are large systems?

11         A     Well, in the sheriff's office it would be

12   their New World law enforcement package.

13         Q     So you're talking about programs?

14         A     M-hm.

15         Q     Yes?

16         A     Yes.

17         Q     Okay.

18         A     They have large systems with large

19   databases that hold all of the information, and then

20   they have the desktop PCs, so there's a big

21   difference between the two.

22         Q     Okay.   And speaking of Ms. Hotary, did you

23   have any disagreements or arguments with her?

24         A     No.

25         Q     What information does Ms. Hotary have

**EXHIBIT 3**

1    regarding your work performance?

2         A    I can't say.

3         Q    And was there any way that Ms. Hotary's

4    performance of her job would impact your performance

5    of your job?

6         A    We were a team, so, yeah, if she wasn't

7    doing her job, then the rest of us would have stuff

8    to cover.

9         Q    What information does Ms. Hotary have

10   regarding the 2016 layoffs?

11        A    I can't say.

12        Q    Do you have a belief as to Ms. Hotary's

13   credibility?

14        A    I don't know.

15        Q    Do you have a belief as to Ms. Hotary's

16   honesty?

17        A    I don't know.

18        Q    Have you talked with Ms. Hotary since your

19   employment ended with Mesa County?

20        A    No.

21        Q    When you say you don't know regarding

22   Ms. Hotary's credibility, does that mean you find her

23   not credible or you don't have an opinion?

24        A    I don't know.

25        Q    And when you say you don't know regarding

**EXHIBIT 3**

*DEBRA BOURICIUS 2/22/2019*                                      127

**AB Court Reporting & Video**

1    Ms. Hotary's honesty, does that mean you don't have

2    an opinion or she's dishonest?

3         A    I don't know.

4         Q    Is there anything that would help you to

5    know whether you find Ms. Hotary to be credible or

6    honest?

7         A    I can't think of anything.

8         Q    The next witness there is Crislynn

9    Howerton.  Do you know Ms. Howerton?

10        A    Yes.

11        Q    Who is she?

12        A    She was the help desk support in the IT

13   department at Mesa County.

14        Q    And when did you meet Ms. Howerton?

15        A    I don't recall.

16        Q    Was she hired after you?

17        A    Yes.

18        Q    What was your relationship like?

19        A    We worked well together.

20        Q    Did you have any disagreements?

21        A    No.

22        Q    How would you work together?

23        A    She was the help desk person, and so I --

24   she would put in the call -- take calls from a

25   customer, take in the tickets, and some of those

**EXHIBIT 3**

*AB Court Reporting & Video*

1        A     I'm -- yes.

2        Q     All right.

3              MS. SEVERN:  I would note for the record

4     that Ms. Bouricius is nonresponsive to those

5     questions.

6              MS. BISBEE:  Do you want to take a break?

7     Maybe I can help.

8              MS. SEVERN:  If you think you can, we can

9     take a break.  That's fine.  Sure.

10             (Recess from 1:35 p.m. to 1:38 p.m.)

11        Q     (By Ms. Severn) All right.  We're back on

12    the record.  And we were talking about opinions as to

13    credibility and honesty.

14             And, Ms. Bouricius, was there anything you

15    wanted to add or go back over?

16        A     Well, I'm willing to go back and give you

17    my opinion.

18        Q     All right.  Let's go back.

19             This afternoon after lunch we started with

20    Ms. Hotary.  So let's start there, Ms. Hotary, and

21    you can tell me your opinion as to credibility and

22    honesty.

23        A     Credibility, I have no reason to believe

24    that she's dishonest or not credible.

25        Q     What about Crislynn Howerton, your

**EXHIBIT 3**

*DEBRA BOURICIUS 2/22/2019*                                    174

1    to be laid off?

2        A    I was a high performer and he laid me off.

3        Q    Where did you -- let me start that again.

4            How did you come to the conclusion that

5    you were a high performer?

6        A    Based on my performance evaluations.

7        Q    Did Frank Whidden ever tell you you were a

8    high performer?

9        A    No.

10       Q    Do you know what information Whidden

11   considered as part of the layoff?

12       A    No.

13       Q    Let's look at paragraph 38.  Go ahead and

14   read that paragraph to yourself.

15       A    Okay.

16       Q    All right.  And what information do you

17   have to support the statement that "Ms. Bouricius was

18   one of the most skilled and knowledgeable employees

19   in the IT department"?

20       A    Because I had been there the longest, and

21   I trained new people coming on and -- so that's how I

22   feel that.

23       Q    Who did you train?

24       A    I trained Kelly, Terrie, Elizabeth, Ron

25   Sage.  I don't know.  I can't recall others.

**EXHIBIT 3**

1      Q      What did you train them on?

2          A      Well, Kelly was in the PC support, and so

3      I trained him how to become a senior business analyst

4      and support the system.  And same with Ron Sage.  He

5      started -- when he started.  So it was to do the

6      systems analyst job is what I trained him on.

7          Q      And what about Terrie and Elizabeth?

8      A      Same.

9      Q      All right.  Did Frank Whidden ever tell

10     you that you were one of the most skilled and

11     knowledgeable employees in IT?

12     A      No.

13     Q      Were other employees able to support all

14     of Mesa County's departments?

15     A      No.

16     Q      How do you know that?

17     A      Because they've never supported them.

18     Q      How do you know they haven't?

19     A      Because I supported them.

20     Q      How do you know that other employees

21     didn't do projects here and there?

22     A      Because I know what people worked on.

23     Q      How did you come to have that knowledge?

24     A      27 years.

25     Q      Were you their supervisors?

**EXHIBIT 3**

*DEBRA BOURICIUS 2/22/2019*                                    229

**AB Court Reporting & Video**

1    working relationships.  Do you recall that from 2014?

2        A    No.

3        Q    Did something happen in 2014 that you can

4    recall related to organization or interpersonal --

5        A    No.

6        Q    -- working relationships?

7             I'm sorry, say again?

8        A    No.

9        Q    What did you do to work on these skills

10   outlined for you in 2015?

11       A    I think by leading projects and, you know,

12   taking the lead facility -- facilitating meetings,

13   that kind of thing, shows that you're a leader in the

14   organization.

15            Cross training would be when you help your

16   co-workers learn other systems and train each other.

17   I think he was concerned because Kelly and I knew the

18   sheriff's office side of it and Lori didn't know --

19   Lori -- Terrie and Elizabeth didn't know the other

20   side, so, you know, there was a lot of -- they wanted

21   everybody to be able to support everything, so --

22       Q    And if that would happen --

23       A    And I know he was concerned too about the

24   sheriff's office, that everybody was trained.  Yeah,

25   we did a lot of cross training with each other.

**EXHIBIT 3**

Transcript of the Testimony of

## JANINE CORSI
**April 22, 2019**

**Debra Bouricius**
**v**
**Mesa County, et al.**

# Linda L. Frizzell, RPR

*Linda L. Frizzell, RPR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444



**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                               April 22, 2019

 1   actually, I think Lhana worked for Troy, and then there

 2   was some PC support people:  Derek Conlon, two other guys

 3   that were PC support, and then there was Paul Mitts and

 4   Chrislynn Howerton were the -- basically the phone help

 5   desk.  They would answer the calls and create tickets and

 6   that kind of thing.

 7          And then my husband had web group, which was

 8   Leilani Boyles and Joe Keene; the GS group:  Chris Kadel,

 9   and Ryan, I can't remember his last name; and then the

10   BSA group, which was Lori Marak, Deb Bouricius, Terrie --

11   she was -- I can't remember her last name, Kelly

12   Leuallen, and David Barnett.  They were all business

13   systems analysts.

14          Basically, he had web, database, and GIS and

15   business systems analyst.  And Troy had network

16   administration and help desk.  And Frank was directly

17   above Rick and Troy.

18       Q.  So when Frank Whidden was the IT director, was

19   his office in your space?

20       A.  No.  He was in the third floor of the

21   courthouse, which is kind of a -- it's an older building,

22   so it's kind of in, like, the spiral staircase.  So there

23   wasn't a lot of direct contact with Frank.  He would come

24   down occasionally.

25       Q.  How often?

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                              April 22, 2019

                                                      Page 54
 1   people that they could have gotten rid of that everybody
 2   knew weren't doing a good job.
 3        Q.  (BY MS. BISBEE) Okay.  Who were these people?
 4        A.  Derek Conlon at the sheriff's office.  Terrie --
 5   Terrie.
 6        Q.  She did law enforcement work, right?
 7        A.  Right, she was at the sheriff's office.  And the
 8   other thing was people they laid off were more crucial to
 9   their business than some of the people that were left and
10   had a lot more knowledge and experience.
11        Q.  Okay.  And you don't think they were poor
12   performers?
13            MS. SEVERN:  Object to form.
14        A.  Nobody that was laid off.
15        Q.  (BY MS. BISBEE) Did you think it was their age
16   as well?
17        A.  I don't think it was based on performance.  It
18   couldn't have been because they didn't do any reviews.
19   They didn't have anything to back up any -- any
20   performance issues.
21        Q.  (BY MS. BISBEE) Okay.
22        A.  That's the first thing they would do if they
23   wanted to get rid of somebody let's start documenting
24   what they were doing wrong, and that didn't happen in our
25   case.

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

Page 55

1        **Q.   Uh-huh.   Do you know anything that Terrie Hotary**
2   **has not done well on?**
3            MS. SEVERN:  Object to form.
4        A.   I know she doesn't get along with her coworkers
5   that well, and she just didn't do things she was
6   supposed -- she didn't get things done basically that she
7   was supposed to be doing.
8        **Q.   (BY MS. BISBEE) And she's --**
9        A.   She was fairly recently hired.
10       **Q.   Okay.**
11       A.   She didn't have a whole lot of experience.
12       **Q.   Do you know if she is younger than Debbie?**
13           MS. SEVERN:  Object to form.
14       A.   I believe she probably is, yeah.  And then just
15   from the type of work that's needed, the network group
16   was pretty much where everybody went for help.  We were
17   the ones that had the technical expertise.  It just
18   didn't make sense to lay off two of us out of four
19   people.
20       **Q.   (BY MS. BISBEE) So who was -- who was left in**
21   **your department?**
22       A.   In our -- in my network?
23       **Q.   Your network administrator group.**
24       A.   Bill Tarlton and Ron Sage.
25       **Q.   Okay.**

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Transcript of the Testimony of

**RICK CORSI**
**April 22, 2019**

**Debra Bouricius**
**v**
**Mesa County, et al.**

## Linda L. Frizzell, RPR

*Linda L. Frizzell, RPR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444



EXHIBIT 3

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                        April 22, 2019

```
                                                            Page 3
 1                    I N D E X

 2   EXAMINATION OF RICK CORSI:                      PAGE
     April 22, 2019
 3
     By Ms. Bisbee:                                      4
 4   By Ms. Severn:                                    116
     By Ms. Bisbee:                                    158
 5   By Ms. Severn:                                    169

 6                                                 INITIAL
     DEPOSITION EXHIBITS:                        REFERENCE
 7
     Exhibit 33   Settlement Agreement and Release
 8               Bates Bouricius 000392-000398          5

 9   Exhibit 34   Evaluations Rick Corsi
                 Bates DEF 4292 and DEF 3737
10               CONFIDENTIAL                          51

11   Exhibit 35   Evaluation David Barnett, Leslie
                 Boyles, Ryan Davidson, Terri Hotary,
12               Kelly Leuallen, Lori Marak, Elizabeth
                 McDowell
13               Bates DEF 4138, 4376, 4490, 4915, 4720
                 5040, 4364 CONFIDENTIAL              51
14
     Exhibit 36   Charge of Discrimination
15               Bates DEF 3571-3587 CONFIDENTIAL    103

16   (Attached to original and copy transcript.)

17   PREVIOUSLY MARKED EXHIBITS:

18   Exhibit 31   Settlement Agreement and Release
                 Bates Bouricius 000385-000391          5
19
     Exhibit 32   April 9, 2017, Email Re:  Rebuttal
20               to Mesa County
                 Bates  Bouricius 000417-000418      121
21
     QUESTIONS DEPONENT INSTRUCTED NOT TO ANSWER:
22                         (None)

23   INFORMATION TO BE PROVIDED:
                           (None)
24

25
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

---

Page 18

 1      A.   There was -- I don't believe there was a --
 2  anyone in a position.  They were all at the same level
 3  except one person.
 4      Q.   (BY MS. BISBEE) Okay.  Who was that person?
 5      A.   Elizabeth McDowell.
 6      Q.   Okay.  And what was her level?  How was she
 7  different?
 8      A.   She was at the same level except she was a GIS
 9  and business system analyst.
10      Q.   Okay.  So you don't recall that anyone having a
11  title, senior business analyst?
12      A.   I'm trying to think if that's what -- what we
13  called them at the time.  I don't recall.  There may have
14  been -- that may have been what the titles were.
15      Q.   Okay.  So would a -- whatever the title is,
16  we'll just say BSA.
17      A.   Right.
18      Q.   Well, who were the BSAs?  Can you tell me that?
19      A.   Deb was one BSA, Kelly Leuallen, Terrie Hotary,
20  Eliz- -- Elizabeth was -- she had the -- the double
21  title, David Barnett, and Lori Marak.  I believe I got
22  them all.
23      Q.   Do you know -- the folks you just listed, do you
24  know how old they are?
25      A.   Not specifically, no.

---

**EXHIBIT 3**

Debra Bouricius                                                RICK CORSI
Mesa County, et al.                                          April 22, 2019

Page 56

1    that might be out there about the staff that was there

2    when you left, would you have had emails documenting any

3    performance issues on any of them?

4         A.  Yes, there would -- there would have been emails

5    or -- but I don't recall having any emails with the --

6    you know, with the current staff that's out there.

7         Q.  I know it's been a long day already.  I don't

8    recall if you were -- your wife said something about

9    this, but was -- was Terrie Hotary a strong BSA?

10             MS. SEVERN:  Object to form.

11        A.  She was one of the newer BSAs and probably not

12   one of the -- the top BSAs technically or -- or working

13   with customers.

14        Q.  (BY MS. BISBEE) Do you recall ever putting

15   anything in writing that documented that?

16        A.  Not specifically, no.

17        Q.  Do you recall ever putting anything in writing

18   about Lori Marak and her performance?

19        A.  Not specifically.  I mean, we did -- there were

20   some issues with the BSA group that supported the

21   sheriff's office, mainly working with each other, and we

22   had some issues there.

23        Q.  Okay.  So interpersonal issues?

24        A.  Interpersonal issues, yes.

25        Q.  Do you remember when those were?

**EXHIBIT 3**

Debra Bouricius                                        RICK CORSI
Mesa County, et al.                                April 22, 2019

Page 70

1         A.   In different areas, different people.  Her

2     project management abilities were probably at the top.

3     Her other skills, I mean, Terrie would have been one that

4     she probably -- she definitely had more experience and --

5     with applications, specifically, in the County.  The

6     different systems -- I mean, it's going to vary from

7     system to system; on the law enforcement side, she

8     wouldn't have been as strong as -- you know, the three

9     primary people supporting that.  On some of the other

10    systems, on the -- the scanning and document system, she

11    wouldn't have been as strong as, say, David Barnett, but

12    it varies, but she was in some areas a strong -- you

13    know, on the top of the -- the areas.

14         Q.   Okay.  Would you have had any concerns with her

15    being able to absorb more work had she been one of the

16    ones that remained at the County?

17              MS. SEVERN:  Object to form.

18         A.   No, no.

19         Q.   (BY MS. BISBEE) Do you think the three law

20    enforcement site BSAs that remained were the three

21    individuals that could have absorbed the remaining

22    work?

23              MS. SEVERN:  Object to form.

24         A.   No.

25         Q.   (BY MS. BISBEE) Was Terrie Hotary well

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

```
                                                    Page 110
   1        Q.  So did you engage in some sort of clandestine
   2   operation with Janine to get access to this?
   3            MS. SEVERN:  Object to form.
   4        A.  No.
   5        Q.  (BY MS. BISBEE) Do you know how old in 2016
   6   Leilani Boyles was?
   7        A.  I don't.
   8        Q.  What about Derek C.?  I don't have the --
   9   Derek -- Derek Conlon?
  10        A.  I don't, no.
  11        Q.  Were you 59?
  12        A.  I believe I was, yes.
  13        Q.  And Janine 60?
  14        A.  Yes.
  15        Q.  Do you know how old John Dallman was?
  16        A.  No.
  17        Q.  What about Troy Flick?
  18        A.  I don't -- I don't know.  I could guess at their
  19   ages, but I don't know how old they were.
  20        Q.  Is he younger than you were?
  21        A.  Yes.
  22        Q.  What about Terrie Hotary?
  23        A.  Younger than me.
  24        Q.  Lhana Jordan?
  25            MS. SEVERN:  Object.
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

---

                                                        Page 113

 1              MS. SEVERN:  Okay.

 2              MS. BISBEE:  Except I'm going to try to identify

 3    what I was looking for before.

 4              MS. SEVERN:  Sure.  Yeah.  Can we take a little

 5    break and then come back?

 6              MS. BISBEE:  Sure.

 7              MS. SEVERN:  Yeah.  Okay.

 8              (Recess taken from 4:19 to 4:27 p.m.)

 9         Q.  (BY MS. BISBEE) Okay.  Mr. Corsi, this big

10    packet of your charge, that I think we marked

11    Exhibit 3- --

12         A.  6.

13         Q.  On page 3579, there at the bottom.

14         A.  Uh-huh.

15         Q.  This last paragraph reads, As recently as the

16    week of November 7, 2016, the DHS director announced at a

17    staff meeting that employees with more than five years

18    experience are being targeted by the Administration and

19    Board to be terminated.  Is the DHS director Terrie

20    Garchar -- or Tracey --

21              MS. SEVERN:  Object to form.

22         A.  Tracey, yes.

23         Q.  (BY MS. BISBEE) -- I'm sorry.

24              MS. SEVERN:  Object to form.

25         A.  Yes, yes.

---

              Hansen & Company, Inc. Registered Professional Reporters
                      (303) 691-0202 * (303) 691-2444

                                                      **EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                    April 22, 2019

```
                                                    Page 138

 1    issues?

 2        A.  Yes, it was Terrie, Lori, and they were the main

 3    two.  But Elizabeth also worked on that project and kind

 4    of got hooked into it.

 5        Q.  Was Ms. Bouricius on this project?

 6        A.  Not at the time, no.

 7        Q.  Did she come on board later?

 8        A.  No, she was on it prior to that.

 9        Q.  Prior.  Okay.

10        A.  And like I said, everybody -- everybody -- all

11    the BSAs were cross trained.  That's what -- what we were

12    going through is cross training BSAs, and I did talk to

13    Mr. Whidden about how to -- trying to get advice about

14    how to handle this situation with the three.

15        Q.  Cross training BSAs, is that something that was

16    new when Mr. Whidden came on board or has that been going

17    on?

18        A.  People have always been cross trained.

19        Q.  Okay.  That's something that you wanted in your

20    department or your part of the department?

21        A.  Yeah, and actually in -- in the entire

22    department that needed to happen:  If someone's out that

23    has a certain skill set, somebody else has to back them

24    up.

25        Q.  Okay.
```

**EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

_____

DEBRA BOURICIUS,

    Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board of
County Commissioners,

    Defendant.

_____

DEPOSITION OF JOHN JUSTMAN

_____


Friday, May 3, 2019

9:02 a.m.


PURSUANT TO NOTICE and the Federal Rules of Civil
Procedure, the above-entitled deposition was taken on
behalf of Plaintiff at 205 North 4th Street, Suite 300,
Grand Junction, Colorado, before K. Michelle Dittmer,
Registered Professional Reporter and Notary Public within
Colorado.

EXHIBIT 3

```
 1    know as much about the county as, or more than, a lot of

 2    commissioners do --

 3              Q.   Okay.

 4              A.   -- just because of my long experience here

 5    and my business background and . . .

 6              Q.   Sure.

 7                   Okay.  And when you became a county

 8    commissioner, who were the other county commissioners?

 9              A.   Rose Pugliese and Steve Acquafresca.

10              Q.   Okay.  You'll have to spell that name for

11    Shelly.  I --

12              A.   I kind of can, but I'm not good.

13                   MR. SANTO:  Why aren't more people named

14    Smith?

15              Q.   (By Ms. Greisen)  Yeah.  Augla- --

16              A.   A-c- -- I don't know --

17                   MR. SANTO:  Q.

18              A.   -- a-u, and then "fresca."  It's fresh

19    water, is what it says.

20                   MR. SANTO:  Yeah.  It's Acquafresca.

21              A.   Yeah.  "Agua" and then "fresca," perhaps.

22              Q.   (By Ms. Greisen)  Oh, okay.

23                   MR. SANTO:  Yeah, we're all looking.

24                   MS. GREISEN:  That's okay.  We'll figure

25    it out later.
```

EXHIBIT 3

Lori Marak   May 10, 2019

1

            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
Civil Action No. 18-cv-01144-WYD-STV
_____
DEPOSITION OF LORI MARAK
                                        May 10, 2019
_____
DEBRA BOURICIUS,

      Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board
of County Commissioners,

      Defendant.
_____


            Pursuant to Notice and the Federal Rules
of Civil Procedure, the deposition of LORI MARAK,
called by Plaintiff, was taken on Friday, May 10,
2019, commencing at 9:13 a.m., at 205 North 4th
Street, Grand Junction, Colorado, before Candice F.
Flowers, Certified Shorthand Reporter and Notary
Public within and for the State of Colorado.

                                        **EXHIBIT 3**

Lori Marak   May 10, 2019

```
 1   environment.  I don't know anything else.
 2        Q    Okay.  Let's assume that all things being
 3   equal between two employees -- actually, strike
 4   that.
 5             Do you think that Deb Bouricius had
 6   better skills than any of the senior BSAs that were
 7   left in the IT department?
 8        A    Yes.
 9        Q    More than one person?  Did she have
10   better skills than more than one person that was
11   left?
12        A    Yes.
13        Q    Can you tell me who Debbie had better
14   skills than that remained in the department?
15        A    She had better skills than Terrie Hotary
16   Smith or Terrie Smith Hotary.
17        Q    I'm not...
18        A    She was Terrie Hotary then; now she's
19   Terrie Smith.
20        Q    Okay.  Terrie Hotary.
21             So would you say that had Terrie Hotary
22   been laid off instead of Deb, Deb would have been
23   able to step in and take over Ms. Hotary's job?
24   Could she have done the work that Terrie Hotary
25   does?
```

**EXHIBIT 3**

Lori Marak   May 10, 2019

56

```
 1              MR. SANTO:  Object to form.
 2      A    I believe so, but we really didn't --
 3  Terrie was working on public safety systems and
 4  there were two others.  That's why I say that.  So
 5  Deb could have filled in with whatever gap was
 6  needed there.  We had a lot of stuff going on with
 7  CJSD, so that might have been why the decision was
 8  made.
 9          Q    (By Ms. Bisbee) So let's break that down.
10          There were six senior BSAs before the
11  layoff, right?
12          A    Uh-huh.
13              MR. SANTO:  Is that a "yes"?
14              THE DEPONENT:  Yes.
15          A    Not senior, but at least four -- wait.
16  I'm sorry.  Let me count.  Deb was senior, Kelly
17  was senior, Terrie was senior because she was
18  hired as a senior, and I was a senior.  So there
19  was at least four.  I'm not sure about the other
20  two, if they were senior yet.
21          Q    (By Ms. Bisbee) And were the other two
22  Elizabeth McDowell and David Barnett?
23          A    Yes.
24          Q    So who before the layoff was doing
25  criminal justice stuff?
```

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

57

```
 1        A     Terrie, Elizabeth, and me.
 2        Q     And you all three stayed doing criminal
 3   justice stuff after the layoff.
 4        A     Yes, although we had to cover other areas
 5   as well, and we do still cover other areas.
 6        Q     Did you have to cover some of the work
 7   that Debbie had done?
 8        A     Yes.
 9        Q     So you -- all of you had to pick up some
10   of Debbie's work?
11        A     Yes.  Like I knew Crystal reports, so I
12   had to help out with a lot of Crystal reports that
13   Deb was really more the resident expert doing.
14        Q     Did Terrie pick up any of Debbie's work?
15        A     Yes.
16        Q     What was that?
17        A     Just helping out and getting to learn the
18   new applications that -- or not the new
19   applications but the applications that needed
20   coverage since Deb was let go and since David
21   Barnett was let go.  So there was Sire, there was
22   Eden, a lot of DHS applications that David Barnett
23   took care of.  So we all had to kind of just step
24   up and start working on other things, so we became
25   less just concentrated in one area.
```

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

58

1      Q     Okay.  So I guess going back to my
2   original question a couple minutes ago, would --
3   this is how I think we started this.
4            If Terrie had been let go, would Deb have
5   been able to absorb her work in the way you guys
6   absorbed Deb's work?
7      A     Yes.
8      Q     Do you think she would have had any
9   problems doing that?
10     A     No.  It would have been a learning curve
11  like any of us had with learning Deb's stuff that
12  we hadn't seen before and have to work on.
13     Q     Okay.  Are there any skills that Terrie
14  Hotary had that Debbie didn't have?
15     A     No.
16     Q     Do you think Debbie was more proficient
17  as a senior BSA than Terrie Hotary?
18     A     I do not know that for sure, but I would
19  guess since her years of experience and knowledge
20  far outweigh Terrie's, yes.
21     Q     Because Debbie had been there for almost
22  30 years?
23     A     I think she had gotten her 30-year pin
24  just the summer before.
25     Q     And Debbie had set up a lot of IT systems

**Lori Marak   May 10, 2019**

59

```
 1    that were running.
 2         A    Yes.
 3         Q    She had seen the County go from
 4    rinky-dink couple of computers to a whole
 5    operation, right?
 6         A    Yes.
 7         Q    And Terrie wasn't part of that?
 8         A    No.
 9         Q    And Terrie didn't grow the IT department
10    in any way, right?
11         A    No.
12         Q    How long had she been there at the time
13    of the layoff?
14         A    Maybe two years.
15         Q    Was she younger than Debbie?
16         A    Yes.
17         Q    Substantially?
18         A    She's my age, so she's 55 now or going to
19    be 55 this year.
20         Q    What about Elizabeth McDowell, how old is
21    she?
22         A    She's younger.  She's in her 30s.
23         Q    Okay.  Does Terrie get along with others
24    in the workplace?
25         A    Some people she does.
```

**EXHIBIT 3**

Lori Marak   May 10, 2019

61

```
 1   looking at who to keep and who to lay off?
 2        A    Well, that should be one consideration,
 3   yes.  I think there's a lot of considerations.  I
 4   wouldn't say that I essentially get along with
 5   everybody either because I'm very cut and dried and
 6   blunt, so I'm sure I have my issues too.
 7        Q    Have you ever been disciplined for not
 8   getting along with anyone or being blunt?
 9        A    I have never been disciplined for that.
10        Q    Is Terrie Hotary still in your public
11   safety group?
12        A    Yes.
13        Q    How many people are doing public safety
14   in IT right now?
15        A    Well, right now there's only two.  Terrie
16   has transitioned away from it.  I'm sorry.  I
17   probably did not hear that question, so you should
18   say it again before I answer fully.
19                  MS. BISBEE:  Candice.
20                  MR. SANTO:  Two ago or one ago?
21                  THE DEPONENT:  The one about Terrie
22   still being in -- what was it -- public safety
23   group or BSA group?
24                  (Record from Page 61, Line 10 to Page 61,
25                  Line 14 was read.)
```

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

62

```
 1              MR. SANTO:  Just identify which one
 2    you are answering.
 3              THE DEPONENT:  So now that we're --
 4    I'm going to answer the first question.  Yes,
 5    Terrie's still doing public safety BSA work, not
 6    entirely.  She has transitioned a lot into filling
 7    Deb's area more since there's only four of us.  She
 8    has moved more to the courthouse applications doing
 9    the Sire replacement, working on Eden, and filling
10    in there.  The new person was put in public
11    safety -- the person that replaced Elizabeth is
12    putting more into public safety to assist me.
13        Q    (By Ms. Bisbee)  Okay.  So currently it's
14    you, the new person, and a little bit Terrie
15    Hotary.
16        A    Yes.  Since there was so much to learn,
17    the new person's still learning, and we still want
18    our lines blurred a little bit more to where it's
19    not just two people on one application.  It's
20    more -- so Terrie is still helping out as needed.
21    It's really hard covering a schedule with 24/7
22    applications when there's only four people.
23        Q    Okay.  So even though they left three
24    public safety BSAs in place, it seems that they
25    really needed a BSA to cover some of the courthouse
```

**EXHIBIT 3**

Lori Marak   May 10, 2019

63

1    stuff and more of the stuff Deb was doing, because

2    now they are moving Terrie into that position?

3         A    Yes.  To cover Deb's vacancy and David

4    Barnett's vacancy, which was all DHS and the

5    courthouse, they have had to have other people help

6    out.

7         Q    So, in retrospect, perhaps, when they did

8    the layoff, they could have left two BSAs in public

9    safety and two in -- on the other side of things

10   and they would end up where they are today?

11        A    Yes, that would have been one way of

12   accomplishing things.

13        Q    Did you ever hear of any coworkers

14   complain about Debbie's performance?

15        A    No.  And I didn't hear anything bad until

16   after she was laid off.  And I don't know -- it's

17   like she wasn't doing any work, but I just took

18   that as a rumor and I can't even remember who said

19   that.  It kind of shocked me.

20        Q    Because that's not something you had

21   observed.

22        A    No.

23        Q    Are you aware of any discipline Debbie

24   ever got?

25        A    I'm aware of during the data breach, I

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

70

1    not really sure.

2         Q    But you didn't have any issues with Deb's

3    performance, right?

4         A    No.

5         Q    And, in fact, you think her performance

6    was better than some of the BSAs that remained,

7    correct?

8         A    Yes, at least one.

9         Q    At least Terrie Hotary?

10        A    At least one.

11        Q    Have you ever had to reach out to Debbie

12   or any of the folks that were laid off to ask them

13   for help on projects that they left behind?

14        A    No, not that I recall.

15        Q    Okay.  Have you ever had any

16   conversations with Frank Whidden about the layoff

17   since it happened?

18        A    I can't specifically remember any

19   conversations with Frank.  I haven't really had

20   much since then as far as conversations with Frank.

21        Q    Did you provide testimony to the CCRD in

22   Debbie's charge of discrimination?

23        A    What is the CCRD?

24        Q    The Colorado Civil Rights Division.

25        A    No, I don't believe so.  I think I did

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

77

```
 1   she had any performance issues.
 2       A     None that I -- none to that level, no.
 3       Q     And she's probably, in fact, better than
 4   at least Ms. Hotary at her job.
 5       A     She's at least better than other BSAs, or
 6   at least one other BSA.
 7       Q     Okay.  Now, it's fair to say or would you
 8   agree that Deb and Kelly Leuallen are about equal
 9   in their skill sets?
10       A     Well, I don't know a fair way of
11   answering that, because they both were doing the
12   same job.  Now, since Deb has left, Kelly has taken
13   on a lot more workload, a lot more responsibility,
14   and really is our best systems analyst.
15       Q     But at the time of the layoff, were they
16   kind of doing the same thing?
17       A     Yes.
18       Q     And Kelly had been there for less time,
19   correct?
20       A     Kelly has been with the department a long
21   time.  He's probably been there 22 to 25 -- wait.
22   He's been there 25 years.  So as far as in the
23   business systems analyst job, less time, but his
24   skill set is definitely good.
25       Q     But he has been there less time than
```

**EXHIBIT 3**

Lori Marak   May 10, 2019

82

```
 1        A    I don't know everybody's age for sure,
 2   but I know Kelly's probably as old as me and Deb,
 3   so -- or in that -- I want to say we're within ten
 4   years of each other, the three of us.
 5        Q    (By Ms. Bisbee) And you're younger than
 6   Deb, correct?
 7        A    Oh, yeah.  I'm not sure exactly how.
 8        Q    But, clearly, if some maxed out people
 9   stayed on, there were other considerations aside
10   from these high-paying positions, correct?
11        A    I don't know how to answer that
12   specifically with a yes or no.  I believe I was
13   kept on because I was doing public safety work, and
14   then Kelly was doing so much work on the other
15   side, he was left on, and we were the oldest at
16   that point, I believe.
17        Q    After the layoff.
18        A    Yes.  And, of course, Terrie Hotary is
19   the same age as me.
20        Q    Are you aware of any problems with
21   attendance or job performance in -- I guess it
22   would be the network administrator group around
23   2014, 2015, 2016?
24        A    Yes.  It seemed like we had a lot of
25   problems trying to get help from them or keep
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

1

         IN THE UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

_____

VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

                                July 11, 2019

_____

DEBRA BOURICIUS,

     Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

     Defendant.


_____



         Pursuant to Notice and the Federal Rules

of Civil Procedure, the videotaped deposition of

FRANK WHIDDEN, called by Plaintiff, was taken on

Thursday, July 11, 2019, commencing at 9:07 a.m.,

at 205 North 4th Street, Grand Junction, Colorado,

before Candice F. Flowers, Certified Shorthand

Reporter and Notary Public within and for the State

of Colorado.

                                        **EXHIBIT 3**

**Frank Whidden   July 11, 2019**

238

```
1    helping the client resolve it, she would basically
2    give them -- tell them to call outside help to get
3    help with the problem.
4         Q    Anything else other than that?
5         A    And then my personal interaction when I
6    asked for help with Eden.
7         Q    Okay.  So have you now told me all the
8    skills that you're aware Ms. Bouricius had at the
9    time of her layoff?
10        A    I believe so, yes.
11        Q    And all of the areas that she worked in,
12   to the best of your knowledge, during her time at
13   the IT department at Mesa County?
14        A    Yes.
15        Q    Did you -- can you tell me what skill
16   sets Terrie Hotary had that Ms. Bouricius did not
17   have in October 2016?
18        A    I felt that, first of all, the salary was
19   less; and, secondly, Terrie was more approachable,
20   more customer service oriented, and seemed more
21   eager to learn, more eager to be a team player,
22   more motivated to be involved and to be engaged.
23   That's what I saw.
24        Q    Is -- are there any documents or any --
25   any specific evidence that you can point to to show
```

**EXHIBIT 3**

**Frank Whidden  July 11, 2019**

239

1    that Terrie was more eager and motivated than Ms.
2    Bouricius?
3         A    I don't have a document to point to.
4    That was, again, feedback that I had heard and
5    received and from personal observation as well.
6         Q    Can you give me any specifics about the
7    feedback you received:  Who it was from, what it
8    was about, and when it occurred?
9         A    I don't remember a specific instance.  I
10   know she was more involved in New World, willing to
11   learn New World and be involved in that.  That was
12   a really critical issue at the time.  And she was
13   showing a willingness to be involved with that and
14   a willingness to learn and grow as far as her SQL
15   knowledge -- it's a language -- and those kinds of
16   things, that she had -- she seemed more motivated
17   to be an engaged player on the team.
18        Q    And, again, is that your personal
19   observations?
20        A    Yes, as well as feedback.  I -- the
21   trouble right now I'm having in my mind is
22   remembering -- Lhana has certainly told me that.  I
23   can't say specifically, though, was that before the
24   layoff or after the layoff.  There certainly has
25   been a lot of good feedback since that time, but

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

240

```
 1   it's hard for me to distinguish exactly, you know,
 2   Okay, did you get told that before or after.
 3        Q    I want to make sure I got your testimony
 4   down.  You said she was more eager and motivated to
 5   learn, and there was another word that you used
 6   too.  A-P-P?
 7        A    Engaged.
 8        Q    Engaged.  Okay.
 9             So more eager, engaged, and motivated
10   than Ms. Bouricius.  Is that your testimony?
11        A    Yes.
12        Q    Okay.  Any other reasons why you chose to
13   keep Terrie Hotary -- or -- I'm sorry.  Let me back
14   up.
15             Are there any other skill sets that
16   Terrie Hotary had that Ms. Bouricius did not have
17   in October of 2016?
18        A    Her involvement with New World.
19        Q    Anything else?
20        A    No.
21        Q    And did you make any inquiry as to Ms.
22   Bouricius' ability to work on the New World
23   software?
24        A    Not that I recall, no.
25        Q    So have you now told me every reason why
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

241

1   you chose to terminate Ms. Bouricius rather than
2   Terrie Hotary?
3        A    Yes.
4        Q    Eager, engaged.
5             Can you tell me what you mean by being
6   more engaged.  You said that Terrie Hotary was more
7   engaged than Ms. Bouricius, what that means.
8        A    It means being willing to interact with
9   the teams, with clients, being more willing to
10  learn about new systems, being -- initiative, to
11  me, is a part of that.
12       Q    And on all those facets, you thought Ms.
13  Hotary was more -- satisfied that skill set more
14  than Ms. Bouricius?
15       A    Yes.
16       Q    And, again, that's just based on your
17  personal observations?
18       A    And -- and feedback from clients.
19       Q    And, again, I'm going to ask you if you
20  have any specifics, which clients, who gave you
21  that feedback.  Can you share them with us?
22       A    I do not.
23       Q    So was Ms. Bouricius as proficient in
24  customer support as was Ms. Hotary?
25       A    I would say no.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

1     they fit in.

2           So it wasn't so much to specifically try

3     to answer your question, you're better than

4     somebody else at doing this, although to me she was

5     head and shoulders above everybody else in the

6     department.

7           Q    Were there skills that Ms. Bouricius had

8     that Lori did not have?

9           A    I don't think Lori is as strong on the

10    Eden system as Deb was or is.

11          Q    What about Terrie Hotary, are there

12    skills that Ms. Bouricius had that Ms. Hotary did

13    not have?

14          A    She was much more senior and I thought,

15    yes, she probably had stronger skills in, for

16    instance, SQL, Sequel, and Eden itself.

17          Q    SQL?

18          A    Structured Query Language.

19          Q    So SQL and -- and Eden.

20          Are there any other skill sets that Ms.

21    Bouricius had that were stronger than Ms. Hotary's?

22          A    I think those were the main ones.

23               MR. SANTO:  We're going to need a

24    break.  I'm not feeling quite as well.

25               MS. GREISEN:  It is not my fault.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

338

1    testified to all the information that you have

2    under Matter No. 2.

3         A    Yes.

4         Q    Or that Mesa County has.

5         A    I believe that all the information that

6    would pertain to that matter we have covered, yes.

7         Q    Okay.  So Matter No. 3, we talked a

8    little bit about skill sets.  So I would like you

9    to, if you could, look at Exhibit 52, the second

10   page of Exhibit 52 -- the second and third pages

11   are pages that have the employees that remained.

12   And if you could just go down and tell me -- are

13   you on the same page?

14        A    I think.

15        Q    Yeah.  It's Defendant 61 at the bottom.

16        A    This.

17        Q    Yeah.  Okay.  So Matter No. 3 says:  For

18   each skill, Plaintiff, Ms. Bouricius, did not have

19   in comparison with individuals that stayed.

20             Tell me each one of these people who had

21   more skills than plaintiff.

22        A    Okay.  Lhana had more skills and David

23   did, Troy did, Lori did, Kelly did, Chris did,

24   Leilani did, Joseph did, Elizabeth did, Paul did,

25   Eric did, William Tarlton did, and Terrie Hotary

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

1    A    Generally speaking, yes.  But Paul is

2    help desk extraordinaire.  He is simply amazing and

3    is able to handle all manner of -- whether it's

4    hardware, software, he is amazing.  And so cus --

5    from customer service and all of that, Paul -- so I

6    think he's got some tremendous skills there that,

7    to my knowledge, that's not -- that's not her

8    forte.

9         Q    Do you know whether Ms. Bouricius has

10   ever worked on the help desk?

11        A    I do not know.

12        Q    Did you ask anyone?

13        A    No.

14        Q    Okay.  What about the -- we've gone

15   through Terrie Hotary and I think we've gone

16   through Tarlton.

17        A    Uh-huh.

18        Q    Eric Farslow, does he have any skills

19   that Ms. Bouricius doesn't have?

20        A    Same comment as the other technicians.

21   He's got extreme skills with the hardware and the

22   frontline techs, just like the others that we

23   discussed.

24        Q    Okay.  Is that true with all the support

25   specialists, kind of this frontline --

**EXHIBIT 3**

# Composite Deposition Testimony of

# Lhana Jordan

**EXHIBIT 3**

# *BOURICIUS*

# *VS.*

# *MESA COUNTY*

### Deposition

# *DEBRA BOURICIUS*

*02/22/2019*

---

# *AB Court Reporting & Video*
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

**EXHIBIT 3**

*AB Court Reporting & Video*

1    credibility?

2         A      I don't know.

3         Q      Do you have a belief as to her honesty?

4         A      I don't know.

5         Q      Have you talked with Ms. Howerton since

6    your employment with Mesa County ended?

7         A      I sent her an e-mail asking -- -- e-mail

8    or something asking how she was doing.  That's all.

9         Q      Did she respond to that e-mail?

10        A      I believe so, yes.

11        Q      Did you talk at all about any charge of

12   discrimination or about a lawsuit?

13        A      No.

14        Q      Do you remember what Ms. Howerton's

15   response was?

16        A      I believe she had gotten a job.  I don't

17   recall any more than that.

18        Q      The next witness is Lhana Jordan.  Do you

19   know Ms. Jordan?

20        A      Yes.

21        Q      Who is Ms. Jordan?

22        A      She was a supervisor of the help desk and

23   the PC support group in Mesa County in the IT

24   department.

25        Q      When did you meet Ms. Jordan?

**EXHIBIT 3**

**AB Court Reporting & Video**

```
 1        A    I can't say specifically.

 2        Q    Was she hired after you were already

 3   there?

 4        A    Yes.

 5        Q    What was your relationship like with

 6   Ms. Jordan?

 7        A    We got along well.

 8        Q    Did you ever have any disagreements?

 9        A    I can't say that we did.

10        Q    How would you work together?

11        A    Well, because she was PC support -- I

12   guess I didn't work with her directly that much.  So

13   that's ..

14        Q    Okay.  Would you ever work with her

15   directly?

16        A    If there was an issue with something that

17   I felt she needed to make a decision on in her

18   position, I would.

19        Q    What kind of things would she make a

20   decision on that you would need her input for?

21        A    Well, of course, she's managing all of the

22   PCs -- people that support the PCs and the decisions

23   that go into keeping them updated, for example,

24   anything like that, and she also managed the help

25   desk, so if there was an issue with how things were
```

**EXHIBIT 3**

1    or were not being communicated, I would probably go

2    to her.

3         Q    What information does Ms. Jordan have

4    regarding your work performance?

5         A    I can't say.

6         Q    Would Ms. Jordan's performance of her job

7    impact the performance of your job?

8         A    Of course.  She was part of the IT

9    department.

10        Q    How specifically would her performance of

11   her job impact your performance?

12        A    I can't say.  I mean, that's -- that would

13   be speculating.

14        Q    Do you have any ideas?

15        A    Hm-hm.

16        Q    No?

17        A    She's part of the team.  If a team member

18   isn't doing their job, it impacts the rest of the

19   team.

20        Q    And what information does Ms. Jordan have

21   regarding the 2016 layoffs?

22        A    I can't say.

23        Q    Do you have a belief as to Ms. Jordan's

24   credibility?

25        A    I can't say.

**EXHIBIT 3**

AB Court Reporting & Video

```
 1        Q      Do you have a belief as to her honesty?

 2        A      I can't say.

 3        Q      Is there anything that would help you be

 4   able to determine her credibility or honesty?

 5        A      No.

 6        Q      Have you talked with Ms. Jordan since your

 7   employment ended at Mesa County?

 8        A      Yes.

 9        Q      When did you talk with Ms. Jordan?

10        A      I can't recall.

11        Q      Was it by phone?

12        A      I can't recall.

13        Q      E-mail?

14        A      I can't recall.

15        Q      What did you talk about?

16        A      Her son was -- had taken care of our cats

17   several times, and he liked being at our place, and

18   so we talked to her about him coming out and watering

19   for us.

20        Q      Is that something that her son did?

21        A      Sort of.

22        Q      Sort of.  What do you mean by sort of?

23        A      He started and then he just stopped.

24        Q      He was doing the watering you said?

25        A      Yes.
```

**EXHIBIT 3**

1   opinions about her credibility and honesty?

2        A    It's the same.  I really have, you know,

3   no opinion.  I assume she's credible, and I assume

4   she's honest.

5        Q    What about Lhana Jordan?  Her credibility

6   and honesty?

7        A    Same.  I assume she is.  I have never seen

8   otherwise.

9        Q    So credibility and honesty?

10       A    M-hm.

11       Q    Yes?

12       A    Yes.

13       Q    Thank you.

14            Mr. Justman?

15       A    I sometimes question his credibility.  I

16  believe he's honest.

17       Q    Why do you question the credibility part?

18       A    Some of the things he says in public.

19       Q    Is there anything in particular you can

20  think of?

21       A    No.

22       Q    But it's public statements you're thinking

23  of.

24       A    Yes.

25       Q    Anything to do with the last election,

**EXHIBIT 3**

Transcript of the Testimony of


**JANINE CORSI**
**April 22, 2019**


**Debra Bouricius**
**v**
**Mesa County, et al.**


# Linda L. Frizzell, RPR


*Linda L. Frizzell, RPR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444



**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

Page 9

1        Q.   And to the best of your understanding, Bill
2   Tarlton told Carey Stieb that Troy Flick had not known
3   about the layoff?
4        A.   Right.
5        Q.   In advance --
6        A.   That Troy or Lhana hadn't known about it.  So
7   they weren't any -- he believes they weren't any part of
8   it, and that they were -- Troy and Carey were friends, so
9   I think he would like to have seen that Troy didn't know.
10       Q.   Okay.
11       A.   I don't really know for sure if Troy knew or
12  not.
13       Q.   Okay.  And what was Carey's position?
14       A.   He was the network administrator, but on the --
15  when they laid us off, they had his position wrong, and
16  they also had him as a female instead of a male.
17       Q.   Oh, what do you mean by that?
18       A.   Somewhere I saw where they thought -- because
19  his name was Carey, it might have been some other thing
20  when they were trying to figure out if it was
21  discrimination, but, anyway, when he was laid off, they
22  had his position wrong.  He was -- said he was desktop
23  support or something.  He's actually -- was the same
24  level as me, network administrator.
25       Q.   Okay.  And so when you say "they," are you

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

Page 13

1        Q.  Okay.  Did Troy have the other half of the
2   workers?
3        A.  Yes.  Well, then Lhana came along, and she was
4   desktop so she took over the help desk.  So then there
5   became three managers.  Eventually, Lhana Jordan was the
6   lower-level manager of the help desk.
7        Q.  Do you recall when she started?
8        A.  She came over from DHS.  She had worked there,
9   and she came over as -- I believe as a technician and
10  then they promoted her from there.
11       Q.  Do you recall if Frank Whidden promoted her?
12       A.  I believe so, yes.
13       Q.  Okay.
14       A.  So it was a little bit controversial because she
15  didn't have a degree.
16       Q.  Okay.  So if Frank Whidden -- I think came to
17  the County in 2011, her promotion would have been after
18  that?  Is that --
19       A.  Yeah, she actually --
20           MS. SEVERN:  Object to form.
21       A.  -- talked to him when -- before he started and
22  was getting his phone set up and stuff.  I remember that.
23       Q.  (BY MS. BISBEE) She talked to him?
24       A.  Yeah, to Frank.
25       Q.  Okay.  How do you remember that?

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

                                                      Page 16

 1      Q.  And I think you said the IT department had 24

 2  employees; is that correct?

 3      A.  I believe so.

 4      Q.  Can you explain to me how it was structured?

 5      A.  When we were laid off, there were two IT

 6  managers.

 7      Q.  So was Lhana Jordan an IT manager at that time?

 8      A.  Her position was a different title.

 9      Q.  Okay.

10      A.  I think she was something help desk.

11      Q.  Okay.

12      A.  Maybe help desk -- I don't know what her exact

13  title was actually.

14      Q.  So the IT managers were your husband, Rick

15  Corsi, and Troy Flick?

16      A.  Right.  And I'm not sure if Lhana was directly

17  under Frank, but Rick probably remembers all that better

18  than I do.

19      Q.  And how many -- did you report directly to Troy

20  Flick?

21      A.  Yes.

22      Q.  And how many other folks reported to Flick?

23      A.  There was Bill Tarlton, he was the network

24  administrator; Carey Stieb, network administrator;

25  myself, network administrator; and then there was --

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

                                              **EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

                                                        Page 17

1   actually, I think Lhana worked for Troy, and then there
2   was some PC support people:   Derek Conlon, two other guys
3   that were PC support, and then there was Paul Mitts and
4   Chrislynn Howerton were the -- basically the phone help
5   desk.  They would answer the calls and create tickets and
6   that kind of thing.
7           And then my husband had web group, which was
8   Leilani Boyles and Joe Keene; the GS group:  Chris Kadel,
9   and Ryan, I can't remember his last name; and then the
10  BSA group, which was Lori Marak, Deb Bouricius, Terrie --
11  she was -- I can't remember her last name, Kelly
12  Leuallen, and David Barnett.  They were all business
13  systems analysts.
14          Basically, he had web, database, and GIS and
15  business systems analyst.  And Troy had network
16  administration and help desk.  And Frank was directly
17  above Rick and Troy.
18      Q.  So when Frank Whidden was the IT director, was
19  his office in your space?
20      A.  No.  He was in the third floor of the
21  courthouse, which is kind of a -- it's an older building,
22  so it's kind of in, like, the spiral staircase.  So there
23  wasn't a lot of direct contact with Frank.  He would come
24  down occasionally.
25      Q.  How often?

Debra Bouricius                                              JANINE CORSI
Mesa County, et al.                                        April 22, 2019

                                                              Page 67

 1        A.  No.

 2        Q.  **What about reviewing employees' performance?**

 3   **Were you ever given that responsibility?**

 4        A.  Way back when I first started, we did peer

 5   reviews, but that was like 2- -- when Don Dumont was --

 6   when I was first there, back in the '90s.

 7        Q.  **Do you know when about that stopped?  Was it**

 8   **still in the '90s?**

 9        A.  Yeah, people got mad at each other, and he

10   discontinued doing that fairly quickly after that.  I

11   didn't really have any input in anybody's review as I

12   recall.

13        Q.  **Okay.  Now, you talked some that you thought**

14   **Troy was involved a little bit in the layoff.  Did I**

15   **understand that correctly**?

16        A.  I don't have any evidence, except that Frank had

17   a meeting with Troy, like, shortly before and Lhana and

18   Rick weren't included.

19        Q.  **How do you know about that meeting**?

20        A.  Troy was concerned about it.  I think he was

21   wondering what it was about and why Rick and Lhana

22   weren't invited.  So he mentioned it to my husband.  So

23   it's from my husband.

24        Q.  Okay.  So it wasn't something that Troy talked

25   with you about?

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

```
                                                      Page 68
 1        A.   No.

 2        Q.   Okay.  All right.

 3        A.   And then later, he said it was about Microsoft

 4   licensing.

 5        Q.   Who said it was about Microsoft?

 6        A.   Troy told Rick and Lhana that's what the meeting

 7   was about.

 8        Q.   And then your husband told you?

 9        A.   Yes.

10        Q.   Okay.

11        A.   And it just seemed odd because we got laid off a

12   day or two later.

13        Q.   Okay.

14        A.   It was unusual for Troy to have a meeting with

15   Frank by himself unless it was like a review or

16   something.

17        Q.   Did you ever hear what that meeting was about?

18             MS. BISBEE:  Object to form.

19        A.   Just that Troy said it was about Microsoft

20   licensing.

21        Q.   (BY MS. SEVERN) That was it?

22        A.   Yeah.

23        Q.   Okay.  Did you have any authority regarding who

24   should be laid off in 2016?

25        A.   No.
```

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                               April 22, 2019

```
                                                    Page 84
   1        Q.  She was called as a witness where?

   2        A.  I think for the civil rights case.

   3        Q.  Was that your civil rights case?

   4        A.  My husband and I's both.  We both listed her as

   5   a witness, but subsequently I tried to stay in touch with

   6   Lori, and she didn't return my calls.

   7        Q.  Who else has been reluctant, do you think, to

   8   talk with you?

   9        A.  Anybody that still works there.

  10        Q.  Okay.  The other --

  11        A.  I haven't had any contact with anybody.  Lhana

  12   Jordan was a friend.  I haven't talked to her.

  13        Q.  Okay.  So you think everybody in the IT

  14   department or everybody at Mesa County is reluctant to

  15   talk to you?

  16        A.  I believe it was IT.

  17        Q.  Has anybody said anything about not wanting to

  18   talk to you or --

  19        A.  No, I just thought that it was odd that nobody,

  20   the friends of mine, didn't at least reach out to me when

  21   I was fired.  And when I tried contacting Lori, she

  22   didn't respond, so I just inferred it was because she

  23   felt she was in a bad position.

  24        Q.  Did she ever tell you that, or is that your

  25   guess?
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Transcript of the Testimony of


**RICK CORSI**
**April 22, 2019**


**Debra Bouricius**
**v**
**Mesa County, et al.**


# Linda L. Frizzell, RPR


*Linda L. Frizzell, RPR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444



**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                 April 22, 2019

                                                         Page 13

    1        Q.  (BY MS. BISBEE) How many individuals worked
    2   under you at that time?
    3        A.  Approximately 11, maybe 12.
    4        Q.  Okay.  Was that roughly the same as it had been
    5   since you became the IT manager in -- in the mid-2000s?
    6        A.  Yes.
    7        Q.  Okay.  Okay.  What was the structure of the IT
    8   department when you left?
    9        A.  Frank Whidden had many roles.  He was IT
   10   manager, he was HR director -- or he was IT director, I
   11   guess.  He was HR director, he was finance director, and
   12   I believe he was finance direct- -- director at that
   13   time -- no, I think he became finance director later, and
   14   he was county administrator.  And then myself and Troy
   15   Flick and Lhana Jordan were a different level.  Troy and
   16   I were the same level of IT manager.  Lhana was in charge
   17   of PC support and help desk.
   18        Q.  Okay.  So she was not an IT manager?
   19        A.  I -- I'm not sure.  I don't remember exactly
   20   what her title was at the time.
   21        Q.  Did you ever --
   22        A.  She may have been.  I don't believe she had the
   23   same title.
   24        Q.  Okay.  Do you know -- had you ever seen an
   25   organizational chart of the IT department?

          Hansen & Company, Inc. Registered Professional Reporters
                    (303) 691-0202 * (303) 691-2444
                                                    **EXHIBIT 3**

Debra Bouricius                                      RICK CORSI
Mesa County, et al.                              April 22, 2019

```
                                                  Page 14

    1      A.  Yes.

    2      Q.  Were you and Lhana and -- and Flick on the same

    3   level?

    4      A.  We all reported to Frank Whidden.

    5      Q.  Okay.  But do you know, was Lhana's position

    6   somehow lesser than you and Troy?

    7          MS. SEVERN:  Object to form.

    8      A.  She was -- her pay scale was at a lower level --

    9      Q.  (BY MS. BISBEE) Okay.

   10      A.  -- than mine.

   11      Q.  And her experience, do you know what her

   12   background was?

   13          MS. SEVERN:  Object to the form.

   14      A.  Her experience was she -- when we hired her, she

   15   was working for Department of Human Services.  She had

   16   some computer experience.  We hired her as a help desk

   17   technician, and then she later moved up into a desktop

   18   support position.  And then -- then was promoted into

   19   supervising the desktop and help --

   20      Q.  (BY MS. BISBEE) Okay.

   21      A.  -- desk.

   22      Q.  Did you have anything to do with her being

   23   promoted?

   24      A.  Yes.

   25      Q.  Okay.
```

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

```
                                                   Page 15
    1        A.   I recommended that she --

    2        Q.   Had she at any time reported to you?

    3        A.   No.

    4        Q.   Do you know who she reported to?

    5        A.   Troy Flick.

    6        Q.   Okay.  So was the help desk under Troy Flick

    7   before Lhana became --

    8        A.   Yes.

    9        Q.   -- I guess what I'm trying to say -- in charge

   10   of the help desk?

   11        A.   Yes.

   12        Q.   Okay.  So -- and you had GIS and business

   13   systems analyst were you?

   14        A.   And web.

   15        Q.   And the web.  Okay.  So what are the -- what are

   16   the different roles and responsibilities of the groups,

   17   work groups that reported to you?

   18        A.   GIS was in charge of web development and GIS

   19   application development for the entire County.  We also

   20   supported all -- all GIS work throughout the County.

   21        Q.   Okay.

   22        A.   So different --

   23        Q.   Can you explain that to me like I'm in

   24   kindergarten?  What exactly does GIS do for the County?

   25        A.   GIS processes data, geographic data to be able
```

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                April 22, 2019

```
                                                        Page 26
 1        Q.  (BY MS. BISBEE) So did the BIS -- BIS -- BSAs,
 2   interact with everyone in the -- in the IT department
 3   in some way?
 4        A.  Yes.
 5        Q.  Okay.  And, I guess, when I say "interact," did
 6   they have to work together regularly with other IT
 7   positions?
 8        A.  Yes.
 9             MS. SEVERN:  Object to form.
10        Q.  (BY MS. BISBEE) Did everyone in the IT
11   department have an idea of what everyone else in the IT
12   department was doing for the most part?
13             MS. SEVERN:  Object to form.
14        A.  Yes.
15        Q.  (BY MS. BISBEE) Did you have regular meetings
16   with everyone present?
17        A.  Yes.
18        Q.  So when I say "everyone," it would be everyone
19   that reported to you and Troy Flick and Lhana Jordan?
20             MS. SEVERN:  Object to form.
21        A.  Yes, we had meetings.
22        Q.  (BY MS. BISBEE) Okay.  How often would you-all
23   meet as a group?
24        A.  I would say at least monthly, maybe -- maybe a
25   little more often than that.
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

```
                                                    Page 27
 1        Q.   What about you and Troy and Lhana?   Did you meet
 2   more often than monthly?
 3        A.   Yes.
 4        Q.   How often did you meet?
 5        A.   Probably weekly.
 6        Q.   Okay.  So you had a fairly good understanding of
 7   what their teams were doing, correct?
 8        A.   Yes.
 9             MS. SEVERN:  Object to form.
10        Q.   (BY MS. BISBEE) Now, if a BSA was assigned to
11   a project that needed a network administrator, did
12   those people then collaborate on a regular basis?
13             MS. SEVERN:  Object to form.
14        A.   Yes.
15        Q.   (BY MS. BISBEE) Okay.  Is it -- is that sort
16   of situation something that would happen often?
17        A.   Yes.
18        Q.   Okay.  So in addition to supervision, the -- the
19   three groups that were under you, what other
20   responsibilities, if any, did you -- did you have in your
21   role as IT manager?
22        A.   I managed many projects, you know, along with
23   the business system analysts.  There were some projects
24   that I actually managed on my own and did not have system
25   analysts assigned to it, or I worked right along with
```

**EXHIBIT 3**

Debra Bouricius                                           RICK CORSI
Mesa County, et al.                                   April 22, 2019

---

Page 46

1        **Q.  Maybe once a month --**

2        A.  I wouldn't say on a regular basis once a month,

3   but it could have happened, you know, every 30 days,

4   every now and then.  I mean, I'm not going to say it was

5   every -- for 12 months every 30 days he said something,

6   but there was more that one time he said something --

7        **Q.  Okay.**

8        A.  -- over the 12 months.

9        **Q.  Was there anything that would precipitate these**

10  **comments?  I mean, were you at staffing meetings or**

11  **something that would tend to make it come up?**

12       A.  Not really, no.  I mean, it was at -- yeah, it

13  would have been -- it could have been at meetings or

14  what -- you know, when Lhana and Troy and I met.  I

15  remember once or twice at those meetings him asking me

16  about retirement.

17       **Q.  Okay.  So you do remember Lhana Jordan being**

18  **present at least --**

19       A.  Yeah.

20       **Q.  -- at least once when these comments --**

21       A.  At least once.

22       **Q.  And would that be at least once in the year**

23  **prior to your separation?**

24       A.  Yes.

25       **Q.  Did you -- you hadn't had any plans to retire,**

---

**EXHIBIT 3**

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                            April 22, 2019

Page 58

1    any bad information in a desk file or otherwise about

2    Debbie Bouricius' performance?

3         A.  I did not have anything.

4         Q.  Okay.  And you never documented that she had

5    problems getting along with her coworkers?

6         A.  No.

7         Q.  Do you recall ever receiving any documents

8    complaining about Debbie Bouricius?

9         A.  No.

10        Q.  Do you recall ever having to talk to her about

11   any performance issues?

12        A.  No.

13        Q.  Do you recall ever communicating to Frank

14   Whidden that she was somehow deficient as a business

15   systems analyst?

16        A.  No.

17        Q.  Did he ever ask you?

18        A.  No.

19        Q.  As part of your job in your management role,

20   what, if any, type of input did you have every year at

21   budget time?

22            MS. SEVERN:  Object to form.

23        A.  I worked on -- on the budget, and Troy and Lhana

24   and I all worked on what our -- what the budget plan was

25   along with another lady, Janie, which was, I think,

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

Page 59

1    Frank's admin assistant or something.  We never really

2    figured out what she did, but she was usually involved in

3    wanting spreadsheets and documents.  Frank also met with

4    us, but we planned out the budget.

5          I -- you know, Troy worked on the -- the network

6    side of it, hardware and -- and network infrastructure.

7    I worked on the -- what we were going to be needing to --

8    to spend on applications and GIS, support, maintenance

9    support, and things like that.  Lhana worked on the PC

10   side of it, replacement.  And we all worked together on

11   it.

12        Q.   (BY MS. BISBEE) What about staffing, was that

13   part of your analysis?

14        A.   We knew -- I mean, we knew what the budget was

15   and how much went to staffing.

16        Q.   And then you had to work within what was left

17   over kind of?

18        A.   Yeah, there's -- there's a couple of different

19   pools of money, and so it's separated a little bit that

20   way but because of taxing and whatnot.

21        Q.   Is that -- so this budgetary process, is this

22   something you did every year?

23        A.   Yes.

24        Q.   Once you became manager at least?

25        A.   Yes, I -- from the time I became GIS coordinator

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                      April 22, 2019

```
                                                            Page 96

  1        Q.  Okay.

  2        A.  And I was the highest-paid one in the

  3   department.

  4        Q.  And also the oldest, right?

  5        A.  I wasn't the oldest.

  6        Q.  No?

  7        A.  My wife is older than me.

  8        Q.  Okay.  But you're older than Troy Flick?

  9        A.  Yes.

 10        Q.  And you are older than Lhana Jordan?

 11        A.  Yes.

 12        Q.  So these are all the reasons that you think your

 13   layoff, your termination was based on age discrimination,

 14   correct?

 15        A.  Yes.

 16        Q.  Any other reason that you think it was based on

 17   age discrimination?

 18        A.  Just some of the comments that have been -- that

 19   I had heard, you know.  You don't know there is a pattern

 20   until the pattern has been created.  And there has been a

 21   pattern of age discrimination at the County over many

 22   years.  You could just see.  It's common sense.

 23        Q.  Okay.  So the comments you are talking about

 24   then is that what we talked about earlier --

 25        A.  Yes.
```

**EXHIBIT 3**

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                      April 22, 2019

```
                                                        Page 105

  1    their support.  And --

  2         Q.  Okay.

  3         A.  -- and no one else that was left of the business

  4    system analysts had ever supported DHS.

  5         Q.  Did you ever hear of another time where -- where

  6    Mr. Garchar made any comments about the layoffs?

  7         A.  I don't recall specifically.

  8         Q.  Okay.  So we just kind of looked at this charge

  9    here, I think it was Exhibit 35 [sic].  You'll -- you'll

 10    agree with me that there's several pages of --

 11         A.  Issues.

 12         Q.  -- texts that you wrote --

 13         A.  Yes.

 14         Q.  -- in support of your charge, correct?

 15         A.  Yes.

 16         Q.  But we've already established that you had been

 17    advised to put in as much detail as possible --

 18         A.  Yes.

 19         Q.  -- just to cover your bases, right?

 20         A.  Yes.

 21         Q.  And your primary belief is that it had to do

 22    with your age?  Is that fair to say?

 23         A.  Yes.

 24         Q.  And, you know, even to the extent that there's

 25    the sex discrimination because Lhana Jordan was retained,
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                April 22, 2019

                                                        Page 106

1    she's also younger than you, right?

2         A.  Yes.

3         Q.  And Troy Flick is younger than you, right?

4         A.  Yes.

5         Q.  Did the CCRD investigator ever discuss with you

6    his or her investigation?

7         A.  Um.  We did talk to him I think.  I believe they

8    called us shortly after we filed it, and then I can't

9    recall later what -- during the actual investigation

10   whether there was communication, but --

11        Q.  Do you recall ever learning what any -- what, if

12   anything, any witnesses told the CCRD?

13        A.  No.

14        Q.  Do you recall learning from the CCRD what the

15   county's position was as to your layoff?

16        A.  They filed -- or they submitted a -- I guess, a

17   rebuttal to my position, and they started bringing up

18   other issues that they just -- out of the blue, things

19   that they wanted to try to claim that were now the reason

20   that we were terminated.

21        Q.  What do you mean?

22        A.  Well, they claim that I had access to systems

23   that I shouldn't have had access to, and Janine gave me

24   access to those systems.  And -- and Troy had direct --

25   not Troy, and Lhana had access to those systems.  Several

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                 April 22, 2019

Page 107

1    county attorneys, including Nina, knew that I had been
2    working on coming up with a better public -- or public --
3    or records requests or a request system, and the testing
4    that I was doing and some of the county attorneys, some
5    have been gone now, were having issues with accessing
6    documents and that for CORA requests, and I had the same
7    level of access as they did.  Network administrators have
8    more access, so some of the testing wouldn't have worked
9    as well by them doing it.  Troy had more access since he
10   was a network person.
11           So I had access, Lhana had access to -- to
12   things that they claimed I shouldn't have had access to;
13   as a supervisor, as the person working on many CORA
14   requests for the county attorney's office, I had to have
15   access to them.  And they claim that -- that I should
16   have been terminated -- Janine and I should have been
17   terminated for that.
18       Q.  Okay.  So was this -- I think I'm understanding
19   what you're saying is the County took the position, after
20   the fact, to try and make the case that Janine had
21   somehow given you access you weren't supposed to have?
22       A.  Right.
23           MS. SEVERN:  Object to form.
24       A.  Yes.
25       Q.  (BY MS. BISBEE) Okay.  And had -- did you --

**EXHIBIT 3**

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                              April 22, 2019

```
                                                      Page 108

 1    is part of what you just told us, were you saying that
 2    Lhana and Troy knew you had this access?
 3        A.   Yes, yes.
 4        Q.   Okay.  Did Frank know you had this access?
 5        A.   I believe he did, or he said -- what their
 6    statement said was that the -- he would have had to have
 7    been the one to give me access.  He had never given
 8    anybody access or taken that role on before.  And as IT
 9    manager -- as an IT manager, I then -- the project that I
10    was working on, that the county attorneys were involved
11    in and knew, and they would come to me for CORA assess --
12    for CORA requests, they -- it was well known by many that
13    I had access to email -- most of it was emails --
14        Q.   Okay.
15        A.   -- is what it was.
16        Q.   And this was something you needed to do your
17    job?
18        A.   To do the best testing, yes.
19             MS. SEVERN:  Object to form.
20        Q.   (BY MS. BISBEE) Did you have this email access
21    prior to Frank Whidden becoming -- or, you know, even
22    joining the County?
23        A.   I don't remember when it -- I received the
24    access.
25        Q.   Okay.  Were you ever given a directive not to
```

**EXHIBIT 3**

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                              April 22, 2019

```
                                                Page 110
 1          Q.  So did you engage in some sort of clandestine
 2    operation with Janine to get access to this?
 3              MS. SEVERN:  Object to form.
 4          A.  No.
 5          Q.  (BY MS. BISBEE) Do you know how old in 2016
 6    Leilani Boyles was?
 7          A.  I don't.
 8          Q.  What about Derek C.?  I don't have the --
 9    Derek -- Derek Conlon?
10          A.  I don't, no.
11          Q.  Were you 59?
12          A.  I believe I was, yes.
13          Q.  And Janine 60?
14          A.  Yes.
15          Q.  Do you know how old John Dallman was?
16          A.  No.
17          Q.  What about Troy Flick?
18          A.  I don't -- I don't know.  I could guess at their
19    ages, but I don't know how old they were.
20          Q.  Is he younger than you were?
21          A.  Yes.
22          Q.  What about Terrie Hotary?
23          A.  Younger than me.
24          Q.  Lhana Jordan?
25              MS. SEVERN:  Object.
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                              April 22, 2019

Page 124

1        Q.  Okay.  All right.  All right.  So we talked some

2   this afternoon, you described Lhana Jordan coming in and

3   she had worked at one time for DHS is my understanding?

4        A.  Yes, as a caseworker.

5        Q.  As a caseworker.  Okay.  And then she came over

6   to the IT department; is that right?

7        A.  Yes.

8        Q.  Okay.  Were you involved in hiring Ms. Jordan at

9   all?

10        A.  Yes.

11        Q.  You were.  Okay.  What was your involvement?

12        A.  I was on the interview panel.

13        Q.  Who else was on the panel?

14        A.  I believe Troy Flick.  We usually brought in one

15   or two other people, desktop people.  I'm not sure who --

16   I interviewed dozens.

17        Q.  I'm sorry.  Go ahead.  Dozens?

18        A.  Yes.

19        Q.  Was Ms. Jordan hired before Mr. Whidden --

20            MS. SEVERN:  Are we okay here?

21            MS. BISBEE:  Yeah.

22            MS. SEVERN:  I had that happen in a deposition,

23   a crash right outside the window.  It was terrible.

24            THE DEPONENT:  Another deposition.

25            MS. SEVERN:  All right.  So totally derailed my

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                April 22, 2019

```
                                                    Page 125
 1   train.
 2        Q.  (BY MS. SEVERN) Here we go.  You talked about
 3   the panel hiring -- oh, was Ms. Jordan hired before or
 4   after Mr. Whidden came on board?
 5        A.  Before.
 6        Q.  Before.  So he was not involved?
 7        A.  No, not in the initial hiring.
 8        Q.  All right.  Who made the final decision, then,
 9   to hire Ms. Jordan?
10        A.  I believe she went to work for Troy Flick, so it
11   would have probably been Troy.  I'm not sure if she was
12   hired but -- when Tim was there or when Stephanie was
13   there, but one of them would have also had to have made
14   the --
15        Q.  Okay.
16        A.  -- final determination.
17        Q.  Those two, Troy and one of those?
18        A.  Yeah --
19        Q.  Okay.
20        A.  -- whoever was our boss at the time.
21        Q.  And you also talked some this afternoon about a
22   consultant who talked about an additional position, maybe
23   more positions that were needed.  Do you recall that?
24        A.  Yes.  There was a study several years before.
25        Q.  Okay.
```

**EXHIBIT 3**

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                         April 22, 2019

Page 140

 1        Q.   (BY MS. SEVERN) Okay.

 2        A.   And through, you know, the -- the training plans

 3   and through the opportunities that we provided, yes, we

 4   expected people to meet the goals and they had for the --

 5   the goals.

 6        Q.   Okay.  When you say training plans, is that

 7   related to the cross training that's mentioned?

 8        A.   Cross training, and also we contracted with a

 9   couple different companies to provide IT training and

10   other types of training --

11        Q.   Okay.

12        A.   -- project management, different types of

13   training.

14        Q.   Okay.  All right.  Let's see.  We talked some

15   about how you, Troy, and Lhana put together a budget

16   plan.  Do you remember that conversation?

17        A.   Yes.

18        Q.   Okay.  Were you involved in working on budgets

19   with any other department other than IT?

20        A.   IT covers a lot of departments.  One was -- and

21   we did work with other departments on -- on their budgets

22   and where money was going to come from.  We were working

23   at the time with the sheriff's office on a camera project

24   where they had some funding; we were working on a

25   commissary project at the sheriff's office where, through

**EXHIBIT 3**

Debra Bouricius                                    RICK CORSI
Mesa County, et al.                             April 22, 2019

```
                                              Page 157
 1       Q.   Okay.  What do you think of Frank Whidden?
 2       A.   I thought he was someone that was very reactive.
 3   He liked to please his superiors very much so.  He would
 4   make decisions based on emotion rather than fact.
 5       Q.   Do you have an example?
 6       A.   Edward Morgan was laid off sometime during 2016,
 7   I believe, and shortly after that, I was in a meeting
 8   with Frank and Troy and Lhana, and Frank said I had to
 9   get rid of Edward because he was -- he didn't get along
10   with him.  And that's why he was terminated.
11       Q.   Was that position ever filled?  Mr. Morgan's
12   position?
13       A.   Um.  I believe there were promotions.  I don't
14   know if that specific position was filled, but there were
15   promotions within that department.  That took over some
16   of the duties.
17            MS. BISBEE:  Alicia, I'm sorry.
18            MS. SEVERN:  Yeah.
19            MS. BISBEE:  I -- before Lori leaves, I was
20   hoping she could put together that subpoena.  So I just
21   wanted to call her --
22            MS. SEVERN:  Sure.
23            MS. BISBEE:  -- call upstairs.  I don't know how
24   much longer you had.
25            MS. SEVERN:  I just had one more question.
```

                                              **EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                  April 22, 2019

Page 159

1   **Whidden telling you and Lhana and Troy about a potential**

2   **budget shortfall?**

3       A.   There was -- I mean, yes, there had been talk

4   about budget --

5       Q.   Okay.  But at -- but at no time he said, You

6   need to look at cutting staff?

7       A.   Not that I recall.

8       Q.   Okay.  And you filed CORA requests with the

9   County regarding the budget, correct?

10      A.   Yes.

11      Q.   And I believe you said that you received

12  newspaper articles in response from the County?

13      A.   Yes.

14      Q.   So they didn't provide you actual budget

15  documents?  They gave you third-party information?

16          MS. SEVERN:  Object to form.

17      A.   They gave me third-party information, yes.

18      Q.   (BY MS. BISBEE) Were these the articles -- the

19  same articles they attached to their response to your

20  charge of discrimination?  Do you recall?

21          MS. SEVERN:  Object to form.

22      A.   Yes.  I believe so, yes.

23      Q.   (BY MS. BISBEE) And do you remember the date?

24      A.   That may be when I saw those.

25      Q.   Do you remember the date of when those articles

**EXHIBIT 3**

Debra Bouricius                                        RICK CORSI
Mesa County, et al.                               April 22, 2019

Page 169

1        Q.  (BY MS. BISBEE) You never heard that before?

2        A.  Never once.

3        Q.  And, in fact, you were told the exact opposite;

4    isn't that correct?

5        A.  In fact, at the meeting I spoke of earlier with

6    Edward about Edward Morgan, one of us, Lhana, Troy, or I,

7    I can't remember which one, asked, Are any of us in

8    danger?  And Frank said, You'll know it if you are.

9            MS. BISBEE:  All right.  I think that's all I

10   have.  So -- Alicia?

11           MS. SEVERN:  Okay.  Just a few.

12                       EXAMINATION

13   BY MS. SEVERN:

14       Q.  Mr. Corsi, do you have any reason to believe

15   that Mesa County did not have budget issues going on in

16   2016?

17       A.  I believe they were over- -- overly expressed

18   that about the budget issues.  There were areas where

19   they had no problems spending money.  As recent as this

20   year, I mean, if two years ago they were 2 or $4 million

21   in the hole, where would the money come from for Frank

22   Whidden to get a $60,000 raise or whatever he just got

23   which was in the newspaper?

24       Q.  When you worked for Mesa County or since, have

25   you had access to all of Mesa County's budgetary records

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Lori Marak  May 10, 2019

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

------------------------------------------------------

DEPOSITION OF LORI MARAK

May 10, 2019

------------------------------------------------------

DEBRA BOURICIUS,

     Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

     Defendant.

------------------------------------------------------


          Pursuant to Notice and the Federal Rules
of Civil Procedure, the deposition of LORI MARAK,
called by Plaintiff, was taken on Friday, May 10,
2019, commencing at 9:13 a.m., at 205 North 4th
Street, Grand Junction, Colorado, before Candice F.
Flowers, Certified Shorthand Reporter and Notary
Public within and for the State of Colorado.

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

9

1    generally about Deb's work?

2        A    Yes.   I gave you background.

3        Q    Anything else you can recall?

4        A    No, I can't recall anything else.

5        Q    So aside from me and these fine folks on

6    the other side of the table, did you have any

7    conversations with anyone else about the deposition

8    today?

9            MR. SANTO:   I would object and tell

10   the witness you do not have to disclose

11   communications with your significant other or

12   spouse.

13           I'm sure you are not asking that.

14           MS. BISBEE:   I am not asking.

15           MR. SANTO:   That's covered by a

16   privilege.

17       A    I only told my supervisor, Lhana Jordan,

18   that I was coming today for this.

19       Q    (By Ms. Bisbee) You just told her you

20   were coming?

21       A    Yeah, no details.

22       Q    Did she ask any questions?

23       A    No, she did not.

24       Q    Have you ever had any conversations with

25   anyone currently in the IT department about Deb

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

19

```
 1       A    Yes, there is, but they coordinate
 2   through -- with the State on that.
 3       Q    Okay.  Who is your current -- Lhana
 4   Jordan is your current supervisor; is that correct?
 5       A    Yes.
 6       Q    How long has she been your supervisor?
 7       A    Since 2016 when Rick Corsi was laid off.
 8       Q    And she had been the help desk supervisor
 9   before that, true?
10       A    Yes.
11       Q    Has she ever been a business systems
12   analyst?
13       A    No.
14       Q    Did she get any sort of degree or
15   training to help her make the jump from help desk
16   supervisor to supervising senior business systems
17   analysts?
18       A    Not that I'm aware of.
19       Q    Had she ever performed any job functions
20   that you currently perform?
21       A    No.
22       Q    Do you think she was a good replacement
23   for Rick Corsi?
24       A    That makes me uncomfortable.
25       Q    Okay.
```

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

24

```
 1         A    Yes, I would say that's true.
 2         Q    He never came to you and asked whether
 3    Deb Bouricius was good at her job, did he?
 4         A    No.
 5         Q    Was Frank Whidden ever involved -- since
 6    he became county administrator, has he been
 7    involved in any of the -- any group IT meetings?
 8         A    Since we're so small, we don't have a lot
 9    of regular entire staff meetings.  He's been
10    present at pretty much every important meeting.
11         Q    What kind of meetings are important?
12         A    Like to let us know that people had
13    gotten laid off, things like that.  He shows up
14    sometimes for, you know, parties, like a going-away
15    party for somebody or an IT function where we're
16    doing a get-together, a potluck, things like that,
17    the fellowship sort of -- lunch meetings.
18         Q    But in the last couple of years, do you
19    remember him ever assigning you work?
20         A    No.
21         Q    Putting together teams?
22         A    No.  Pretty much everything from Frank
23    would be communicated down through Lhana.
24         Q    Okay.  Frank wouldn't ever discuss the
25    budget with you?  You specifically, not in a
```

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

25

```
 1    meeting.
 2         A    No, other than just the general talk of
 3    budget cuts.
 4         Q    Do you, in your role in IT, have any part
 5    to play in the budget formulation every year?
 6         A    No.
 7         Q    You don't put together any reports to
 8    send to the board or anything like that?
 9         A    No.
10         Q    Do you know who in IT is responsible for
11    pulling together numbers, if that, in fact,
12    happens?
13         A    That would be probably Lhana and Troy,
14    the two IT managers.
15         Q    But you don't do anything with the
16    sheriff's budget either, right?
17         A    No.  I have in the past, but once Rick
18    took over supervising me, I quit doing a lot of
19    that and would just formulate what was needed for
20    projects and hand that to him and let him take care
21    of how to make it happen.
22         Q    Okay.  Have you ever heard Frank Whidden
23    make any comments related to anybody's age?
24         A    No.
25         Q    Of the current employees in IT, have you
```

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

69

```
 1        A     No, other than just that he hates having

 2   to do -- I mean, you could tell he felt

 3   personally -- personal angst that having to be

 4   done, but that it had to be done to make budget

 5   that year.

 6        Q     Had he ever been -- has he been part of

 7   an IT meeting since?

 8        A     Not that I remember.

 9        Q     Have you ever heard of him having any

10   role in IT since that time?

11        A     No, although I know he does -- the

12   commissioners are generally over the county

13   manager.  That would be the only extent that I'm

14   aware of.

15        Q     You've never received any direction from

16   Lhana that Commissioner Justman wants IT to

17   implement such and such project, have you?

18        A     No.

19        Q     Did anyone ever tell you how staff was

20   selected for layoff?

21        A     I think there's been general conversation

22   that it was more or less performance-based.

23        Q     Okay.  Do you remember where you may have

24   heard that?

25        A     It may have been from management.  I'm
```

**EXHIBIT 3**

**Lori Marak  May 10, 2019**

73

```
 1        Q    Did you ever hear any rumors that the
 2   County was looking into whether the layoff was
 3   discriminatory?
 4        A    We were told that they anticipated a
 5   lawsuit, so don't talk.
 6        Q    Okay.
 7        A    As soon as it happened, I would say, and
 8   I think that was just general, you know, now this
 9   is going to be coming to a lawsuit so -- or that
10   there was a lawsuit coming around.
11        Q    So when you say "they," who is "they"?
12        A    They, I would say management, just
13   because they might have been informed.  I'm not
14   sure, or maybe they anticipated -- IT management.
15   I'm sorry.
16        Q    IT management.  So we are talking Lhana
17   Jordan and Troy Flick.
18        A    Yes.
19        Q    What about Frank Whidden?
20        A    He would probably be in that same group,
21   and I don't know if that was communicated during
22   that meeting right after the layoffs.  I'm sorry.
23   It's all so fuzzy.  It was just getting the
24   heads-up that things were going to probably...
25        Q    If they hadn't done anything wrong, why
```

**EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

_____

VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

                                    July 11, 2019

_____

DEBRA BOURICIUS,

      Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

      Defendant.

_____



          Pursuant to Notice and the Federal Rules

of Civil Procedure, the videotaped deposition of

FRANK WHIDDEN, called by Plaintiff, was taken on

Thursday, July 11, 2019, commencing at 9:07 a.m.,

at 205 North 4th Street, Grand Junction, Colorado,

before Candice F. Flowers, Certified Shorthand

Reporter and Notary Public within and for the State

of Colorado.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

20

```
 1          A      McInnis.

 2          Q      (By Ms. Greisen)  McInnis.   Thank you.

 3          A      We won't tell him that.

 4          Q      Thank you.

 5                 MR. SANTO:   I think it'll be okay.

 6          Q      (By Ms. Greisen)  Have you talked to any
 7    employees about the subject matter of this case?

 8          A      Yes.

 9          Q      Which ones?

10          A      I've discussed it a bit with Lhana
11    Jordan.

12          Q      When did you do that?

13          A      She informed me that Lori had been called
14    to be deposed.

15          Q      Uh-huh.

16          A      And that was the reason that she was
17    going to be missing some work time.

18          Q      Okay.  What else did you discuss with Ms.
19    Jordan?

20          A      I'm sorry.  I didn't hear you.

21          Q      I'm sorry.  What else did you discuss
22    with Ms. Jordan about this case?

23          A      I believe she told me that she was
24    deposed, I think.  I'm not certain, but I think she
25    did.  And that's about it.  I mean, we didn't go
```

**EXHIBIT 3**

**Frank Whidden  July 11, 2019**

46

```
 1   locations that you've already --
 2        A    It could be any of them or -- sorry.
 3              MR. SANTO:  You have to wait until
 4   she finishes.
 5              THE DEPONENT:  Sorry.  I thought I
 6   did.
 7              MS. GREISEN:  That's okay.
 8        Q    (By Ms. Greisen) One of the other
 9   locations that -- that you've already mentioned.
10        A    Yes.  As well as meetings with the
11   cities, the Chamber of Commerce, et cetera.
12        Q    Who are your direct reports?
13        A    Pete Baier, director of public works.  He
14   also carries the title of Deputy Administrator for
15   Public Works or something like that.
16              Brenda Moore, HR manager, and technically
17   all the HR staff reports to me because I'm the
18   director.
19              IT, which is Lhana and -- Lhana Jordan
20   and Troy Flick are managers, and then, again, I'm
21   the director of that department, so you could say
22   all the staff there.
23              There is Greg Linza, who's the director
24   of facilities.
25              Pam Noonan, who is the finance director.
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

67

```
 1          Q    What managers are you referring to?
 2          A    The IT managers in this case, so Lhana,
 3     Troy, and at that time Rick Corsi.
 4          Q    Was Lhana an IT manager?
 5          A    Yes.  She was the customer service
 6     manager, was her title, I believe, at the time.
 7          Q    And you said you were involved in who was
 8     assigned to which projects?  You actually --
 9          A    Yes.
10          Q    -- said, Troy, I want these people
11     assigned to this project?
12          A    We would discuss who was going to be on
13     which project.  If there was an upgrade to a major
14     system, we'd talk about which BSA or if it -- or
15     the team.  Who's going to be on the team, who's
16     going to play what parts, what roles are needed for
17     this project, who's going to -- who's going to do
18     that.
19          Q    So these were in meetings that you had
20     with the IT managers and Lhana Jordan?
21          A    Yes.
22          Q    And are there -- did you have agendas for
23     these meetings?
24          A    Not usually.  We don't usually do written
25     agendas and things like that.
```

**EXHIBIT 3**

Frank Whidden   July 11, 2019

68

1      Q    Any minutes of these meetings?

2      A    No.

3      Q    And were these weekly meetings?

4      A    No, ma'am.  I don't do -- generally, I

5  don't do general -- I don't do standing meetings.

6  The only two standing meetings that I really have

7  are the public hearing and the Tuesday afternoon.

8      Q    But I'm talking as -- when you were

9  Deputy Administrator.

10     A    Oh, even back -- no.  Back then, no.  I'm

11 not a believer in standing meetings.

12     Q    So other than Ms. Jordan, Mr. Flick, and

13 Mr. Corsi, did you directly supervise any of the

14 other IT employees during your time as a deputy

15 administrator?

16     A    Yes.  If questions came up in any given

17 area, I could be involved depending on what the

18 question was and the gravity of it.

19     Q    Well, I understand that you could be.

20     A    Okay.  I'll rephrase that.  I was.  I was

21 involved in decisions if the gravity was enough

22 that I needed to be.  And by "gravity," what am I

23 talking about?  I define that as a production

24 system being down, for instance.  Then I would

25 definitely be involved.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

70

```
1   day-to-day supervision of the IT staff other than
2   Mr. Flick, Ms. Jordan, and Mr. Corsi during your
3   time as the Deputy Administrator?
4        A    I'm not sure exactly what you mean by day
5   to day.  I mean, I have managers who see that did
6   they come in, are they going out sick today.  They
7   would approve those kinds of things.  They would
8   take care of their vacation time, who's going on
9   vacation.  We have a calendar that I can look at
10  and check and see who's in and who's not, but I
11  expect my managers to see to that.
12       Q    Who was assigned to New World?
13       A    Lori is the main person who was assigned.
14  She's been there for a long time.  There was a lady
15  named Elizabeth who's no longer with us who was in
16  there.
17       Q    Is that true back in 2016?  Lori was the
18  project manager?
19       A    I believe so, yes.  She's always been the
20  lead on New World because she was there from before
21  the beginning, when they -- when they talked about
22  getting the software.
23       Q    So she was there when Mesa County
24  discussed whether to bring that software on board
25  or not?
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

71

1       A     Yes, and that was before my time, but
2    that's my understanding, yes.

3       Q     And where do you get that understanding?

4       A     From talking to her.

5       Q     During that eight-month period of time
6    that you were the Deputy Administrator, at IT did
7    you conduct any performance reviews?

8       A     Yes.

9       Q     Whose did you conduct?

10      A     My direct reports.

11      Q     So, again, that would have been
12   Mr. Flick, Ms. Jordan, and Mr. Corsi?

13      A     Correct, for IT.

14      Q     So you were there for eight months but
15   you gave an annual performance review at the end of
16   2014; is that right?

17      A     Yes, but I was IT director the whole
18   time.

19      Q     Right.

20      A     So I gave it based on that position.

21      Q     So you gave them their performance
22   reviews as the IT director?

23      A     Yes.

24      Q     And that was -- let's see.  From 2011 to
25   2014, you were the person responsible for giving

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

72

1    the performance reviews for Mr. Corsi, Ms. Jordan,

2    and Mr. Flick?

3         A    Rick and Troy, the whole time.  We

4    promoted -- we created Lhana's customer management

5    -- customer service management position during that

6    time.  I don't remember exactly when it was.

7    Before that, Troy wrote her performance

8    evaluations, and then once she became the manager,

9    I wrote her performance evaluations.

10        Q    So these -- when you were the director of

11   information technology, was it again Troy Flick,

12   Rick Corsi, and Lhana Jordan?

13        A    For part of the time.  When I first came

14   to Mesa County, she was a technician, and then we

15   decided that it would be helpful to have a direct

16   manager over the technicians.  And, really, Troy

17   and Rick approached me about doing that and who it

18   should be and things like that, and so we made the

19   decision to create that position.

20        Q    Did anyone apply other than Lhana Jordan?

21        A    I don't think so.  We promoted from

22   within.  I don't know that we did a job search for

23   that.  I truly don't remember.

24        Q    During your time as IT director, did you

25   issue any disciplinary actions?

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

74

1    Q    And these were people in the IT
2    department?
3    A    Yes.
4    Q    Was anybody terminated?
5    A    Yes.
6    Q    Was it one or two people who were
7    terminated?
8    A    One was terminated, one was not.
9    Q    What year was that?
10   A    I don't remember.
11   Q    Somewhere between 2011 and 2014?
12   A    Yes.
13   Q    So other than between 2011 and 2014, have
14   you participated in the performance reviews of any
15   IT employees?
16   A    Yes.
17   Q    Tell me who.
18   A    Well, Troy and Lhana and Rick up until he
19   left.
20   Q    Were these written performance reviews?
21   A    Yes.
22   Q    And so those are the types of performance
23   reviews that would have been just kept in the
24   personnel files?
25   A    Yes.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

78

```
 1        A     I changed the format to a narrative
 2   feedback.
 3        Q     (By Ms. Greisen) Uh-huh.
 4        A     That's it.
 5        Q     And you took away the objective scoring
 6   or the numerical scoring.
 7        A     That is correct.
 8        Q     And did you actually write those reviews
 9   yourself?
10        A     I did.
11        Q     And did you also sign off on reviews that
12   other people wrote?
13        A     I did.
14        Q     Okay.  And did you sign off on the
15   reviews that Mr. Flick and Mr. Corsi and Ms. Jordan
16   wrote for their employees?
17        A     I did.
18        Q     The narrative approach as opposed to a
19   numerical approach, tell me -- you said you thought
20   companies were moving away from the numerical
21   rating?
22        A     Uh-huh.
23        Q     Tell me what you mean by that.  Who's
24   moving away from it?
25        A     Companies like Microsoft.
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

```
 1                    MS. GREISEN:  Sorry.

 2        Q    (By Ms. Greisen) An end user trainer?

 3        A    Yes.

 4                    THE DEPONENT:  Did you need me to

 5   spell that?  P-A-T-S-A-N-T-A-R-A-S, I believe.

 6        Q    (By Ms. Greisen) Were you responsible for

 7   laying her off?

 8        A    Ultimately, yes.

 9        Q    Well, who made the decision to --

10        A    I --

11        Q    -- lay her off?

12        A    I told the IT managers that we had to

13   make reductions and they recommended that position

14   to be cut.

15        Q    So was that Rick and Troy --

16        A    Rick and Troy --

17                    MR. SANTO:  I was just slowing him

18   down because he was interrupting your question.

19   That's why he stopped.

20        A    Rick and Troy and Lhana.

21        Q    (By Ms. Greisen) Okay.  So back to the

22   list.  You thought in your mind who you need to

23   keep.  By process of elimination, you got rid of

24   the people that you didn't think were essential.

25   Is that -- is that fair?
```

**Frank Whidden   July 11, 2019**

126

```
 1    also paid their health insurance for that 30 days.
 2    I don't remember that for a solid gold fact, but I
 3    think we did.
 4        Q    So when you created this list of people
 5    to terminate, did you talk with anybody about it
 6    before you finalized your decision?
 7        A    I did speak -- yes.  Before I finalized
 8    the decision, yes.  I met with Troy and Lhana and
 9    asked them to look over the list of people that I
10    was proposing to cut and tell me if they disagreed
11    or if they thought there was a problem with the
12    people that were on the list, that I had made a
13    mistake and that they thought there was somebody
14    that we just couldn't live without.
15        Q    And you actually gave them a hard copy of
16    the list?
17        A    I don't -- no.  I kept -- whatever we
18    reviewed there, that list, was -- was just that.
19    No, I didn't send it around.
20        Q    Well, did they -- I mean, did you just
21    verbally tell them who was on the list or --
22        A    I show -- no.  I shared -- they were -- I
23    mean, I showed them -- I don't remember if I had
24    the piece of paper in my hand or not.  I shared the
25    names with them, and I don't remember if I had that
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

 1    where we asked all the County departments to come

 2    up with a net 5 percent decrease.

 3         Q    That was in 2016?

 4         A    I -- we did it more than once.  I believe

 5    we did it in '16 and '17, as I recall, that we

 6    asked them to come up with that, and that's when

 7    the clerk and recorder decided to make those

 8    reductions in her staff, as well as other parts of

 9    the County.

10         Q    Did you discuss about who to lay off in

11    the IT department with anyone prior to making the

12    final decision?

13         A    Yes.

14         Q    And was that Troy Flick and Lhana Jordan?

15         A    That is correct.

16         Q    Okay.

17         A    And Jean Davis because she helped me

18    create the spreadsheet to talk about the amounts,

19    and I also spoke with Krista Ubersox, who was

20    involved in -- who was an HR person.

21         Q    Krista?

22         A    Krista Ubersox.  She's no longer with the

23    County.  She was the other HR person in there who

24    helped with this kind of a thing.  And so I

25    definitely discussed that because she was part of

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

137

```
 1    that work with that spreadsheet that I referred to.
 2         Q     Did Mr. Flick give you any specific
 3    information about Ms. Bouricius' performance?
 4         A     Not that I recall.
 5         Q     Did Ms. Jordan give you any specific
 6    information about Ms. Bouricius' performance?
 7         A     She did agree that there was weakness in
 8    customer service.
 9         Q     But specifically with respect to Ms.
10    Bouricius, did she give you any information about
11    Ms. Bouricius' performance?
12         A     Yes.  She said that she had weakness in
13    customer service.
14         Q     So Ms. Jordan said that Ms. Bouricius was
15    weak in customer service?
16         A     Uh-huh.
17         Q     And did she give you any more -- give you
18    any more details?
19         A     She said that there had been people
20    around the County who had complained about
21    incidents that Deb had worked on.
22         Q     Can you give me an example?
23         A     I don't remember specifically.  Deb was
24    over the Eden system, which is the financial
25    system, and that would have been the system that
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

138

```
 1    she would have been particularly involved with, I
 2    would think, in giving assistance.  She had worked
 3    with me personally on that and I had observed some
 4    issues I thought with her customer service.
 5         Q    What issues did you observe?
 6         A    I felt like she was less than helpful
 7    with an attitude that like, well, I've showed you
 8    and she didn't want to come back and deal with it
 9    again when I had the same problem again the next
10    week.
11         Q    Did you document that issue?
12         A    No.
13         Q    Any other issues that you had with her
14    performance?
15         A    No.  I would say that there were -- there
16    was skill sets I thought that weren't there as far
17    as other systems, that she wasn't -- she didn't
18    work with, as far as I knew.
19         Q    Okay.  Well, let's get back to Ms.
20    Jordan.
21              Did Ms. Jordan give you any specifics on
22    how she thought Ms. Bouricius had weaknesses in
23    customer service?
24         A    As I said, she said she had customer
25    complaints.
```

**Frank Whidden   July 11, 2019**

139

```
 1        Q    Did she give you any more information
 2   than that?
 3        A    Did she name somebody?  I don't recall.
 4   This has been too many years ago.  I don't remember
 5   a specific name saying, Well, she dealt with
 6   so-and-so personally and this was the problem that
 7   was there, no.
 8        Q    Where was this meeting?
 9        A    I don't remember where we had that
10   conver -- wait.  Are you talking about when I met
11   with Troy and Lhana?
12        Q    Yeah.
13        A    Oh, I'm sorry.  In my office.
14        Q    Did you call a meeting?
15        A    Yes.
16        Q    And did you, at that meeting, give them
17   the list of names that you were going to lay off?
18        A    Yes, I shared the list with them, the
19   names.
20        Q    How long was that meeting?
21        A    I don't remember.  It wasn't a hugely
22   long time.  I don't -- less than an hour.
23        Q    Did you tell them why you decided on the
24   people you chose?
25        A    No.  What I asked them was was to --
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

141

1    he thought we couldn't do without Rick, he would

2    say so and so would Lhana, that they would -- they

3    would tell you that, Well, now wait a minute,

4    Frank.   I think he's got this particular set of

5    skills.   One thing you need to understand is Rick's

6    not technical.   By that I mean he doesn't have an

7    IT background.   He's GIS, government information

8    systems, mapping.   That's where he comes from.

9    That's what he does.

10        Q    Did Troy supervise Rick?

11        A    No.   They were -- they were peers.

12        Q    Did Lhana supervise anybody on the -- on

13   the list of people to be terminated?

14        A    Yes.

15        Q    Who did she supervise?

16        A    The lady who was on the help desk.   She

17   supervised her, and Troy supervised Janine.   So

18   there were people out of -- out of almost every

19   group, there was people who were reduced.

20        Q    So the customer service manager was

21   responsible for supervising which employees?

22        A    The technicians and the help desk.

23        Q    Okay.   So there were two technicians?

24        A    No.

25        Q    Technical support specialist, is that

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

153

```
 1         Q     Did you --
 2                    MS. GREISEN:  Is this interfering
 3    with you?  Okay.
 4         Q     (By Ms. Greisen) Did you talk with anyone
 5    other than the attorneys about the facts that
 6    formed the basis of your opinion?
 7         A     No, other than -- unless you count the
 8    meeting where Troy -- I discussed with Troy and
 9    Lhana the people that I was going to release, but I
10    didn't talk about -- we didn't get into, well, why
11    did you pick this one or why did you pick that one.
12    We did not -- that wasn't part of the discussion.
13         Q     So in this preliminary meeting with Troy
14    Flick and Lhana Jordan, the three of you did not
15    discuss the ins and -- the details of who was being
16    picked, right?
17         A     That is correct.
18         Q     Okay.  And is it your testimony that you
19    didn't discuss that with anybody?
20         A     That is correct.
21         Q     Okay.  And did you document the basis for
22    that opinion in any manner?  Did you document your
23    decision to terminate those specific employees?
24         A     No.
25         Q     To your knowledge, did anybody else
```

**Frank Whidden   July 11, 2019**

217

```
 1   felt that Kelly, I still feel, that Kelly was
 2   stronger.
 3        Q    Can you give me any more examples of how
 4   Kelly's knowledge about systems was better?
 5        A    I think that was sufficient.  No.
 6        Q    Okay.  And can you give me any examples
 7   of how Kelly was better with customers than Ms.
 8   Bouricius?
 9        A    Yes.  Kelly is thorough, very painstaking
10   as far as explaining how a system works or doesn't
11   work or helping a client deal with whatever issues
12   they may have in front of them.  I got reports of
13   that from clients, from management, that he was --
14   he was more thorough, more detailed, and more
15   helpful to the clients.
16        Q    Can you give me any specific clients?
17        A    As far as being thorough, I know that
18   Kristen Cole in my office upstairs has been -- is
19   an example of someone who says that Kelly is
20   extremely thorough.  Lhana has said that.  I have
21   seen it as evidenced in his documentation, the
22   e-mails that he sends out about how to do things,
23   how to -- like if we're making an upgrade, here are
24   the changes, here's what the user can see with
25   screenshots and examples and, you know, ad
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

220

1   had -- they all work very closely together, so...

2       Q     So -- but Rick Corsi was her direct

3   supervisor.

4       A     Direct supervisor, sure.

5       Q     So did you go and talk to Mr. Corsi about

6   what skills Ms. Bouricius did or did not have?

7       A     No.

8       Q     Why not?

9       A     Because I could not signal this action

10  ahead of time.

11      Q     Well, you wouldn't have to tell him he

12  was going to be a part of a layoff, right?

13      A     I could not signal with a layoff of this

14  size what was coming.  Rumors start very quickly,

15  and that would present a security risk for IT.

16      Q     But didn't you signal it to Troy Flick

17  and Lhana Jordan?

18      A     Only immediately beforehand.

19      Q     Oh, I thought you told me there was a

20  conversation at least a week beforehand.

21      A     I'm saying -- okay.  When I say

22  immediately beforehand, that's what I'm talking

23  about --

24      Q     Uh-huh.

25      A     -- is it was right there and they were

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

237

```
 1       A    Lhana did have -- she said that she had
 2    had complaints from customer -- about customers and
 3    customer service.
 4       Q    Okay.  But none documented that you're
 5    aware of?
 6       A    I don't know if there was anything in the
 7    work orders or not that stated, Okay, I don't like
 8    how this ended up or I'm not happy with the
 9    resolution.  I don't know.  I'm not saying that
10    there isn't.
11       Q    What year were these complaints made?
12       A    I don't know.
13       Q    Well, was it close in time to her
14    termin -- to Ms. Bouricius' termination or was it
15    many years prior?
16       A    It was, I would say, yeah, close enough
17    to her termination that I remembered it, was aware
18    of it, and felt that it was an issue.
19       Q    And what was it that the complaint was
20    based on?  What kind of complaint was it?
21       A    As I --
22       Q    What did they complain about?
23       A    As I stated earlier, they felt that she
24    was not as helpful as she should be, that she
25    would -- that a question would arise and instead of
```

**Frank Whidden   July 11, 2019**

239

1    that Terrie was more eager and motivated than Ms.

2    Bouricius?

3         A    I don't have a document to point to.

4    That was, again, feedback that I had heard and

5    received and from personal observation as well.

6         Q    Can you give me any specifics about the

7    feedback you received:  Who it was from, what it

8    was about, and when it occurred?

9         A    I don't remember a specific instance.  I

10   know she was more involved in New World, willing to

11   learn New World and be involved in that.  That was

12   a really critical issue at the time.  And she was

13   showing a willingness to be involved with that and

14   a willingness to learn and grow as far as her SQL

15   knowledge -- it's a language -- and those kinds of

16   things, that she had -- she seemed more motivated

17   to be an engaged player on the team.

18        Q    And, again, is that your personal

19   observations?

20        A    Yes, as well as feedback.  I -- the

21   trouble right now I'm having in my mind is

22   remembering -- Lhana has certainly told me that.  I

23   can't say specifically, though, was that before the

24   layoff or after the layoff.  There certainly has

25   been a lot of good feedback since that time, but

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

249

1    the GIS piece, yes.

2         Q    And who would be most knowledgeable about

3    the division of Ms. McDowell's time between

4    business system analyst and GIS?

5         A    Lhana was her last supervisor before she

6    left, so Lhana would have been and then Rick before

7    that.

8         Q    When did she leave?

9         A    It's -- I would say a year or so back.  I

10   don't remember the exact time, but it's been a

11   while that she left.  I was -- as far as

12   knowledgeable about her position, one of the

13   important projects that she worked on in GIS had to

14   do with how tax revenue is distributed along the

15   various entities in the County:  School districts,

16   municipalities, all that.  And I was aware of that

17   project because of its relationship to the outside

18   entities.  And that was one of the real concerns

19   that I had, especially when she left, was who was

20   going to take that over and how we're going to deal

21   with that.

22        Q    All right.  But that's -- you're talking

23   about 2018 now, right?

24        A    That was -- it's -- well, no.  I knew

25   about it when we first had her doing it.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

256

```
 1        A     Did I look at what?

 2        Q     His pay compared to her pay?

 3        A     I would -- at the time that that

 4   occurred, I thought it would even be less because

 5   she was a senior and he was new and only a tech.

 6        Q     Would it surprise you to hear they were

 7   making about $6,000 difference?

 8        A     A little bit because, like I said, she

 9   was at the top -- she was one of the ones, I

10   believe, who were redlined because they were at the

11   top of their rating.

12        Q     Who else was at the top of the rating?

13        A     I think Kelly was.  The people who had

14   been there a long time were the ones who -- I

15   think Janine was.  I don't know if Ron was

16   redlined.  He got caught in the freeze.  But we --

17   I had about four, and mostly BSAs, not Janine, but

18   mostly the BSAs who were at the top of their scale.

19        Q     Well, Lhana was at the top, wasn't she,

20   Lhana Jordan?  Why don't you look at Exhibit 52

21   that's in front of you to help you refresh your

22   memory.

23        A     I --

24        Q     And we can look at the salaries.  If you

25   look at Defendant's Bates 61 on Exhibit 62, you see
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

257

1    that Lhana was at the top of the salary, right?

2        A    It depends on where the red line was

3    drawn and --

4        Q    Well, I'm just --

5        A    -- with this --

6        Q    -- trying to identify kind of the group

7    of highest paid.

8        A    I hear you.  I knew that the longstanding

9    BSAs were at the top and they were redlined,

10   because there was a point where -- this goes back

11   to early on when I came to Mesa County, that the

12   decision had been made that anybody who was above

13   the red line was going to get cut --

14       Q    What's the red line?

15       A    -- salaries.

16       Q    What are you talking about?

17       A    The grid.  Okay.  So there's a grid of

18   low, medium, and high.  It's the range, the pay

19   range for a given line, okay?

20       Q    Where is this written down?

21       A    HR.  HR is...

22       Q    So HR has a grid for each person that

23   says the salary range, or each position?

24       A    Each position.

25       Q    Okay.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

267

```
 1    terminated, right?

 2         A     Yes.

 3         Q     And Carey had 19 and a half years of

 4    service, right?

 5         A     Yes.

 6         Q     And let's see.  I want to make sure

 7    I'm -- I'm comparing apples to apples.

 8               Mr. Tarlton, if I'm saying his name...

 9         A     We usually say Tarlton.  It doesn't

10    matter.

11         Q     Tarlton.  He had 5.3 years of experience,

12    right, at the time of the layoffs?

13         A     With Mesa County, yes.

14         Q     And Ronald Sage had 8.5 years of

15    experience?

16         A     Yes.

17         Q     So have you now told me all the reasons

18    that you thought Lhana Jordan has more special

19    skills than did Mr. Corsi?

20         A     Yes.  Well, let me answer that some more.

21    Lhana has -- Lhana is technical and she does have

22    the hardware background and knowledge.  She was --

23    she was a technician before she got promoted into

24    management and still does a lot of that.  She had a

25    great deal and does -- has a great deal of
```

**EXHIBIT 3**

Frank Whidden   July 11, 2019

268

1    technical knowledge that Corsi did not have.

2        Q    Can you give me an example?

3        A    How to replace a motherboard, how to

4    replace memory in a computer.  Do you want me to

5    name all the parts of the computer that she can do

6    because it's every one of them, and he can't.

7        Q    And how do you know he can't?

8        A    He's not technical, doesn't have the

9    background, doesn't have the credentials or the

10   experience, to the best of my knowledge.

11       Q    Is it just based on your personal

12   observations that you believe he's got -- he

13   doesn't have as strong of skills as Ms. Jordan?

14       A    Correct.  And as well as, I've said, my

15   knowledge of the fact that -- I don't know if you

16   call this personal observation or not -- that his

17   background is GIS, which I believe is where he's

18   gone to again, is back into the GIS field.

19       Q    Is Lhana Jordan still the customer

20   service manager or has she gotten a promotion?

21       A    She was promoted to take over the

22   business systems analysts, so she got that in

23   addition to what she had before.

24       Q    When was she promoted to the BSA

25   position?

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

269

1     A     To supervise the BSAs.  Right after the
2  terminations were done, because somebody had to
3  take the lead on that.
4     Q     So right after Ms. Bouricius was
5  terminated, Lhana Jordan assumed the
6  responsibilities of supervising the BSAs?
7     A     Yes.
8     Q     And did she also get a raise?
9     A     I believe I gave her a small raise at
10  that time.  I think I did.  I'm not certain.  She
11  has had subsequent raises, for sure.  I think so.
12  I think --
13     Q     So this was in 2016, she would have
14  gotten a raise?
15     A     I honestly don't remember.  We had that
16  freeze on, and I can't remember if that was a
17  problem with doing any raises at that point.  I
18  don't remember for sure if she got one before the
19  end of '16 or not.  I don't remember.
20     Q     Did anyone else get a promotion after the
21  2016 layoffs?
22     A     Not until quite some time later.  Troy
23  got the Web team and GIS, but he didn't get any
24  promotion.  His title didn't change.  So I split
25  the teams that Rick had between Troy and Lhana.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

272

1    resources to accomplish the objectives that I'm

2    given, and I had to try to keep the best that I

3    could with the resources that I knew I was going to

4    have and I had to fit it under that cap.

5         Q    Well, I appreciate that, but you also are

6    aware that usually the longest time -- the longest

7    term employees are usually the highest paid, right?

8         A    Yes.

9         Q    And they tend to be the older employees,

10   too, right?

11        A    Not necessarily in the IT world.  I mean,

12   I -- you -- it depends on the function.

13        Q    It may be that there's exceptions, but

14   generally would you agree that the longest-serving

15   employees are typically the oldest?

16        A    Yes.

17        Q    So did you know whether Rick Corsi ever

18   worked in support -- as a support specialist?

19        A    No, I don't.  But to the best of my

20   knowledge, if he did, I did not know that.

21        Q    What about comparing Lhana's skills --

22   Lhana Jordan's skills to Ms. Bouricius.  What

23   skills did Lhana have that Ms. Bouricius did not

24   have?

25        A    It's the same comparison, almost direct,

**EXHIBIT 3**

Frank Whidden   July 11, 2019

```
 1    except Deb's got the software side of things that
 2    Rick didn't have.  Deb -- wait.  You're comparing
 3    Rick to Lhana.
 4         Q    No.  I'm comparing Deb to Lhana.
 5         A    Oh.  As far as I knew, again, the
 6    hardware skill -- hardware skills of a technician,
 7    all of the things associated with desktop user
 8    support, and then stronger customer service skills.
 9         Q    When you say "desktop user support," how
10    was Lhana more skilled at desktop user support than
11    was Ms. Bouricius?
12         A    I see her do that all day, every day.  I
13    never observed or was told or had any information
14    that Deb had any skills in that area.
15         Q    Okay.  Do you have any other evidence of
16    desktop user -- of Lhana being stronger in desktop
17    user support than Ms. Bouricius other than what
18    you've just testified?
19         A    No.
20         Q    And you said hardware skills.  You
21    believe Lhana has better hardware skills than Ms.
22    Bouricius?
23         A    Yes.
24         Q    And what's that based on?
25         A    Personal observation.
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

274

```
 1          Q    And you said -- oh, you said also that
 2     Lhana had better software skills.
 3          A    No.  Better customer service skills.
 4          Q    Better customer service.
 5               Again, is that just based on your
 6     personal observation?
 7          A    Yes.  And also, as I said earlier, about
 8     information I had been given about customer
 9     complaints.
10          Q    From Lhana.
11          A    From Lhana.  I've had -- I've had
12     customers tell me that they didn't like the service
13     that they received.
14          Q    What customers?
15          A    Kristen Cole would be one.  I don't
16     remember exactly who said that to me over the
17     years.
18          Q    So Kristen Cole.  What -- what -- what --
19          A    She's administrative assistant and -- and
20     I think Kristen was there before Deb left.
21          Q    So what year was this complaint made?
22          A    I don't remember.
23          Q    Was there anything in writing about it?
24          A    Not unless there was something in work
25     orders that covered it.  I didn't read anything
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

```
 1    that I can recall.  It was verbal.
 2         Q    So why do you need these skills to be a
 3    manager?
 4         A    I think that in order to manage,
 5    especially frontline technicians, you've got to
 6    have a knowledge of the work that they are doing.
 7    That's what I think.
 8         Q    And you think Lhana had better knowledge
 9    of that than Ms. Bouricius?
10         A    Yes.
11         Q    Again, is that just based on your
12    personal observations?
13         A    Yes.  And I've also heard the flip side
14    of customers rave about Lhana and the work that she
15    does and the relationship to the users.
16         Q    Okay.  And I think I cut you off before
17    and I apologize.
18              We were talking about this chart.  You
19    called it a compensation table.
20         A    Uh-huh.  Yes.
21         Q    Thank you.
22              What -- what, if any, role -- I take that
23    back.
24              Where -- did you say HR keeps a copy of
25    that?
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

283

```
1    was canceled by the end of the month, of October,

2    right?

3         A    That's what that letter says.

4         Q    Do you have any reason to disbelieve it?

5         A    No.

6         Q    So are there any -- well, I want to go

7    back and talk about how the whole termination

8    meeting happened.

9         A    Uh-huh.

10        Q    You've said that you had a conversation

11   with Troy Flick and Ms. Lhana Jordan about a week

12   before and got their okay for your decision.

13        A    Yes.

14        Q    Is that fair?

15        A    Yes.

16        Q    And then what did you decide to do at

17   that point?

18        A    I decided that we would have one meeting

19   and have everybody there and I would announce what

20   was happening with the layoff, and then Brenda --

21   at the time I expected it to be Krista, but she was

22   on vacation.  That Brenda would be there and she

23   would go through the HR details, for instance, of

24   health insurance, COBRA, all of the things that are

25   involved, retirement accounts, all those things.
```

**EXHIBIT 3**

Frank Whidden   July 11, 2019

313

```
 1    just --
 2         A     Who else -- who else was involved in
 3    this.
 4         Q     In making the decision to terminate --
 5         A     Right.
 6         Q     -- these individuals.
 7         A     That was -- that was me, and then if
 8    you -- depending on how you want to count Troy and
 9    Lhana when I asked them to vet the list.
10         Q     But you were the sole decision-maker.
11         A     Yes.
12         Q     Okay.
13         A     I was.
14         Q     Do you still operate your outside
15    business of marriage and family therapy?
16         A     It exists.  I don't -- I'm not actively
17    doing anything right now.  I hurt my back back in
18    January, and I only ever had one set of clients, so
19    I don't think I can be said to be operating a
20    business.
21         Q     Well, you got a license to conduct this
22    business, right?
23         A     I have what's called a candidate's
24    license, yes.  And that was the point of trying to
25    set that business up, is because I have to amass
```

**EXHIBIT 3**

Frank Whidden   July 11, 2019

338

```
 1    testified to all the information that you have
 2    under Matter No. 2.
 3         A    Yes.
 4         Q    Or that Mesa County has.
 5         A    I believe that all the information that
 6    would pertain to that matter we have covered, yes.
 7         Q    Okay.  So Matter No. 3, we talked a
 8    little bit about skill sets.  So I would like you
 9    to, if you could, look at Exhibit 52, the second
10    page of Exhibit 52 -- the second and third pages
11    are pages that have the employees that remained.
12    And if you could just go down and tell me -- are
13    you on the same page?
14         A    I think.
15         Q    Yeah.  It's Defendant 61 at the bottom.
16         A    This.
17         Q    Yeah.  Okay.  So Matter No. 3 says:  For
18    each skill, Plaintiff, Ms. Bouricius, did not have
19    in comparison with individuals that stayed.
20              Tell me each one of these people who had
21    more skills than plaintiff.
22         A    Okay.  Lhana had more skills and David
23    did, Troy did, Lori did, Kelly did, Chris did,
24    Leilani did, Joseph did, Elizabeth did, Paul did,
25    Eric did, William Tarlton did, and Terrie Hotary
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

1   did.

2        Q    And I think the next page is also people

3   that stayed.

4        A    Right.  So Ryan...

5        Q    Is it just all of them had more skills

6   than she did?

7        A    I believe, yes.  Looking at this --

8        Q    Okay.

9        A    -- the difference, yes.

10       Q    So can you identify --

11       A    Not counting the temps.

12       Q    Okay.

13       A    I don't know those people.

14       Q    Can you identify -- we can go through

15   this pretty quickly -- if there is any additional

16   information, other than what you have already given

17   to me, what skills does Ms. Jordan have more than

18   Ms. Bouricius?

19       A    The hardware skills, the -- we did answer

20   this before.

21       Q    Okay.

22       A    The hardware skills, the customer service

23   skills, those things.

24       Q    And is that true with David Underwood as

25   well?

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

343

```
 1        A    Yes.

 2        Q    -- hardware --

 3        A    Yes.

 4        Q    -- experience?

 5        A    Yes.  Yes.

 6        Q    Okay.  Is there anything else you feel

 7   like that you know or can tell me about Matter No.

 8   3?

 9        A    No.

10        Q    Can you answer No. 4 for me.  Can you

11   give me the identity of all persons with personal

12   knowledge that support the defense asserted by Mesa

13   County in this case?

14        A    I believe that would be mainly Troy Flick

15   and Lhana Jordan.

16        Q    Anyone else?

17        A    Not to my knowledge.

18        Q    Okay.  No. 5, can you tell me the

19   identity of any documents reviewed to prepare any

20   of your 30(b)(6) rule deposition?

21        A    I didn't refer to any documents to

22   prepare for this.

23        Q    Okay.  So let's go down to Denials in

24   Defendant's Answer.  Let's go to 15.  And why don't

25   you open up Exhibit 12 because I don't expect you
```

**Frank Whidden   July 11, 2019**

```
 1    of you?

 2         A    Yes.

 3         Q    That doesn't count as my one question.

 4              If you would go to the third page of that

 5    document.

 6         A    Yes.

 7         Q    I believe you were asked by counsel for

 8    the plaintiff who to identify with respect to

 9    Matter No. 4, all persons with personal knowledge

10    which support blah, blah, blah, blah, blah.

11              Do you see that?

12         A    Yes.

13         Q    Okay.  And you identified Mr. Flick and

14    Lhana Jordan?

15         A    Correct.

16         Q    Would you also include yourself in that

17    list as well?

18              MS. GREISEN:  Well, that's leading,

19    but I won't object, because I will stipulate that

20    Mr. Whidden has personal knowledge.

21         A    Yes.  I didn't include myself in that

22    list, but yes.

23              MR. SANTO:  I have no further

24    questions.

25              MS. GREISEN:  We are done.  Thank
```

**EXHIBIT 3**

# Composite Deposition Testimony of

# Kelly Leuallen

**EXHIBIT 3**

# *BOURICIUS*

# *VS.*

# *MESA COUNTY*

### Deposition

# *DEBRA BOURICIUS*

*02/22/2019*

---

# *AB Court Reporting & Video*
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

**EXHIBIT 3**

**AB Court Reporting & Video**

```
1          A      So our living conditions are less than

2     perfect now, and we can't afford to live in a -- you

3     know, a nice home or apartment.  To buy a piece of

4     property equivalent to what we had in Mesa County

5     would cost a million dollars or more.

6                 And we liked -- we -- what we loved about

7     that place was all the wildlife and enjoying the

8     wildlife, being, you know, away from people, and we

9     lost that lifestyle.

10                And we were planning to stay there.  I was

11    planning to work with Mesa County till I retired.

12    And I put up with numerous years without even a raise

13    or cost of living increase.  And, you know, Kelly was

14    looking for a job at one time, and I said, you're

15    crazy, the traffic's bad, housing is hugely

16    expensive, you know, this is the best place to work

17    and live.

18         Q      Is there anything else about emotional

19    damages?

20         A      Other than, you know, it hurts.  It really

21    does hurt.

22         Q      Let me ask you a little about your husband

23    Steve.  Does he work?

24         A      No, he's retired.

25         Q      What did he retire from?
```

**EXHIBIT 3**

**AB Court Reporting & Video**

```
1        Q      Now, the statement regarding Ms. Corsi

2    also talks about her own work performance.  Did her

3    work performance have any bearing on your work

4    performance?

5        A      Janine was the best of all of the network

6    people there.  If I needed somebody to get something

7    done, she was always willing to do it.  She was there

8    most of the time, whereas the other network database

9    administrators were off and not available.

10               You can ask Lori and Kelly.  She was

11   always the one they would go to if they needed

12   something done.

13       Q      Janine was somebody that Lori and Kelly

14   would go to?

15       A      Absolutely.

16       Q      How do you know that others were not

17   available?

18       A      Because they were out of the office.

19       Q      So you'd walk around and try to find one

20   of them and --

21       A      Sure.

22       Q      Is that how you always did it?  You'd walk

23   around?

24       A      No.  I'd call, that kind of thing.

25       Q      Who would you call?
```

**EXHIBIT 3**

AB Court Reporting & Video

```
 1    in Mesa County.

 2         Q      So it was more like a work call.

 3         A      Right.

 4         Q      The next name down is Kelly Luellen.

 5         A      M-hm.

 6         Q      Do you know Ms. Luellen?

 7         A      Mr.

 8         Q      Mr.  Thank you very much for that

 9    correction.

10         A      Yes.

11         Q      Who is Mr. Luellen?

12         A      He was a business systems analyst --

13    senior business systems analyst with Mesa County IT.

14         Q      When did you meet Mr. Luellen?

15         A      I can't say specifically.

16         Q      Was he hired after you were already at

17    Mesa County?

18         A      Yes.

19         Q      What was your relationship like with

20    Mr. Luellen?

21         A      It was good.

22         Q      How did you work together?

23         A      We both supported the same areas within

24    Mesa County.

25         Q      What are those areas?
```

**EXHIBIT 3**

*AB Court Reporting & Video*

1    to be laid off?

2         A      I was a high performer and he laid me off.

3         Q      Where did you -- let me start that again.

4                How did you come to the conclusion that

5    you were a high performer?

6         A      Based on my performance evaluations.

7         Q      Did Frank Whidden ever tell you you were a

8    high performer?

9         A      No.

10        Q      Do you know what information Whidden

11   considered as part of the layoff?

12        A      No.

13        Q      Let's look at paragraph 38.  Go ahead and

14   read that paragraph to yourself.

15        A      Okay.

16        Q      All right.  And what information do you

17   have to support the statement that "Ms. Bouricius was

18   one of the most skilled and knowledgeable employees

19   in the IT department"?

20        A      Because I had been there the longest, and

21   I trained new people coming on and -- so that's how I

22   feel that.

23        Q      Who did you train?

24        A      I trained Kelly, Terrie, Elizabeth, Ron

25   Sage.  I don't know.  I can't recall others.

**EXHIBIT 3**

**AB Court Reporting & Video**

1    Q      What did you train them on?

2    A      Well, Kelly was in the PC support, and so

3    I trained him how to become a senior business analyst

4    and support the system.  And same with Ron Sage.  He

5    started -- when he started.  So it was to do the

6    systems analyst job is what I trained him on.

7    Q      And what about Terrie and Elizabeth?

8    A      Same.

9    Q      All right.  Did Frank Whidden ever tell

10   you that you were one of the most skilled and

11   knowledgeable employees in IT?

12   A      No.

13   Q      Were other employees able to support all

14   of Mesa County's departments?

15   A      No.

16   Q      How do you know that?

17   A      Because they've never supported them.

18   Q      How do you know they haven't?

19   A      Because I supported them.

20   Q      How do you know that other employees

21   didn't do projects here and there?

22   A      Because I know what people worked on.

23   Q      How did you come to have that knowledge?

24   A      27 years.

25   Q      Were you their supervisors?

**EXHIBIT 3**

DEBRA BOURICIUS 2/22/2019                    229

1    working relationships.  Do you recall that from 2014?

2        A    No.

3        Q    Did something happen in 2014 that you can

4    recall related to organization or interpersonal --

5        A    No.

6        Q    -- working relationships?

7             I'm sorry, say again?

8        A    No.

9        Q    What did you do to work on these skills

10   outlined for you in 2015?

11       A    I think by leading projects and, you know,

12   taking the lead facility -- facilitating meetings,

13   that kind of thing, shows that you're a leader in the

14   organization.

15            Cross training would be when you help your

16   co-workers learn other systems and train each other.

17   I think he was concerned because Kelly and I knew the

18   sheriff's office side of it and Lori didn't know --

19   Lori -- Terrie and Elizabeth didn't know the other

20   side, so, you know, there was a lot of -- they wanted

21   everybody to be able to support everything, so --

22       Q    And if that would happen --

23       A    And I know he was concerned too about the

24   sheriff's office, that everybody was trained.  Yeah,

25   we did a lot of cross training with each other.

**EXHIBIT 3**

Transcript of the Testimony of

## JANINE CORSI
### April 22, 2019

### Debra Bouricius
### v
### Mesa County, et al.

# Linda L. Frizzell, RPR

*Linda L. Frizzell, RPR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444



**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

                                                      Page 17

1    actually, I think Lhana worked for Troy, and then there

2    was some PC support people:  Derek Conlon, two other guys

3    that were PC support, and then there was Paul Mitts and

4    Chrislynn Howerton were the -- basically the phone help

5    desk.  They would answer the calls and create tickets and

6    that kind of thing.

7            And then my husband had web group, which was

8    Leilani Boyles and Joe Keene; the GS group:  Chris Kadel,

9    and Ryan, I can't remember his last name; and then the

10   BSA group, which was Lori Marak, Deb Bouricius, Terrie --

11   she was -- I can't remember her last name, Kelly

12   Leuallen, and David Barnett.  They were all business

13   systems analysts.

14           Basically, he had web, database, and GIS and

15   business systems analyst.  And Troy had network

16   administration and help desk.  And Frank was directly

17   above Rick and Troy.

18        Q.  So when Frank Whidden was the IT director, was

19   his office in your space?

20        A.  No.  He was in the third floor of the

21   courthouse, which is kind of a -- it's an older building,

22   so it's kind of in, like, the spiral staircase.  So there

23   wasn't a lot of direct contact with Frank.  He would come

24   down occasionally.

25        Q.  How often?

**EXHIBIT 3**

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                               April 22, 2019

Page 38

1        Q.  Was that just by virtue of the department

2   growing?

3        A.  Yeah.

4        Q.  More internet-based services, et cetera, et

5   cetera?

6        A.  More interconnecting buildings and building up

7   the network infrastructure, the fiber between buildings.

8   And there was just a lot of that happened.  We went from

9   Unix to Windows.  We got rid of a big -- a couple big

10  mini computers.  But -- so Deb kind of evolved to -- from

11  doing the Unix and Fornix to doing Microsoft SQL server.

12  So it was constantly changing.

13       You have to just try and keep up.  But I always

14  valued Deb's opinion.  She always seemed very wise to me,

15  and she is a hard worker.

16       Q.  Did you ever ask her anything she couldn't help

17  you out with?

18       A.  No.  If she didn't know the answer, she'd find

19  out for me.

20       Q.  Was she one of the most, in your opinion,

21  experienced BSAs?

22           MS. SEVERN:  Object to form.

23       A.  Yes.

24       Q.  (BY MS. BISBEE) Okay.

25       A.  Her and Kelly Leuallen, I would say.  I would go

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

EXHIBIT 3

Debra Bouricius                                    JANINE CORSI
Mesa County, et al.                                April 22, 2019

```
                                                   Page 39

 1   to them first if I need -- needed to know something.
 2        Q.  Okay.  Do you know when Kelly started?
 3            MS. SEVERN:  Object to form.
 4        A.  He started shortly after I did, I believe.
 5        Q.  (BY MS. BISBEE) Okay.  So he's been there less
 6   time as Deb as well?
 7        A.  Yes, he started more as a PC support person.
 8        Q.  Are you aware of any problems anyone at Mesa
 9   County had with Deb Bouricius' work?
10            MS. SEVERN:  Object to form.
11        A.  No.
12        Q.  (BY MS. BISBEE) Did you ever hear that she
13   didn't complete a project?
14            MS. SEVERN:  Object to form.
15        A.  No.  The problems that came up were mostly the
16   vendors not performing, but she didn't have any control
17   over that.
18        Q.  (BY MS. BISBEE) So I'm sorry, it's -- your
19   testimony is that if one of her projects had an issue,
20   it was generally a vendor problem not --
21        A.  Yeah, just the software wasn't designed to do
22   what they needed it to do.
23        Q.  Okay.  So if she could make a patch, would she
24   make the -- the right patch on that?
25        A.  She'd work with the vendors to get the problems
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                          JANINE CORSI
Mesa County, et al.                                    April 22, 2019

Page 78

1      A.   She was the main person.  I think Kelly Leuallen

2   knew about it.

3      Q.   How do you know what Ms. Bouricius and

4   Mr. Leuallen know?

5      A.   Just by knowing they're the ones doing the work,

6   I guess, seeing them interact with finance, and how the

7   help desk tickets got routed to Deb.

8      Q.   So are you assuming that they have this

9   knowledge?

10      MS. BISBEE:  Objection.  Form.

11      A.   No, I'd say I know it for a fact.

12      Q.   (BY MS. SEVERN) Did you ever talk with them

13   about what they know?

14      A.   Yes.

15      Q.   What did they tell you?

16      MS. BISBEE:  Objection.  Object to form.

17      A.   It was mostly I'd ask questions on things I

18   needed to solve, problems.  I didn't go to them and say,

19   Do you know about this or what do you know, but they all

20   had a lot of training and experience.

21      Q.   (BY MS. SEVERN) What was --

22      A.   I guess, I just trusted they're professionals,

23   they knew what they were doing, and I never had any

24   reason to doubt that.

25      Q.   What questions did you ask them specifically

**EXHIBIT 3**

Transcript of the Testimony of

**RICK CORSI**
**April 22, 2019**

**Debra Bouricius**
**v**
**Mesa County, et al.**

# Linda L. Frizzell, RPR

*Linda L. Frizzell, RPR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444



**EXHIBIT 3**

Debra Bouricius                                                    RICK CORSI
Mesa County, et al.                                             April 22, 2019

```
                                                              Page 3

  1                     I N D E X
  2    EXAMINATION OF RICK CORSI:                       PAGE
       April 22, 2019
  3
       By Ms. Bisbee:                                      4
  4    By Ms. Severn:                                    116
       By Ms. Bisbee:                                    158
  5    By Ms. Severn:                                    169
  6                                                  INITIAL
       DEPOSITION EXHIBITS:                          REFERENCE
  7
       Exhibit 33   Settlement Agreement and Release
  8                 Bates Bouricius 000392-000398          5
  9    Exhibit 34   Evaluations Rick Corsi
                    Bates DEF 4292 and DEF 3737
 10                 CONFIDENTIAL                          51
 11    Exhibit 35   Evaluation David Barnett, Leslie
                    Boyles, Ryan Davidson, Terri Hotary,
 12                 Kelly Leuallen, Lori Marak, Elizabeth
                    McDowell
 13                 Bates DEF 4138, 4376, 4490, 4915, 4720
                    5040, 4364 CONFIDENTIAL                51
 14
       Exhibit 36   Charge of Discrimination
 15                 Bates DEF 3571-3587 CONFIDENTIAL     103
 16    (Attached to original and copy transcript.)
 17    PREVIOUSLY MARKED EXHIBITS:
 18    Exhibit 31   Settlement Agreement and Release
                    Bates Bouricius 000385-000391          5
 19
       Exhibit 32   April 9, 2017, Email Re:  Rebuttal
 20                 to Mesa County
                    Bates Bouricius 000417-000418       121
 21
       QUESTIONS DEPONENT INSTRUCTED NOT TO ANSWER:
 22                       (None)
 23    INFORMATION TO BE PROVIDED:
                          (None)
 24
 25
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                              RICK CORSI
Mesa County, et al.                                      April 22, 2019

Page 18

1        A.  There was -- I don't believe there was a --

2   anyone in a position.  They were all at the same level

3   except one person.

4        Q.  (BY MS. BISBEE) Okay.  Who was that person?

5        A.  Elizabeth McDowell.

6        Q.  Okay.  And what was her level?  How was she

7   different?

8        A.  She was at the same level except she was a GIS

9   and business system analyst.

10       Q.  Okay.  So you don't recall that anyone having a

11  title, senior business analyst?

12       A.  I'm trying to think if that's what -- what we

13  called them at the time.  I don't recall.  There may have

14  been -- that may have been what the titles were.

15       Q.  Okay.  So would a -- whatever the title is,

16  we'll just say BSA.

17       A.  Right.

18       Q.  Well, who were the BSAs?  Can you tell me that?

19       A.  Deb was one BSA, Kelly Leuallen, Terrie Hotary,

20  Eliz- -- Elizabeth was -- she had the -- the double

21  title, David Barnett, and Lori Marak.  I believe I got

22  them all.

23       Q.  Do you know -- the folks you just listed, do you

24  know how old they are?

25       A.  Not specifically, no.

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

Page 41

```
1        A.  No.
2        Q.  Who else was involved in the project?
3        A.  Lori, and I'm not sure if Elizabeth was involved
4   at that time, but Lori Marak would have been involved in
5   the project.  And Kelly Leuallen had involvement in the
6   project.  I don't remember if anybody else was directly
7   involved.  I think actually Dan may have been involved in
8   the project.
9        Q.  Dan, I'm sorry?
10       A.  The one that was later terminated.
11       Q.  Okay.  Do you know if Debbie was the only one
12   that got a letter in her file --
13            MS. SEVERN:  Object to form.
14       Q.  (BY MS. BISBEE) -- out of those folks?
15       A.  I believe she was, yes.
16       Q.  Okay.  Well, based on the fact that you just
17   rattled off a bunch of names, is it fair to say that this
18   was -- the whole project was all-IT-hands-on-deck-type
19   situation?
20       A.  At least half -- you know, probably half the
21   department had some involvement on the project.
22       Q.  Okay.  Aside from that, that letter that
23   Ms. Bouricius got, are you aware of any other poor
24   performance ratings or --
25       A.  No.
```

**EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

```
                                                         Page 57
 1        A.  I don't.  Probably a year to two years back
 2   from --
 3        Q.  Anything that led to the level of discipline?
 4        A.  No, it was more they could not -- we were having
 5   trouble with them working together.
 6        Q.  Okay.
 7        A.  I did go to Frank about it.
 8        Q.  Uh-huh.  Did Debbie have problems working with
 9   people?
10        A.  No.
11        Q.  Do you recall ever putting anything in writing
12   in your desk file or emails or memos about Kelly
13   Leuallen's performance?
14        A.  No.
15        Q.  How about Elizabeth McDowell's?
16        A.  No.
17        Q.  What about David Barnett's?
18        A.  No.  We were working on some of his -- his work
19   habits.
20        Q.  Okay.
21        A.  But other -- and there may have, I just don't
22   recall without having anything specifically in the desk
23   file.  I mean, it's been over two and a half years now
24   since I --
25        Q.  But can you say for sure that you didn't have
```

                                                  **EXHIBIT 3**

Debra Bouricius                                          RICK CORSI
Mesa County, et al.                                   April 22, 2019

                                                        Page 155

1        Q.  Am I understanding correct that cross training

2    is not related to the different systems, it's related to

3    how to handle on call?

4        A.  It's related to different systems --

5        Q.  Okay.

6        A.  -- and how those systems are supported both

7    after hours and during work hours.  So if someone

8    supported, like, in Barney's -- in David Barnett's case,

9    if one supported and was the primary support for the

10   document imaging system, and DHS is the primary user of

11   that system, if no one else that's left has much more

12   experience than basic troubleshooting skills, that would

13   leave a void.

14       Q.  Okay.  Who had cross trained in to DocuSigning?

15       A.  Myself, Kelly Leuallen, Deb.

16       Q.  No one else?

17       A.  I don't recall specifically.  It was a new

18   implementation, and I don't recall anybody being

19   specifically being cross trained on that.

20       Q.  Did Mr. Whidden ask you for any advice regarding

21   cross training before the layoff in 2016?

22       A.  Not that I recall.

23       Q.  Okay.  All right.  And we talked some about --

24   about how you had access to parts of the -- the CORA

25   system that you came up with.  Do you remember that

            Hansen & Company, Inc. Registered Professional Reporters
                    (303) 691-0202 * (303) 691-2444
                                                        **EXHIBIT 3**

**Lori Marak  May 10, 2019**

1

             IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV
_____

DEPOSITION OF LORI MARAK
                                       May 10, 2019
_____

DEBRA BOURICIUS,

     Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

     Defendant.
_____


          Pursuant to Notice and the Federal Rules
of Civil Procedure, the deposition of LORI MARAK,
called by Plaintiff, was taken on Friday, May 10,
2019, commencing at 9:13 a.m., at 205 North 4th
Street, Grand Junction, Colorado, before Candice F.
Flowers, Certified Shorthand Reporter and Notary
Public within and for the State of Colorado.

                                        **EXHIBIT 3**

**Lori Marak   May 10, 2019**

13

1   you sit down and talk about what everyone's doing

2   and who is going to work with whom on what?  How

3   does that work?

4        A    So work is assigned according to what

5   type of project needs to be done.  So if it's an

6   application, then the group that -- the analyst

7   group that me and Deb are in -- were in is done

8   according to whose expertise.  So if it was like a

9   courthouse app, that would be Deb and Kelly.  If it

10  was public safety, it would be me and Liz.  We

11  run -- I'm sorry.  We run the project and pull in

12  whether we need web, GIS, networks.

13       Q    Okay.  So the BSAs kind of serve as the

14  project manager; is that right?

15       A    Yes.

16       Q    And then you're free to pull in kind of

17  the more technical people.  Is that kind of what

18  I'm understanding?

19       A    Yes.  It depends.  Sometimes we act as

20  technical lead for somebody else's project, but

21  generally if there's a more specific need that's

22  outside of the data realm, if it's networking, then

23  we pull in networking.  If it's something to do

24  with web, we would pull in web.

25       Q    So let's step back a minute.  I didn't

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

37

```
1        Q    What about Eagle Assessor, do you know
2    what that is?
3        A    I know what it is, and the same would be
4    for that too.  I never heard anything derogatory
5    about her performance on that.
6        Q    What about DocuSign?
7        A    I'm more familiar with that because the
8    sheriff's office used that for warrants, and, once
9    again, I never heard anything either way on that.
10       Q    Did Debbie help at the sheriff's office
11   or was that after she left?  Getting on DocuSign, I
12   mean.
13       A    I believe it was her and Kelly working on
14   implementing DocuSign; and, of course, it was used,
15   once again, like Eden, everybody who needs
16   signatures.  And I never heard of or had any
17   problems with getting things done in DocuSign.
18       Q    Okay.  We have talked a lot about Eden.
19            Was Debbie kind of the primary person on
20   Eden as far as you understand?
21       A    Yes.
22       Q    And I understand other people may have
23   helped out with Eden, right?
24       A    Yes.  Her partner with most of the
25   courthouse applications was Kelly Leuallen.
```

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

56

```
 1                   MR. SANTO:  Object to form.
 2         A    I believe so, but we really didn't --
 3    Terrie was working on public safety systems and
 4    there were two others.  That's why I say that.  So
 5    Deb could have filled in with whatever gap was
 6    needed there.  We had a lot of stuff going on with
 7    CJSD, so that might have been why the decision was
 8    made.
 9         Q    (By Ms. Bisbee) So let's break that down.
10              There were six senior BSAs before the
11    layoff, right?
12         A    Uh-huh.
13                   MR. SANTO:  Is that a "yes"?
14                   THE DEPONENT:  Yes.
15         A    Not senior, but at least four -- wait.
16    I'm sorry.  Let me count.  Deb was senior, Kelly
17    was senior, Terrie was senior because she was
18    hired as a senior, and I was a senior.  So there
19    was at least four.  I'm not sure about the other
20    two, if they were senior yet.
21         Q    (By Ms. Bisbee) And were the other two
22    Elizabeth McDowell and David Barnett?
23         A    Yes.
24         Q    So who before the layoff was doing
25    criminal justice stuff?
```

**EXHIBIT 3**

**Lori Marak   May 10, 2019**

77

```
 1   she had any performance issues.
 2        A     None that I -- none to that level, no.
 3        Q     And she's probably, in fact, better than
 4   at least Ms. Hotary at her job.
 5        A     She's at least better than other BSAs, or
 6   at least one other BSA.
 7        Q     Okay.  Now, it's fair to say or would you
 8   agree that Deb and Kelly Leuallen are about equal
 9   in their skill sets?
10        A     Well, I don't know a fair way of
11   answering that, because they both were doing the
12   same job.  Now, since Deb has left, Kelly has taken
13   on a lot more workload, a lot more responsibility,
14   and really is our best systems analyst.
15        Q     But at the time of the layoff, were they
16   kind of doing the same thing?
17        A     Yes.
18        Q     And Kelly had been there for less time,
19   correct?
20        A     Kelly has been with the department a long
21   time.  He's probably been there 22 to 25 -- wait.
22   He's been there 25 years.  So as far as in the
23   business systems analyst job, less time, but his
24   skill set is definitely good.
25        Q     But he has been there less time than
```

**EXHIBIT 3**

Lori Marak   May 10, 2019

78

 1    Debbie?

 2        A    Yes.

 3        Q    So assuming their skills were equal and

 4    the County had to make a decision solely based on

 5    years of service, Kelly would lose in that

 6    situation, correct?

 7        A    If it was based on years of service.

 8                   MR. SANTO:   Object to form.   Go

 9    ahead.

10        Q    (By Ms. Bisbee) How did you know that the

11    Corsis were filing a lawsuit or whatever it is you

12    knew they were doing?

13        A    I think that would have been when

14    Janine -- Janine might have called me and said that

15    they were going to sue, which I had assumed.

16        Q    Why had you assumed that?

17        A    I just assumed all of them were going to

18    sue.

19        Q    Was there a reason?

20        A    Just based on the fact that it was

21    long-term employees that were let go.

22        Q    So had you been familiar with the idea of

23    age discrimination?

24                   MR. SANTO:   Object to form.

25        A    I would be speculating on any of that,

**EXHIBIT 3**

Lori Marak   May 10, 2019

82

```
 1        A    I don't know everybody's age for sure,
 2   but I know Kelly's probably as old as me and Deb,
 3   so -- or in that -- I want to say we're within ten
 4   years of each other, the three of us.
 5        Q    (By Ms. Bisbee) And you're younger than
 6   Deb, correct?
 7        A    Oh, yeah.  I'm not sure exactly how.
 8        Q    But, clearly, if some maxed out people
 9   stayed on, there were other considerations aside
10   from these high-paying positions, correct?
11        A    I don't know how to answer that
12   specifically with a yes or no.  I believe I was
13   kept on because I was doing public safety work, and
14   then Kelly was doing so much work on the other
15   side, he was left on, and we were the oldest at
16   that point, I believe.
17        Q    After the layoff.
18        A    Yes.  And, of course, Terrie Hotary is
19   the same age as me.
20        Q    Are you aware of any problems with
21   attendance or job performance in -- I guess it
22   would be the network administrator group around
23   2014, 2015, 2016?
24        A    Yes.  It seemed like we had a lot of
25   problems trying to get help from them or keep
```

**EXHIBIT 3**

                IN THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

_____

VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

                                      July 11, 2019

_____

DEBRA BOURICIUS,

      Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

      Defendant.

_____



           Pursuant to Notice and the Federal Rules

of Civil Procedure, the videotaped deposition of

FRANK WHIDDEN, called by Plaintiff, was taken on

Thursday, July 11, 2019, commencing at 9:07 a.m.,

at 205 North 4th Street, Grand Junction, Colorado,

before Candice F. Flowers, Certified Shorthand

Reporter and Notary Public within and for the State

of Colorado.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

216

1   analyst, which was her position, I believe, and

2   those who would remain; but, in particular, the

3   other senior BSA who would remain.

4         Q    Who was that?

5         A    Kelly Leuallen.

6         Q    Okay.  What was that knowledge based on?

7         A    I believe that Kelly is more

8   knowledgeable about more systems.  I believed that

9   he stays up to date better on the changes and

10  things that are made.  I believe that he does a

11  better job as far as customers are concerned.  I

12  felt like he did a much better job as far as

13  documentation was concerned, and I felt like that,

14  therefore, he was the stronger player.  That was a

15  hole in the boat that we couldn't afford at that

16  time.

17        Q    And can you give me an example of how you

18  thought Kelly was more knowledgeable about systems

19  than Ms. Bouricius.

20        A    Whenever I -- questions came up and the

21  more complex they were, the more involved Kelly

22  was.  As far as the systems that we supported, he

23  appeared, to me, to be more well-rounded and more

24  knowledgeable about the whole stack.  We have some

25  100 to 200 software systems in our stack, and I

Frank Whidden   July 11, 2019

217

1   felt that Kelly, I still feel, that Kelly was
2   stronger.
3        Q     Can you give me any more examples of how
4   Kelly's knowledge about systems was better?
5        A     I think that was sufficient.  No.
6        Q     Okay.  And can you give me any examples
7   of how Kelly was better with customers than Ms.
8   Bouricius?
9        A     Yes.  Kelly is thorough, very painstaking
10  as far as explaining how a system works or doesn't
11  work or helping a client deal with whatever issues
12  they may have in front of them.  I got reports of
13  that from clients, from management, that he was --
14  he was more thorough, more detailed, and more
15  helpful to the clients.
16       Q     Can you give me any specific clients?
17       A     As far as being thorough, I know that
18  Kristen Cole in my office upstairs has been -- is
19  an example of someone who says that Kelly is
20  extremely thorough.  Lhana has said that.  I have
21  seen it as evidenced in his documentation, the
22  e-mails that he sends out about how to do things,
23  how to -- like if we're making an upgrade, here are
24  the changes, here's what the user can see with
25  screenshots and examples and, you know, ad

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

218

```
 1   infinitum there.  He -- I have seen that myself
 2   come across.
 3           So that's -- and that's something that
 4   generally IT people don't do and we have to work on
 5   them, is do that kind of documentation at that
 6   level so a normal person can understand what is
 7   expected and what they need to do.
 8      Q   Can you give me some examples of when Ms.
 9   Bouricius was not thorough with her documentation.
10      A   I don't recall seeing her write out
11   anything like that that compared to the work that
12   Kelly's done.  I don't recall seeing her send
13   something out that had that level of detail in it.
14      Q   Okay.  So with Ms. Bouricius, you said
15   you decided to terminate her because -- you talked
16   about Kelly Leuallen, but Kelly Leuallen wasn't the
17   only BSA, right?
18      A   But he was -- they were the two that were
19   most senior.
20      Q   Okay.  Did you compare her to anyone
21   else?
22      A   As far as the remaining stack that was
23   there and the systems they covered, I felt that the
24   coverage that we needed on the various systems was
25   better represented by the people who remained.
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

242

1      Q    Why is that?

2      A    For the reasons that I have already

3   given, what I've already covered.  It seems to me

4   that's the same thing, the same thing --

5      Q    Okay.

6      A    -- I think.

7      Q    So what skill sets did Kelly Leuallen

8   have that Ms. Bouricius did not have?

9      A    I believe we have asked and answered

10   that.  I said -- I went through the whole thing:

11   His documentation, all those things that I said

12   before.

13      Q    So documentation.  What else?

14      A    Customer service, knowledge of more

15   systems, more willing to learn, more motivated,

16   more interested in customer service.  Those are the

17   kinds of things that Kelly excels at and I believe

18   is a stronger player.

19      Q    And Lori Marak, what skill sets did Lori

20   Marak have that Ms. Bouricius did not have in

21   October of 2016?

22      A    The -- her strength in New World was the

23   biggest piece, her knowledge of law enforcement,

24   the whole public safety community, having been

25   involved with that project -- this was before my

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

246

```
 1                    MR. SANTO:  Okay.  I'll take your
 2      word for it.
 3                    MS. GREISEN:  We can take a break if
 4      you want.
 5                    MR. SANTO:  I apologize.  Thank you
 6      for that.
 7                    MS. GREISEN:  That's fine.
 8                    THE VIDEOGRAPHER:  The time is 3:14.
 9      We're off the record.
10                    (Recess taken.)
11                    THE VIDEOGRAPHER:  The time is 3:27.
12      We're back on the record.
13          Q    (By Ms. Greisen) Mr. Whidden, do you know
14      who trained Kelly Leuallen when he first came on to
15      the IT department?
16          A    I do not.
17          Q    What skill sets did Elizabeth McDowell
18      have that Ms. Bouricius did not have?
19          A    She was actually part-time GIS as well as
20      IT, so she had a whole GIS skill set that, as far
21      as I know, Deb didn't have, and she was also part
22      of the New World team.  So she -- Lori had been
23      training her on New World.  In fact, they had an
24      office in IT and over at the sheriff's office, and
25      they generally spent most their time at the SO and
```

**EXHIBIT 3**

**Frank Whidden  July 11, 2019**

256

1        A     Did I look at what?

2        Q     His pay compared to her pay?

3        A     I would -- at the time that that

4    occurred, I thought it would even be less because

5    she was a senior and he was new and only a tech.

6        Q     Would it surprise you to hear they were

7    making about $6,000 difference?

8        A     A little bit because, like I said, she

9    was at the top -- she was one of the ones, I

10   believe, who were redlined because they were at the

11   top of their rating.

12       Q     Who else was at the top of the rating?

13       A     I think Kelly was.  The people who had

14   been there a long time were the ones who -- I

15   think Janine was.  I don't know if Ron was

16   redlined.  He got caught in the freeze.  But we --

17   I had about four, and mostly BSAs, not Janine, but

18   mostly the BSAs who were at the top of their scale.

19       Q     Well, Lhana was at the top, wasn't she,

20   Lhana Jordan?  Why don't you look at Exhibit 52

21   that's in front of you to help you refresh your

22   memory.

23       A     I --

24       Q     And we can look at the salaries.  If you

25   look at Defendant's Bates 61 on Exhibit 62, you see

**EXHIBIT 3**

Frank Whidden   July 11, 2019

338

```
1    testified to all the information that you have

2    under Matter No. 2.

3         A    Yes.

4         Q    Or that Mesa County has.

5         A    I believe that all the information that

6    would pertain to that matter we have covered, yes.

7         Q    Okay.  So Matter No. 3, we talked a

8    little bit about skill sets.  So I would like you

9    to, if you could, look at Exhibit 52, the second

10   page of Exhibit 52 -- the second and third pages

11   are pages that have the employees that remained.

12   And if you could just go down and tell me -- are

13   you on the same page?

14        A    I think.

15        Q    Yeah.  It's Defendant 61 at the bottom.

16        A    This.

17        Q    Yeah.  Okay.  So Matter No. 3 says:  For

18   each skill, Plaintiff, Ms. Bouricius, did not have

19   in comparison with individuals that stayed.

20             Tell me each one of these people who had

21   more skills than plaintiff.

22        A    Okay.  Lhana had more skills and David

23   did, Troy did, Lori did, Kelly did, Chris did,

24   Leilani did, Joseph did, Elizabeth did, Paul did,

25   Eric did, William Tarlton did, and Terrie Hotary
```

EXHIBIT 3

**Frank Whidden   July 11, 2019**

340

1      A    David Underwood, customer service, I
2    would say yes.   But he's already a hardware tech so
3    the hardware skills.

4      Q    And Troy Flick?

5      A    The network administration skills as well
6    as management skills.

7      Q    And Lori Marak, Marak?

8      A    Lori Marak.   New World particularly and
9    institutional knowledge.   We have talked about that
10   as well making a comparison.

11     Q    And Kelly Leuallen I think you have
12   already talked about.

13     A    We went lengthy into that.

14     Q    Chris Kadel?

15     A    Chris is a GIS expert and all that.

16     Q    I understand that they have different job
17   titles than she did.   I would like you to tell me,
18   as best you can, what specific skill they had more
19   proficient than Ms. Bouricius, if you can.

20     A    That's what I meant, was GIS expert.
21   He's an expert in government informational systems,
22   the mapping, and Esri and all the -- which is a
23   database and a platform.   So all the things that
24   are associated with GIS, that's the skill set that
25   he has that she, to my knowledge, doesn't have.

**EXHIBIT 3**

Composite Deposition Testimony of

Scott McInnis

**EXHIBIT 3**

# *BOURICIUS*

# *VS.*

# *MESA COUNTY*

**Deposition**

## *DEBRA BOURICIUS*

*02/22/2019*

---

## *AB Court Reporting & Video*

*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

**EXHIBIT 3**

1    We -- Steve and I built our own house.  We loved the

2    property.  We loved the area and the community.  We

3    planted an 18-foot wildlife shelter, and we would --

4    we called our orchard Hummingbird Orchards because we

5    banded and studied hummingbirds in our orchard, and

6    so that's why we called it Hummingbird Orchards.

7           We'd have the community and Audubon groups

8    come and visit, people from all over the state,

9    people from other countries come to see our property

10   for the wildlife that we built.  We were in a book

11   called Habitat Heroes for Colorado in Audubon.  Scott

12   McInnis, the commissioner, brought his children and

13   grandchildren out, and we spent half a day with him

14   showing what we were studying.

15          We had plans to put in a vineyard, and my

16   husband has the equipment to crush and de-stem

17   grapes, so what we were considering was having --

18   selling the grapes and producing the juice so that --

19   and teaching classes and making homemade wines.

20          I had a pottery studio in the garage, and

21   there's no room for that now at the mountain

22   property.

23          And so Mesa County not only took my job

24   and my lifestyle away from me, they took our dreams

25   away too.  And now we're in a very tiny home.  We

**EXHIBIT 3**

**AB Court Reporting & Video**

```
1        Q       Did you provide a reference for her or

2   anything like that?

3        A       Hm-hm.

4        Q       No?

5        A       No.

6        Q       Did she communicate with you about her

7   application?

8        A       Not really.

9        Q       What do you mean by "not really"?

10       A       I mean, she never said anything about it.

11       Q       How do you know that she applied for a job

12  at Boulder County?

13       A       I don't know how I know.  I mean, I assume

14  that she told me, but I don't know.

15       Q       Okay.

16       A       I don't recall.

17       Q       You don't recall having a conversation

18  with her?

19       A       I really don't, no.  I mean, I -- I don't

20  remember the specifics, so I don't want to say

21  something.

22       Q       Could it have been by text messages,

23  social media or some form like that?

24       A       Probably an e-mail.

25       Q       Next witness we have here is Scott
```

**EXHIBIT 3**

*AB Court Reporting & Video*

```
 1     McInnis.   Do you know Mr. McInnis?

 2          A      Yes.

 3          Q      Who is he?

 4          A      He's a Mesa County commissioner.

 5          Q      When did you meet Mr. McInnis?

 6          A      I can't recall.

 7          Q      Was it after you'd been employed by Mesa

 8     County?

 9          A      Yes.

10          Q      What was your relationship like with

11     Mr. McInnis?

12          A      It was good.

13          Q      You told me a little bit this morning

14     about how he came to your orchard.   Did you work with

15     him at Mesa County?

16          A      No.

17          Q      You did not.   Okay.

18                 Did you ever have any disagreements with

19     him?

20          A      No.

21          Q      What information does Mr. McInnis have

22     about the allegations in your Complaint?

23          A      I can't say.

24          Q      What information does he have about the

25     causes of action in your Complaint?
```

**EXHIBIT 3**

```
 1          A      I can't say.

 2          Q      What information does he have about any of

 3   the statements and defenses in Mesa County's Answer?

 4          A      I can't say.

 5          Q      What information does Mr. McInnis have

 6   about how Mesa County treated you?

 7          A      I can't say.

 8          Q      What information does he have about your

 9   employment?

10          A      I can't say.

11          Q      What information does Mr. McInnis have

12   about your termination?

13          A      I can't say.

14          Q      What information does Mr. McInnis have

15   about selecting other employees as part of the

16   layoff?

17          A      I can't say.

18          Q      What information does Mr. McInnis have

19   about settlements with other employees?

20          A      I can't say.

21          Q      Is there anything that would help you have

22   an opinion about any of the questions I just asked?

23          A      I can't think of anything.

24          Q      Do you have a belief as to Mr. McInnis's

25   credibility?
```

**EXHIBIT 3**

```
1        A      I can't say.

2        Q      Do you have a belief as to his honesty?

3        A      I can't say.

4        Q      Have you talked with Mr. McInnis since

5   your employment with Mesa County ended?

6        A      No.

7        Q      The next witness we have here is Becky

8   McKay.  Do you know Ms. McKay?

9        A      Yes.

10       Q      Who is she?

11       A      She's -- I don't know her current

12  position, but she was, I believe, the benefits

13  administrator in the HR department.

14       Q      At Mesa County?

15       A      At Mesa County.

16       Q      Did she come on after you were already

17  there?

18       A      Yes.

19       Q      What was your relationship like with

20  Ms. McKay?

21       A      It was good.

22       Q      Did you ever have occasion to work

23  together?

24       A      Yes.

25       Q      How did you work together?
```

**EXHIBIT 3**

*AB Court Reporting & Video*

1          Q       What's your opinion about Mr. McInnis's

2   credibility and honesty?

3          A       I have a feeling that he may not be

4   totally credible or honest, and it's just a feeling.

5          Q       Let's take those one at a time.  What

6   makes you think that he may not be totally credible?

7          A       Just public statements.

8          Q       Is there a public statement, or several,

9   in particular that you're thinking of?

10         A       Well, I think there was one time where he

11  wrote a paper and used somebody else's information as

12  a senator.

13         Q       Anything else?

14         A       It's just a feeling.

15         Q       What about believing that Mr. McInnis is

16  not honest?  Is there anything that's happened that

17  makes you think that way?

18         A       No, but I feel that he came out, spent

19  time with us, got to know me, and it hurts that he

20  did not take me into consideration enough to look at

21  my performance at Mesa County and what I have done,

22  the loyalty that I showed, and he let me go.

23         Q       Is there something that happened that

24  makes you think he didn't look at your performance or

25  your loyalty?

**EXHIBIT 3**

*DEBRA BOURICIUS 2/22/2019*                                    *177*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

————————————————————————————————————————

DEBRA BOURICIUS,

    Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board of
County Commissioners,

    Defendant.

————————————————————————————————————————

DEPOSITION OF JOHN JUSTMAN

————————————————————————————————————————


Friday, May 3, 2019

9:02 a.m.


PURSUANT TO NOTICE and the Federal Rules of Civil
Procedure, the above-entitled deposition was taken on
behalf of Plaintiff at 205 North 4th Street, Suite 300,
Grand Junction, Colorado, before K. Michelle Dittmer,
Registered Professional Reporter and Notary Public within
Colorado.

EXHIBIT 3

```
 1    sounds like you do a million different things.
 2                    But can you give me a sense of -- I know
 3    there's the three of you:  It's McInnis, Pugliese, and
 4    yourself; is that right?
 5            A.    Correct.
 6            Q.    Okay.  And do the three of you work in the
 7    same office?
 8            A.    We're on the same floor.  We have separate
 9    offices.
10            Q.    Okay.  And is it a situation where the
11    three of you come to work every day, to your office?
12            A.    Some days, yes.  Some days, no.
13            Q.    Okay.
14            A.    Our schedules are not exactly the same, I
15    mean, every day.  I mean, I can be out of town, they can
16    be out of town.
17            Q.    Okay.  But it's a full-time job in the --
18            A.    Yes.
19            Q.    -- sense that --
20                    MR. SANTO:  You have to wait for her to
21    finish.
22                    MS. GREISEN:  That's okay.
23            Q.    (By Ms. Greisen)  It's a full-time job in
24    the sense that on a regular basis, you and your other
25    county commissioners are working on county business; is
```

**EXHIBIT 3**

1    Pugliese and Commissioner McInnis, they go do -- I don't

2    know what they do.  They don't go have lunch together,

3    either.

4              Q.   Are there any rifts, that you're aware of,

5    that have occurred between the commissioners, the three

6    commissioners?

7              A.   Have a what?

8              Q.   Disagreements, I will say public

9    disagreements.

10             A.   Not really.

11             Q.   You function, as a board, pretty

12   smoothly --

13             A.   Uh-huh.

14             Q.   -- in your opinion?

15             A.   Yes.

16             Q.   Okay.

17             A.   Our voting record is pretty similar.  I

18   mean, yes, we have split votes.  And I tell people, "If

19   you're going to vote 100 percent, three, three, three, or

20   whatever it is, you only need one commissioner."

21                  And there's been times where each one of

22   us has been the one person out, for whatever reason.  I

23   don't -- you know, over the years.

24             Q.   Have the --

25             A.   It's not -- it's a -- it's a pretty -- a

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

```
            IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

------------------------------------------------------

VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

                                        July 11, 2019

------------------------------------------------------

DEBRA BOURICIUS,

     Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

     Defendant.


------------------------------------------------------



          Pursuant to Notice and the Federal Rules

of Civil Procedure, the videotaped deposition of

FRANK WHIDDEN, called by Plaintiff, was taken on

Thursday, July 11, 2019, commencing at 9:07 a.m.,

at 205 North 4th Street, Grand Junction, Colorado,

before Candice F. Flowers, Certified Shorthand

Reporter and Notary Public within and for the State

of Colorado.
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

19

```
 1        Q     Well, I guess my question was a little

 2    bit different than that.

 3              There's a federal court case against the

 4    County and if I'm understanding your testimony

 5    correctly, the only time you've had discussions

 6    with the commissioner are kind of just in passing

 7    that it's happening, but nothing substantive; is

 8    that right?

 9        A     That's correct.

10        Q     Do you not discuss federal lawsuits with

11    the commissioners?

12        A     Very frequently and certainly not without

13    counsel present.

14        Q     Did you discuss it with any of the other

15    commissioners?

16        A     Not that I can recall.

17        Q     So that's referring to Commissioner

18    Justman, right?

19        A     Uh-huh.

20              MR. SANTO:  Is that yes?

21              THE DEPONENT:  That's a yes.  Sorry.

22    I'm sorry.  Yes, yes.

23        Q     (By Ms. Greisen) And I'm not remembering

24    the other commissioner's --

25              MR. SANTO:  McInnis.
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

```
 1      A     McInnis.

 2      Q     (By Ms. Greisen) McInnis.   Thank you.

 3      A     We won't tell him that.

 4      Q     Thank you.

 5            MR. SANTO:   I think it'll be okay.

 6      Q     (By Ms. Greisen) Have you talked to any

 7   employees about the subject matter of this case?

 8      A     Yes.

 9      Q     Which ones?

10      A     I've discussed it a bit with Lhana

11   Jordan.

12      Q     When did you do that?

13      A     She informed me that Lori had been called

14   to be deposed.

15      Q     Uh-huh.

16      A     And that was the reason that she was

17   going to be missing some work time.

18      Q     Okay.   What else did you discuss with Ms.

19   Jordan?

20      A     I'm sorry.   I didn't hear you.

21      Q     I'm sorry.   What else did you discuss

22   with Ms. Jordan about this case?

23      A     I believe she told me that she was

24   deposed, I think.   I'm not certain, but I think she

25   did.   And that's about it.   I mean, we didn't go
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

34

1   County Administrator, Tom Fisher, decided to wipe

2   out a layer of directors, and that included HR, IT,

3   finance, facilities.  And it was regional services

4   grouped together like facilities, parks and rec,

5   and things like that.

6            He decided to wipe all of that out and

7   make me responsible for all of those, and that's

8   the responsibility I had there in '14.  And then he

9   left and the commissioners made me County

10   Administrator, so I had all of that responsibility

11   plus the County Administrator.

12            Since that time, I managed to hire --

13   well, I hired a chief financial officer, Scott

14   Stewart, who was with us for a year or two and then

15   he left, and I promoted from within a director of

16   finance.  I also -- in that time after I became

17   County Administrator, I created a facilities

18   director, so I have that now, and I combined parks

19   and all of that and the fairgrounds under the

20   director of facilities.

21      Q    Okay.  We're going to -- I'm going to ask

22   you some more specific questions about that, but

23   just so I understand.

24            When the previous County Administrator

25   left, you were doing the County Administrator's job

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

```
 1        A     No, not that I know of.
 2        Q     Were there any executive sessions about
 3   it?
 4        A     No.
 5        Q     Did you tell them before it was going to
 6   happen?  Did you tell the Board of County
 7   Commissioners that you were going to do the layoffs
 8   before you did the layoff?
 9        A     Yes.
10        Q     When did you do that?
11        A     In discussions prior to taking the
12   action, but I couldn't say like, Okay, I know that
13   on this day, I talked to Scott, on this day I
14   talked to Rose.  I just had -- I know that I told
15   them that in order to meet the target, I had to
16   reduce staff.
17        Q     What other options did you look at other
18   than reducing staff?
19        A     We -- we looked at everything we could,
20   and we had been doing that for years to see what
21   could we cut in programs, services, those kinds of
22   things, without having complaints out of the
23   departments that we were -- you know, we were
24   hampering their procedures or their business.
25        Q     Well, I'm just talking about in
```

**EXHIBIT 3**

Composite Deposition Testimony of

Rose Pugliese

**EXHIBIT 3**

# *BOURICIUS*

# *VS.*

# *MESA COUNTY*

### Deposition

# *DEBRA BOURICIUS*

*02/22/2019*

---

# *AB Court Reporting & Video*
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

**EXHIBIT 3**

**AB Court Reporting & Video**

1          Q      What information does Mr. Mitts have

2     regarding the 2016 layoffs?

3          A      I can't say.

4          Q      Do you have a belief as to Mr. Mitts'

5     credibility?

6          A      I can't say.

7          Q      Do you have a belief as to Mr. Mitts'

8     honesty?

9          A      I can't say.

10          Q      Have you talked with Mr. Mitts since your

11     employment with Mesa County ended?

12          A      No.

13          Q      Next witness we have here is Rose

14     Pugliese.  Do you know Ms. Pugliese?

15          A      Yeah.

16          Q      Who is she?

17          A      She's a Mesa County commissioner for Mesa

18     County.

19          Q      When did you meet her?

20          A      I can't say.

21          Q      Was it after you were already working for

22     Mesa County?

23          A      Yes.

24          Q      What was your relationship like with

25     Ms. Pugliese?

**EXHIBIT 3**

**AB Court Reporting & Video**

```
 1        A    I can't say.

 2        Q    Did you ever work with her directly?

 3        A    No.

 4        Q    Did you have any indirect communications?

 5   For example, preparing a report for her, anything

 6   like that?

 7        A    I can't recall anything.

 8        Q    Did you ever have any arguments with her?

 9        A    No.

10        Q    What information does Ms. Pugliese have

11   about the allegations in your Complaint?

12        A    I can't say.

13        Q    What information does she have about the

14   causes of action in your Complaint?

15        A    I can't say.

16        Q    What information does she have about any

17   of the statements and defenses in Mesa County's

18   Answer?

19        A    I can't say.

20        Q    What information does Ms. Pugliese have

21   about how Mesa County treated you?

22        A    I can't say.

23        Q    What information does Ms. Pugliese have

24   about your employment?

25        A    I can't say.
```

**EXHIBIT 3**

**AB Court Reporting & Video**

```
 1        Q        What information does she have about your

 2    termination?

 3        A        I don't know.

 4        Q        What information does she have about

 5    selecting other employees as part of the layoff?

 6        A        I don't know.

 7        Q        What information does Ms. Pugliese have

 8    about settlements with other employees?

 9        A        I don't know.

10        Q        Do you have an opinion as to -- or belief

11    as to Ms. Pugliese's credibility?

12        A        I don't -- I don't know.

13        Q        Do you have a belief as to her honesty?

14        A        I don't know.

15        Q        Have you talked with Ms. Pugliese since

16    your employment with Mesa County ended?

17        A        No.

18        Q        The next witness we have here is Ron Sage.

19    Do you know Mr. Sage?

20        A        Yes.

21        Q        Who is he?

22        A        He's an IT network database administrator.

23        Q        For Mesa County?

24        A        For Mesa County.

25        Q        When did you meet Mr. Sage?
```

**EXHIBIT 3**

**AB Court Reporting & Video**

1      A      Yeah, because I was a top performer, one

2    of the top performers in IT, and the personnel manual

3    says that's the first thing they need to look at when

4    they're laying somebody off.

5      Q      Anything else that you believe affected

6    his honesty or credibility?

7      A      No, it's just a feeling.

8      Q      What about Ms. McKay's credibility and

9    honesty?  What are your opinions?

10     A      I believe she's credible, and I have no

11   indication that she's dishonest.

12     Q      Mr. Mitts?  What's your opinion about his

13   credibility --

14     A      Same thing.  I believe he's credible, and

15   I have no reason to believe he's dishonest.

16     Q      What's your opinion about Ms. Pugliese's

17   credibility and honesty?

18     A      I believe she's dishonest, and I'm not

19   sure about her credibility.

20     Q      Why do you believe Ms. Pugliese is

21   dishonest?

22     A      Because there's been things in the paper

23   about her transparency, and she likes to hide things

24   to the public.

25     Q      What paper is that?

**EXHIBIT 3**

*DEBRA BOURICIUS 2/22/2019*                    *178*

1          Q          And the line below that says:    I would

2     love a public apology from Mrs. P and Frank.

3                     Do you see that?

4          A          Yes.

5          Q          Who is Mrs. P?

6          A          That would be Rose Pugliese.

7          Q          Rose, okay.

8                     Why did you want an apology from

9     Ms. Pugliese?

10         A          I don't know.

11         Q          Had she said something to you that you

12    recall?

13         A          No.

14         Q          Why did you want an apology from Frank?

15         A          I don't know.

16         Q          Is that Frank Whidden you're talking about

17    here?

18         A          M-hm.

19         Q          Yes?

20         A          Yes.

21         Q          Were you only looking for lost vacation,

22    attorneys fees and an apology when you started this

23    lawsuit?

24         A          No.

25         Q          Why did you only mention these things

**EXHIBIT 3**
*DEBRA BOURICIUS 2/22/2019*          *273*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

────────────────────────────────────────────

DEBRA BOURICIUS,

    Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board of
County Commissioners,

    Defendant.

────────────────────────────────────────────

DEPOSITION OF JOHN JUSTMAN

────────────────────────────────────────────


Friday, May 3, 2019

9:02 a.m.


PURSUANT TO NOTICE and the Federal Rules of Civil
Procedure, the above-entitled deposition was taken on
behalf of Plaintiff at 205 North 4th Street, Suite 300,
Grand Junction, Colorado, before K. Michelle Dittmer,
Registered Professional Reporter and Notary Public within
Colorado.

**EXHIBIT 3**

```
 1   know as much about the county as, or more than, a lot of

 2   commissioners do --

 3              Q.   Okay.

 4              A.   -- just because of my long experience here

 5   and my business background and . . .

 6              Q.   Sure.

 7                   Okay.  And when you became a county

 8   commissioner, who were the other county commissioners?

 9              A.   Rose Pugliese and Steve Acquafresca.

10              Q.   Okay.  You'll have to spell that name for

11   Shelly.  I --

12              A.   I kind of can, but I'm not good.

13                   MR. SANTO:  Why aren't more people named

14   Smith?

15              Q.   (By Ms. Greisen)  Yeah.  Augla- --

16              A.   A-c- -- I don't know --

17                   MR. SANTO:  Q.

18              A.   -- a-u, and then "fresca."  It's fresh

19   water, is what it says.

20                   MR. SANTO:  Yeah.  It's Acquafresca.

21              A.   Yeah.  "Agua" and then "fresca," perhaps.

22              Q.   (By Ms. Greisen)  Oh, okay.

23                   MR. SANTO:  Yeah, we're all looking.

24                   MS. GREISEN:  That's okay.  We'll figure

25   it out later.
```

**EXHIBIT 3**

```
 1    sounds like you do a million different things.

 2                   But can you give me a sense of -- I know

 3    there's the three of you:  It's McInnis, Pugliese, and

 4    yourself; is that right?

 5          A.    Correct.

 6          Q.    Okay.  And do the three of you work in the

 7    same office?

 8          A.    We're on the same floor.  We have separate

 9    offices.

10          Q.    Okay.  And is it a situation where the

11    three of you come to work every day, to your office?

12          A.    Some days, yes.  Some days, no.

13          Q.    Okay.

14          A.    Our schedules are not exactly the same, I

15    mean, every day.  I mean, I can be out of town, they can

16    be out of town.

17          Q.    Okay.  But it's a full-time job in the --

18          A.    Yes.

19          Q.    -- sense that --

20                   MR. SANTO:  You have to wait for her to

21    finish.

22                   MS. GREISEN:  That's okay.

23          Q.  (By Ms. Greisen)  It's a full-time job in

24    the sense that on a regular basis, you and your other

25    county commissioners are working on county business; is
```

EXHIBIT 3

1    Pugliese and Commissioner McInnis, they go do -- I don't

2    know what they do.  They don't go have lunch together,

3    either.

4              Q.   Are there any rifts, that you're aware of,

5    that have occurred between the commissioners, the three

6    commissioners?

7              A.   Have a what?

8              Q.   Disagreements, I will say public

9    disagreements.

10             A.   Not really.

11             Q.   You function, as a board, pretty

12   smoothly --

13             A.   Uh-huh.

14             Q.   -- in your opinion?

15             A.   Yes.

16             Q.   Okay.

17             A.   Our voting record is pretty similar.  I

18   mean, yes, we have split votes.  And I tell people, "If

19   you're going to vote 100 percent, three, three, three, or

20   whatever it is, you only need one commissioner."

21                  And there's been times where each one of

22   us has been the one person out, for whatever reason.  I

23   don't -- you know, over the years.

24             Q.   Have the --

25             A.   It's not -- it's a -- it's a pretty -- a

EXHIBIT 3

              IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01144-WYD-STV

_____

VIDEOTAPED DEPOSITION OF FRANK WHIDDEN

                                      July 11, 2019

_____

DEBRA BOURICIUS,

      Plaintiff,

vs.

MESA COUNTY, by and through the Mesa County Board

of County Commissioners,

      Defendant.

_____


           Pursuant to Notice and the Federal Rules

of Civil Procedure, the videotaped deposition of

FRANK WHIDDEN, called by Plaintiff, was taken on

Thursday, July 11, 2019, commencing at 9:07 a.m.,

at 205 North 4th Street, Grand Junction, Colorado,

before Candice F. Flowers, Certified Shorthand

Reporter and Notary Public within and for the State

of Colorado.

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

17

```
 1          Q    When -- when did you start that?
 2          A    I don't remember exact.  It's been a few
 3     years.  I couldn't tell you exactly.
 4          Q    Was it bef -- do you remember whether
 5     it's before or after 2016?
 6          A    I -- I don't remember.  I think before
 7     that, but I'm not certain.
 8          Q    So who have you talked to other than your
 9     counsel to prepare for your deposition today?
10          A    No one.
11          Q    Did you tell anyone other than your
12     counsel that you were coming to your deposition
13     today?
14          A    I did.
15          Q    Who did you tell?
16          A    My wife, Commissioner Pugliese.
17          Q    What was the conversation with you and
18     Commissioner Pugliese?
19          A    That I was coming to the deposition
20     today.
21          Q    Anything else?
22          A    No.
23          Q    Did she ask you what the case was about?
24          A    She knew what it was about, so I didn't
25     have to give her the background.
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

37

```
1   applied?
2       A    Rose Pugliese told me.
3       Q    Did she tell you that after you had
4   already been appointed the position or before?
5       A    Long after.
6       Q    Did you talk to any of the other County
7   Commissioners?
8       A    No.
9       Q    I should restate that just so the record
10  is clear.
11           Did you talk to any of the other County
12  Commissioners about who applied for your position
13  as County Administrator?
14      A    No, ma'am.
15      Q    So give me an overview of what your job
16  duties are as the County Administrator.
17      A    Well, the bottom line is that my job is
18  to implement the policies that the board has given
19  me.  It's to oversee the day-to-day affairs of the
20  County.  The way the County is organized, there are
21  three direct reports to the board:  Myself, the
22  County Attorney, the executive director of DHS,
23  Tracy Garchar.  I do not oversee them or their
24  operations.  I also don't oversee directly the
25  seven elected departments or offices.  So that's my
```

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

128

1   I don't remember what the order of companies was.

2   About the time -- it was one season, so about the

3   time I went to work for the University of West

4   Alabama, I would say, in between there.

5       Q    So going back to what we were talking

6   about before we took a break, you mentioned that

7   you had talked with Rose Pugliese about the layoffs

8   or who -- about the need for layoffs; is that

9   right?

10      A    Correct.

11      Q    In 2016?

12      A    Yes.

13      Q    Did you talk with any of the other County

14  Commissioners about that?

15      A    Yes.

16      Q    Which ones?

17      A    Both of the others.

18      Q    Okay.  Was there a public discussion held

19  about the 1.4-million-dollar deficit?

20      A    No.

21      Q    Was there a public discussion held about

22  potential layoffs?

23      A    Not before, no.  Not before any layoffs

24  were made, I don't believe, no.

25      Q    So is it your belief that there were

**EXHIBIT 3**

**Frank Whidden   July 11, 2019**

130

```
 1        A     No, not that I know of.
 2        Q     Were there any executive sessions about
 3   it?
 4        A     No.
 5        Q     Did you tell them before it was going to
 6   happen?  Did you tell the Board of County
 7   Commissioners that you were going to do the layoffs
 8   before you did the layoff?
 9        A     Yes.
10        Q     When did you do that?
11        A     In discussions prior to taking the
12   action, but I couldn't say like, Okay, I know that
13   on this day, I talked to Scott, on this day I
14   talked to Rose.  I just had -- I know that I told
15   them that in order to meet the target, I had to
16   reduce staff.
17        Q     What other options did you look at other
18   than reducing staff?
19        A     We -- we looked at everything we could,
20   and we had been doing that for years to see what
21   could we cut in programs, services, those kinds of
22   things, without having complaints out of the
23   departments that we were -- you know, we were
24   hampering their procedures or their business.
25        Q     Well, I'm just talking about in
```

**EXHIBIT 3**